UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

725 EATERY CORP., etc., *et ano.,*                          :

                                 Plaintiffs,     :

                 - against -                          :          Civil Action No.
                                           02 CV 4431 (WHP)

THE CITY OF NEW YORK, et al.,                          :

                              Defendants.   :

------------------------------------------------------------------X

59 MURRAY ENTERPRISES INC., etc., *et al.,*          :

                                   Plaintiffs,     :

                 - against -                          :          Civil Action No.
                                           02 CV 4432 (WHP)

THE CITY OF NEW YORK, et al.,                          :

                              Defendants.   :

------------------------------------------------------------------X

CLUB AT 60TH STREET, INC., etc., *et al.,*          :

                                   Plaintiffs,     :

                 - against -                          :          Civil Action No.
                                           02 CV 8333 (WHP)

THE CITY OF NEW YORK,                          :

                              Defendant.    :

------------------------------------------------------------------X

336 LLC., etc., *et al.,*                          :

                                     Plaintiffs,     :

                 - against -                          :          Civil Action No.
                                           18 CV 3732 (WHP)

THE CITY OF NEW YORK,                          :

                              Defendant.    :

------------------------------------------------------------------X

## NOTICE OF FILING OF PLAINTIFFS' JOINT APPENDIX VOLUME 4 IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**PLEASE TAKE NOTICE,** that Plaintiffs hereby file the within Volume 4 of

Plaintiffs' Joint Appendix in the above-captioned actions.

Dated:         New York, New York
              November 21, 2018

*Respectfully,*

**DANIEL A. SILVER**                    **JOHN H. WESTON**
**SILVER & SILVER**                     **G. RANDALL GARROU**
One Liberty Square                      **WESTON, GARROU & MOONEY**
New Britain, Connecticut 06050-0698     12121 Wilshire Boulevard, Suite 525
(860) 225-3518                          Los Angeles, CA 90025-1176
                                        (310) 442-0072

        - and-                                  - and -

**JENNIFER KINSLEY**                    **ALAN M. ABRAMSON**
Kinsley Law Office                      **ABRAMSON & MORAK**
Post Office Box 19478                   35 Worth Street
Cincinnati, Ohio 45219                  New York, New York 10013
(513) 708-2595                          (212) 226-7098

*Attorneys for Plaintiffs*              *Attorneys for*
*725 Eatery Corp., etc., et ano.*       *Club At 60th Street, Inc., etc., et al.*

By:   s/Daniel A. Silver
Daniel A. Silver                        By:   s/John Weston
                                              John Weston

**EDWARD S. RUDOFSKY**
**ZANE and RUDOFSKY**                   **ERICA DUBNO**
601 West 26th Street, # 1315            Fahringer & Dubno
New York, New York  10001               767 Third Avenue, Suite 3600
(212) 245-2222                          New York, New York
                                        (212) 319-5351
*Attorneys for Plaintiffs*
*59 Murray Enterprises, Inc., etc.*     *Attorneys for Plaintiffs*
*et al.*                                *336 LLC, etc., et al.*

By:   s/Edward S. Rudofsky             By:   s/Erica T. Dubno
      Edward S. Rudofsky                     Erica T. Dubno

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
725 EATERY CORP., etc., *et ano.,*               :

                       Plaintiffs,      :

          - against -                          :               Civil Action No.
                                                                02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,               :

                     Defendants.   :
-----------------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*      :

                       Plaintiffs,      :

          - against -                          :               Civil Action No.
                                                                02 CV 4432 (WHP)
THE CITY OF NEW YORK, et al.,               :

                     Defendants.   :
-----------------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*               :

                       Plaintiffs,      :

          - against -                          :               Civil Action No.
                                                                02 CV 8333 (WHP)
THE CITY OF NEW YORK,               :

                     Defendant.   :
-----------------------------------------------------------------X

336 LLC., etc., *et al.,*               :

                       Plaintiffs,      :

          - against -                          :               Civil Action No.
                                                                18 CV 3732 (WHP)
THE CITY OF NEW YORK,               :

                     Defendant.   :
-----------------------------------------------------------------X

## PLAINTIFFS' JOINT APPENDIX
### (<u>VOL. 4 of 17; pp. 0047-0338</u>)

Per the Court's Order of November 7, 2018, Plaintiffs in each of the four above-entitled actions hereby submit their unitary Joint Appendix consisting exclusively of evidentiary documents upon which some or all of the Plaintiffs may choose to rely. The inclusion of documents in this Joint Appendix does not automatically signify an endorsement or promotion of any of these documents by any individual Plaintiff or group of Plaintiffs. That will depend on specific adoption of any of these documents by any Plaintiffs or Group of Plaintiffs in documents they may file with the Court.

The reference below to the "Club Plaintiffs" refers to all the Plaintiffs in Action Nos. 02 CV 4431, 02 CV 4432 and 02 CV 8333. The reference below to the "Bookstore Plaintiffs" refers to all the Plaintiffs in Action No. 18 CV 3732.

## <u>TABLE OF CONTENTS</u>

| <u>Tab No.</u> | <u>Description of Document</u> | <u>Joint Appendix Starting Page #</u> |
|---|---|---|
| | <u>**DOCUMENTS SUBMITTED BY CLUB PLAINTIFFS**</u> | |
| | **VOLUME 1** <br> **(pp. 0001--0030)** | |
| | <u>**CLUB PLAINTIFFS' EXPERT DECLARATIONS**</u> | |
| A | **Declaration of Michael Berzak Regarding Adult Business Sites in Support of Plaintiffs' Motion for** | **0001** |

| | | |
|---|---|---|
| | Preliminary Injunction | |
| | *Exhibit 1*: Sequential Maps of Adult Business Sites in Manhattan, Prepared by Berzak Associates | 0019 |
| | **VOLUME 2**<br>**(pp. 0031--0038)** | |
| | *Exhibit 2*: Sequential Maps of Adult Business Sites in Queens, Prepared by Berzak Associates | 0031 |
| | *Exhibit 3*: Sequential Maps of Adult Business Sites in the Bronx, Prepared by Berzak Associates | 0035 |
| | **VOLUME 3**<br>**(pp. 0039--0046)** | |
| | *Exhibit 4*: Sequential Maps of Adult Business Sites in Brooklyn, Prepared by Berzak Associates | 0039 |
| | *Exhibit 5*: Sequential Maps of Adult Business Sites in Staten Island, Prepared by Berzak Associates | 0043 |
| | **VOLUME 4**<br>**(pp. 0047--0338)** | |
| | *Exhibit 6*: Relevant Portions of AZR § 12-10 (definitions), § 32-01 (commercial zone restrictions on adult uses) and § 42-01 (manufacturing zone restrictions on adult uses) | 0047 |
| | *Exhibit 7*: 1 RCNY § 9000-01 | 0059 |
| | *Exhibit 8*: DOB Operations Policy and Procedure Notice No. 17/95 | 0061 |
| | *Exhibit 9*: DOB Operations Policy and Procedure Notice No. 6/96 | 0065 |
| | *Exhibit 10*: DOB Operations Policy and Procedure Notice No. 7/96 | 0074 |

| | | |
|---|---|---|
| | *Exhibit 11*: DOB Operations Policy and Procedure Notice No. 8/96 | 0077 |
| | *Exhibit 12*: DOB Operations Policy and Procedure Notice No. 4/98 | 0080 |
| | *Exhibit 13*: DOB Operations Policy and Procedure Notice No. 6/98 | 0083 |
| | *Exhibit 14*: DOB Operations Policy and Procedure Notice No. 7/02 | 0087 |
| | *Exhibit 15*: Online DOB handbook published in 2016 entitled "Adult Establishment Applications" | 0091 |
| | *Exhibit 16*: City-generated Map Showing the Gowanus Canal Areas Which are Under Consideration for Zoning Changes Allowing Residential and Mixed Uses | 0103 |
| **B** | **Declaration of Michael Berzak in Support of Permitting Issues Presented in Plaintiffs' Motion for Preliminary Injunction** | 0105 |
| | *Exhibit 1*: Curriculum Vitae | 0124 |
| | *Exhibit 2*: NYCAC Title 27 Subchapter 1, Article 10 (Permits) | 0126 |
| | *Exhibit 3*: 1 RCNY § 9000-01 | 0129 |
| | *Exhibit 4*: NYCAC § 27-217 | 0131 |
| | *Exhibit 5*: NYCAC Title 27 Subchapter 1, Article 9 (Approval of Plans) | 0133 |
| | *Exhibit 6*: Relevant Portions of NYCAC Title 27 Subchapter 1, Article 19 (Issuance of Permits) | 0137 |
| | *Exhibit 7*: DOB's Buildings Bulletin 2016-010 | 0140 |
| | *Exhibit 8*: OPPN # 7/02 | 0145 |

6

| | | |
|---|---|---|
| | *Exhibit 9*: DOB Code Note (Adult Establishment Applications) | 0149 |
| C | Declaration of Hugh Kelly in Support of Plaintiffs' Motion for Preliminary Injunction | 0161 |
| D | Affidavit of Lance Freeman in Support of Plaintiffs' Motion for Preliminary Injunction | 0212 |
| | **CLUB CLIENTS' DECLARATIONS** | |
| E | Declaration of David M. Talla in Support of Plaintiffs' Motion for Preliminary Injunction | 0227 |
| F | Declaration of Keith Warech in Support of Plaintiffs' Motion for Preliminary Injunction | 0248 |
| G | Declaration of Anthony Capeci in Support of Plaintiffs' Motion for Preliminary Injunction | 0262 |
| H | Declaration of Barry Lipsitz in Support of Plaintiffs' Motion for Preliminary Injunction | 0265 |
| I | Declaration of Anthony D'Amico in Support of Plaintiffs' Motion for Preliminary Injunction | 0283 |
| J | Declaration of Maurice Kavanagh in Support of Plaintiffs' Motion for Preliminary Injunction | 0297 |
| | **OTHER ITEMS** | |
| K | Declaration of Edward Rudofsky in Support of Plaintiffs' Motion for Preliminary Injunction Regarding Legislative History and Related Matters | 0312 |
| L | Declaration of Edward S. Rudofsky in Support of Plaintiffs' Motion for Preliminary Injunction Regarding the Status of Veil NYC and Headquarters n/k/a Rosewood Theater | 0335 |
| | **VOLUME 5**<br>**(pp. 0339--0519)** | |

| M | Club Plaintiffs' Request To Take Judicial Notice | 0339 |
|---|---|---|
| | *Exhibit 1*: NYC Council Resolution 1322-1995 ("1995 Ordinance") | 0348 |
| | *Exhibit 2*: NYC Council Resolution 0208-1998 (regarding signage regulations) | 0364 |
| | *Exhibit 3*: NYC Council Resolution 2096-2001 ("2001 Amendments") | 0378 |
| | *Exhibit 4*: Relevant portions of NYC Council Resolution 586-2004 (amending, *inter alia*, AZR §§ 32-01 & 42-01 regarding adult businesses) | 0384 |
| | *Exhibit 5*: Relevant portions of NYC Council Resolution 499-2010 (amending, *inter alia*, AZR §§ 32-01 & 42-01 regarding adult businesses) | 0391 |
| | *Exhibit 6*: NYC AZR § 31-17 | 0394 |
| | *Exhibit 7*: NYC AZR § 31-18 | 0397 |
| | *Exhibit 8*: NYC AZR § 32-01 (multiple versions) | 0400 |
| | *Exhibit 9*: NYC AZR § 32-69 (multiple versions) | 0404 |
| | *Exhibit 10*: NYC AZR § 42-01 (multiple versions) | 0408 |
| | *Exhibit 11*: NYC AZR § 52-11 | 0412 |
| | *Exhibit 12*: NYC AZR § 52-61 | 0415 |
| | *Exhibit 13*: NYC AZR § 52-734 | 0419 |
| | *Exhibit 14*: NYC AZR § 52-77 | 0423 |
| | *Exhibit 15*: NYC AZR § 72-41 | 0427 |
| | *Exhibit 16*: NYC Administrative Code, Title 27, Chapter 1, Article 9 ("Approval of Plans") | 0431 |

| | | |
|---|---|---|
| | ***Exhibit 17***: NYC Administrative Code, Title 27, Chapter 1, Article 10 ("Permits") | 0438 |
| | ***Exhibit 18***: NYC Administrative Code, Title 27, Chapter 1, Article 19 ("Issuance of Permits") (relevant sections) | 0444 |
| | ***Exhibit 19***: NYC Administrative Code, Title 27, Chapter 1, Article 22, § 27-217 ("Certificates of Occupancy / Change of Occupancy of Use") | 0457 |
| | ***Exhibit 20***: NYC Dept. of Buildings Administrative Materials: Directive 14 of 1975 (authorizing self-certification of applications for building permits by licensed architects and engineers) | 0462 |
| | ***Exhibit 21***: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 17/95 (prohibiting self-certification of adult uses by architects and engineers) | 0466 |
| | ***Exhibit 22***: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 6/96 (reaffirming prohibition on self-certification of adult uses by architects and engineers) | 0483 |
| | ***Exhibit 23***: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 7/96 (defining "place of worship" and "church") | 0492 |
| | ***Exhibit 24***: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 8/96 (describing methodology for measuring separation between adult uses and other adult uses or sensitive receptors) | 0495 |
| | ***Exhibit 25***: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 4/98 (definition of "substantial portion") | 0501 |
| | ***Exhibit 26***: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 6/98 (explanation of "substantial portion" in context of multiple uses) | 0505 |

| | | |
|---|---|---|
| | *Exhibit 27*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 5/02 (clarifying procedures for self-certification by architects and engineers) | 0509 |
| | *Exhibit 28*: NYC Dept. of Buildings Administrative Materials: OPPN 7/02 (clarifying procedures for seeking adult use "priority" permit) | 0516 |
| | **VOLUME 6**<br>**(pp. 0520--0629)** | |
| | *Exhibit 29*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 1/04 (clarifying procedures for self-certification by architects and engineers) | 0520 |
| | *Exhibit 30*: NYC Dept. of Buildings Administrative Materials: Bulletin 2016-010 (most recent document clarifying procedures for self-certification by architects and engineers) | 0532 |
| | *Exhibit 31*: NYC Dept. of Buildings Administrative Materials: Code Note on Adult Establishment Applications (handbook from DOB website) | 0537 |
| | *Exhibit 32*: NYC Dept. of Buildings Administrative Materials: Rule Title 1, Rules of City of New York § 9000-01 (establishing priority of locations under adult zoning scheme) | 0549 |
| | *Exhibit 33*: Legislative History of 2001 Amendments, 3/21/01 DCP Application No. N 010508 ZRY (to amend the AZR definition of adult establishment) | 0551 |
| | *Exhibit 34*: Legislative History of 2001 Amendments, CEQR Negative Declaration No. 01DCP045Y of 3/23/01, and Environmental Assessment Statement No. 01DCP045Y filed 3/23/01 | 0563 |

| | | |
|---|---|---|
| | **VOLUME 7**<br>**(pp. 0630--0707)** | |
| | ***Exhibit 35***: Legislative History of 2001 Amendments, Transcript of New York City Planning Commission Public Hearing held 5/23/01 | 0630 |
| | **VOLUME 8**<br>**(pp. 0708--0889)** | |
| | ***Exhibit 36***: Legislative History of 2001 Amendments, 8/8/01 New York City Planning Commission Report | 0708 |
| | ***Exhibit 37***: Legislative History of 2001 Amendments, Transcript of New York City Planning Commission Public Hearing held 8/8/01 | 0835 |
| | ***Exhibit 38***: Legislative History of 2001 Amendments, Transcript of 10/1/01 Hearing of Zoning and Franchises Subcommittee of New York City Council | 0848 |
| | **VOLUME 9**<br>**(pp. 0890--1068)** | |
| | ***Exhibit 39***: Legislative History of 2001 Amendments, Correspondence between Edward S. Rudofsky and New York City Council (10/9/01), and David Karnovsky and New York City Council (10/24/01) | 0890 |
| | ***Exhibit 40***: Legislative History of 2001 Amendments, Transcript of 10/25/01 Meeting of Zoning and Franchises Subcommittee of New York City Council | 0899 |
| | ***Exhibit 41***: Legislative History of 2001 Amendments, Transcript of 10/25/01 Meeting of Land Use Committee of New York City Council | 0911 |
| | ***Exhibit 42***: Legislative History of 2001 Amendments, Transcript of 10/31/01 Meeting of the New York City Council | 0919 |

| | | |
|---|---|---|
| | ***Exhibit 43***: Excerpt of Record On Appeal, Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County, Index No. 121197/2002 ("State Action"), Affidavit of David Karnovsky, Counsel to the New York City Department of City Planning, sworn to 10/23/02, filed in State Action on 10/25/02 (without internal Exhibits) | **1032** |
| | **VOLUME 10**<br>**(pp. 1069--1296)** | |
| | ***Exhibit 44***: Excerpts of Record On Appeal, Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County, Index No. 121197/2002 ("State Action"), Relevant pages from Transcripts of evidentiary hearing in State Action in Supreme Court, New York County, on 2/23/09 through 3/2/09 | **1069** |
| | **VOLUME 11**<br>**(pp. 1297--1381)** | |
| | ***Exhibit 45***: New York City Department of City Planning ("DCP") Materials, NYC DCP "Manufacturing Districts: M3" webpage (<u>https://www.1.nyc.gov/site/planning/zoning/districts-tools/m3.page</u>) | **1297** |
| | ***Exhibit 46***: New York City Department of City Planning ("DCP") Materials, NYC Department of City Planning "Manufacturing Districts: 1/1/02 to 1/1/12" webpage (<u>https://www.1.nyc.gov/site/planning/zoning/districts-tools/mfg-districts-2002-2012.page</u>) | **1300** |
| | ***Exhibit 47***: Studies, Moss and Quing, "<u>The Dynamic Population of Manhattan</u>", Rudin Center for Transportation Policy and Management of the New York University Wagner School of Public Service (2012) (https://wagner.nyu.edu/files/faculty/publications/dynamic_pop_manhattan.pdf) | **1304** |

| | | |
|---|---|---|
| | *Exhibit 48:* **Linz and Paul, "Measuring the Secondary Effects of 60/40 Businesses in New York City: A Study of Calls for Service to the Police", including Figures and Tables (2005) Exhibits 6 and 6A admitted into evidence at evidentiary hearing held on February 23 through March 2, 2009 in** <u>**Ten's Cabaret, Inc. v City of New York**</u>**, Supreme Court, New York County, Index No. 121197/2002** | **1330** |
| | **VOLUME 12**<br>**(pp. 1382--1467)** | |
| | *Exhibit 49:* **Studies, Freeman, "Examining The Relationship Between Businesses That Comply With the '60/40' Zoning Regulations and Surrounding Property Values in New York City" (2008) (Exhibit 8 admitted in evidence at evidentiary hearing held on 2/23/09 through 3/2/09 in** <u>**Ten's Cabaret, Inc. v. City of New York**</u>**, Supreme Court, New York County, Index No. 121197/2002** | **1382** |
| | *Exhibit 50:* **Studies, Focus Probe, Inc., "Perceived Differences Between Adult Entertainment Clubs With 'Subdued Facades' vs. 'Loud Facades', with photographs (Exhibits 12, 12A, 12B and 12C admitted in evidence at evidentiary hearing held on 2/23/09 through 3/2/09 in** <u>**Ten's Cabaret, Inc. v. City of New York**</u>**, Supreme Court, New York County, Index No. 121197/2002)** | **1418** |
| | *Exhibit 51:* **New York Court of Appeals Brief, Excerpt from Respondents' Brief of City of New York, et al., in** <u>**Stringfellow's of New York, Inc. v. City of New York**</u>**, New York County Index Nos. 113049/96 103568/96 and 103569/96, filed in New York Court of Appeals, dated 12/11/97** | **1443** |

| | | |
|---|---|---|
| | *Exhibit 52:* **Excerpts from September 3, 1996 deposition testimony of Marilyn Mammamo, Director of Zoning & Urban Design of the NYC Department of City Planning, in <u>Hickerson v. The City of New York</u>, New York County Index No. 103569/96** | **1448** |
| | *Exhibit 53:* **Undocketed Correspondence With Court, Litigation Management Agreement dated 9/25/17 (Exhibit B to 3/2/18 letter from Plaintiffs to Hon. William Pauley) in all current club cases** | **1459** |
| | <u>**DOCUMENTS SUBMITTED BY BOOKSTORE PLAINTIFFS**</u> | |
| | **VOLUME 13 (pp. 1468--1574)** | |
| **N** | **Declaration of Dr. Elliott Sclar in Support of Plaintiffs' Motion for Preliminary Injunction** | **1468** |
| | *Exhibit 1:* **Dr. Sclar's Curriculum Vitae** | **1515** |
| | *Exhibit 2:* **Maps Prepared by the Department of City Planning in Support of the 1995 Resolution Showing Permissible Areas for Adult Establishments** | **1539** |
| | *Exhibit 3:* **Maps Prepared by the Department of City Planning Showing Zoning Changes between 1995 and 2001 in Support of the 2001 Resolution** | **1545** |
| | *Exhibit 4:* **Reports issued by the Department of City Planning and Information in the Press Confirming the Effectiveness of Mayor Bloomberg's Administration in Rezoning New York City** | **1561** |

|   | **VOLUME 14**<br>**(pp. 1575--1683)** |   |
|---|---|---|
|   | ***Exhibit 5***: Report Prepared by the Department of City Planning Detailing the Reduction in Manufacturing Districts between 2002 and January 2012 | 1575 |
|   | ***Exhibit 6***: Map Depicting Zoning Changes in New York City between January 2002 and September 2018 | 1594 |
|   | ***Exhibit 7***: Table 1: List of Adopted Rezonings that Impacted Manufacturing Use | 1596 |
|   | ***Exhibit 8***: Table 2: List of Certified Rezonings that Impact Manufacturing Use | 1603 |
|   | ***Exhibit 9***: Map of Anticipated Mandatory Inclusion Housing ("MIH") Rezonings | 1605 |
|   | ***Exhibit 10***: Department of City Planning Report on City Planning History | 1607 |
|   | ***Exhibit 11***: MTA Staten Island Railway ("SIR") System Map | 1612 |
|   | ***Exhibit 12***: Map Showing the Staten Island Railway Route Superimposed on the Map of Permissible Areas on Staten Island Prepared by the Department of City Planning in Support of the 1995 Resolution | 1614 |
| **O** | Declaration of Daniel J. Zazzali in Support of Plaintiffs' Motion for Preliminary Injunction | 1616 |
| **P** | Declaration of Daniel Knecht in Support of Plaintiffs' Motion for Preliminary Injunction | 1643 |

| | | |
|---|---|---|
| | *Exhibit 1*: Map of Public Transportation between the Plaintiffs' Bookstore at 336 Eighth Avenue, in Manhattan, and the Only Permissible Adult Bookstore with booths, on Staten Island | 1659 |
| Q | Declaration of Yitzik Shachaf in Support of Plaintiffs' Motion for Preliminary Injunction | 1662 |
| R | Declaration of Erica T. Dubno in Support of Plaintiffs' Motion for Preliminary Injunction | 1670 |
| | **VOLUME 15**<br>**(pp. 1684--1755)** | |
| S | Bookstore Plaintiffs' Request to Take Judicial Notice | 1684 |
| | *Exhibit 54*: Z.R. § 42-11 | 1691 |
| | *Exhibit 55*: Z.R. § 42-13 | 1694 |
| | *Exhibit 56*: New York City Charter § 85 "Borough Board" | 1698 |
| | *Exhibit 57*: DCP "Use Groups" webpage | 1702 |
| | *Exhibit 58*: DCP "Manufacturing Districts: Overview" webpage | 1707 |
| | *Exhibit 59*: DCP City Planning History webpage | 1710 |
| | *Exhibit 60*: DCP "Community-Based Planning" webpage | 1715 |
| | *Exhibit 61*: DCP "Special Purpose Districts: Citywide" webpage | 1722 |
| | *Exhibit 62*: DCP "Special Purpose Districts" webpage | 1730 |

| | | |
|---|---|---|
| | *Exhibit 63*: DCP Press Release, November 15, 2011, containing "Mayor Michael Bloomberg's Remarks at Zoning the City Conference, as Delivered by Deputy Mayor Robert K. Steel | 1732 |
| | *Exhibit 64*: DCP's Portion of the Mayor's Management Report, dated September 2012 | 1736 |
| | *Exhibit 65*: Excerpts from NYC's Risk Landscape: A Guide to Hazard Mitigation, Coastal Erosion Chapter 4.2, developed by the NYC Emergency Management in Partnership with the DCP and Close Collaboration with the NYC Mayor's Office of Recovery and Resiliency | 1741 |
| | **VOLUME 16**<br>**(pp. 1756--1852)** | |
| | *Exhibit 66*: Excerpts from the NYC Building Department's "Place of Assembly" guide | 1756 |
| | *Exhibit 67*: Excerpts from the NYC Fire Department's "Theater Inspections, Maintenance and Recordkeeping" Rules | 1759 |
| | *Exhibit 68*: MTA Staten Island Railway ("SIR") System Map | 1765 |
| | *Exhibit 69*: MTA Notice regarding Bridges and Tunnels Tolls | 1767 |
| | *Exhibit 70*: Zoning and the Comprehensive Plan, James A. Coon Local Government Technical Series, Revised 2015 | 1772 |
| | *Exhibit 71*: NYS Public Health Law § 3000-d | 1791 |
| | *Exhibit 72*: Charles V. Bagli, "Going Out With a Building Boom, Mayor Pushes Billions in Projects", N.Y. Times, Dec. 15, 2013 | 1795 |

| | | |
|---|---|---|
| | *Exhibit 73*: Ford Fessenden, "The Bloomberg Years: Reshaping New York", N.Y. Times, Aug. 18, 2013 (interactive feature) | **1801** |
| | *Exhibit 74*: "Mayor Bloomberg's NYC Mayoralty Comes To An End", dailyfreeman.com, Dec. 31, 2013 | **1803** |
| | *Exhibit 75*: James Dao, "The 1993 Elections: Staten Island; Secession is Approved; Next Move is Albany's", N.Y. Times, Nov. 3, 1993 | **1806** |
| | *Exhibit 76*: Maps (Reduced Size Versions) Generated by the DCP of Manhattan, Brooklyn, Bronx, Queens, and Staten Island indicating "Areas Where Adult Uses Would Continue to be Allowed Under the Proposal and Encumbered Property Within those Areas" filed in State Judicial Proceedings in Connection with the 1995 Resolution: <u>Amsterdam Video, Inc. v. City of New York</u>, Supreme Court, New York County, Index No. 103568/96, and <u>Hickerson v. City of New York</u>, Supreme Court, New York County, Supreme Court, New York County, Index No. 103569/96 | **1810** |
| | *Exhibit 77*: Excerpts from September 3, 1996 deposition testimony of Marilyn Mammano, Director of Zoning & Urban Design of the NYC Department of City Planning, in <u>Hickerson v. The City of New York</u>, New York County Index No. 103569/96 | **1816** |
| | *Exhibit 78*: Maps generated by the DCP depicting the reduction in permissible areas for adult businesses based on Zoning Changes between 1995 and 2001, filed in <u>For the People Theatres</u> on October 17, 2002, as Exhibit S to the Affidavit of David Karnovsky | **1838** |

| | **VOLUME 17**<br>**(pp. 1854--1881)** | |
|---|---|---|
| | ***Exhibit 79***: Excerpts from Affidavit of David Karnovsky filed in <u>For The People Theatres of N.Y., Inc., et al. v. The City of New York, et al.</u>, New York County Supreme Court Index No. 121080/02 | **1854** |
| | ***Exhibit 80***:  Excerpts from the DCP's Adult Entertainment Study, November 1994 | **1864** |
| | ***Exhibit 81***: 8/2/17 Stipulation and Agreement between Bookstore Plaintiffs and The City of New York | **1875** |

Dated:        New York, New York
                  November 21, 2018

*Respectfully,*

**DANIEL A. SILVER**
**SILVER & SILVER**
One Liberty Square
New Britain, Connecticut 06050-0698
(860) 225-3518

- and -

**JENNIFER KINSLEY**
Kinsley Law Office
Post Office Box 19478
Cincinnati, Ohio 45219
(513) 708-2595

*Attorneys for Plaintiffs*
*725 Eatery Corp., etc., et ano.*

By:    s/Daniel A. Silver
              Daniel A. Silver

**EDWARD S. RUDOFSKY**
**ZANE and RUDOFSKY**
601 West 26th Street, # 1315
New York, New York  10001
(212) 245-2222

*Attorneys for Plaintiffs*
*59 Murray Enterprises, Inc., etc.*
*et al.*

By:    s/Edward S. Rudofsky_____
        Edward S. Rudofsky

**JOHN H. WESTON**
**G. RANDALL GARROU**
**WESTON, GARROU & MOONEY**
12121 Wilshire Boulevard, Suite 525
Los Angeles, CA 90025-1176
(310) 442-0072

- and -

**ALAN M. ABRAMSON**
**ABRAMSON & MORAK**
35 Worth Street
New York, NY 10013
(212) 226-7098

*Attorneys for*
*Club At 60th Street, Inc., etc., et al.*

By:    s/John Weston_____
        John Weston

**FAHRINGER & DUBNO**
767 Third Avenue, Suite 3600
New York, New York 10017
(212) 319-5351

*Attorneys for Plaintiff's*
*336 LLC, etc., et al.*

By:    s/Erica T. Dubno_____
        Erica T. Dubno

# Exhibit 6

Relevant Portions of
AZR §§ 12-10, 32-01 & 42-01

## 12-10

Adult establishment (10/31/01)

(1) Adult Establishment: An "adult establishment" is a commercial establishment which is or includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof, as defined below:

(a) An adult book store is a book store that offers "printed or visual material" for sale or rent to customers where a "substantial portion" of its stockin-trade of "printed or visual material" consists of "adult printed or visual material," defined as "printed or visual material" characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas";

(b) An adult eating or drinking establishment is an eating or drinking establishment which regularly features in any portion of such establishment any one or more of the following:

(1) live performances which are characterized by an emphasis on "specified anatomical areas" or "specified sexual activities"; or

(2) films, motion pictures, videocassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or

(3) employees who, as part of their employment, regularly expose to patrons "specified anatomical areas"; and which is not customarily open to the general public during such features because it excludes or restricts minors.

(c) An adult theater is a commercial establishment which regularly features one or more of the following:

(1) films, motion pictures, videocassettes, slides or similar photographic reproductions characterized by an emphasis on the depiction or description of "specified sexual activities" or "specified anatomical areas"; or

(2) live performances characterized by an emphasis on "specified anatomical areas" or "specified sexual activities"; and which is not customarily open to the general public during such features because it excludes or restricts minors.

An adult theater shall include commercial establishments where such materials or performances are viewed from one or more individual enclosures.

(d) An other adult commercial establishment is a facility - - other than an adult book store, adult eating or drinking establishment, adult theater, commercial studio, or business or trade school -- which features employees who as part of their employment, regularly expose to patrons "specified anatomical areas" and which is not customarily open to the general public during such features because it excludes or restricts minors.

(2) Defined Terms:

(a) For purposes of paragraph (1)(a), "printed or visual materials" are books, magazines, or other printed matter, including product packaging or wrapping, or photographs, films, motion pictures, video cassettes, slides or other visual matter;

(b) For purposes of paragraph (1)(a), (b) and (c), "specified sexual activities" are:

(i) human genitals in a state of sexual stimulation or arousal;

(ii) actual or simulated acts of human masturbation, sexual intercourse or sodomy; or

(iii) fondling or other erotic touching of human genitals, pubic region, buttock, anus or female breast.

(c) For purposes of paragraph (1)(a), (b), (c) and (d),"specified anatomical areas" are: (i) less than completely and opaquely concealed: (aa) human genitals, pubic region, (bb) human buttock, anus, or (cc) female breast below a point immediately above the top of the areola; or (ii) human male genitals in a discernibly turgid state, even if completely and opaquely concealed.

(d) For the purpose of determining under paragraph (1)(a) whether a "substantial portion" of a book store's stock-in-trade of "printed or visual" material consists of "adult printed or visual material," the following factors shall be considered:

(i) the amount of stock of "adult printed or visual material" accessible to customers as compared to the total stock of "printed or visual material" accessible to customers in the establishment; and

(ii) the amount of #floor area# and #cellar# space accessible to customers containing stock of "adult printed or visual material"; and

(iii) the amount of #floor area# and #cellar# space accessible to customers containing stock of "adult printed or visual material" as compared to the amount of #floor area# and #cellar# space accessible to customers containing "printed or visual material" which is not "adult printed or visual material," provided that "printed or visual material"

which is not "adult printed or visual material" (hereinafter for purposes of this paragraph "other printed or visual material") shall not be considered stock-in-trade for purposes of this paragraph where such store has one or more of the following features:

(aa) An interior configuration and layout which requires customers to pass through an area of the store with "adult printed or visual material" in order to access an area of the store with "other printed or visual material";

(bb) One or more individual enclosures where adult movies or live performances are available for viewing by customers;

(cc) A method of operation which requires customer transactions with respect to "other printed or visual material" to be made in an area of the store which includes "adult printed or visual material";

(dd) A method of operation under which "other printed or visual material" is offered for sale only and "adult printed or visual material" is offered for sale or rental;

(ee) A greater number of different titles of "adult printed or visual material" than the number of different titles of "other printed or visual material";

(ff) A method of operation which excludes or restricts minors from the store as a whole or from any section of the store with "other printed or visual material";

(gg) A sign that advertises the availability of "adult printed or visual material" which is disproportionate in size relative to a sign that advertises the availability of "other printed or visual material," when compared with the proportions of "adult" and other "printed or visual materials" offered for sale or rent in the store, or the proportions of #floor area# or #cellar# space accessible to customers containing stock of "adult" and "other printed or visual materials";

(hh) A window display in which the number of products or area of display of "adult printed or visual material" is disproportionate in size relative to the number of products or area of display of "other printed or visual material," when compared with the proportions of adult and "other printed or visual materials" offered for sale or rent in the store, or the proportions of #floor area# or #cellar# space accessible to customers containing stock of "adult" and "other printed or visual materials";

(ii) Other features relating to configuration and layout or method of operation, as set forth in rules adopted by the Commissioner of Buildings, which the Commissioner has determined render the sale or rental of "adult printed or visual material" a substantial purpose of the business conducted in such store.

Such rules shall provide for the scheduled implementation of the terms thereof to commercial establishments in existence as of October 31, 2001, as necessary.

(e) For the purposes of paragraph (1)(b), an "eating or drinking establishment" includes:

(i) any portion of a commercial establishment within which food or beverages are offered for purchase, or are available to or are consumed by customers or patrons; and

(ii) any portion of a commercial establishment from which a portion of a commercial establishment described in (i) above is accessible by customers or patrons.


Joint living-work quarters for artists (8/27/98)

A "joint living-work quarters for artists" consists of one or more #rooms# in a non-#residential building#, on one or more floors, with lawful cooking space and sanitary facilities meeting the requirements of the Housing Maintenance Code, occupied:

(a) and arranged and designed for use by, and is used by, not more than four non-related #artists#, or an #artist# and his household, and including adequate working space reserved for the #artist#, or #artists# residing therein;

(b) by any household residing therein on September 15, 1986 whose members are all unable to meet the #artist# certification qualifications of the Department of Cultural Affairs that registers with the Department of Cultural Affairs prior to nine months from January 8, 1987; or

(c) by any person who is entitled to occupancy by any other provision of law.

An #artist# is a person so certified by the New York City Department of Cultural Affairs. Regulations governing #joint living-work quarters for artists# are set forth in Article I, Chapter 5, Sections 42-14, paragraph (D) (Use Group 17 - Special Uses), 42-141 (Modification by certification of the City Planning Commission of uses in M1-5A and M1-5B Districts), 43-17 (Special Provisions for Joint Living- Work Quarters for Artists), 74-78 (Conversions of Non-Residential Buildings) and Article XI, Chapter 1 (Special Tribeca Mixed Use District).

Loft dwelling (8/27/98)

A "loft dwelling" is a #dwelling unit# in the #Special Tribeca Mixed Use District#, in a #building# designed for non #residential use# erected prior to December 15, 1961.

Regulations governing #loft dwellings# are set forth in Article XI, Chapter 1 (Special Tribeca Mixed Use District).

Manufacturing District (12/15/61)

A "Manufacturing District" includes any district whose designation begins with the letter "M".

An "M1" District includes any district whose designation begins with the symbol "M1".

An "M2" District includes any district whose designation begins with the symbol "M2".

An "M3" District includes any district whose designation begins with the symbol "M3".

Non-conforming, or non-conformity

A "non-conforming" #use# is any lawful #use#, whether of a #building or other structure# or of a tract of land, which does not conform to any one or more of the applicable #use# regulations of the district in which it is located, either on December 15, 1961 or as a result of any subsequent amendment thereto. A #non-conforming use# shall result from failure to conform to the applicable district regulations on either permitted Use Groups or performance standards. A #non-conformity# is a failure by a #non-conforming use# to conform to any one of such applicable #use# regulations.

However, no existing #use# shall be deemed #non-conforming#, nor shall a #nonconformity# be deemed to exist, solely because of any of the following:

(a) the existence of less than the required #accessory# offstreet parking spaces or loading berths;

(b) the existence of #non-conforming accessory signs#; or

(c) the existence of conditions in violation of the provisions of either Sections 32-41 and 32-42, relating to Supplementary Use Regulations, or Sections 32-51 and 32-52 relating to Special Provisions Applying along District Boundaries, or Sections 42-41, 42-42, 42-44 and 42-45, relating to Supplementary Use Regulations and Special Provisions Applying along District Boundaries.

Residence, or residential (9/9/04)

A "residence" is a #building# or part of a #building# containing #dwelling units# or #rooming units#, including one-family or twofamily houses, multiple dwellings, boarding or rooming houses, or #apartment hotels#. However, #residences# do not include:

0052

(a) such transient accommodations as #transient hotels#, #motels# or #tourist cabins#, or #trailer camps#;

(b) #non-profit hospital staff dwellings#;

(c) student dormitories, fraternity or sorority student houses, monasteries or convents, sanitariums, nursing homes, or other living or sleeping accommodations in #community facility buildings# or portions of #buildings# used for #community facility uses#; or

(d) in a #mixed building#, that part of the #building# used for any non-#residential uses#, except #accessory# to #residential uses#.

"Residential" means pertaining to a #residence#.

Residence District

A "Residence District" includes any district whose designation begins with the letter "R."
An "R1" District includes any district whose designation begins with the symbol "R1."
An "R3" District includes any district whose designation begins with the symbol "R3."
An "R7" District includes any district whose designation begins with the symbol "R7."
An "R10" District includes any district whose designation begins with the symbol "R10."

School

A "school" is:

(a) an institution providing full-time day instruction and a course of study that meets the requirements of Sections 3204, 3205, and 3210 of the New York State Education Law; or

(b) a nursery school or kindergarten:

(1) whose annual session does not exceed the school sessions for full-time day schools prescribed in Section 3204 of the New York State Education Law; and

(2) which is operated by the Board of Education, any established religious organization as part of an elementary school, or under a permit issued pursuant to Section 47.03 of the New York City Health Code.

Use (12/15/61)

A "use" is:

(a) any purpose for which a #building or other structure# or a tract of land may be designed, arranged, intended, maintained or occupied; or

(b) any activity, occupation, business or operation carried on, or intended to be carried on, in a #building or other structure# or on a tract of land.

**32-01**

Special Provisions for Adult Establishments

In addition to the applicable regulations for the #uses# listed in a permitted Use Group, #adult establishments# shall be subject to the following provisions:

(a)      #Adult establishments# are not permitted in C1, C2, C3, C4, C5, C6-1, C6-2 or C6-3 Districts.

(b)      In C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 Districts, no #adult establishment# shall be established less than 500 feet from a house of worship, a #school#, a #Residence District#, a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 District, or a #Manufacturing District#, other than an M1-6M District, in which new #residences# or new #joint-living work quarters for artists# are allowed as-of-right or by special permit or authorization.  No provisions or findings of such special permit or authorization which require an assessment of the impact of new #residences# or new #joint living-work quarters for artists# on #commercial# or #manufacturing uses# within a #Manufacturing District# shall be construed as a limitation on the scope of this provision.  However, on or after October 25, 1995, an #adult establishment# that otherwise complies with the provisions of this paragraph shall not be rendered #non-conforming# if a house of worship or a #school# is established on or after April 10, 1995, within 500 feet of such #adult establishment#.

(c)      In C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 Districts, no #adult establishment# shall be established less than 500 feet from a previously established #adult establishment#.

(d)      In C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 Districts, no more than one #adult establishment# permitted under this Section shall be established on a #zoning lot#.

(e)      In C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 Districts, #adult establishments# shall not exceed, in total, 10,000 square feet of #floor area# and #cellar# space not used for enclosed storage or mechanical equipment.

(f)      #Adult establishments# which were established on October 25, 1995, and conform to all provisions of the Zoning Resolution relating to #adult establishments# other than the provisions of all or any combination of paragraphs (c), (d), and (e) of this Section, shall not be subject to the provisions of Section 52-77 (Termination of Adult Establishments).

For purposes of this Section, an #adult establishment# shall be established upon the date of a permit issued by the Department of Buildings therefor, or, in the case of an #adult establishment# in existence prior to August 8, 2001, as determined by the Department of Buildings may prescribe regarding the failure to perform work authorized under a permit

or to commence operation pursuant to a permit and the discontinuance of an #adult establishment#.

## 42-01

Special Provisions for Adult Establishments

In addition to the applicable regulations for the #uses# listed in a permitted Use Group, #adult establishments# shall be subject to the following provisions:

(a)     #Adult establishments# are not permitted in a #Manufacturing District# in which #residences# or #joint living-work quarters for artists# are allowed as-of-right or by special permit or authorization.  No provisions or findings of such special permit or authorization which require an assessment of the impact of new #residences# or new #joint living-work quarters for artists# on #commercial# or #manufacturing uses# within a #Manufacturing District# shall be construed as a limitation on the scope of this provision.

(b)     In all other #Manufacturing Districts#, no #adult establishment# shall be established less than 500 feet from a house of worship, a #school#, a #Residence District#, a C1, C2, C3, C4, C5-1, C6-1, C6-2 or C6-3 District, or a #Manufacturing District#, other than an M1-6M District, in which new #residences# or new #joint living-work quarters for artists# are allowed as-of-right or by special permit or authorization. No provisions or findings of such special permit or authorization which require an assessment of the impact of new #residences# or new #joint living-work quarters for artists# on #commercial# or #manufacturing uses# within a #Manufacturing District# shall be construed as a limitation on the scope of this provision.  However, on or after October 25, 1995, an #adult establishment# that otherwise complies with the provisions of this paragraph shall not be rendered #non-conforming# if a house of worship or a #school# is established on or after April 10, 1995, within 500 feet of such #adult establishment. #

(c)     No #adult establishment# shall be established less than 500 feet from another #adult establishment#.

(d)     No more than one #adult establishment# permitted under this Section shall be established on a #zoning lot#.

(e)     #Adult establishments# shall not exceed, in total, 10,000 square feet of #floor area# and #cellar# space not used for enclosed storage or mechanical equipment.

(f)     #Adult establishments# which were established on October 25, 1995, and conform to all provisions of the Zoning Resolution relating to #adult establishments# other than the provisions of all or any combination of paragraphs (c), (d), and (e) of this Section, shall not be subject to the provisions of Section 52-77 (Termination of Adult Establishments).

For purposes of this Section, an #adult establishment# shall be established upon the date of a permit issued by the Department of Buildings therefor, or, in the case of an #adult

establishment# in existence prior to August 8, 2001, as determined by the Department of Buildings may prescribe regarding the failure to perform work authorized under a permit or to commence operation pursuant to a permit and the discontinuance of an #adult establishment#.

# Exhibit 7

## 1 RCNY § 9000-01

# 1 RCNY §9000-01

## CHAPTER 9000

### Zoning

**§9000-01 Adult establishments.**

Dates of establishment and discontinuance of adult establishments, houses of worship, and schools for the purposes of sections 32-01 and 42-01 of the zoning resolution. In determining whether an adult establishment may lawfully be established at a a location pursuant to sections 32-01 and 42-01 of the zoning resolution, the department will use the following criteria to determine the dates of establishment and discontinuance for adult establishments, houses of worship and schools located or proposed to be located within 500 feet of each other.

(a)   The date of establishment of an adult establishment, house of worship, or school in existence and operating prior to August 8, 2001 shall be the date of issuance of an appropriate department permit or, if no permit was required, the date that it commenced operation, as determined by the department.

(b)   Except as otherwise provided in subdivision a of this section, the date of establishment of an adult establishment, house of worship, or school shall be the date of issuance of an appropriate department permit, subject to the following qualifications:

    (1)  With respect to a new building permit or alteration permit:

        (i)   significant progress must be shown toward completion of the work under the permit. For the purposes of this paragraph, the term "significant progress" means the issuance of a temporary certificate of occupancy or, if applicable, department signoff of the work within one year of issuance of the permit, except that upon application, the commissioner or his or her designee, may extend the one year period in accordance with subdivision c of this section for a period of time not exceeding one year, and

        (ii)  the use or operation for which the building is constructed or altered must commence within six months after the issuance of a temporary certificate of occupancy or, if applicable, within six months after a department signoff that the work has been completed, except that upon application, the commissioner or his or her designee, may extend the six month period in accordance with subdivision c of this section for a period of time not exceeding six months.

    (2)  With respect to applications for permits filed solely to establish priority, where no work requiring a building permit is proposed, the use or operation for which the permit is issued must commence within two months of the issuance of such permit, except that upon application, the commissioner or his or her designee may extend such two month period in accordance with subdivision c of this section for a period of time not exceeding two months.

(c)   An extension of time pursuant to subdivision b of this section may be granted where the permittee submits an application no later than 30 days prior to the expiration of the applicable time period together with satisfactory evidence that significant progress or the commencement of use or operations within the applicable time period is impracticable. The commissioner or his or her designee shall make a determination and notify the applicant in writing of his or her determination not later than 30 days after receipt of the application by the department. If the application is denied, the commissioner or his or her designee shall state the reason(s) therefor. If the commissioner or his or her designee fails to act upon the application within such 30-day period, the application shall be deemed to be granted.

(d)   An adult establishment, otherwise in compliance with the zoning resolution, may be established within 500 feet of a discontinued adult establishment, house of worship or school. For the purposes of this subdivision, once established, an adult establishment, house of worship, or school shall not be deemed to be discontinued until it has ceased operation for a continuous period of one year or longer.

(e)   The time periods set forth in this section for significant progress of work, or for commencement of operations shall commence to run as of the effective date of this section or issuance of the permit, whichever is later.

# Exhibit 8

## Operations Policy and Procedures
## Notice No. 17/95



*The City of New York*

**DEPARTMENT OF BUILDINGS**

EXECUTIVE OFFICES
60 HUDSON STREET, NEW YORK, N.Y. 10013

JOEL A. MIELE, Sr., P.E., COMMISSIONER

**BARRY G. COX**
Assistant Commissioner
Borough Operations
(212) 312-8004

Issuance #   493

---

**OPERATIONS**
**POLICY AND PROCEDURE NOTICES  #17/95**

---

**TO:**        Distribution

**FROM:**    Barry G. Cox

**DATE:**     27 December 1995

**SUBJECT:**  Adult Establishments

--------------------------------------------------------------------------------

**Reference:**   Zoning Resolution Sections 11-113, 11-30, 12-10, 32-00, 42-00,  42-55, 51-00, 52-00, and 72-00, et seq.

**Purpose:**   To establish a procedure to assure the provisions of the Zoning Resolution relating to adult establishments is accurately enforced.

**Effective:**   October 25, 1995

**Specifics:**

◆          **Filing Process:**

**Applicant:**
    Directive 14 of 1975 and the Professional Certification of Application and Plans Process (PPN #2/95) may not be used for any filing related to adult establishments.

    In Section 16 (comments) of the PW1, the applicant shall indicate whether the filing he/she is making is to create, enlarge or extend  an adult establishment or to erect a business

0062

sign accessory to such an adult establishment.

The application shall also include a separate area diagram detailing all existing uses and block and lot numbers within a 500 foot radius of the zoning lot of the adult establishment and include the location of any adult establishment identified on the enclosed list from the Department of City Planning. (Appendix A)

. Plan Examiner:

An objection shall be raised if there exists another adult establishment within 500 feet of the proposed use or on the same zoning lot or if the establishment is in the wrong zoning district. Examiners should be guided by Appendix B.

. Permit Clerk:

Prior to issuing a work permit for an adult establishment, the clerk shall refer the applicant to the Borough Commissioner (or his/her designee) who shall verify from a batch report of all applications filed on or after October 25, 1995 to create, enlarge or extend an adult establishment made available weekly by MIS, that the new establishment meets the criteria established under the Zoning Resolution.

♦ **Enforcement Process:**

*Borough Complaint Clerk:*

*For all Boroughs Except Manhattan:*

Any complaint received about an adult establishement shall be data entered onto BIS using complaint category code 75. The complaint will automatically be assigned a "B" priority. The jurisdiction must state "refer to Operations", category 98.

The disposition of the complaint by the Night Squad shall be data entered upon being returned to the Borough office and a written response letter generated to the complainant.

*For Manhattan Only:*

Any complaint received about an adult establishment shall be data entered onto BIS using complaint category code 75. The complaint will automatically be assigned a "B" priority. The jurisdiction must state "refer to Office of Midtown Enforcement" category G7.

A written response letter will be generated and mailed to the complainant indicating the complaint was referred to the Office of Midtown Enforcement, 330 West 42nd Street, 15th Floor, New York, N.Y. 10036.

2

On a weekly basis, the Borough office shall batch these complaint letters to that Office for investigation.

## *Executive Chief Inspector's Office*:

The Executive Chief shall secure a city-wide BIS printout of all category code 75 complaints on a weekly basis, print out the required work orders and route the Night Squad inspectors to these premises.

Complaints about premises appearing on Appendix A shall not be inspected prior to October 25, 1996 unless the complaint alleges such premises has been enlarged or the use extended.

The Executive Chief's office shall request the respective borough office to provide the following information with respect to each premises to be inspected:

* Certificate of occupancy
* sign permits
* any other documentation which may establish the existing legal use of the premises.
* Zoning or Sanborn map showing premises location.

## *Night Emergency Squad*:

Any Department of Buildings notice of violation written for violating Zoning Resolution Section 11-113 must identify the specific type of adult establishment defined in Zoning Resolution Section 12-10 as either:

* An Adult Bookstore, or
* Adult Eating or Drinking Establishment, or
* An Adult Theater or
* Other commercial establishment or
* Any combination of the above

To the extent possible, the Night Squad log should include a brief layout of any premises inspected, the extent of the adult establishment and a description of the activities taking place in the premises. Backup documentation and the results of the inspection written on the work order shall be submitted to the Executive Chief who shall review the materials. If a determination is made that a violation should be issued, it shall be returned to the respective Borough Office for data entry.

Inspectors should refer to Appendix B for further guidance.

BGC:yaj
adult.est

3

# Exhibit 9

## Operations Policy and Procedures
## Notice No. 6/96



**DEPARTMENT OF BUILDINGS**

EXECUTIVE OFFICES
60 HUDSON STREET, NEW YORK, N.Y. 10013-3394

GASTON SILVA, R.A., Commissioner

(212) 312-8100

Richard C. Visconti, R.A.
First Deputy Commissioner
Technical Affairs/Operations
(212) 312-8120
TTY (212) 312-8188

**Issuance # 506**

## OPERATIONS
## POLICY AND PROCEDURE NOTICES # 6/96

**TO:**       Distribution

**FROM:**     Richard C. Visconti, R.A.

**DATE:**     October 25, 1996

**SUBJECT:**  Adult Establishments -- Applications and Complaint Procedure

**Reference:**  Zoning Resolution Sections 11-113, 11-30, 12-10, 32-00, 42-00, 42-55, 51-00, 52-00, and 72-00, et seq.

**Purpose:**  To clarify procedures for enforcement of the provisions of the Zoning Resolution relating to adult establishments.

**Effective:**  October 26, 1996

**Specifics:**  This PPN supersedes PPN # 17/95.

♦   **FILING PROCESS**

   •   **Applicant**

Directive 14 of 1975 and the Professional Certification of Application and Plans Process (PPN #2/95) may not be used for any filing related to adult establishments.

In Section 16 (comments) of the PWI, the applicant shall indicate whether the filing he/she is making is to create, enlarge or extend an adult establishment or to erect a business sign accessory to such an establishment.

0066

The application shall also include a separate area diagram detailing all existing uses and block and lot numbers within 500 feet of the center line of the door(s) of the principal entrance of the adult establishment or of the center line of the ground floor door(s) giving the most direct street access to the adult establishment.

### • Plan Examiner

An objection shall be raised if there exists another adult establishment within 500 feet of the proposed use or on the same zoning lot or if the establishment is in the wrong zoning district. Examiners should be guided by the Provision of the Zoning Resolution Relating to Adult Establishments, a copy of which is attached hereto as Appendix A.

### • Permit Clerk

Prior to issuing a work permit for an adult establishment, the clerk shall refer the applicant to the Borough Commissioner (or his/her designee) who shall verify from a batch report of all applications filed on or after October 25, 1995 to create, enlarge or extend an adult establishment made available weekly by MIS, that the new establishment meets the criteria established under the Zoning Resolution.

## ♦ ENFORCEMENT PROCESS

### *Borough Complaint Clerk:*

### • For All Boroughs Except Manhattan

Any complaint received about an adult establishment shall be data entered into BIS using complaint category code 75. The complaint will automatically be assigned a "B" priority. The jurisdiction must state "refer to Operations", category 98.

The disposition of the complaint by the Night Squad shall be data entered upon being returned to the Borough office and a written response letter generated to the complainant.

### • For Manhattan Only

Any complaint received about an adult establishment shall be data entered onto BIS using complaint category code 75. The complaint will automatically be assigned a "B" priority. The jurisdiction must state "refer to Office of Midtown Enforcement" category G7.

A written response letter will be generated and mailed to the complainant indicating the complaint was referred to the Office of Midtown Enforcement, 330 West 42nd Street, 15th Floor, New York, New York 10036.

On a weekly basis, the Borough Office shall batch these complaint letters to that Office for investigation.

- **Executive Chief Inspector's Office**

The Executive Chief shall secure a city-wide BIS printout of all category code 75 complaints on a weekly basis, print out the required work orders and route the Night Squad inspectors.

The Executive Chief's Office shall request the respective borough office to provide the following information with respect to each premises to be inspected.

* Certificate of Occupancy,
* Sign permits,
* Any other documentation which may establish the existing legal use,
* Zoning or Sanborn map showing premises location.

- **Night Emergency Squad**

Any Department of Buildings notice of violation written for violating Zoning Resolution Section 11-113 must identify specific type of adult establishment defined in the Zoning Resolution Section 12-10 as the following:

* An Adult Bookstore, or
* An Adult Eating or Drinking Establishment, or
* An Adult Theater, or
* Other commercial establishment, or
* Any combination of the above.

To the extent possible, the Night Squad log should include, but not be limited to, the following:

* a brief layout of any premises inspected, including the size of the space, location and number of entrances, and description and location of signs,
* the extent of the adult establishment,
* a description of the activities taking place inside the premises,
* the name(s) of the person(s) in charge (if possible), and
* proximity to any places of worship/churches, schools or other adult establishments,
* the size of the area devoted to the adult establishment and/or adult materials in relation to the total floor area and cellar space accessible to the customer, and
* the quantity of stock/inventory devoted to adult material in relation to the entire stock/inventory

Back-up documentation and the results of the inspection written on the work order shall be submitted to the Executive Chief who shall review the materials. If a determination is made that a violation

should be issued, it shall be returned to the respective Borough Office for data entry.

Inspectors should refer to Appendix A for further guidance.

c:\aeproc.ppn

# PROVISIONS OF THE ZONING RESOLUTION RELATING TO ADULT ESTABLISHMENTS

## DEFINITION OF AN ADULT ESTABLISHMENT

ZR §12-10 defines an adult establishment as any commercial establishment which features the depiction, description or display of "specified anatomical areas" or "specified sexual activities" to the degree specified in the text. Adult establishments include:

- adult bookstores,
- adult eating or drinking establishments
- adult theaters,
- other adult commercial establishments,
- or any combination of the above.

When determining whether a **substantial portion of an establishment** is devoted to an adult establishment(s), the following factors are to be considered:

(1)   the amount of floor area and cellar space accessible to the customer and allocated to such an establishment, and

(2)   the percentage of total floor area and cellar space accessible to the customer and allocated to such establishment -- (["adult" FA accessible to the customer  + "adult" cellar space accessible to the customer] / [total FA accessible to the customer]).

When determining whether a **substantial portion of an establishment's stock in trade** is devoted to specified materials, the following factors are to be considered:

(1)   the percentage of total stock accessible to the customer that such materials represent -- (["adult" stock accessible to the customers] / [total stock accessible to the customer]), and

(2)   the amount of floor area and cellar space accessible to the customer containing such materials, and

(3)   the percentage of total floor area and cellar space accessible to the customer containing such materials -- (["adult" FA accessible to the customer + "adult" cellar space accessible to the customer] / [total FA accessible to the customer]).

See definition under ZR §12-10 for further guidance.

**APPENDIX A**

0070

## PROVISIONS OF THE ZONING RESOLUTION RELATING
## TO ADULT ESTABLISHMENTS

### PROHIBITED LOCATIONS

Adult establishments are not permitted in the following districts or locations:

- on the same zoning lot as another adult establishment.
- Residence districts
- C1, C2, C3, C4, C5, C6-1, C6-2, or C6-3 zoning districts.
- C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 zoning districts within 500' of:
  - a church
  - a school
  - a residence districts
  - a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 zoning district,
  - a manufacturing district, other than M1-6M district, in which new residence, new joint living-work quarters for artists, or new loft dwellings are allowed, under the provisions of the zoning resolution, as-of-right or by special permit or authorization, or
  - another adult establishment.

EXCEPTION:   An adult establishment will not become non-conforming if a church or school locates within 500 feet of an existing adult establishment after April 10, 1995 (ZR 32-01 and 42-10).

- Manufacturing districts in which residences, joint living-work quarters for artists, or loft dwellings are, under the provisions of the Zoning Resolution, allowed as-of-right or by special permit or authorization.
- In all other manufacturing districts within 500' of:
  - a church
  - a school
  - a residence district,
  - a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 zoning district,
  - a manufacturing district, other than M1-6M district, in which new residence, new joint living-work quarters for artists, or new loft dwellings are allowed, under the provisions of the Zoning Resolution, as-of-right by special permit or authorization, or

0071

## PROVISIONS OF THE ZONING RESOLUTION RELATING
## TO ADULT ESTABLISHMENTS

- another adult establishment

EXCEPTION:    An adult establishment will not become non-conforming if a church or school locates within 500 feet of an <u>existing</u> adult establishment after April 10, 1995 (ZR 32-01 and 42-10).

### SIZE LIMITATIONS

- Under no circumstances may an adult establishment exceed in total 10,000 square feet of floor area or cellar space not used for enclosed storage or mechanical equipment.

### SIGN LIMITATIONS

- Accessory business signs for adult establishments are permitted but are subject to the sign regulations otherwise applicable in C1 zoning districts except that the provisions of ZR §32-64 shall not apply.
- The maximum surface area of accessory business signs for adult establishments shall not exceed, in the aggregate, three times the street frontage of the zoning lot, but in no event more than 150 square feet per establishment, of which no more than 50 square feet may be illuminated, non-flashing signs
- In manufacturing districts, accessory business signs for adult establishments are not permitted on the roof of any building and are not permitted to extend above curb level at height of greater than 25 feet

### TERMINATION OF EXISTING ADULT ESTABLISHMENTS (ZR §52-77)

General rule:    In all districts, non-conforming adult establishments, including any business signs accessory thereto, shall <u>terminate</u> within one year from October 25, 1995, or from such later date that the adult establishment or sign becomes non-conforming.

Exceptions:    Any adult establishment which existed on October 25, 1995, and which conforms to provisions of the Zoning Resolution relating to adult establishments other than the provisions of all or any combination of paragraphs (c), (d), and (e) of ZR §32-01 or paragraphs (c), (d), and (e) of ZR §42-01 shall not be subject to ZR §52-77 (Amortization provision).

0072

The Board of Standards and Appeals may, pursuant to ZR §72-40 and ZR §52-734, extend the time period for amortization of an adult establishment or business sign accessory thereto under specified circumstances.

## NON-CONFORMING USES (ZR §52-38)

- A legal non-conforming use may not be changed to an adult establishment, except as provided in Section 32-01 or Section 42-01.

# Exhibit 10

Operations Policy and Procedures
Notice No. 7/96

0074



**DEPARTMENT OF BUILDINGS**

EXECUTIVE OFFICES
60 HUDSON STREET, NEW YORK, N.Y. 10013-3394

GASTON SILVA, R.A., Commissioner

(212) 312-8100

Richard C. Visconti, R.A.
First Deputy Commissioner
Technical Affairs/Operations
(212) 312-8120
TTY (212) 312-8188

Issuance # 507

## OPERATIONS
## POLICY AND PROCEDURE NOTICES # 7/96

**TO:**      Distribution

**FROM:**   Richard C. Visconti, R.A.

**DATE:**   October 25, 1996

**SUBJECT:**  Adult Establishments -- Places of Worship/Churches

**Reference:**  Zoning Resolution Sections 11-113, 11-30, 12-10, 32-00, 42-00, 42-55, 51-00, 52-00, and 72-00, et seq.

**Purpose:**  To establish a uniform definition of a "place of worship"/"church" in order to assure the provisions of the Zoning Resolution relating to adult establishments is accurately enforced.

**Effective:**  October 26, 1996

**Specifics:**

The Department of Buildings does not maintain a survey or catalogue of all churches or other places of worship in the City of New York for the purpose of enforcing the adult establishment provision in the Zoning Resolution.  With respect to enforcing zoning regulations for adult establishments, this PPN will refer to a "church" as any "place of worship".

Evidence supporting the allegation that a particular premises is occupied by a place of worship

should be issued, it shall be returned to the respective Borough Office for data entry.

Inspectors should refer to Appendix A for further guidance.

c:\aeproc.ppn

# Exhibit 11

Operations Policy and Procedures
Notice No. 8/96

0077



**DEPARTMENT OF BUILDINGS**
EXECUTIVE OFFICES
60 HUDSON STREET, NEW YORK, N.Y. 10013-3394

GASTON SILVA, R.A., Commissioner

(212) 312-8100

Richard C. Visconti, R.A.
First Deputy Commissioner
Technical Affairs/Operations
(212) 312-8120
TTY (212) 312-8188

Issuance # 508

## OPERATIONS
## POLICY AND PROCEDURE NOTICES # 8/96

**TO:**       Distribution

**FROM:**     Richard C. Visconti, R.A.

**DATE:**     October 25, 1996

**SUBJECT:**  Adult Establishments -- Measuring the 500 feet distance requirement

**Reference:** Zoning Resolution Sections 11-113, 11-30, 12-10, 32-00, 32-01, 42-00, 42-01, 42-55, 51-00, 52-00, and 72-00, et seq.

**Purpose:**  To clarify the manner in which the Department determines the distances between adult establishments and schools or places of worship/churches.

**Effective:** October 26, 1996

**Specifics:**

  Pursuant to the Zoning Resolution, adult establishments are not permitted in residence districts and certain commercial districts. In those districts in which adult establishments are permitted, the Zoning Resolution requires that such establishments be located at least 500 feet from a place of worship/church, a school (both also referred to as "sensitive receptors"), or another adult establishment. A "place of worship"/"church" is defined in PPN # 7/96. A "school" is defined in Section 12-10 of the Zoning Resolution. In order to ascertain whether an adult establishment is within 500 feet of such sensitive receptor or another adult establishment, the Department of Buildings shall determine the 500-foot distance radially as set forth below.

0078

## Measuring From the Adult Establishment

When measuring from the adult establishment, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of the adult establishment or from the center line of the ground floor door(s) giving the most direct street access to the adult establishment.

## Measuring Between Two Adult Establishments "A" and "B"

When measuring between two adult establishments, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of adult establishment "A" or from the center line of the ground floor door(s) giving the most direct street access to adult establishment "A" to the center line of the door(s) of the principal entrance of adult establishment "B" or to the center line of the ground floor door(s) giving the most direct street access to adult establishment "B".

## Measuring From the Adult Establishment to the Sensitive Receptor

With respect to measuring from the adult establishment to the sensitive receptor, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of the adult establishment or from the center line of the ground floor door(s) giving the most direct street access to the adult establishment to the outside face of the closest demising wall of the school or place of worship. If there are outdoor spaces directly adjacent to and customarily used by such school or place of worship, such as a school playground, the 500-foot distance shall be measured from the previously described door(s) of the adult establishment to the nearest boundary point of a school playground rather than the boundary of the school building.

However, if a school or place of worship shares a zoning lot with an unrelated use such as a commercial office building, the office building portion of the zoning lot shall not be considered part of the sensitive receptor site.

c:\ae500.ppn

# Exhibit 12

## Operations Policy and Procedures
## Notice No. 4/98

Menu



Search

NYC CodesCode NotesCode DevelopmentReference

Select ▼

- Buildings Bulletins
- Executive Orders
- Directives & Memoranda
- Policy and Procedure Notices
- Rules
- Local Laws
- OTCR
- NYS DEC Wetlands
- Presentations

| | |
|---|---|
| **Date:** | **July 22, 1998** |
| **Subject:** | **Adult Establishment -- "Substantial Portion"** |
| **Effective:** | Immediately |
| **Purpose:** | To provide guidance as to the meaning of the phrase "substantial portion" as used in the definition of "adult establishment" in Section 12-10 of the Zoning Resolution. |
| **Reference:** | Zoning Resolution Sections 12-10, 32-01, 32-69, 42-01, 42-55, 52-734, 52-77, 72-40 |
| **Specifics:** | Section 12-10 of the Zoning Resolution ("ZR") defines an adult establishment as an establishment, a "substantial portion" of which is occupied by an adult use. The phrase "substantial portion" is again used to define an adult book store as a book store with a substantial portion of its stock-in-trade in materials as defined in ZR §12-10 (a)(1) and (a)(2) ("adult materials"). In order that the provisions relating to adult establishments be properly enforced, this OPPN sets forth guidelines to clarify the meaning of the phrase "substantial portion."<br><br>Adult Book Store |

An establishment shall be deemed a book store if its principal use is selling books, magazines, periodicals or other printed matter or photographs, films, motion pictures, video cassettes, slides or other visual representations, regardless of floor area. If at least 40 percent of the book store's total stock accessible or available ("accessible") for sale or rent to customers is comprised of adult materials, then the book store has a "substantial portion" of its stock in adult materials, and is therefore an "adult book store."

An establishment also includes an adult book store if 40 percent of the establishment's floor area and cellar space accessible to customers contains stock in adult materials.

If 10,000 or more square feet of an establishment is occupied by adult materials, the establishment is deemed to be an "adult book store" regardless of the overall size of the establishment.

General interest stores, including general interest book and video stores, with a section of adult materials that is modest in scale as compared to the overall size or stock of the store, are not intended to be covered by the adult establishment definition in ZR §12-10.

<u>Adult eating or drinking establishment, theater or other commercial establishment</u>

The determination whether a "substantial portion" of an eating or drinking establishment, theater or other commercial establishment includes an adult use should include consideration of the amount of floor area and cellar space accessible to customers allocated to adult use for performance and viewing purposes as compared to total combined floor area and cellar space accessible to customers.

Thus, if an eating or drinking establishment, a theater or other commercial establishment, has at least 40 percent of the floor and cellar area that is accessible to customers, available for adult performance and viewing purposes, then a "substantial portion" of the establishment is devoted to an adult use and is an "adult eating or drinking establishment", an "adult theater" or an "other adult commercial establishment."

If 10,000 or more square feet of an eating or drinking establishment, a theater or other commercial establishment is occupied by an adult use, the establishment is deemed to be an "adult eating or drinking establishment", an "adult theater" or an "other adult commercial establishment" regardless of the overall size of the establishment.

Adult entertainment should be the principal form of entertainment at the establishment.

# Exhibit 13

## Operations Policy and Procedures Notice No. 6/98

0083

Menu



Search

NYC CodesCode NotesCode DevelopmentReference

Select ▼

- Buildings Bulletins
- Executive Orders
- Directives & Memoranda
- Policy and Procedure Notices
- Rules
- Local Laws
- OTCR
- NYS DEC Wetlands
- Presentations

| | |
|---|---|
| **Date:** | **August 13, 1998** |
| **Subject:** | **Adult Establishment -- "Substantial Portion"** |
| **Effective:** | Immediately |
| **Reference:** | Zoning Resolution Sections 12-10, 32-01, 32-69, 42-01, 42-55, 52-734, 52-77, 72-40 |
| **Purpose:** | To provide guidance as to the meaning of the phrase "substantial portion" as used in the definition of "adult establishment" in Section 12-10 of the Zoning Resolution. |
| **Supercedes:** | OPPN #4/98 |
| **Specifics:** | Section 12-10 of the Zoning Resolution ("ZR") defines an adult establishment as an establishment, a "substantial portion" of which is occupied by an adult book store, adult eating or drinking establishment, adult theater, or "other adult commercial establishment" ("adult use"). The phrase "substantial portion" is again used to define an adult book store as a book store with a substantial portion of its stock-in-trade in materials as defined in ZR §12-10 (a)(1) and (a)(2) ("adult materials"). In order that the provisions relating to adult |

Building Department Policy And Procedure Notices #page

establishments be properly enforced, this OPPN sets forth guidelines to clarify the meaning of the phrase "substantial portion."

## I. Adult Book Store

An establishment shall be deemed a book store if its principal use is selling books, magazines, periodicals or other printed matter or photographs, films, motion pictures, video cassettes, slides or other visual representations, regardless of floor area. If at least 40 percent of the book store's total stock accessible or available ("accessible") for sale or rent to customers is comprised of adult materials, then the book store has a "substantial portion" of its stock in adult materials, and is therefore an "adult book store."

An establishment also includes an adult book store if 40 percent of the establishment's floor area and cellar space accessible to customers contains stock in adult materials.

If 10,000 or more square feet of an establishment is occupied by adult materials, the establishment is deemed to be an "adult book store" regardless of the overall size of the establishment.

General interest stores, including general interest book and video stores, with a section of adult materials that is modest in scale as compared to the overall size or stock of the store, are not intended to be covered by the adult establishment definition in ZR §12-10.

## II. Adult Establishment

The determination as to whether a "substantial portion" of a commercial establishment with two or more uses, at least one of which is not a book store, an eating or drinking establishment, a theater, or an "other adult commercial establishment," includes an adult use should include consideration of (1) the amount of floor area and cellar space accessible to customers allocated to adult use and (2) such amount of floor area and cellar space as compared to total combined floor area and cellar space accessible to customers.

Thus, if a commercial establishment with two or more uses, at least one of which is not a book store, an eating or drinking establishment, a theater, or an "other adult commercial establishment," has at least 40 percent of the floor and cellar area that is accessible to customers available for adult use, then a "substantial portion" of the establishment is devoted to an adult use and the commercial establishment is deemed to be an adult establishment.

If 10,000 or more square feet of a commercial establishment with two or more uses, at least one of which is not a book store, an eating or drinking establishment, a theater, or an "other adult commercial establishment," is occupied by an adult use, the commercial establishment is deemed to be an "adult establishment" regardless of the overall size of the establishment.

Section II shall not apply to a commercial establishment that is entirely an eating or drinking establishment, a theater, an "other adult establishment," or

0085

any combination thereof.

# Exhibit 14

Operations Policy and Procedures
Notice No. 7/02

### ISSUANCE #619

**OPERATIONS POLICY AND PROCEDURE NOTICE #7/02**

| | |
|---|---|
| **Date:** | **October 16, 2002** |
| **Subject:** | **Adult Establishments -- Securing Priorities** |
| **Effective:** | **Immediately** |
| **Reference:** | Zoning Resolution provisions relating to adult establishments |
| **Supersedes:** | **OPPN 06/96** |
| **Purpose:** | To clarify procedures in order to ascertain whether a proposed adult establishment within 500 feet of or on the same zoning lot as another adult establishment is in violation of NYC Zoning Resolution ("ZR") §§32-01 and 42-01. |
| **Specifics:** | I.  **APPLICANT** |
| | A.  Directive 14 and the Professional Certification of Application and Plans Process (OPPN #5/02) shall not be used for any filing related to adult establishments. No permit issued under a professionally certified application shall be a basis for an establishment to secure its priority to operate as an adult establishment. |
| | B.  ZR §§32-01 (c) and 42-01 (c) prohibit an adult establishment from locating within 500 feet of another adult establishment. ZR §§32-01 (d) and 42-01 (d) prohibit more than one adult establishment on a zoning lot.  <br><br> For an adult establishment that began operating on or after August 8, 2001, a Department permit is required to secure its priority to operate as an adult establishment at a particular location. For an adult establishment that is identified by the Department as having been operating as a lawful adult establishment prior to August 8, 2001, a Department permit is not required to secure its priority. However, if an adult establishment operating prior to August 8, 2001 does not obtain a Department permit to secure priority, it might not be able to establish its priority to operate as an adult |

establishment.

Securing priority to operate as an adult establishment means that another adult establishment that subsequently proposes to locate or locates within 500 feet of it or on the same zoning lot will not be allowed.

C. For all filings relating to existing or proposed adult establishments, the applicant shall indicate in Section 16 (comments) of the PW1 application form that the filing is to create, alter, enlarge or extend an adult establishment or to erect a business sign accessory to an adult establishment or that the filing otherwise involves an adult establishment. Priority to operate as an adult establishment at a permitted location shall be as of the issuance date of the permit that authorizes the adult use.

To secure priority as an adult establishment when no work requiring a building permit is proposed, an applicant may file an Alteration (Alt.) III application with the Department and secure a "no work" permit.

D. A filing/application to secure priority as an adult establishment shall include the following:

    1. a separate area diagram detailing all existing uses and block and lot numbers within 500 feet of the center line of the door(s) of the principal entrance of the proposed adult establishment or of the center line of the ground floor of the door(s) giving the most direct street access to the proposed adult establishment, including a statement that there are no churches or schools within the 500 foot radius;

    2. a survey detailing the zoning districts within 500 feet of the center line of the door(s) of the principal

entrance of the proposed adult establishment or of the center line of the ground floor of the door(s) giving the most direct street access to the proposed adult establishment;

3. a statement that no other adult establishment exists within 500 feet of the center line of the door(s) of the principal entrance of the proposed adult establishment or of the center line of the ground floor of the door(s) giving the most direct street access to the proposed adult establishment.

## II.   **PLAN EXAMINER**

An objection shall be raised if: (1) there exists a church, school, or another adult establishment whether existing, permitted, or approved, within 500 feet of the proposed adult establishment; (2) there is an adult establishment whether existing, permitted, or approved, on the same zoning lot as the proposed adult establishment; (3) the proposed adult establishment is in or within 500 feet of a prohibited zoning district; or (4) the proposed adult establishment fails to comply in any other way with zoning or other applicable provisions.

# Exhibit 15

DOB Handbook Published in 2016 entitled
"Adult Establishment Applications"



# Adult Establishment

Applications



**Bill de Blasio**
Mayor

**Rick D. Chandler, PE**
Commissioner

nyc.gov/buildings
Version 1 | 6.2016

0092

# ADULT ESTABLISHMENT
Applications

# An adult establishment is any commercial establishment which features the depiction, description, or display of "specified anatomical areas" or "specified sexual activities" to the degree defined in the Zoning Resolution.

## Zoning

Regulations governing use and bulk vary according to zoning districts and outline requirements for lot coverage, floor area, open space, density, yards, height, setbacks, and parking.  As defined in Section 12-10 of the Zoning Resolution (1995), an adult establishment is a commercial establishment in which a substantial portion—at least 40 percent—of the establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, other adult commercial establishment, or any combination of the above.

When determining whether a substantial portion of a commercial establishment is used for adult purposes, the following factors are to be considered: (1) the amount of floor area and cellar space accessible to customers and allocated to such an establishment, and (2) the percentage of total floor area and cellar space accessible to customers and allocated to such establishment -- (**["adult" FA accessible to customers + "adult" cellar space accessible to customers] / [total FA accessible to customers]**).

When determining whether a substantial portion of a commercial establishment's stock-in-trade is devoted to specified materials, the following factors are to be considered: (1) the percentage of total stock accessible to customers that such materials represent -- (**["adult" stock accessible to customers] / [total stock accessible to customers]**), and (2) the amount of floor area and cellar space accessible to customers containing such materials, and (3) the percentage of total floor area and cellar space accessible to customers containing such materials -- (**["adult" FA accessible to customers + "adult" cellar space accessible to customers] / [total FA accessible to customers]**).

0093

# ADULT ESTABLISHMENT
## Applications

*This publication is a general overview of the requirements for this type of work. There may be additional, applicable Zoning Resolution, Construction Code, Multiple Dwelling Law, or Energy Code requirements.*

## FIRST STEPS

- PW1 review for scope

- Zoning District, Site Designations *(special purpose districts, waterfront area or block, flood hazard area, fire district, landmark district, little 'e' DEP designated block, wetlands, 200' within transit authority infrastructure)*

- Street status (ZR 12-10 "street" and GCL 36 frontage on a mapped street).  Also street width (wide or narrow) is important for zoning calculations in certain zoning districts

- Lot diagram *(dimensions of lot, building, yards, distance to corner street inter- section, street names, zoning use group, building occupancy group, construction classification, number of stories, buildings on adjacent lots, distance to nearest fire hydrant, curb cut application numbers, multiple dwelling classification)*

- Borough commissioner determinations, if applicable


## ADMINISTRATIVE

### DOB Forms

- PW1 (verify gross floor area, including cellar counted for fees)

- PW1-A (verify use groups and occupancy classifications)

- PW1-B

- TR1

- TR8

- ZD1

0094

# ADULT ESTABLISHMENT
## Applications

## Applicant

- Directive 14 of 1975 and the Professional Certification of Application and Plans Process (BB 2016-010) may not be used for any filing related to adult establishments.

- In the PW1 comments section, the applicant shall indicate whether the filing he/she is making is to create, enlarge, or extend an adult establishment or to erect a business sign accessory to an adult establishment.

- The application shall also include a separate area diagram detailing all existing uses and block and lot numbers within a 500 feet of the center line of the door(s) of the principal entrance of the adult establishment or of the center line of the ground floor door(s) giving the most direct street access to the adult establishment.

## Adult Establishments, Houses of Worship, and Schools

Pursuant to the Zoning Resolution, adult establishments are not permitted in residence districts and certain commercial districts. In districts where adult establishments are permitted, the Zoning Resolution requires that such establishments be located at least 500 feet from a house of worship, a school (both also referred to as "sensitive receptors"), or another adult establishment that was previously established.  A "place of worship"/"church" is defined in PPN # 7/96. A "school" is defined in Section 12-10 of the Zoning Resolution.

Under 1 RCNY § 9000-01, the Department clarifies the criteria for determining the dates of establishment and discontinuance for adult establishments, houses of worship, and schools.  The following shall be used to determine the dates of establishment for adult establishments, houses of worship, and schools and to confirm the priority of an existing establishment.

## Permitted between August 8, 2001 and July 9, 2010

An adult establishment that obtained a new-building or alteration permit between August 8, 2001, and July 9, 2010, that has not obtained a Temporary Certificate of Occupancy (TCO), or if applicable a Department sign-off, by July 10, 2011, or started operating within six months of TCO or sign-off, will lose priority to operate as an adult establishment if a new adult establishment, house of worship, or school obtains a permit to be located within a 500-foot radius of the adult establishment.

If a house of worship or school obtained a new-building or alteration permit between

# ADULT ESTABLISHMENT
## Applications

August 8, 2001, and July 9, 2010, but did not obtain a TCO, or if applicable a Department sign-off, by July 10, 2011, or start operating within six months of TCO or sign-off, a permit may be issued for an adult establishment to be located within a 500-foot radius of the permitted house of worship or school.

## Permitted on or after July 10, 2010

An adult establishment that obtained a new-building or alteration permit on or after July 10, 2010, that has not obtained a TCO, or if applicable a Department sign-off, within one year from the date of permit issuance or started operating within six months of TCO or sign-off will lose priority to operate as an adult establishment if a new adult establishment, house of worship, or school obtains a permit to be located within a 500-foot radius of the adult establishment.

If a house of worship or school obtained a new-building or alteration permit on or after July 10, 2010, but did not obtain a TCO, or if applicable a Department sign-off, within one year from the date of permit issuance, or start operating within six months of TCO or sign-off, a permit may be issued for an adult establishment to be located within a 500-foot radius of the permitted house of worship or school.

## No-Work Permits Issued on or after July 10, 2010

Adult establishments authorized solely by a no-work permit that have not started operating within two months of permit issuance will lose priority to operate as an adult establishment if a new adult establishment, house of worship or school obtains a permit to be located within a 500-foot radius of the adult establishment.

If a house of worship or school authorized solely by a no-work permit issued on or after July 10, 2010 did not start operating within 2 months of permit issuance, a permit may be issued for an adult establishment to be located within a 500-foot radius of the permitted house of worship or school.

Note: Houses of worship, schools, and adult establishments in existence and operating lawfully prior to August 8, 2001, that have not ceased operations for a continuous period of one year or longer—as determined by the Department—are considered established.

# ADULT ESTABLISHMENT
## Applications

In order to ascertain whether an adult establishment is within 500 feet of a sensitive receptor or another adult establishment, the Department of Buildings shall determine the 500-foot distance radially as set forth below.

### Measuring from the Adult Establishment
When measuring from the adult establishment, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of the adult establishment or from the centerline of the ground floor door(s) giving the most direct street access to the adult establishment.

### Measuring between Two Adult Establishments "A" and "B"
When measuring between two adult establishments, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of adult establishment "A" or from the center line of the ground-floor door(s) giving the most direct street access to adult establishment "A" to the center line of the door(s) of the principal entrance of adult establishment "B" or to the centerline of the ground floor door(s) giving the most direct street access to adult establishment "B."

### Measuring from the Adult Establishment to the Sensitive Receptor
With respect to measuring from the adult establishment to the sensitive receptor, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of the adult establishment or from the center line of the ground floor door(s) giving the most direct street access to the adult establishment to the outside face of the closest demising wall of the school or place of worship. If there are outdoor spaces directly adjacent to and customarily used by such school or place of worship, such as a school playground, the 500-foot distance shall be measured from the previously described door(s) of the adult establishment to the nearest boundary point of a school playground rather than the boundary of the school building. However, if a school or place of worship shares a zoning lot with an unrelated use such as a commercial office building, the office building portion of the zoning lot shall not be considered part of the sensitive receptor site.

## Required Statement

For all applications for adult establishments submitted on or after July 10, 2010, applicants must include the following statement on the plans:

"No school, house of worship, or other adult establishment has been established within 500 feet of the center line of the door(s) of the principal

# ADULT ESTABLISHMENT
## Applications

entrance of the proposed adult establishment or of the center line of the ground floor of the door(s) giving the most direct street access to the proposed adult establishment."

## BIS Required Items

• Check current Department memos and service notices

## ZONING

### Provisions of Zoning Resolution Relating to Adult Establishments

Prohibited Locations

Zoning Resolution Sections 11-30, 12-10, 32-00, 32-01, 42-00, 42-01, 42-55, 51-00, 52-00, and 72-00

Adult establishments are not permitted in the following districts or locations:

• on the same zoning lot as another adult establishment
• Residence districts
• Cl, C2, C3, C4, C5, C6-1, C6-2, or C6-3 zoning districts
• C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 zoning districts within 500′ of:
  • a house of worship;
  • a school;
  • a residence district;
  • a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 zoning district,
  • a manufacturing district, other than M1-6M district, in which new residence, new joint living-work quarters for artists, or new loft dwellings are allowed, under the provisions of the zoning resolution, as-of-right or by special permit or authorization; or
  • another adult establishment.

EXCEPTION: An adult establishment will not become non-conforming if a church or school locates within 500 feet of an existing adult establishment after April 10, 1995 (ZR §§ 32-01 and 42-01).

0098

# ADULT ESTABLISHMENT
## Applications

• Manufacturing districts in which residences, joint living-work quarters for artists, or loft dwellings are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization

• In all other manufacturing districts within 500′ of:

- a house of worship;
- a school;
- a residence district;
- a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 zoning district;
- a manufacturing district, other than M1-6M district, in which new residence, new joint living-work quarters for artists, or new loft dwellings are allowed, under the provisions of the zoning resolution, as-of-right or by special permit or authorization; or
- another adult establishment.

EXCEPTION: An adult establishment will not become non-conforming if a house of worship or school locates within 500 feet of an existing adult establishment after April 10, 1995 (ZR §§ 32-01 and 42-01).

## Size Limitations

Under no circumstances may an adult establishment exceed in total 10,000 square feet of floor area or cellar space not used for enclosed storage or mechanical equipment.

## Sign Limitations

Accessory business signs for adult establishments are permitted but are subject to the sign regulations otherwise applicable in Cl zoning districts except that the provisions of ZR § 32-69 shall not apply.

The maximum surface area of accessory business signs for adult establishments shall not exceed, in the aggregate, three times the street frontage of the zoning lot, but in no event more than 150 square feet per establishment, of which no more than 50 square feet may be illuminated, non-flashing signs.

# ADULT ESTABLISHMENT
## Applications

In manufacturing districts, accessory business signs for adult establishments are also not permitted on the roof of any building and are not permitted to extend above curb level at height of greater than 25 feet per ZR § 42-57.

### Termination of Existing Adult Establishments (ZR § 52-77)

General rule: In all districts, non-conforming adult establishments, including any business signs accessory thereto, shall terminate within one year from October 25, 1995, or from such later date that the adult establishment or sign becomes non-conforming.

Exceptions: Any adult establishment which existed on October 25, 1995, and which conforms to provisions of the Zoning Resolution relating to adult establishments other than the provisions of all or any combination of paragraphs (c), (d), and (e) of ZR § 32-01 or paragraphs (c), (d), and (e) of ZR § 42-01 shall not be subject to ZR § 52-77 (Amortization provision).

The Board of Standards and Appeals may, pursuant to ZR § 72-40 and ZR § 52-734, extend the time period for amortization of an adult establishment or business sign accessory thereto under specified circumstances.

### Non-Conforming Uses (ZR § 52-38)

A lawful non-conforming use may not be changed to an adult establishment, except as provided in Section 32-01 or Section 42-01.

## MULTIPLE DWELLING LAW

- N/A

## FIRE CODE

- Standpipe Systems- FC 905

- Sprinkler Systems- FC 903

0100

# ADULT ESTABLISHMENT
## Applications

## BUILDING CODE

### Egress – BC Chapter 10

- Occupant load – BC §1004

- Egress: width – BC §1005, doors – BC §1008

- Illumination – BC §1006

- Stairways: width, headroom, vertical rise – BC §1009; handrails – §1012

- Ramps: when used as an egress component – BC §1010; exterior ramps and stairways – BC §1026

- Guards – BC §1013

- Exit: exit access – BC §1014; exit and exit access doorways – §1015; exits – §1020; exit access travel distance – BC §1016; number of exits – BC §1021; exit discharge – BC §1027; corridors – BC §1018

- Exit enclosures – BC §1022

- Signage – BC §1030

### Fire Protection

- Height and area limitations – BC Table 503

- Fire separation of separate occupancies and tenancies – BC Table 508.4

- Construction Classification – BC Table 601, 602

- Fire-rated construction details – BC Chapter 7

- Sprinkler systems – BC §903

- Standpipe systems – BC §905

- Fire alarm and detection, emergency alarms and smoke control systems (smoke, alarms, controls and carbon monoxide) – BC §907, §908 and §909

- Fire protection plan requirements – BC §28-109.2

0101

# ADULT ESTABLISHMENT
## Applications

## ENERGY CODE

**See Code Notes on Energy Code.**

## APPLICABLE BULLETINS, DIRECTIVES, PPNS, MEMOS

- OPPN 1/1995: Adult Establishment – Moratorium on adult establishments

- OPPN 8/1996: Adult Establishment – Measuring the 500 feet distance requirement

- OPPN 7/1996: Adult Establishment – Places of Worship/Churches

- OPPN 6/1996: Adult Establishment – Applications and Complaint Procedure

- 1 RCNY 9000-1: Adult Establishments – Zoning

- Code Notes on Place of Assembly

## OTHER AGENCY APPROVALS

- Board of Standards and Appeals: for use variance

- City Planning Commission: certification required for waterfront area or block

- Department of Environmental Protection: hydrant flow test letter for new sprinkler installation; approval for SD1 and 2 or site connection; Notice to Proceed for lot with little 'e' designation

- NYC Fire Department: variance where Fire Code provisions not met

- Landmarks Preservation Commission: approval if landmark or in historic district

0102

# Exhibit 16

City-generated Map Showing the Gowanus
Canal Areas Which are Under Consideration
for Zoning Changes Allowing Residential and
Mixed Uses

# Gowanus Neighborhood Planning Study



Context Map

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
725 EATERY CORP., etc., *et ano.,*   :

        Plaintiffs,  :

   - against -     :   Civil Action No.
               02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,   :

        Defendants. :
-------------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,* :

        Plaintiffs,  :

   - against -     :   Civil Action No.
               02 CV 4432 (WHP)
THE CITY OF NEW YORK, et al.,   :

        Defendants. :
-------------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*  :

        Plaintiffs,  :

   - against -     :   Civil Action No.
               02 CV 8333 (WHP)
THE CITY OF NEW YORK,     :

        Defendant. :
-------------------------------------------------------------X

**DECLARATION OF MICHAEL BERZAK IN SUPPORT OF PERMITTING ISSUES
PRESENTED IN PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

   MICHAEL BERZAK, hereby declares the following pursuant to 28 USC §1746:

   1.  I, Michael David Berzak, have personal knowledge of each of the facts stated

herein and would so testify if called as a witness.  I make this declaration regarding the City's

zoning and building permitting procedures affecting adult entertainment businesses in support of

Plaintiffs' Motions for Preliminary Injunction.  (In a separate declaration I address issues relating to *sites* for adult businesses in New York City.)

2.        I have been retained by Plaintiffs' counsel (at my firm's customary professional hourly rates) to explain, based on my knowledge and experience as a licensed and New York City registered architect, the process for adult establishments to obtain zoning approval and building permits from the City of New York and my experiences with those processes.

3.        The statements below are true and accurate to the best of my knowledge, experience, and expertise as a licensed, professional architect.

## I.  EXPERIENCE

4.        I am and have been a licensed architect in New York State since August 1985.  I am registered with the National Council of Architectural Registration Boards ("NCARB") for national reciprocal licensing.   I am registered as an architect with the New York City Department of Buildings ("DOB"), as required by New York City Administrative Code ("NYCAC") § 27-140.1(a) and thus may present, file and seek DOB approval of building permit applications and plans.   Additionally, I have at various times also held architect licenses in Massachusetts, Connecticut, Pennsylvania, Virginia, the District of Columbia, and Michigan.  I am a member of the Board of the New York Chapter of the Society of American Registered Architects.  I am the owner and principal of Berzak Architects Associates P.C., an architectural firm located at 110 W. 34th Street, New York, New York 10001.  A copy of my curriculum vitae is attached as Exhibit 1.

5.        I have filed several *hundred* applications with the DOB for both the construction of new buildings and alterations of all types involving commercial developments, office, and residential projects in New York City.

2

6.      Both before and after the 2001 Amendments to the City's adult zoning legislation, I have filed numerous applications with the DOB for clients to establish and/or renovate uses presenting live adult entertainment, including both "adult establishments" (as defined in the various amendments to New York City's Amended Zoning Resolution ("AZR")) and 60/40 non-adult uses.  I am familiar with the City's original 1995 Adult Zoning Ordinance (City Council Resolution 1322 of 1995) and as amended over the years, both by the City Council and through numerous Technical Policy and Procedure Notices ("TPPNs"), Operations Policy and Procedure Notices ("OPPNs"), and Building Department Bulletins issued by the DOB, all of which I have routinely utilized in seeking to obtain permits for my clients.

7.      Since 2001, I have submitted 31 permit applications to the DOB for 60/40 businesses and nine for 100% adult businesses, including two in 2017 and two in 2018.

## II.  CONCLUSIONS

8.      The NYC permitting procedures to approve changes or modifications to the use of real property, both on their face and/or by well-established consistent practice, discriminate against and are significantly more onerous, costly and time-consuming for adult uses compared to their non-adult business counterparts (seemingly only because they are adult businesses).  This is so despite the fact that except for special adult zoning considerations, all of the relevant architectural, engineering and other building construction issues, standards and skills required for non-adult uses are the same as are required for adult uses.

9.      For the reasons explained herein, based on my extensive knowledge and experience in representing both adult entertainment businesses and non-adult businesses in filing and processing building permit applications before the DOB, it is my considered opinion that:

3

a.  The City's permitting scheme imposes at least two substantial unique burdens on adult businesses *not* imposed on any other types of businesses seeking building permits:

i.   It denies them the right in the permit process, available to every other type of business or land use, to submit building plans which have been *self-certified* by a qualified architect or engineer and thus bypass the lengthy plan approval review by DOB inspectors required where submitted plans are not self-certified. (Not being able to utilize *self-certified* plans dramatically increases the time it takes to get plans approved for adult businesses compared to the time required by all other types of business and uses (i.e., *other than* adult entertainment businesses) which elect to submit self-certified plans); and

ii.  It subjects adult businesses (and no others) to a time-consuming process of at least three months solely for zoning review by DOB legal counsel before DOB plan examiners will even *start* their review of submitted building plans.

b.  There is no justification I can discern for not allowing qualified registered architects to self-certify plans for adult businesses since the necessary building considerations and professional qualifications are identical for both adult and non-adult uses, and those same qualified, registered  architects are allowed to self-certify plans for all non-adult businesses.  This is particularly

0108

true given that the City independently audits *all self-certified* plan approval applications involving zoning changes for zoning compliance.

c.   The City's permitting scheme has within it a "sensitive use veto," i.e., a scheme whereby churches and schools (hereafter "sensitive uses") may be "established" while an adult business' permit application is pending, and thus defeat the adult business' permit application, *even if the adult application was filed first and even if filed significantly earlier.*   Worse, the City's permitting scheme provides mechanisms which guarantee that a church or school can be established and gain "priority" *far* more quickly than an adult business.

d.   Since multiple businesses presenting adult entertainment will be required to relocate simultaneously if enforcement of the 2001 Adult Zoning Amendments goes into effect, given the comparatively small number of permissible locations for those uses, it is likely that both displaced and any new adult businesses will be competing with each other for sites within 500 feet of each other.   Because only *one* such site may be approved within any 500 foot radius, the City's permitting system, by failing to give enforceable priority to the "first to file," in my opinion, creates a significant risk that a business which had expended a great deal of time, effort and money to secure a lawful location and which was the first to file the requisite permit application(s) would be prohibited from opening.

0109

### III.  THE CITY'S PERMIT APPLICATION PROCESS

### A.  Overview

10.     All of Plaintiffs' businesses would require a permit from the DOB in order to relocate and re-establish at new locations.  If, as is usually the case, alterations are required, then building permits would be necessary.  *See* New York City Administrative Code ("NYCAC") § 27-147 (a copy of which I attach as part of Exhibit 2 hereto).  In the rare case where no alterations are required, a proposed adult business would at least require what the City calls a "no work" permit.  *See* 1 RCNY (the DOB's Rules of the City of New York) § 9000-01 (attached as Exhibit 3).  Proposed adult businesses need to obtain at least *some* type of DOB permit for two reasons:

(a) **It is necessary for a required certificate of occupancy.** The conversion of a property from a non-adult use to an adult use subjects it to different zoning restrictions, and, under NYCAC § 27-217 (attached as Exhibit 4), any change of use which subjects a property to different zoning restrictions requires a new certificate of occupancy.  The DOB will not issue a new certificate of occupancy without either a building permit or a "no work" permit attesting, at a minimum, to compliance with all zoning requirements.

(b) **It is necessary to secure vesting/priority.**  Per 1 RCNY § 9000-01, the right to operate an adult establishment at any site in New York City does not "vest" until either a building permit or a "no work" permit approving the use has been granted.  Because the AZR prohibits adult establishments from locating within 500 feet of any house of worship, school, or other adult establishment, 1 RCNY § 9000-01(a) establishes a priority system for determining which of two potentially conflicting uses was established first.  Under 1 RCNY § 9000-01, the date of issuance of either a building permit or "no-work"

6

permit determines the date an adult or potentially disqualifying "sensitive use" (i.e., house of worship or school)  is deemed established.

11.     Issuance of a building permit to alter an existing building is a two-step process. The first step is to file an application with the DOB for "plan approval" and the second, once plan approval is obtained, is to file an application for issuance of the permit.

12.     The procedures for the first step, "plan approval," are contained in Title 27, Chapter 1, Article 9 of the NYCAC (entitled "Approval of Plans" and attached in full as Exhibit 5).

13.     The second separate step (application for permit issuance), is necessary because DOB's computers will not accept an application for issuance of any type of building permit until the applicant has obtained plan approval.  Additionally, NYCAC has *separate* procedures and time limits for *issuance* of any type of building permit following plan approval.   These procedures are found in Title 27, Chapter 1, Article 19 of the NYCAC (entitled "Issuance of Permits," relevant sections of which are attached as Exhibit 6).

### B.  The plan approval process

### 1. The "standard method"

14.     There are two different ways a *non-adult* business may seek plan approval for an alteration.  The first, which I call the "standard method," typically involves submitting an array of plans to the DOB for review of all proposed architectural, mechanical, structural, excavation (if necessary), plumbing and any other work, along with all relevant code requirements, laws, and rules, including zoning compliance.  This review process is extremely time-consuming. Initially, a DOB clerk reviews the submission package to determine whether it is complete.  If so, and if no other problems are found, the application is officially logged into the DOB's

computer, and the applicant told that the DOB will send an email in a few days scheduling an appointment two to three weeks thereafter with a qualified DOB plan examiner to go over the details of the plans.  However, not all plan examiners are qualified to review zoning issues.  So, if a permit application involves a change of use potentially triggering different zoning requirements, it usually takes considerably longer to obtain the requisite plan exam because of the lesser number of plan examiners qualified to review zoning issues.

15.     Unfortunately, the DOB strictly limits a plan examiner to 20 minutes with the applicant for any one plan exam, and that is never sufficient time to review all the plans.  Consequently, after the incomplete initial plan exam, the applicant must email the DOB and request *another* plan exam (even though, in reality, it is for a *continuation* of the first plan exam).  A few days later, as before, the DOB will send a response scheduling another plan exam two to three weeks after that notice is sent out.  This process then continues as many times as necessary to complete the review of all of the originally submitted plans.  In my experience, even in the simplest case *not* involving a change of use or any different zoning requirements, the process for an alteration application takes approximately three to four months to complete.  If the alteration involves a zoning change, an additional plan exam is typically necessary (and/or it takes longer to schedule a plan exam due to a shortage of qualified plan examiners), adding an average of another three weeks to the time to obtain plan approval.

16.     Pursuant to NYCAC § 27-144 (attached as part of Exhibit 5), the time allotted the DOB for plan approval of properly prepared plans is a maximum of 40 days with one allowed extension of 20 days.   Section 27-144 states, in pertinent part:

> **Approval of application and plans.** - [A]pplications and plans complying with the provisions of this code and other applicable laws and regulations shall be approved by the commissioner and *written notice of approval shall be given the applicant* promptly and *no later than forty calendar days after the submission*

0112

*thereof*, and applications and plans failing to comply with the provisions of this code and other applicable laws and regulations shall be rejected and written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than forty calendar days after the submission thereof, *except that on or before the fortieth day, the commissioner may on good cause shown, and upon notification to the applicant, extend such times for an additional twenty days*.

17.     However, in my 33 years' experience as a practicing architect in New York City, the *vast* majority of *all* fully complete and compliant building permit applications (both adult and non-adult) I have filed using the "standard method" (i.e., no self-certification), as well as all those with which I am familiar, have taken *more* than 60 days for plan approval.  However, for *multiple* reasons discussed below, fully complete and compliant applications for *adult* businesses take *substantially* longer to get DOB approval than comparable plans submitted by non-adult businesses using the same standard permit application method.

18.     Moreover, I am not aware of the City's ever having provided an applicant with the notice required by NYCAC § 27-144 that it is granting itself a 20 day extension, much less *several* of them.  In essence, my experience is that the DOB *routinely* ignores the time limits imposed by this section.  While this is true in all cases, and not merely those involving adult establishments, the DOB's practice of ignoring these time limits has a disproportionate impact on adult establishments because, as described below, the DOB's procedures routinely cause consideration of adult establishment plan approval applications to take far longer than those for non-adult businesses involving comparable work.

### 2. Self-certification

19.     The other – and *far* more expeditious – method for obtaining DOB plan approval, which is available to all uses *other* than adult establishment uses, is to submit plans which are self-certified for compliance by a registered architect or other qualifying professional.  Self-certification is expressly authorized by both the Administrative Code and by the DOB's

Buildings Bulletin 2016-010 (attached as Exhibit 7), by which a building permit applicant may bypass all or most of the entire time-consuming process described above.  In pertinent part, the Buildings Bulletin states:

> The Department of Buildings ... [has] a Professional Certification Program ... under which construction and other submittal documents are accepted with no Department examination based on the professional certification of an applicant who is a Registered Design Professional (RDP), i.e., a New York State licensed Professional Engineer or Registered Architect.
>
> ***
>
> The Department's acceptance of a submission under the professional certification program ... shall have the same force and effect as the approval of construction documents after full examination by the Department.  The Department will rely on the truth and accuracy of statements contained in the professionally certified application of the registered design professional … as verification of compliance with the provisions of the Zoning Resolution, the New York City Construction Codes, and all other applicable laws and rules.

20.     Not being able to self-certify a permit application makes the permitting process for adult businesses significantly longer (and because of the multiple in-office meetings with DOB examiners,  much more expensive) than for comparable non-adult businesses.

21.     Generally, *with self-certification*, plan approval is immediate after DOB has accepted an application as complete, compared to the average of three to four months *without self-certification* in simple cases and longer in more complicated cases. Although DOB requires *all* self-certified applications involving a zoning change to be audited by a zoning qualified DOB examiner – a process which takes between three to four weeks – adult business applications, *none of which may be self-certified*, still take an average of three to four months longer for plan approval than self-certified plans, and, even longer in complicated cases. All that extra time would be eliminated if adult business applications could be self-certified.

22.     Adult entertainment businesses have been expressly barred from self certifying their permits in a succession of OPPNs dating back to 1995 when the City's first adult zoning

10

ordinance was enacted.  *See, e.g.,* OPPN # 7/02 (Exhibit 8 *hereto*) which, in paragraph I-A, states:

> A.    Directive 14 and the Professional Certification of Application and Plans Process (OPPN #5/02) *shall not be used for any filing related to adult establishments*.   No permit issued under a professionally certified application shall be a basis for an establishment to secure its priority to operate as an adult establishment.  (Emphasis added.)

23.    This policy continues to be enforced today by the DOB.

24.    Accordingly, although I am a long-time DOB-registered architect who has filed several hundred building permit applications including innumerable self-certified plans for non-adult businesses, I have not been permitted to self-certify for *any* of the scores of applications I have filed for adult entertainment businesses. Nor would any other registered architect have been permitted to either. All filings must comply with the same code requirements whether self-certified or not. Why the DOB deems me and all other registered professionals competent to self-certify non-adult plans but will not permit us to do so for adult entertainment plans is inexplicable and, in my opinion, completely unjustified.

### C.  The permit approval process

25.    Once plans have been approved under either method, permits are usually issued expeditiously after paying the required fees and complying with minor ministerial requirements set forth in NYCAC §§ 27-150-152   (attached as part of Exhibit 2).   However, there is no *requirement* that they be issued expeditiously in *every* case.

26.    Although the DOB issues most permits promptly after plan approval, the NYCAC *allows* the DOB, in its unfettered discretion, up to an *additional* 60 days to *issue* a permit after plan approval.  Specifically, NYCAC § 27-191 (attached as part of Exhibit 6) states, in pertinent part:

11

**27-191 Approval of permit application. - . . .** [A]pplications complying with the provisions of this code and other applicable laws and regulations shall be approved by the commissioner and the permit issued promptly and not later than forty calendar days after the submission thereof, and applications failing to comply with the requirements of this code and other applicable laws and regulations shall be rejected and written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than forty calendar days after the submission thereof, except that on or before the fortieth day, the commissioner may on good cause shown, and upon notification to the applicant, extend such time for an additional twenty days.

### D.  Requirement of Pre-Approval of Adult Zoning by DOB Counsel

27.     In addition to the significant delay caused adult businesses by not being able to submit self-certified plans, they are subject to an even *greater* delay from *another* aspect of the permit approval process.

28.     Specifically, DOB's universal practice has been not even to *commence* review of an adult business applicant's plans until those plans have been approved for adult zoning compliance by DOB legal counsel.  Every application I have filed involving any adult entertainment has been forwarded immediately by DOB counter clerks to DOB legal counsel for review, and no examination of the plans has begun until zoning compliance has been verified by DOB legal counsel.

29.     There are *no time limits* for DOB legal counsel to render a decision regarding adult zoning compliance, making the whole plan approval process (of which DOB counsel zoning approval is an integral component) *de facto* exempt from NYCAC § 27-144's 60 day time limit.

30.     In my speediest case, DOB legal counsel took nearly three months to review and approve an application's adult zoning component, but, more typically, my cases have taken a minimum of three to four months to review and approve an application's adult zoning component.

12

31.     In my experience in filing permit applications with the DOB for 60/40 and 100% adult businesses, there have been *multiple* occasions when, without explanation, DOB legal counsel took far more than four months for the zoning review before the DOB would then process the remainder of the application.

### E.  "No Work" Permits

32.     Even if a location for a new or relocating adult establishment will require no significant alteration, the business must still obtain a new certificate of occupancy to indicate that the location is permissible for the new adult use.  In that circumstance, the business would not seek a building alteration permit, but what the DOB calls a "no work" permit, since no construction is proposed.

33.     "No work" permits are not unique to adult businesses, but are routinely sought for businesses requiring a new certificate of occupancy for a change of use, but which do not require alterations necessitating any building permits.  For example, I have obtained a "no work" permit to allow the "conversion" of a single office in a multistory building to a permissible "school" use.  Such "no work" permits are crucial for adult businesses since obtaining any type of DOB permit establishes "priority" under the City's adult zoning scheme.

34.     "No work" permits are expressly referenced both in paragraph I-C of the DOB's Operations Policy and Procedural Notice ("OPPN") # 7/02 relating to adult businesses (Exhibit 8 hereto) and also at p. 5 of a DOB "Code Note" entitled "Adult Establishment Applications,"[1] a true copy of which is attached hereto as Exhibit 9.

35.     To obtain a "no work" permit, only a cursory set of plans must be submitted, but the time for DOB to review even *those* plans will be dramatically less if they are self certified.

---

[1]   This was last published Jan. 6, 2016, but remains available online at http://www1.nyc.gov/assets/buildings/pdf/code_notes_adult_establishment.pdf.

0117

Self-certified plans are deemed approved on submission, subject only to the mandatory post-submission zoning audit referenced in Buildings Bulletin 2016-010, ¶ 4.  Review of non-self-certified plans in support of even a "no work" permit takes substantially longer, as planning examiners must not only review their zoning component, but every other component required to be approved for the new use as well (a process which is avoided for self-certified plans).

36.     Obtaining a "no work" permit for an *adult* use takes far longer than a "no work" permit for a non-adult use because of, among other things, the DOB's previously-referenced standard practice to send *every* permit application for an adult use to DOB legal counsel for zoning approval before DOB plan examiners will examine the submitted plans.  These delays caused by DOB counsel's zoning review of adult business' "*no work*" permit applications are the same as with any adult business' *building permit* applications for actual work and add a minimum of three to four extra *months* to the time required to obtain an adult establishment "no work" permit.

## IV.  SENSITIVE USE VETO

37.     In addition to the significant delays incurred by adult businesses during the permitting process, adult businesses face a potential calamity while they await approval of their permits.

38.     Because the City's AZR prohibits adult entertainment uses from being established within 500 feet of schools and houses of worship (i.e., sensitive uses) or any other adult uses, disputes arise as to which of these various competing uses was first established.  1 RCNY § 9000-01 sets forth procedures for determining which use has priority over the other and which can disqualify an applicant for a new adult business.  As to any uses created since August 8,

2001, 1 RCNY § 9000-01 provides that they shall be deemed established on the date that either a building permit or "no work" permit is issued for the use.

39.    Because, for the reasons set forth above, a non-adult use such as a school or church can obtain its building permits and/or "no work" permits much faster than an adult use, this "priority race" can severely prejudice whether a permit will ever be issued for a proposed new adult use.

40.    Specifically, a sensitive use will regularly be able to obtain its "no work" permit – and thus priority – *at least* three to four months faster than any prospective nearby adult use, regardless of whether the adult use had submitted its application *months* before the later-filed nearby disqualifying non-adult sensitive use.

41.    I am personally familiar with one situation where an adult business, in what was literally an 11th hour attempt to stop my client from opening a competing adult business, conspired with a local church to convert church-owned office and storage space near my client's site into worship space to try to disqualify my client's site and block issuance of the business' permits, and keep it from opening.  Fortunately, the competitor-sponsored church started its efforts too late in the process, so its attempt failed and my client's permits were issued. Nonetheless, the church's efforts caused the DOB to institute proceedings to revoke my client's permits which went on for approximately two years until the DOB finally ruled for my client. Had the blocking process started a bit earlier, it might well have prevailed and succeeded in disqualifying my client's site, even though my client's permit process had been ongoing for many months.

42.    While in the case above, the attempt to defeat my client's ability to open did not succeed, had the attempt been launched earlier in the permit process, it might well have

15

succeeded even though my client's application had been filed well before the opponent's. A rule creating a vesting option based on the *time of filing* an initial permit application (but requiring completion of construction within reasonable specified time periods) would eliminate this sensitive use veto problem, but the City has no such rule.

### V. UNIQUE TIME AND COSTS IN OBTAINING BUILDING PERMITS
### FOR ADULT LIVE ENTERTAINMENT BUSINESSES

43.     Based on my experience, it will take anywhere between 8 and 20 months to obtain an alteration permit for an adult live entertainment establishment, *significantly* longer than for comparable non-adult uses. This is for three distinct reasons:

      A.     The requirement of zoning pre-approval by DOB counsel (discussed above);

      B.     The ability of non-adult uses (but not adult uses) to bypass plan examination entirely by self-certification.

      C.     The significantly longer time taken by DOB plan examiners to review adult business plans compared to comparable plans for non-adult businesses which are not self-certified. Specifically, it typically takes DOB 6-8 weeks longer to process an adult business plan approval application than it takes to process a non-adult business application which is not self-certified. Moreover, this comparison doesn't even factor in the *additional* 3-4 months the adult business must first wait to get zoning approval from DOB's general counsel. This is because DOB scrutinizes the plans of adult businesses more closely than those of non-adult businesses and that typically results in two or more extra plan exams;

44.     This greater time required to obtain permits also makes the building permit process far more *costly* for adult uses. Specifically, the longer applications for plan

0120

approval and permits are pending, the more rent, etc. applicants must pay before opening for business or even knowing they'll be permitted to open.  Also, professional fees incurred prior to issuance of a building permit for large-scale entertainment projects can easily run well into the six-figure range, and if the permit is ultimately not approved, those fees will have been lost and similar sums will have to be spent for another location.  This is particularly significant for adult businesses because, unlike non-adult businesses, they are subject to a greater risk of being disqualified during their extended permit process by virtue of a zone change in their own or surrounding properties, or the establishment of a sensitive use or other adult use within 500 feet, before the adult business obtains its building alteration permit.

## VI.    TIME REQUIRED TO <u>OPEN</u>

### AN ADULT LIVE ENTERTAINMENT BUSINESS

44.    A client seeking to establish a new adult eating and drinking establishment in New York City (after first locating, negotiating for and securing a site believed to be legally permissible) must then anticipate the following:  first, all such businesses require at least several months for preparation of the requisite plans and then having them accepted by DOB for *initial* filing.  Thereafter, it will typically take from 8 to 20 months to obtain all required plan approvals and building permits.  After that, like any other business pursuing alterations, it must commence and complete construction and obtain interim and final inspections and sign offs from building inspectors before being issued a certificate of occupancy. The post construction final inspection/sign off process adds another 2-3 months to the entire permitting process necessary to open.  Finally, there are numerous post-construction start-up steps to actually get the business open, made more complicated by not being able to obtain any meaningful advance ability to have a realistic ETA for the permitting process.

45.    Based on all of the foregoing, in my experience, the total amount of time required to establish and open a new adult live entertainment business in New York City will typically range from 15 months to 2 years or even more, depending upon the complexity of construction for the proposed business.

17

46.     Additionally, if, in order to establish a new adult eating and drinking establishment, it were necessary to construct a new building on vacant land, or to first demolish an existing structure, it would take at least 3 to 4 years to complete such a project, though, I am not familiar with any adult business' having done so in New York.

## VII.    IMPACT OF HEIGHTENED PERMIT-RELATED TIME AND COSTS FOR ADULT BUSINESSES

47.     From a practical standpoint, and based on personal experience, the difficulty of finding a suitable, permissible, available and commercially viable property, coupled with no meaningful time limit or deadlines for DOB to complete plan approval, including for zoning, and to issue final permits and certificates of occupancy, results in a situation where no entrepreneur may reasonably anticipate a development schedule upon which to formulate any business plan for developing a new adult eating and drinking establishment in New York City.

48.     Additionally, lease commitments and rent, debt service, mortgage payments and other expenditures will continue indefinitely for a proposed location while permits applications are pending, with no meaningful ability to reasonably estimate a specific date for "being able to open" the adult business on a legally permissible site.

49.     In conclusion, establishing a new adult live entertainment establishment in New York City, assuming one can locate and secure an acceptable and permissible site, involves a long, and unpredictable process, fraught with delay, uncertainty, ongoing expenses and no ability to guarantee completion, let alone timely completion.  The cost, delay and risk for adult business are far greater than for any comparable non-adult business, epitomizing the expression "you can't fight city hall."

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of November, 2018, within the United States of America, at New York, New York.

_____
Michael Berzak

18

46.     Additionally, if, in order to establish a new adult eating and drinking establishment, it were necessary to construct a new building on vacant land, or to first demolish an existing structure, it would take at least 3 to 4 years to complete such a project, though, I am not familiar with any adult business' having done so in New York.

## VII.    IMPACT OF HEIGHTENED PERMIT-RELATED TIME AND COSTS FOR ADULT BUSINESSES

47.     From a practical standpoint, and based on personal experience, the difficulty of finding a suitable, permissible, available and commercially viable property, coupled with no meaningful time limit or deadlines for DOB to complete plan approval, including for zoning, and to issue final permits and certificates of occupancy, results in a situation where no entrepreneur may reasonably anticipate a development schedule upon which to formulate any business plan for developing a new adult eating and drinking establishment in New York City.

48.     Additionally, lease commitments and rent, debt service, mortgage payments and other expenditures will continue indefinitely for a proposed location while permits applications are pending, with no meaningful ability to reasonably estimate a specific date for "being able to open" the adult business on a legally permissible site.

49.     In conclusion, establishing a new adult live entertainment establishment in New York City, assuming one can locate and secure an acceptable and permissible site, involves a long, and unpredictable process, fraught with delay, uncertainty, ongoing expenses and no ability to guarantee completion, let alone timely completion.  The cost, delay and risk for adult business are far greater than for any comparable non-adult business, epitomizing the expression "you can't fight city hall."

I declare under penalty of perjury that the foregoing is true and correct.

Executed this **12**th day of November, 2018, within the United States of America, at New York, New York.

_____

Michael Berzak

18

0123

# Exhibit 1

Curriculum Vitae

# MICHAEL BERZAK R.A.

**BERZAK ASSOCIATES ARCHITECTS**
110  W 34TH ST  NEW YORK CITY, NY 10014
PH.212.505.3350 X5501   CELL: 917.681.2282
MBERZAK@BERZAKARCHITECTS.COM
WWW.BERZAKARCHITECTS.COM

Michael Berzak R.A. has the qualifications and experience that have come from over 30 years of diverse architectural projects for both private and public sector clients.  His portfolio includes a wide range of projects, including complete design and documentation of new commercial and residential buildings, full rehabilitation of existing buildings, exterior and interior renovations, and interior design.

Principal Michael David Berzak, RA is involved with all office projects, yet each is run by a team led by a project architect with the appropriate experience. This includes a comprehensive working knowledge of all local Administrative Code and Zoning Resolution issues that bear on the project, ensuring initial designs can safely and quickly move forward into development phases. With a focus on aesthetics and practicality for each unique client, BAA continually strives to generate distinctive solutions to design and code challenges.

The firm provides full scope professional services ranging from documentation of existing site and/or building conditions through schematic design, design development, construction documentation and coordination with various engineering consultants, to construction administration and project closeout for a number of national and local retailers, restaurants, corporate offices, residences, educational institutes and sports facilities.

Work History:

**Berzak Associates Architects, N.Y.C. 2005-Present**
Owner/Principal Architect

**Berzak-Gold, N.Y.C. 1997-2005**
Partner/Principal Architect
Architectural and Engineering firm

**Michael David Berzak Architect, N.Y.C.  1990-1997**
Owner/Principal Architect

**Berzak Partners, N.Y.C. 1985-1990**
Partner/Principal Architect

**Berzak Partners, N.Y.C. 1983-1985**
Architectural Drafting and design

**Energy Design Collaborative,  Hartsdale, NY 1980-1982**
Architectural Drafting and design for small firm focused on alternative enery design.

Professional Affiliation:
NCARB
National Council of Registered Architects

Education:
**B.Architecture** City College of NY 1983
**B.Science Architecture** City College of NY 1982
**B.Arts Political Science** Boston University 1977

# Exhibit 2

NYCAC Title 27 Subchapter 1, Article 10 (PERMITS)

0126

**ARTICLE 10 PERMITS**

**§[C26-109.1] 27-147 When permits required.-** No building construction or alteration work, foundation or earthwork, demolition or removal work, or plumbing work shall be commenced, and no signs or service equipment of the types listed in articles sixteen and seventeen of this subchapter shall be erected, installed, altered, repaired, or used, nor shall any service equipment of the types listed in article eighteen of this subchapter be used or operated, unless and until a written permit therefor shall have been issued by the commissioner. The provisions of this section shall not apply, however, to minor alterations and ordinary repairs, as defined and delineated in article five of this subchapter or to work or equipment exempted from permit requirements under the provisions of sections 27-176, 27-179, 27-184, and 27-189 of this subchapter.

**§[C26-109.2] 27-148 Classification of permits.-** For the purposes of this code, permits shall be classified as follows:

    **(a)** **New building permits**: for the construction of new buildings, as provided in article eleven of this subchapter.

    **(b)** **Alteration permits**: for the alteration of existing buildings, as provided in article twelve of this subchapter.

    **(c)** **Foundation and earthwork permits**: for the construction or alteration of foundations, including earthwork excavation and fill, as provided in article thirteen of this subchapter.

    **(d)** **Demolition and removal permits**: for the demolition or removal of existing buildings, as provided in article fourteen of this subchapter.

    **(e)** **Plumbing permits**: for the installation or alteration of plumbing and plumbing systems including gas piping, as provided in article fifteen of this subchapter.

    **(f)** **Sign permits**: for the erection or alteration of signs and sign installations, as provided in article sixteen of this subchapter.

    **(g)** **Equipment work permits**: for the installation or alteration of service equipment, as provided in article seventeen of this subchapter.

    **(h)** **Equipment use permits**: for the use and operation of service equipment, as provided in article eighteen of this subchapter.

\*\* **§[C26-109.3] 27-149 Separate permits required**.- Separate permits shall be required, as provided above, except that separate permits for foundations and earthwork, or for the installation or alteration of service equipment, other than fire suppression piping systems, shall not be required whenever plans for such work are included in and form a part of the plans for the construction of new buildings or the alteration of existing buildings.
*** Local Law 107-1993.*

\***§[C26-109.4] 27-150 Application for permit.-** All applications for permits shall be submitted on forms furnished by the department, and shall be accompanied by the required fee. The application shall contain a general description of the proposed work or equipment, its location, and such other pertinent information as required pursuant to section 27-198.1 or as the commissioner may require.
**Local Law 76-1985, language juxtaposed per Ch. 907-1985.*

**§[C26-109.5] 27-151 Applicant.-** Applications for permits shall be made by or in behalf of the owner or lessee of the buildings; and if made by a person other than the owner, the application shall be accompanied by a signed statement of the applicant declaring that he or she is authorized by the owner to make the application. The full names of the owner, lessee, and applicant, and of the principal officers thereof, if a corporation, shall be set forth in the application.

**§[C26-109.6] 27-152 Other application requirements**.- In addition to the foregoing general requirements, applications for permits shall be subject to the further requirements of articles eleven through eighteen of this subchapter, as the same may be applicable.

\*\* **§[C26-109.7] 27-153 Place of filing applications.-** Except as otherwise provided by rule, applications for permits and accompanying papers and plans shall be filed in the department office in the borough in which the work or equipment is located. Applications shall be numbered and docketed promptly as received; and for purposes of identification and reference, all such papers shall be marked with the block and lot number of the property to which they apply, and with street and house number where possible. ***Local Law 107-1993.*

**§[C26-109.8] 27-154 Amendments to applications.-** Subject to the limitations of section 27-155 of this article, amendments to permit applications and any accompanying plans and papers may be submitted at any time before final inspection of the work or equipment is completed; and such amendments shall be deemed part of the original permit application and shall be filed therewith.

**§[C26-109.9] 27-155 Time limitation of application.-** An application for a permit shall be deemed to have been abandoned twelve months after date of submission, unless such application has been diligently prosecuted after rejection in whole or in part, or a permit shall have been issued under article nineteen of this subchapter except that the commissioner may, for reasonable cause, grant extensions of time for additional twelve month periods.

# Exhibit 3

1 RCNY § 9000-01

# 1 RCNY §9000-01

## CHAPTER 9000

### Zoning

**§9000-01 Adult establishments.**

Dates of establishment and discontinuance of adult establishments, houses of worship, and schools for the purposes of sections 32-01 and 42-01 of the zoning resolution. In determining whether an adult establishment may lawfully be established at a a location pursuant to sections 32-01 and 42-01 of the zoning resolution, the department will use the following criteria to determine the dates of establishment and discontinuance for adult establishments, houses of worship and schools located or proposed to be located within 500 feet of each other.

(a)  The date of establishment of an adult establishment, house of worship, or school in existence and operating prior to August 8, 2001 shall be the date of issuance of an appropriate department permit or, if no permit was required, the date that it commenced operation, as determined by the department.

(b)  Except as otherwise provided in subdivision a of this section, the date of establishment of an adult establishment, house of worship, or school shall be the date of issuance of an appropriate department permit, subject to the following qualifications:

   (1)  With respect to a new building permit or alteration permit:

      (i)  significant progress must be shown toward completion of the work under the permit. For the purposes of this paragraph, the term "significant progress" means the issuance of a temporary certificate of occupancy or, if applicable, department signoff of the work within one year of issuance of the permit, except that upon application, the commissioner or his or her designee, may extend the one year period in accordance with subdivision c of this section for a period of time not exceeding one year, and

      (ii)  the use or operation for which the building is constructed or altered must commence within six months after the issuance of a temporary certificate of occupancy or, if applicable, within six months after a department signoff that the work has been completed, except that upon application, the commissioner or his or her designee, may extend the six month period in accordance with subdivision c of this section for a period of time not exceeding six months.

   (2)  With respect to applications for permits filed solely to establish priority, where no work requiring a building permit is proposed, the use or operation for which the permit is issued must commence within two months of the issuance of such permit, except that upon application, the commissioner or his or her designee may extend such two month period in accordance with subdivision c of this section for a period of time not exceeding two months.

(c)  An extension of time pursuant to subdivision b of this section may be granted where the permittee submits an application no later than 30 days prior to the expiration of the applicable time period together with satisfactory evidence that significant progress or the commencement of use or operations within the applicable time period is impracticable. The commissioner or his or her designee shall make a determination and notify the applicant in writing of his or her determination not later than 30 days after receipt of the application by the department. If the application is denied, the commissioner or his or her designee shall state the reason(s) therefor. If the commissioner or his or her designee fails to act upon the application within such 30-day period, the application shall be deemed to be granted.

(d)  An adult establishment, otherwise in compliance with the zoning resolution, may be established within 500 feet of a discontinued adult establishment, house of worship or school. For the purposes of this subdivision, once established, an adult establishment, house of worship, or school shall not be deemed to be discontinued until it has ceased operation for a continuous period of one year or longer.

(e)  The time periods set forth in this section for significant progress of work, or for commencement of operations shall commence to run as of the effective date of this section or issuance of the permit, whichever is later.

# Exhibit 4

NYCAC § 27-217

**ARTICLE 22 CERTIFICATES OF OCCUPANCY**

**§[C26-121.5] 27-217 Change of occupancy or use.-**
  (a) No change shall be made in the occupancy or use of an existing building which is inconsistent with the last issued certificate of occupancy for such building, or which would bring it under some special provision of this code or other applicable law or regulation, unless a new certificate of occupancy is issued by the commissioner certifying that such building or part thereof conform to all of the applicable provisions of this code and all other applicable laws and regulations for the proposed new occupancy or use.
  (b) Except as provided by law, a new certificate of occupancy shall not be required where the change of use is within the same use group as listed in the amended zoning resolution. Where a building exceeds three stories in height and the change does not exceed twenty per cent of the total floor area, an amendment to the existing certificate of occupancy for such building shall be issued by the commissioner certifying that the proposed new occupancy and use conforms to the provisions of the laws governing building construction and that the proposed use will not be in conflict with any provisions of the labor law, multiple dwelling law or the zoning resolution.

# Exhibit 5

NYCAC Title 27 Subchapter 1, Article 9 (APPROVAL OF PLANS)

ARTICLE 9 APPROVAL OF PLANS

§[C26-108.1] 27-138 Separate approval of plans required.- Whenever plans are required to be submitted in connection with applications for work permits, as provided in articles ten through seventeen of this subchapter, separate application shall be made for the approval of the plans therefor. The application may be made at or prior to the time of submitting the work permit application.

§[C26-108.2] 27-139 Application for approval of plans.- Applications for approval of plans shall be made on forms furnished by the department, and shall be accompanied by the required fee. The application shall contain a general description of the proposed work, its location, and such other pertinent information as the commissioner may require. All applications for approval of plans for any new construction, in which plumbing fixtures are to be installed, shall be accompanied by the following:

    1.   Information as to the availability of a public sewer system.

    2.In the event that a private sewage treatment plant is proposed, evidence of submission of plans for approval of such plant to the department of environmental protection and the department of health as required by law[shall be submitted. In the case of plans for the construction of new buildings or the alteration of existing buildings, separate application may be made for the approval of:

    (a) the lot diagram showing compliance with the zoning resolution, as provided in paragraph one of subdivision (a) of section 27-157 of article eleven of this subchapter
    (b) the foundation plans, as provided in paragraphs one and seven of subdivision (b) of section 27-157 of article eleven of this subchapter;
    (c) the floor and roof plans showing compliance with exit requirements, as provided in paragraph three of subdivision (a) of section 27-157 of article eleven of this subchapter;
    (d) the detailed architectural, structural and mechanical drawings, as provided in subdivisions (a) through (c) of section 27-157 of article eleven of this subchapter. **Local Law 65-1996.

*§[C26-108.3] 27-140 Applicant.- Applications for approval of plans shall be made in behalf of the owner or lessee or condominium unit owner or cooperative shareholder by the person who prepared or supervised the preparation of the plans, and shall be accompanied by a signed statement of the owner, condominium board of managers or cooperative board of directors stating that the applicant is authorized to make the application. In the case of applications for approval of plans for the construction or alteration of buildings, for the installation or alteration of plumbing or plumbing systems, or for the installation or alteration of service equipment which involves changes in the structure of the building or requirements for fire protection, light, heat, ventilation, or means of egress, the application shall be made by protection, light, heat, ventilation, or means of egress, the application shall be made by an architect or engineer. The full names and addresses of the owner, including the condominium unit owner or cooperative shareholder, lessee, and applicant, and of the principal officers thereof, if a corporation, shall be set forth in the application. *Local Law 72-1991.

§27-140.1 Registration requirements.-
    (a) No person, other than those described in subdivision (c) of this section, may present, submit, furnish or seek approval of applications for approval of plans or remove any documents from the possession of the department, without first having registered with the department his or her name, address and company affiliation on a form to be furnished by the department. Consistent with article twenty-three-A of the correction law, registration may be denied to any person who has been convicted of a criminal offense relating to bribing or receipt of a bribe, giving or receiving unlawful gratuities, official misconduct, or other corruption-related acts. The commissioner, after due notice and a hearing before the office of administrative trials and hearings, pursuant to section one thousand forty-eight of the charter and rules established thereunder, shall have the power to revoke, suspend or limit the registration of any person upon a finding that such person has willfully or negligently violated the rules of the department or has engaged in any misconduct arising out of his or her business dealings with the department. Misconduct shall be defined by the rules of the commissioner promulgated pursuant to subdivision (d) of this section.

(b) No person shall use the term "registered with the department of buildings", "registered" or any similar representation in such a manner as to convey the impression that such person is registered with the department of buildings unless such person is registered in accordance with the provisions of this section.

(c) The following persons are exempt from the provisions of this section:

(i)  the owners of the premises for which the building applications are filed including, in the case of partnerships or corporations, the general partners or the principal officers of the corporation. Principal officers of a corporation shall include the president, vice presidents, secretary and treasurer;

(iii) the lessees of such premises authorized by the owner to file building applications; condominium unit owners authorized by the condominium board of managers to file building applications;

(iv) cooperative shareholders authorized by the cooperative board of directors to file building applications;

(v)  registered architects licensed by the New York state department of education;

(vi) professional engineers licensed by the New York state department of education;

(vii) attorneys admitted to practice in New York state; master plumbers licensed pursuant to article two of subchapter two of chapter one of title twenty-six of this code;

(viii)     master fire suppression piping contractors licensed pursuant to article two of subchapter two of chapter one of title twenty-six of this code; and

(ix) master electricians licensed pursuant to subchapter one of chapter three of title twenty-seven of this code.

(d) the commissioner shall promulgate rules for the proper and efficient administration and enforcement of this section.
*Local Law 72-1991.*

## §[C26-108.4] 27-141 Plans.- With each application for approval of plans, there shall be submitted such number of copies of the plans as the commissioner may require. All plans shall comply in form and content with requirements of this code and other applicable laws and regulations.

## §[C26-108.5] 27-142 Applicant's statement.-

(a)     A signed statement of the applicant shall also be submitted with the application, stating that he or she is authorized by the owner to make the application and that, to the best of his or her knowledge and belief, the plans and the work shown thereon comply with the provisions of this code and other applicable laws and regulations. If there are practical difficulties in the way of carrying out the strict letter of the law, the applicant shall set forth the nature of such difficulties in such signed statement.

(b)     In addition to all other requirements of this article, an application for approval of plans for the alteration of an existing building or the construction of a new building shall be accompanied by a signed statement of the applicant certifying either (1) that the building to be altered, or the site of the new building, as the case may be, contains no occupied housing accommodations subject to control under chapter three of title twenty-six of the administrative code, or (2) that the owner has notified the city rent agency of his or her intention to file such plans and has complied with all requirements imposed by the regulations of such agency as preconditions for such filing.

## §[C26-108.6] 27-143 Examination of application and plans.- All applications for approval of plans and all plans submitted in connection therewith, and any amendments thereto, shall be numbered, docketed and examined promptly after their submission. The examination shall be made under the direction of the commissioner for compliance with the provisions of this code and other applicable laws and regulations. The commissioner may at his or her discretion, when the application is submitted by an architect or an engineer, designate portions of the examination for limited supervisory check. The personnel employed for examination of plans shall be qualified engineers or architects experienced in building construction and design.

## *§[C26-108.7] 27-144 Approval of application and plans.- Except as otherwise provided in section 27-198 and section 27-198.1 of article nineteen of this subchapter, applications and plans complying with the provisions of this code and other applicable laws and regulations shall be approved by the commissioner and written notice of

approval shall be given the applicant promptly and no later than forty calendar days after the submission thereof, and applications and plans failing to comply with the provisions of this code and other applicable laws and regulations shall be rejected and written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than forty calendar days after the submission thereof, except that on or before the fortieth day, the commissioner may on good cause shown, and upon notification to the applicant, extend such times for an additional twenty days. Whenever an application and accompanying plans have been rejected and are thereafter revised and resubmitted to meet stated grounds of rejection, the revised application and plans shall be approved if they meet the stated grounds of rejection, or shall be rejected if they fail to meet the stated grounds of rejection; and written notice of approval or written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than twenty calendar days after the resubmission thereof. *Local Law 76-1985, language juxtaposed per Ch. 907-1985.*

**§[C26-108.8] 27-145 Conditional approval of plans.-** All approvals of plans given prior to the submission of the work permit application shall be conditioned upon and subject to compliance with the requirements of this code and other applicable laws and regulations in effect at the time of submission of the permit application, and shall also be conditioned upon the submission of the work permit application not later than twelve months after the date of notice of plan approval.

**§[C26-108.9] 27-146 Endorsement of approved plans.-** All plans and amendments thereto, when approved by the commissioner, shall be stamped or endorsed approved under the official seal of the department, followed by a notation of the date of plan approval. One set of such approved plans shall be retained in the department office of the borough in which the building premises or equipment is located; and after the issuance of a work permit, a second set of such approved plans shall be retained at the place where the building premises or equipment is located, and shall be open at all times to inspection by the commissioner and his or her authorized representatives until final inspection of the work is complete

# Exhibit 6

Relevant Portions of
NYCAC Title 27 Subchapter 1, Article 19 (ISSUANCE OF PERMITS)

**ARTICLE 19 ISSUANCE OF PERMITS**

**§[C26-118.1] 27-191 Approval of permit application.-**All applications for permits and any accompanying plans and papers, including any amendments thereto, shall be examined promptly after their submission for compliance with the provisions of this code and other applicable laws and regulations. Except as otherwise provided in section 27- 198 of this article, applications complying with the provisions of this code and other applicable laws and regulations shall be approved by the commissioner and the permit issued promptly and not later than forty calendar days after the submission thereof, and applications failing to comply with the requirements of this code and other applicable laws and regulations shall be rejected and written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than forty calendar days after the submission thereof, except that on or before the fortieth day, the commissioner may on good cause shown, and upon notification to the applicant, extend such time for an additional twenty days. Whenever a permit application has been rejected and is thereafter revised and resubmitted to meet stated grounds of rejection, the revised application shall be approved if it meets the stated grounds of rejection, or shall be rejected if it fails to meet the stated grounds of rejection; and the permit shall be issued or written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than 20 calendar days after the resubmission thereof.

**§[C26-118.2] 27-192 Approval of application in part**.-The commissioner may approve the application and issue a permit for construction of part of a building, including foundations, before complete plans and specifications for the entire building have been submitted and approved, provided that adequate information and detailed plans or statements have been submitted complying with the provisions of this code and any other applicable laws and regulations, and provided further that the holder of such permit shall proceed with the building operation at his or her own risk and without assurance that a permit for construction of the entire building will thereafter be issued**.**

**§[C26-118.3] 27-193 Signature to permit.-** Every permit issued by the commissioner shall have his or her signature affixed thereto; but the commissioner may authorize any subordinate to affix such signature.

**§[C26-118.4] 27-194 Posting of permit.-** A permit card bearing the permit number, application number, location of the premises or equipment for which the permit is issued, and such other information as the commissioner may determine, shall be furnished the applicant in connection with the issuance of the permit; and such permit card shall be posted in a conspicuous place at such location open to public inspection during the entire time of the prosecution of the work or the use and operation of the equipment, or until the expiration of the permit. No such permit card shall be posted or displayed at any location other than the location of the premises or equipment for which the permit was issued.

**§[C26-118.5] 27-195 Notice of commencement of work.-** At least twenty-four hours written notice shall be given to the commissioner before the commencement of any work for which a permit has been issued. Before any work is commenced on an item of construction requiring controlled inspection, all persons responsible for such controlled inspection shall be notified in writing at least seventy-two hours prior to such commencement.

**\*§[C26-118.6] 27-196 Expiration of permit.-**Except as otherwise provided in section 27-190 of article eighteen of this subchapter, all permits issued by the commissioner shall expire by limitation and become invalid if the permitted work or use is not commenced within twelve months from the date of issuance of the permit or, if commenced, is suspended or abandoned for a period of twelve months thereafter. All permits for work in a special flood hazard area as delineated in reference standard RS4-4 shall expire if the actual start of permanent construction has not occurred within one hundred eighty-eight days of the date on which such permit is issued. The commissioner may, however, upon good cause shown, reinstate a work permit at any time within a period of two years from the date of issuance of the original permit, provided that the work shall comply with all the requirements of this code and other applicable laws and regulations in effect at the time application for reinstatement is made, and provided further that the applicant shall pay a renewal fee in accordance with section 26-211 of the code.
*Local Law 38-1990; Local Law 33-1988.*

**\*\*§[C26-118.7] 27-197 Revocation of permit.-** The commissioner may, on notice to the applicant, revoke any permit for failure to comply with the provisions of this code or other applicable laws and regulations; or whenever there has been any false statement or any misrepresentation as to a material fact in the application or accompanying plans and papers upon the basis of which the permit was issued; or whenever any permit has been issued in error and

conditions are such that a permit should not have been issued. Such notice shall inform the applicant that he or she shall have the right to present to the commissioner or his or her representative within five business days or personal service or ten days of the posting of service by mail information as to why the permit should not be revoked. The commissioner may suspend a permit immediately when the commissioner has determined that an imminent peril to life or property exists and shall at the same time notify the applicant that the permit shall be revoked and that the applicant has the right to present to the commissioner or his or her representative within five business days of personal service or ten days of the posting of service by mail information as to why the permit should not be revoked.

**Local Law 11-1988.*

# Exhibit 7

DOB's Buildings Bulletin 2016-010



**Buildings**

NYC Buildings Department
280 Broadway, New York, NY 10007

Rick D. Chandler, P.E., Commissioner



# BUILDINGS BULLETIN 2016-010
## Operational

| | |
|---|---|
| **Supersedes:** | Operations Policy and Procedure Notice #1/04 |
| **Issuer:** | Thomas Fariello, RA<br>First Deputy Commissioner |
| **Issuance Date:** | April 8, 2016 |
| **Purpose:** | This bulletin revises the established operational procedures for the Professional Certification Program, which allows a Professional Engineer (PE) or Registered Architect (RA), as an applicant, to certify the job's compliance with the New York City Construction Codes, Zoning Resolution and all applicable laws and rules on related application(s). |
| **Related Code Section(s):** | AC 28-104.2.1    AC 28-104.7    1 RCNY 21-02    MC 106    PC 106<br>AC 28-104.2.2    AC 28-104.8    BC 107         FGC 106    FC 105 |
| **Subject(s):** | Professional Certification Program |

## 1. Background

The Department of Buildings (Department) instituted a Professional Certification Program since 1995, under which construction and other submittal documents are accepted with no Department examination based on the professional certification of an applicant who is a Registered Design Professional (RDP), i.e. a New York State licensed Professional Engineer or Registered Architect (PEs/RAs). Participation in the program calls for the display of appropriate standards of professional competence and integrity by the licensed professional who must have both knowledge and experience with the New York City Construction Codes, the New York City Zoning Resolution, the Department's rules, and any other applicable laws and rules.

## 2. Professional Certification Program and Limitations

By participating in the program, the applicant acknowledges his or her obligation to comply with the construction documents and submission requirements set forth in sections AC 28-104.7 and 28-104.8; Building Code section 107; Mechanical Code section 106; Fuel Gas Code section 106; Plumbing Code section 106; and Fire Code section 105.

All professionally certified applications or submissions of construction documents for architectural, mechanical, structural, excavation and earthwork, and plumbing work must be complete, coordinated, and in accordance with code, zoning and all other applicable laws and rules. Refer to Plan Examination Guidelines for Minimum Requirements for Review of Design Drawings (available on DOB website: http://www1.nyc.gov/assets/buildings/pdf/plan_exam_user_guide.pdf).

build safe | live safe

0141

The Department's acceptance of a submission under the professional certification program and in accordance with sections AC 28-104.2.1 and 28-104.2.2, shall have the same force and effect as the approval of construction documents after full examination by the Department. The Department will rely on the truth and accuracy of statements contained in the professionally certified application of the registered design professional, and any amendments submitted in connection therewith, as verification of compliance with the provisions of the Zoning Resolution, the New York City Construction Codes, and all other applicable laws and rules.

### A. Excluded Work
The following work applications cannot be professionally certified:
i.   Subdivisions.

ii.  Full demolitions and applications containing demolition work that includes the use of mechanical equipment, other than handheld equipment, per BC section 3306.5.

iii. Applications for work on projects that require, or are related to projects that require approval, permit, or another type of determination from the Board of Standards and Appeals (BSA).

### B. Project Responsibility and Withdrawal
The applicant, a RDP who is participating in the program, shall be responsible for the project's code compliant design until a letter of completion or certificate of occupancy is issued, except as provided below:

1. **Withdrawal**:  If an applicant withdraws responsibility from a professionally certified project, the Department must be notified immediately. All work shall stop and no permit renewal, letter of completion or certificate of occupancy shall be allowed until a successor RDP is designated as the applicant of record; or

2. **Revocation:**  When the Department revokes an applicant's professional certification privileges, the applicant may continue responsibility only for applications that were permitted prior to the revocation, and provided a PAA is not filed after the revocation. See section 5 of this Bulletin.

### C. Zoning Audit of New Building, Alteration Type-1 and Enlargements
Professionally certified New Building, Alteration Type 1 and other enlargement applications are subject to a zoning audit by the Department, prior to acceptance, as outlined in Section 4 of this Bulletin.

## 3.  Operational Guidelines

### A.  Application Submission for Acceptance

In addition to an application complying with all of the applicable requirements and guidelines in effect at the time of its submission, a professionally certified application of construction documents and other submittals must also include the following:
i.   Professional and Owner Certification: Certification from the RDP and statement and signature of the owner to submit a professionally certified application.

ii.  Required Items Checklist for Professional Certification.

iii. Approvals, permits and/or certifications from other governmental agencies submitted prior to acceptance of the professionally certified application.

iv.  If applicable, any written determinations, easements and declarations, and zoning lot exhibits.

### B.  Permits

Once the professionally certified application is accepted and all applicable fees are paid, a permit will be issued.

build safe | live safe

0142

### C.  Post Approval Amendments

Any Post Approval Amendments (PAAs) shall be professionally certified. Such PAA submissions shall include all changes and amendments to the construction documents of the previously accepted application. PAAs shall be restricted to the following:

a)  Changes required in the previously accepted application's work due to unforeseen field conditions.

b)  Deliberate modifications, of a limited nature, to the project's initial scope of work.

c)  Changes needed to comply with audit comments, as outlined in Section 4.C of this Bulletin.

## 4.  Audit of Professionally Certified Applications

All professionally certified applications are subject to audit. An audit of a professionally certified application may be conducted at any time based on the following audit process.

### A.  Audit Process

A selection of professionally certified applications, including Post Approval Amendments, will be audited according to the following types:

i.   **Zoning Audits:** Prior to acceptance, all professionally certified New Building, Alteration Type 1, enlargement alteration applications and zoning-related PAAs, are subject to a zoning audit.

ii.  **Program Audits:** A representative sample of professionally certified applications, including PAAs, will be selected for audit upon issuance of permit(s).

iii. **Targeted Audits:** In addition to the above, the Department may perform a targeted audit of professionally certified applications based upon receipt of a complaint, evidence of non-compliance, or at the discretion of the Commissioner.

If the auditor finds no objection to the application, the audit of the selected application will be recorded as "Accepted" and no further action will be taken.

### B.  Failed Audits

If an auditor fails the application or conditionally accepts it with minor objections, an objection sheet is sent to the applicant, owner and filing representative. For failed audits, the Department may send a 15-day "Notice - Intent to Revoke" and in addition, a stop-work order may also be issued at the discretion of the Commissioner.

### C.  Resolving Objections

The applicant must resolve comments/objections with the auditor. The applicant may be required to file a PAA with the latest revision of the Additional Information (AI) form that clearly explains how the construction documents, forms, reports, certifications, etc., were added or modified to address all of the auditor's comments /objections.

### D.  Failure to Resolve Objections / Revocation of Permit

If the comments/objections are not resolved to the satisfaction of the auditor following the scheduled meeting, the Commissioner shall revoke the permit(s), approval, and/or acceptance of the application and construction documents.  If permit(s) have been issued, a stop-work order shall be issued at the discretion of the Borough Commissioner.

If the applicant fails to respond to the auditor, neglects to schedule a meeting to address any comments/objections, or if the applicant cannot resolve the issues in a timely manner, the Department may determine that any permit and/or acceptance of the construction documents was in

build safe | live safe

error, and the Commissioner may issue a Notice of Revocation letter and a stop work order, revoking the permit, approval and/or acceptance of the application and construction documents.

**Reinstatement:**

After an application is revoked, if the owner hires a new applicant to continue the project, a revised design drawing is required. However, if the owner wishes to continue the project with the same applicant, a revised design drawing may be required. The applicant and owner must obtain approval by the Commissioner to reinstate such an application and pay the applicable reinstatement fee.

5. **Discipline / Exclusion from the Professional Certification Program**

The Department may, after a hearing at the Office of Administrative Trials & Hearings, suspend, exclude or otherwise condition the professional certification privileges of an RDP as outlined in section AC 28-104.2.1.3.2 and 1 RCNY §21-02.  The Department will refer evidence of wrongdoing to the New York City Department of Investigation for criminal prosecution as warranted and to the New York State Office of Professional Discipline for their disciplinary action.

build safe | live safe

# Exhibit 8

OPPN # 7/02

ISSUANCE #619

OPERATIONS POLICY AND PROCEDURE NOTICE #7/02

| Date: | October 16, 2002 |
|---|---|
| Subject: | Adult Establishments -- Securing Priorities |
| Effective: | Immediately |
| Reference: | Zoning Resolution provisions relating to adult establishments |
| Supersedes: | OPPN 06/96 |
| Purpose: | To clarify procedures in order to ascertain whether a proposed adult establishment within 500 feet of or on the same zoning lot as another adult establishment is in violation of NYC Zoning Resolution ("ZR") §§32-01 and 42-01. |
| Specifics: | I. **APPLICANT**<br><br>A. Directive 14 and the Professional Certification of Application and Plans Process (OPPN #5/02) shall not be used for any filing related to adult establishments. No permit issued under a professionally certified application shall be a basis for an establishment to secure its priority to operate as an adult establishment.<br><br>B. ZR §§32-01 (c) and 42-01 (c) prohibit an adult establishment from locating within 500 feet of another adult establishment. ZR §§32-01 (d) and 42-01 (d) prohibit more than one adult establishment on a zoning lot.<br><br>For an adult establishment that began operating on or after August 8, 2001, a Department permit is required to secure its priority to operate as an adult establishment at a particular location. For an adult establishment that is identified by the Department as having been operating as a lawful adult establishment prior to August 8, 2001, a Department permit is not required to secure its priority. However, if an adult establishment operating prior to August 8, 2001 does not obtain a Department permit to secure priority, it might not be able to establish its priority to operate as an adult |

establishment.

Securing priority to operate as an adult establishment means that another adult establishment that subsequently proposes to locate or locates within 500 feet of it or on the same zoning lot will not be allowed.

C. For all filings relating to existing or proposed adult establishments, the applicant shall indicate in Section 16 (comments) of the PW1 application form that the filing is to create, alter, enlarge or extend an adult establishment or to erect a business sign accessory to an adult establishment or that the filing otherwise involves an adult establishment. Priority to operate as an adult establishment at a permitted location shall be as of the issuance date of the permit that authorizes the adult use.

To secure priority as an adult establishment when no work requiring a building permit is proposed, an applicant may file an Alteration (Alt.) III application with the Department and secure a "no work" permit.

D. A filing/application to secure priority as an adult establishment shall include the following:

1. a separate area diagram detailing all existing uses and block and lot numbers within 500 feet of the center line of the door(s) of the principal entrance of the proposed adult establishment or of the center line of the ground floor of the door(s) giving the most direct street access to the proposed adult establishment, including a statement that there are no churches or schools within the 500 foot radius;

2. a survey detailing the zoning districts within 500 feet of the center line of the door(s) of the principal

0147

entrance of the proposed
adult establishment or of
the center line of the
ground floor of the door(s)
giving the most direct
street access to the
proposed adult
establishment;

3.  a statement that no other
    adult establishment exists
    within 500 feet of the
    center line of the door(s) of
    the principal entrance of the
    proposed adult
    establishment or of the
    center line of the ground
    floor of the door(s) giving
    the most direct street
    access to the proposed
    adult establishment.

II.  **PLAN EXAMINER**

An objection shall be raised if: (1) there exists a
church, school, or another adult establishment
whether existing, permitted, or approved, within
500 feet of the proposed adult establishment; (2)
there is an adult establishment whether existing,
permitted, or approved, on the same zoning lot
as the proposed adult establishment; (3) the
proposed adult establishment is in or within 500
feet of a prohibited zoning district; or (4) the
proposed adult establishment fails to comply in
any other way with zoning or other applicable
provisions.

0148

# Exhibit 9

DOB Code Note (ADULT ESTABLISHMENT APPLICATIONS)



# Adult Establishment

Applications



**Bill de Blasio**
Mayor

**Rick D. Chandler, PE**
Commissioner

# ADULT ESTABLISHMENT
## Applications

**An adult establishment is any commercial establishment which features the depiction, description, or display of "specified anatomical areas" or "specified sexual activities" to the degree defined in the Zoning Resolution.**

## Zoning

Regulations governing use and bulk vary according to zoning districts and outline requirements for lot coverage, floor area, open space, density, yards, height, setbacks, and parking.  As defined in Section 12-10 of the Zoning Resolution (1995), an adult establishment is a commercial establishment in which a substantial portion—at least 40 percent—of the establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, other adult commercial establishment, or any combination of the above.

When determining whether a substantial portion of a commercial establishment is used for adult purposes, the following factors are to be considered: (1) the amount of floor area and cellar space accessible to customers and allocated to such an establishment, and (2) the percentage of total floor area and cellar space accessible to customers and allocated to such establishment -- (**["adult" FA accessible to customers + "adult" cellar space accessible to customers] / [total FA accessible to customers]**).

When determining whether a substantial portion of a commercial establishment's stock-in-trade is devoted to specified materials, the following factors are to be considered: (1) the percentage of total stock accessible to customers that such materials represent -- (**["adult" stock accessible to customers] / [total stock accessible to customers]**), and (2) the amount of floor area and cellar space accessible to customers containing such materials, and (3) the percentage of total floor area and cellar space accessible to customers containing such materials -- (**["adult" FA accessible to customers + "adult" cellar space accessible to customers] / [total FA accessible to customers]**).

0151

# ADULT ESTABLISHMENT
## Applications

***This publication is a general overview of the requirements for this type of work. There may be additional, applicable Zoning Resolution, Construction Code, Multiple Dwelling Law, or Energy Code requirements.***

## FIRST STEPS

- PW1 review for scope

- Zoning District, Site Designations *(special purpose districts, waterfront area or block, flood hazard area, fire district, landmark district, little 'e' DEP designated block, wetlands, 200' within transit authority infrastructure)*

- Street status (ZR 12-10 "street" and GCL 36 frontage on a mapped street).  Also street width (wide or narrow) is important for zoning calculations in certain zoning districts

- Lot diagram *(dimensions of lot, building, yards, distance to corner street inter-section, street names, zoning use group, building occupancy group, construction classification, number of stories, buildings on adjacent lots, distance to nearest fire hydrant, curb cut application numbers, multiple dwelling classification)*

- Borough commissioner determinations, if applicable

## ADMINISTRATIVE

### DOB Forms

- PW1 (verify gross floor area, including cellar counted for fees)

- PW1-A (verify use groups and occupancy classifications)

- PW1-B

- TR1

- TR8

- ZD1

# ADULT ESTABLISHMENT
## Applications

### Applicant

- Directive 14 of 1975 and the Professional Certification of Application and Plans Process (BB 2016-010) may not be used for any filing related to adult establishments.

- In the PW1 comments section, the applicant shall indicate whether the filing he/she is making is to create, enlarge, or extend an adult establishment or to erect a business sign accessory to an adult establishment.

- The application shall also include a separate area diagram detailing all existing uses and block and lot numbers within a 500 feet of the center line of the door(s) of the principal entrance of the adult establishment or of the center line of the ground floor door(s) giving the most direct street access to the adult establishment.

### Adult Establishments, Houses of Worship, and Schools

Pursuant to the Zoning Resolution, adult establishments are not permitted in residence districts and certain commercial districts. In districts where adult establishments are permitted, the Zoning Resolution requires that such establishments be located at least 500 feet from a house of worship, a school (both also referred to as "sensitive receptors"), or another adult establishment that was previously established.  A "place of worship"/"church" is defined in PPN # 7/96. A "school" is defined in Section 12-10 of the Zoning Resolution.

Under 1 RCNY § 9000-01, the Department clarifies the criteria for determining the dates of establishment and discontinuance for adult establishments, houses of worship, and schools.  The following shall be used to determine the dates of establishment for adult establishments, houses of worship, and schools and to confirm the priority of an existing establishment.

### Permitted between August 8, 2001 and July 9, 2010

An adult establishment that obtained a new-building or alteration permit between August 8, 2001, and July 9, 2010, that has not obtained a Temporary Certificate of Occupancy (TCO), or if applicable a Department sign-off, by July 10, 2011, or started operating within six months of TCO or sign-off, will lose priority to operate as an adult establishment if a new adult establishment, house of worship, or school obtains a permit to be located within a 500-foot radius of the adult establishment.

If a house of worship or school obtained a new-building or alteration permit between

# ADULT ESTABLISHMENT
## Applications

August 8, 2001, and July 9, 2010, but did not obtain a TCO, or if applicable a Department sign-off, by July 10, 2011, or start operating within six months of TCO or sign-off, a permit may be issued for an adult establishment to be located within a 500-foot radius of the permitted house of worship or school.

## Permitted on or after July 10, 2010

An adult establishment that obtained a new-building or alteration permit on or after July 10, 2010, that has not obtained a TCO, or if applicable a Department sign-off, within one year from the date of permit issuance or started operating within six months of TCO or sign-off will lose priority to operate as an adult establishment if a new adult establishment, house of worship, or school obtains a permit to be located within a 500-foot radius of the adult establishment.

If a house of worship or school obtained a new-building or alteration permit on or after July 10, 2010, but did not obtain a TCO, or if applicable a Department sign-off, within one year from the date of permit issuance, or start operating within six months of TCO or sign-off, a permit may be issued for an adult establishment to be located within a 500-foot radius of the permitted house of worship or school.

## No-Work Permits Issued on or after July 10, 2010

Adult establishments authorized solely by a no-work permit that have not started operating within two months of permit issuance will lose priority to operate as an adult establishment if a new adult establishment, house of worship or school obtains a permit to be located within a 500-foot radius of the adult establishment.

If a house of worship or school authorized solely by a no-work permit issued on or after July 10, 2010 did not start operating within 2 months of permit issuance, a permit may be issued for an adult establishment to be located within a 500-foot radius of the permitted house of worship or school.

Note: Houses of worship, schools, and adult establishments in existence and operating lawfully prior to August 8, 2001, that have not ceased operations for a continuous period of one year or longer—as determined by the Department—are considered established.

0154

# ADULT ESTABLISHMENT
## Applications

In order to ascertain whether an adult establishment is within 500 feet of a sensitive receptor or another adult establishment, the Department of Buildings shall determine the 500-foot distance radially as set forth below.

### Measuring from the Adult Establishment
When measuring from the adult establishment, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of the adult establishment or from the centerline of the ground floor door(s) giving the most direct street access to the adult establishment.

### Measuring between Two Adult Establishments "A" and "B"
When measuring between two adult establishments, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of adult establishment "A" or from the center line of the ground-floor door(s) giving the most direct street access to adult establishment "A" to the center line of the door(s) of the principal entrance of adult establishment "B" or to the centerline of the ground floor door(s) giving the most direct street access to adult establishment "B."

### Measuring from the Adult Establishment to the Sensitive Receptor
With respect to measuring from the adult establishment to the sensitive receptor, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of the adult establishment or from the center line of the ground floor door(s) giving the most direct street access to the adult establishment to the outside face of the closest demising wall of the school or place of worship. If there are outdoor spaces directly adjacent to and customarily used by such school or place of worship, such as a school playground, the 500-foot distance shall be measured from the previously described door(s) of the adult establishment to the nearest boundary point of a school playground rather than the boundary of the school building. However, if a school or place of worship shares a zoning lot with an unrelated use such as a commercial office building, the office building portion of the zoning lot shall not be considered part of the sensitive receptor site.

## Required Statement

For all applications for adult establishments submitted on or after July 10, 2010, applicants must include the following statement on the plans:

"No school, house of worship, or other adult establishment has been established within 500 feet of the center line of the door(s) of the principal

# ADULT ESTABLISHMENT
## Applications

entrance of the proposed adult establishment or of the center line of the ground floor of the door(s) giving the most direct street access to the proposed adult establishment."

## BIS Required Items

- Check current Department memos and service notices

## ZONING

### Provisions of Zoning Resolution Relating to Adult Establishments

Prohibited Locations

Zoning Resolution Sections 11-30, 12-10, 32-00, 32-01, 42-00, 42-01, 42-55, 51-00, 52-00, and 72-00

Adult establishments are not permitted in the following districts or locations:

- on the same zoning lot as another adult establishment
- Residence districts
- Cl, C2, C3, C4, C5, C6-1, C6-2, or C6-3 zoning districts
- C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 zoning districts within 500′ of:
    - a house of worship;
    - a school;
    - a residence district;
    - a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 zoning district,
    - a manufacturing district, other than M1-6M district, in which new residence, new joint living-work quarters for artists, or new loft dwellings are allowed, under the provisions of the zoning resolution, as-of-right or by special permit or authorization; or
    - another adult establishment.

EXCEPTION: An adult establishment will not become non-conforming if a church or school locates within 500 feet of an existing adult establishment after April 10, 1995 (ZR §§ 32-01 and 42-01).

0156

# ADULT ESTABLISHMENT
## Applications

• Manufacturing districts in which residences, joint living-work quarters for artists, or loft dwellings are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization

• In all other manufacturing districts within 500′ of:

- a house of worship;
- a school;
- a residence district;
- a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 zoning district;
- a manufacturing district, other than M1-6M district, in which new residence, new joint living-work quarters for artists, or new loft dwellings are allowed, under the provisions of the zoning resolution, as-of-right or by special permit or authorization; or
- another adult establishment.

EXCEPTION: An adult establishment will not become non-conforming if a house of worship or school locates within 500 feet of an existing adult establishment after April 10, 1995 (ZR §§ 32-01 and 42-01).

## Size Limitations

Under no circumstances may an adult establishment exceed in total 10,000 square feet of floor area or cellar space not used for enclosed storage or mechanical equipment.

## Sign Limitations

Accessory business signs for adult establishments are permitted but are subject to the sign regulations otherwise applicable in Cl zoning districts except that the provisions of ZR § 32-69 shall not apply.

The maximum surface area of accessory business signs for adult establishments shall not exceed, in the aggregate, three times the street frontage of the zoning lot, but in no event more than 150 square feet per establishment, of which no more than 50 square feet may be illuminated, non-flashing signs.

0157

# ADULT ESTABLISHMENT
## Applications

In manufacturing districts, accessory business signs for adult establishments are also not permitted on the roof of any building and are not permitted to extend above curb level at height of greater than 25 feet per ZR § 42-57.

### Termination of Existing Adult Establishments (ZR § 52-77)

General rule: In all districts, non-conforming adult establishments, including any business signs accessory thereto, shall terminate within one year from October 25, 1995, or from such later date that the adult establishment or sign becomes non-conforming.

Exceptions: Any adult establishment which existed on October 25, 1995, and which conforms to provisions of the Zoning Resolution relating to adult establishments other than the provisions of all or any combination of paragraphs (c), (d), and (e) of ZR § 32-01 or paragraphs (c), (d), and (e) of ZR § 42-01 shall not be subject to ZR § 52-77 (Amortization provision).

The Board of Standards and Appeals may, pursuant to ZR § 72-40 and ZR § 52-734, extend the time period for amortization of an adult establishment or business sign accessory thereto under specified circumstances.

### Non-Conforming Uses (ZR § 52-38)

A lawful non-conforming use may not be changed to an adult establishment, except as provided in Section 32-01 or Section 42-01.

## MULTIPLE DWELLING LAW

- N/A

## FIRE CODE

- Standpipe Systems- FC 905

- Sprinkler Systems- FC 903

0158

# ADULT ESTABLISHMENT
Applications

## BUILDING CODE

### Egress – BC Chapter 10

- Occupant load – BC §1004

- Egress: width – BC §1005, doors – BC §1008

- Illumination – BC §1006

- Stairways: width, headroom, vertical rise – BC §1009; handrails – §1012

- Ramps: when used as an egress component – BC §1010; exterior ramps and stairways – BC §1026

- Guards – BC §1013

- Exit: exit access – BC §1014; exit and exit access doorways – §1015; exits – §1020; exit access travel distance – BC §1016; number of exits – BC §1021; exit discharge – BC §1027; corridors – BC §1018

- Exit enclosures – BC §1022

- Signage – BC §1030

### Fire Protection

- Height and area limitations – BC Table 503

- Fire separation of separate occupancies and tenancies – BC Table 508.4

- Construction Classification – BC Table 601, 602

- Fire-rated construction details – BC Chapter 7

- Sprinkler systems – BC §903

- Standpipe systems – BC §905

- Fire alarm and detection, emergency alarms and smoke control systems (smoke, alarms, controls and carbon monoxide) – BC §907, §908 and §909

- Fire protection plan requirements – BC §28-109.2

0159

# ADULT ESTABLISHMENT
## Applications

## ENERGY CODE

**See Code Notes on Energy Code.**

## APPLICABLE BULLETINS, DIRECTIVES, PPNS, MEMOS

• OPPN 1/1995: Adult Establishment – Moratorium on adult establishments

• OPPN 8/1996: Adult Establishment – Measuring the 500 feet distance requirement

• OPPN 7/1996: Adult Establishment – Places of Worship/Churches

• OPPN 6/1996: Adult Establishment – Applications and Complaint Procedure

• 1 RCNY 9000-1: Adult Establishments – Zoning

• Code Notes on Place of Assembly

## OTHER AGENCY APPROVALS

• Board of Standards and Appeals: for use variance

• City Planning Commission: certification required for waterfront area or block

• Department of Environmental Protection: hydrant flow test letter for new sprinkler installation; approval for SD1 and 2 or site connection; Notice to Proceed for lot with little 'e' designation

• NYC Fire Department: variance where Fire Code provisions not met

• Landmarks Preservation Commission: approval if landmark or in historic district

0160

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

725 EATERY CORP., etc., *et ano.,*          :

                 Plaintiffs,          :

       - against -          :          Civil Action No.
                                     02 CV 4431 (WHP)

THE CITY OF NEW YORK, et al.,          :

                 Defendants.    :
---------------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*          :

                 Plaintiffs,          :

       - against -          :          Civil Action No.
                                     02 CV 4432 (WHP)

THE CITY OF NEW YORK, et al.,          :

                 Defendants.    :
---------------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*   :

                 Plaintiffs,          :

       - against -          :          Civil Action No.
                                     02 CV 8333 (WHP)

THE CITY OF NEW YORK, et al.,          :

                 Defendants.    :
---------------------------------------------------------------X

_____

# DECLARATION OF HUGH KELLY, PhD, CRE
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
_____

1

Comes now Declarant, Hugh Kelly, who states under oath and under penalty of perjury as follows:

1.     I, Hugh Kelly, am the Director of the Graduate Program and Chair of the Curriculum Committee at the Fordham University Real Estate Institute at Lincoln Center in New York, New York.  I am also a special advisor to the Real Estate Institute.  I previously held appointments at New York University as a Clinical Professor of Real Estate, Clinical Associate Professor, and Adjunct Professor of Real Estate.  I have also served as an invited Guest Lecturer at various institutions of higher education, including Cornell University, Dartmouth College, the Wharton School at the University of Pennsylvania, Columbia University, the Kellogg School at Northwestern University, Harvard University (at both the Negotiation Project in Kennedy School of Government and the Graduate School of Design), Baruch College-CUNY, and Clemson University, where I was a Counselor in Residence.  I have been employed as a real estate educator in some capacity in higher education since 1984.

2.     I hold a PhD in urban economics and the built environment from the University of Ulster in Northern Ireland and a B.A. in Philosophy, issued magna cum laude, from Cathedral College in Douglaston, New York.  I also undertook graduate studies in Theology at Pontifical Gregorian University in Rome, Italy and in Philosophy at the New School for Social Research in New York, New York.  I have also completed professional studies through the Appraisal Institute, including Appraisal Principles and Practice I & II, Capitalization Theory and Techniques, Case Studies, Ethics and Standards of Professional Practice, and Report Writing.

3.     I have published more than 300 articles in professional publications and academic journals on the topic of real estate, including risk management, 24-hour cities, the commercial office space market, and the redevelopment of New York.  I have also served as the Editor-in-

0162

Chief of several well-respected real estate publications, including *Real Estate Issues* and *Landauer/CCIM Investment Trends Quarterly*.  I am the author or contributing author of four books addressing real estate markets, appraisal, and mathematics.

4.     I frequently lecture at international, national, and regional conferences of real estate and related industry associations, including the Mortgage Bankers Association (MBA), the Counselors of Real Estate (CRE), the National Council of Real Estate Investment Fiduciaries (NCREIF), the Building Owners and Managers Association (BOMA), The Institute of Real Estate Management (IREM), the Society of Industrial and Office Realtors (SIOR), the Association of Foreign Investors in Real Estate (AFIRE), the Commercial Investment Real Estate Institute (CCIM Institute), the National Network of Commercial Real Estate Women (CREW), the American Institute of Certified Public Accountants (AICPA), and the American Bar Association (ABA).  Of note, I recently spoke at the Belfast One City conference on "Lessons from New York's Revitalization."  I have also delivered talks on the United States' real estate industry in London, Paris, Berlin, Munich, Frankfurt, Amsterdam, Utrecht, and Toronto.

5.     My curriculum vitae, which lists selected publications, professional awards, and speaking engagements, is attached to this Declaration.

6.     I have been asked to opine as to the status of the Borough of Manhattan as a distinct real estate market within the City of New York.  Based on my education and experience as a real estate professor, educator, and practitioner, and as set forth below, it is my professional opinion that the Borough of Manhattan constitutes a distinct real estate market, particularly as to entertainment demand generally and adult entertainment demand in specific, which is separate and unique from the remaining boroughs in New York City.

0163

## I.  New York City Overview

### A.  Population Characteristics: Resident base for entertainment demand

7.     New York is America's most populous city and is its *de facto* economic capital. The city has a resident population of 8,537,673 (as of July 1, 2016), having grown by 4.4%, or 362,540 persons since the 2010 decennial census. It is a compact city of only 302.64 square miles, and has the highest population density of any U.S. city, at 27,013 per square mile. It is comprised of five boroughs, which are coterminous with five New York State Counties. For ease of reference, the borough and county names are:

| Table 1: NYC Borough and County Names | |
|---|---|
| **Borough Name** | **County Name** |
| Bronx | Bronx |
| Brooklyn | Kings |
| Manhattan | New York |
| Queens | Queens |
| Staten Island | Richmond |

8.     The extraordinary concentration of population within the New York City limits and its growth relative to the surrounding region are significant attributes of identity as the nation's premier 24-hour city, the live-work-play character that both real estate industry literature (such as the Urban Land Institute/PwC annual survey *Emerging Trends in Real Estate*) and academic publications (such as the *Journal of Real Estate Portfolio Management*) have examined as markets exhibiting superior commercial property performance.

9.     Such a large region has tremendous variety in its socio-economic structure, and this is evident clearly in the broad level of differences at the metro, citywide, and borough levels. The following table illustrates a number of those distinctions:

4

| Table 2: Selected Socio-Economic Measures of New York | | | | | | | |
|---|---|---|---|---|---|---|---|
| Variable | NY Metro | New York City | Manhattan | Brooklyn | Queens | Bronx | Staten Island |
| Population (2016) | 19,745,289 | 8,537,673 | 1,643,734 | 2,504,706 | 2,333,054 | 1,455,720 | 476,015 |
| Share of NYC total | 231.3% | 100.0% | 19.3% | 29.3% | 27.3% | 17.1% | 5.6% |
| Percent Change since 2010 | 2.4% | 4.4% | 3.6% | 5.0% | 4.6% | 5.1% | 1.6% |
| Population Density (per sq. mile) | 411.2 | 27,012.5 | 69,467.5 | 35,369.1 | 20,553.6 | 32,903.6 | 8,030.3 |
| Median Household Income ($) | 60,741 | 55,191 | 75,513 | 50,640 | 59,758 | 35,302 | 74,021 |
| Per Capita Income | 34,212 | 34,099 | 66,522 | 28,134 | 27,621 | 18,896 | 32,678 |
| Total Employer Establishments | 544,073 | 239,174 | 104,691 | 57,621 | 49,597 | 18,025 | 9,240 |
| Share of NYC total | 227.5% | 100.0% | 43.8% | 24.1% | 20.7% | 7.5% | 3.9% |
| Total Employment | 8,178,694 | 3,777,664 | 2,245.903 | 606,738 | 563,339 | 260,629 | 101,055 |
| Share of NYC total | 216.5% | 100.0% | 59.5% | 16.1% | 14.9% | 6.9% | 2.7% |
| Total Annual Payroll ($ millions) | 521,873 | 308,322 | 241,159 | 24,612 | 26,655 | 11,697 | 4,199 |
| Share of NYC total | 169.3% | 100.0% | 78.2% | 8.0% | 8.6% | 3.8% | 1.4% |
| Source: US Bureau of the Census, accessed at https://www.census.gov/quickfacts  on April 19, 2018. Shares of NYC totals calculated by researcher. NYC total employer establishments, total employment, and total annual payroll equal the sum of the five boroughs. Data are as reported for 2016. | | | | | | | |

10.     Manhattan's role as the city and region's central business district stands out in the data. With just 19.3% of the city's population, Manhattan is home to 59.5% (2.2 million) of New York City's 3.8 million jobs. The borough houses 43.8% of all employment establishments citywide, an indication that the average size of establishment (by number of employees) is about 36% larger than city's average (employment share divided by establishment share). Moreover, Manhattan's jobs generate a stunningly high 78.2% of New York City's total annual payroll. Manhattan not only concentrates economic activity, but income generation. Consequently, it is unsurprising that this borough has the highest median household income and per capita income, the latter measure by an exceptionally high margin over all other boroughs. Map 1 (Census

Tracts by Neighborhood Type) depicts the prevalence of high income households in Manhattan

neighborhoods south of 96th Street.



Source: Community Housing and Planning Council, "Making Neighborhoods" Report (2014)

11.     According to the Official Guide to New York City published by NYC & Co., the

destination marketing organization of the five boroughs:

> When people think of New York City, Manhattan is often the first place they
> picture. It's no wonder: the borough is home to big-name attractions, such as
> Central Park, the Empire State Building, St. Patrick's Cathedral, the High Line
> and One World Observatory; world-class museums, restaurants and concert halls;
> and the bright lights of Times Square and Broadway. But there's more to the
> borough than the obvious sights. Manhattan contains charming neighborhoods
> and hidden green spaces, trendy boutiques and classic bars.

6

12.     It is notable that this description highlights the mix of attributes. The economy, culture and entertainment, restaurants and shopping, parks and bars, all are essential ingredients of Manhattan's human ecosystem. The agglomeration of diverse elements, taken together and mutually reinforcing, is at the heart of Manhattan's vibrancy, a vibrancy that pumps energy throughout the citywide and regional economies.

**B.     Resident expenditure base for entertainment establishments**

13.     The economic relevance of the basic socio-economic description above to the issue of economic viability for entertainment venues requires an analytical focus on how population and income characteristics translate into consumer expenditures, broadly, and then specifically as entertainment-related expenditures. This analytical specification is developed in Table 3: Distribution of Entertainment Expenditures.

| Table 3: Distribution of Entertainment Expenditures in New York Metro, City, and Boroughs | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **NY Metro** | **NYC** | **Manhattan** | **Brooklyn** | **Queens** | **Bronx** | **Staten Island** |
| **Population** | 19,745,289 | 8,537,673 | 1,643,734 | 2,504,706 | 2,333,054 | 1,455,720 | 476,015 |
| **Per Capita Income** | $34,212 | $34,099 | $66,522 | $28,134 | $27,621 | $18,896 | $32,678 |
| **Aggregate Income (millions)** | $675,525 | $291,126 | $109,344 | $70,467 | $64,441 | $27,507 | $15,555 |
| **Median HH Income** | $60,741 | $55,191 | $75,513 | $50,640 | $59,756 | $35,302 | $74,021 |
| **Income Decile** | Sixth | sixth | seventh | sixth | sixth | fourth | seventh |
| **Expenditures as % of Income** | 89.8% | 89.8% | 80.7% | 89.8% | 89.8% | 117.3% | 80.7% |
| **Indicated Total Expenditure (Millions)** | $606,622 | $261,431 | $88,240 | $63,279 | $57,868 | $32,266 | $12,553 |
| **Entertainment as % of expenditures** | 5.2% | 5.2% | 4.9% | 5.2% | 5.2% | 4.8% | 4.9% |
| **Indicated Expenditure on Entertainment (Millions)** | $31,544 | $13,594 | $4,323, | $3,290 | $3,009 | $1,548 | $615 |
| Sources: Population, Per Capita Income, Aggregate Income, and Median Household Income from Table 2 (as sourced); Income deciles, expenditures as % of income, and entertainment as % of expenditures from Consumer Expenditure Survey, U.S. Bureau of Labor Statistics, August, 2017 | | | | | | | |

7

14.     The U.S. Bureau of Labor Statistics periodically publishes its Consumer Expenditure Survey (CES), which disaggregates spending into a variety of demographic and economic strata, and gives the amounts and shares of total for various categories of spending. Table 3 identifies the income decile (that is, the grouping – lowest [or first] to highest [or tenth] – into which median household incomes fall, displaying the difference for each geographical unit in the region), and applies that decile's calculated expenditures as percent of income, and share of expenditures applied to entertainment, to derive an indicated expenditure on entertainment, in millions of dollars, for the New York metro, New York City, and for each of the boroughs.

15.     The CES tracks a phenomenon known as the marginal propensity to spend, which indicates that lower-income households are more likely to spend any additional dollar available to meet their current needs, while higher income households tend to save any additional income since their basic needs have already been met. In the lowest strata of incomes, expenditures may exceed income, reflecting such factors as subsidies and borrowing. In the highest strata of income (the top decile), the CES shows expenditures at only 50.8% of pre-tax income, even though the dollar value of top decile spending ($136,873 per household) is more than twice that of the seventh decile ($59,395), which represents 80.7% of that decile's pre-tax income. The seventh decile represents the median household income for Manhattan and Staten Island. The sixth decile encompasses the median household income for the metropolitan area, for the city as a whole, and for the boroughs of Brooklyn and Queens. The Bronx, with a higher poverty level, has median household income in the fourth decile.

16.     Entertainment expenditures are significantly higher in Manhattan than in the other boroughs.  Given the significant differences in aggregate income (per capita income times population), expenditures on entertainment among the boroughs range between a low of $615

million on Staten Island to a high of $4.3 billion in Manhattan. The New York City total comes to $13.6 billion in entertainment expenditures, with the balance of the region contributing $17.9 billion in resident entertainment expenditures. These data represent expenditure patterns based on place of residence, not the place where the entertainment is provided. Intuitively, much of the entertainment expenditure of borough residents, and of those living in the metro area's suburbs, flows into Manhattan due to the concentration of venues in Manhattan discussed later in this Declaration.

       **C.    Travel and Tourism: an additional source of entertainment demand**

     17.    New York City is a travel/tourism mecca unrivaled by any other U.S. city, and ranks with Paris, London, Rome, and other world capitals as a top global destination. When combined with its economic factors, as well as its entertainment options, New York is one of only two "Alpha++" cities on the planet (London is the other), based upon quantitative rankings by the Globalization and World Rankings Research Institute. The next-ranked "Alpha+" cities are Singapore, Hong Kong, Paris, Beijing, Tokyo, Dubai, and Shanghai. Among U.S. cities, Chicago is rated 13th on the worldwide scale, while Los Angeles is 28th.

     18.    In 2017, New York City set a new record for visitation, with 62.8 million travelers coming. This made last year the eighth consecutive time the city set a new record for visitors. Since 2010 travel to the city from both domestic and international sources has grown 3.7% per year (Chart 1). About 79.3% of all visitation (49.8 million in 2017) represents leisure travel, while 20.7% (13.0 million) is business travel, according to NYC & Co., the official destination marketing company for the city.

0169

**Chart 1**



**Domestic and International Travel to New York Has Grown 3.7% Annually to 62.8 Million**

Source: NYC & Company Travel and Tourism reports for 2016 and 2017

19.     Visitor direct spending in 2016 amounted to $43.0 billion, as indicated in Chart 2. Spending was broadly distributed into five categories: lodging (28%), food and beverage (21%), shopping (20%), local transportation (18%), and the arts, entertainment, and recreation (12%). The elements of visitor expenditures are mutually reinforcing, that is, it is the entire menu of consumption choices provided by New York that draws visitors to the city and encourages their significant contribution to the city economy. Together these five sectors form a cluster of industries that are a "base" or "export" industry for New York, providing services to the national and international marketplace.

0170

## Chart 2



**NYC Direct Visitor Spending (%)**

- 28% Lodging
- 21% Food & Beverage
- 1% Misc.
- 18% Local Transportation
- 20% Shopping
- 12% Arts, Entertainment & Recreation

**Highlights**

2016 visitor spending of $43.0 billion was 1.6% higher than in 2015.

International travelers accounted for 48% of NYC total direct spending, but just 21% of all visitors.

Nearly 70% of total direct spending comes from leisure visitors.

11                                    NYC & Company | New York City Travel + Tourism Trend Report

20.      The attractions that draw the greatest visitation are familiar to New Yorkers and famous worldwide. The newspaper *USA Today* lists the ten top attractions in New York as:

- The Empire State Building
- One World Observatory (World Trade Center)
- 9/11 Memorial and Museum
- Top of the Rock
- Rockefeller Center
- Statue of Liberty
- Broadway and Times Square
- Central Park
- Grand Central Terminal
- Metropolitan Museum of Art

http://traveltips.usatoday.com/top-10-tourist-attractions-new-york-106787.html.

21.      The crowds flocking to these attractions are legendary.  Times Squares attract 50 million visitors a year. The Broadway theater district has an audience numbering 13 million annually. More than 750,000 persons pass through Grand Central daily. And the Metropolitan Museum is one of the world's three most visited museums, with more than seven million patrons

0171

annually. Nine of the ten attractions are located in Manhattan and the tenth, the Statue of Liberty, is primarily accessed by a ferry departing from Manhattan. So Manhattan is not only the core of the region's employment base, it is the heart of the industry cluster that draws business and leisure travelers from both domestic and international sources.

22.     Live performance entertainment also displays a strongly Manhattan-weighted locational preference. Reviewing sources such as Time Out New York, Grub Street, and Hyperbot (well-visited entertainment review sites covering NYC), Manhattan's venues range from the very large (such as Madison Square Garden and Radio City Music Hall, to a wide variety of jazz, blues, and rock clubs) and total 43 individual venues from the Lower East Side to Harlem.  No other borough maintains this concentration or visibility of entertainment venues. Brooklyn, which ranks second, contains less than half of the entertainment venues as Manhattan with only 19 venues, several of which are small bars or stages in less populated areas of the borough.  Queens has only three entertainment venues, and the Bronx contains only one, while Staten Island lacks any existing entertainment sites.

23.     Lastly, sixteen TV shows broadcast live or "live on tape" to studio audiences, many providing free tickets. All such opportunities are in Manhattan. *Saturday Night Live, the Tonight Show with Jimmy Fallon, Late Night with Seth Myers, Megan Kelly Today,* and *The Today Show* all originate at 30 Rockefeller Plaza. On the West Side, between 50th and 67th Streets, visitors can find *The Late Show with Stephen Colbert, The Daily Show with Trevor Noah, Last Week Tonight, Dr. Oz, Live with Kelly and Ryan,* and *The View*. From Chelsea Studios audiences can catch *Rachel Ray* and *Wendy Williams. Good Morning America* is broadcast live from Times Square, Comedy Central's *The Opposition* from the Hotel

0172

Pennsylvania on Seventh Avenue and 32nd Street, and *The Chris Gethard Show* from 401 Fifth Avenue at 37th Street.

24.     This provides further evidence of the positive economic synergy termed "agglomeration benefits" by economists since the time of Alfred Marshall, more than 125 years ago. Merriam Webster defines the term as "a localized economy in which a large number of companies, services, and industries exist in close proximity to one another and benefit from the cost reductions and gains in efficiency that result from this proximity." There are both "scale" and "networking" advantages to agglomeration. For New York, the economies of scale include the attraction of talented workers as well as business and tourist visitors to the city and to Manhattan specifically. The networking benefits derive from the mixed-use character of the entire urban core, which place many elements of the live-work-play urban framework within walking or easy public transit distance of each other. That mixed-use is recognized as a highly efficient urban form, facilitating economic connections, and also providing the kind of more intensive property utilization that produces higher rents and values for 24-hour cities when compared to 9-to-5 locations.

25.     To reap the benefits of agglomeration – the clustering together of mutually supportive business – it is not necessary to locate similar businesses chock-a-block with absolute homogeneity of use. In fact, the excessive "separation of uses" that flowed from the simplistic application of so-called "Euclidean Zoning" principles has been deservedly criticized as hindering the development of mixed-use neighborhoods of the kind extolled by the seminal urban commentaries of Jane Jacobs and more recently expressed in the "live-work-play" paradigm analyzed by the Urban Land Institute and by scholars of the "24-hour city."

26.     Nevertheless, there is benefit to proximity, especially when this is accompanied by sufficient density and transportation accessibility. To illustrate, note the frequency of the term "district" in New York's economic geography.  Some of these maintain currency in contemporary description of activity. The "Theater District" centered on Times Square certainly qualifies, although "Off-Broadway" theaters provide live entertainment in other Manhattan areas and in some few locations in other boroughs. Other "district" names are more legacy denominators. For instance, the "Garment District" and the "Financial District" are no longer virtually exclusively devoted to the apparel and banking industries, but have diversified their business bases.

27.     Even where the term "district" is not commonly employed, urban way-finding is improved by groupings such as the "Museum Mile" on Fifth Avenue, both north and south of the linchpin Metropolitan Museum of Art. Yet other museums (such as the Whitney, Guggenheim, and MOMA) are not hindered by locations elsewhere in Manhattan since those locations provide both accessibility and complementary land uses. Or, in another example, consider the clustering of performance venues at Lincoln Center, which has not precluded the success of Carnegie Hall, Symphony Space, WQXR's Jerome L. Greene Space, or the 92nd Street Y for classical music.

28.     In the dynamic evolution of New York's economy and Manhattan's economy specifically, evidence of new clustering reinforces the lesson of positive agglomeration. Lower Manhattan and the Hudson Square neighborhood have become known as preferred locations for the so-called TAMI industry. TAMI is an acronym for "technology, advertising, media, and information" businesses whose economic activities overlap considerably and whose functions can often be consolidated in a single company. Or consider the transformation of the former "Meatpacking District" on the West Side of Manhattan just north of Greenwich Village. Spurred

14

in part by the redevelopment of the abandoned "High Line" rail spur into a linear urban park, the Meatpacking District is now home to boutiques, galleries, museums, restaurants, office buildings, high-rise residential properties, and recreational uses. As long as there is sufficient density, walkability, transportation access, and heterogeneous land uses that are mutually supportive (the live-work-play paradigm), neighborhoods may flourish.

**D.    Accommodating the Visitation: Profile of the NYC Hotel Market**

29.    The active inventory of hotels rooms available in New York City amounted to 116,500 as of 2017, having grown from 76,400 in 2009, an expansion of 40,100 rooms (Chart 3). NYC & Co. reported 34.8 million room-nights sold in calendar year 2016, at an occupancy rate of 86.9% and an average daily room rate of $282 per night sold. The hotel industry contributed $574 million in room tax revenue to New York's coffers for the year. Total room nights sold was up from 25.8 million in 2010, an advance of 35%.

**Chart 3**



Source: NYC & Co., "Outlook for Hotel Development in NYC"

30.     As might be expected, Manhattan dominates the geographic distribution of New York's hotels. NYC & Co. lists 204 hotels on its interactive website marketing the city to meeting planners, and 170 of these (83%) are in Manhattan (Chart 4). Furthermore, of the 170 Manhattan hotels, 98 are in just five neighborhoods and 136 (80% of the borough total) are in ten neighborhoods (Chart 5). Those neighborhoods are those with the most significant concentrations of office workplaces, shopping, entertainment and recreation, and eating/drinking establishments.

**Chart 4**



Source: NYC & Co, accessed at https://business.nycgo.com/meeting-planners/product-directory/hotels-for-meetings/?skip=0&sort=title&subcatids=2221&regionids=170

31.     In 2017 the New York City Department of City Planning published a comprehensive report analyzing New York's hotel market in detail, both in its current state and in terms of needs for further hotel development. This report, titled *NYC Hotel Market Analysis: Existing Conditions and 10-Year Outlook,* is consistent with the agglomeration discussion in the preceding section of this report. Furthermore, its detail illustrates the tight linkage with New

16

York's entertainment industry, the context in which the economic viability of adult entertainment venues should be considered.

32.     Because of its comprehensive nature, the City Planning report includes a greater number of hotels (627) than NYC & Co.'s website, which is targeted to national and international meeting planners and therefore focuses on high-end properties with greater arrays of services. Nevertheless, Manhattan still ranks highest in the number of properties, with 421 or 67% of total and its base of larger facilities maintains its share of total rooms at 83% (95,449 of 115,521 rooms). Queens counts 116 hotels (19%) with 12,264 rooms (11%), largely accounted for by facilities near LaGuardia and Kennedy Airports. Brooklyn's 64 hotels are about 10% of total, and its room count of 5,953 is just 5% of the NYC total. The Bronx and Staten Island, with 20 and 6 hotels respectively, are home to a small sliver of the NYC hotel market, consistent with the distribution from NYC & Co. shown in Chart 4.

**Chart 5**



**Manhattan Hotels Cluster for Efficiency in Key Commercial Neighborhoods**

Number of Hotels by Manhattan Neighborhood

Source: NYC & Co, accessed at https://business.nycgo.com/meeting-planners/product-directory/hotels-for-meetings/?skip=0&sort=title&subcatids=2221&regionids=170

17

33.     The City Planning report (pp. 12-13) groups hotels according to the following typology:

1. ECONOMY

This category describes the lowest tier of hotel in terms of pricing and services/amenities within the market. Many of the new hotels recently developed in areas outside of Manhattan include Economy and Mid-Level facilities. Such brands include Econolodge, Rodeway Inn, and Days Inn.

2. MIDSCALE

This category describes mid-range, primarily nationally branded hotel properties with Limited-Service assets, such as breakfast room, business center and perhaps a fitness center. Many of the hotels that opened in West Midtown and, later in Gowanus and Long Island City can be classified as Midscale. Brands in this category include Best Western, Quality Inn, and Ramada.

3. UPSCALE

Upscale hotels are generally full-service properties with restaurants and, potentially, banquet facilities. This is the largest category of hotels in Manhattan and many newer hotels in Long Island City, Downtown Brooklyn, Jamaica and Flushing fall into this category. The new cohort of hotels in North Brooklyn is also classified as Upscale, more so than in any other submarket. Properties in North Brooklyn tend to be independent rather than branded. Hotels such as Doubletree, Hilton Garden Inn, Sheraton, Hyatt Regency, Marriott, Wyndham, and Hilton fall into the Upscale category.

0178

4. LUXURY

These are the highest and most expensive hotel properties in the city, equivalent to "five-star" properties that attract the global elite. As of today, there are no Luxury hotel properties outside Manhattan. Luxury brands include Ritz Carlton, JW Marriott, Conrad, Andaz, Grand Hyatt, and Intercontinental.

34.     Chart 6 (below) presents the distribution of the inventory by class of facility.



### Chart 6
## Two-Thirds of NYC Hotel Rooms are Upscale or Luxury, Predominantly in Manhattan

Hotels by Typology

■ Economy   ■ Midscale   ■ Upscale   ■ Luxury

35.     The City Planning Report notes, at p. 20, that:

Despite the growth in Brooklyn, Queens, the Bronx and Staten Island hotel development, Manhattan unquestionably remains the largest, most diversified, and most mature hotel market in New York City by a large margin. Manhattan is home to 83 percent of New York City's hotel rooms and the only borough in New York City to have hotels of every typology. And, while the areas outside of Manhattan have seen an unprecedented boom in new hotel development, almost 75 percent of new hotel rooms that have come online in New York City since 2010 are located in Manhattan.

0179

36.     Discussing the hotel industry and development trends in the other four boroughs, the City Planning report observes:

> In the four boroughs outside Manhattan, hotel development is concentrated in a relatively small number of submarkets – notably, Long Island City, LaGuardia/Flushing, and Jamaica/JFK in Queens; and Downtown Brooklyn/Gowanus and Williamsburg/Greenpoint in Brooklyn. These five submarkets together account for almost 70 percent of all hotel properties and 82 percent of all hotel rooms outside of Manhattan. Put another way, of the 8,715 hotel rooms in Brooklyn, Queens, the Bronx and Staten Island that have been delivered since 2010, 82 percent of them are located in these five submarkets, with Downtown Brooklyn/Gowanus accounting for a quarter of this total and Long Island City accounting for almost 20 percent. Based on stakeholder interviews and market reports, principal factors driving hotel growth in these submarkets are as follows:
>
> • Proximity to Manhattan
> • Access to public transportation (principally subway lines)
> • Presence of services and amenities in neighborhood
> • Significant office or commercial market
> • Existing critical mass of hotels in neighborhood (most hotel are market
>   followers not market leaders)
> • Land Value
> • Proximity to airports
> • Proximity to neighborhoods (family visitation)
> • Ability to develop hotels as-of-right without zoning changes

37.     Again, the importance of agglomeration effects can be seen as well as the advantage of central location in the City and the contribution of access to amenities and transportation services to economic success. As will be detailed in the section on Adult Entertainment Locations, the tools of Walk Score and Transit Score help to quantify such agglomeration benefits. Maps 2 through 6, extracted from the City Planning report of 2017, help to visualize the borough and neighborhood concentration of hotels, which are closely aligned with the location of adult entertainment venues.

0180

**Map 2**



Sources: New York City Department of City Planning, 2017; STR, 2017.

0181

**Map 3**



Sources: New York City Department of City Planning, 2017; STR, 2017.

**Map 4**



Sources: *New York City Department of City Planning, 2017; STR, 2017.*

**Map 5**



Sources: *New York City Department of City Planning, 2017; STR, 2017.*

0184

**Map 6**



Sources: New York City Department of City Planning, 2017; STR, 2017.

## II.  The Location of Adult Entertainment Venues

38.    The chart below (Table 4) lists 18 adult entertainment establishments currently doing business in New York City by borough.  The chart indicates whether the business is a confirmed 100% adult venue or one that has been doing business under the zoning provision limiting "adult uses" to less than 40% of floor area (one establishment's status is unknown at present), the Walk Score and Transit Score ratings for the location, and the neighborhood within which they are situated. The borough and neighborhood identifiers are useful in relating the data on the venues to Maps 1 through 6, giving socio-economic neighborhood types and the distribution of hotel facilities. Such variables are considered relevant to the economic viability of the adult entertainment venues.

0186

| Table 4: Location Characteristics of Adult Entertainment Venues | | | | | |
|---|---|---|---|---|---|
| Name/Address | Borough | 100% or 60/40 | Walk Score | Transit Score | Neighborhood |
| Flashdancers NYC 1674 Broadway 10019 | Manhattan | 100 | 99 | 100 | Theater District |
| Scores New York 536 W. 28th St. 10001 | Manhattan | 100 | 93 | 100 | Chelsea |
| Rick's Cabaret 50 W. 33rd St. 10001 | Manhattan | 100 | 100 | 100 | Koreatown |
| Larry Flynt's Hustler Club, 641 W. 51st St. 10019 | Manhattan | 100 | 93 | 88 | Hell's Kitchen |
| Penthouse Executive Club 603 W. 45th St. | Manhattan | 100 | 93 | 100 | Hell's Kitchen |
| Vivid Cabaret 61 W. 37th St. | Manhattan | 100 | 100 | 100 | Garment District |
| Sapphire New York 20 W. 39th St. | Manhattan | 100 | 99 | 100 | Garment District |
| Sapphire 333 E. 60th St. | Manhattan | 60/40 | 100 | 100 | Upper East Side |
| Lace 725 7th Ave. 10022 | Manhattan | 60/40 | 100 | 100 | Theater District |
| Satin Dolls 689 8th Ave. 10036 | Manhattan | 60/40 | 99 | 100 | Theater District |
| NY Dolls 59 Murray St. 10007 | Manhattan | 60/40 | 100 | 100 | Tribeca |
| Private Eyes 302 W. 45th St. 10036 | Manhattan | 60/40 | 98 | 100 | Hell's Kitchen |
| VIP 20 W. 20th St. 10011 | Manhattan | 60/40 | 100 | 100 | Flatiron |
| Headquarters 552 W. 38th St. 10018 | Manhattan | 60/40 | 94 | 100 | Hell's Kitchen |
| Vixen 60-07 Metropolitan Ave. 11385 | Queens | 60/40 | 92 | 80 | Ridgewood |
| Starlets 49-09 25th Ave. 11377 | Queens | 60/40 | 87 | 71 | Woodside |
| Riviera 34-48 Steinway St. 11101 | Queens | 60/40 | 97 | 89 | Astoria |
| Sugar Daddy's 51-07 27th St. 11101 | Queens | – | 80 | 92 | Long Island City |

39.     Similar to many of the other data sets, the venues show a propensity to locate in Manhattan and within Manhattan in highly dense and active neighborhoods. In this way, the adult entertainment industry behaves in the mainstream of the urban economy by locating in

0187

central locations, with good transportation access, proximate to a variety of amenities, and near complementary land uses such as commercial office buildings and hotels. The entertainment venues depend upon a mixed customer base of New York residents, others from the region (the "bridge and tunnel" customers) who may be among the 23 million annual "day trip" travelers who come from within 50 miles of the city, and nearly 40 million domestic and international travelers who stay for leisure or business purposes. (Data from the September 2017 NYC & Co. publication, "New York City Travel and Tourism Report").

40.     In particular, Map 1 "Census Tracts by Neighborhood Type" shows that adult venues in Manhattan are predominantly in areas whose residents are either white or racially mixed high-income neighborhoods. Map 2 "Manhattan Hotels by Class" and Chart 5 "Manhattan Hotels Cluster for Efficiency" show that the broad market areas of Midtown West, Midtown East, Times Square/Theater District, Chelsea, Hell's Kitchen (aka the Clinton neighborhood), and the Garment District are the areas where adult venues have become a successful part of the local economy. This is no surprise given the size of the local workforce in Manhattan's office districts and the extraordinary volume of travelers who stay in the hotels south of Central Park.

41.     On the other hand, non-Manhattan locations for the adult venues noted in the chart above – Ridgewood, Woodside, and Astoria – have far less of an amenity mix, density of employees, and convenience to hotels, as can be seen in Maps 3 through 6. Meanwhile, especially in the non-Manhattan neighborhoods, the adult venues are situated in poor or lower-middle-income areas, with sparser amenity mixes, reflected in lower Walk Scores.

**A.     Walk Score and Transit Score as a Measure of Locational Strength/Weakness**

42.     Walk Scores (and Transit Scores) are determined by algorithms developed by the website walkscore.com, which has become a much-cited source not only in commercial location

0188

analysis, but in the marketing of residential real estate. Scores run from a low of zero to a high of 100. The algorithms measure the relative density of supporting land uses such as neighborhood restaurants, coffee shops, grocery stores, schools, parks, libraries, fitness centers, etc., as well as the average walking distance to those features. Transit scores are based on such elements as subway stops, bus stops, and the connectivity those transit routes provide to work, shopping, and recreational features. These scores have been used by planners and urban scholars to evaluate large cities [see, for example, "The Walkability Factor" essay in Data Driven Detroit (2011) accessed at https://datadrivendetroit.org/blog/2011/11/30/the-walkability-factor/] and smaller cities such as Baton Rouge ("An analysis of neighborhood walkability: City of Baton Rouge and Parish of East Baton Rouge, 2013 accessed at http://lagic.lsu.edu/rsgis/2013/downloads/Presentations/Wednesday%20Presentations/Session%205%20John/Walkability%20presentationPriola.pdf).  In the marketing of real estate, the National Association of Realtors® has been presenting the utility of the Walk Score as a sales tool since at least 2010 (see https://www.nar.realtor/on-common-ground/know-your-neighborhood).

43.     To provide perspective for the scores earned by the reviewed adult entertainment venues, New York has the nation's highest average Walk Score and Transit Score at the municipal level, with a citywide Walk Score of 89.2 and a citywide Transit Score of 85.3. Walk Scores and Transit Scores criteria are established on a nationwide basis, and compared to most other cities across the country New York's density and extensive transit system propel its scores toward the top of the 0 to 100 scales. Scores that might be relatively high elsewhere in the U.S. can still indicate an underperforming location within New York City, if a business (or a residential neighborhood) is competing within the New York City market itself. This is a critical issue, since consumers of real estate and entertainment services will evaluate the comparative

0189

strength of locations – as indicated by the Walk Score and Transit Score – by reference to alternatives within New York, not scores attained elsewhere in the country.

44.    To illustrate this, compare the Walk Scores for the ten "most walkable" cities in the U.S. (as rated in 2017) with the scores for an array of New York City neighborhoods (in Manhattan and the other boroughs).

| Table 5: Representative City and NYC Neighborhood Walk Scores | | | | |
|---|---|---|---|---|
| **City** | **Walk Score** | **NYC Neighborhood** | **Borough** | **Walk Score** |
| **New York** | 89.2 | **Upper East Side** | Manhattan | 99 |
| **San Francisco** | 86.0 | **Theater District** | Manhattan | 99 |
| **Boston** | 80.9 | **Hell's Kitchen** | Manhattan | 98 |
| **Miami** | 79.2 | **Flatiron** | Manhattan | 100 |
| **Philadelphia** | 79.0 | **Tribeca** | Manhattan | 99 |
| **Chicago** | 77.8 | **College Point** | Queens | 78 |
| **Washington, DC** | 77.3 | **Woodside** | Queens | 94 |
| **Seattle** | 73.1 | **Sunset Park** | Brooklyn | 95 |
| **Oakland** | 72.0 | **Williamsburg** | Brooklyn | 91 |
| **Long Beach** | 69.9 | **Hunts Point** | Bronx | 91 |
| **Source: www.walkscore.com** | | | | |

45.    A Walk Score is calculated by distance from amenities (including restaurants, bars, parks, shopping, and entertainment), density of population, block length, and pedestrian friendliness, and is based on an algorithm reflecting walking routes (rather than simply linear distance). It should be noted that Walk Scores and Transit Scores for cities and for neighborhoods represent the average scores across those respective geographies, and that individual locations within each geography may have higher or lower scores than those averages.

46.    Similarly, Transit Scores are algorithmically generated ratings of accessibility by all modes of mass transportation (commuter rail, subway, bus, light rail, ferry, cable car, or other modality). The algorithm, like the Walk Score methodology, is proprietary and patent-protected. But the website www.walkscore.com describes the technique as calculating a score for a specific

0190

point by summing the relative "usefulness" of nearby routes. Usefulness is defined as the distance to the nearest stop on the route, the frequency of the route, and type of route.

## Map 7: New York City Subway System

Source: New York Metropolitan Transportation Authority (MTA)

31

0191

47.    Table 6 provides the Transit Scores for the same cities and neighborhoods displayed in Table 5. Like Table 5 it shows New York City to be the highest ranked of the selected cities, and Manhattan neighborhoods to have superior scores to the indicated neighborhoods in the other boroughs of New York City. The extraordinarily high Transit Scores for Manhattan neighborhoods is no accident, as the city's mass transit system was developed to provide residents throughout the five boroughs with access to the region's core. In Manhattan, subway lines converge on the area between the Battery at the island's southern tip and roughly 63rd Street. Access from Brooklyn (See NYC Subway System map, Map 7) is via seven tunnels and bridges traversing the East River. Access from Queens is via three tunnels, and from the Bronx via six tunnels and bridges north of 125th Street. The map clearly shows the confluence of the subway lines south of 63rd Street, and their dispersal once entering the Bronx, Queens, and Brooklyn.

| Table 6: Representative City and NYC Neighborhood Transit Scores | | | | |
|---|---|---|---|---|
| **City** | **Transit Score** | **NYC Neighborhood** | **Borough** | **Transit Score** |
| **New York** | 85 | **Upper East Side** | Manhattan | 99 |
| **San Francisco** | 80 | **Theater District** | Manhattan | 100 |
| **Boston** | 73 | **Hell's Kitchen** | Manhattan | 100 |
| **Miami** | 57 | **Flatiron** | Manhattan | 100 |
| **Philadelphia** | 67 | **Tribeca** | Manhattan | 100 |
| **Chicago** | 65 | **College Point** | Queens | 58 |
| **Washington, DC** | 68 | **Woodside** | Queens | 95 |
| **Seattle** | 60 | **Sunset Park** | Brooklyn | 85 |
| **Oakland** | 56 | **Williamsburg** | Brooklyn | 93 |
| **Long Beach** | 51 | **Hunts Point** | Bronx | 82 |
| **Source: www.walkscore.com** | | | | |

## B.    Specific Relocation Options for 60/40 Adult Entertainment Venues

48.    I have considered potential relocation options for 60/40 adult entertainment businesses, both within and outside of Manhattan.  By comparison, the Manhattan locations are

32

0192

significantly more accessible than the non-Manhattan locations and are located significantly more proximately to patrons who either live or work nearby and who have disposable income to spend on entertainment.

49.     The greater restrictions defining sub-areas acceptable for 60/40 adult entertainment venues direct prospective relocations to lower-rated neighborhoods, less accessible by walking or by transit. And such locations are significantly inferior in accessibility to the Manhattan locations, as detailed in Table 8. The Manhattan 60/40 locations have Walk Scores and Transit Scores of 98 – 100, at the very top of the rating range. The qualifying sites in the other boroughs have scores ranging between 50 and 80, below the New York City average ratings.

| Table 7: Representative Qualifying Sites for 60/40 Adult Entertainment Venues | | | |
|---|---|---|---|
| **Address** | **Borough/ Neighborhood** | **Walk Score** | **Transit Score** |
| **169 Gardner Ave. Brooklyn, NY 11237** | Brooklyn/ Williamsburg- Greenpoint | 66 | 73 |
| **1331 Viele Ave. Bronx, NY 10474** | Bronx/ Hunts Point | 80 | 50 |
| **134-15 20th Ave. College Point, NY 11356** | Queens/ College Point | 70 | 65 |
| **Source: Burkat Global, LLC** | | | |

| Table 8: Existing 60/40 Adult Venues in Manhattan | | | |
|---|---|---|---|
| **Name/Address** | **Neighborhood** | **Walk Score** | **Transit Score** |
| **Sapphire 333 East 60th St, NY 10022** | Upper East Side | 100 | 100 |
| **Lace 725 7th Avenue, NY 10019** | Theater District | 100 | 100 |
| **Satin Dolls 689 8th Avenue, NY 10036** | Theater District | 99 | 100 |
| **NY Dolls 59 Murray Street, NY 10007** | Tribeca | 100 | 100 |
| **Private Eyes 302 West 45th St, NY 10036** | Hell's Kitchen | 98 | 100 |
| **VIP 20 West 20th St, NY 10011** | Flatiron | 100 | 100 |

0193

50.     As is evident from the data included in Table 9 ("Synoptic Matrix of Socio-economic and Location Attributes"), the variance in Walk Scores and Transit Scores between the Manhattan and non-Manhattan locations reflects the basic socio-economic conditions distinguished the two sets of sites. Median household incomes for the Manhattan Zip Codes for the six existing 60/40 adult entertainment venues range between $83,812 and $234,958, while the income range for the street outer borough locations is $26,901 to $57,849. Table 2 ("Selected Socio-economic Measures of New York") shows the citywide median income as $55,191. As an indication of resident population incomes, and therefore available consumer dollars proximate to each site, Table 9 shows that one of the pools of potential patrons (local residents in the non-Manhattan locations) would have significantly less discretionary income, a result that is consonant with the analysis performed in Table 3 above ("Distribution of Entertainment Expenditures in New York Metro, City, and Boroughs").

0194

| Table 9: Synoptic Matrix of Socio-economic and Location Attributes | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Venue/Zip Code** | | | | | | | | | |
| **Variable** | **Lace 10019** | **Sapphire 10022** | **Satin Dolls 10036** | **NY Dolls 10007** | **Private Eyes 10036** | **VIP 10011** | **Bronx Viele Ave. 10474** | **Queens 20th Avenue 11356** | **Brooklyn Gardner Avenue 11237** |
| Population | 39,505 | 30,362 | 25,987 | 6,740 | 25,987 | 50,404 | 12,793 | 24,405 | 53,678 |
| Median HH Income ($) | 94,477 | 123,693 | 83,812 | 234,958 | 83,812 | 114,134 | 26,901 | 57,849 | 46,351 |
| Poverty Rate | 11.8% | 4.9% | 12.4% | 3.4% | 12.4% | 9.7% | 41.8% | 12.7% | 30.8% |
| Businesses | | | | | | | | | |
| Establish-ments | 4,832 | 6,371 | 6,131 | 1,440 | 6,131 | 4,002 | 671 | 813 | 1,104 |
| Employees | 140,747 | 139,181 | 163,895 | 32,862 | 163,895 | 63,376 | 14,426 | 9,576 | 11,683 |
| Payroll (Millions $) | 20,943 | 22,166 | 21,158 | 3,149 | 21,158 | 5,320 | 832 | 528 | 511 |
| Walk Score | 100 | 100 | 99 | 100 | 98 | 100 | 80 | 70 | 66 |
| # Hotels with 1 mile | 16+ | 5 | 14 | 2 | 14 | 2 | 0 | 2 | 0 |
| # Bars within half mile | 16+ | 16 | 16+ | 16+ | 16+ | 16+ | 3 | 1 | 2 |
| # Restaurants within half mile | 16+ | 14 | 16+ | 16+ | 16+ | 16+ | 16 | 16+ | 16+ |
| Transit Score | 100 | 100 | 100 | 100 | 100 | 100 | 50 | 75 | 73 |
| Subway Lines within half mile | 10+ | 9 | 10+ | 10+ | 10+ | 10+ | 1 | 0 | 1 |
| Bus Routes with half mile | 10+ | 10+ | 10+ | 10+ | 10+ | 10+ | 3 | 3 | 3 |
| **Sources: Population, income and business data from U.S. Bureau of the Census, accessed through https://factfinder.census.gov; Walk Score and Transit Score (and component) data from www.walkscore.com** | | | | | | | | | |

51.     The Poverty Rates for the indicated neighborhoods (by Zip Code) support this conclusion, with the Upper East Side and Tribeca neighborhoods registering poverty rates well below the citywide average of 20.3%, and both the East Williamsburg and Hunts Points neighborhoods having an incidence of poverty substantially above the citywide benchmark.

35

While the areas of Williamsburg closer to the East River have been significantly gentrified, the area east of Bushwick Avenue ( "East Williamsburg") that is deemed appropriate by the City as a relocation district for adult entertainment venues is still a blighted area of decommissioning warehouses and factories, scrapyards, bus storage, and building materials and equipment staging areas which NYC City Planning's draft report (September 2016) still designates as "core industrial" land proximate to Newtown Creek. The City's "revised framework" for East Williamsburg specifically differentiates "core industrial" from upgraded planned "innovation districts," or plans for improved commercial employment or residential redevelopment.

52.     As displayed above, Table 2 powerfully demonstrates Manhattan's superiority in supporting a second pool of potential patrons, the number of employed persons, and their earnings at the place of work (Household Income data reflect "place of residence" information). The benchmark from Table 2 indicates that Manhattan-based jobs generates 78.2% of all citywide payroll, far in excess of its 19.3% of New York City population. Taken down to the Zip Code level (in Table 8) the number of business establishments in the relevant Manhattan locations range from 1,440 in Zip 10007 (Tribeca) to 6,371 in Zip 10036 (the Theater District). There are far fewer businesses in the three indicated outer-borough locations, with a low of 671 in Zip 10474 (Hunts Point) and a high of 1,104 in Zip 11237 (Williamsburg). This gap widens under other measures of business size such as total employment (by headcount) and by annual payroll. As in the case of resident incomes, so with the working population, the key metric is aggregate dollars since, as Table 3 shows, the percentage of earnings spent on entertainment falls in a narrow range (4.9% to 5.2%) across income levels by borough. Annual payroll in the relevant Manhattan Zip Codes runs from a low of $3.1 billion in Tribeca to $22.1 billion in Zip

36

0196

10022 (Upper East Side). The comparative levels vary between $511 million for Zip 11237 (Williamsburg) and $832 million for Zip 10474 (Hunts Point).

53.     If the outer-borough venues suffer the disadvantage of lower pools of spendable income from both residents and workers, any shortfall would need to be made up from patrons traveling from outside the neighborhoods, specifically targeting the Bronx, Queens, and Brooklyn areas as entertainment destinations. The lower levels of Walk Score indicate that this patronage decision would rely upon highly targeted demand, as there is a measurably lower degree of amenity agglomeration in the relevant borough locations, when compared with existing Manhattan 60/40 adult entertainment venues. Of particular importance is the sharp falloff in the number and quality of hotels in the outer-borough locations, a condition already displayed in Chart 4 and Maps 2 through 5. Although all Zip Codes examined had a sufficient density of eating places, the number of bars in Williamsburg, Hunts Point, and College Point were just one to three per Zip Code, while the Manhattan venues each had 16 or more bars per Zip Code. As bars are a particular indicator of "adult patronage" (being limited to those aged 21 or over by New York's drinking age statutes), the sharp contrast in numbers of bars signals a distinct economic disadvantage to adult patronage in the areas delineated by the zoning requirements restricting where the 60/40 adult establishments would need to relocate.

54.     From the standpoint of economic geography, there is no surprise in such empirical findings. Both the early work of the German economist Von Thunen (19th century) and the development of Central Place Theory by the 20th century German geographer Walter Christaller have laid the conceptual foundation for locational preferences for various land uses and the consequent clustering of land uses in specific parts of an economic region. As discussed earlier in this report, the seminal neo-classical British economist Alfred Marshall elaborated the

0197

importance of the forces of agglomeration in the early 20th century, with the clustering of industries enhancing the efficiency of core areas as magnets for business and for workers. Manhattan is a particular powerful example of that magnetism.

55.     The benefits of clustering have been the subject of much of the academic work of Harvard's Michael Porter in the past several decades. He has been joined by his Harvard colleague Edward Glaeser (and Glaeser's numerous co-authors) in literally dozens of research papers. Over the past twenty years, moreover, the research of Stuart Rosenthal (Syracuse University) and William Strange (University of Toronto) has identified a vitally important phenomenon, termed "attenuation," whereby agglomeration benefits decay over distance. The power of successful agglomeration in a central place (for example, Manhattan) is highly localized, and degree to which those benefits are shared spatially drops rapidly with distance from the center.

56.     While there are several reasons why this "decay" occurs, transportation costs loom large as an explanation. Rosenthal and Strange point out that this is not simply a question transporting physical goods from one place to another, but that "social spillovers and [business] allegiances are costly to maintain" over distance… [and] this could reflect access to particular neighborhood amenities… In either case, the important result is rapid attenuation." (Rosenthal & Strange, "The Geography of Entrepreneurship in the New York Metropolitan Area," Federal Reserve of New York Economic Policy Review, December 2005).

57.     The lower Transit Scores for the eligible outer-borough sites (ranging from 50 to 75) are decidedly inferior to the existing Manhattan 60/40 venues, all of which score perfect 100 ratings. A key reason for this is the distance of the outer-borough sites from subway and bus lines. The Hunts Point and Williamsburg sites have only one subway line within a half-mile, and

0198

the College Point site has none. All Manhattan sites have ten or more rail transit sites within a half mile of their location. Bus service is not much better. The three outer-borough sites each have three bus lines with a half-mile, while all the Manhattan venues enjoy bus access from more than ten bus routes.

58.     The Transit Score algorithm considers frequency of service as a key factor in evaluating accessibility. Even with the presence of subway and bus routes, however minimal in number, near the outer-borough sites, service is sparse during the night time hours when customer demand for adult entertainment uses peaks.

59.     For example, the site at Viele Avenue, in Hunts Point, putatively has service from the Number 6 subway line and bus routes Bx6, Bx-SBS, and Bx46. But the frequency of service on the Number 6 drops from its daytime headway (time between trains) of six to nine minutes to a 15-20 headway between midnight and 4 a.m. The nearest station stop on the No. 6 is on the far side of I-278, an elevated highway, and is in the adjacent neighborhood of Longwood. And, of the three bus routes in the vicinity, only the Bx6 runs around the clock, with frequency reduced to an hourly bus between 2 and 4 a.m.

60.     Similarly, subway service at the Gardner Avenue site in Williamsburg is provided by the "L" train at the Jefferson Street station stop, a half-mile from the indicated address of the venue. Late night service on the "L" train has a scheduled headway of 15 – 20 minutes after midnight. Of the bus routes, the B57 along Flushing Avenue suspends service between midnight and 4 a.m. The Q57 service shifts to hourly service after 12:45 a.m. along Metropolitan Avenue. The Q59 on Grand Avenue has slightly more frequent late-night service, at a 45 minute headway. All the subway and bus routes have Saturday schedules similar to those on weekdays.

39

61.     No subway stop exists on the peninsula known as College Point, the site of the third prospective outer-borough venue. Bus service reported by walkscore.com includes routes Q20A, Q20B, and Q76. The Q20A runs on a 20-minute headway between midnight and 1:40 a.m., and hourly thereafter until approximately 4 a.m. The Q20B has no late night service, nor does the Q76.

62.     Thus, two of three of the outer-borough sites have subway access through station stops fully a half-mile from the prospective venue, and the third has no nearby subway service at all. And, although all three prospective sites have daytime service from three bus lines, each site depends upon a single bus route in the late night hours, and service frequency declines to as low as one bus per hour.

63.     To test travel times from a prominent Manhattan location, Columbus Circle, to each of the prospective venues for a late night traveler seeking access to adult entertainment in the outer boroughs, trips were modeled to and from each of the three venues, with a midnight departure from Columbus Circle on May 18, 2018, and a return trip scheduled to commence from the venues at 3 a.m. that day:

- The trip to the Hunts Point site would arrive at 1:09 a.m., with the traveler taking a northbound Number 2 subway train to Intervale Avenue in the Bronx, walking 2 minutes to the nearest bus stop, and then waiting 14 minutes for the bus connection. Once off the bus (at 1:05 a.m.) the traveler would walk four minutes to 1331 Viele Avenue. A return trip departing that address at 3 a.m. would bring the traveler back to Columbus Circle at 3:52 a.m. To examine the impact of the presumed midnight departure, a sensitivity analysis assuming a journey commencing at Columbus Circle at 8 p.m. or at 10 p.m. was performed. At those earlier departure times there is little difference in total estimated travel – 1 hour and six minutes for an 8 p.m. departure from Columbus Circle and 1 hour and three minutes for a 10 p.m. departure. The minor variance in total travel time is principally a function of waiting time for the first leg of the journey at the Columbus Circle station stop.

0200

- A trip to the Williamsburg site would bring the traveler to the 169 Gardner Avenue venue at 1:08 a.m. The route would utilize a southbound A train to 14th Street and 8th Avenue in Manhattan, where a transfer to the L train can be made. Exiting at the Grand Street station, the traveler would walk 2 minutes to the Q59 bus stop, exiting at Grand Avenue and Gardner Avenue, and then walking four minutes to the site. The return trip would bring the traveler to Columbus Circle at 4:24 a.m. Testing an earlier departure from Columbus Circle does reduce travel time to the Gardner Avenue venue, with an 8 p.m. departure generating estimated travel of 48 minutes to the site, and a 10 p.m. departure having a similar 47 minute estimated commutation. Greater frequency on the L line and the Q59 bus accounts for the variance.

- For the College Point site, late night travel would be more expensive for a comparable arrival time at 1:06 a.m. Taking a southbound Number 2 train to Pennsylvania Station, the traveler would take the Long Island Railroad commuter train on the Port Washington line to Main Street-Flushing. After a 4 minute walk to the Q25 bus, the traveler would disembark at 127th Street and 20th Avenue in College Point, leaving an eight minute walk to 134-15  20th Avenue. With the reduction in service frequency, a departure from the venue at 3 a.m. would return the traveler to Columbus Circle at 5:06 a.m. The sensitivity tests for earlier departure actually generate longer travel times on the MTA info TripPlanner (see http://tripplanner.mta.info/MyTrip/mobile/Start.html) with an 8 p.m. departure necessitating 1 hour and fourteen minutes to the venue, and a 10 p.m. departure having a slightly longer 1 hour and sixteen minute trip. However, such trips would be slightly less costly since a Long Island Railroad ticket fare would be avoided.

64.     Using public transportation is the least costly travel option from a centrally located Manhattan landmark such as Columbus Circle but, as the above itineraries clearly show, they require extensive travel time – a disincentive for those seeking an entertainment venue. New York is also serviced by Yellow and Green taxicabs and by the ride-sharing service Uber and its competitors such as Lyft. Another researcher on this project has performed an analysis of cost and time, reporting the following ranges for one-way travel from Columbus Circle to each of the outer borough venues. For the Bronx site on Viele Avenue 8.8 miles away, travel time is estimated at 29 minutes, with the taxi fare at $42.90 and Uber X at $33.70. For the Brooklyn site on Gardner Avenue, a trip of 6.3 miles, the taxi fare is estimated at $37.82 for 30 minutes of travel time, with Uber X priced at $55.90. Travel to the Queens site at 134-15 20th Avenue is

41

estimated at 36 minutes for 12.8 miles, with a taxi fare of $54.50 and an Uber X charge of $40.10. These are one-way costs, which can be anticipated to be approximately doubled for a round trip, and may not account for tipping costs, tolls, and variables such as Uber surge pricing.

65.     A Staten Island relocation would be particularly burdensome for the 60/40 adult venues and so has not been considered in equal detail with the Bronx, Brooklyn, and Queens addresses. As noted in Table 2, Staten Island does not have sufficient resident population (5.6% of the NYC total), nor does it have an adequate local employment base (2.7% of NYC jobs; 1.4% of NYC payroll in dollars) to support patronage demand from local sources. And, with only six relatively small hotels, Staten Island does not provide a local travel/tourism base. So such a venue would require patrons to travel from Manhattan to a permissible site, such as the non-residentially zoned Bloomfield district. Access by public transit would take between 2 hours and two minutes (for an 8 p.m. departure from Columbus Circle) and 2 hours and forty-two minutes (at midnight), and this would require a more expensive Express Bus fare as well as several transfers. By car, the trip would cover 23.5 miles, and necessitate travel through the Lincoln Tunnel, the New Jersey Turnpike, and the Goethals Bridge, requiring payment of tolls for a trip lasting approximately one hour.

66.     For ease of reference, a listing of tolls for the bridge and tunnel crossings operated by the Port Authority of New York and New Jersey, and by the Metropolitan Transportation Authority are listed in Table 10. These tolled bridge and tunnel crossings are typically the fastest means of access to the outer-borough venues listed in Table 7, as these facilities typically debouche directly to limited access highways. The New York City Department of Transportation (NYCDOT) operates a number of bridges connecting Manhattan to Brooklyn, Queens, and the Bronx, but these facilities typically debouche onto local streets and avenues and require

42

additional travel time due to lower street-level speed limits and traffic signalization. For this reason, taxi and ride-share drivers will normally select tolled-routes, passing the cost of the toll to the rider.

0203

| Table 10: Bridge and Tunnel Tolls in NYC Region | | | | |
|---|---|---|---|---|
| **Name of Facility** | **Connects** | **Operator** | **Cash or Pay by Mail Toll** | **EZ-Pass Discount** |
| **George Washington Bridge** | Manhattan/New Jersey | Port Authority | $15.00 Eastbound Only | $10.50 (off-peak); $12.50 (peak) |
| **Lincoln Tunnel** | Manhattan/New Jersey | Port Authority | $15.00 Eastbound Only | $10.50 (off-peak); $12.50 (peak) |
| **Holland Tunnel** | Manhattan/New Jersey | Port Authority | $15.00 Eastbound Only | $10.50 (off-peak); $12.50 (peak) |
| **Bayonne Bridge** | Staten Island/New Jersey | Port Authority | $15.00 Eastbound Only | $10.50 (off-peak); $12.50 (peak) |
| **Goethals Bridge** | Staten Island/New Jersey | Port Authority | $15.00 Eastbound Only | $10.50 (off-peak); $12.50 (peak) |
| **Outerbridge Crossing** | Staten Island/New Jersey | Port Authority | $15.00 Eastbound Only | $10.50 (off-peak); $12.50 (peak) |
| **Queens Midtown Tunnel** | Manhattan/Queens | MTA | $8.50 each way | $5.76 each way |
| **Verrazzano-Narrows Bridge** | Brooklyn/Staten Island | MTA | $17.00 (entering Staten Island) | $11.52; $5.50 for Staten Island residents |
| **Hugh L. Carey Tunnel** | Manhattan/Brooklyn | MTA | $8.50 each way | $5.76 each way |
| **Robert F. Kennedy Bridge** | Manhattan/Queens/Bronx | MTA | $8.50 each way | $5.76 each way |
| **Bronx-Whitestone Bridge** | Bronx/Queens | MTA | $8.50 each way | $5.76 each way |
| **Throgs Neck Bridge** | Bronx/Queens | MTA | $8.50 each way | $5.76 each way |
| **Sources: websites of Port Authority of New York and New Jersey.** | | | | |

0204

67.     The detailed look at transportation accessibility, travel time and distance, and the price to reduce time by using more expensive taxi or car services makes concrete the theoretical point made by scholars studying the attenuation of agglomeration effects: as distance from the center increases, the economic costs of location increase significantly by the disincentives of inconvenience and added price. Hours of potential travel time and/or taxi/Uber costs of $100 or more roundtrip are significant hurdles to patronage for potential customers traveling to New York and staying at the 83% of all New York City hotel rooms that are located in Manhattan.

C.     **The issue of economic "rent-seeking" behavior**

68.     The reduction in patronage demand resulting from the push of the 60/40 adult entertainment venues from their existing locations in Manhattan to peripheral sites that are poorer, less economically active, and remote from the city's travel and tourism business heart can be rationally expected, even if not deliberately intended. A second predictable if possibly unintended consequence is a phenomenon known in the economic literature as "rent-seeking."

69.     The University of Chicago Booth School of Business (in The Stigler Center blog) defines "rent-seeking" as follows:

> "When one group tries to obtain privileges from the government to secure profits beyond those available under well-functioning markets. Importantly, such privileges-seeking does not create new value in the economy. It merely transfers value from one group to another, while wasting physical, human, and social capital." (*see* https://promarket.org/category/rent-seeking)

70.     "Rent-seeking" is an effort to extract profit beyond that available in a normal competitive market from one or more economic factors. Normally, profit potential is limited by the emergence of competitors who see a surplus of demand over supply, and who then add to supply in order to earn a share of that surplus profit. "Rent-seeking" behavior occurs when

45

economic agents find constraints on competition that protect them from new supply, locking in levels of profit that would not be available if the market were free to seek equilibrium.

71.     Typically, such constraints on competition arise from the political domain. Textbook examples include protective tariffs, lobbying efforts to insulate existing firms from emerging competitors, subsidies of various kinds to offset costs to "incentivize" particular outcomes (e.g., tax reductions as corporate lures by economic development agencies), and various forms of regulation that may explicitly or implicitly establish quotas.  Scholars including Richard Posner, Edward Glaeser, Erico Moretti – among others – have maintained that excessive zoning is a classic contributor to rent-seeking behaviors leading to market distortions. (See, *inter alia,*  Richard A. Posner (1975), 'The Social Costs of Monopoly and Regulation', Journal of Political Economy Vol. 83, No. 4; Edward Glaeser, *The Triumph of the City, especially Chapter 6 "What's So Great About Skyscapers (pp. 135-164) Penguin Press, 2011; Hsieh, Chang-Tai, and Enrico Moretti. 2015. "Housing Constraints and Spatial Misallocation."NBER Working Paper 21154.)*

72.     The key to understanding "rent-seeking" is that constraints can create artificial scarcities, and the beneficiaries of those scarcities can bolster their profits beyond free-market levels without themselves making any further contribution to the economy. To this degree, such profits amount to unearned income, paid for at the expense of economic inefficiency. But someone has to pay for those profits, and that can be taxpayers, consumers, or particular other economic agents.

73.     Enforcement of zoning restricting 60/40 adult entertainment venues opens the door to a particularly obvious occasion for rent-seeking behavior. Because such establishments may only relocate to narrowly confined districts, a quasi-monopoly power is bestowed upon

46

0206

landlords in such districts. Any other permitted use in those areas (including South Bronx neighborhoods like Hunts Point, the industrial areas remain in the north Queens district of College Point, and the warehousing/manufacturing districts along Newtown Creek in Williamsburg/Greenpoint) would be subject to normal price adjustments accord to classic supply/demand laws. But any adult entertainment use would be immediately recognized by a building owner as having limited options in securing a facility, tilting negotiating power toward the landlord. Rent-seeking behavior would prompt the landlord to extract additional profit from the adult entertainment tenant, whose options would be restricted by the knowledge of other potential landlords who would also push for "rent-seeking" levels of surplus profit.

74.     Such higher business costs would either be absorbed by the tenant itself, or be passed along to consumers. The added costs of time and travel to venues less accessible locations than the existing Manhattan 60/40 businesses are also economic inefficiencies borne by consumers, costs that are part of the economic "payment" for landlords' unearned advantage as quasi-monopolists, an advantage provided by the zoning regulation. Finally, to the degree that increased inefficiency is occasioned by such rent-seeking, lesser economic activity can be expected for the City of New York, on a net basis, to the detriment of its residents, workers, and employers as a whole.

### III. Conclusion

75.     Manhattan offers unprecedented walkability, transit access, proximity to hotels, and a patron base that lives and works nearby and has disposable income to spend on entertainment in a way that the other boroughs of New York City and indeed no other place in the United States can match.  In addition, the neighborhoods accommodating existing adult businesses in New York City have benefited from the general appreciation in property values

0207

over the last two decades or more, and have also participated in the long-term decline in crime that has marked recent history in New York. Economically, there seems to be little reason to consider adult entertainment venues in any distinct way as different from other land uses catering to the public consuming target-market specific services.

76.     Uprooting existing establishments from locations where they have flourished as part of a district's mix of uses into areas with lesser levels of live-work-play synergy and access to resident and visitor volumes would inflict a measurable degree of economic hardship on such businesses, as well as other businesses with which they share synergy. In effect, the forced relocation of the 60/40 venues would divorce the "play" element of the live-work-play nexus from the residential and employment supports critical to its economic viability. Such separation follows the outdated Euclidean approach of use segregation put in place during the era of environmentally noxious heavy industry, which has been tempered for decades in New York City by the widespread practice of "zoning overlays," specific exceptions to the basic permitted uses in the Zoning Resolution in recognition of the City's economic and social evolution.

77.     Potentially eligible adult business relocation sites in Hunts Point (Bronx), College Point (Queens), and Williamsburg (Brooklyn) have lower levels of potential patronage from neighborhood residents, who are typically fewer in number and lower in income than those near the existing Manhattan 60/40 adult entertainment venues. The outer-borough sites have far less potential patronage from their local employment bases, with fewer workers and a vastly lower aggregate payroll. The distance of these sites from the Manhattan concentration of hotels, and the associated time and cost of travel – especially in the late night hours critical to adult entertainment patronage – would see a rapid decay of potential patronage, following established

48

principles of economic geography, readily illustrated by the tests of travel time and cost detailed above.

78.     All such factors point to a thinner market in the immediate vicinity of the non-Manhattan locations and increased time, effort, and transportation costs for prospective patrons visiting New York from elsewhere in the United States or from abroad. Those factors would tend to materially inhibit the willingness and economic incentive to patronize the prospective venues when compared with the six existing 60/40 establishments in Manhattan. The related diseconomies to consumers, diseconomies that would be magnified by landlords' rent-seeking behaviors described above, would reduce effective demand from a significant percentage of prospective patrons.

79.     Chart 7 documents New York's position as the world's top entertainment and media capital, in dollar terms, with more than twice the volume of Los Angeles and more than three times the volume of Chicago in terms of business receipts, according to data generated by PWC (f/k/a PriceWaterhouseCoopers). Tables 2 and 3 provide detail showing overall dominance in socio-economic terms and specifically in entertainment expenditures. Forcing venues (with the possible exception of large land-using facilities such as sports stadiums) into areas remote from Manhattan, places that may be unfamiliar to otherwise interested patrons or prospective patrons, particularly non-resident tourists and/or traveling businesspersons, will palpably reduce patronage, the businesses' likelihood of survival, and the public's access to the expression in the venues.

**Chart 7**



New York Is The World's Media Capital
Estimated entertainment & media spending in 2014*

| Location | Spending |
|---|---|
| New York | $19.7b |
| Tokyo | $19.5b |
| London | $16.3b |
| Seoul | $11.9b |
| Hong Kong | $9.1b |
| Los Angeles | $8.3b |
| Sydney | $8.0b |
| Chicago | $5.7b |
| Singapore | $5.4b |
| Berlin | $4.8b |

* includes consumer spending on internet access, entertainment & media as well as advertising spending
Source: PwC

@Statista_com

statista

80.    In summary, if 60/40 locations presently thriving in Manhattan are forced to relocate to the outer Boroughs, the loss of affluent patronage, inconvenience of location vis-à-vis the center of commercial and tourist activity, and the diminution of demand resulting from weaker local resident spending, combined with weaker local workforce spending, and weaker travel/tourism spending would likely reduce patronage at adult entertainment establishments below the level of economic viability. The additional negative effect of "rent-seeking" on the part of landlords granted quasi-monopolistic pricing power under the contemplated zoning enforcement would paradoxically increase the business costs of the displaced venues, despite the likely downward pressure on their income-producing potential. This squeeze from both the

demand and supply sides would in all likelihood amount to an existential threat to the adult entertainment industry's economic future.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___9___ day of November, 2018, within the United States of America, at New York, New York,

_____
Hugh F. Kelly, PhD, CRE

51

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
725 EATERY CORP., etc., *et ano.,*          :

                            Plaintiffs,          :

         - against -          :          Civil Action No.
                                             02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,          :

                     Defendants.   :
---------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*   :

                            Plaintiffs,          :

         - against -          :          Civil Action No.
                                             02 CV 4432 (WHP)
THE CITY OF NEW YORK, et al.,          :

                     Defendants.   :
---------------------------------------------------------X
CLUB AT 60^(TH) STREET, INC., etc., *et al.,*   :

                            Plaintiffs,          :

         - against -          :          Civil Action No.
                                             02 CV 8333 (WHP)
THE CITY OF NEW YORK,          :

                     Defendant.   :
---------------------------------------------------------X

**AFFIDAVIT OF DR. LANCE FREEMAN**

       Comes now Affiant, Dr. Lance Freeman, who states under oath and under penalty of

perjury as follows:

       1.       I, Lance Freeman, am a Professor in the Urban Planning program at Columbia

University in New York, New York.  I hold both a Masters degree and a Ph.D in City and

1

Regional Planning from the University of North Carolina at Chapel Hill.  I have also taught in the School of Urban Affairs and Public Policy at the University of Delaware and, prior to entering academia, was previously employed as a researcher at Mathematica Policy Research in Washington, D.C.  I have also worked as a City Planner for the New York City Housing Authority, as a budget analyst for the New York City Department of Environmental Protection, and as a Community Development coordinator for the North Carolina Institute of Minority Economic Development.  Sum total, my professional career in the urban planning field spans more than two decades.

2.      I have been employed at Columbia since 1999.  In my 18 years at Columbia, I have taught a range of courses addressing community development, research methods, and housing policy.  My scholarly agenda has focused on gentrification patterns and the relationship between the built environment and well-being.  I have published numerous articles in refereed journals on issues related to neighborhood change, urban poverty, housing policy, and urban sprawl, including "Gentrification and Displacement in New York City." *Journal of the American Planning Association*. 70(1):39-52 (with Frank Braconi).  I am also the author of the book *There Goes the Hood: View of Gentrification from the Ground Up* (Temple University Press).  A copy of my most recent curriculum vita is attached to this affidavit.

3.      Prior to issuing this affidavit, I conducted research into existing housing patterns, property values, crime rates, and gentrification patterns in the Times Square Business Improvement District.  In my research, I relied upon the following sources:

a.      1967. "WOR-TV To Examine Times Square Area." *New York Times*, June 30, 1967.

b.      1972. "Bringing Back Broadway." *New York Times*, August 12, 1972.

c.      1974. "New Times Square." *New York Times*.

0213

d.      2007. "Did Giuliani Really Clean Up Times Square?". CBS News, Last Modified December 28, 2007, accessed June 20, 2017. http://www.cbsnews.com/news/did-giuliani-really-clean-up-times-square/.

e.      Chakraborty, Deblina. 2016. "When Times Square was Sleazy." *CNN*, April 18, 2016.

f.      Freeman, Lance. 2012. "Gentrification and Well-Being." In *International Encyclopedia of Housing and Home*, edited by Susan J. Smith. Elsevier.

g.      Gent, George. 1967. "The Great Blight Way Seen on Channel 9." *New York Times*, July 13, 1967.

h.      HR&A. 2007. Valuing Times Square: The Economic Impact of Times Square. New York, NY: Times Square Alliance.

i.      HR&A. 2011. Times Square Retail Study Update. New York, NY: Times Square Alliance.

j.      Lieberman, Samuel. 2016. "Times Square Crime Has Dropped So Much That the Police Station Is Losing Its Jail Cell." *New York*, February 18, 2016.

k.      New York City Department of City Planning. 1994. Adult Entertainment Stuudy. New York, NY: New York City Department of City Planning.

l.      Reichl, Alexander J. 1999. *Reconstructing TImes Square: Politics and Culture in Urban Development*: University of Kansas Press.

m.      Rosen, Felix GilbertLew. 1963. "Activity is Brisk Near the River New Office Buildings and Motels Brighten 42nd Street's Tarnished Image." *New York Times*, November 17, 1963.

n.      Shadish, William R., Thomas D. Cook, and Donald T. Campbell. 2002. *Experimental and Quasi-Experimental Designs*. Boston: Houghton Mifflin Company.

4.      Prior to issuing this affidavit, I also reviewed the New York City Department of City Planning 1994 Adult Entertainment Study.

5.      Based upon my experience, education, research, and teaching, I have formed an opinion as to whether current urban development conditions in the Times Square area are similar or different from those that existed in 1994.  In this affidavit, I offer my opinion on the changing condition of the neighborhood encompassing the Satin Dolls Club and Lace adult entertainment

0214

venues, hereafter referred to as Times Square, and the soundness of research methodology employed by the New York City Department of City Planning (DCP) in its 1994 Adult Entertainment Study.

6.      My analysis of anecdotal, historical and systematic evidence leads to the conclusion that the neighborhood encompassing the Satin Dolls Club and Lace adult entertainment venues, hereafter referred to as Times Square, has experienced gentrification. The Satin Dolls Club is located at 689 8th Avenue and Lace is located 725 7th Avenue. Both clubs are in Manhattan.

7.      In addition, after reviewing the research methodology employed by the DCP in its 1994 Adult Entertainment Study, I conclude that reliable and valid inferences about the relationship between adult oriented businesses and secondary effects cannot be drawn.

8.      In the remainder of this affidavit, I define gentrification, specify the neighborhood conditions in Times Square that have changed in a way consistent with gentrification, and detail my critique of the research methodology employed by DCP in its 1994 Adult Entertainment Study.

**I.   Definition of Gentrification**

9.      Gentrification is a type of neighborhood change whereby a neighborhood housing or serving a relatively poor and/or marginalized population experiences an influx of investment and begins to service a higher socioeconomic status population with more upscale retail and services.[1]

---

[1] (Freeman 2012)

0215

## II.  Evidence of Gentrification

10.     This section presents evidence of the gentrification of Times Square. First considered is whether Times Square was at one time a neighborhood housing or serving a relatively poor or marginalized population.

11.     There is considerable historical evidence that Times Square was at one time considered a dangerous district that provided services for marginalized groups and outcasts. Indeed, decades before the Department of City Planning Report was completed in 1994, the Times Square neighborhood had been considered the "red light" district of New York. The decline of the Times Square area from the "Great White Way" and theater capital of America is traced by Political Scientist Alexander Reichl to Prohibition during the 1920s and 1930s. Without liquor sales, many legitimate theaters in the area found it difficult to remain profitable. To survive, some theaters converted to burlesque houses while others converted to theaters showing "B" movies targeting a largely male audience. Other types of downscale entertainment such as adult bookstores, arcades, and "dime museums" found their niche in the evolving honky-tonk atmosphere.[2] It was a place that attracted adult men and those with non-majority sexual practices including homosexuals and transvestites.

12.     Thus, by 1960 Times Square's reputation as a red light district had already been established. A 1963 article described West 42nd Street as "the worst block in town."[3] In 1967 WOR-TV had produced a documentary entitled "The Great Blight Way" which documented the neighborhood's decline from opulence at the turn of the last century to its then current "garish" and "sordid" character where prostitution and other illicit activity was rampant.[4] A 1972 New

---

[2] (Reichl 1999)
[3] (Rosen 1963)
[4] (1967, Gent 1967)

0216

York Times editorial described the area as "the underlife" of New York City.[5] Another New York Times editorial two years later described the neighborhood as full of "sordid decay" and a "textbook of social pathology."[6] CBS News described the neighborhood in 1992 as "…a cesspool, overrun with crime and home to sex shops and peep shows. Drug addicts shot up on the street. Locals avoided the neighborhood."[7]

13. Aside from these impressionistic accounts, we can consider how the architects of the Marriott Marquis Hotel designed the building in the 1980s. According to Kathy Duffy, New York market director of public relations for Marriott International, the hotel was designed in the 1980s "…to shield both guests and employees from that chaos that was Times Square… The hotel main lobby, check-in and lobby was on the eighth floor, and it still is. At that time, it was for a reason," said Duffy. "You didn't want people at street level handling cash and checking people in because there was a lot of riff-raff in Times Square."[8]

14. Finally, the actions of the City and State of New York when implementing the Times Square Redevelopment Plan allow us to infer the marginalized condition of the Times Square neighborhood in the past. Starting in 1980 New York State declared portions of the neighborhood as "blighted" to justify using eminent domain to acquire properties for redevelopment. Blight typically refers to neighborhoods that are deteriorated or substandard in some way.

15. This brief overview of anecdotal and historical evidence makes clear that the Times Square neighborhood fit the image of a relatively marginalized neighborhood serving a less than upscale population in the last decades of the 20th century.

---

[5] (1972)
[6] (1974)
[7] (2007)
[8] (2007)

0217

16.     We now turn to considering the evidence supporting the contention that Times Square has underwent gentrification. Presented here will be both anecdotal, impressionistic accounts and more systematic data on neighborhood conditions in Times Square in the last decade of the 20th and first decade of the 21st century.

17.     A confluence of factors including the creation of the Times Square Business Improvement District, the Times Square Redevelopment Plan and the growing economic importance of central business districts led to the gentrification of Times Square beginning in the 1990s. The City and State's redevelopment plan for the area began to bear fruit as developers took advantage of tax incentives to redevelop theaters in the area, and to build new office towers and luxury housing. Times Square and the central business districts of Manhattan became more attractive as the finance, professional services and information sectors of the economy, which favor locating in dense central business districts, boomed in the late 20th and early 21st centuries.

18.     The end result is that by the first decades of the 21st century signs of Time Square's gentrification were very conspicuous.   Anecdotal evidence of Times Squares' gentrification abounds. A news article heralded the transformation of Times Square as "complete" by 2010. Tim Tompkins, president of the Times Square Alliance was quoted by CNN as saying "The problem used to be that you couldn't get through Times Square without getting mugged or killed, and then by the 2000s, the problem was you couldn't get through Times Square because it was so crowded."[9]

19.     More systematic data from secondary sources also suggest gentrification has been occurring in Times Square. Tourism in the area had risen 74% since 1993 to 35 Million in 2007

---

[9] (Chakraborty 2016)

0218

and was estimated to have reached 39 million visitors a year in 2011.[10] A study by an economic consulting firm found retail space in Times Square was more valuable than anywhere else in the City save for the tony shopping districts of Fifth Avenue and Madison Avenue.[11] As Alexander Reichl put it, Times Square has been transformed from "…a low-income entertainment district into a Disney-fied tourist mecca."[12] An article in New York Magazine reporting the pending closure of the Times Square holding cell also gives one a sense of the gentrification that has occurred in Times Square. "Things have changed dramatically in Times Square," said deputy commissioner of management and budget Vincent Grippo. "We don't view Times Square as a high-crime area, certainly not the types of crimes we were looking at decades ago." In 2014 Times Square had one-tenth the number of violent crimes it saw in 1994.[13]

20.    The final set of evidence considered here are trends in crime, housing values, and median household income. Crime is considered by social scientists a measure of disorder and often declines in neighborhoods undergoing gentrification. Increases in household income and housing values typically occur in gentrifying neighborhoods and are commonly used metrics by social scientists to track gentrification.

---

[10] (HR&A 2011, 2007)
[11] (HR&A 2007)
[12] (Reichl 1999)
[13] (Lieberman 2016)

0219



Source: NYC Police Department, http://www1.nyc.gov/site/nypd/stats/crime-statistics/crime-statistics-landing.page

21.     Figure 1 shows trends in seven major felonies (murder, rape, robbery, felonious assault, burglary, grand larceny and grand larceny auto) from 1990 to 2016 for the Midtown South Precinct and Manhattan. Crime in the Midtown South Precinct, which encompasses Times Square, has fallen steadily over the past quarter century. Indeed, by 2016 the total number of crimes was less than 20% of what it was in 1990. This is a truly dramatic decline that confirms the anecdotal evidence cited above.

22.     Figure 2 illustrates trends in median household income (adjusted for inflation) for the census tracts that encompass the Satin Dolls Club (689 8th avenue) and Lace club (725 7th avenue), respectively. In both census tracts there has been a substantial increase in median household income. The increase in the census tract encompassing Lace has been spectacular, increasing nearly fivefold since 1990. But even in the census tract that encompasses the Satin

0220

Dolls Club there has been a sizable increase since 2000. The data presented in Figure 2 suggests the population in Times Square is becoming more affluent—a pattern consistent with gentrification.



Source: U.S. Census Bureau. Median Household Income, 1990, 2000, 2005/2009, 2011/2015. Prepared by Social Explorer. (accessed June 20, 2017).

23.     The final indicator of gentrification considered is median housing value. Figure 3 shows the trend in median housing values for the census tracts that encompass the Satin Dolls Club (689 8th avenue) and Lace club (725 7th avenue), respectively. The small number of housing units in the census tract encompassing Lace results in there not being  any data in the sample for 1990 and 2005/2009. Nevertheless, the upward trend in housing values in that census tract and the census tract encompassing the Satin Dolls Club is clear. Housing values have risen dramatically in Times Square according to the data presented in Figure 3. This trend is to be expected in a neighborhood experiencing gentrification.



Source: U.S. Census Bureau. Median Household Income, 1990, 2000, 2005/2009, 2011/2015. Prepared by Social Explorer. (accessed June 20, 2017).

24.     The data presented above show that since the 1990s Times Square has experienced considerable gentrification. Anecdotal, historical and systematic empirical evidence all show the neighborhood has experienced considerable gentrification.

25.     Aside from gentrification, the decline in the presence of adult-oriented businesses has also been another change in the neighborhood. For example, the Department of City Planning's 1994 study listed seven adult-oriented theaters in Community District Five, which includes Times Square. All of those theaters have since closed. The same DCP study lists 18 adult-oriented video stores in Community District Five. A search of Google Maps only list five such video stores as of this writing. Finally, there were 10 adult-oriented bookstores listed in the DCP study, but only one such store is revealed in a Google Maps search.

0222

26.     Taken together, the available evidence confirms the notion that the Times Square neighborhood has underwent considerable gentrification since the 1994 DCP Adult Entertainment Study.

### III. Critique of DCP Study Methodology

27.     In this section I offer my perspective on the reliability and validity of the conclusions drawn from the 1994 DCP Adult Entertainment Study.[14] Much of the study is actually a review of other studies done elsewhere. Here I focus on the portion of the study actually undertaken by DCP. In their study DCP surveyed street and signage conditions, local organizations and businesses, real estate brokers, and police and sanitation officers, and analyzed criminal complaint and property assessment data for six study areas across New York City. The hypothesis being tested in the DCP study is whether adult oriented businesses have deleterious impacts on the surrounding neighborhood.

28.     Social scientists look for five criteria when attempting to establish causality.[15] (1) The first is theory. In other words, if A causes B, there must be some theoretical explanation for why A might cause B. (2) The second is time order. If A causes B, A must precede B temporally. (3) The third is covariation. This means that if A causes B, then a change in A should result in a change in B. (4) Fourth, nonspuriousness is necessary to establish causality. Nonspuriousness means the relationship between A and B is not spurious, or B is caused by A and not some third factor (e.g. C). (5) Finally, both A and B must be correctly measured to establish A causing B. With these criteria outlined we can consider reliability and validity of the DCP findings.

29.     The surveys of local organizations and businesses, real estate brokers, and police and sanitation officers, while perhaps providing useful information, fail to establish causality

---

[14] (New York City Department of City Planning 1994)
[15] (Shadish, Cook, and Campbell 2002)

0223

between adult oriented businesses and conditions in the surrounding neighborhoods. The survey respondents give no indication as to whether any negative conditions they observed preceded the establishment of the adult businesses. We also don't know if there are alternative explanations for the neighborhood conditions that the survey respondents observed. Finally, we don't know if the respondents accurately measured the various neighborhood conditions alluded to in the survey. For these reasons, this section of the DCP study does not allow one to infer a causal relationship between adult oriented businesses and the surrounding neighborhood conditions.

30.     The DCP study also included a comparison of criminal complaints on block fronts with adult businesses and control block fronts without adult businesses. The findings of this portion of the study also fail to establish causality between adult oriented businesses and the surrounding neighborhood conditions. Although the authors of the study did include "control" block fronts, it is not clear that these control block fronts are truly comparable to the block fronts where the adult businesses are. As the authors themselves acknowledge, "differences in the number of criminal complaints between or among study areas may be a function of variations in population densities, or other factors for which no controls were established." Moreover, the study failed to establish time order—that is, adult businesses preceding any changes in crime rates.

31.     The final outcome considered in the DCP study is assessed property values on block fronts with adult businesses. This analysis also fails to establish causality between the presence of adult oriented businesses and assessed property values in the surrounding areas. Although assessed property values were collected for three points in time, it is not clear if the property assessments occurred before or after the establishment of the adult oriented businesses. Thus, time order is not established. It is possible that adult oriented businesses may be more

13

0224

likely to be established on block fronts where assessed property values systematically differ from assessed property values elsewhere. By failing to establish time order, we cannot rule this possibility out. Finally, although there are control geographies (e.g. control block fronts, the surrounding community district, etc.) included in the analysis we cannot be certain that these control geographies did not differ systematically from the block fronts with adult businesses in a way that leads to differences in assessed values. For example, the buildings on block fronts with adult oriented businesses may tend to be much smaller and appreciate more slowly. Without systematically attempting to control for differences in appreciation rates, we cannot rule this possibility out.

32.    It should also be noted that the aforementioned shortcomings of the research methodology notwithstanding, the DCP study could not "…draw definitive conclusions from the analysis of criminal complaints" and that "the analysis of trends in assessed values relative to adult entertainment uses was inconclusive."[16]

---

[16] (New York City Department of City Planning 1994, 49-58)

33.     In conclusion, the DCP study fails to document a causal relationship between adult oriented businesses and conditions in the surrounding neighborhoods. Moreover, given the gentrification in Times Square documented in the previous section, the conditions described in that neighborhood in the DCP study are no longer extant.

Further Affiant Sayeth Naught.

_____
Lance Freeman

STATE OF NEW ~~YORK~~ Jersey :
COUNTY OF Bergen :

Sworn to and subscribed before me in my presence on the ____30th____ day of June, 2017.

_____
Notary Public

DIANE PAVENTA
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Aug. 23, 2017

0226

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
729 CORP., etc., *et ano.,*      :

                          Plaintiffs,      :

           - against -                :            Civil Action No.
                                                02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,            :

                          Defendants.   :
--------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*  :

                          Plaintiffs,      :

           - against -                :            Civil Action No.
                                                02 CV 4432 (WHP)
THE CITY OF NEW YORK, et al.,            :

                          Defendants.   :
--------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et ano.,*   :

                          Plaintiffs,      :

           - against -                :            Civil Action No.
                                                02 CV 8333 (WHP)
THE CITY OF NEW YORK, et al.,            :

                          Defendants.   :
--------------------------------------------------------X

## **DECLARATION OF DAVID M. TALLA IN SUPPORT OF**
## **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

      David M. Talla, hereby declares the following pursuant to 28 USC §1746:

      1.      My legal name is David Michael Talla and I have personal knowledge of

the facts stated herein and would so testify if called as a witness at trial.

0227

2.      I submit this declaration on behalf of plaintiffs Club at 60th St., Inc. ("Club at 60th") and Jacaranda Club, LLC ("Jacaranda").

3.      During the period 1998 to the present, I have been the CEO of The Sports Club Company, Inc. ("SCC") (except from 2006 to 2012) and a Director throughout; and, since 2001 to the present, the CEO and sole shareholder of Club at 60th.

4.      Since December 2008, I have been the Manager of Jacaranda which owns and operates "Sapphire," an eating and drinking establishment located on the ground floor of 333 E. 60th St. in Manhattan (hereafter "the Premises") and which presents live adult entertainment in less than 40% of its premises.

5.      I have personal knowledge of the facts and circumstances set forth herein as they relate to the entire period described above. Any statements herein as to prior periods are true to the best of my information and belief, based upon the business records and information provided by personnel who worked at The Sports Club Company, Inc. or at 333 E. 60th St., or who were associated with SCC or Jacaranda at the time.

6.      At all times since 1979, the building on which the Premises are located (the "Building") has been, and currently is, a five-story building located in the shadow of and directly across the street from the Westside onramp to the Queensboro Bridge, on East 60th Street between First and Second Avenues.

7.      At all times since 1979, the Building has been, and currently is, located within what I am informed by legal counsel and my architect is a C8-4 zoning district and within five hundred feet (500') of several zoning districts, including the C2-8, C4-7 and C6-2 zoning districts, proximity to all of which is prohibited for adult businesses.

8.      Between 1991 and 1998 (when the 60/40 requirements took effect), live dance entertainment was presented throughout the public portion of the Premises, such that the business was an "adult eating and drinking establishment" under both the 1995 "adult use" amendments to the New York City Zoning Resolution (the "1995 Ordinance") and the 2001 Amendments.

9.      In 1998, SCC obtained the master lease for the property located at 333 E. 60th Street ("the Building"), thus becoming the sub-lessor of the Premises to the then-existing tenant, Scores.

10.     Beginning in 1998, concurrent with the enforcement of the 1995 Ordinance, the Premises were reconfigured so that live adult entertainment was presented only in less than forty percent (40%) of its customer accessible space.

11.     This re-configuration was ultimately achieved by building a sports bar, full service restaurant and kitchen facilities in 60+% of the square-footage attributable to the leasehold, at a cost of approximately $2,500,000.

12.     The purpose of this re-configuration was to conform to the space percentage requirements of the 1995 Ordinance, such that the Premises would no longer be classified as an "adult eating and drinking establishment" and the existing business could continue to operate. When the re-configuration was completed in 1998, Scores' operation, including presentation of its adult entertainment in less than 40% of the premises, was fully compliant with all existing zoning regulations including those of the 1995 Amendment.

0229

13.     The basic internal configuration of the Premises has not been materially altered since 1998, notwithstanding remodeling, and through today, the Premises have been continuously utilized to present the same live adult entertainment in less than forty percent (40%) of the Premises' customer accessible space.

14.     Concurrent with the re-configuration in 1998, the then-existing sexually themed exterior signage was removed and replaced by new and different "subdued" exterior signage in order to conform to the signage requirements of the 1995 Ordinance, at a cost of approximately $10,000.

15.     In May of 2001, SCC subleased the Premises to Club at 60th, which became the sub-sublessor to Scores and which sub-sublease remains in effect.

16.     Since December of 2008, Club at 60th has sub-sublet the Premises to Jacaranda which, in 2008, had purchased Scores' physical assets including its possessory interest in the property.

17.     In 2008 and 2009, when Jacaranda acquired and developed its interest in the Premises, respectively, enforcement of the 2001 amendments was enjoined City-wide by a preliminary injunction originally issued by the New York State Supreme Court in 2002.

18.     In 2008 Jacaranda assumed the existing sub-sub lease for the Premises, ultimately extending the term until September 30, 2028. Its current base rent is approximately $100,000 per month.

19.     After acquiring its leasehold interest in the Premises, Jacaranda substantially renovated and remodeled the location at a cost of $2,500,000. In its remodel

0230

in 2008-9, Jacaranda specifically remained fully compliant with the 60/40 requirement, which was the governing law at the time, whereby live adult entertainment would be presented in less than 40 percent of the customer accessible floor space.

20.     Jacaranda opened Sapphire at the Premises in January, 2009, and has continuously operated it there for almost 10 years as a 60/40 establishment presenting live adult entertainment in less than 40% of its space, with the balance utilized for a high quality full service restaurant with kitchen, food and beverage storage facilities and a sports bar, in full compliance with the requirements of the 1995 Ordinance.

21.     I am informed and believe that the subject Premises have been continuously used for the presentation of live adult entertainment since at least 1991, when 333 E. 60th Street, Inc., dba, "Scores" opened in the location.

22.     Jacaranda has in excess of 450 individuals including managers, DJs, cooks, bartenders, wait staff, bussers, janitors, security personnel, and entertainers in its workforce.

23.     I am advised by legal counsel and believe that the 2001 Amendments to the 1995 Ordinance changed the definition of an "adult establishment" for zoning purposes, such that regularly presenting live adult entertainment in "*any* portion" of the Premises will bring it within the definition of an "adult establishment" for zoning purposes. Given its proximity to various zoning districts including those described above, the 2001 Amendments will require Sapphire to re-locate in order to continue to offer *any* amount of adult entertainment.

0231

24.     Although the 2001 Amendments have not yet been enforced against the Premises or Jacaranda, should they hereafter become enforceable, it would certainly be my desire for Jacaranda to continue to operate its business at a new location. However, I am unwilling and unable to do so because of the combination of reasons set forth herein and in Exhibit A hereto, which I have read and believe to be true and correct in all respects as concerns Jacaranda Club, LLC.

25.     My reluctance to relocate Sapphire is particularly heightened based upon several aspects of my own relatively recent personal experience in attempting to establish a second Sapphire location in Manhattan on 39th St.

26.     Starting in 2012, and after searching for nearly two years, we found one of the few legally permissible, commercially viable and available sites in Manhattan for an adult eating and drinking establishment, located at 20 West 39th St. (hereafter "Sapphire 2"). After extensive negotiation, we acquired a leasehold interest in the property on July 1, 2014.

27.     After we obtained our no work building permit (which confirmed and "guaranteed" that we conformed to all relevant zoning requirements), an unrelated competitor adult entertainment establishment caused several unfounded "objections" to the validity of our permit to be filed by a church organization. We retained counsel, who, with our architect, vigorously opposed the challenges which were ultimately rejected by the DOB, but only after nine months of intense administrative battles. Even though we prevailed, we incurred significant legal and other professional fees to do so.

28.    I've been advised by our attorneys and architect that if the opponents had started their opposition earlier before our permit was granted, they might well have succeeded. Fortunately, they did not.  But, *unfortunately*, while our permit was being challenged, we understandably did NOT go forward with generating the architectural and design plans necessary to proceed with our contemplated extensive remodeling of the new location until we had definitively prevailed. During this nine month "holding" period, we paid approximately $480,000 in rent while we fought back the challenges to our permit and before filing our remodeling permit applications many months later.

29.    Ultimately our building permits were definitively upheld and issued, we completed construction, obtained our temporary and permanent certificates of occupancy and place of assembly permit and our SLA permit. We completed our interior design work, hired and trained our work force and thereafter opened in October, 2016 – approximately four years after we began our search for a location.

30.    Thereafter, to my shock after struggling for four years with Sapphire 2, I only recently learned from my legal counsel that our Sapphire 2 business could be forced to close within one year should the City hereafter rezone any of the property within 500 feet of it (including the property itself) to any of a number of commercial districts or any manufacturing districts which allow mixed-use residential uses. This is in contrast to what I understand to be the rule for every other type of business in the City which, upon becoming a nonconforming use, may remain in perpetuity.

31.    Opening an adult eating and drinking establishment like Sapphire is an extremely costly proposition. It requires long term leases, building permits, architectural

0233

plans, the installation of one or more stages, and sophisticated sound and lighting equipment and wiring, significant remodeling to comply with rigorous ingress and egress requirements, obtaining an SLA permit and other substantial steps.

32.    I am also aware that the City often goes through a preliminary process for contemplated zoning changes of a particular district or districts. During that time, it is known that a certain area is under consideration for a zoning change (and what change is contemplated), but the area is not definitively zoned differently until when and if the process is complete and the change is formally implemented. I know that there are significant areas throughout the City which are being considered for zones changes which would render areas (and any areas within 500 feet) impermissible for adult businesses which currently are permissible. Obviously, we would not consider relocating to any such areas even if any included an otherwise currently suitable, available and commercially viable location.

33.    Based upon the cost, time and uncertainty I encountered establishing Sapphire 2, combined with what I have now learned about the uncertain prospects for long-term stability for any adult business, I would unquestionably *not* attempt to relocate our original Sapphire business to any location in New York City requiring any significant alterations, remodeling, adult zoning approval or a new certificate of occupancy modified to allow adult use.

34.    Even if we wanted to move out of Manhattan, which we do not, we do not know where we could possibly endeavor to relocate. The City has not generated any

0234

maps, or provided any other information, indicating permissible areas for "adult eating and drinking establishments."

35.     More significantly, based on what I have learned in my efforts to open businesses presenting adult entertainment in Manhattan, there is *no* possibility, even if we could find a feasible compliant location, that we could relocate and open in under a year, and, in all likelihood, it would take several years.  As a result, any relocation of our business (no matter how unlikely a possibility) would cause us to lose practically all our regular customers and the goodwill we have developed over the last four years.

36.     The City limits the allowable size of the portion of any business presenting adult entertainment to 10,000 square feet. Our type of upscale adult entertainment business needs a site as close as possible to that amount of square footage in order to commercially succeed.

37.     Sapphire occupies 10,000 sq feet at its 60th Street location, of which less than 4,000 sq feet are used for the presentation of adult entertainment. Sapphire 2 also occupies 10,000 sq feet, but because it is zoning compliant even under the 2001 Amendments, it may use all of that space to present adult entertainment. We could not replicate (for possible relocation purposes) our current 60th St Sapphire location in less than 10,000 sq feet, or in less than 5,000 sq feet if we were to discontinue the restaurant use if the 2001 Amendments were upheld and enforced and the 60/40 format was eliminated. It is very difficult to locate a site this size.

0235

38.     I have had conversations with countless patrons, employees, managers and others at the club during my many years as Manager of Jacaranda. The vast majority of Sapphire's patrons are local residents, employees of local businesses, and tourists visiting Manhattan. I do not believe that any significant percentage of these patrons would go outside of Manhattan to visit a potentially relocated Sapphire. Accordingly, it is my considered opinion that Sapphire could not successfully operate outside of Manhattan. Moreover, I am unaware of any commercially feasible and legally permissible locations which are currently available in the Borough of Manhattan to which Sapphire could possibly re-locate.

39.     Neither Jacaranda, LLC nor Club at 60th St. was a party to any prior lawsuit challenging the constitutionality of the 2001 Resolution.

40.     Given all of these facts and circumstances, if a preliminary injunction is not issued, and the 2001 Resolution, which has never been enforced against existing businesses, becomes enforceable, then we must immediately cease presenting our live adult entertainment.

41.     Because of the critical role adult entertainment plays in the operation of our business, without it, we will sustain significant damages that would require the business to permanently close. If we are forced to close, the approximately 450 individuals in our workforce will lose their jobs. The consequences to our business – and to our customers – and to our workforce will be devastating and irreparable.

42.     Jacaranda has no source of income other than revenue from Sapphire, so if it is forced to close, it would almost immediately become insolvent and unable to pay its

0236

obligations, including its lease, utilities, taxes, insurance and other vendor contracts and would likely have no choice but to file bankruptcy.

43.     Without a preliminary injunction, the City could bring enforcement proceedings under the Nuisance Abatement Law while this Court is considering the merits of our civil rights lawsuit. It would not help us to eventually win the case if our expression has been enjoined, and we already lost our business and livelihood.

44.     In addition to Nuisance Abatement proceedings, 60/40 businesses like Sapphire across New York City could face criminal charges as part of the City's potential enforcement campaign if we did not have injunctive relief pending resolution of this case. Such a prosecution can subject the operator (and employees) of an adult eating and drinking establishment like Sapphire to a conviction and *imprisonment of up to one year* if there is live adult entertainment in Premises which are not properly zoned for it.

45.     I would cause Sapphire to cease presenting any live adult entertainment, and silence our expression, rather than run the risk of my, or members of our work force, being thrown in jail or facing criminal prosecution.

46.     For all these reasons, and those contained in the other documents filed in this case, I respectfully ask that the Court grant the Plaintiffs' motion for a preliminary injunction, and such other and additional relief as is just under all the circumstances of this case.

I hereby declare the preceding statements to be true and correct under the penalty of perjury.

0237

Executed in the United States of America, at Los Angeles, California, on the ___ day of November, 2018.

_____
David M. Talla

Executed in the United States of America, at Los Angeles, California, on the 12 day of November, 2018.

David M. Talla

0239

## EXHIBIT A TO DAVID M. TALLA DECLARATION

**I.    Zoning Restrictions**

A.    In order to leave the business's current location and relocate to a new location, the business must first locate a site that meets the City's zoning requirements.

B.    I am not adept at the legalities of the zoning and building code. I would need expert assistance, including at a minimum, lawyers, real estate brokers and architects, to help me find a legally permissible and suitable relocation site. This expert assistance would likely be costly and time-consuming.

C.    I am also aware that the City has made several changes to the zoning in areas throughout the City since enactment of the 2001 amendments and that a great deal of land which used to be legally permissible for adult businesses is now prohibited.

D.    I am also aware that the City requires any lawful adult business which becomes nonconforming due to one of these zoning changes to terminate within one year after the City makes any such zoning change.

E.    This means that, even if my business were to relocate to a site that today conforms with the City's zoning restriction, the City could subsequently change the zoning of the site and render it nonconforming. The City could also change the zoning of any areas within 500 feet of my relocation site to one of the numerous districts which prohibit adult uses, which could also make my relocation

1

0240

site nonconforming. As a result, even if I were to relocate my business, I could be required to close it within a year of any zoning change. This shifting zoning landscape makes me very reluctant to invest the time, money, resources, marketing, and energy it would take to move my business from its current location to an entirely new location.

      F.      Given the possibility that the City could change the zoning of such a site before it even opened, and certainly long before it made enough income to offset the very substantial startup costs and justify the risk of entering into an expensive long term lease, it simply would make no commercial sense to attempt to relocate so long as the City continues to require the termination of adult businesses, and no others, within a year after they become nonconforming.

## II.     Loss of Manhattan-Based Economic and Commercial Value

      A.      My business's goodwill has been established in Manhattan, and the type of business I operate obtains a substantial portion of its income from both domestic and international tourists. Those patrons almost always book accommodations in Manhattan rather than the other boroughs, because it is well known as the entertainment capital of the world.   If the business was to move outside of Manhattan, it would lose a key consumer base and would likely no longer be economically viable.

      B.      There is high economic value to being located in Manhattan. This stems from a variety of factors, including proximity to other entertainment and nightlife venues, high pedestrian traffic, and a strong tourism and business market.

0241

Moving from Manhattan would cause my business to suffer significant economic loss.

     C.    Additionally, many of our patrons merely work in Manhattan or are there only temporarily on business. For them, as with traditional tourists, the proximity and ease of accessing my business enhance its appeal and their interest in and willingness to patronize it. They are familiar and comfortable with Manhattan, either personally or anecdotally, and like the rest of the world, have heard much about Manhattan's vaunted and celebrated nightlife and entertainment venues.

     D.    The prospect of locating and travelling to and from an adult eating and drinking establishment like my business (in the unlikely event that I could relocate and re-establish it) in The Bronx, Staten Island, Queens, or Brooklyn, would be both daunting and disincentivizing to many of my current and prospective patrons. For many of those who do not live in New York City, and even for some who do, the "unknown" factor alone (especially during nighttime) would be inhibiting, in addition to the physical difficulties, significantly increased travel time and expense (charges and tolls) in getting there and back via public (trains and buses), cabs and Uber or self-driving. My Manhattan business is in a known, comfortable, inviting and easily accessible location; none of which would be inherently true if it were required to move to another borough.

0242

### III.    Permitting Problems

A.    In my experience, including what I've been advised, it would take *substantially* more than a year to relocate my business from its existing location to a new location.

B.    After finding a suitable, available, and legally permissible site, I would then have to negotiate the terms of a lease with the landlord and/or obtain financing to purchase the property outright. This process would be complicated by the fact that all other displaced 60/40 adult uses would be competing for the same small number of available relocation sites.

C.    Assuming I was able to secure the property, I would then be required to seek a variety of building and zoning approval permits, depending on the property's prior usage. Because I am not savvy at navigating the City's building and zoning requirements, I would need additional expert assistance with this process. This would be costly and time-consuming, and especially so because adult uses are not permitted to self-certify the plans for their building permit applications.

D.    Zoning approval is part of the building permit process. Based on my experience as an adult business owner in New York City, I understand that just obtaining zoning approval for adult uses routinely takes many months, and in some instances well over a year.

E.    Upon receiving zoning approval, I would also need to hire architects and engineers, at great cost to me, to prepare the detailed building permit plans that are required to comply with the City's building code provisions. This, as well,

4

0243

would be not only expensive, but add substantial additional time to the startup process.

F.      Once building permits finally issued, I would commence the process of construction and seeking a temporary, and ultimately permanent, certificate of occupancy. This would add very substantial additional time to the overall time necessary to relocate and open.

G.      In addition, it is my understanding that any new premises would have to qualify for permitting by the Department of Buildings and New York City Fire Department as a "place of assembly." This would require a Certificate of Occupancy permitting the use, as well as compliance with all of the myriad Occupancy Group F-4 (as to premises subject to the 1968 Building Code) or Assembly Group A-2 (as to premises subject to the 2014 Building Code) rules and regulations concerning ingress and egress, sprinklers, fire alarms, and the like, a Place of Assembly Certificate of Operation, and an approved Place of Assembly Plan (subject to a separate Building Department examination). These requirements are summarized in the Building Department's published Code Notes for Place of Assembly PA Applications (https://www1.nyc.gov/site/buildings/business/place-of-assembly.page). While existing places of assembly would qualify, other commercial spaces typically would not without substantial, time-consuming, and expensive alterations subject to the Building Department processes of plan examination, approval, permitting, and inspection. Although, as I understand it, applications for places of assembly permits are generally filed during the building permit or construction phase, they cannot be actually *issued* until after the temporary

5

0244

certificate of occupancy is granted, and the process of actual issuance of the assembly permit can add substantial additional time to the entire project.

H.     Moreover, even if I am successful in finding a lawful and commercially available relocation site and obtaining all the necessary permits and inspections, I still would have to meet the separate "siting" standards of the Alcoholic Beverage Control ("ABC") Law and the Rules of the State Liquor Authority ("SLA") in order to continue selling liquor, which is an essential component of my business. As premises licensed by the SLA to sell liquor "on premises," my business cannot be operated at another location without the permission of the SLA, which requires that any business locations comply with local law [see SLA Rule 48.3] *and* satisfy the "public interest and convenience" criteria [see ABC Law, *§§* 64-(7)(b) and (f) (License to sell liquor at retail for consumption on the premises")] when there are more existing premises licensed within five hundred feet of a proposed new business to be licensed. Upon the advice of counsel, and based upon my own knowledge as an experienced consultant, manager, and operator of licensed premises, if otherwise suitable locations could be found, they would require a discretionary approval by the SLA that the grant of the license would be "in the public interest" if located within 500 feet of three other on-premises liquor-licensed premises (regardless of any consideration of "adult") [see ABC Law §64-(7)(f)], and no license could be issued prior to review by and consultation with the local Community Board [see ABC Law§ 64-(7)(f)]. In short, the requirement of SLA approval of any location would considerably complicate, and potentially substantially delay, the process of re-locating and opening my business.

0245

I.      Yet another problem that would deter me from attempting to relocate to a new site not previously zoned for an adult use, is what I've heard described as the "sensitive use veto" problem. My attorneys have explained, and based on my experience as an operator of adult businesses in the City I have come to understand, that while a building permit application for an adult business is pending - as part of the business' efforts to obtain city confirmation that it is lawfully located and secure prioritization of its location against any new disqualifying businesses coming in and knocking out the adult business - if the disqualifying new business gets its permit first, then the adult business will be disqualified, even if it filed its permit application way before the disqualifying new business. If this weren't bad enough, my attorneys have advised me that non-adult businesses can get their permits granted much faster than an adult business.

J.      My own experience with this "sensitive use veto" is described in Paragraph nos. 25-28 of my declaration to which this Exhibit A is attached.

## IV.    Chilling Effect of the Above

Based on all of the above, and based upon my knowledge of the New York City adult business industry, I believe it would be impossible to relocate and open in less than a year and would likely take at least as much as several years to do so.

As a result of each of the above-described problems, risks and costs facing an adult club attempting to relocate, and, because there is no realistic option for relocation, if the 2001 Amendments are enforced and I were forced to close my existing business, although it would certainly be my desire for our club to continue

0246

to operate its business at a new location, I am unwilling and unable to attempt to do so because of the combination of reasons set forth herein and in my accompanying declaration and would simply close my business.

0247

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
725 EATERY CORP., etc., *et aL.,* :

                              Plaintiffs,      :

         - against -                           :         Civil Action No.
                                                         02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,                  :

                              Defendants.  :
-----------------------------------------------------------X

## DECLARATION OF KEITH WARECH IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Keith Warech, hereby declares the following pursuant to 28 USC §1746:

1.      My legal name is Keith Warech and I have personal knowledge of the facts

stated herein.

2.      I submit this declaration on behalf of plaintiffs 725 Eatery Corp. d/b/a

"Platinum Dolls" ("Platinum Dolls") and 689 Eatery Corp. d/b/a "Satin Dolls" ("Satin

Dolls").

3.      725 Eatery Corp. d/b/a Platinum Dolls has been doing business at premises

725 7th Avenue, New York, New York ("Building") since approximately September 17,

2018.  Prior to that time, the business was known as "Lace".  During this period I have

been the President and Sole Stock Holder.   I have personal knowledge of the facts and

circumstances set forth herein as they relate to that period. Any statements herein as to

prior periods are true to the best of my information and belief, based upon the business

1

records and information provided by personnel who previously worked at this location operating a similar business.

4.      I am advised by counsel and believe that our live entertainment is defined by the "1995 Ordinance".

5.      I have reviewed the Declaration of Anthony Capeci and concur with the facts set forth in that Declaration.

6.      The internal configuration of Platinum Dolls has not been materially altered since September 17, 2018 and it continues through the present to feature live entertainment as defined by the 1995 Ordinance in less than forty percent (40%) of its customer accessible space.

7.      Platinum Dolls has maintained "subdued" exterior signage in order to conform to the signage requirements of the 1995 Ordinance.

8.      Satin Dolls has been doing business at premises 689 8th Avenue at 43rd Street, New York, New York ("Building") since approximately 2017.  During the period 2017 - present, I have been the President and Sole Stock Holder.   I have personal knowledge of the facts and circumstances set forth herein as they relate to that period. Any statements herein as to prior periods are true to the best of my information and belief, based upon the business records and information provided by personnel who previously worked at this location operating a similar business.

9.      At all times since 1992 the Building has been and currently is a five story building located in Times Square in Manhattan, at 689 8th Avenue and is currently the

2

tenant and occupant of the basement and first floor of the Building. The upper floors are residential apartments.

10.     At all times since 1992, the Building has been and currently is located within a C-6-4 zoning district and within five hundred feet (500') of a sensitive receptor which does not allow for an "Adult Use" as defined by the 1995 "Adult Use" amendments to the New York City Zoning Resolution.  (The "1995 Ordinance").

11.     Between 1992 and present, Satin Dolls and its predecessor featured entertainment as defined by the 1995 Ordinance throughout the occupied portion of the Building.

12.     I am advised by legal counsel and believe that the 2001 Amendments to the 1995 Ordinance changed the definition of "live entertainment" for zoning purposes, such that regularly featuring entertainment (as defined by the 1995 Ordinance) in "any portion" of Platinum Dolls or Satin Doll's space will bring it within the definition of the 1995 Ordinance for zoning purposes and, given its  proximity to sensitive receptors, will require it to re-locate in order to continue to offer this type of entertainment on their business premises.  Both Platinum Dolls and Satin Dolls have ten (10) years remaining on their respective leases.

13.     In that event, it would certainly be my desire to re-locate both Platinum Dolls and Satin Dolls, and continue to operate the business.  However, I am unwilling and unable to do so because of the reasons set forth in Exhibit A hereto, which I have read and believe to be true and correct in all respects as concerns both Platinum Dolls and Satin Dolls.

0250

14.    Furthermore, I have had conversations with many patrons while operating Platinum Dolls and Satin Dolls. The vast majority of its patrons are tourists and business people visiting the Times Square area of Manhattan. I do not believe that any significant percentage of these patrons would have any interest in traveling outside of Manhattan. Accordingly, it is my considered opinion that Platinum Dolls and Satin Dolls could not realistically be moved outside of Manhattan. Furthermore, if Platinum Dolls and Satin Dolls were required to re-locate in order to remain in business, I would have to find two properly zoned locations that would comply with the current Administrative Code and regulatory requirements, including handicap accessibility, public assembly and fire code requirements. Moreover, in order to realistically conduct business, each business would require a <u>minimum</u> of 2,500 square feet of space for one or more bars, one or more stages, main and VIP customer seating areas, offices, storage of liquor, dressing rooms and toilets. It is my understanding, based upon inquiry of local real estate brokers and others in our industry, that no such locations are currently available, and that it is likely that it would take a year or more in order to find and convert one (not two) for use as an adult cabaret.

15.    Given all of these facts and circumstances, I am advised by legal counsel and believe that Plaintiffs should be granted a preliminary injunction against enforcement of the 2001 Amendments and related provisions of the Amended Zoning Resolution.

***WHEREFORE,*** I urge the Court to grant Plaintiffs' motion for a preliminary injunction, together with such other, further and different relief as is just, necessary and proper.

0251

Executed in the United States of America, at New York,
New York, on the _15_ of November, 2018.

Keith Warech

**Exhibit A to Warech Declaration**
**Reasons Precluding Relocation of 60/40 Adult Uses**

I.  **Zoning Restrictions**

A.  In order to leave the business's current location and relocate to a new location, the business must first locate a site that meets the City's zoning requirements.

B.  I am not adept at the legalities of the zoning and building code. I would need expert assistance, including at a minimum, lawyers, real estate brokers and architects, to help me find a legally permissible and suitable relocation site. This expert assistance would likely be costly and time-consuming.

C.  I have made a preliminary investigation, through lawyers and land use experts, into legally and commercially available sites in Manhattan and have been unable to locate any such sites in Manhattan.

D.  I am also aware that the City has made several changes to the zoning in areas throughout the City since enactment of the 2001 amendments and that a great deal of land which used to be legally permissible for adult businesses is now prohibited.

E.  I am also aware that the City requires any lawful adult business which becomes nonconforming due to one of these zoning amendments to terminate within one year after the City makes any such zoning change.

0253

F.     This means that, even if my business were to relocate to a site that today conforms with the City's zoning restriction, the City could subsequently change the zoning of the site and render it nonconforming. The City could also change the zoning of any areas within 500 feet of my relocation site to one of the numerous districts which prohibit adult uses, which could also make my relocation site nonconforming. As a result, even if I were to relocate my business, I could be required to close it within a year of any zoning change. This shifting zoning landscape makes me very reluctant to invest the time, money, resources, marketing, and energy it would take to move my business from its current location to an entirely new location.

G.     Given the possibility that the City could change the zoning of such a site before it even opened, and certainly long before it made enough income to offset the very substantial startup costs and justify the risk of entering into an expensive long term lease, it simply would make no commercial sense to attempt to relocate so long as the City continues to require the termination of adult businesses, and no others, within a year after they become nonconforming.

.     **Loss of Manhattan-Based Economic and Commercial Value**

A.     My business's goodwill has been established in Manhattan, and the type of business I operate obtains a substantial portion of its income from both domestic and international tourists. Those patrons almost always book accommodations in Manhattan rather than the other boroughs, because it is well known as the entertainment capital of

the world. If the business was to move outside of Manhattan, it would lose a key consumer base and would likely no longer be economically viable.

      B.    There is high economic value to being located in Manhattan. This stems from a variety of factors, including proximity to other entertainment and nightlife venues, high pedestrian traffic, and a strong tourism and business market. Moving from Manhattan would cause my business to suffer significant economic loss.

      C.    Additionally, many of our patrons merely work in Manhattan or are there only temporarily on business. For them, as with traditional tourists, the proximity and ease of accessing my business enhance its appeal and their interest in and willingness to patronize it. They are familiar and comfortable with Manhattan, either personally or anecdotally, and like the rest of the world, have heard much about Manhattan's vaunted and celebrated nightlife and entertainment venues.

      D.    The prospect of locating and travelling to and from an adult eating and drinking establishment like my business (in the unlikely event that I could relocate and re-establish it) in The Bronx, Staten Island, Queens, or Brooklyn, would be both daunting and disincentivizing to many of my current and prospective patrons. For many of those who do not live in New York City, and even for some who do, the "unknown" factor alone (especially during nighttime) would be inhibiting, in addition to the physical difficulties, significantly increased travel time and expense (charges and tolls) in getting there and back via public (trains and buses), cabs and Uber or self-driving. My Manhattan business is in a known, comfortable, inviting and easily accessible location; none of which would be inherently true if it were required to move to another borough.

III. Permitting Problems

A.   In my experience including what I've been advised, it would take *substantially* more than a year to relocate my business from its existing location to a new location.

B.   After finding a suitable, available, and legally permissible site, I would then have to negotiate the terms of a lease with the landlord and/or obtain financing to purchase the property outright. This process would be complicated by the fact that all other displaced 60/40 adult uses would be competing for the same small number of available relocation sites.

C.   Assuming I was able to secure the property, I would then be required to seek a variety of building and zoning approval permits, depending on the property's prior usage. Because I am not savvy at navigating the City's building and zoning requirements, I would need additional expert assistance with this process. This would be costly and time-consuming, and especially so because adult uses are not permitted to self-certify the plans for their building permit applications.

D.   Zoning approval is part of the building permit process. Based on my experience as an adult business owner in New York City, I understand that just obtaining zoning approval for adult uses routinely takes many months, and in some instances well over a year.

E       Upon receiving zoning approval, I would also need to hire architects and engineers, at great cost to me, to prepare the detailed building permit plans that are required to comply with the City's building code provisions. This, as well, would be not only expensive, but add substantial additional time to the startup process.

F.      Once building permits finally issued, I would commence the process of construction and seeking a temporary, and ultimately permanent, certificate of occupancy. This would add very substantial additional time to the overall time necessary to relocate and open.

G.      In addition, it is my understanding that any new premises would have to qualify for permitting by the Department of Buildings and New York City Fire Department as a "place of assembly." This would require a Certificate of Occupancy permitting the use, as well as compliance with all of the myriad Occupancy Group F-4 (as to premises subject to the 1968 Building Code) or Assembly Group A-2 (as to premises subject to the 2014 Building Code) rules and regulations concerning ingress and egress, sprinklers, fire alarms, and the like, a Place of Assembly Certificate of Operation, and an approved Place of Assembly Plan (subject to a separate Building Department examination). These requirements are summarized in the Building Department's published Code Notes for Place of Assembly PA Applications (http://www 1 .nyc.govi assets.buildinesip_clf/code notes place-of-assembly.pdf).       While existing places of assembly would qualify, other commercial spaces typically would not without substantial, time-consuming, and expensive alterations subject to the Building Department processes of plan examination, approval, permitting, and inspection. Although, as I understand it, applications for places of assembly

permits are generally filed during the building permit or construction phase, they cannot be

actually *issued* until after the temporary certificate of occupancy is granted, and the process

of actual issuance of the assembly permit can add substantial additional time to the entire

project.

      H.      In addition, even if I am successful in finding a lawful and commercially available relocation site and obtaining all the necessary permits and inspections, I still

would have to meet the separate "siting" standards of the Alcoholic Beverage Control

("ABC") Law and the Rules of the State Liquor Authority ("SLA") in order to continue

selling liquor, which is an essential component of my business. As premises licensed by

the SLA to sell liquor "on premises," my business cannot be operated at another location

without the permission of the SLA, which requires that any business locations comply with

local law [see SLA Rule 48.3] *and* satisfy the "public interest and convenience" criteria

[see ABC Law, §§ 64(7)(b) and (f) ("License to sell liquor at retail for consumption on the

premises")] when there are there or more existing premises licenced within five hundred

feet of a proposed new business to be licensed. Upon the advice of counsel, and based

upon my own knowledge as an experienced consultant, manager, and operator of licensed

premises, if otherwise suitable locations could be found, they would require a discretionary

approval by the SLA that the grant of the license would be "in the public interest" if located

within 500 feet of three other on-premises liquor-licensed premises (regardless of any

consideration of "adult") [see ABC Law §647(f)], and no license could be issued prior to

review by and consultation with the local Community Board [see ABC Law § 647(f)]. In

short, the requirement of SLA approval of any location would considerably complicate, and potentially substantially delay, the process of re-locating and opening my business.

I. Yet another problem that would deter me from attempting to relocate to a new site not previously zoned for an adult use, is what I've heard described as the "sensitive use veto" problem. My attorneys have explained, and based on my experience as an operator of adult businesses in the City I have come to understand, that while a building permit application for an adult business is pending — as part of the business' efforts to obtain city confirmation that it is lawfully located and secure prioritization of its location against any new disqualifying businesses coming in and knocking out the adult business — if the disqualifying new business gets its permit first, then the adult business will be disqualified, even if it filed its permit application way before the disqualifying new business. If this weren't bad enough, my attorneys have advised me that non-adult businesses can get their permits granted much faster than an adult business.

J.     As an example, I have heard of one situation where an adult business, in what was literally an 11th hour attempt to stop a competitor's new adult business, conspired with a local church to convert church-owned office and storage space near the new club's site into worship space in an attempt to disqualify the site and keep the new club from operating. Fortunately, the competitor-sponsored church started its efforts too late in the process, so its attempt failed, and the new club prevailed. Nonetheless, the church's efforts caused the DOB to institute proceedings to revoke the new club's permits which

went on for approximately two years until the DOB finally ruled for the new club. Had the blocking process started a bit earlier, the church might well have prevailed and succeeded in disqualifying the new club's site, even though the club had in good faith filed its permit applications way earlier and had spent millions of dollars on its lease, architecture and design fees and other related costs.

## IV.     Chilling Effect of the Above

Based on all of the above, and based upon my knowledge of the New York City adult business industry, I believe it would be impossible to relocate and open in less than a year and would likely take at least as much as several years to do so.

As a result of each of the above-described problems, risks and costs facing an adult club attempting to relocate, if the 2001 Amendments are enforced and I were forced to close my existing business(es) and, because there is no realistic option for relocation, I believe it is highly likely that I would not attempt to relocate my business(es) but would simply close it (them).

I hereby declare the preceding statements to be true and correct under the penalty of perjury.

I hereby declare the preceding statements to be true and correct under the penalty of perjury.

Executed in the United States of America, at New York, New York, on the 15 day of November, 2018.

Keith Warech

0261

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
725 EATERY CORP., etc., *et ano.,*            :

                              Plaintiffs,    :

        - against -                          :          Civil Action No.
                                                        02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,                :

                              Defendants.    :
--------------------------------------------------------X

### DECLARATION OF ANTHONY CAPECI IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Anthony Capeci, hereby declares the following pursuant to 28 USC §1746:

1.      My legal name is Anthony Capeci and I have personal knowledge of the facts stated herein.

2.      I submit this declaration on behalf of plaintiff 725 Eatery Corp. d/b/a "Lace" ("Lace")

3.      Lace has been doing business at premises 725 7th Avenue, New York, New York ("Building") since approximately 1995.  During the period 1995 to September 16, 2018 I have been the President and sole stockholder of MLB Enterprises Corp. which was the owner of the business.   I have personal knowledge of the facts and circumstances set forth herein as they relate to that period. Any statements herein as to prior periods are true to the best of my information and belief, based upon the business records and information provided by personnel who worked at Lace or were associated with the business at the time.

1

4.      At all times since 1972, the Building has been and currently is located in the heart of Times Square and currently is the tenant and occupant of the first two floors of the Building, with an office on the third floor.

5.      At all times since 1995, the Building has been and currently is located within a C-6-7 zoning district and within five hundred feet (500') of property used as a church rectory which the State Courts of New York determined to be a church as defined by the 1995 "Adult Use" amendments to the New York City Zoning Resolution establishing priority.

6.      Between 1972 and present, Lace, and its predecessors, featured live entertainment as defined in the 1995 Ordinance throughout the publicly occupied portion of the Building.

7.      I am advised by counsel and believe that our form of live entertainment was defined by the 1995 Ordinance.

8.      Concurrent with the enforcement of the 1995 Ordinance, Lace re-configured its business premises so that such live entertainment was featured and could be observed by patrons in less than forty percent (40%) of its customer-accessible space.

9.      This re-configuration was achieved by moving walls, at a cost of approximately $20,000.00

10.     The balance of the space (i.e., more than sixty percent (60%)), was and is used as a liquor-licensed bar featuring televised sports programming.

11.     The purpose of this re-configuration was to conform to the spatial requirements of the 1995 Ordinance, such that Lace would not be classified as

2

0263

entertainment under the 1995 Ordinance and would not have to relocate in order to continue its business.

12.      The internal configuration of Lace has not been materially altered since 1998 and it continues through the present to feature live entertainment (as defined by the 1995 Ordinance) in less than forty percent (40%) of its customer-accessible space.

13.      Lace installed new subdued exterior signage, which does not feature the term "XXX" and does not contain bright or flashing lights, in order to conform to the signage requirements of the 1995 Ordinance, at a cost of approximately $5,000.00.

**WHEREFORE,** I urge the Court to grant Plaintiffs' motion for a preliminary injunction, together with such other, further and different relief as is just, necessary and proper.

I hereby declare the preceding statements to be true and correct under the penalty of perjury.

Executed in the United States of America, at New York,
New York, on the 15th  day of November, 2018.


Anthony Capeci

3

0264

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

59 MURRAY ENTERPRISES, INC. a/k/a
59 MURRAY CORP., d/b/a "New York Dolls",
AAM HOLDING CORP. d/b/a "Private
Eyes", WEST 20TH ENTERPRISES CORP. d/b/a
"VIP Club New York", and JNS VENTURES
LTD. d/b/a "Vixen",

                         Plaintiffs,

Civil Action No.
02 CV 4432 (WHP)

           -  against -

THE CITY OF NEW YORK; BILL DE BLASIO,
as Mayor of the City of New York; and RICK D.
CHANDLER, as Commissioner of Buildings of
The City of New York,

                      Defendants.

----------------------------------------------------------X

## DECLARATION OF BARRY LIPSITZ IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**BARRY LIPSITZ**, hereby declares the following pursuant to 28 USC §1746:

1.    My legal name is Barry Lipsitz and I have personal knowledge of the facts

stated herein.

2.    I submit this declaration on behalf of plaintiffs 59 Murray Enterprises, Inc.

("59 Murray Corp.") d/b/a "New York Dolls" (n/k/a "Flashdancers Downtown") and AAM Holding Corp. d/b/a "Private Eyes" (n/k/a "Flashdancers NYC").[*]

### As To New York Dolls

3.    New York Dolls has been doing business at premises 59 Murray Street, New York, New York ("Building") since approximately 1983. During that period, I was a long-time operations consultant to the business (1983 - 2008), until I became the sole shareholder and officer of the corporation in March 2008 (to the present). As a result, I have personal knowledge of the configuration and operation of New York Dolls throughout this entire period.

4.    At all times since 1983, the Building has been and currently is a small, 3-story building located in the Tribeca area of Manhattan, on Murray Street, between Church Street and West Broadway, and New York Dolls has been and currently is the sole tenant and occupant of the Building.

5.    At all times since 1983, the Building has been and currently is located within a C6-2A zoning district and within five hundred feet (500') of property used as of right for residential purposes.

---

[*]  Concurrent with the preparation of this declaration, "New York Dolls" has been re-named "Flashdancers Downtown" and "Private Eyes" has been re-named "Flashdancers NYC." There was no change in the corporate ownership of either business. In order to conform to the Amended Complaint in this action and to avoid unnecessary confusion, I refer in this declaration to the business operated at 59 Murray Street, by 59 Murray Enterprises, Inc., by its historical tradename, "New York Dolls," and to the business operated at 320 West 45th Street, by AAM Holding Corp., by its historical tradename, "Private Eyes."

0266

6.     Before the 60/40 requirements took effect in 1998, New York Dolls featured live dance entertainment throughout the occupied portion of the Building, such that the business was an "adult eating and drinking establishment" as then defined by AZR 12-10 as amended by the 1995 "adult use" amendments to the New York City Zoning Resolution (the "1995 Ordinance").

7.     Beginning in 1998, concurrent with the enforcement of the 1995 Ordinance, New York Dolls re-configured its business premises so that such "adult entertainment" was featured and could be observed by patrons in less than forty percent (40%) of its customer accessible space.

8.     This re-configuration was achieved by the erection of opaque partitions and installation of televisions in the >60% area, at a cost of approximately $10,000.

9.     The balance of the space (i.e., more than sixty percent (60%)), was and is used as licensed on-premises liquor bars, featuring televised news and sports programming, and not featuring any form of "adult entertainment".

10.    The purpose of this re-configuration was to conform to the spatial requirements of the 1995 Ordinance, such that New York Dolls would not be classified as an "adult establishment" and would not have to re-locate in order to continue its business.

11.    On November 13, 1998, the City of New York (the "City") stipulated in Supreme Court, New York County, under Index No. 403944/98, that as of that date less

0267

than forty percent (40%) of the customer accessible space in New York Dolls was allocated to and used for "adult" purposes as defined by the 1995 Ordinance.

12.    The internal configuration of New York Dolls, which occupies approximately 4,000 square feet of space, has not been materially altered since 1998 and it continues through the present to feature its adult entertainment in less than forty percent (40%) of its customer accessible space.

13.    Concurrent with its spatial re-configuration, New York Dolls installed new "subdued" exterior signage in order to conform to the signage requirements of the 1995 Ordinance, at a cost of approximately $2,500 for a new awning and window signage.

14.    At the present time, New York Dolls employs in excess of 135 individuals as managers, bartenders, hosts and hostesses, wait staff, janitors, security personnel, and performers.

15.    New York Dolls' present lease of its space runs through March 31, 2027.

## As To Private Eyes

16.    Private Eyes has been doing business at premises 320 West 45th Street, New York, New York ("Building") since approximately 1993. During that period, after a long tenure as an operations consultant to the business (1993 – 2017), I became a shareholder and officer in May 2017, and the sole shareholder and officer of the

4

corporation in March 2018 (to the present). As a result, I have personal knowledge of the configuration and operation of Private Eyes throughout this entire period.

17.  At all times since 1993, the Building has been and currently is a small, 3-story building located in the Hell's Kitchen area of Manhattan, on West 45th Street, between 8th and 9th Avenues, and Private Eyes has been and currently is the tenant and occupant of the basement and first floor of the Building.

18.  At all times since 1993, the Building has been and currently is located within a C6-2 zoning district and within five hundred feet (500') of property used as of right for residential purposes.

19.  Prior to the time that the 60/40 requirements took effect in 1998, Private Eyes featured "Adult Entertainment" throughout the occupied portion of the Building, as that term is defined by AZR 12-10 as amended by the 1995 "adult use" amendments to the New York City Zoning Resolution (the "1995 Ordinance").

20.  Beginning in 1998, concurrent with the enforcement of the 1995 Ordinance, Private Eyes re-configured its business premises so that such "adult entertainment" was featured and could be observed by patrons in less than forty percent (40%) of its customer accessible space.

21.  This re-configuration was achieved by the erection of opaque partitions installation of televisions in the >60% space, at a cost of approximately $10,000.

5

22.     The balance of the space (i.e., more than sixty percent (60%)), was and is used as licensed on-premises liquor bars, featuring televised news and sports programming, and not featuring any form of "adult entertainment".

23.     The purpose of this re-configuration was to conform to the spatial requirements of the 1995 Ordinance, such that Private Eyes would not be classified as an "adult establishment" and would not have to re-locate in order to continue its business.

24.     On November 18, 1998, the City of New York (the "City") stipulated in Supreme Court, New York County, under Index No. 404014/98, that as of that date less than forty percent (40%) of the customer accessible space in Private Eyes was allocated to and used for "adult" purposes as defined by the 1995 Ordinance.

25.     The internal configuration of Private Eyes, which occupies approximately 3,200  square feet of space, has not been materially altered since 1998 and it continues through the present to feature "adult entertainment" (as defined by the 1995 Ordinance) in less than forty percent (40%) of its customer accessible space.

26.     Concurrent with its spatial re-configuration, Private Eyes installed new "subdued" exterior signage in order to conform to the signage requirements of the 1995 Ordinance, at a cost of approximately $3,000.

27.     In August, 2008, Private Eyes filed a simple request for approval of a Public Assembly Plan (DOB Job # 110238323), which was not approved until 14 months

6

later, in October 2009.  In my experience, and based upon my conversations with other club operators, this is typical of the types of delays encountered in dealing with the Department of Buildings.

28.     At the present time, Private Eyes employs in excess of 120 individuals as managers, bartenders, hosts and hostesses, wait staff, janitors, security personnel, and performers.

29.     Private Eyes' present lease of its space runs through May 27, 2027.

### As To Both New York Dolls And Private Eyes

30.     I am advised by legal counsel and believe that the 2001 Amendments to the 1995 Ordinance changed the definition of an "adult establishment" for zoning purposes, such that regularly featuring "adult entertainment" (as defined by the 1995 Ordinance) in "any portion" of New York Dolls and Private Eyes' spaces will bring each such premises within the definition of an "adult establishment" for zoning purposes and, given their proximity to sensitive receptors (residential areas), will require each to re-locate in order to continue to offer "adult entertainment" on their business premises.

0271

31.    In that event, it would certainly be my desire to re-locate both New York Dolls and Private Eyes and continue to operate both businesses.   However, I am unwilling and unable to do so because of the reasons set forth in Exhibit A hereto, which I have read and believe to be true and correct in all respects as concerns both New York Dolls and Private Eyes.

32.    Furthermore, if New York Dolls and Private Eyes were required to re-locate in order to remain in business, I would have to find two properly zoned locations that would comply with the current Administrative Code and regulatory requirements, including handicap accessibility, public assembly and fire code requirements.   Moreover, in order to realistically conduct business, each business would require a minimum of (a) approximately 1,000 square feet for a coat room, cashier, office, storage of liquor, equipment and supplies, dressing room, and toilets, and (b) approximately 2,500 square feet of space for one or more bars, one or more stages, and main and VIP customer seating areas.   It is my understanding, based upon inquiry of local real estate brokers and others in our industry, that no such locations are currently available, and that it is likely that it would take a year or more in order to find and convert one (not two) for use as an adult cabaret.

33.    Given all of these facts and circumstances, I am advised by legal counsel and believe that Plaintiffs should be granted a preliminary injunction against enforcement of the 2001 Amendments and related provisions of the Amended Zoning Resolution.

0272

*WHEREFORE,* I urge the Court to grant Plaintiffs' motion for a preliminary injunction, together with such other, further and different relief as is just, necessary and proper.

I hereby declare the preceding statements to be true and correct under the penalty of perjury.

Executed in the United States of America, at New York,
New York, on the 12th day of November, 2018.

_____
Barry Lipsitz

.

**Exhibit A to Lipsitz Declaration**
**Reasons Precluding Relocation of 60/40 Adult Uses**

I.      **Zoning Restrictions**

A.      In order to leave the business's current location and relocate to a new location, the business must first locate a site that meets the City's zoning requirements.

B.      I am not adept at the legalities of the zoning and building code.  I would need expert assistance, including at a minimum, lawyers, real estate brokers and architects, to help me find a legally permissible and suitable relocation site.  This expert assistance would likely be costly and time-consuming.

C.      I have made a preliminary investigation, through lawyers and land use experts, into legally and commercially available sites in Manhattan and have been unable to locate any such sites in Manhattan.

D.      I am also aware that the City has made several changes to the zoning in areas throughout the City since enactment of the 2001 amendments and that a great deal of land which used to be legally permissible for adult businesses is now prohibited.

E.      I am also aware that the City requires any lawful adult business which becomes nonconforming due to one of these zoning amendments to terminate within one year after the City makes any such zoning change.

0274

F.      This means that, even if my business were to relocate to a site that today conforms with the City's zoning restriction, the City could subsequently change the zoning of the site and render it nonconforming. The City could also change the zoning of any areas within 500 feet of my relocation site to one of the numerous districts which prohibit adult uses, which could also make my relocation site nonconforming. As a result, even if I were to relocate my business, I could be required to close it within a year of any zoning change. This shifting zoning landscape makes me very reluctant to invest the time, money, resources, marketing, and energy it would take to move my business from its current location to an entirely new location.

G.      Given the possibility that the City could change the zoning of such a site before it even opened, and certainly long before it made enough income to offset the very substantial startup costs and justify the risk of entering into an expensive long term lease, it simply would make no commercial sense to attempt to relocate so long as the City continues to require the termination of adult businesses, and no others, within a year after they become nonconforming.

## II.   Loss of Manhattan-Based Economic and Commercial Value

A.      My business's goodwill has been established in Manhattan, and the type of business I operate obtains a substantial portion of its income from both domestic and international tourists. Those patrons almost always book accommodations in Manhattan rather than the other boroughs, because it is well known as the entertainment capital of

11

0275

the world.  If the business was to move outside of Manhattan, it would lose a key consumer base and would likely no longer be economically viable.

B.     There is high economic value to being located in Manhattan.  This stems from a variety of factors, including proximity to other entertainment and nightlife venues, high pedestrian traffic, and a strong tourism and business market.  Moving from Manhattan would cause my business to suffer significant economic loss.

C.     Additionally, many of our patrons merely work in Manhattan or are there only temporarily on business.  For them, as with traditional tourists, the proximity and ease of accessing my business enhance its appeal and their interest in and willingness to patronize it.  They are familiar and comfortable with Manhattan, either personally or anecdotally, and like the rest of the world, have heard much about Manhattan's vaunted and celebrated nightlife and entertainment venues.

D.     The prospect of locating and travelling to and from an adult eating and drinking establishment like my business (in the unlikely event that I could relocate and re-establish it) in The Bronx, Staten Island, Queens, or Brooklyn, would be both daunting and disincentivizing to many of my current and prospective patrons.  For many of those who do not live in New York City, and even for some who do, the "unknown" factor alone (especially during nighttime) would be inhibiting, in addition to the physical difficulties, significantly increased travel time and expense (charges and tolls) in getting there and back via public (trains and buses), cabs and Uber or self-driving.  My

12

Manhattan business is in a known, comfortable, inviting and easily accessible location; none of which would be inherently true if it were required to move to another borough.

## III.   Permitting Problems

A.    In my experience including what I've been advised, it would take *substantially* more than a year to relocate my business from its existing location to a new location.

B.    After finding a suitable, available, and legally permissible site, I would then have to negotiate the terms of a lease with the landlord and/or obtain financing to purchase the property outright.  This process would be complicated by the fact that all other displaced 60/40 adult uses would be competing for the same small number of available relocation sites.

C.    Assuming I was able to secure the property, I would then be required to seek a variety of building and zoning approval permits, depending on the property's prior usage.    Because I am not savvy at navigating the City's building and zoning requirements, I would need additional expert assistance with this process.  This would be costly and time-consuming, and especially so because adult uses are not permitted to self-certify the plans for their building permit applications.

D.    Zoning approval is part of the building permit process.  Based on my experience as an adult business owner in New York City, I understand that just obtaining

zoning approval for adult uses routinely takes many months, and in some instances well over a year.

E       Upon receiving zoning approval, I would also need to hire architects and engineers, at great cost to me, to prepare the detailed building permit plans that are required to comply with the City's building code provisions.  This, as well, would be not only expensive, but add substantial additional time to the startup process.

F.       Once building permits finally issued, I would commence the process of construction and seeking a temporary, and ultimately permanent, certificate of occupancy.  This would add very substantial additional time to the overall time necessary to relocate and open.

G.       In addition, it is my understanding that any new premises would have to qualify for permitting by the Department of Buildings and New York City Fire Department as a "place of assembly."  This would require a Certificate of Occupancy permitting the use, as well as compliance with all of the myriad Occupancy Group F-4 (as to premises subject to the 1968 Building Code) or Assembly Group A-2 (as to premises subject to the 2014 Building Code) rules and regulations concerning ingress and egress, sprinklers, fire alarms, and the like, a Place of Assembly Certificate of Operation, and an approved Place of Assembly Plan (subject to a separate Building Department examination).  These requirements are summarized in the Building Department's published Code Notes for Place of Assembly PA Applications (http://www1.nyc.gov/

14

assets/buildings/pdf/code_notes_place-of-assembly.pdf).      While  existing  places  of

assembly  would  qualify,  other  commercial  spaces  typically  would  not  without

substantial,  time-consuming,  and  expensive  alterations  subject  to  the  Building

Department  processes  of  plan  examination,  approval,  permitting,  and  inspection.

Although,  as  I  understand  it,  applications  for  places  of  assembly  permits  are  generally

filed during the building permit or construction phase, they cannot be actually *issued* until

after the temporary certificate of occupancy is granted, and the process of actual issuance

of the assembly permit can add substantial additional time to the entire project.

H.      In addition, even if I am successful in finding a lawful and commercially

available relocation site and obtaining all the necessary permits and inspections, I still

would have to meet the separate "siting" standards of the Alcoholic Beverage Control

("ABC") Law and the Rules of the State Liquor Authority ("SLA") in order to continue

selling liquor, which is an essential component of my business.  As premises licensed by

the SLA to sell liquor "on premises," my business cannot be operated at another location

without the permission of the SLA, which requires that any business locations comply

with local law [see SLA Rule 48.3] *and* satisfy the "public interest and convenience"

criteria  [see  ABC  Law,  §§  64-(7)(b)  and  (f)  ("License  to  sell  liquor  at  retail  for

consumption on the premises")] when there are more existing premises licensed within

five hundred feet of a proposed new business to be licensed.  Upon the advice of counsel,

and based upon my own knowledge as an experienced consultant, manager, and operator

of licensed premises, if otherwise suitable locations could be found, they would require a

15

discretionary approval by the SLA that the grant of the license would be "in the public interest" if located within 500 feet of three other on-premises liquor-licensed premises (regardless of any consideration of "adult") [see ABC Law §64-(7)(f)], and no license could be issued prior to review by and consultation with the local Community Board [see ABC Law § 64-(7)(f)]. In short, the requirement of SLA approval of any location would considerably complicate, and potentially substantially delay, the process of re-locating and opening my business.

I.      Yet another problem that would deter me from attempting to relocate to a new site not previously zoned for an adult use, is what I've heard described as the "sensitive use veto" problem. My attorneys have explained, and based on my experience as an operator of adult businesses in the City I have come to understand, that while a building permit application for an adult business is pending – as part of the business' efforts to obtain city confirmation that it is lawfully located and secure prioritization of its location against any new disqualifying businesses coming in and knocking out the adult business – if the disqualifying new business gets its permit first, then the adult business will be disqualified, even if it filed its permit application way before the disqualifying new business. If this weren't bad enough, my attorneys have advised me that non-adult businesses can get their permits granted much faster than an adult business.

J.      As an example, I have heard of one situation where an adult business, in what was literally an 11th hour attempt to stop a competitor's new adult business,

0280

conspired with a local church to convert church-owned office and storage space near the new club's site into worship space in an attempt to disqualify the site and keep the new club from operating. Fortunately, the competitor-sponsored church started its efforts too late in the process, so its attempt failed, and the new club prevailed. Nonetheless, the church's efforts caused the DOB to institute proceedings to revoke the new club's permits which went on for approximately two years until the DOB finally ruled for the new club. Had the blocking process started a bit earlier, the church might well have prevailed and succeeded in disqualifying the new club's site, even though the club had in good faith filed its permit applications way earlier and had spent millions of dollars on its lease, architecture and design fees and other related costs.

## IV.   Chilling Effect of the Above

Based on all of the above, and based upon my knowledge of the New York City adult business industry, I believe it would be impossible to relocate and open in less than a year and would likely take at least as much as several years to do so.

As a result of each of the above-described problems, risks and costs facing an adult club attempting to relocate, if the 2001 Amendments are enforced and I were forced to close my existing business(es) and, because there is no realistic option for relocation, I

17

believe it is highly likely that I would not attempt to relocate my business(es) but would simply close it (them).

I hereby declare the preceding statements to be true and correct under the penalty of perjury.

Executed in the United States of America, at New York, New York, on the /2ᵗʰ day of November, 2018.

Barry Lipsitz

18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

59 MURRAY ENTERPRISES, INC. a/k/a
59 MURRAY CORP., d/b/a "New York Dolls",
AAM HOLDING CORP. d/b/a "Private
Eyes", WEST 20TH ENTERPRISES CORP. d/b/a
"VIP Club New York", and JNS VENTURES
LTD. d/b/a "Vixen",

                         Plaintiffs,

          -   against -

THE CITY OF NEW YORK; BILL DE BLASIO,
as Mayor of the City of New York; and RICK D.
CHANDLER, as Commissioner of Buildings of
The City of New York,

                         Defendants.

-----------------------------------------------------------X

Civil Action No.
02 CV 4432 (WHP)

## DECLARATION OF ANTHONY D'AMICO IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**ANTHONY D'AMICO**, hereby declares the following pursuant to 28 USC §1746:

1.    My legal name is Anthony D'Amico and I have personal knowledge of the facts stated herein.

0283

2. I submit this declaration on behalf of plaintiffs JNS Ventures, Ltd. d/b/a "Vixen."

3. Vixen (previously known "Treasure Chest") has been doing business at premises 60-07 Metropolitan Avenue, Ridgewood, New York ("Building") since approximately 1993. Since March, 1997, I have been the sole shareholder in the corporation. As a result, I have personal knowledge of the configuration and operation of Vixen throughout this entire period.

4. At all times since 1993, the Building has been and currently is a small, 1-story building located in the Ridgewood area of Queens, on Metropolitan Avenue, between Elliot Avenue and 60th Street, and Vixen has been and currently is the sole tenant and occupant of the Building.

5. At all times since 1993, the Building has been and currently is located within a C2-4 (within an R-6B) zoning district and within five hundred feet (500') of property used as of right for residential purposes.

6. Before the 60/40 requirements took effect in 1998, Vixen  featured live dance entertainment throughout the occupied portion of the Building, such that the business was an "adult eating and drinking establishment" as then defined by AZR 12-10

2

0284

as amended by the 1995 "adult use" amendments to the New York City Zoning Resolution (the "1995 Ordinance").

7.      Beginning in 1998, concurrent with the enforcement of the 1995 Ordinance, Vixen renovated its business premises so that such "adult entertainment" was featured and could be observed by patrons in less than forty percent (40%) of its customer accessible space.

8.      This renovation was achieved by re-furbishing the existing westerly portion of the Building (which houses more than sixty percent (60%) of the customer-accessible space), and legalizing it for use as a liquor-licensed cabaret lounge with live music, featuring local jazz artists and musical groups and karaoke nights, and as a venue for birthdays, baby showers, bar mitzvahs, retirement parties, and similar parties and occasions, at a cost of approximately $10,000.

9.      The purpose of this re-furbishment was to conform to the spatial requirements of the 1995 Ordinance, such that Vixen would not be classified as an "adult establishment" and would not have to re-locate in order to continue its business.

10.     The internal configuration of Vixen has not been materially altered since 1998, consists of 2,700 square feet of space, and continues through the present to feature its adult entertainment in less than forty percent (40%) of its customer accessible space.

0285

11.     Shortly thereafter, Vixen installed new "subdued" exterior signage in order to conform to the signage requirements of the 1995 Ordinance, at a cost of approximately $3,000.

12.     At the present time, Vixen employs in excess of 100 individuals as managers, bartenders, hosts/hostesses, wait staff, janitors, security personnel, and performers.

13.     Vixen's present lease of its space runs to January 1, 2020.

14.     I am advised by legal counsel and believe that the 2001 Amendments to the 1995 Ordinance changed the definition of an adult establishment for zoning purposes, such that regularly featuring "adult entertainment" (as defined by the 1995 Ordinance) in "any portion" of Vixen's space will, for the first time, bring it within the definition of an "adult establishment" for zoning purposes and, given its location in a C-2 zone and proximity to sensitive receptors (residences as of right), will require it to re-locate in order to continue to offer "adult entertainment" on their business premises.

15.     In that event, it would certainly be my desire to re-locate Vixen and continue to operate the business.  However, I am unwilling and unable to do so because of the reasons set forth in Exhibit A hereto, which I have read and believe to be true and correct in all respects as concerns Vixen.

0286

16.     Furthermore, if I was required to re-locate in order to remain in business, I would have to find a properly zoned location that would comply with the current Administrative Code and regulatory requirements, including handicap accessibility, public assembly and fire code requirements.  Moreover, in order to realistically conduct business, I would require a <u>minimum</u> of (a) approximately 1,000 square feet for a coat room, cashier, office, storage of liquor, equipment and supplies, dressing room, and toilets, and (b) approximately 2,500 square feet of space for one or more bars, one or more stages, and main and VIP customer seating areas.   It is my understanding, based upon inquiry of local real estate brokers and others in our industry, that no such locations are currently available, and that it is likely that it would take a year or more in order to find and convert one for use as an adult cabaret.

17.     Given all of these facts and circumstances, I am advised by legal counsel and believe that Plaintiffs should be granted a preliminary injunction against enforcement of the 2001 Amendments and related provisions of the Amended Zoning Resolution.

***WHEREFORE,*** I urge the Court to grant Plaintiffs' motion for a preliminary injunction, together with such other, further and different relief as is just, necessary and proper.

0287

I hereby declare the preceding statements to be true and correct under the penalty of perjury.

Executed in the United States of America, at New York,
New York, on the _12_ day of November, 2018.

Anthony D'Amico

6

**Exhibit A to D'Amico Declaration**
**Reasons Precluding Relocation of 60/40 Adult Uses**

## I.      Zoning Restrictions

A.      In order to leave the business's current location and relocate to a new location, the business must first locate a site that meets the City's zoning requirements.

B.      I am not adept at the legalities of the zoning and building code.  I would need expert assistance, including at a minimum, lawyers, real estate brokers and architects, to help me find a legally permissible and suitable relocation site.  This expert assistance would likely be costly and time-consuming.

C.      I have made a preliminary investigation, through lawyers and land use experts, into legally and commercially available sites in Manhattan and have been unable to locate any such sites in Manhattan.

D.      I am also aware that the City has made several changes to the zoning in areas throughout the City since enactment of the 2001 amendments and that a great deal of land which used to be legally permissible for adult businesses is now prohibited.

E.      I am also aware that the City requires any lawful adult business which becomes nonconforming due to one of these zoning amendments to terminate within one year after the City makes any such zoning change.

7

F.    This means that, even if my business were to relocate to a site that today conforms with the City's zoning restriction, the City could subsequently change the zoning of the site and render it nonconforming.  The City could also change the zoning of any areas within 500 feet of my relocation site to one of the numerous districts which prohibit adult uses, which could also make my relocation site nonconforming.  As a result, even if I were to relocate my business, I could be required to close it within a year of any zoning change.  This shifting zoning landscape makes me very reluctant to invest the time, money, resources, marketing, and energy it would take to move my business from its current location to an entirely new location.

G.    Given the possibility that the City could change the zoning of such a site before it even opened, and certainly long before it made enough income to offset the very substantial startup costs and justify the risk of entering into an expensive long term lease, it simply would make no commercial sense to attempt to relocate so long as the City continues to require the termination of adult businesses, and no others, within a year after they become nonconforming.

## II.    Permitting Problems

A.    In my experience including what I've been advised, it would take *substantially* more than a year to relocate my business from its existing location to a new location.

8

B.     After finding a suitable, available, and legally permissible site, I would then have to negotiate the terms of a lease with the landlord and/or obtain financing to purchase the property outright.  This process would be complicated by the fact that all other displaced 60/40 adult uses would be competing for the same small number of available relocation sites.

C.     Assuming I was able to secure the property, I would then be required to seek a variety of building and zoning approval permits, depending on the property's prior usage.  Because I am not savvy at navigating the City's building and zoning requirements, I would need additional expert assistance with this process.  This would be costly and time-consuming, and especially so because adult uses are not permitted to self-certify the plans for their building permit applications.

D.     Zoning approval is part of the building permit process.  Based on my experience as an adult business owner in New York City, I understand that just obtaining zoning approval for adult uses routinely takes many months, and in some instances well over a year.

E      Upon receiving zoning approval, I would also need to hire architects and engineers, at great cost to me, to prepare the detailed building permit plans that are required to comply with the City's building code provisions.  This, as well, would be not only expensive, but add substantial additional time to the startup process.

F.      Once building permits finally issued, I would commence the process of construction and seeking a temporary, and ultimately permanent, certificate of occupancy.  This would add very substantial additional time to the overall time necessary to relocate and open.

G.      In addition, it is my understanding that any new premises would have to qualify for permitting by the Department of Buildings and New York City Fire Department as a "place of assembly."  This would require a Certificate of Occupancy permitting the use, as well as compliance with all of the myriad Occupancy Group F-4 (as to premises subject to the 1968 Building Code) or Assembly Group A-2 (as to premises subject to the 2014 Building Code) rules and regulations concerning ingress and egress, sprinklers, fire alarms, and the like, a Place of Assembly Certificate of Operation, and an approved Place of Assembly Plan (subject to a separate Building Department examination).   These requirements are summarized in the Building Department's published Code Notes for Place of Assembly PA Applications (http://www1.nyc.gov/assets/buildings/pdf/code_notes_place-of-assembly.pdf).   While existing places of assembly would qualify, other commercial spaces typically would not without substantial, time-consuming, and expensive alterations subject to the Building Department processes of plan examination, approval, permitting, and inspection. Although, as I understand it, applications for places of assembly permits are generally

0292

filed during the building permit or construction phase, they cannot be actually *issued* until after the temporary certificate of occupancy is granted, and the process of actual issuance of the assembly permit can add substantial additional time to the entire project.

H.     In addition, even if I am successful in finding a lawful and commercially available relocation site and obtaining all the necessary permits and inspections, I still would have to meet the separate "siting" standards of the Alcoholic Beverage Control ("ABC") Law and the Rules of the State Liquor Authority ("SLA") in order to continue selling liquor, which is an essential component of my business.  As premises licensed by the SLA to sell liquor "on premises," my business cannot be operated at another location without the permission of the SLA, which requires that any business locations comply with local law [see SLA Rule 48.3] *and* satisfy the "public interest and convenience" criteria [see ABC Law, §§ 64-(7)(b) and (f) ("License to sell liquor at retail for consumption on the premises")] when there are more existing premises licensed within five hundred feet of a proposed new business to be licensed.  Upon the advice of counsel, and based upon my own knowledge as an experienced consultant, manager, and operator of licensed premises, if otherwise suitable locations could be found, they would require a discretionary approval by the SLA that the grant of the license would be "in the public interest" if located within 500 feet of three other on-premises liquor-licensed premises (regardless of any consideration of "adult") [see ABC Law §64-(7)(f)], and no license

11

0293

could be issued prior to review by and consultation with the local Community Board [see ABC Law § 64-(7)(f)]. In short, the requirement of SLA approval of any location would considerably complicate, and potentially substantially delay, the process of re-locating and opening my business.

I.     Yet another problem that would deter me from attempting to relocate to a new site not previously zoned for an adult use, is what I've heard described as the "sensitive use veto" problem. My attorneys have explained, and based on my experience as an operator of adult businesses in the City I have come to understand, that while a building permit application for an adult business is pending – as part of the business' efforts to obtain city confirmation that it is lawfully located and secure prioritization of its location against any new disqualifying businesses coming in and knocking out the adult business – if the disqualifying new business gets its permit first, then the adult business will be disqualified, even if it filed its permit application way before the disqualifying new business. If this weren't bad enough, my attorneys have advised me that non-adult businesses can get their permits granted much faster than an adult business.

J.     As an example, I have heard of one situation where an adult business, in what was literally an 11th hour attempt to stop a competitor's new adult business, conspired with a local church to convert church-owned office and storage space near the new club's site into worship space in an attempt to disqualify the site and keep the new

12

club from operating.  Fortunately, the competitor-sponsored church started its efforts too late in the process, so its attempt failed, and the new club prevailed. Nonetheless, the church's efforts caused the DOB to institute proceedings to revoke the new club's permits which went on for approximately two years until the DOB finally ruled for the new club. Had the blocking process started a bit earlier, the church might well have prevailed and succeeded in disqualifying the new club's site, even though the club had in good faith filed its permit applications way earlier and had spent millions of dollars on its lease, architecture and design fees and other related costs.

## III.    Chilling Effect of the Above

Based on all of the above, and based upon my knowledge of the New York City adult business industry, I believe it would be impossible to relocate and open in less than a year and would likely take at least as much as several years to do so.

As a result of each of the above-described problems, risks and costs facing an adult club attempting to relocate, if the 2001 Amendments are enforced and I were forced to close my existing business(es) and, because there is no realistic option for relocation, I

0295

believe it is highly likely that I would not attempt to relocate my business(es) but would simply close it (them).

Executed in the United States of America, at New York,
New York, on the 12 day of November, 2018.

_Anthony D'Amico_
Anthony D'Amico

14

0296

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

59 MURRAY ENTERPRISES, INC. a/k/a
59 MURRAY CORP., d/b/a "New York Dolls",
AAM HOLDING CORP. d/b/a "Private
Eyes", WEST 20TH ENTERPRISES CORP. d/b/a
"VIP Club New York", and JNS VENTURES
LTD. d/b/a "Vixen",

                    Plaintiffs,

     -  against -

THE CITY OF NEW YORK; BILL DE BLASIO,
as Mayor of the City of New York; and RICK D.
CHANDLER, as Commissioner of Buildings of
The City of New York,

                    Defendants.

-----------------------------------------------------------X

Civil Action No.
02 CV 4432 (WHP)

## DECLARATION OF MAURICE KAVANAGH IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**MAURICE KAVANAGH**, hereby declares the following pursuant to 28 USC §1746:

1.    My legal name is Maurice Kavanagh and I have personal knowledge of the facts stated herein.

2.    I submit this declaration on behalf of plaintiff West 20th Enterprises Corp. d/b/a "VIP Club New York" ("VIP").

0297

3.    VIP has been doing business at premises 20 West 20th Street, New York, New York ("Building") since approximately 1996.  During the period 2004 – 2015, I was a 50% shareholder and manager of the business.   Since December 2015, I have been the sole shareholder.

4.    I have personal knowledge of the facts and circumstances set forth herein as they relate to that period. Any statements herein as to prior periods are true to the best of my information and belief, based upon the business records and information provided by personnel who worked at VIP or were associated with the business at the time.

5.    At all times since VIP has been in occupancy, the Building has been and currently is an 11-story building located in the Flatiron District of Manhattan, on West 20th Street between Fifth and Sixth Avenues, and VIP has been and currently is the tenant and occupant of the First Floor and Mezzanine of the Building.

6.    To the best of my knowledge, upon the advice of counsel, at all relevant times, the Building has been and currently is located within a C6-4A zoning district and within five hundred feet (500') of property used as of right for residential purposes.

7.    Before the 60/40 requirements took effect in 1998, VIP featured live dance entertainment throughout the occupied portion of the Building, such that the business was an "adult eating and drinking establishment" as then as then defined by AZR 12-10 as amended by the 1995 "adult use" amendments to the New York City Zoning Resolution (the "1995 Ordinance").

2

8.      To the best of my knowledge, beginning in or about 1998, concurrent with the enforcement of the 1995 Ordinance, VIP re-configured its business premises so that such "adult entertainment" was featured and could be observed by patrons in less than forty percent (40%) of its customer accessible space.

9.      This re-configuration was achieved by erection of the opaque partitions and renovating the premises to include a full-service restaurant, kitchen, etc.  I do not know the exact expense incurred for this renovation, but based upon my experience in the industry I believe the cost had to be in excess of $200,000.

10.     The balance of the space (i.e., more than sixty percent (60%)), was and is used as a liquor-licensed restaurant and bar featuring televised sports programming.

11.     The purpose of this re-configuration was to conform to the spatial requirements of the 1995 Ordinance, such that VIP would not be classified as an "adult establishment" and would not have to re-locate in order to continue its business.

12.     The internal configuration of VIP, which presently consists of 10,000 square feet of space, has not been materially altered since 1998 and it continues through the present to feature its adult entertainment in less than forty percent (40%) of its customer accessible space.

13.     Concurrent with its spatial re-configuration, VIP installed new "subdued" exterior signage in order to conform to the signage requirements of the 1995 Ordinance. Based on the cost of subsequent signage changes made by VIP during the period of my

0299

ownership, I would estimate the cost of changing the exterior signage was approximately $25,000.

14.     VIP has experienced extreme delays in the Department of Buildings approval process.  For example, in October, 1998 we filed an application to approve and legalize existing conditions in the premises (DOB Job # 101951853); it was not approved until January, 2002 (38 months later).      Then in May, 2008 we filed to modify the existing 60/40 establishment by installing interior, non-bearing partitions (DOB Job # 110159916); that application was not approved until April, 2010 (23 months after filing). Similarly, our January, 2009 application for approval of our Public Assembly Plan (DOB Job # 110426227) was not granted until April, 2013 (52 months).  And our April, 2010 application for a post-approval amendment to modify the existing 60/40 interior layout (DOB Job # 110159916) was not approved until April, 2011 (12 months).

15.     At the present time, VIP employs in excess of 110 individuals as managers, bartenders, hosts and hostesses, wait staff, janitors, security personnel, and performers.

16.     VIP's present lease of its space runs until 2025, with a five (5) year renewal option.

17.     I am advised by legal counsel and believe that the 2001 Amendments to the 1995 Ordinance changed the definition of an "adult establishment" for zoning purposes,

4

0300

such that regularly featuring adult entertainment in "any portion" of VIP's space will, for the first time, bring it within the definition of an "adult establishment" for zoning purposes and, given its proximity to sensitive receptors (residences and, I believe, a house of worship), will require it to re-locate in order to continue to offer adult entertainment on their business premises.

18.     In that event, it would certainly be my desire to re-locate VIP and continue to operate the business.  However, I am unwilling and unable to do so because of the reasons set forth in Exhibit A hereto, which I have read and believe to be true and correct in all respects as concerns VIP.

19.     Furthermore, if VIP was required to re-locate in order to remain in business, it would have to find a properly zoned location that would comply with the current Administrative Code and regulatory requirements, including handicap accessibility, public assembly and fire code requirements.   Moreover, in order to realistically conduct business, it would require a minimum of (a) approximately 1,200 square feet for a coat room, cashier, office, storage of liquor, equipment and supplies, dressing room, and toilets, and (b) approximately 4,000 square feet of space for one or

5

more bars, one or more stages, and main and VIP customer seating areas.   It is my understanding, based upon inquiry of local real estate brokers and others in our industry, that no such locations are currently available, and that it is likely that it would take a year or more in order to find and convert one for use as an adult cabaret.

20.     However, it is my understanding, based upon inquiry of local real estate brokers and others in our industry, that no such locations are currently available, and that it is likely that it would take a year or more in order to find and convert one for use as an adult cabaret.

21.     Given all of these facts and circumstances, I am advised by legal counsel and believe that Plaintiffs should be granted a preliminary injunction against enforcement of the 2001 Amendments and related provisions of the Amended Zoning Resolution.

*WHEREFORE,* I urge the Court to grant Plaintiffs' motion for a preliminary injunction, together with such other, further and different relief as is just, necessary and proper.

I hereby declare the preceding statements to be true and correct under the penalty of perjury.

Executed in the United States of America, at New York,
New York, on the /2 th day of November, 2018.

Maurice Kavanagh

6

0302

**Exhibit A to Kavanagh Declaration**
**Reasons Precluding Relocation of 60/40 Adult Uses**

## I.    Zoning Restrictions

A.    In order to leave the business's current location and relocate to a new location, the business must first locate a site that meets the City's zoning requirements.

B.    I am not adept at the legalities of the zoning and building code.  I would need expert assistance, including at a minimum, lawyers, real estate brokers and architects, to help me find a legally permissible and suitable relocation site.  This expert assistance would likely be costly and time-consuming.

C.    I have made a preliminary investigation, through lawyers and land use experts, into legally and commercially available sites in Manhattan and have been unable to locate any such sites in Manhattan.

D.    I am also aware that the City has made several changes to the zoning in areas throughout the City since enactment of the 2001 amendments and that a great deal of land which used to be legally permissible for adult businesses is now prohibited.

E.    I am also aware that the City requires any lawful adult business which becomes nonconforming due to one of these zoning amendments to terminate within one year after the City makes any such zoning change.

0303

F.      This means that, even if my business were to relocate to a site that today conforms with the City's zoning restriction, the City could subsequently change the zoning of the site and render it nonconforming. The City could also change the zoning of any areas within 500 feet of my relocation site to one of the numerous districts which prohibit adult uses, which could also make my relocation site nonconforming. As a result, even if I were to relocate my business, I could be required to close it within a year of any zoning change. This shifting zoning landscape makes me very reluctant to invest the time, money, resources, marketing, and energy it would take to move my business from its current location to an entirely new location.

G.      Given the possibility that the City could change the zoning of such a site before it even opened, and certainly long before it made enough income to offset the very substantial startup costs and justify the risk of entering into an expensive long term lease, it simply would make no commercial sense to attempt to relocate so long as the City continues to require the termination of adult businesses, and no others, within a year after they become nonconforming.

## II.    Loss of Manhattan-Based Economic and Commercial Value

A.      My business's goodwill has been established in Manhattan, and the type of business I operate obtains a substantial portion of its income from both domestic and international tourists. Those patrons almost always book accommodations in Manhattan rather than the other boroughs, because it is well known as the entertainment capital of

8

the world.  If the business was to move outside of Manhattan, it would lose a key consumer base and would likely no longer be economically viable.

B.      There is high economic value to being located in Manhattan.  This stems from a variety of factors, including proximity to other entertainment and nightlife venues, high pedestrian traffic, and a strong tourism and business market.  Moving from Manhattan would cause my business to suffer significant economic loss.

C.      Additionally, many of our patrons merely work in Manhattan or are there only temporarily on business.  For them, as with traditional tourists, the proximity and ease of accessing my business enhance its appeal and their interest in and willingness to patronize it.  They are familiar and comfortable with Manhattan, either personally or anecdotally, and like the rest of the world, have heard much about Manhattan's vaunted and celebrated nightlife and entertainment venues.

D.      The prospect of locating and travelling to and from an adult eating and drinking establishment like my business (in the unlikely event that I could relocate and re-establish it) in The Bronx, Staten Island, Queens, or Brooklyn, would be both daunting and disincentivizing to many of my current and prospective patrons.  For many of those who do not live in New York City, and even for some who do, the "unknown" factor alone (especially during nighttime) would be inhibiting, in addition to the physical difficulties, significantly increased travel time and expense (charges and tolls) in getting there and back via public (trains and buses), cabs and Uber or self-driving.  My

9

Manhattan business is in a known, comfortable, inviting and easily accessible location; none of which would be inherently true if it were required to move to another borough.

## III.   Permitting Problems

A.    In my experience including what I've been advised, it would take *substantially* more than a year to relocate my business from its existing location to a new location.

B.    After finding a suitable, available, and legally permissible site, I would then have to negotiate the terms of a lease with the landlord and/or obtain financing to purchase the property outright.  This process would be complicated by the fact that all other displaced 60/40 adult uses would be competing for the same small number of available relocation sites.

C.    Assuming I was able to secure the property, I would then be required to seek a variety of building and zoning approval permits, depending on the property's prior usage.   Because I am not savvy at navigating the City's building and zoning requirements, I would need additional expert assistance with this process.  This would be costly and time-consuming, and especially so because adult uses are not permitted to self-certify the plans for their building permit applications.

D.    Zoning approval is part of the building permit process.  Based on my experience as an adult business owner in New York City, I understand that just obtaining

10

0306

zoning approval for adult uses routinely takes many months, and in some instances well over a year.

     E     Upon receiving zoning approval, I would also need to hire architects and engineers, at great cost to me, to prepare the detailed building permit plans that are required to comply with the City's building code provisions. This, as well, would be not only expensive, but add substantial additional time to the startup process.

     F.     Once building permits finally issued, I would commence the process of construction and seeking a temporary, and ultimately permanent, certificate of occupancy. This would add very substantial additional time to the overall time necessary to relocate and open.

     G.     In addition, it is my understanding that any new premises would have to qualify for permitting by the Department of Buildings and New York City Fire Department as a "place of assembly." This would require a Certificate of Occupancy permitting the use, as well as compliance with all of the myriad Occupancy Group F-4 (as to premises subject to the 1968 Building Code) or Assembly Group A-2 (as to premises subject to the 2014 Building Code) rules and regulations concerning ingress and egress, sprinklers, fire alarms, and the like, a Place of Assembly Certificate of Operation, and an approved Place of Assembly Plan (subject to a separate Building Department examination). These requirements are summarized in the Building Department's published Code Notes for Place of Assembly PA Applications (http://www1.nyc.gov/

11

assets/buildings/pdf/code_notes_place-of-assembly.pdf).   While existing places of assembly would qualify, other commercial spaces typically would not without substantial, time-consuming, and expensive alterations subject to the Building Department processes of plan examination, approval, permitting, and inspection. Although, as I understand it, applications for places of assembly permits are generally filed during the building permit or construction phase, they cannot be actually *issued* until after the temporary certificate of occupancy is granted, and the process of actual issuance of the assembly permit can add substantial additional time to the entire project.

H.   In addition, even if I am successful in finding a lawful and commercially available relocation site and obtaining all the necessary permits and inspections, I still would have to meet the separate "siting" standards of the Alcoholic Beverage Control ("ABC") Law and the Rules of the State Liquor Authority ("SLA") in order to continue selling liquor, which is an essential component of my business. As premises licensed by the SLA to sell liquor "on premises," my business cannot be operated at another location without the permission of the SLA, which requires that any business locations comply with local law [see SLA Rule 48.3] *and* satisfy the "public interest and convenience" criteria [see ABC Law, §§ 64-(7)(b) and (f) (License to sell liquor at retail for consumption on the premises")] when there are more existing premises licensed within five hundred feet of a proposed new business to be licensed. Upon the advice of counsel, and based upon my own knowledge as an experienced consultant, manager, and operator of licensed premises, if otherwise suitable locations could be found, they would require a

0308

discretionary approval by the SLA that the grant of the license would be "in the public interest" if located within 500 feet of three other on-premises liquor-licensed premises (regardless of any consideration of "adult") [see ABC Law §64-(7)(f)], and no license could be issued prior to review by and consultation with the local Community Board [see ABC Law § 64-(7)(f)]. In short, the requirement of SLA approval of any location would considerably complicate, and potentially substantially delay, the process of re-locating and opening my business.

I.      Yet another problem that would deter me from attempting to relocate to a new site not previously zoned for an adult use, is what I've heard described as the "sensitive use veto" problem. My attorneys have explained, and based on my experience as an operator of adult businesses in the City I have come to understand, that while a building permit application for an adult business is pending – as part of the business' efforts to obtain city confirmation that it is lawfully located and secure prioritization of its location against any new disqualifying businesses coming in and knocking out the adult business – if the disqualifying new business gets its permit first, then the adult business will be disqualified, even if it filed its permit application way before the disqualifying new business. If this weren't bad enough, my attorneys have advised me that non-adult businesses can get their permits granted much faster than an adult business.

J.      As an example, I have heard of one situation where an adult business, in what was literally an 11th hour attempt to stop a competitor's new adult business,

13

conspired with a local church to convert church-owned office and storage space near the new club's site into worship space in an attempt to disqualify the site and keep the new club from operating. Fortunately, the competitor-sponsored church started its efforts too late in the process, so its attempt failed, and the new club prevailed. Nonetheless, the church's efforts caused the DOB to institute proceedings to revoke the new club's permits which went on for approximately two years until the DOB finally ruled for the new club. Had the blocking process started a bit earlier, the church might well have prevailed and succeeded in disqualifying the new club's site, even though the club had in good faith filed its permit applications way earlier and had spent millions of dollars on its lease, architecture and design fees and other related costs.

## IV.    Chilling Effect of the Above

Based on all of the above, and based upon my knowledge of the New York City adult business industry, I believe it would be impossible to relocate and open in less than a year and would likely take at least as much as several years to do so.

As a result of each of the above-described problems, risks and costs facing an adult club attempting to relocate, if the 2001 Amendments are enforced and I were forced to close my existing business(es) and, because there is no realistic option for relocation, I

0310

believe it is highly likely that I would not attempt to relocate my business(es) but would simply close it (them).

I hereby declare the preceding statements to be true and correct under the penalty of perjury.

Executed in the United States of America, at New York,
New York, on the /2'' day of November, 2018.

Maurice Kavanagh

15

0311

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
725 EATERY CORP., etc., *et ano.,*                 :

                      Plaintiffs,        :

        - against -                              :          Civil Action No.
                                          02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,               :

                    Defendants.    :
---------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,* :

                      Plaintiffs,        :

        - against -                              :          Civil Action No.
                                          02 CV 4432 (WHP)
THE CITY OF NEW YORK, et al.,               :

                    Defendants.    :
---------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*    :

                      Plaintiffs,        :

        - against -                              :          Civil Action No.
                                        02 CV 8333 (WHP)
THE CITY OF NEW YORK,                         :

                    Defendant.     :
---------------------------------------------------------X

**DECLARATION OF EDWARD S. RUDOFSKY IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
(REGARDING LEGISLATIVE HISTORY AND RELATED MATTERS)**

      **EDWARD S. RUDOFSKY** hereby declares as follows:

1.     I am an attorney admitted to the practice of law in the State of New York continuously since 1974, have been member of the Bar of this Court continuously since 1979, and am a member of Zane and Rudofsky, attorneys for plaintiffs 59 Murray Enterprises, Inc. d/b/a "New York Dolls" (n/k/a "Flashdancers Downtown"), AAM Holding Corp. d/b/a "Private Eyes" (n/k/a "Flashdancers NYC"), West 20th Enterprises Corp. d/b/a "VIP Club New York", and JNS Ventures Ltd. d/b/a "Vixen".

2.     I submit this declaration in support of the motion for preliminary injunction on behalf of my clients, as well as plaintiffs in the companion actions, *725 Eatery Corp., etc., et ano. v. The City of New York*, SDNY Case No. 02 CV 4431 (WHP), and *Club at 60th Street, Inc., etc., et al.,* SDNY Case No. 02 CV 8333 (WHP).

3.     I have reviewed the following documents from the legislative record preceding the City's adoption of the 2001 Amendments, which are attached as Exhibits 33-42 to Club Plaintiffs' Request to Take Judicial Notice, which is submitted at pages 339 *et seq.* of Plaintiffs' Joint Appendix ("PJA"):

   A. DCP Application N 010508 ZRY dated March 23, 2001 (**RJN Ex. 33**) (PJA 551); and

   B. The "Negative Declaration" and Environmental Assessment Statement issued March 26, 2001 in regard to Application N 010508 ZRY (**RJN Ex. 34**) (PJA 563); and

0313

C.   The transcript of the public hearing held on Application N 010508 ZRY by the City Planning Commission on May 23, 2001.  (**RJN Ex. 35**) (PJA 630)

D.   The August 8, 2001 Report of the New York City Planning Commission, including written comments on Application N 010508 ZRY by twenty-one Community Boards and three Borough Boards dated April 25, 2001 through May 25, 2001 (**RJN Ex. 36**) (PJA 708); and

E.   The transcript of the public hearings held on Application N 010508 ZRY by the City Planning Commission August 8, 2001 (**RJN Ex. 37**) (PJA 835); and

F.   The transcript of the public hearing held on Application N 010508 ZRY by the Zoning & Franchises Subcommittee of the Land Use Planning Committee of the New York City Council on October 1, 2001 (**RJN Ex. 38**) (PJA 848)

G.   The correspondence between Edward S. Rudofsky and the New York City Council dated October 9, 2001, and David Karnovsky and the New York City Council dated October 24, 2001 (**RJN Ex. 39**) (PJA 890)

H.   The transcript of the public hearing held on Application N 010508 ZRY by the Zoning & Franchises Subcommittee of the Land Use Planning

3

Committee of the New York City Council on October 25, 2001 (**RJN Ex. 40**) (PJA 899) ; and

I.  The transcript of the public hearing held on Application N 010508 ZRY by the Land Use Planning Committee of the New York City Council on October 25, 2001 (**RJN Ex. 41**) (PJA 911) ; and

J.  The transcript of the meeting of the New York City Council on October 31, 2001, at which Application N 010508 ZRY was adopted.  (**RJN Ex. 42**) (PJA 919)

4.      I have also reviewed the Affidavit of David Karnovsky, Counsel to the New York City Department of City Planning ("DCP"), sworn to October 23, 2002, a copy of which, without internal exhibits, is submitted as **RJN Ex. 43** (PJA 1032).  In his affidavit, Mr. Karnovsky details what he believes to be relevant facts regarding the drafting, adoption, and intent of the 2001 Amendments.

5.      I have also reviewed the sworn hearing testimony of Robert Iulo, one of the City's witnesses before Hon. Louis B. York, in Supreme Court, New York, on February 23, 2009, excerpts of which are submitted as part of **RJN Ex. 44** (PJA 1072, at 1086-1093) (and which is discussed further at ¶ 20 below.)

6.      I have also reviewed the sworn deposition testimony of Marilyn Mammano, Director of Zoning & Urban Design of the NYC Department of City Planning, on September 6, 1996, in *Hickerson v. The City of New York,* New York County Index No.

0315

103569/96, excerpts of which are submitted as **RJN Ex. 52** (PJA 1448; *see*, *also*, **RJN Exhibit 77** (PJA 1816) (and which is discussed further at ¶ 21 below).

7.     According to Mr. Karnovsky, the City amended the 1995 Ordinance in 2001 because it believed that 60/40 clubs' compliance with the adult business spatial requirements was a "sham."  *See, generally,* Affidavit of David Karnovsky, Counsel to the New York City Department of City Planning ("DCP"), *id.,* at ¶ 45 *et seq.,* esp. ¶ 46 ("sham compliance"), ¶ 47 ("ambiguity in the text"), ¶ 54 ("60/40" clubs "evaded classification as adult establishments"), ¶54 n. 14 ("[t]he analysis of the [New York] Court of Appeals stemmed from a misreading of the 1995 regulations"), and ¶ 56 (2001 Amendments proposed "to better and more completely reflect the legislative intent behind the 1995 regulations") (**RJN Ex. 43**) (PJA 1032, at 1052-1057).

8.     In passing the 2001 amendments, the City relied upon no adverse secondary effects attributable to the "60/40" business model, which admittedly was not studied in 1994/1995 because it did not exist at that time.  See Karnovsky Affidavit at ¶ 44 (PJA 1051-1052), quoting from the 1995 City Planning Commission report: "[a]s a general rule, the Commission believes that *an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied in the DCP Study and thus be an 'adult establishment' or an 'adult bookstore.' \*\*\*"*  [Emphasis added.]

5

0316

9.     On March 23, 2001, allegedly in order to "better and more completely reflect the legislative intent" (*id.* at ¶ 56), the DCP filed application N 010508 ZRY to further amend the AZR ("2001 Application") (**RJN Ex. 33**) (PJA 551)

10.    The proposed 2001 Amendments were reviewed pursuant to the New York State Environmental Quality Review Act ("SEQRA") and the City Environmental Quality Review ("CEQR").  Copies of the "Negative Declaration" and Environmental Assessment Statement ("EAS") are submitted as **RJN Ex. 34** (PJA 563).   These reviews concluded that adoption of the 2001 Amendments would have "no significant effect on the quality of the environment" and "neighborhood character" - - the antithesis of a finding of "adverse secondary effects" being ameliorated by the proposed regulation.

11.    The Negative Declaration and EAS were submitted to the City Council together with the 2001 City Planning Commission ("CPC") Report formally proposing the 2001 Amendments.  (**RJN Ex. 36**) (PJA 708)  They purport to set out the universe of facts on which the 2001 Amendments were predicated, but there is no express mention of any adverse secondary effects associated with 60/40 businesses. The City's position was that such business were merely in "sham compliance" with the 1995 Ordinance, but the City offered no evidence that 60/40 businesses, even if in so-called "sham compliance," generated any secondary effects, much less those attributed to the 100% uses studied in 1994.

6

12.     The proposed 2001 Amendments were also subject to review by the Community and Borough Boards.  Twenty-one Community Boards and three Borough Boards voted on them.  Their reports are included with the CPC Report (**RJN Ex. 36**) (PJA 708, at 776 *et. seq.*)

A.     One of the Community Boards in which a number of 60/40 businesses are located – Manhattan Board 5 - opposed the 2001 Amendments in part because it did "not find any significant negative impacts of adult uses within its district at [that] time and accordingly believe[d] that there [was] no need for further regulation of those uses."  Manhattan Board 5 also believed that "the proposed changes would create overbroad definitions of adult use establishments that may violate the First Amendment to the U. S. Constitution and will allow arbitrary and capricious enforcements against a wide variety of businesses."

B.     Four other Community Boards opposed the 2001 Amendments, likewise with no indication of any adverse secondary effects that required further regulation.  Manhattan Board 3 noted the "violation of 1st Amendment rights and other free speech guarantees." Manhattan Board 4 "believe[d] the general public does not need further protection from adult establishments.  Further, the proposals designed to close 'loopholes' are not substantive in that the text frequently uses 'substantial portion' or 'an emphasis upon,' phrases which are open to many interpretations.   *** We believe enforcement of the proposed text change would be a waste of manpower and other assets."  Manhattan Board 6 voted against the 2001 Amendments on the grounds that

7

0318

they made the AZR "too complicated" and enforcement "too complex", that DOB inspectors are "ill-equipped" to make the enforcement judgments required, and that "it is a contrivance to use the Zoning Resolution to measure and gauge the content of" adult material.   Manhattan Board 7 found that "the City has failed to present adequate verifiable data to support is assertions of alleged negative secondary effects caused by adult establishments, which are in face legal businesses", and that "the original 1995 zoning text amendment and … the currently proposed zoning text amendment [are] deliberate attempts to regulate the content of certain forms of speech" and that they are "unwarranted intrusions on rights guaranteed to all under the Constitution of the United States of America and the Constitution of the State of New York".

C.    Sixteen Community Boards supported the 2001 Amendments; not a single one pointed to any adverse secondary effects justifying the amendments.    As noted in that exhibit, Bronx Board 12 complained of "sham compliance".   Brooklyn Board 1 supported the proposal on the basis that it closed "loopholes" in the 1995 Ordinance.   Brooklyn Board 2 supported the proposal as further "the goal of removing all sex/adult related establishments in our community."    Brooklyn Boards 7 and 10 supported the proposal as "clos[ing] … loopholes".   Manhattan Board 1 supported the amendments as eliminating "superficial compliance" with the 1995 Ordinance. Manhattan Board 2 supported the amendments without comment except to request clarification as to the measurement of the 500' buffer zone.   Queens Board 5 supported the proposal on the ground that it would "help to curtail adult entertainment

8

establishments in residential areas."  Queens Boards 2, 4, 6, 9, and 11 supported the proposal without explanation, as did Manhattan Board 8 and Staten Island Board 3.

        D.    The Manhattan Borough Board voted against the 2001 Amendments, noting, *inter alia,* that "few, if any, secondary effects have been observed (criminal activity, deterioration of quality of life, damaging neighborhood character, reducing economic development and property values).  There is no further need for protection felt by these communities.  The Brooklyn Borough Board voted in favor, but stated only in conclusory fashion that the proposed amendments are "a means to address the inadequacies of the existing regulations."  The Queens Borough Board likewise voted in favor but with no explanation other than to recount the prior votes taken by the local Boards.

    13.    Following these submissions, the CPC held a public hearing on May 23, 2001.  A copy of the transcript is submitted as **<u>RJN Ex. 35</u>** (PJA 630).  Seventeen witnesses testified:

        A.    Richard Bearak read a statement by Brooklyn Borough President Howard Golden, which referred generically to "adult establishments" operating "illegally" and causing "blight" in the community of Sunset Park, Brooklyn, and called upon the CPC to include provisions in the proposed amendments directing more aggressive enforcement of the 1995 Ordinance.  There was no mention of the 60/40

0320

business model, nor any claim of adverse secondary effects allegedly attributable to it. (Tr. 3-8)

B.    Doris Diether, a representative of Manhattan Community Board 2, discussed the need to clarify the 500' buffer zone measurement, but did not address the 60/40 business model or claim there were any adverse secondary effects allegedly attributable to it.  (Tr. 8-9)

C.    John Cornelius, a representative of Queens Community Board 7, summarily asserted that the "substantial portion" standard of the 1995 Ordinance was "supposed to apply to only book store or videos."  Again, there was no discussion of any adverse secondary effects allegedly attributable to the 60/40 business model.  (Tr. 9-10)

D.    Attorney Herald Price Fahringer spoke on behalf of the Coalition for Free Expression and 29 individuals present at the hearing (identified in the transcript as having "signed up in opposition, but not choosing to speak").  (Tr. 11-21)  *Inter alia*, Mr. Fahringer noted that:

> there has never been a showing that establishments that have reduced the adult material to less than 40% of their business cause any adverse secondary effects.  All the studies that have ever been conducted have been with establishments that exclusively deal in that material.  We now have over 20 court decisions that say, no they are not causing any harm to the community[,] and even … as recently as within the last two weeks, [Manhattan] Community Board #5[,] that has more 'adult establishments' in its district than any other community board[,] voted unanimously against this law and indicated in their resolution that they did not believe the establishments within their area caused any adverse secondary effect[s]. *** Community Board #4[,] which is the next district[,] that has the next largest number of 'adult establishments'[,] reached the same conclusion.

10

They firmly issued a resolution saying that they were opposed to this law
and indicated that they felt that their community needed no more protection
from these establishments which are operating 60/40 …. [Tr. 15-16]

E.    Attorney Beth Haroules, of the New York Civil Liberties Union,

urged that the proposed 2001 Amendment were unconstitutional on a number of different

grounds and suggested a number of less restrictive means for regulating bars and other

businesses offering adult entertainment, but there was no discussion of the 60/40business

model or any claim of adverse secondary effects allegedly attributable to such businesses.

(Tr. 21-35)

F.    Christopher Farrell, an individual consumer, spoke about the

potential adverse impact of the 2001 Amendments on the gay community.   Again, there

was no discussion of the 60/40 business model or any claim of adverse secondary effects

allegedly attributable to such businesses.   (Tr. 35-38)

G.    Attorney Ira Weiner spoke about fact that the 1995 Ordinance was a

"dispersal plan," and the lack of any study of the effect of the 1995 Ordinance and

whether "there are any negative secondary effects that [remain] to be addressed."   (Tr.

38-41)

H.    Daniel Golub read a statement by New York State Assembly

Member Richard Gottfried which criticized many aspects of the proposed 2001

Amendments.   *Inter alia,* Assemblyman Gottfried noted that the proposal was not "an

effort … to improve the quality of life in … neighborhoods," but rather "part of this

0322

administration's continued effort to … regulate constitutionally protected speech and concentrate adult uses in a few communities."  (Tr. 41-46)

I.      Attorney Martin Mehler, representing 69-20 Queens Blvd. Inc. d/b/a "Nickels," a 60/40 business, testified (Tr. 46-48), *inter alia*, that:

> the [City] cannot impose these new restrictions on topless bars without undertaking a thorough study to establish the effect which the present law [i.e., the 1995 Ordinance] has on a premises such as Nickels and the surrounding communities in which they are located.  We do not believe that any such study would justify the new restrictions that have been proposed, but the present situation in which there has plainly been no study at all to justify the new restrictions sought to be imposed at this time is an affront to my client's constitutional rights.  [Tr. 47]

J.      Carmen Vazquez, the Director of Public Policy for the Lesbian & Gay Community Services Center, testified about the potential adverse impact of the 2001 Amendments on the lesbian and gay community, stating, *inter alia*, that:

> the existing regulations, although we opposed them originally, are enough. The[y] allow individuals to purchase erotica without walking in isolated parts of the [C]ity where they have reason to fear for their safety. They offer customers choices.  They protect minors and adults from being exposed to materials they might not have wanted or expected to see.  We don't need more censorship.  [Tr. 50]

K.      William Dobbs, of the New Yorkers for Free Expression, testified that both the 1995 Ordinance and the proposed 2001 Amendments were forms of censorship.  Of note, he emphasized the lack of negative secondary effects attributed to

0323

"130 businesses or so, in 620 square miles," explaining that the clubs along Queens Boulevard "blend in like one of the stars in th[e] flag …."  (Tr. 52-55)

L.      Attorney Charles Axelrod, representing Wesjoe Restaurant, Inc. d/b/a "New York Dolls," the predecessor to Plaintiff 59 Murray Enterprises, Inc., testified, *inter alia,* that "before this commission considers the [C]ity's proposed changes, the [C]ity must conduct a study to determine the affect which the current AZR has had on topless bars and the communities in which they are located.  We believe that such a study would establish that the new restrictions proposed by the [C]ity are not justified."  (Tr. 55-57)

M.      Jeremy Laufer, a representative of Brooklyn Community Board 7, testified to the concentration of adult uses in Sunset Park and related enforcement issues, and that "complying with the 60/40 rule does not necessarily mean changing the nature of your business when your external appearance doesn't change and you continue to advertise to the consumer that you have all these sex related items and you don't even acknowledge that you have other items externally."  However, there was no evidence offered of adverse secondary effects attributable to the 60/40 businesses themselves. Indeed, when asked by one member of the CPC for "more detail about what kinds of public nuisances are created as a result," Mr. Laufer's response was that he could not prove an alleged increase in prostitution, but "I would like to get … the statistics … so I can prove that."  (Tr. 57-62)

0324

N.      Abbey Ehmann, an entertainer who had worked in a now-closed topless bar known as "Billy's Topless," testified, *inter alia*, that "they never had any negative secondary effects.  For 20 years they functioned with no problem from their community board …."  (Tr. 62-64)

O.      Joe Grabarz, the Deputy Executive Director of the Empire State Pride Agenda, testified (Tr. 64-70) that the proposed 2001 Amendments were, *inter alia*, "unnecessary," and sought to harass

> legitimate lawful business establishment[s] … which, though sexually oriented, are in fact productive lawful parts of their neighborhoods.  Many of the businesses that would now fall under these new regulations have peacefully existed in these neighborhoods for years without complaints of their neighbors.  The sweeping regulations adopted in 1995 seemed to have effectively kept the ratio of adult businesses to a significantly reduced level ….  At the risk of sounding cynical, this new proposal seems to be a political solution in search of a problem.  [Tr. 66-67]

P.      Irving Poy read a statement on behalf of the Queens Borough President, asserting that there had been "court rulings, interpretations and practices that circumvent the intent of" the 1995 Ordinance, and that the proposed 2001 Amendments "will provide the opportunity to enforce these regulations [i.e., the 1995 Ordinance] as intended to protect the areas around residences, schools and houses of worship from the negative influences of these uses."   (Tr. 70-72) There was no explanation of what "negative influences" were being referred to, nor any discussion of the 60/40 business model, nor any claim of adverse secondary effects allegedly attributable to such businesses at that time or in the past.

14

Q.     Theresa Jefferson, of the New York City Anti-Violence Project, testified that the claim of adverse secondary effects attributable to adult businesses was "rhetoric … that has yet to be substantiated."  She concluded that "[t]hese amendments, like the regulations they stem from, are draconian, counterproductive, nonsensical, more than likely unconstitutional and quite unnecessary in a city that is not overrun by adult businesses."  (Tr. 72-76)

14.     The 2001 Amendments were approved by the CPC at a public hearing held on August 8, 2001.  A copy of the transcript is submitted as **RJN Ex. 37** (PJA 835).

A.     Chairman Joseph Rose spoke in favor of the proposal on the ground that it implemented "the spirt and the intent and the letter of the original regulations," and addressed "subterfuges" and "sham demonstrations of compliance" with the 1995 Ordinance, but did not address whether 60/40 businesses caused adverse secondary effects or offer any such evidence.  (Tr. 3-6)  Commissioners Albert Abney, Angela Battaglia, Amanda Burden, Irwin Cantor, Marilyn Gelber, and John Merolo summarily agreed with the Chairman or simply voted in favor without further explanation.  (Tr. 6 *et seq*.)

B.     Commissioner Alex Garvin voted in favor, noting that the 1995 Ordinance "had a positive impact" and that "[t]here is a reduction in establishments by 23%."  (Tr. 7-9)  He characterized the proposed 2001 Amendments as an "adjustment"

0326

but did not discuss the 60/40 business model, nor make any claim of adverse secondary effects allegedly attributable to such businesses or offer any evidence of such.

C.     Commissioner William Grinker abstained, explaining, *inter alia,* that:

> … [U]nfortunately, I think this is a solution in search of a problem.  I say this because, first, there is no documentation of any proliferation but[,] rather, the number of adult use facilities has gone down substantially … which was the original intent of the [1995] zoning plan.  Secondly, there is nothing but anecdotal information presented on the failure of the 60/40 rules.  For example, I have no clear idea how many establishments are honestly trying to meet the standards set forth compared to how many of the kind of sham that is the source of this concern.  And, finally, the community boards in Manhattan[,] where fully 40% or more of these establishments exist[,] have expressed satisfaction that there are no significant secondary impacts from the remaining adult use establishments in their neighborhoods.  Given these facts, or lack of alternative facts … I believe that, over all, there is no justification for the extensive modifications to the zoning requirements that are being proposed, and it could be argued that this is … little more than an effort at ongoing harassment which has no place in our constitutional interpretation of free speech.   ***  These proposals put forth in [an] highly unfriendly political atmosphere and with adequate justification violation my own standards of fairness when it comes to the protection of First Amendment rights.  [Tr. 9-11]

D.     Commissioner Kenneth Knuckles voted in favor and commented that he believed that the 2001 Amendment "attempt to mitigate what are clearly defined established secondary impacts of adult establishments…," but did not address what those "clearly defined established second impacts" were nor offer any basis (or evidence) for believing that adverse secondary effects are caused by 60/40 businesses.  (Tr. 11-12)

16

15.    The favorable recommendation of the CPC was next considered by the Zoning & Franchises Subcommittee of the Land Use Committee of the New York City Council, on October 1, 2001.   A copy of the portion of the transcript of the hearing relating to this item is submitted as **RJN Ex. 38** (PJA 848).  Six witnesses testified.

A.    David Jaffee, General Counsel to the New York City Criminal Justice Coordinator, testified that the proposed 2001 Amendments "would close the judicially-created loopholes that illegal adult establishments have utilized to remain in operation while only maintaining sham compliance with the City's zoning laws.  *** These loopholes are simply wrong, for they so distort the original law passed by the Council as to make it almost meaningless.  There was no so-called '60-40' provisions for these businesses."  (Tr. 27-31)

B.    David Karnovsky, DCP General Counsel (Tr. 31 *et.seq*.), claimed that the 2001 Amendments were necessary to address "what we consider to be a bizarre reading [by the Courts] of the regulations that led to the artificial separation of adult and non-adult sections."  (Tr. 32)  However, when questioned specifically about the attempt to regulate 60/40 clubs out of existence, he conceded that a new study was necessary:

> MR. KARNOVSKY:  *** In terms of the secondary impacts, of course, the 1995 regulations were adopted based on studies and in consideration of evidence that was provided.  ***

> COUNCIL MEMBER QUINN:  So we don't actually know if that may be the case, because it's just too much asking for 60 – 40.

We don't know whether they had continued to cause secondary negative effects.

MR. KARNOVSKY:   That certainly is an interesting question.  I can't draw a conclusion at the moment.  [Tr. 36]

\*   \*   \*

COUNCIL MEMBER McCAFFREY:  Mr. Karnovsky, let me just ask you, in essence there is no need for additional studies of secondary impacts that were cited in the Council at hat tiem of the adoption, is that correct.

MR. KARNOVSKY:  That's correct.

COUNCIL MEMBER McCAFFREY:  What about with the 60 – 40 rule?

MR. KAROVSKY:  We are not quite sure that the 60 – 40  - - you cannot change the text without doing another study to see that the establishments of that nature have secondary impacts. [Tr. 37-38]

C.      Attorney Herald Price Fahringer, noted, *inter alia,* that "when it comes to secondary adverse effects … the Community Boards that are the most concerned … felt that there was no need for any further regulations."  (Tr. 41-42)

0329

D.      NYCLU Attorney Beth Haroules testified that the proposed 2001 Amendments were unconstitutional on a number of grounds, but did not discuss adverse secondary effects.  (Tr. 43-48)

E.      Attorney Mark Alonso, attorney for Ten's Cabaret, Inc., *inter alia,* called the attention of the Subcommittee to the portion of the 1994 DCP Adult Entertainment Study which concluded that "[i]t was not possible to isolate the impact of adult uses relative to criminal complaints" (a conclusion which the Subcommittee Chair stated had been "discredited"); provided the Subcommittee with a single monthly NYPD report that he had obtained, which showed that "topless clubs do not cause crime, foster crime, create a crime area in their vicinity or in any way cause the secondary adverse effects which are the reason you are considering this amendment"; advised the Subcommittee that the NYPD was resisting disclosure of the other NYPD monthly reports for the relevant period; and requested that the Subcommittee obtain the balance of the NYPD monthly reports before proceeding.  (Tr. 51-57)

F.      Steven Aslan, who at the time ran Club VIP (one of the Plaintiff businesses herein), testified, *inter alia,* that his and other "high end" clubs were "good neighbor[s]" and "there are very few problems in our industry."  (Tr. 57-59)

G.      I testified, *inter alia*, that "[t]here has never been a study by New York City, or anybody else involving the [e]ffect of a 60 – 40 Rule, a Substantial Portion

Rule, or anything [similar] to the regime that [has been pro]posed.  ***  Mr. Karnovsky acknowledged that there has been no study for the 60 – 40 Rule."  (Tr. 59-64)

16.     By letter to the Subcommittee dated October 9, 2001 (copied to the entire Council, among others), I urged that the City be compelled to produce the balance of the NYPD "problem club" reports referred to in the Alonso testimony and urged that "the DCP and/or CPC … conduct a statistically valid "Secondary Effects Study" and issue a full report, including all NYPD data, as a condition precedent to … amend[ing] the definition of 'adult eating & drinking establishment.'"  By responsive letter dated October 24, 2001 (addressed only to the Subcommittee Chair and not copied to the members of the Council), Mr. Karnovsky did not deny the existence of the NYPD reports in question, but urged that no new secondary effects study was necessary, as "the sole purpose of the [proposed] amendments as they relate to topless bars and restaurants is to allow the City to implement the [1995] regulations according to their original intent." Copies of both letters are included in **<u>RJN Ex. 39</u>** (PJA 890).

17.     The 2001 Amendments were then approved by the Subcommittee on October 25, 2001 by a vote of 3-1-1. (**<u>RJN Ex. 40</u>**) (PJA 899) Council Members Berman, Malave-Dilan, and McCaffrey voted in favor, without comment or explanation.  (Tr. 6 *et seq.*)  Council Member Dear did not vote on the proposal, likewise without explanation. (Tr. 8)  Council Member Quinn voted against, explaining, *inter alia*, that "I have questions about its Constitutionality" and that adopting the 2001 Amendments "is only going to further raise constitutional questions."  (Tr. 7)

0331

18.     The full Land Use Committee then approved the 2001 Amendments by a vote of 12-1.   (**RJN Ex. 41**) (PJA 911) None of those voting in favor made any comments or offered any explanation for their vote.   Council Member Quinn repeated her complaint that the legislation would have the effect of "send[ing] more Triple X establishments into the West Side into my district and directly into the area that abuts the waterfront." (Tr. 4-5)

19.     The 2001 Amendments were then approved at the New York City Council meeting held on October 31, 2001, by a vote of 38-4-3.   (**RJN Ex. 42**) (PJA 919)  None of those voting in favor explained their vote, other than Council Member Oddo, who complained that the opening of a 60/40 club in his district had "knocked the community down on its knees," but did not offer any specifics (Tr. 59-60), and Council Member Leffler, who merely expressed the hope that the new amendments would be upheld.  (Tr. 67)  Council Member Eldridge voted against and observed that the 2001 Amendments were inconsistent with personal freedom and "absurd." (Tr. 51)  Council Member Lopez voted no and stated his belief that "the government has no business regulating the sexuality of human beings."  (Tr. 55)  Council Member Michaels voted against and stated that "I studied the [proposed] law and I believe there are some problems here that have to be more succinctly and more objectively - - - the standard here is not objective enough …." (Tr. 57)  Council Member Quinn voted against and observed that the 2001 Amendments were "a further restriction on the [F]irst [A]mendment."  (Tr. 61-62) Council Member Reed abstained and stated, *inter alia*, that "I believe this is excessive

21

0332

[and] arbitrary …. This issue could have been resolved in a more intelligent fashion and I think this is just pandering to a Mayor who thinks he has to have it his way. …[H]e couldn't get it defined the way he wanted by a court, so he's coming backing around this way; …." (Tr. 62-63)

20.     Mr. Iulo, a DOB Building Inspector who had retired by the time of the trial before Justice York, held a Master's Degree in Urban Planning from New York University (**RNJ Ex. 44)** (PJA 1072) at Tr. 186; *see, also,* Tr. 203) and trained New York City personnel in enforcement of the adult use provisions of the Amended Zoning Resolution (*id.* at Tr. 189), was an expert in commercial and advertising signage (*id.* at Tr. 204), very familiar with the signage issues associated with adult entertainment at the time of the enactment of the 1995 Ordinance (*id.* at Tr. 204 – 207), and, as of the time of the trial in 2009, had observed that the signage for adult establishments was "toned down quite a bit … to the point with respect to where quite a few of the eating and drinking establishments [that] you would even know what it was from the outside …" and "you don't see any more signs like "Triple X" or "Girls, Girls, Girls" associated with those eating and drinking establishments …." (*id.* at Tr. 207 – 210, esp. Tr. 209-210).

21.     Ms. Mammano was the Director of Zoning & Urban Design of the NYC Department of City Planning at the time the 1995 Ordinance was proposed and enacted. She was deposed in *Hickerson v. The City of New York*, New York County Index No. 103569/96, one of the three companion challenges to the constitutionality of the 1995

0333

Ordinance decided in *Stringfellow's of New York, Inc. v. City of New York,* 91 N.Y.2d 382 (1998).   *Inter alia,* she testified that "exist[ing] adult establishments were not considered" in the City's calculation of the number of potentially available sites for adult establishments, and "there was no attempt to … draw 500-foot circles around them on [the City's] map[s]."  (**RJN Ex. 52** at 151-152) (PJA 1448).

I hereby declare the foregoing to be true under the laws of perjury of the United States of America.

Executed at New York, New York
on the 21st day of November, 2018.

s/Edward S. Rudofsky
Edward S. Rudofsky

0334

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

725 EATERY CORP., etc., *et ano.,*       :

                Plaintiffs,    :

       - against -            :        Civil Action No.
                                                        02 CV 4431 (WHP)

THE CITY OF NEW YORK, et al.,    :

                Defendants.  :

----------------------------------------------------------X

59 MURRAY ENTERPRISES INC., etc., *et al.,* :

                Plaintiffs,    :

       - against -            :        Civil Action No.
                                                        02 CV 4432 (WHP)

THE CITY OF NEW YORK, et al.,    :

                Defendants.  :

----------------------------------------------------------X

CLUB AT 60TH STREET, INC., etc., *et al.,*    :

                Plaintiffs,    :

       - against -            :        Civil Action No.
                                                        02 CV 8333 (WHP)

THE CITY OF NEW YORK,         :

                Defendant.   :

----------------------------------------------------------X

## DECLARATION OF EDWARD S. RUDOFSKY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (REGARDING THE STATUS OF VEIL NYC AND HEADQUARTERS N/K/A ROSEWOOD THEATER)

**EDWARD S. RUDOFSKY** hereby declares as follows:

1.      I am an attorney admitted to the practice of law in the State of New York continuously since 1974, have been member of the Bar of this Court continuously since 1979, and am a member of Zane and Rudofsky, attorneys for plaintiffs 59 Murray Enterprises, Inc. d/b/a "New York Dolls" (n/k/a "Flashdancers Downtown"), AAM Holding Corp. d/b/a "Private Eyes" (n/k/a "Flashdancers NYC"), West 20th Enterprises Corp. d/b/a "VIP Club New York", and JNS Ventures Ltd. d/b/a "Vixen".

2.      I submit this declaration in support of the motion for preliminary injunction on behalf of my clients, as well as plaintiffs in the companion actions, *725 Eatery Corp., etc., et ano. v. The City of New York*, SDNY Case No. 02 CV 4431 (WHP), and *Club at 60th Street, Inc., etc., et al.,* SDNY Case No. 02 CV 8333 (WHP), to document the existence of another "60-40" club in Manhattan (not connected to any of the Plaintiffs) that will be forced to close and/or seek a relocation site if the 2001 Amendments are upheld.

## AS TO THE STATUS OF VEIL NYC

3.      On November 2, 2018, I reviewed the website (www.veilnyc.com), personally visited the location of Veil NYC, at 680 – 12th Avenue, New York, New York 10019 (a/k/a 637 - 639 West 50th Street, New York, New York 10019) to confirm that it is open and operating, personally reviewed the on-line records of the NYC Department of

2

0336

Buildings and the New York State Liquor Authority for this location, and personally reviewed the on-line records of the NYS Department of State for Veil NYC LLC.

4.     I have thereby determined that Veil NYC is a new "mixed use" restaurant/cigar bar/cabaret presenting "topless dancing" and other live adult entertainment by performers exposing "specified anatomical areas" as defined in AZR 12-10, that opened within the past 12 months in Manhattan, on or about (or after) March 29, 2018; is not situated at a location at which adult use is permissible; is operating as a non-adult use on a "60/40" basis; and, if the 2001 Amendments are enforced, would be required to re-locate in order to continue to offer adult entertainment.

## AS TO HEADQUARTER N/K/A ROSEWOOD THEATER

5.     On   November   2,   2018,   I   reviewed   the   current   websites (https://www.rosewoodtheater.com   and   https://www.diehappytonight.com/rosewood-theater/), personally visited 552 W. 38th Street, New York, New York 10018) to confirm that the business located at that address is open and operating, personally reviewed the on-line records of the NYC Department of Buildings and New York State Liquor Authority for this location, and personally reviewed the on-line records of the NYS Department of State for Veil NYC LLC.

6.     I have thereby determined that Rosewood Theater is the new tradename for the premises formerly operated under the name Headquarters; holds itself out as a

3

0337

"private gentlemen's club" presenting live adult entertainment by performers exposing "specified anatomical areas" as defined in AZR 12-10; that the liquor license for this premises was issued to Silk Corp. in 2003 and continues to be held in the name of that corporation; that this business is not situated at a location at which adult use is permissible and, upon information and belief, is operating as a non-adult use on a "60/40" basis (as Headquarters was operated for many years); and, likewise upon information and belief, if the 2001 Amendments are enforced, would be required to re-locate in order to continue to offer adult entertainment.

I hereby declare the foregoing to be true under the laws of perjury of the United States of America.

Executed at New York, New York
on the 9th day of November, 2018.

Edward S. Rudofsky

4

0338