UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
725 EATERY CORP., etc., *et ano.,*                    :

        Plaintiffs,  :

    - against -       :    Civil Action No.
                   02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,    :

        Defendants. :
-------------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*          :

        Plaintiffs,  :

    - against -       :    Civil Action No.
                   02 CV 4432 (WHP)
THE CITY OF NEW YORK, et al.,    :

        Defendants. :
-------------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*           :

        Plaintiffs,  :

    - against -       :    Civil Action No.
                   02 CV 8333 (WHP)
THE CITY OF NEW YORK,      :

        Defendant. :
-------------------------------------------------------------X
336 LLC., etc., *et al.,*                            :

        Plaintiffs,  :

    - against -       :    Civil Action No.
                   18 CV 3732 (WHP)
THE CITY OF NEW YORK,      :

        Defendant. :
-------------------------------------------------------------X

# NOTICE OF FILING OF PLAINTIFFS' JOINT APPENDIX VOLUME 12 IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**PLEASE TAKE NOTICE,** that Plaintiffs hereby file the within Volume 12 of

Plaintiffs' Joint Appendix in the above-captioned actions.

Dated:       New York, New York
             November 21, 2018

*Respectfully,*

**DANIEL A. SILVER**                        **JOHN H. WESTON**
**SILVER & SILVER**                         **G. RANDALL GARROU**
One Liberty Square                          **WESTON, GARROU & MOONEY**
New Britain, Connecticut 06050-0698         12121 Wilshire Boulevard, Suite 525
(860) 225-3518                              Los Angeles, CA 90025-1176
                                            (310) 442-0072

        - and-                                      - and -

**JENNIFER KINSLEY**                        **ALAN M. ABRAMSON**
Kinsley Law Office                          **ABRAMSON & MORAK**
Post Office Box 19478                       35 Worth Street
Cincinnati, Ohio 45219                      New York, New York 10013
(513) 708-2595                              (212) 226-7098

*Attorneys for Plaintiffs*                  *Attorneys for*
*725 Eatery Corp., etc., et ano.*           *Club At 60th Street, Inc., etc., et al.*

By: ___s/Daniel A. Silver_____           By: ___s/John Weston_____
Daniel A. Silver                                   John Weston

**EDWARD S. RUDOFSKY**                      **ERICA DUBNO**
**ZANE and RUDOFSKY**                       Fahringer & Dubno
601 West 26th Street, # 1315                767 Third Avenue, Suite 3600
New York, New York  10001                   New York, New York
(212) 245-2222                              (212) 319-5351

*Attorneys for Plaintiffs*                  *Attorneys for Plaintiffs*
*59 Murray Enterprises, Inc., etc.*         *336 LLC, etc., et al.*
*et al.*

By: ___s/Edward S. Rudofsky_____           By: ___s/Erica T. Dubno_____
      Edward S. Rudofsky                           Erica T. Dubno

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
725 EATERY CORP., etc., *et ano.,*                    :

                               Plaintiffs,     :

             - against -                    :          Civil Action No.
                                                  02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,                    :

                            Defendants.   :
-------------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*       :

                                Plaintiffs,     :

             - against -                    :          Civil Action No.
                                                  02 CV 4432 (WHP)
THE CITY OF NEW YORK, et al.,                    :

                            Defendants.   :
-------------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*       :

                                Plaintiffs,     :

               - against -                    :          Civil Action No.
                                                  02 CV 8333 (WHP)
THE CITY OF NEW YORK,                    :

                            Defendant.   :
-------------------------------------------------------------X

336 LLC., etc., *et al.,*                    :

                                Plaintiffs,     :

               - against -                    :          Civil Action No.
                                                  18 CV 3732 (WHP)
THE CITY OF NEW YORK,                    :

                            Defendant.   :
-------------------------------------------------------------X

## PLAINTIFFS' JOINT APPENDIX
### (VOL. 12 of 17; pp. 1382--1467)

Per the Court's Order of November 7, 2018, Plaintiffs in each of the four above-entitled actions hereby submit their unitary Joint Appendix consisting exclusively of evidentiary documents upon which some or all of the Plaintiffs may choose to rely.  The inclusion of documents in this Joint Appendix does not automatically signify an endorsement or promotion of any of these documents by any individual Plaintiff or group of Plaintiffs.  That will depend on specific adoption of any of these documents by any Plaintiffs or Group of Plaintiffs in documents they may file with the Court.

The reference below to the "Club Plaintiffs" refers to all the Plaintiffs in Action Nos. 02 CV 4431, 02 CV 4432 and 02 CV 8333.  The reference below to the "Bookstore Plaintiffs" refers to all the Plaintiffs in Action No. 18 CV 3732.

## TABLE OF CONTENTS

| Tab No. | Description of Document | Joint Appendix Starting Page # |
|---|---|---|
| | **DOCUMENTS SUBMITTED BY CLUB PLAINTIFFS** | |
| | **VOLUME 1 (pp. 0001--0030)** | |
| | **CLUB PLAINTIFFS' EXPERT DECLARATIONS** | |
| A | **Declaration of Michael Berzak Regarding Adult Business Sites in Support of Plaintiffs' Motion for** | 0001 |

| | | |
|---|---|---|
| | **Preliminary Injunction** | |
| | ***Exhibit 1***: Sequential Maps of Adult Business Sites in Manhattan, Prepared by Berzak Associates | 0019 |
| | **VOLUME 2** <br> **(pp. 0031--0038)** | |
| | ***Exhibit 2***: Sequential Maps of Adult Business Sites in Queens, Prepared by Berzak Associates | 0031 |
| | ***Exhibit 3***: Sequential Maps of Adult Business Sites in the Bronx, Prepared by Berzak Associates | 0035 |
| | **VOLUME 3** <br> **(pp. 0039--0046)** | |
| | ***Exhibit 4***: Sequential Maps of Adult Business Sites in Brooklyn, Prepared by Berzak Associates | 0039 |
| | ***Exhibit 5***: Sequential Maps of Adult Business Sites in Staten Island, Prepared by Berzak Associates | 0043 |
| | **VOLUME 4** <br> **(pp. 0047--0338)** | |
| | ***Exhibit 6***: Relevant Portions of AZR § 12-10 (definitions), § 32-01 (commercial zone restrictions on adult uses) and § 42-01 (manufacturing zone restrictions on adult uses) | 0047 |
| | ***Exhibit 7***: 1 RCNY § 9000-01 | 0059 |
| | ***Exhibit 8***: DOB Operations Policy and Procedure Notice No. 17/95 | 0061 |
| | ***Exhibit 9***: DOB Operations Policy and Procedure Notice No. 6/96 | 0065 |
| | ***Exhibit 10***: DOB Operations Policy and Procedure Notice No. 7/96 | 0074 |

| | | |
|---|---|---|
| | *Exhibit 11*: DOB Operations Policy and Procedure Notice No. 8/96 | 0077 |
| | *Exhibit 12*: DOB Operations Policy and Procedure Notice No. 4/98 | 0080 |
| | *Exhibit 13*: DOB Operations Policy and Procedure Notice No. 6/98 | 0083 |
| | *Exhibit 14*: DOB Operations Policy and Procedure Notice No. 7/02 | 0087 |
| | *Exhibit 15*: Online DOB handbook published in 2016 entitled "Adult Establishment Applications" | 0091 |
| | *Exhibit 16*: City-generated Map Showing the Gowanus Canal Areas Which are Under Consideration for Zoning Changes Allowing Residential and Mixed Uses | 0103 |
| B | Declaration of Michael Berzak in Support of Permitting Issues Presented in Plaintiffs' Motion for Preliminary Injunction | 0105 |
| | *Exhibit 1*: Curriculum Vitae | 0124 |
| | *Exhibit 2*: NYCAC Title 27 Subchapter 1, Article 10 (Permits) | 0126 |
| | *Exhibit 3*: 1 RCNY § 9000-01 | 0129 |
| | *Exhibit 4*: NYCAC § 27-217 | 0131 |
| | *Exhibit 5*: NYCAC Title 27 Subchapter 1, Article 9 (Approval of Plans) | 0133 |
| | *Exhibit 6*: Relevant Portions of NYCAC Title 27 Subchapter 1, Article 19 (Issuance of Permits) | 0137 |
| | *Exhibit 7*: DOB's Buildings Bulletin 2016-010 | 0140 |
| | *Exhibit 8*: OPPN # 7/02 | 0145 |

| | | |
|---|---|---|
| | *Exhibit 9*: DOB Code Note (Adult Establishment Applications) | 0149 |
| C | Declaration of Hugh Kelly in Support of Plaintiffs' Motion for Preliminary Injunction | 0161 |
| D | Affidavit of Lance Freeman in Support of Plaintiffs' Motion for Preliminary Injunction | 0212 |
| | **CLUB CLIENTS' DECLARATIONS** | |
| E | Declaration of David M. Talla in Support of Plaintiffs' Motion for Preliminary Injunction | 0227 |
| F | Declaration of Keith Warech in Support of Plaintiffs' Motion for Preliminary Injunction | 0248 |
| G | Declaration of Anthony Capeci in Support of Plaintiffs' Motion for Preliminary Injunction | 0262 |
| H | Declaration of Barry Lipsitz in Support of Plaintiffs' Motion for Preliminary Injunction | 0265 |
| I | Declaration of Anthony D'Amico in Support of Plaintiffs' Motion for Preliminary Injunction | 0283 |
| J | Declaration of Maurice Kavanagh in Support of Plaintiffs' Motion for Preliminary Injunction | 0297 |
| | **OTHER ITEMS** | |
| K | Declaration of Edward Rudofsky in Support of Plaintiffs' Motion for Preliminary Injunction Regarding Legislative History and Related Matters | 0312 |
| L | Declaration of Edward S. Rudofsky in Support of Plaintiffs' Motion for Preliminary Injunction Regarding the Status of Veil NYC and Headquarters n/k/a Rosewood Theater | 0335 |
| | **VOLUME 5**<br>**(pp. 0339--0519)** | |

| | | |
|---|---|---|
| **M** | **Club Plaintiffs' Request To Take Judicial Notice** | **0339** |
| | *Exhibit 1*: NYC Council Resolution 1322-1995 ("1995 Ordinance") | **0348** |
| | *Exhibit 2*: NYC Council Resolution 0208-1998 (regarding signage regulations) | **0364** |
| | *Exhibit 3*: NYC Council Resolution 2096-2001 ("2001 Amendments") | **0378** |
| | *Exhibit 4*: Relevant portions of NYC Council Resolution 586-2004 (amending, *inter alia*, AZR §§ 32-01 & 42-01 regarding adult businesses) | **0384** |
| | *Exhibit 5*: Relevant portions of NYC Council Resolution 499-2010 (amending, *inter alia*, AZR §§ 32-01 & 42-01 regarding adult businesses) | **0391** |
| | *Exhibit 6*: NYC AZR § 31-17 | **0394** |
| | *Exhibit 7*: NYC AZR § 31-18 | **0397** |
| | *Exhibit 8*: NYC AZR § 32-01 (multiple versions) | **0400** |
| | *Exhibit 9*: NYC AZR § 32-69 (multiple versions) | **0404** |
| | *Exhibit 10*: NYC AZR § 42-01 (multiple versions) | **0408** |
| | *Exhibit 11*: NYC AZR § 52-11 | **0412** |
| | *Exhibit 12*: NYC AZR § 52-61 | **0415** |
| | *Exhibit 13*: NYC AZR § 52-734 | **0419** |
| | *Exhibit 14*: NYC AZR § 52-77 | **0423** |
| | *Exhibit 15*: NYC AZR § 72-41 | **0427** |
| | *Exhibit 16*: NYC Administrative Code, Title 27, Chapter 1, Article 9 ("Approval of Plans") | **0431** |

| | | |
|---|---|---|
| | *Exhibit 17*: NYC Administrative Code, Title 27, Chapter 1, Article 10 ("Permits") | 0438 |
| | *Exhibit 18*: NYC Administrative Code, Title 27, Chapter 1, Article 19 ("Issuance of Permits") (relevant sections) | 0444 |
| | *Exhibit 19*: NYC Administrative Code, Title 27, Chapter 1, Article 22, § 27-217 ("Certificates of Occupancy / Change of Occupancy of Use") | 0457 |
| | *Exhibit 20*: NYC Dept. of Buildings Administrative Materials: Directive 14 of 1975 (authorizing self-certification of applications for building permits by licensed architects and engineers) | 0462 |
| | *Exhibit 21*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 17/95 (prohibiting self-certification of adult uses by architects and engineers) | 0466 |
| | *Exhibit 22*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 6/96 (reaffirming prohibition on self-certification of adult uses by architects and engineers) | 0483 |
| | *Exhibit 23*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 7/96 (defining "place of worship" and "church") | 0492 |
| | *Exhibit 24*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 8/96 (describing methodology for measuring separation between adult uses and other adult uses or sensitive receptors) | 0495 |
| | *Exhibit 25*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 4/98 (definition of "substantial portion") | 0501 |
| | *Exhibit 26*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 6/98 (explanation of "substantial portion" in context of multiple uses) | 0505 |

| | | |
|---|---|---|
| | ***Exhibit 27***: **NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 5/02 (clarifying procedures for self-certification by architects and engineers)** | **0509** |
| | ***Exhibit 28***: **NYC Dept. of Buildings Administrative Materials: OPPN 7/02 (clarifying procedures for seeking adult use "priority" permit)** | **0516** |
| | **VOLUME 6**<br>**(pp. 0520--0629)** | |
| | ***Exhibit 29***: **NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 1/04 (clarifying procedures for self-certification by architects and engineers)** | **0520** |
| | ***Exhibit 30***: **NYC Dept. of Buildings Administrative Materials: Bulletin 2016-010 (most recent document clarifying procedures for self-certification by architects and engineers)** | **0532** |
| | ***Exhibit 31***: **NYC Dept. of Buildings Administrative Materials: Code Note on Adult Establishment Applications (handbook from DOB website)** | **0537** |
| | ***Exhibit 32***: **NYC Dept. of Buildings Administrative Materials: Rule Title 1, Rules of City of New York § 9000-01 (establishing priority of locations under adult zoning scheme)** | **0549** |
| | ***Exhibit 33***: **Legislative History of 2001 Amendments, 3/21/01 DCP Application No. N 010508 ZRY (to amend the AZR definition of adult establishment)** | **0551** |
| | ***Exhibit 34***: **Legislative History of 2001 Amendments, CEQR Negative Declaration No. 01DCP045Y of 3/23/01, and Environmental Assessment Statement No. 01DCP045Y filed 3/23/01** | **0563** |

| | | |
|---|---|---|
| | **VOLUME 7**<br>**(pp. 0630--0707)** | |
| | *Exhibit 35*: Legislative History of 2001 Amendments, Transcript of New York City Planning Commission Public Hearing held 5/23/01 | 0630 |
| | **VOLUME 8**<br>**(pp. 0708--0889)** | |
| | *Exhibit 36*: Legislative History of 2001 Amendments, 8/8/01 New York City Planning Commission Report | 0708 |
| | *Exhibit 37*: Legislative History of 2001 Amendments, Transcript of New York City Planning Commission Public Hearing held 8/8/01 | 0835 |
| | *Exhibit 38*: Legislative History of 2001 Amendments, Transcript of 10/1/01 Hearing of Zoning and Franchises Subcommittee of New York City Council | 0848 |
| | **VOLUME 9**<br>**(pp. 0890--1068)** | |
| | *Exhibit 39*: Legislative History of 2001 Amendments, Correspondence between Edward S. Rudofsky and New York City Council (10/9/01), and David Karnovsky and New York City Council (10/24/01) | 0890 |
| | *Exhibit 40*: Legislative History of 2001 Amendments, Transcript of 10/25/01 Meeting of Zoning and Franchises Subcommittee of New York City Council | 0899 |
| | *Exhibit 41*: Legislative History of 2001 Amendments, Transcript of 10/25/01 Meeting of Land Use Committee of New York City Council | 0911 |
| | *Exhibit 42*: Legislative History of 2001 Amendments, Transcript of 10/31/01 Meeting of the New York City Council | 0919 |

| | | |
|---|---|---|
| | ***Exhibit 43***: Excerpt of Record On Appeal, Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County, Index No. 121197/2002 ("State Action"), Affidavit of David Karnovsky, Counsel to the New York City Department of City Planning, sworn to 10/23/02, filed in State Action on 10/25/02 (without internal Exhibits) | 1032 |
| | **VOLUME 10**<br>**(pp. 1069--1296)** | |
| | ***Exhibit 44***: Excerpts of Record On Appeal, Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County, Index No. 121197/2002 ("State Action"), Relevant pages from Transcripts of evidentiary hearing in State Action in Supreme Court, New York County, on 2/23/09 through 3/2/09 | 1069 |
| | **VOLUME 11**<br>**(pp. 1297--1381)** | |
| | ***Exhibit 45***: New York City Department of City Planning ("DCP") Materials, NYC DCP "Manufacturing Districts: M3" webpage (https://www.1.nyc.gov/site/planning/zoning/districts-tools/m3.page) | 1297 |
| | ***Exhibit 46***: New York City Department of City Planning ("DCP") Materials, NYC Department of City Planning "Manufacturing Districts: 1/1/02 to 1/1/12" webpage (https://www.1.nyc.gov/site/planning/zoning/districts-tools/mfg-districts-2002-2012.page) | 1300 |
| | ***Exhibit 47***: Studies, Moss and Quing, "The Dynamic Population of Manhattan", Rudin Center for Transportation Policy and Management of the New York University Wagner School of Public Service (2012) (https://wagner.nyu.edu/files/faculty/ publications/dynamic_pop_manhattan.pdf) | 1304 |

| | | |
|---|---|---|
| | *Exhibit 48:* **Linz and Paul, "Measuring the Secondary Effects of 60/40 Businesses in New York City: A Study of Calls for Service to the Police", including Figures and Tables (2005) Exhibits 6 and 6A admitted into evidence at evidentiary hearing held on February 23 through March 2, 2009 in** <u>**Ten's Cabaret, Inc. v City of New York**</u>**, Supreme Court, New York County, Index No. 121197/2002** | **1330** |
| | **VOLUME 12**<br>**(pp. 1382--1467)** | |
| | *Exhibit 49:* **Studies, Freeman, "Examining The Relationship Between Businesses That Comply With the '60/40' Zoning Regulations and Surrounding Property Values in New York City" (2008) (Exhibit 8 admitted in evidence at evidentiary hearing held on 2/23/09 through 3/2/09 in** <u>**Ten's Cabaret, Inc. v. City of New York**</u>**, Supreme Court, New York County, Index No. 121197/2002** | **1382** |
| | *Exhibit 50:* **Studies, Focus Probe, Inc., "Perceived Differences Between Adult Entertainment Clubs With 'Subdued Facades' vs. 'Loud Facades', with photographs (Exhibits 12, 12A, 12B and 12C admitted in evidence at evidentiary hearing held on 2/23/09 through 3/2/09 in** <u>**Ten's Cabaret, Inc. v. City of New York**</u>**, Supreme Court, New York County, Index No. 121197/2002)** | **1418** |
| | *Exhibit 51:* **New York Court of Appeals Brief, Excerpt from Respondents' Brief of City of New York, et al., in** <u>**Stringfellow's of New York, Inc. v. City of New York**</u>**, New York County Index Nos. 113049/96 103568/96 and 103569/96, filed in New York Court of Appeals, dated 12/11/97** | **1443** |

| | | |
|---|---|---|
| | *Exhibit 52:* Excerpts from September 3, 1996 deposition testimony of Marilyn Mammamo, Director of Zoning & Urban Design of the NYC Department of City Planning, in <u>Hickerson v. The City of New York</u>, New York County Index No. 103569/96 | 1448 |
| | *Exhibit 53*: Undocketed Correspondence With Court, Litigation Management Agreement dated 9/25/17 (Exhibit B to 3/2/18 letter from Plaintiffs to Hon. William Pauley) in all current club cases | 1459 |
| | **<u>DOCUMENTS SUBMITTED BY BOOKSTORE PLAINTIFFS</u>** | |
| | **VOLUME 13 (pp. 1468--1574)** | |
| N | Declaration of Dr. Elliott Sclar in Support of Plaintiffs' Motion for Preliminary Injunction | 1468 |
| | *Exhibit 1*: Dr. Sclar's Curriculum Vitae | 1515 |
| | *Exhibit 2*: Maps Prepared by the Department of City Planning in Support of the 1995 Resolution Showing Permissible Areas for Adult Establishments | 1539 |
| | *Exhibit 3*: Maps Prepared by the Department of City Planning Showing Zoning Changes between 1995 and 2001 in Support of the 2001 Resolution | 1545 |
| | *Exhibit 4*: Reports issued by the Department of City Planning and Information in the Press Confirming the Effectiveness of Mayor Bloomberg's Administration in Rezoning New York City | 1561 |

| | | |
|---|---|---|
| | **VOLUME 14**<br>**(pp. 1575--1683)** | |
| | *Exhibit 5*: Report Prepared by the Department of City Planning Detailing the Reduction in Manufacturing Districts between 2002 and January 2012 | 1575 |
| | *Exhibit 6*: Map Depicting Zoning Changes in New York City between January 2002 and September 2018 | 1594 |
| | *Exhibit 7*: Table 1: List of Adopted Rezonings that Impacted Manufacturing Use | 1596 |
| | *Exhibit 8*: Table 2: List of Certified Rezonings that Impact Manufacturing Use | 1603 |
| | *Exhibit 9*: Map of Anticipated Mandatory Inclusion Housing ("MIH") Rezonings | 1605 |
| | *Exhibit 10*: Department of City Planning Report on City Planning History | 1607 |
| | *Exhibit 11*: MTA Staten Island Railway ("SIR") System Map | 1612 |
| | *Exhibit 12*: Map Showing the Staten Island Railway Route Superimposed on the Map of Permissible Areas on Staten Island Prepared by the Department of City Planning in Support of the 1995 Resolution | 1614 |
| O | Declaration of Daniel J. Zazzali in Support of Plaintiffs' Motion for Preliminary Injunction | 1616 |
| P | Declaration of Daniel Knecht in Support of Plaintiffs' Motion for Preliminary Injunction | 1643 |

| | | |
|---|---|---|
| | *Exhibit 1*: Map of Public Transportation between the Plaintiffs' Bookstore at 336 Eighth Avenue, in Manhattan, and the Only Permissible Adult Bookstore with booths, on Staten Island | 1659 |
| Q | Declaration of Yitzik Shachaf in Support of Plaintiffs' Motion for Preliminary Injunction | 1662 |
| R | Declaration of Erica T. Dubno in Support of Plaintiffs' Motion for Preliminary Injunction | 1670 |
| | **VOLUME 15**<br>**(pp. 1684--1755)** | |
| S | Bookstore Plaintiffs' Request to Take Judicial Notice | 1684 |
| | *Exhibit 54*: Z.R. § 42-11 | 1691 |
| | *Exhibit 55*: Z.R. § 42-13 | 1694 |
| | *Exhibit 56*: New York City Charter § 85 "Borough Board" | 1698 |
| | *Exhibit 57*: DCP "Use Groups" webpage | 1702 |
| | *Exhibit 58*: DCP "Manufacturing Districts: Overview" webpage | 1707 |
| | *Exhibit 59*: DCP City Planning History webpage | 1710 |
| | *Exhibit 60*: DCP "Community-Based Planning" webpage | 1715 |
| | *Exhibit 61*: DCP "Special Purpose Districts: Citywide" webpage | 1722 |
| | *Exhibit 62*: DCP "Special Purpose Districts" webpage | 1730 |

| | | |
|---|---|---|
| | *Exhibit 63*: DCP Press Release, November 15, 2011, containing "Mayor Michael Bloomberg's Remarks at Zoning the City Conference, as Delivered by Deputy Mayor Robert K. Steel | 1732 |
| | *Exhibit 64*: DCP's Portion of the Mayor's Management Report, dated September 2012 | 1736 |
| | *Exhibit 65*: Excerpts from NYC's Risk Landscape: A Guide to Hazard Mitigation, Coastal Erosion Chapter 4.2, developed by the NYC Emergency Management in Partnership with the DCP and Close Collaboration with the NYC Mayor's Office of Recovery and Resiliency | 1741 |
| | **VOLUME 16**<br>**(pp. 1756--1852)** | |
| | *Exhibit 66*: Excerpts from the NYC Building Department's "Place of Assembly" guide | 1756 |
| | *Exhibit 67*: Excerpts from the NYC Fire Department's "Theater Inspections, Maintenance and Recordkeeping" Rules | 1759 |
| | *Exhibit 68*: MTA Staten Island Railway ("SIR") System Map | 1765 |
| | *Exhibit 69*: MTA Notice regarding Bridges and Tunnels Tolls | 1767 |
| | *Exhibit 70*: Zoning and the Comprehensive Plan, James A. Coon Local Government Technical Series, Revised 2015 | 1772 |
| | *Exhibit 71*: NYS Public Health Law § 3000-d | 1791 |
| | *Exhibit 72*: Charles V. Bagli, "Going Out With a Building Boom, Mayor Pushes Billions in Projects", N.Y. Times, Dec. 15, 2013 | 1795 |

| | | |
|---|---|---|
| | *Exhibit 73*: Ford Fessenden, "The Bloomberg Years: Reshaping New York", N.Y. Times, Aug. 18, 2013 (interactive feature) | **1801** |
| | *Exhibit 74*: "Mayor Bloomberg's NYC Mayoralty Comes To An End", dailyfreeman.com, Dec. 31, 2013 | **1803** |
| | *Exhibit 75*: James Dao, "The 1993 Elections: Staten Island; Secession is Approved; Next Move is Albany's", N.Y. Times, Nov. 3, 1993 | **1806** |
| | *Exhibit 76*: Maps (Reduced Size Versions) Generated by the DCP of Manhattan, Brooklyn, Bronx, Queens, and Staten Island indicating "Areas Where Adult Uses Would Continue to be Allowed Under the Proposal and Encumbered Property Within those Areas" filed in State Judicial Proceedings in Connection with the 1995 Resolution: <u>Amsterdam Video, Inc. v. City of New York</u>, Supreme Court, New York County, Index No. 103568/96, and <u>Hickerson v. City of New York</u>, Supreme Court, New York County, Supreme Court, New York County, Index No. 103569/96 | **1810** |
| | *Exhibit 77*: Excerpts from September 3, 1996 deposition testimony of Marilyn Mammano, Director of Zoning & Urban Design of the NYC Department of City Planning, in <u>Hickerson v. The City of New York</u>, New York County Index No. 103569/96 | **1816** |
| | *Exhibit 78*: Maps generated by the DCP depicting the reduction in permissible areas for adult businesses based on Zoning Changes between 1995 and 2001, filed in <u>For the People Theatres</u> on October 17, 2002, as Exhibit S to the Affidavit of David Karnovsky | **1838** |

| | **VOLUME 17**<br>**(pp. 1854--1881)** | |
|---|---|---|
| | *Exhibit 79*: Excerpts from Affidavit of David Karnovsky filed in <u>For The People Theatres of N.Y., Inc., et al. v. The City of New York, et al.</u>, New York County Supreme Court Index No. 121080/02 | **1854** |
| | *Exhibit 80*:  Excerpts from the DCP's Adult Entertainment Study, November 1994 | **1864** |
| | *Exhibit 81*: 8/2/17 Stipulation and Agreement between Bookstore Plaintiffs and The City of New York | **1875** |

Dated:        New York, New York
              November 21, 2018

                             *Respectfully,*

                             **DANIEL A. SILVER**
                             **SILVER & SILVER**
                             One Liberty Square
                             New Britain, Connecticut 06050-0698
                             (860) 225-3518

                                   - and -

                             **JENNIFER KINSLEY**
                             Kinsley Law Office
                             Post Office Box 19478
                             Cincinnati, Ohio 45219
                             (513) 708-2595

                             *Attorneys for Plaintiffs*
                             *725 Eatery Corp., etc., et ano.*

                             By:    s/Daniel A. Silver
                                    Daniel A. Silver

**EDWARD S. RUDOFSKY**
**ZANE and RUDOFSKY**
601 West 26th Street, # 1315
New York, New York  10001
(212) 245-2222

*Attorneys for Plaintiffs*
*59 Murray Enterprises, Inc., etc.*
*et al.*

By: ___s/Edward S. Rudofsky_____ _____
        Edward S. Rudofsky

**JOHN H. WESTON**
**G. RANDALL GARROU**
**WESTON, GARROU & MOONEY**
12121 Wilshire Boulevard, Suite 525
Los Angeles, CA 90025-1176
(310) 442-0072

              - and -

**ALAN M. ABRAMSON**
**ABRAMSON & MORAK**
35 Worth Street
New York, NY 10013
(212) 226-7098

*Attorneys for*
*Club At 60th Street, Inc., etc., et al.*

By: ___s/John Weston_____
        John Weston

**FAHRINGER & DUBNO**
767 Third Avenue, Suite 3600
New York, New York 10017
(212) 319-5351

*Attorneys for Plaintiff's*
*336 LLC, etc., et al.*

By: ___s/Erica T. Dubno_____
        Erica T. Dubno

20

# Exhibit 49

# EXAMINING THE RELATIONSHIP BETWEEN BUSINESSES THAT COMPLY
# WITH THE "60/40" ZONING REGULATIONS AND SURROUNDING
# PROPERTY VALUES IN NEW YORK CITY

By

Lance Freeman
Columbia University

*35 PAGES*

March 26, 2008



PLAINTIFF'S
EXHIBIT
8
PENGAD 800-631-6989

1383

## Abstract

Adult businesses have often been criticized as nuisances that have deleterious impacts, including a negative impact on property values, on surrounding neighborhoods. The study reported here investigates the relationship between businesses in New York City that feature exotic dancing that have been configured so that 61 percent of the floor space of the premises is devoted to nonadult uses and the remaining 39 percent is reserved for adult cabaret dancing (so called "60/40 businesses") and surrounding residential property values. The study uses conventional social science methods that have been developed to discern how environmental traits affect property values. The results indicate that once differences in property characteristics are accounted for; there is consistent relationship between proximity to a 60/40 business and assessed property values. Indeed, certain specifications of our statistical models show properties nearer 60/40 businesses had higher assessed values than those further away. These results are for the most part consistent with the most rigorous studies that have tested the hypothesis of secondary effects due to proximity to an adult business. For the most part, other studies employing conventional social science methodology have also failed to find evidence of secondary effects.

1384

## INTRODUCTION

Adult businesses have often been criticized as nuisances that have deleterious impacts, including a negative impact on property values, on surrounding neighborhoods. According to this school of thought, the social stigmatization of adult businesses due to the nature of the activities occurring within these businesses spills over into the surrounding neighborhood thereby stigmatizing this area as well through what are known as "adverse secondary effects." Among the most widely presumed adverse secondary effects are decreases in property values as a result of the presence of an adult business. Based on this secondary effects thesis, a number of municipalities have enacted land use controls that restrict the location of adult businesses to "protect" surrounding communities from these negative effects. Several studies have also been conducted purporting to document the relationship between adult businesses and surrounding neighborhoods. These studies, however, have generally used unacceptable ad-hoc methodologies that do not systematically address the fact that properties near adult businesses might differ from other properties. Thus, the justification for land use controls for adult businesses rests on scant empirical evidence.

The study reported here investigates the relationship between businesses in New York City that feature exotic dancing that have been configured so that 61 percent of the floor space of the premises is devoted to nonadult uses and the remaining 39 percent is reserved for adult cabaret dancing (so called "60/40 businesses" due to the fact that at least 40 percent of the establishment must be devoted to adult use in order to be considered an "adult business") and surrounding property values. The study uses

● Page 3

1385

conventional social science methods that have been developed to discern how environmental traits affect property values.  The results of this analysis speak directly to the veracity of claims regarding the secondary effects of these businesses on surrounding properties.

## BACKGROUND[1]

Since 1976, the United States Supreme Court has decided a series of cases focusing on whether the free speech clause of the First Amendment allows cities and states to enact legislation controlling the location of adult businesses.  These zoning regulations (e.g., laws or ordinances that prevent a sex-related business from operating within a certain number of feet from residences, schools and houses of worship or a given distance from one another) have been predicated on the notion that cities and other municipalities have a substantial interest in combating so-called negative secondary effects on the neighborhoods surrounding adult businesses.  These secondary effects have most often included alleged increases in crime, decreases in property values, and other indicators of neighborhood deterioration in the area surrounding the adult business. Typically, communities have either conducted their own investigations of potential secondary effects or have relied on studies conducted by other cities or localities.

In the last 25 years, beginning with the 1976 case, *Young v. American Mini Theatres Inc., 21* several United States Supreme Court decisions have provided guidance as to what constitutes permissible government regulation of the location of adult entertainment establishments under the free speech clause of the First Amendment.  The

Court has normally subjected ordinances that restrict the location of adult businesses to an evaluation under the framework for content-neutral restrictions on symbolic speech set forth in the four-part test in *United States v. O'Brien.*

Justice Powell applied the four-part *O'Brien* test in his concurring opinion in *Young.* In this case, the Court upheld a Detroit zoning ordinance that regulated the location of adult theaters. The ordinance mandated that adult theaters not locate within 1,000 feet of any two other regulated uses or within 500 feet of a residential area. The Detroit ordinance did not attempt to eliminate adult entertainment; rather its aim was to disperse such businesses in an effort to minimize so called negative secondary effects. In upholding this ordinance, the plurality opinion of the Court reaffirmed the doctrine that a statute (including a zoning ordinance) must have a real and substantial deterrent effect on legitimate expression before it will be invalidated. The Court said the ordinance was not an invalid prior restraint on protected expression because it had neither the intent nor the effect of suppressing speech, but was aimed at controlling the secondary effects caused by adult businesses on surrounding uses.

In another landmark decision regarding a municipality's attempt to control secondary effects allegedly caused by adult businesses, *City of Renton v. Playtime Theatres*, the Court upheld a Renton, Washington, zoning ordinance that, although not banning adult businesses altogether, did prohibit them from locating within 1,000 feet of any residential zone, church, park, or school. The Court held that the Renton ordinance did not restrict First Amendment rights, as the purposes of the ordinance were unrelated

---

[1] This section is based on the author's discussions with Dan Linz of the University of California, Santa

to the suppression of speech, and the restrictions were the least intrusive means by which to further the government's interests.  Part of the constitutional precedent set forth by the decision in *Renton* is a three prong test stipulating that an ordinance must:  1) be content neutral and only aimed at curbing secondary effects, 2) provide alternate avenues of communication, and 3) further a substantial governmental interest.

It is noteworthy that in this case the Court stated, for the first time, that a city interested in restricting the operation of adult businesses was not required to show adverse impact from the operation of adult theaters, but could instead rely on the experiences of other cities as a rationale for supporting the passage of an ordinance.  Prior to this ruling, the lower Court of Appeals found that "because the Renton ordinance was enacted without the benefit of studies specifically relating to the particular problems or needs of Renton, the city's justifications for the ordinance were conclusory and speculative".

The Supreme Court maintained that the Court of Appeals had required an unnecessary burden of proof on the city.  The Court ruled that Renton could rely primarily on experiences of, and studies produced by the nearby city of Seattle as evidence of a relationship between adult uses and negative secondary effects.  Thus, the Court ruled that the First Amendment does not require a city to conduct new studies or produce new evidence before enacting an ordinance, so long as the evidence relied upon is reasonably believed to be relevant to the problem the city faces.

---

Barbara, and McCarthy et al. 2001.

● Page 6

In later years, the Court has considered the constitutionality of anti-nudity ordinances passed by municipalities or states that have relied on negative secondary effects to justify the legislation.  The Court in *Barnes v. Glens Theater Inc.*, held that the State of Indiana could regulate nudity.  Justice Souter and a plurality of the Court ruled that the government could undertake such regulation on the basis of the <u>presumed</u> negative secondary effects on the surrounding community.  More recently, in *City of Erie v. Pap's A.M.* the Court again held that municipalities have the right to pass anti-nudity ordinances.  Again, however, the Court was divided. Three Justices agreed with Justice O'Connor's opinion that combating negative secondary effects associated with adult businesses was a legitimate basis for the imposition of an anti-nudity ordinance.

Justice Souter's dissent in the *Pap's* decision is noteworthy.  He significantly revised the position he took regarding secondary effects in *Barnes*.  In *Pap's*, Justice Souter admitted that the evidence of a relationship between adult businesses and negative secondary effects is at best inconclusive.  He called into question the reliability of past studies that purported to demonstrate these effects and suggested that municipalities wishing to ban nudity must show evidence of a relationship between adult businesses and negative secondary effects.

Most recently, Justice O'Connor joined by the Chief Justice, Justice Scalia and Justice Thomas concluded that the city of Los Angeles acted reasonably when it relied on a study it conducted in 1977 to demonstrate that its present ban on multiple-use adult establishments serves its interest in reducing crime.  The Court held that the municipality might rely on any evidence that is reasonably believed to be relevant for demonstrating a

● Page 7

connection between speech and a substantial, independent governmental interest. However, the Court noted: "This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support its rationale for its ordinance. If plaintiff's fail to cast direct doubt on this rationale, either by demonstrating that the municipalities evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the *Renton* standard. If plaintiffs succeed in casting doubt on a municipality's rational in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance. See, e.g., *Erie v. Pap's A.M.* 529 U.S. 277, 298.

**Prior Studies of Secondary Effects**

The Court's opinion in *Renton* established that cities themselves are not required to show adverse impact, but could rely on other cities' experiences to establish that a sufficient government interest was at stake. Since *Renton,* a number of cities, counties, and states have undertaken investigations intended to establish the presence of such secondary effects and their connection to adult facilities. These studies have, in turn, been shared with other municipalities and generally served as the basis for claims that adult entertainment establishments are causally related to harmful secondary effects, such as increased crime and decreases in property values. Many local governments across the United States have relied on this body of shared information as evidence of the secondary effects of adult businesses. Further, in most cases, cities and other governmental agencies

have used the experiences of a core set of studies from other locales as a rationale for instituting regulation of such businesses in their own communities.

This recent expansion of the negative secondary effects "doctrine" to include not only the zoning of adult businesses but now the regulation of the content of expression within these establishments, begs the question: How reliable and valid are "studies" conducted by individual municipalities and shared nationwide with other municipalities attempting to regulate the location of, and most recently, erotic expression within, adult businesses?

The basic requirements for the acceptance of scientific evidence such as the secondary effects studies were prescribed by the Supreme Court in the 1993 case of *Daubert v. Merrell Dow*. In *Daubert*, Justice Blackmun held that there are limits on the admissibility of scientific evidence offered by "expert witnesses" in federal courts. The Court noted that scientific knowledge must be grounded in the methods and procedures of science and must be based on more than subjective belief or unsupported speculation. Offering observations as to how this connection can be made, the Court provided a list of factors that federal judges could consider in ruling on a proffer of expert scientific testimony, including: the notion of falsifiability, peer review and publication, error rate, and adherence to professional standards in using the technique in question.

It is important to keep these standards in mind when considering the body the research that has been brought to bear to support. This research is discussed in the following section. For a full, critical evaluation of the literature, see: Bryant Paul, Daniel Linz, and Bradley Shafer (2001).

The body of social science research sponsored by the 1970 Presidential Commission on Obscenity and Pornography in the United States was the first systematic academic foray into the study of the affects of exposure to sexually explicit materials. Consistent with the more liberal Court rulings in the 1960's, the commission concluded that there were no scientifically demonstrated harmful effects of pornography and recommended legalization of all forms of sexually explicit communication.

Since the 1980s social scientists have extensively tested the feminist socio-legal theory regarding pornography's effect on attitudes that justify violence towards women, undermine viewer sensitivity to female victims of rape and violence, and increase discriminatory behavior.  According to one researcher "literally hundreds of studies have been published in this field…yet the results of this vast body of empirical work are both inconclusive and hotly contested (Boyle p.187; See Cumberbatch and Howitt (1989); Gauntlett (1995,1997) and Miller and Philo (1998) for reviews of this evidence).

Although social scientists have extensively studied the relationship between pornography and behavior, there is a dearth of research conducted by social scientists that tests the secondary effects thesis that under girds much of the land use legislation restricting the location of adult businesses.  Studies have been done, but as will be shown below, for the most part they have relied on ad hoc methods that do not systematically address the fact that properties near adult businesses might differ from other properties. The notion of professional standards described above is suggestive of the use of techniques that are generally accepted in social science.

In social science, the gold standard for establishing causality is the use of an experiment where one randomly selected group receives a treatment and another randomly selected control group does not. Because it is hard to imagine a scenario whereby adult businesses are randomly assigned to certain neighborhoods, some type of quasi-experimental research design would be necessary to meet the standard of social science. At a minimum, this would entail some attempt to systematically control for the possibility that properties close to an adult business might differ from properties not proximate to an adult business.

Four studies have been most frequently cited (and relied upon) to establish the extent of negative secondary effects. These studies, designated by city are: Indianapolis, IN (1984), Phoenix, AZ (1979), Los Angeles, CA (1977), and St. Paul, MN (1978). These studies have been cited as evidence of the relationship between adult entertainment businesses and negative secondary effects by no less than 27 different municipalities (Bryant, et al, 2000).

Among the studies, the St. Paul, Minnesota (1978) work represents the most methodologically sound of all of the empirical research we reviewed. Ironically, given its widespread use as justification for passing regulations designed to combat secondary effects, the study does not claim to have found any support for the existence of a relationship between sexually oriented adult entertainment businesses and negative secondary effects.

The research examined all 76 census tracts within the St. Paul region. They compared all tracts containing adult entertainment establishments with all of those that

did not.  The study compared levels of neighborhood deterioration, determined by examining crime counts, housing values, and market and legal influences over the study period, for study and control areas and maintained a substantial time lag between the first and second measures of deterioration. Changes in neighborhood climate between the first and second measures were considered reliable neighborhood changes rather than erratic fluctuations in social activity.

The study found no relationship between sexually oriented businesses and neighborhood deterioration.  In fact, the study found that the only factor that was predictive of neighborhood deterioration was whether an alcohol-serving establishment operated within the area.  No relationship was found to exist between neighborhood deterioration and the presence of establishments that both served alcoholic beverages and offered live nude entertainment.

The Los Angeles, California (1977) study is perhaps the most often incorrectly referenced of any empirical research investigating the effects of adult oriented businesses on surrounding areas.  Although this study is a frequently relied upon piece of research cited for establishing the relationship between adult oriented businesses and negative social repercussions, including deleterious effects on property values, the researchers did not find any significant support for such a connection.

The first part of the study was based on the comparison of average property value changes for five study areas and four control areas.  Each of the five study areas was chosen because it contained a known cluster of adult entertainment businesses.  The four control areas were chosen because of their proximity and supposed similarity to at least

● Page 12

one of the study areas, and because they did not have an adult entertainment business operating within their borders.  All of the study and control areas were in Hollywood, North Hollywood, or Studio City.

In this part of the study, the researchers reported that it was difficult to find any consistent increase or decrease in property values associated with adult businesses.  This result was based on comparisons that showed that while treatment and control areas both decreased in average value, there was a far larger decrease in the control (non-adult) area.  Further, treatment (adult) areas increased in value by more than 400% over their comparable control (non-adult) areas.  The researchers concluded that there is "...insufficient evidence to support the contention that concentrations of sex oriented businesses have been the primary cause of these patterns of change in assessed valuations between 1970 and 1976."

Another portion of the Los Angeles study used survey results to establish that the public is strongly opposed to the operation of adult businesses.  Importantly, the study did not obtain a random sample of respondents.  Without adherence to this requirement, one cannot calculate an error rate and the reliability of the results cannot be determined.

The Indianapolis, Indiana (1984) is probably the report most widely cited by municipalities as evidence of negative secondary effects.  The overall study offered equivocal findings regarding the supposed relationship between adult businesses and negative secondary effects.  The study contained reports of four separate analyses, each with significant methodological problems that undercut its reliability.  The most striking example of this was a survey that asked a national sample of real estate appraisers who

● Page 13

were not from Indianapolis to consider only a hypothetical scenario concerning adult businesses in an unspecified community.

The Indianapolis report claimed to have found a substantially smaller increase in property values for the treatment areas relative to the control areas. However, the researchers failed to match adequately treatment and control areas for this analysis. The analysis compared the average home mortgage value and average number of homes sold for the control and study areas discussed in the first study, as well as those for the center township area. The study reported that the average mortgage value for the control areas and central township area increased by 77% and 56% respectively, while the treatment areas saw only an average increase of 26%. However, vast differences in initial mortgage values associated with the failure to properly match control and study areas rendered the two areas far too dissimilar to be considered as suitable comparison groups.

Other frequently referenced studies by municipalities are reports produced by: Austin, TX (1986); St. Paul, MN (1987/1988); Amarillo, TX (1977); Detroit, MI (1972); Beaumont, TX (1982); and, Kent, Washington (1982). The Beaumont, TX (1982) and Detroit, MI (1972) studies are not empirical. The Beaumont study, for example, is merely a report prepared by the planning department of that municipality, suggesting a need for regulation of adult businesses. The remaining four reports failed to meet one or more of the necessary criteria for a scientifically valid study of adverse secondary effects.

All of the studies cited claimed to find a negative relationship between adult businesses and the quality of surrounding neighborhoods. None of the cited studies,

● Page 14

however, used methodology that systematically addresses the fact that properties near adult businesses might differ from other properties.

**The 1994 City of New York Study**

The City of New York (1994) commissioned a study "to determine the nature and extent of the secondary impacts of adult entertainment uses on communities in the city." The study also cited the results of several other studies (including several of those described above) purporting to have examined the link between adult businesses and property values. All of the studies cited claimed to find a negative relationship between adult businesses and the quality of surrounding neighborhoods. None of the cited studies, however, used methodology that systematically addresses the fact that properties near adult businesses might differ from other properties.

One of the cited studies (City Planning Commission 1977) speculated that the proliferation of adult businesses in the Time Square are could be related to disinvestment in that area without any type of systematic comparison to support this claim. Another study reported that after the number of adult businesses in the Time Square area was reduced a number of major investments were undertaken in the area (Office of Midtown Enforcement (1983). But no comparison of other neighborhoods was included in this analysis, nor any attempt to consider if other factors could have been responsible for the investments.

Another cited study in the City of New York report relied on the impressions of business owners located near adult businesses to draw the conclusion that the proliferation of adult businesses was harmful to the community (Chelsea Action Coalition

● Page 15

and Community Board 4, 1993).  The most rigorous of the cited studies compared the appreciation of assessed values on blocks with adult businesses with assessed value appreciation on blocks without adult businesses (Insight Associates 1994).  This study did find greater appreciation rates on blocks without adult businesses.  Although superior to the ad hoc approaches described above, it is difficult to ascertain if the control blocks truly are the same as the blocks with adult businesses, therefore the findings of this last study should be treated with caution.

The City of New York's study also included several analyses conducted by the Department of City Planning to ascertain secondary effects on property values.  These included a survey of real estate brokers, the majority of whom were of the opinion that at distances of 500 feet or 1000 feet, adult businesses would diminish the market values of properties.  Another analysis, using the methodology described above whereby the appreciation of assessed values on blocks with adult businesses were compared with assessed values appreciation on blocks without adult businesses found no difference in appreciation rates between the two different types of blocks.  Because of the shortcomings of this approach that were described above, however, little confidence can be placed in this result.

**The "60/40" Land Use Legislation in New York City**

Despite the problems inherent in the research approach undertaken by the City, the Department of City Planning adopted a set of regulations developed in 1995 for Adult use in 1998.   These regulations were adopted on the basis of the study conducted by the Planning Commission had shown that triple-X video and bookstores, adult live or movie

● Page 16

theaters and topless or nude bars have significant negative impacts on the neighborhoods in which they are located.  These impacts, according to the Planning Commission include negative effects on economic development and property values (DCP Study at iv – ix, pp. 56-65).  The 1995 regulations were intended to address those adult establishments with a "predominant, on-going focus on sexually explicit materials or activities."

In general terms, the 1995 Regulations restrict the permitted locations of such adult establishments by prohibiting them in all residence districts, certain commercial districts and manufacturing districts that permit new residential uses; by requiring that adult establishments be at least 500 feet from such districts; by requiring that each adult establishment in a permitted location be at least 500 feet from another such establishment; and by requiring that adult establishments be at least 500 feet from certain 'sensitive receptors' (schools, day care centers, and houses of worship).   The amendments were designed to 'minimize the potential for adverse secondary effects throughout the city' and protect those areas and uses 'particularly vulnerable to the negative effects of adult uses.'"

The Commission stated that as a general guideline an establishment would need to have at least 40 percent of its accessible stock and floor area dedicated to adult material in order to make it similar to the establishments in the Commission study.  This guideline developed into the so-called '60/40' standard embodied in guidelines issued by the Department of Buildings, the agency charged with enforcement of the guidelines.

After implementation of the 1995 ordinance a number of adult business owners reconfigured the premises of their businesses so as to not offer adult entertainment or

materials in a "substantial portion" of the premises. This reconfiguration may allow the businesses to operate as nonadult businesses and thus not be required to maintain a buffer of 500 feet from residences, sensitive receptiors and from other adult establishments.

For the most part, these alterations, as they have been undertaken for eating and drinking establishments that feature topless dancing, have included configurations so that the adult entertainment takes place in a section of the establishment which comprises less than 40 percent of the establishment's total floor area. To date, it is difficult to determine exactly how many eating and drinking establishments are operating in this fashion since, as noted by the Planning Commission, the interior configurations and method of operation of these establishments are subject to change.

The City, however, contends that the 60/40 guidelines were never intended to apply to eating and drinking establishments and that court rulings "have mistakenly applied an analysis under which, once it is found that an eating and drinking establishment 'regularly features' adult entertainment, it must then be determined whether a 'substantial portion' of the floor area of the establishment is dedicated to that adult entertainment." (DPC N 010508 ZRY, pg 35). Further, the city noted that there has never been a finding of fact in any judicial or other enforcement proceeding that adverse secondary impacts are curtailed through the adoption of a 60/40 configuration by these eating and drinking establishments.

The present investigation is concerned with whether adverse secondary effects in the form of lower property values are associated with eating and drinking establishments

● Page 18

that have configured themselves according to the 60/40 guidelines.  Below we lay out a

conceptual framework for investigating whether these negative effects are present.

## CONCEPTUAL FRAMEWORK FOR THE PRESENT ECONOMIC ANALYSIS--
## THE HEDONIC APPROACH

Despite the prevalence of land use regulations that restrict adult businesses,

evidence to support their rationale—that adult businesses negatively impact property

values-- is surprisingly thin.

Probably the most sophisticated examination of the secondary effects thesis is that

done by McCarthy, Renski and Linz (2001).  This study examined whether properties

within one kilometer of an adult business appreciated more slowly than properties further

away within the city of Charlotte, North Carolina.  By comparing appreciation rates in a

systematic manner, this study avoids the ad hoc approaches described above.  The authors

found "price appreciation rates for housing near adult clubs are at least as high as those

further away in eleven of the twenty study years" (McCarthy et al., 2001, p. 19).  The

authors concluded that there was "no evidence that negative secondary effects on house

price appreciation can be found in two decades of housing transactions in Mecklenburg

County, North Carolina" (McCarthy et al., 2001, p. 21).

A methodology for ascertaining secondary effects that meets the standards of

conventional social science that compliments the method employed by McCarthy et al.

(2001) is employed in the present study.  We use the hedonic approach to estimate the

impact of 60/40 businesses on surrounding residential properties.  Hedonic models are

regression models that attempt to decompose the value of a property into implicit prices

● Page 19

paid for each of the various attributes of the property, such as rooms, yard, fireplaces, maintenance levels, year of construction—as well as attributes associated with the property's surroundings (Rosen, 1974; Rothenberg et al. 1991). The latter includes everything from the quality of local schools, proximity to shopping, and potentially, proximity to 60/40 businesses. The notion here is that homes with a different bundle of attributes will sell for different prices and that a property's sales price can be predicted if one measures the amount of each attribute and then multiplies that amount by its implicit price, and aggregates everything. Using the hedonic method each attribute, then, has a discernible impact on the value of the property. The measurement of the value of each attribute is accomplished by the use of multivariate regression, which allows us to isolate and estimate the impact of each characteristic on the property's value while holding constant potentially confounding factors.

Hedonic approaches have been used extensively by social scientists to discern the effect of environmental characteristics of property values. Examples include investigations of the effect of subsidized housing (Freeman and Botein, 2002; Galster et al. 1999; Lee et al. 1999; Lyons and Loveridge, 1993; Nourse 1963), landfills (Hite et al., 2001; Kohlhase, 1991; Nelson et al. 1992), and transit facilities (Huang 1996; Ryan 1999) on property values.

Use of a hedonic approach to determine the impact of 60/40 businesses on property values entails using the value of the property as the dependent variable, proximity to a 60/40 business as the independent variable, and the characteristics of each property and its surrounding neighborhood as the control variables. The regression

coefficients of each variable can thus be interpreted as the impact each of these characteristics has on the property's value. Therefore, should a regression of property values on the properties' housing and neighborhood attributes produce a positive and statistically significant coefficient for the attribute "distance from 60/40 business" this would suggest the market penalizes proximity to a 60/40 business. This would also be consistent with the notion that 60/40 businesses have adverse effects on surrounding neighborhoods, for whatever reason (fear of crime, adversity to nudity, etc.). Alternatively, if the coefficient for the attribute "distance from 60/40 business" was either substantively small, negative, or statistically insignificant, this would imply those 60/40 businesses did not have a discernible impact on surrounding properties.

## METHODOLOGY

This research utilizes the RPAD data obtained from Community Studies of New York. This data is the record of assessed values of properties in 1998 in New York City used for tax purposes. Consequently, our analysis will examine the effect of 60/40 businesses on assessed property values. Although assessed values are an estimate of how the market values a particular property, and hence bound to include some measurement error, using assessed values does have the advantage of being able to include all the properties in the study area as part of the analysis. In contrast, an analysis based on actual sales data will typically include a small nonrandom sample of all properties in a given year. Whether the observed sales transactions are actually representative of all properties in a given area is unknown. We limit our analysis to housing properties, as these are the type of properties likely to be most sensitive to proximity to a 60/40 business.

Our analysis examined the effect of 36 New York City 60/40 businesses on assessed property values. Of the 36, six are in the Bronx, 11 are in Manhattan, and 19 are in Queens. These businesses were chosen because they had attempted to comply with the New York 60/40 zoning regulations by devoting the majority of the business floor space to nonadult activity, thus rendering these businesses not 'predominately" adult use. Table one lists the clubs included in this analysis and is in the appendix of this report, as are all subsequent tables.

**Model Specification**

In our hedonic models the assessed value of the property is the dependent variable while the characteristics of the property are considered the control variables. Proximity to a 60/40 business is the independent variable of interest. To control for the effect of neighborhood characteristics we used a zip-code level fixed effects approach. Because some of the 60/40 businesses were close to the zip code boundaries, we also included those properties that fell outside of the zip code but were within 5,000 feet of a 60/40 business. This means our sample was limited to zip codes within New York City that have a 60/40 business, or that contain properties within 5,000 feet of a 60/40 business. In essence we will compare the assessed value of residential properties in proximity to a 60/40 business with other residential properties not in proximity to a 60/40 business but within the same zip code, or within 5,000 feet of the zip code boundary. Our dependent variable is the log of the assessed value per unit.

According to the secondary effects thesis, properties in proximity to a 60/40 business should be stigmatized and consequently be valued less than otherwise similar

properties further away from a 60/40 business. Therefore, we use distance in feet from a 60/40 business as the independent variable. If the secondary effects hypothesis is correct, this variable should be positive, meaning property values are higher as one moves further away from a 60/40 business, statistically significant, and substantively large.

A distance measure assumes a linear relationship between proximity to a 60/40 business and property values. It is possible, however, that the relationship is nonlinear, and the relationship between 60/40 businesses and property values only manifests itself at certain distances. Unfortunately, the theory is silent on the functional form of the relationship between proximity to a 60/40 business and property values. Therefore, we attempted the following specifications:

1. A dummy variable taking on a value of 1 if a 60/40 business is within 500 feet, and equal to 0 otherwise.

2. A dummy variable taking on a value of 1 if a 60/40 business is within 1000 feet, and equal to 0 otherwise.

3. A dummy variable taking on a value of 1 if a 60/40 business is within 2000 feet, and equal to 0 otherwise.

Although these distance designations are somewhat arbitrary, these distances were cited by a majority of real estate brokers (80% cited 500 feet and 54% 1000 feet) in one study as distances within which the negative secondary impacts of adult businesses would be observed. Beyond 1000 feet, only 25% of the real estate brokers believed an impact would be observed (Department of City Planning 1994). Thus to the extent secondary effects exist, it seems reasonable to assume that they should observed within 1000 feet.

● Page 23

Nevertheless we include a 2000-foot specification as an additional robustness check. According to the secondary effects thesis these variables should be negative, meaning properties within the distance rings have lower values, statistically significant, and substantively large.

An additional non-linear specification that was attempted was a quadratic specification which entails including a squared term for the distance measure. This quadratic specification does not restrict the relationship between 60/40 businesses and property values to a linear one, but rather allows for the possibility of decreasing or increasing returns to property values as a result of 60/40 business proximity. According the secondary effects thesis the net effect of the distance measure and its squared counterpart should be substantially large, statistically significant and positively related to the property values prices (meaning the further one is away from a 60/40 business the higher the property values).

Some properties are proximate to more than one 60/40 business and this raises the possibility that a concentration of 60/40 businesses might to exert a stronger nonlinear impact on surrounding properties than a single 60/40 business. To explore this possibility we also attempt three specifications indicative of proximity to a concentration of 60/40 businesses at varying distances. These independent variables were specified as follows:

1.  A dummy variable equal to one if the property is within 500 feet of more than one 60/40 business, and equal to 0 otherwise.

2.  A dummy variable equal to one if the property is within 1000 feet of more than one 60/40 business, and equal to 0 otherwise.

● Page 24

3.      A dummy variable equal to one if the property is within 2000 feet of

more than one 60/40 business, and equal to 0 otherwise.

The secondary effects thesis predicts that these dummy variables will be statistically significant, substantively large, and negative, meaning properties within the distance rings of respective concentrations of 60/40 businesses have lower values.

We thus have eight (8) specifications of a model of the relationship between proximity to a 60/40 business and property values.  The secondary effects thesis suggests the independent variables should be statistically significant and substantially meaningful. The conventional 95% level of confidence will be used to determine statistical significance.

One of the assumptions of the Ordinary Least Squares (OLS) regression model estimation is that the stochastic error $\varepsilon$ is independent and identically distributed.  If the error term were independently distributed it would imply that the value of a given property in say area A would be unrelated to the value of another property in say area B. However, in our conceptual framework we argue that real property may indeed be affected by surrounding neighborhood attributes including the value of adjacent properties, which is a violation of $\varepsilon$ being independently distributed.  So to correct for this autocorrelation of $\varepsilon$ described above, as well as any violation of the assumption that $\varepsilon$ is identically distributed, we estimate our models using the Huber/White/Sandwich corrected standard errors.

Table two lists the definitions of the variables used in the analysis and Table Three provide descriptive statistics.

● Page 25

1407

**Results**

The first set of results we present are simple comparisons of assessed property values between properties proximate to a 60/40 business and properties further away. This is a naïve approach that does not consider if the properties close to a 60/40 business are systematically different from other properties. Although naïve, it can still be quite informative by shedding light on the nature of the relationship and that which is likely to be observed. If properties near 60/40 businesses were assessed at lower values than other properties this would explain the perception that the 60/40 businesses lower property values. This would not be a very convincing argument of causality, as it does not control for differences in property characteristics, but it would at least explain the perception.

The results presented in Table four, provide little evidence on the existence of secondary effects. The second row suggests properties within 500 ft of a 60/40 business have assessed values that are substantially lower than those outside this distance threshold. This difference, however, is not statistically significant. As the threshold distance increases to 1000 feet the relationship between proximity to a 60/40 club reverses. Properties within 1000 feet actually have higher assessed values, although this difference is not statistically significant. At 2000 feet the properties further from 60/40 businesses had lower mean values than those within the 2000 foot threshold and this result was statistically different from zero. Taken together the bivariate analyses are inconsistent with the secondary effects thesis. The only statistically significant difference found properties within 2000 feet of a 60/40 businesses having higher assessed values than those further away. But this simple bivariate comparison does not take into

● Page 26

consideration the possibility that properties within 2000 feet of a 60/40 business could be systematically different from other properties. Consequently, this apparent relationship does not make a convincing case for causality.

**Multivariate Results**

The multivariate analyses allow us to come closer to establishing whether any causal relationship between 60/40 businesses and property values exist because differences in the physical characteristics of the properties are controlled for. In addition, by using a zip-code level fixed effects approach we hold constant any difference that could be due to neighborhood characteristics. We discuss only the results for the independent variables of interest, proximity to a 60/40 business, and for the first model discussed measures of goodness of fit for the entire model. The measures of goodness of fit for subsequent models were essentially the same as for the first model discussed, hence for the entire models.

The first set of results is presented in the second and third columns of Table Five and use the distance in feet from a 60/40 business as the independent variable. The regression coefficient for this variable can be interpreted as meaning that for every additional 100 feet away from a 60/40 business, property values decrease by .00283 percent. Although this result is statistically significant, the magnitude of this relationship is so small as to be substantively unimportant. The direction of the relationship is also inconsistent with the secondary effects thesis that postulates a detrimental impact on property values exerted by 60/40 businesses. Here proximity to a 60/40 business is

● Page 27

associated with *higher* albeit only modestly higher property values.  This finding directly contradicts the secondary effects thesis.

The model as a whole performs fairly well.  The F-statistic indicates the independent variables taken together have a statistically significant relationship to the dependent variable.  As indicated by the $R^2$ the model explains approximately 70% of the variation in assessed property values.  The models discussed below are also statistically significant and similar in explaining approximately 70% of the variation in assessed property values.

To examine the possibility that the relationship between a 60/40 business and property values is nonlinear, the next set of results includes a squared term for the distance measure.  The results of this nonlinear specification are presented in columns four and five in Table Five.  The p-values show that neither the distance variable nor its squared counterpart is statistically significant.  This suggests that whatever the relationship between proximity to 60/40 businesses and property values, it is not captured by quadratic specification.

Table Six uses dummy variables representing rings of 500, 1000, and 2000 feet away, respectively, from a 60/40 business. These results are presented in the second and third, fourth and fifth, and sixth and seventh columns, respectively of Table Six.  The statistically significant coefficients in columns two and four show that properties within 500 feet of a 60/40 business sold for an 11% premium, while properties within 1000 feet sold for an approximately three percent premium.  The last two columns of Table Six show there was no statistically significant difference between property values within 2000

● Page 28

feet of a 60/40 business and those further away.  As a whole, the results in Table Six are inconsistent with the secondary effects thesis.  The relationships that were statistically significant indicate proximity to 60/40 businesses is associated with *higher* property values, the opposite of what the secondary effects thesis would predict.

The final set of results is presented in Table Seven.  These models test the relationships between proximity to concentrations of 60/40 businesses within 500, 1000, and 2000 feet, respectively.  The second and third columns show properties within 500 feet of more than one 60/40 business had 12% higher property values than those beyond 500 feet of more than one 60/40 business.  The fifth and sixth columns do not show a statistically significant relationship whereas the sixth and seventh column show a statistically significant and negative relationship between properties within 2000 feet of more than one 60/40 business and those beyond 2000 feet.  That is, properties within 2000 feet of more than one 60/40 business had assessed values that were nine percent lower than other properties, ceterius paribus.

The findings presented in Table Seven are somewhat contradictory.  On the one hand, properties within 500 feet of a concentration of 60/40 businesses had higher values compared to those beyond 500 feet.  In contrast, properties beyond 2000 feet had higher property values than those more proximate to 60/40 businesses.  And the test of more than one property within 1000 feet was not statistically significant.  Taken together, we can only infer that the relationship between concentrations of 60/40 businesses and property values is not particularly robust.  Different specifications yield vastly different results.

● Page 29

In sum, the results of these analyses provide little evidence to support the secondary effects thesis, which states adult businesses have a negative impact on property values.  In only one of eight models presented were the relationships statistically significant, substantively meaningful and in the direction the secondary effects thesis would suggest.  Moreover, in several of the models proximity to a 60/40 business was associated with *higher* property values.

## CONCLUSIONS

The methodological approach used here, the hedonic methodology, is the method most widely used by social scientists to answer the question of how a neighborhood attribute, such as a 60/40 business, affects property values. The validity of the modeling method has been established through peer-reviewed research published in leading housing research journals.  The model is estimated using an extensive, publicly available data set.  The data captures all assessed properties in New York City.  Thus, the study presented here meets the requirements established by the Court for admissibility of scientific evidence.

The results indicate that once differences in property characteristics are accounted for, there is no consistent significant difference in the assessed values of properties near a 60/40 businesses and those further away.  Indeed, it was more often the case that properties proximate to 60/40 businesses had *higher* assessed values than those further away, a relationship in direct contradiction to the secondary effects thesis.

The findings of this study cast doubt directly on the City's assumption that adverse secondary impacts are associated with 60/40 configuration eating and drinking

● Page 30

establishments.  The present investigation examined whether adverse secondary effects in the form of lower property values are associated with eating and drinking establishments that have configured themselves according to the 60/40 guidelines.  The results indicate that once differences in property characteristics are accounted for, there is no consistent significant difference in the assessed values of properties near a 60/40 businesses and those further away.  These findings would seem to suggest that the burden is now upon the City to demonstrate that their original contention about these businesses and negative secondary effects is, in fact, correct.

**General Applicability of the Findings**

These results are for the most part consistent with the most rigorous studies that have been tested the hypothesis of secondary effects due to proximity to an adult business (e.g., McCarthy et al. 2001).  For the most part, other studies employing conventional social science methodology have also failed to find evidence of secondary effects.

This study by itself, however, cannot be taken to be the final word on secondary effects.  First, the analysis presented here is limited to one city.  Thus, the results may not be generalizable to other parts of the country.   Second, this analysis only examines property values at one point in time.  Despite these drawbacks, one can still conclude that the evidence presented here is inconsistent with the secondary effects thesis.

Since a core set of studies have been, and continue to be, relied upon by hundreds of local municipalities as evidence of negative secondary effects, a central concern must be the methodological rigor, and therefore trustworthiness, of these studies.  This is particularly true given the precedent the Supreme Court established that a municipality

● Page 31

must show that such regulations are necessary to further the governmental interest of ameliorating secondary effects.

In this paper we have indicated that there is reason to challenge the assumption made by communities across the United States that past studies of secondary effects show an empirical relationship between adult businesses and negative effects. There is also no legitimate basis for extending the secondary effects doctrine to the regulation of expression within adult businesses based on these studies. The study has provided a method for measuring secondary effects of proximity to adult establishments. Application of the method shows no evidence that negative secondary effects on assessed property values in New York City.

# REFERENCES

Allyn, David. 2000. *Make Love not War: The Sexual Revolution: An Unfettered History*. New York: Little, Brown and Company.

Barouth, Nicholas. 1998. Regime Approaches to Obscenity Policy: 1960s to 1980s. *Journal of Urban Affairs*. 20(4):395-417.

Boyle, Karen. 2000. The Pornography Debates: Beyond Cause and Effect. *Women's Studies International Forum* 23(2):187-95.

Cumberbatch, Guy and Dennis Howitt. 1989. *A Measure of Uncertainty; The Effects of the Mass Media*. London: John Libbey.

Freeman, Lance and Hilary Botein. 2001. The Impacts of Subsidized Housing on Surrounding Neighborhoods: A Theoretical Synthesis and Empirical Review. *Journal of Planning Literature* Forthcoming.

Galster, George, Peter Tatian, and Robin Smith. 1999. The Impact of Neighbors who Use Section 8 Certificates on Property Values. *Housing Policy Debate*. 10(4):879-918.

Gauntlett, David. 1997. Ten things Wrong with the Effects Model. In Roger Dickison, Ramaswani Harindrandth, & Olga Linne (Eds.), *Approaches to Audiences: A Reader* (pp.120-130). London: Arnold.

Hamilton, Shawn W. and Gregory M Schwann. 1995. Do High Voltage Electric Transmission Lines Affect Property Values? *Land Economics*. 71(4)436-44.

Holl J., Michael. Kevin J. Booyle, and Roy Bouchard. 2000. Does the Measurement of Environmental Quality Affect Implicit Prices Estimated from Hedonic Models? *Land Economics*. 76 (2)-283-98.

Hite, Diane, Wen Chern, Fred Hitzhusen, and Allan Randall. 2001. Property Value Impacts of an Environmental Disamenity: The Case of Landfills. *Journal of Real Estate Finance and Economics* 22(2/3):185-202.

Huang, Herman. 1996. The Land Use Impacts Transportation Infrastructure on Nearby Property Values. A Review of the Literature. *Journal of Planning Literature*. 11(1):17-30.

Kolhase, J. 1991. The Impact of Toxic Waste Sites on Housing Values. *Journal of Urban Economics* 30:1-26.

Lee, Chang-Moo, Dennis P. Culhane, and Susan M. Wachter. 1999.  The differential impacts of federally assisted housing programs on nearby property values: A Philadelphia case study. Housing Policy Debate 10, 1: 75-93.

Lyons, Robert F., and Scott Loveridge.  1993.  A hedonic estimation of the effect of federally subsidized housing on nearby residential property values.  Staff Paper P93-6. University of Minnesota: Department of Agricultural and Applied Economics.

McCarthy, George W., Henry Renski and Dan Linz. 2001. Measuring Secondary Effects Using Spatio-Temporal Estimation of Real Estate Appreciation. Unpublished manuscript.

Miller, David, and Greg Philo. 1998. The Effective Media. In Greg Philo (Ed.), *Message Received* (pp. 21-32). Harlow: Longman.

Nourse, Hugh O. 1963. The effect of public housing on property values in St. Louis. Land Economics 39: 433-41.

Quercia, Roberto, George McCarthy, Rhonda Ryznar, and Ayse Can. 2001. Spatio-Temporal Estimation of House Price Appreciation in Underserved Areas. *Journal of Housing Research*

Rosen, Sherwin. 1974. Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition. *Journal of Political Economics* 82:34-35.

Rothenberg, Jerome, and George Galster. 1991. The maze of urban housing markets: Theory, evidence, and policy.  Chicago: University of Chicago Press.

Ryan, Sherry.1999.  Property Values and Transportation Facilities: Finding the Transportation-Land Use Connection. *Journal of Planning Literature*. 13(4):412-427.

# APPENDIX

# Exhibit 50

# 1559

Exhibit 12 (November 16-17, 2006, Focus Probe Inc., "Perceived Differences
Between Adult Entertainment Clubs With 'Subdued Facades' vs. 'Loud Facades')
(Pages 1559 Through 1576)

### EXHIBIT

> # Perceived Differences Between
> # Adult Entertainment Clubs With
> # "Subdued Facades" vs. "Loud
> # Facades"

Market Research Study
Conducted in NYC November 16-17, 2006
By Focus Probe Inc.
New Milford, CT



NY Project Report, 2006  12

1419

**1560**

# Market Research Objective

Focus Probe Inc. ("Focus Probe") was commissioned to conduct market research by the lawyer representing Pussycat Lounge, Inc. and others in a case pending in the Supreme Court for the State of New York, County of New York, litigating the constitutionality of the City of New York Zoning Resolutions relating to Adult Entertainment. The study design and questionnaire were prepared in conjunction with Professor Bryant Paul of Indiana University.

Focus Probe was informed that Pussycat Lounge and many similar businesses originally operated adult cabarets with loud garish exterior signage and most, if not all, of the interior floor space was devoted exclusively to the presentation of the form of adult entertainment commonly known as "topless" or "nude" dancing. Focus Probe was further informed that following certain amendments to the City's zoning resolution, Pussycat Lounge and these other businesses modified their exterior signage and remodeled their interior space, changing them in two important respects: (1) modifying the exterior signage so as to significantly de-emphasize or eliminate any ongoing focus on the "topless" or "nude" nature of the entertainment being presented; and (2) reducing the amount of space devoted to such "adult" entertainment to less than 40% of the floor space of the pre-existing cabaret and developing the other 60+% of the floor space for a variety of non-adult business purposes, not involving "topless" or "nude" dancing or other forms of "adult" entertainment.

Given these assumptions, the objective of my study was to determine whether the change to lower profile signage, standing alone, was likely to have a significant impact on the perception of New York City residents concerning the quality of life in the neighborhoods in which such businesses operated.

For purposes of this study, New York City residents were shown pairs of photos of a single club, with one version showing a "subdued facade" (virtually identical to the type of facade presently operated by at least one of the current 60-40 businesses) and another photo of the same club but computer-modified to show a "loud facade" with signage and graphics created to be consistent with the appearance of most of these businesses before their conversion. The respondents were not told anything concerning the nature of the business activities occurring within each club, but were asked to indicate their perceptions based solely on the perceived differences in the exterior appearances of the loud and subdued facades.

# Market Research Method

This study was conducted using the "Street Intercept" method of approaching individuals in public spaces. Adults age 18+ were intercepted in parks and other leisure spaces in New York City and asked to participate in a study about the quality of life in New York by interviewers dressed in distinctive red jackets to make clear that this was a legitimate study and not a sales intrusion.

The study was conducted on November 16 and 17, 2006, by a team of 12 young men and women working in Bryant Park and Union Square in Manhattan and on Flatbush Avenue in Brooklyn. Each interviewer was instructed to approach adults 18+ to fill out the questionnaire and to avoid discussing it or biasing the results. Respondents who did not live in the five boroughs of New York City were thanked and excluded from the study.

**1561**

# Research Design

Respondents were presented a folder with a questionnaire and just one pair of photos of city street scenes for their reaction and comparison. To totally eliminate the variables of showing different clubs and different street scenes, the same street and location were used for each separate pair of clubs, with a total of three different streets and locations being used in all. Each pairing was based on the outward appearance of a currently existing club, though subject to computer-generated photographic modifications so the real names of the clubs would not be used.

The "Subdued facade" club was shown essentially as it is today, but with a fictitious name. Using the same scene and the same name, the photo for the "Loud facade" club was digitally altered to show sexually oriented signs and provocative graphics which we were told were typical of clubs in NYC prior to attempts to comply with 60-40 regulations in 1998.

To expose the sampling group to a variety of clubs, the sample of 651 individuals was divided into three segments of 200 or more respondents each. Each respondent saw only *one set* of the three pairs of photos.

    One segment was exposed to a pair of photos of a club renamed "Player."

    The second segment was exposed to a pair of photos of a club renamed "Frills"

    The third segment was exposed to a pair of photos of a club renamed "Winners." [1]

    To eliminate order bias, each pair of clubs was shown half the time with the "Subdued facade" club first and half the time with the "Loud facade" club first.

Questionnaires were color coded to match with the appropriate pair of photos.

---

[1] In the real world, the club depicted as "Player" is actually a club named "VIP Club", located at West 20th in Manhattan; the club depicted as "Frills" is actually a club named "Lace", located on 7th in Manhattan; and the club depicted as "Winners" is actually a club named "Scores", located at East 60th St. in Manhattan. The original photos of these three "real world" clubs, which served as the models for this study, are reproduced on the final page of this report.

# 1562

## Questions

Respondents were each given the following five questions, asking them to view the pair of photos and compare and contrast their perceptions of the "Subdued facade" club with the "Loud facade" version of the same club:

1.    Based only on these pictures, which of the immediately surrounding neighborhoods do you think is more likely to have a better overall quality of life?

2.    Based only on these pictures, in which neighborhood do you think it would be safer to walk down the street?

3.    Suppose you lived in or near each of these two neighborhoods.   Based only on these pictures, in which neighborhood do you think you would prefer to continue living?

4.    Based only on these pictures, in which of these two neighborhoods do you think the *average person* would rather continue living?

5.    Based only on these pictures, and assuming all of the stores in each neighborhood were exactly the same, in which of these two neighborhoods do you think you would be more likely to go shopping?

(A sample of the actual questionnaire is included as an exhibit.)

# Sample Composition

The total sample for this study was 651 adults. Some respondents skipped demographic questions in this self-administered questionnaire.

By Place of Residence
Manhattan       228
Brooklyn        212
Bronx            65
Queens           89
Staten Island    21
No answer        36

By Gender
Male            276
Female          254
Skipped question 121

By Age
18-40           355
40+             190
Skipped question 106

1563

NY Project Report, 2006  20

1423

# Summary of Findings

- A clear majority thinks neighborhoods pictured with "Subdued facades" would have a Better Quality of Life than those pictured with "Loud facade" clubs
  - o 68% selected "Subdued facade" clubs as much more or somewhat more likely to have a Better Quality of Life
  - o Only 14% selected "Loud facade" clubs; 18% think there is no difference
- A majority said neighborhoods pictured around "Subdued facade" clubs look safer
  - o 64% think "Subdued facade" club neighborhoods look safer compared to only 10% for "Loud facade" clubs. 26% said there looks like no difference
- A majority (65%) would prefer to continue living in a neighborhood with a "Subdued facade" club than a "Loud facade" club, compared to only 10% who would prefer living near a "Loud facade" club.
  - o 26% would not find either any more or less favorable than the other
- A majority (63%) thinks the average person would prefer to continue living in a neighborhood with a "Subdued facade" club vs. a "Loud facade" club, compared to only 14% who think the average person would prefer living near a "Loud facade" club.
- 59% would be more likely to go shopping in a neighborhood pictured with a "Subdued facade" club than a "Loud facade" club
  - o 23% would be equally likely to shop in either neighborhood; only 17% would shop in a "Loud facade" club neighborhood
- Photos of the club named "Frills" (Lace on 7th Avenue) used "A Gentlemen's Club" on the marquee. Results were identical to clubs not using the "Gentlemen's Club" description.

Results were remarkably consistent by gender and age.

> Q. 1: Based only on these pictures, which of the immediately surrounding neighborhoods
> do you think is more likely to have a better overall <u>quality of life</u>?

- Two-thirds surveyed (68%) think the neighborhoods pictured with "Subdued facade" clubs are more likely to have a better overall quality of life than the neighborhoods pictured with "Loud facade" clubs
- About 18% think there would be no difference whatsoever
- Only 14% thought neighborhoods pictured with "Loud facade" clubs would have a better overall quality of life
- Results are consistent among both males and females and both those younger and older
- Those exposed to photos of "Frills" and "Winner" as "Subdued facade" clubs were slightly more favorable than those exposed to "Player" club, which looked darker than the other two

| | Total | Player Club | Frills Club | Winner Club | Males | Females | Age 18-40 | Age 40+ |
|---|---|---|---|---|---|---|---|---|
| SAMPLE | 651 | 203 | 222 | 226 | 276 | 254 | 355 | 190 |
| | 100% | 100 | 100% | 100% | 100% | 100% | 100% | 100% |
| "Subdued facade" Neighborhood | | | | | | | | |
| Looks Much More Likely | 49% | 39% | 57% | 50% | 51% | 50% | 50% | 52% |
| Looks Somewhat More Likely | 19% | 22% | 16% | 20% | 17% | 20% | 18% | 16% |
| Subtotal 60/40 Neighborhood | 68% | 61% | 73% | 70% | 68% | 70% | 68% | 68% |
| | | | | | | | | |
| Looks like No difference Whatsoever | 18% | 24% | 15% | 16% | 15% | 20% | 16% | 20% |
| | | | | | | | | |
| "Loud facade" Neighborhood | | | | | | | | |
| Looks Somewhat More Likely | 4% | 5% | 1% | 5% | 4% | 3% | 4% | 4% |
| Looks Much More Likely | 10% | 10% | 11% | 9% | 13% | 7% | 11% | 9% |
| Subtotal 100% Adult | 14% | 15% | 12% | 14% | 17% | 10% | 15% | 13% |
| No Answer | | | | | | | | |

1565

NY Project Report, 2006  22

> *Q. 2: Based only on these pictures, in which neighborhood do you think it would be <u>safer</u> to walk down the street?*

- A majority, 64%, think neighborhoods pictured around "Subdued facade" clubs would be safer
- 26% think there would be no difference in perceived safety
- Only 10% think the neighborhoods pictured with "Loud facade" clubs would be safer, perhaps because there might be more pedestrians and activity
- Results were consistent by gender and age

| | Total | Player Club | Frills Club | Winner Club | Males | Females | Age 18-40 | Age 40+ |
|---|---|---|---|---|---|---|---|---|
| SAMPLE | 651 | 203 | 222 | 226 | 276 | 254 | 355 | 190 |
| | 100% | 100 | 100% | 100% | 100% | 100% | 100% | 100% |
| **"Subdued facade" Neighborhood** | | | | | | | | |
| Looks Much Safer | 47% | 37% | 49% | 54% | 48% | 48% | 46% | 51% |
| Looks Somewhat Safer | 17% | 22% | 14% | 17% | 16% | 18% | 17% | 15% |
| Subtotal 60/40 Neighborhood | 64% | 59% | 63% | 71% | 64% | 66% | 63% | 66% |
| | | | | | | | | |
| Looks like No difference Whatsoever | 26% | 30% | 32% | 16% | 24% | 25% | 26% | 25% |
| | | | | | | | | |
| **"Loud facade" Neighborhood** | | | | | | | | |
| Looks Somewhat Safer | 3% | 3% | 1% | 4% | 3% | 2% | 4% | 1% |
| Looks Much Safer | 7% | 8% | 4% | 9% | 8% | 7% | 7% | 8% |
| Subtotal 100% Adult | **10%** | 11% | 5% | 13% | 11% | 9% | 11% | 9% |
| No Answer | | | | | | | | |

NY Project Report, 2006  23

1566

1426

Q. 3: Suppose you live in or near each of these two neighborhoods. Based only on these pictures, in which neighborhood do you think you would prefer to <u>continue living</u>?

- A majority, 63%, would prefer to continue living in neighborhoods pictured around "Subdued facade" clubs vs. "Loud facade" clubs
- An average of 26% would not find either any more or less favorable than the other
- Only 10% would prefer to live in neighborhoods pictured around "Loud facade" clubs

| | Total | Player Club | Frills Club | Winner Club | Males | Females | Age 18-40 | Age 40+ |
|---|---|---|---|---|---|---|---|---|
| SAMPLE | 651 | 203 | 222 | 226 | 276 | 254 | 355 | 190 |
| | 100% | 100 | 100% | 100% | 100% | 100% | 100% | 100% |
| **"Subdued facade" Neighborhood** | | | | | | | | |
| Prefer to continue living Much More | 46% | 37% | 49% | 54% | 48% | 48% | 46% | 51% |
| Prefer…Somewhat More | 17% | 22% | 14% | 17% | 16% | 18% | 17% | 15% |
| Subtotal 60/40 Neighborhood | 63% | 59% | 63% | 71% | 64% | 66% | 63% | 66% |
| | | | | | | | | |
| Neither more or less favorable | 26% | 32% | 32% | 16% | 24% | 25% | 26% | 25% |
| | | | | | | | | |
| **"Loud facade" Neighborhood** | | | | | | | | |
| Prefer…Somewhat More | 2% | 3% | 1% | 4% | 3% | 2% | 4% | 1% |
| Prefer to continue living Much More | 8% | 8% | 4% | 9% | 8% | 7% | 7% | 8% |
| Subtotal 100% Adult | 10% | 11% | 5% | 13% | 11% | 9% | 11% | 9% |
| No Answer | 1% | 2% | 1% | | 1% | | | 1% |

1567

| Q. 4: Based only on these pictures, in which neighborhood do you think the average person would prefer to <u>continue living</u>? |
|---|

- A majority, 64%, think the average person would prefer to live in a neighborhood pictured with a "Subdued facade" club rather than one with a "Loud facade" club
- 22% think the average person would not find either neighborhood any more or less favorable than the other
- Only 14% think the average person would prefer the "Loud facade" club neighborhood

|  | Total | Player Club | Frills Club | Winner Club | Males | Females | Age 18-40 | Age 40+ |
|---|---|---|---|---|---|---|---|---|
| SAMPLE | 651 | 203 | 222 | 226 | 276 | 254 | 355 | 190 |
|  | 100% | 100 | 100% | 100% | 100% | 100% | 100% | 100% |
| "Subdued facade" Neighborhood |  |  |  |  |  |  |  |  |
| Avg. person prefer Much More | 45% | 37% | 50% | 49% | 49% | 45% | 45% | 53% |
| Avg. person prefer Somewhat More | 18% | 22% | 14% | 18% | 14% | 19% | 16% | 14% |
| Subtotal 60/40 Neighborhood | 63% | 60% | 64% | 67% | 63% | 64% | 61% | 67% |
|  |  |  |  |  |  |  |  |  |
| Neither more or less favorable | 22% | 28% | 19% | 19% | 20% | 22% | 23% | 19% |
|  |  |  |  |  |  |  |  |  |
| "Loud facade" Neighborhood |  |  |  |  |  |  |  |  |
| Avg. person prefer Somewhat More | 4% | 3% | 3% | 5% | 4% | 4% | 4% | 3% |
| Avg. person prefer Much More | 10% | 9% | 12% | 9% | 12% | 9% | 11% | 10% |
| Subtotal 100% Adult | 14% | 12% | 15% | 14% | 16% | 13% | 15% | 13% |
| No Answer | 1% |  | 2% |  | 1% | 1% | 1% | 1% |

1568

1428

Q. 5: Based only on these pictures, and assuming all of the stores in each neighborhood were exactly the same, in which of these two neighborhoods do you think you would be more likely <u>to go shopping</u>?

- A majority, 59%, would be more likely to shop in neighborhoods pictured with "Subdued facade" clubs
- 23% would be equally likely to shop in either neighborhood
- 17% would be more likely to shop in neighborhoods around the "Loud facade" clubs

| | Total | Player Club | Frills Club | Winner Club | Males | Females | Age 18-40 | Age 40+ |
|---|---|---|---|---|---|---|---|---|
| SAMPLE | 651 | 203 | 222 | 226 | 276 | 254 | 355 | 190 |
| | | | | | | | | |
| **"Subdued facade" Neighborhood** | | | | | | | | |
| Much more likely to go shopping | 44% | 37% | 52% | 41% | 40% | 49% | 43% | 48% |
| Somewhat more likely to shop | 15% | 19% | 10% | 16% | 14% | 13% | 12% | 14% |
| Subtotal 60/40 Neighborhood | 59% | 56% | 62% | 57% | 54% | 62% | 55% | 62% |
| | | | | | | | | |
| Looks like No difference Whatsoever | 23% | 28% | 20% | 22% | 22% | 23% | 27% | 19% |
| | | | | | | | | |
| **"Loud facade" Neighborhood** | | | | | | | | |
| Somewhat more likely to shop | 4% | 4% | 1% | 8% | 5% | 4% | 4% | 4% |
| Much more likely to go shopping | 13% | 12% | 15% | 13% | 18% | 11% | 14% | 13% |
| Subtotal 100% Adult | 17% | 16% | 16% | 21% | 23% | 15% | 18% | 17% |
| No Answer | 1% | | 2% | | 1% | | | 2% |

1569

1429

# 1570

| Interviewer: Your initials:_____ | Location: _____ |
|---|---|
| | Match photo codes to questionnaire color |
| ( ) white 101 above vs. 201 below, | ( ) blue 201 above vs. 101 below |
| ( ) pink 301 above vs. 401 below, | ( ) yellow 401 above vs. 301 below |
| ( ) buff 501 above vs. 601 below, | ( ) gray 601 above vs. 501 below |

Thank you for taking part in this survey about neighborhood life in NYC.
This survey is only for residents of New York City. In which borough do you live? [ ]
Manhattan, [ ] Bronx, [ ] Queens, [ ]Brooklyn, [ ]Staten Island
Is your age [ ] 18 to 40  or  [ ] 40+?        Male [ ] or Female [ ]

*Please compare these two pictures. Each shows a business located within a neighborhood. Answer the following questions related to the possible impact either of these businesses may have on their surrounding neighborhoods.*

*Check only one answer for each question.*

1.  Based only on these pictures, which of the immediately surrounding neigh-borhoods do you think is more likely to have a better overall quality of life?

*Check only one*

a) The neighborhood above looks *much more* likely
    to have a better quality of life                                              [  ]
b) The neighborhood above looks *somewhat more* likely
    to have a better quality of life.                                            [  ]
c) It looks like there would be *no difference whatsoever*
    in the quality of life in these two neighborhoods.                [  ]
d) The neighborhood below looks *somewhat more* likely
    to have a better quality of life.                                            [  ]
e) The neighborhood below looks *much more* likely
    to have a better quality of life.                                            [  ]

2.  Based only on these pictures, in which neighborhood do you think it would be safer to walk down the street?

*Check only one*

a) Neighborhood above looks *much safer.*                          [  ]
b) Neighborhood above looks *somewhat safer.*                  [  ]
c) It looks like there is *no difference whatsoever*
    in the level of safety in the two neighborhoods.               [  ]
d) Neighborhood below looks *somewhat safer.*                  [  ]
e) Neighborhood below looks *much safer.*                         [  ]

# 1571

3.  Suppose you lived in or near each of these two neighborhoods.  Based only on these pictures, in which neighborhood do you think you would prefer to <u>continue living</u>?

<div align="right"><em>Check only one</em></div>

a) I would prefer to continue living in neighborhood above <u>*much more*</u>.     [  ]
b) I would prefer to continue living in neighborhood above <u>*somewhat more*</u>.     [  ]
c) I would <u>*not find either any more or less favorable than the other*</u>.     [  ]
d) I would prefer to continue living in neighborhood below <u>*somewhat more*</u>.     [  ]
e) I would prefer to continue living in neighborhood below <u>*much more*</u>.     [  ]

4.  Based only on these pictures, in which of these two neighborhoods do you think the *average person* would rather <u>continue living</u>?

<div align="right"><em>Check only one</em></div>

a) I think the average person would prefer to continue living
   in neighborhood above <u>*much more*</u>.     [  ]
b) I think the average person would prefer to continue living
   in neighborhood above <u>*somewhat more*</u>.     [  ]
c) I think the average person would <u>*not find either neighborhood
   any more or less favorable than the other.*</u>     [  ]
d) I think the average person would prefer to continue living
   in neighborhood below <u>*somewhat more*</u>.     [  ]
e) I think the average person would prefer to continue living
   in neighborhood below <u>*much more*</u>.     [  ]

5.  Based only on these pictures, and assuming all of the stores in each neighborhood were exactly the same, in which of these two neighborhoods do you think you would be more likely <u>to go shopping</u>?

<div align="right"><em>Check only one</em></div>

a) I would be <u>*much more likely*</u> to go shopping in neighborhood above.     [  ]
b) I would be <u>*somewhat more likely*</u> to go shopping in neighborhood above.     [  ]
c) I would be <u>*equally likely*</u> to shop in either neighborhood.     [  ]
d) I would be <u>*somewhat more likely*</u> to go shopping in neighborhood below.     [  ]
e) I would be <u>*much more likely*</u> to go shopping in neighborhood below.     [  ]

Thank you for participating

## 1572

Perception and Reality      29

PHOTOS FOR NY PROJECT, 2006



"Frills" as "Subdued facade" club



"Frills" as "Loud facade" club

NY Project Report, 2006  29

1573



"Player" as "Subdued facade" club



"Player" as "Loud facade" club

# 1574



"Winners" as "Subdued facade" club



"Winners" as "Loud facade" Club

NY Project Report, 2006  31

1575

Perception and Reality     32



Lace, 7th Avenue & 47th Street, NYC, Sep. '06



VIP Club, 20 W. 20 St., NYC, Sep, '06

NY Project Report, 2006  32

# 1576

Perception and Reality      33



Scores, East 60th Street, NYC, Sep '06

**1577**
Exhibit 12A (Focus Probe Study Photographs) (Pages 1577 Through 1578)



1578





### 1579
**Exhibit 12B (Focus Probe Study Photographs) (Pages 1579 Through 1580)**





**1580**





**1581**
Exhibit 12C (Focus Probe Study Photographs) (Pages 1581 Through 1582)





## 1582



501



601

# Exhibit 51

N.Y. Co. Index
Nos. 113049/96, 103568/96,
and 103569/96

To be argued by:
LEONARD KOERNER
(25 minutes)

## COURT OF APPEALS
## STATE OF NEW YORK

STRINGFELLOW'S OF NEW YORK, LTD.,

Plaintiff-Appellant,

- against -

THE CITY OF NEW YORK, et al.,

Defendants-Respondents,

-and-

TIMES SQUARE BUSINESS IMPROVEMENT DISTRICT,

Intervenor-Defendant-Respondent,

-and-

CENTER FOR THE COMMUNITY INTEREST, et al.,

Intervenors-Defendants-Respondents.

--------------------------------------------------------------------x

AMSTERDAM VIDEO INC., et al.,

Plaintiffs-Respondents,

-against-

THE CITY OF NEW YORK, et al.,

Defendants-Respondents,

(and other Intervenors-Defendants-Respondents).

--------------------------------------------------------------------x

RACHEL HICKERSON, et al.,

Plaintiffs-Respondents,

-against-

THE CITY OF NEW YORK, et al.,

Defendants-Respondents,

(and other Intervenors-Defendants-Respondents).

## CITY RESPONDENTS' BRIEF

JEFFREY D. FRIEDLANDER,
Acting Corporation Counsel of
the City of New York,
Attorney for the City
Defendants-Respondents,
100 Church Street,
New York, New York 10007.
(212) 788-1010 or 1033

LEONARD KOERNER,
ALBERT G. FREDERICKS,
ELIZABETH S. NATRELLA,
of Counsel.
December 11, 1997

Reproduced on Recycled Paper

1444

**Pages i-xiii and 1-58 Omitted**

subdivided and are also available, nor did it account for lots that do not front a roadway. Inclusion of those lots would have been entirely appropriate. . . .

Another factor used in assessing whether an adult use ordinance provides for sufficient public access to such uses is whether the ordinance under review allows for the operation of as many adult establishments as existed in the community at the time of the law's enactment. Islip, 73 N.Y.2d at 560.

The record here shows, as the Supreme Court found, that DCP calculated that a total of approximately 500 potential adult establishments may operate under the Amendments, which is more than adequate to cover the 177 existent businesses and almost a 3-to-1 ratio (A52-53). This calculation took into account only the 4% of the City's total land area which was found by DCP not to be encumbered by certain properties that are unlikely to be developed for any commercial use, including properties occupied with public utilities or oil storage facilities, property designated as wetlands by the State Department of Environmental Conservation, and publicly-owned property of more than 10,000 square feet (ante, pp. 18-20). In making this estimate, DCP also took into account both the limitation on districts where adult uses are permitted and the requirement that an adult establishment be located a 500-foot distance from certain zoning districts, specified community facilities and other adult establishments (id.).

The Amendments thus not only permit all of the City's existing adult establishments to continue to operate in New York City, but also provide for a significant expansion of the City's adult use market. Significantly, moreover, as the Supreme Court recognized (A49), in looking at reasonable access to adult uses, the following factors must be considered: 1) very few currently operating establishments are as large as the 10,000 square foot useable floor area size permitted; and 2) the Amendments do not restrict establishments which sell or display limited amounts of adult material, often found at the numerous general purpose book and video stores and newsstands throughout the City, a significant factor cited in Islip. 73 N. Y.2d at 558. Plaintiffs fail to acknowledge these significant factors.

-59-

**Pages 60-84 Omitted**

# Exhibit 52

1

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK

3  ------------------------------------------x
   RACHEL HICKERSON, DEREK JONES, TY

4  McCONNELL, and ELLIOT STAMLER,

5                           Plaintiffs,
                                          Index No.

6        - against -                      103569/96

7  THE CITY OF NEW YORK and HON.
   RUDOLPH W. GIULIANI, as Mayor of the

8  City of New York, JOEL A. MIELE, SR.,
   as Commissioner of the Department of

9  Buildings of the City of New York,
   and JOSEPH B. ROSE, as the Director

10 of the Department of City Planning
   of the City of New York,

11
                           Defendants.

12 ------------------------------------------x

13                       September 3, 1996
                         12:20 p.m.

14

15           Deposition of MARILYN MAMMANO, taken

16 by the Hickerson Plaintiffs, pursuant to Order,

17 at the offices of New York Civil Liberties

18 Union, 132 West 43rd Street, New York, New York,

19 before Loretta M. Bodtmann, a Shorthand Reporter

20 and Notary Public within and for the State of

21 New York.

22

23            GREENHOUSE REPORTING, INC.

24         363 Seventh Avenue - 20th Floor
              New York, New York 10001

25               (212) 279-5108

EXHIBIT C

1449

A P P E A R A N C E S:

NEW YORK CIVIL LIBERTIES UNION
Attorneys for the Hickerson Plaintiffs
132 West 43rd Street
New York, New York 10036
BY: BETH HAROULES, ESQ.

LIPSITZ, GREEN, FAHRINGER, ROLL, SALISBURY & CAMBRIA
Attorneys for Amsterdam Video
110 East 59th Street
New York, New York 10022-1304
BY: HERALD PRICE FAHRINGER, ESQ.

LAW OFFICES OF MARK J. ALONSO, P.C.
Attorneys for Stringfellow's
275 Madison Avenue
New York, New York 10016
BY: MARK J. ALONSO, ESQ.

DEWEY BALLANTINE
Attorneys for American Alliance for Rights & Responsibilities, et al.
1301 Avenue of the Americas
New York, New York 10019-6092
BY: HEATHER K. McDEVITT, ESQ.

3

1

2                    A P P E A R A N C E S  (Continued):

3

4       CRAVATH, SWAINE & MOORE
               Attorneys for Times Square
5                 Business Improvement District
               825 Eighth Avenue
6              New York, New York  10019-7475
         BY:   DAVID A. STOLL, ESQ.
7

8

9

         PAUL A. CROTTY, ESQ.
10            Corporation Counsel
               for the City of New York
11            100 Church Street
              New York, New York  10007
12       BY:   ALBERT G. FREDERICKS, ESQ.

13

14

15       MELANIE MEYERS, ESQ.
               Attorney for the City of New York
16               Department of City Planning,
                 Zoning & Urban Design
17            22 Reade Street
              New York, New York  10007-1216

18

19

20

21

         Also Present:
22
               RITA LEDUC
23

24

25

GREENHOUSE REPORTING, INC.        (212) 279-5108

1451

4

## STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED
by and between counsel for the respective
parties hereto that all rights provided by
the CPLR including the right to object to
any question except as to the form or to
move to strike any testimony at this
examination before trial shall not be a
bar or waiver to make such motion at, and
is reserved for the trial of the action.

IT IS FURTHER STIPULATED AND AGREED
by and between counsel for the respective
parties hereto that this examination may
be sworn to by the witness being examined
before a Notary Public other than the
Notary Public before whom this examination
was begun, but the failure to do so or to
return the original of the examination to
counsel, shall not be deemed a waiver of
the rights provided by Rule 3116 and Rule
3117 of the CPLR and shall be controlled
thereby.

5

1

2    MARILYN MAMMANO ,

3          residing at 131 East 39th Street, New

4          York, New York 10016, having been duly

5          sworn by the Notary Public, was examined

6          and testified as follows:

7    EXAMINATION BY

8    MS. HAROULES:

9          Q.    Good afternoon, Ms. Mammano.  My

10   name is Beth Haroules.  I'm an attorney with the

11   New York Civil Liberties Union.  We represent

12   the plaintiffs in the Hickerson action against

13   the City of New York concerning the zoning

14   resolution that the City passed last October.

15          I will be asking you questions

16   primarily about the zoning resolution and how

17   that zoning resolution impacts on the number of

18   permissible sites for adult establishments in

19   New York City.  If there is anything I ask where

20   you are not clear, please let me know on the

21   record, and I will try to make sure that I

22   adjust the question accordingly.  Is that okay?

23          A.    That is fine.

24          Q.    Could you state your full name and

25   address on the record please.

6

M. Mammano

1

2      A.     My name is Marilyn Mammano.  I'm the

3  Director of Zoning and Urban Design with the New

4  York City Department of City Planning.

5             My work address is 22 Reade Street,

6  New York 10007.  My home address is 131 East

7  39th Street, New York 10016.

8      Q.     How long have you held the position

9  that you just described?

10      A.     I've been the director of Zoning and

11  Urban Design since 1991.

12      Q.     Could you describe your employment

13  history prior to that?

14      A.     Prior to that I was a member -- on

15  the City Planning Commission from 1987 to 19 --

16  the end of 1989.  And previous to that I was a

17  member of the Department of City Planning in

18  various positions, the most -- the closest to my

19  services at the Commission, I was Director of

20  Planning for Staten Island from 1981 to 1987.

21      Q.     Could you describe your educational

22  background briefly?

23      A.     I have a Bachelor's degree in

24  architecture and a Master's degree in City and

25  Regional Planning from Pratt Institute.

Pages 7 -150 omitted

151

1           M. Mammano

2    and strictly mathematical, strictly computer

3    oriented, as we were dealing with blank raw

4    space to determine this matter, these maps,

5    Exhibit 7 to 11, there was no consideration for

6    existing adult uses in that area?

7           A.    No, that is not correct.

8           Q.    There were?

9           A.    Yes.  Having done the capacity

10   analysis, we then indicated that the capacity

11   included what was to the best of our ability to

12   calculate the existing users which could remain

13   for each borough and for the City as a whole.

14   That is what the numbers on the August 3rd memo

15   represent for the proposal as it was presented

16   to the Commission, and that was later updated to

17   reflect that the chance that the City Planning

18   Commission --

19          Q.    I think you are misunderstanding my

20   question.  I mean on the map, if there was a big

21   facility or a little facility, for that matter,

22   in one of these zones which is now an adult

23   permissible zone?

24          A.    I understand your question now.  No,

25   the map indicates that legend that the exists

152

M. Mammano

1

2   adult establishments were not considered in the

3   graphic representation of the map.

4        Q.   So there was no attempt to take any

5   of these, any of the businesses which are

6   underlined, and draw 500-foot circles around

7   them on the map?

8        A.   That's correct.

9        Q.   This only relates, is it a fair

10  statement to say that this statute only relates

11  to legal business?

12       A.   These are all legal businesses as

13  far as we are concerned.  If it is an illegal

14  business, it shouldn't be in operation.

15       Q.   Is the City aware that there might

16  be some adult businesses that are illegal?

17       A.   I am sorry, I don't know what you

18  mean by illegal.

19       Q.   That there might be some businesses

20  in New York that don't put them on a tax lot as

21  a topless bar or theater or video store, or is

22  the city not aware of that fact?

23       A.   I'm sorry, I don't know how to

24  answer that question because I don't know what

25  you are asking me.

GREENHOUSE REPORTING, INC.     (212) 279-5108

1457

Pages 153-end omitted

# Exhibit 53

LITIGATION MANAGEMENT AGREEMENT

AGREEMENT made as of the 25th day of September, 2017, between and among the undersigned attorneys on behalf of the eating and drinking establishments enumerated on Schedule A hereto (hereafter "Plaintiffs"), and the Corporation Counsel of the City of New York, on behalf of the City of New York.

WHEREAS, in 2001 the City of New York ("City") adopted certain amendments to the Zoning Resolution of the City of New York, as amended, effective October 30, 2002 and set forth in Text Amendment N 010508 ZRY ("2001 Amendments"); and

WHEREAS, in 2002, the undersigned attorneys commenced the Federal Actions enumerated on Schedule B hereto, to declare the 2001 Amendments unconstitutional as they relate to eating and drinking establishments that regularly feature adult entertainment and enjoin their enforcement against eating and drinking establishments that regularly feature adult entertainment under the First Amendment to the United States Constitution ("Federal Actions"); and

WHEREAS, in 2002, multiple lawsuits (enumerated on Schedules C and D hereto) were commenced concurrently in the New York State Courts challenging the 2001 Amendments ("State Actions"); and

WHEREAS, prior to the adjudication of the Federal Actions on the merits, the 2001 Amendments were declared unconstitutional in the State Actions and their enforcement enjoined city-wide; and

WHEREAS, in light of the judgment and stays entered in the State Actions, the Federal Actions were administratively closed "with leave to petition to re-open for good cause shown"; and

*WHEREAS,* after closing the Federal Actions the Court indicated that it did not want to entertain re-opening the Federal Actions until there was a final resolution of all pending state court actions challenging the 2001 Amendments; and

*WHEREAS,* on June 6, 2017, the Court of Appeals of the State of New York issued its Opinion and Remittitur reversing the prior lower court judgments in the State Actions and upholding the 2001 Amendments ("June 6[th] Decision"), the effect of which is to allow enforcement of the 2001 Amendments; and

*WHEREAS,* a motion is *sub judice* in the New York Court of Appeals for reargument of a portion of the June 6th Decision ("Reargument Motion"); and

*WHEREAS,* the time to apply to the United States Supreme Court for any writ of certiorari will commence upon finality of the appeals to the New York Court of Appeals, including a ruling on the pending Reargument Motion; and

*WHEREAS,* all undersigned counsel have been engaged in ongoing discussions regarding how to proceed with the closed Federal Actions in light of the June 6th Decision, the potential enforcement of the 2001 Amendments by the City, and the Federal court's prior actions regarding re-opening the Federal Cases; and

*WHEREAS,* during these discussions, the City has refrained from enforcement of the 2001 Amendments, and Plaintiffs have similarly refrained from taking any action to revive the closed Federal Actions or to file new ones; and

*WHEREAS,* the undersigned attorneys for Plaintiffs have advised the Corporation Counsel that, but for this Litigation Management Agreement and the negotiations leading to its execution, they would

2

have immediately applied to the United States District Court to re-open the Federal Actions (other than Action No. 3 as set forth in Schedule B, which is moot), and/or filed new actions in Federal Court to declare the 2001 Amendments unconstitutional under the First Amendment to the United States Constitution, and sought temporary restraining orders and preliminary injunctions; and

WHEREAS, the undersigned attorneys and the Corporation Counsel have consulted with one another and have concluded that it is in the best interests of the parties and the public to enter into this agreement in order to provide for the orderly and efficient management of litigation and conclusive determination of claims;

NOW, THEREFORE, it is hereby agreed as follows:

1.      The City of New York will continue to refrain from enforcing the 2001 Amendments in connection with the locations shown in Schedule A until 60 days after the District Court's determination of Plaintiffs' motions for preliminary injunctions against enforcement, upon the following terms and conditions:

A.      The closed Federal Actions shall be re-opened and amended and supplemental complaints filed therein (or, alternatively, new actions shall have been commenced by the filing of new complaints) not later than 60 days after (a) December 11, 2017 (the expiration of the time provided by law for filing a petition to the Supreme Court of the United States for a Writ of Certiorari to review the New York Court of Appeals' June 6th Decision), if no certiorari petition is timely filed by a party listed in Schedule C ("a Schedule C Party" or collectively "the Schedule C Parties"), or (b) the final determination by the Supreme Court of the United States of any petition(s) for a Writ(s) of Certiorari filed by a Schedule C Party, (or, alternatively, in the

3

event certiorari is granted, within 60 days of the entry of the final judgment of the Supreme Court), whichever is the last to occur.

B.      Upon the service of Plaintiffs' amended and/or supplemental complaints in the re-opened Federal Actions (or, alternatively, Plaintiffs' new complaints filed in new actions), the parties shall consult with each other in good faith concerning (a) the possible extension of the time to move for preliminary injunction(s) established hereunder, (b) the possible consolidation of dispositive motions or the trial(s) on the merits of the actions with the hearing(s) on the motions for preliminary injunctions under F.R.Civ.P. 65(a)(2), and (c) the possible extension of this agreement to refrain from enforcement.   Nothing set forth herein is intended or shall be deemed or construed to obligate the City or Plaintiffs to agree to any of the foregoing.

C.      Absent the parties' agreement to the contrary, motions for preliminary injunctions shall be filed within 30 days of the service of the amended and supplemental complaints (or alternatively the filing of new complaints in a new action).

D.      The City of New York shall file its responses to the amended and supplemental complaints (or new complaints, as the case may be) within 60 days of service upon it.

E.      Notwithstanding the time frames set forth subsections A-C, the City may, at any time upon 75 days written notice to undersigned counsel for Plaintiffs, require that Plaintiffs take immediate steps to obtain judicial relief from the City's enforcement of the 2001 Amendments.

2.      The City of New York will continue to refrain from enforcing the 2001 Amendments in connection with the locations shown in Schedule C until the later of: (a) December 11, 2017 (the

4

1463

expiration of the time for the Schedule C Parties to file a petition for writ of certiorari); or (b) if any such petition is filed, 30 days after the denial of the petition or entry of the final Judgment of the Supreme Court, whichever is longer.

3.     The City shall not oppose Plaintiffs' motions, if any, for: (a) re-opening of the closed Federal Actions upon application therefore (other than Action No. 3 enumerated in Schedule B hereto, for the reasons set forth above), and/or (b) consolidation of the re-opened Federal Actions for any or all purposes.

4.     Nothing set forth herein is intended or shall be deemed or construed to preclude any application to the Federal Court for other, further and different relief not inconsistent herewith.

5.     Nothing in this agreement prevents the City from enforcing the provisions of City Zoning Resolution Text Amendment N 950384 ZRY in connection with the locations shown in Schedule A.

6.     Fed. R. Civ. Proc. 6 shall apply in computing any time period specified in this Agreement.

7.     The undersigned attorneys represent that they are each and all authorized to enter into this Agreement on behalf of their respective clients (including the City of New York); that this Agreement shall be binding upon and inure to the benefit of each and all of such attorneys and clients; and that this Agreement is enforceable against each of the parties hereto.

8.     This Agreement is the product of negotiation between the undersigned attorneys.  Any ambiguity shall not be construed against any party.

9.     In the event any provision of this Agreement is determined by any Court to be unenforceable for any reason, (a) any such provision shall be reformed to the extent necessary to render

5

it enforceable, and (b) in any event, the balance of the Agreement shall be nonetheless enforceable in accordance with the remaining terms.

10.     This Agreement integrates all understandings and agreements of the parties hereto with respect to the subject matter hereof.  Any prior understanding or agreement, written or oral, is hereby merged herein and shall not survive execution of this Agreement.

11.     This Agreement may be amended or modified only in a writing (including e-mail) signed by all of the parties hereto.

12.     There shall be no oral waivers of this Agreement.   Any waiver shall be in writing (including e-mail) signed by the party to be charged or confirmed in a transcribed record of a judicial proceeding.

13.     This Agreement may be executed in counterpart copies, all of which, taken together, shall constitute one and the same instrument.

14.     Facsimile signatures on behalf of any of the undersigned shall be deemed original for all purposes.

6

1465

15.    Neither party will rely on this agreement to suggest that any party has made any

admission, concession, or other waiver of any kind with respect to the merits of Plaintiffs' claims.

*WHEREFORE,* the undersigned have executed this Agreement at New York, New York, as of the

date first set forth above.

**WESTON GARROU & MOONEY**
*Attorneys for Sapphire*

By: _____ ( John H. Weston )

**SILVER & SILVER**
*Attorneys for Lace and Satin Dolls*

By: _____
Daniel A. Silver

**HON. ZACHARY W. CARTER**
*Corporation Counsel of the City of New York*

By: _____
Mark Muschenheim

**ZANE and RUDOFSKY**
*Attorneys for New York Dolls, Private Eyes, VIP, and Vixen*

By: _____
Edward S. Rudofsky

7

## SCHEDULE A

1) Sapphire, 333 E 60th St, New York, NY 10022
2) Lace, 725 7th Ave, New York, NY 10019
3) Satin Dolls (formerly Lace II), 689 8th Ave, New York, NY 10036
4) NY Dolls, 59 Murray St, New York, NY 10007
5) Private Eyes, 302 W 45th St, New York, NY 10036
6) VIP, 20 W 20th St #1, New York, NY 10011
7) Vixen, 60-07 Metropolitan Ave, Ridgewood, NY 11385

## SCHEDULE B

1) MLB Enterprises Corp. v. The City of New York, et al., SDNY Case No. 02-cv-04431-WHP
2) 59 Murray Corp., et ano. v. The City of New York, et al., SDNY Case No. 02-cv-04432-WHP
3) Pulse Nite Club, Inc. et al. v. The City of New York, et al., SDNY Case No. 02-cv-06193-WHP
4) Club at 60th Street, Inc. et ano. v. The City of New York, SDNY Case No. 02-cv-08333-WHP

## SCHEDULE C

1) Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County; Index No. 121197/2002
2) Pussycat Lounge, Inc. v. Bloomberg, Supreme Court, New York County, Index No. 122740/2002

## SCHEDULE D

1) For the People Theatres of N.Y., Inc. v. et al. v. City of New York, et al., New York County Index No. 121080/2002

8

1467