UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
725 EATERY CORP., etc., *et ano.,*                    :

                     Plaintiffs,      :

        - against -                          :        Civil Action No.
                                                02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,                         :

                    Defendants.   :
-------------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*           :

                     Plaintiffs,      :

        - against -                          :        Civil Action No.
                                                02 CV 4432 (WHP)
THE CITY OF NEW YORK, et al.,                         :

                    Defendants.   :
-------------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*            :

                     Plaintiffs,      :

        - against -                          :        Civil Action No.
                                              02 CV 8333 (WHP)
THE CITY OF NEW YORK,                                 :

                    Defendant.    :
-------------------------------------------------------------X

336 LLC., etc., *et al.,*                             :

                     Plaintiffs,      :

        - against -                          :        Civil Action No.
                                              18 CV 3732 (WHP)
THE CITY OF NEW YORK,                                 :

                    Defendant.    :
-------------------------------------------------------------X

# NOTICE OF FILING OF PLAINTIFFS' JOINT APPENDIX VOLUME 13
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**PLEASE TAKE NOTICE,** that Plaintiffs hereby file the within Volume 13 of

Plaintiffs' Joint Appendix in the above-captioned actions.

Dated:         New York, New York
               November 21, 2018

*Respectfully,*

**DANIEL A. SILVER**                          **JOHN H. WESTON**
**SILVER & SILVER**                           **G. RANDALL GARROU**
One Liberty Square                            **WESTON, GARROU & MOONEY**
New Britain, Connecticut 06050-0698           12121 Wilshire Boulevard, Suite 525
(860) 225-3518                                Los Angeles, CA 90025-1176
                                              (310) 442-0072

         - and-                                        - and -

**JENNIFER KINSLEY**                          **ALAN M. ABRAMSON**
Kinsley Law Office                            **ABRAMSON & MORAK**
Post Office Box 19478                         35 Worth Street
Cincinnati, Ohio 45219                        New York, New York 10013
(513) 708-2595                                (212) 226-7098

*Attorneys for Plaintiffs*                    *Attorneys for*
*725 Eatery Corp., etc., et ano.*             *Club At 60th Street, Inc., etc., et al.*

By:    s/Daniel A. Silver                     By:    s/John Weston
Daniel A. Silver                                     John Weston

**EDWARD S. RUDOFSKY**                        **ERICA DUBNO**
**ZANE and RUDOFSKY**                         Fahringer & Dubno
601 West 26th Street, # 1315                  767 Third Avenue, Suite 3600
New York, New York  10001                     New York, New York
(212) 245-2222                                (212) 319-5351

*Attorneys for Plaintiffs*                    *Attorneys for Plaintiffs*
*59 Murray Enterprises, Inc., etc.*           *336 LLC, etc., et al.*
*et al.*

By:    s/Edward S. Rudofsky                   By:    s/Erica T. Dubno
       Edward S. Rudofsky                            Erica T. Dubno

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
725 EATERY CORP., etc., *et ano.,*                :

                      Plaintiffs,     :

          - against -                :                Civil Action No.
                                                02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,                    :

                    Defendants.   :
----------------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*      :

                      Plaintiffs,     :

          - against -                :                Civil Action No.
                                                02 CV 4432 (WHP)
THE CITY OF NEW YORK, et al.,                    :

                    Defendants.   :
----------------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*      :

                      Plaintiffs,     :

          - against -                :                Civil Action No.
                                                02 CV 8333 (WHP)
THE CITY OF NEW YORK,                            :

                    Defendant.    :
----------------------------------------------------------------X
336 LLC., etc., *et al.,*                          :

                      Plaintiffs,     :

          - against -                :                Civil Action No.
                                                18 CV 3732 (WHP)
THE CITY OF NEW YORK,                            :

                    Defendant.    :
----------------------------------------------------------------X

## PLAINTIFFS' JOINT APPENDIX
## (VOL. 13 of 17; pp. 1468--1574)

Per the Court's Order of November 7, 2018, Plaintiffs in each of the four above-entitled actions hereby submit their unitary Joint Appendix consisting exclusively of evidentiary documents upon which some or all of the Plaintiffs may choose to rely.  The inclusion of documents in this Joint Appendix does not automatically signify an endorsement or promotion of any of these documents by any individual Plaintiff or group of Plaintiffs.  That will depend on specific adoption of any of these documents by any Plaintiffs or Group of Plaintiffs in documents they may file with the Court.

The reference below to the "Club Plaintiffs" refers to all the Plaintiffs in Action Nos. 02 CV 4431, 02 CV 4432 and 02 CV 8333.  The reference below to the "Bookstore Plaintiffs" refers to all the Plaintiffs in Action No. 18 CV 3732.

## TABLE OF CONTENTS

| Tab No. | Description of Document | Joint Appendix Starting Page # |
|---------|------------------------|--------------------------------|
| | **DOCUMENTS SUBMITTED BY CLUB PLAINTIFFS** | |
| | **VOLUME 1 (pp. 0001--0030)** | |
| | **CLUB PLAINTIFFS' EXPERT DECLARATIONS** | |
| A | **Declaration of Michael Berzak Regarding Adult Business Sites in Support of Plaintiffs' Motion for** | **0001** |

| | Preliminary Injunction | |
|---|---|---|
| | ***Exhibit 1***: Sequential Maps of Adult Business Sites in Manhattan, Prepared by Berzak Associates | 0019 |
| | **VOLUME 2**<br>**(pp. 0031--0038)** | |
| | ***Exhibit 2***: Sequential Maps of Adult Business Sites in Queens, Prepared by Berzak Associates | 0031 |
| | ***Exhibit 3***: Sequential Maps of Adult Business Sites in the Bronx, Prepared by Berzak Associates | 0035 |
| | **VOLUME 3**<br>**(pp. 0039--0046)** | |
| | ***Exhibit 4***: Sequential Maps of Adult Business Sites in Brooklyn, Prepared by Berzak Associates | 0039 |
| | ***Exhibit 5***: Sequential Maps of Adult Business Sites in Staten Island, Prepared by Berzak Associates | 0043 |
| | **VOLUME 4**<br>**(pp. 0047--0338)** | |
| | ***Exhibit 6***: Relevant Portions of AZR § 12-10 (definitions), § 32-01 (commercial zone restrictions on adult uses) and § 42-01 (manufacturing zone restrictions on adult uses) | 0047 |
| | ***Exhibit 7***: 1 RCNY § 9000-01 | 0059 |
| | ***Exhibit 8***: DOB Operations Policy and Procedure Notice No. 17/95 | 0061 |
| | ***Exhibit 9***: DOB Operations Policy and Procedure Notice No. 6/96 | 0065 |
| | ***Exhibit 10***: DOB Operations Policy and Procedure Notice No. 7/96 | 0074 |

| | | |
|---|---|---|
| | *Exhibit 11*: DOB Operations Policy and Procedure Notice No. 8/96 | 0077 |
| | *Exhibit 12*: DOB Operations Policy and Procedure Notice No. 4/98 | 0080 |
| | *Exhibit 13*: DOB Operations Policy and Procedure Notice No. 6/98 | 0083 |
| | *Exhibit 14*: DOB Operations Policy and Procedure Notice No. 7/02 | 0087 |
| | *Exhibit 15*: Online DOB handbook published in 2016 entitled "Adult Establishment Applications" | 0091 |
| | *Exhibit 16*: City-generated Map Showing the Gowanus Canal Areas Which are Under Consideration for Zoning Changes Allowing Residential and Mixed Uses | 0103 |
| B | Declaration of Michael Berzak in Support of Permitting Issues Presented in Plaintiffs' Motion for Preliminary Injunction | 0105 |
| | *Exhibit 1*: Curriculum Vitae | 0124 |
| | *Exhibit 2*: NYCAC Title 27 Subchapter 1, Article 10 (Permits) | 0126 |
| | *Exhibit 3*: 1 RCNY § 9000-01 | 0129 |
| | *Exhibit 4*: NYCAC § 27-217 | 0131 |
| | *Exhibit 5*: NYCAC Title 27 Subchapter 1, Article 9 (Approval of Plans) | 0133 |
| | *Exhibit 6*: Relevant Portions of NYCAC Title 27 Subchapter 1, Article 19 (Issuance of Permits) | 0137 |
| | *Exhibit 7*: DOB's Buildings Bulletin 2016-010 | 0140 |
| | *Exhibit 8*: OPPN # 7/02 | 0145 |

| | | |
|---|---|---|
| | *Exhibit 9*: DOB Code Note (Adult Establishment Applications) | 0149 |
| C | Declaration of Hugh Kelly in Support of Plaintiffs' Motion for Preliminary Injunction | 0161 |
| D | Affidavit of Lance Freeman in Support of Plaintiffs' Motion for Preliminary Injunction | 0212 |
| | CLUB CLIENTS' DECLARATIONS | |
| E | Declaration of David M. Talla in Support of Plaintiffs' Motion for Preliminary Injunction | 0227 |
| F | Declaration of Keith Warech in Support of Plaintiffs' Motion for Preliminary Injunction | 0248 |
| G | Declaration of Anthony Capeci in Support of Plaintiffs' Motion for Preliminary Injunction | 0262 |
| H | Declaration of Barry Lipsitz in Support of Plaintiffs' Motion for Preliminary Injunction | 0265 |
| I | Declaration of Anthony D'Amico in Support of Plaintiffs' Motion for Preliminary Injunction | 0283 |
| J | Declaration of Maurice Kavanagh in Support of Plaintiffs' Motion for Preliminary Injunction | 0297 |
| | OTHER ITEMS | |
| K | Declaration of Edward Rudofsky in Support of Plaintiffs' Motion for Preliminary Injunction Regarding Legislative History and Related Matters | 0312 |
| L | Declaration of Edward S. Rudofsky in Support of Plaintiffs' Motion for Preliminary Injunction Regarding the Status of Veil NYC and Headquarters n/k/a Rosewood Theater | 0335 |
| | VOLUME 5 (pp. 0339--0519) | |

| M | Club Plaintiffs' Request To Take Judicial Notice | 0339 |
|---|---|---|
| | *Exhibit 1*: NYC Council Resolution 1322-1995 ("1995 Ordinance") | 0348 |
| | *Exhibit 2*: NYC Council Resolution 0208-1998 (regarding signage regulations) | 0364 |
| | *Exhibit 3*: NYC Council Resolution 2096-2001 ("2001 Amendments") | 0378 |
| | *Exhibit 4*: Relevant portions of NYC Council Resolution 586-2004 (amending, *inter alia*, AZR §§ 32-01 & 42-01 regarding adult businesses) | 0384 |
| | *Exhibit 5*: Relevant portions of NYC Council Resolution 499-2010 (amending, *inter alia*, AZR §§ 32-01 & 42-01 regarding adult businesses) | 0391 |
| | *Exhibit 6*: NYC AZR § 31-17 | 0394 |
| | *Exhibit 7*: NYC AZR § 31-18 | 0397 |
| | *Exhibit 8*: NYC AZR § 32-01 (multiple versions) | 0400 |
| | *Exhibit 9*: NYC AZR § 32-69 (multiple versions) | 0404 |
| | *Exhibit 10*: NYC AZR § 42-01 (multiple versions) | 0408 |
| | *Exhibit 11*: NYC AZR § 52-11 | 0412 |
| | *Exhibit 12*: NYC AZR § 52-61 | 0415 |
| | *Exhibit 13*: NYC AZR § 52-734 | 0419 |
| | *Exhibit 14*: NYC AZR § 52-77 | 0423 |
| | *Exhibit 15*: NYC AZR § 72-41 | 0427 |
| | *Exhibit 16*: NYC Administrative Code, Title 27, Chapter 1, Article 9 ("Approval of Plans") | 0431 |

| | | |
|---|---|---|
| | *Exhibit 17*: NYC Administrative Code, Title 27, Chapter 1, Article 10 ("Permits") | 0438 |
| | *Exhibit 18*: NYC Administrative Code, Title 27, Chapter 1, Article 19 ("Issuance of Permits") (relevant sections) | 0444 |
| | *Exhibit 19*: NYC Administrative Code, Title 27, Chapter 1, Article 22, § 27-217 ("Certificates of Occupancy / Change of Occupancy of Use") | 0457 |
| | *Exhibit 20*: NYC Dept. of Buildings Administrative Materials: Directive 14 of 1975 (authorizing self-certification of applications for building permits by licensed architects and engineers) | 0462 |
| | *Exhibit 21*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 17/95 (prohibiting self-certification of adult uses by architects and engineers) | 0466 |
| | *Exhibit 22*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 6/96 (reaffirming prohibition on self-certification of adult uses by architects and engineers) | 0483 |
| | *Exhibit 23*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 7/96 (defining "place of worship" and "church") | 0492 |
| | *Exhibit 24*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 8/96 (describing methodology for measuring separation between adult uses and other adult uses or sensitive receptors) | 0495 |
| | *Exhibit 25*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 4/98 (definition of "substantial portion") | 0501 |
| | *Exhibit 26*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 6/98 (explanation of "substantial portion" in context of multiple uses) | 0505 |

| | | |
|---|---|---|
| | *Exhibit 27*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 5/02 (clarifying procedures for self-certification by architects and engineers) | 0509 |
| | *Exhibit 28*: NYC Dept. of Buildings Administrative Materials: OPPN 7/02 (clarifying procedures for seeking adult use "priority" permit) | 0516 |
| | **VOLUME 6**<br>**(pp. 0520--0629)** | |
| | *Exhibit 29*: NYC Dept. of Buildings Administrative Materials: Policy and Procedure Notice OPPN 1/04 (clarifying procedures for self-certification by architects and engineers) | 0520 |
| | *Exhibit 30*: NYC Dept. of Buildings Administrative Materials: Bulletin 2016-010 (most recent document clarifying procedures for self-certification by architects and engineers) | 0532 |
| | *Exhibit 31*: NYC Dept. of Buildings Administrative Materials: Code Note on Adult Establishment Applications (handbook from DOB website) | 0537 |
| | *Exhibit 32*: NYC Dept. of Buildings Administrative Materials: Rule Title 1, Rules of City of New York § 9000-01 (establishing priority of locations under adult zoning scheme) | 0549 |
| | *Exhibit 33*: Legislative History of 2001 Amendments, 3/21/01 DCP Application No. N 010508 ZRY (to amend the AZR definition of adult establishment) | 0551 |
| | *Exhibit 34*: Legislative History of 2001 Amendments, CEQR Negative Declaration No. 01DCP045Y of 3/23/01, and Environmental Assessment Statement No. 01DCP045Y filed 3/23/01 | 0563 |

| | | |
|---|---|---|
| | **VOLUME 7**<br>**(pp. 0630--0707)** | |
| | ***Exhibit 35***: Legislative History of 2001 Amendments, Transcript of New York City Planning Commission Public Hearing held 5/23/01 | 0630 |
| | **VOLUME 8**<br>**(pp. 0708--0889)** | |
| | ***Exhibit 36***: Legislative History of 2001 Amendments, 8/8/01 New York City Planning Commission Report | 0708 |
| | ***Exhibit 37***: Legislative History of 2001 Amendments, Transcript of New York City Planning Commission Public Hearing held 8/8/01 | 0835 |
| | ***Exhibit 38***: Legislative History of 2001 Amendments, Transcript of 10/1/01 Hearing of Zoning and Franchises Subcommittee of New York City Council | 0848 |
| | **VOLUME 9**<br>**(pp. 0890--1068)** | |
| | ***Exhibit 39***: Legislative History of 2001 Amendments, Correspondence between Edward S. Rudofsky and New York City Council (10/9/01), and David Karnovsky and New York City Council (10/24/01) | 0890 |
| | ***Exhibit 40***: Legislative History of 2001 Amendments, Transcript of 10/25/01 Meeting of Zoning and Franchises Subcommittee of New York City Council | 0899 |
| | ***Exhibit 41***: Legislative History of 2001 Amendments, Transcript of 10/25/01 Meeting of Land Use Committee of New York City Council | 0911 |
| | ***Exhibit 42***: Legislative History of 2001 Amendments, Transcript of 10/31/01 Meeting of the New York City Council | 0919 |

| | | |
|---|---|---|
| | ***Exhibit 43***: Excerpt of Record On Appeal, Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County, Index No. 121197/2002 ("State Action"), Affidavit of David Karnovsky, Counsel to the New York City Department of City Planning, sworn to 10/23/02, filed in State Action on 10/25/02 (without internal Exhibits) | **1032** |
| | **VOLUME 10**<br>**(pp. 1069--1296)** | |
| | ***Exhibit 44***: Excerpts of Record On Appeal, Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County, Index No. 121197/2002 ("State Action"), Relevant pages from Transcripts of evidentiary hearing in State Action in Supreme Court, New York County, on 2/23/09 through 3/2/09 | **1069** |
| | **VOLUME 11**<br>**(pp. 1297--1381)** | |
| | ***Exhibit 45***: New York City Department of City Planning ("DCP") Materials, NYC DCP "Manufacturing Districts: M3" webpage (https://www.1.nyc.gov/site/planning/zoning/districts-tools/m3.page) | **1297** |
| | ***Exhibit 46***: New York City Department of City Planning ("DCP") Materials, NYC Department of City Planning "Manufacturing Districts: 1/1/02 to 1/1/12" webpage (https://www.1.nyc.gov/site/planning/zoning/districts-tools/mfg-districts-2002-2012.page) | **1300** |
| | ***Exhibit 47***: Studies, Moss and Quing, "The Dynamic Population of Manhattan", Rudin Center for Transportation Policy and Management of the New York University Wagner School of Public Service (2012) (https://wagner.nyu.edu/files/faculty/publications/dynamic_pop_manhattan.pdf) | **1304** |

| | | |
|---|---|---|
| | *Exhibit 48:* **Linz and Paul, "Measuring the Secondary Effects of 60/40 Businesses in New York City: A Study of Calls for Service to the Police", including Figures and Tables (2005) Exhibits 6 and 6A admitted into evidence at evidentiary hearing held on February 23 through March 2, 2009 in** <u>Ten's Cabaret, Inc. v City of New York</u>**, Supreme Court, New York County, Index No. 121197/2002** | **1330** |
| | **VOLUME 12**<br>(pp. 1382--1467) | |
| | *Exhibit 49*: **Studies, Freeman, "Examining The Relationship Between Businesses That Comply With the '60/40' Zoning Regulations and Surrounding Property Values in New York City" (2008) (Exhibit 8 admitted in evidence at evidentiary hearing held on 2/23/09 through 3/2/09 in** <u>Ten's Cabaret, Inc. v. City of New York</u>**, Supreme Court, New York County, Index No. 121197/2002** | **1382** |
| | *Exhibit 50*: **Studies, Focus Probe, Inc., "Perceived Differences Between Adult Entertainment Clubs With 'Subdued Facades' vs. 'Loud Facades', with photographs (Exhibits 12, 12A, 12B and 12C admitted in evidence at evidentiary hearing held on 2/23/09 through 3/2/09 in** <u>Ten's Cabaret, Inc. v. City of New York</u>**, Supreme Court, New York County, Index No. 121197/2002)** | **1418** |
| | *Exhibit 51*: **New York Court of Appeals Brief, Excerpt from Respondents' Brief of City of New York, et al., in** <u>Stringfellow's of New York, Inc. v. City of New York</u>**, New York County Index Nos. 113049/96 103568/96 and 103569/96, filed in New York Court of Appeals, dated 12/11/97** | **1443** |

| | | |
|---|---|---|
| | **Exhibit 52:** Excerpts from September 3, 1996 deposition testimony of Marilyn Mammamo, Director of Zoning & Urban Design of the NYC Department of City Planning, in <u>Hickerson v. The City of New York</u>, New York County Index No. 103569/96 | **1448** |
| | **Exhibit 53:** Undocketed Correspondence With Court, Litigation Management Agreement dated 9/25/17 (Exhibit B to 3/2/18 letter from Plaintiffs to Hon. William Pauley) in all current club cases | **1459** |
| | **<u>DOCUMENTS SUBMITTED BY<br>BOOKSTORE PLAINTIFFS</u>** | |
| | **VOLUME 13<br>(pp. 1468--1574)** | |
| **N** | Declaration of Dr. Elliott Sclar in Support of Plaintiffs' Motion for Preliminary Injunction | **1468** |
| | **Exhibit 1:** Dr. Sclar's Curriculum Vitae | **1515** |
| | **Exhibit 2:** Maps Prepared by the Department of City Planning in Support of the 1995 Resolution Showing Permissible Areas for Adult Establishments | **1539** |
| | **Exhibit 3:** Maps Prepared by the Department of City Planning Showing Zoning Changes between 1995 and 2001 in Support of the 2001 Resolution | **1545** |
| | **Exhibit 4:** Reports issued by the Department of City Planning and Information in the Press Confirming the Effectiveness of Mayor Bloomberg's Administration in Rezoning New York City | **1561** |

| | | **VOLUME 14**<br>**(pp. 1575--1683)** | |
|---|---|---|---|
| | | *Exhibit 5*: Report Prepared by the Department of City Planning Detailing the Reduction in Manufacturing Districts between 2002 and January 2012 | 1575 |
| | | *Exhibit 6*: Map Depicting Zoning Changes in New York City between January 2002 and September 2018 | 1594 |
| | | *Exhibit 7*: Table 1: List of Adopted Rezonings that Impacted Manufacturing Use | 1596 |
| | | *Exhibit 8*: Table 2: List of Certified Rezonings that Impact Manufacturing Use | 1603 |
| | | *Exhibit 9*: Map of Anticipated Mandatory Inclusion Housing ("MIH") Rezonings | 1605 |
| | | *Exhibit 10*: Department of City Planning Report on City Planning History | 1607 |
| | | *Exhibit 11*: MTA Staten Island Railway ("SIR") System Map | 1612 |
| | | *Exhibit 12*: Map Showing the Staten Island Railway Route Superimposed on the Map of Permissible Areas on Staten Island Prepared by the Department of City Planning in Support of the 1995 Resolution | 1614 |
| O | | Declaration of Daniel J. Zazzali in Support of Plaintiffs' Motion for Preliminary Injunction | 1616 |
| P | | Declaration of Daniel Knecht in Support of Plaintiffs' Motion for Preliminary Injunction | 1643 |

| | | |
|---|---|---|
| | *Exhibit 1*: Map of Public Transportation between the Plaintiffs' Bookstore at 336 Eighth Avenue, in Manhattan, and the Only Permissible Adult Bookstore with booths, on Staten Island | 1659 |
| Q | Declaration of Yitzik Shachaf in Support of Plaintiffs' Motion for Preliminary Injunction | 1662 |
| R | Declaration of Erica T. Dubno in Support of Plaintiffs' Motion for Preliminary Injunction | 1670 |
| | **VOLUME 15**<br>**(pp. 1684--1755)** | |
| S | Bookstore Plaintiffs' Request to Take Judicial Notice | 1684 |
| | *Exhibit 54*: Z.R. § 42-11 | 1691 |
| | *Exhibit 55*: Z.R. § 42-13 | 1694 |
| | *Exhibit 56*: New York City Charter § 85 "Borough Board" | 1698 |
| | *Exhibit 57*: DCP "Use Groups" webpage | 1702 |
| | *Exhibit 58*: DCP "Manufacturing Districts: Overview" webpage | 1707 |
| | *Exhibit 59*: DCP City Planning History webpage | 1710 |
| | *Exhibit 60*: DCP "Community-Based Planning" webpage | 1715 |
| | *Exhibit 61*: DCP "Special Purpose Districts: Citywide" webpage | 1722 |
| | *Exhibit 62*: DCP "Special Purpose Districts" webpage | 1730 |

| | | |
|---|---|---|
| | *Exhibit 63*: DCP Press Release, November 15, 2011, containing "Mayor Michael Bloomberg's Remarks at Zoning the City Conference, as Delivered by Deputy Mayor Robert K. Steel | 1732 |
| | *Exhibit 64*: DCP's Portion of the Mayor's Management Report, dated September 2012 | 1736 |
| | *Exhibit 65*: Excerpts from NYC's Risk Landscape: A Guide to Hazard Mitigation, Coastal Erosion Chapter 4.2, developed by the NYC Emergency Management in Partnership with the DCP and Close Collaboration with the NYC Mayor's Office of Recovery and Resiliency | 1741 |
| | **VOLUME 16**<br>**(pp. 1756--1852)** | |
| | *Exhibit 66*: Excerpts from the NYC Building Department's "Place of Assembly" guide | 1756 |
| | *Exhibit 67*: Excerpts from the NYC Fire Department's "Theater Inspections, Maintenance and Recordkeeping" Rules | 1759 |
| | *Exhibit 68*: MTA Staten Island Railway ("SIR") System Map | 1765 |
| | *Exhibit 69*: MTA Notice regarding Bridges and Tunnels Tolls | 1767 |
| | *Exhibit 70*: Zoning and the Comprehensive Plan, James A. Coon Local Government Technical Series, Revised 2015 | 1772 |
| | *Exhibit 71*: NYS Public Health Law § 3000-d | 1791 |
| | *Exhibit 72*: Charles V. Bagli, "Going Out With a Building Boom, Mayor Pushes Billions in Projects", N.Y. Times, Dec. 15, 2013 | 1795 |

| | | |
|---|---|---|
| | *Exhibit 73*: Ford Fessenden, "The Bloomberg Years: Reshaping New York", N.Y. Times, Aug. 18, 2013 (interactive feature) | **1801** |
| | *Exhibit 74*: "Mayor Bloomberg's NYC Mayoralty Comes To An End", dailyfreeman.com, Dec. 31, 2013 | **1803** |
| | *Exhibit 75*: James Dao, "The 1993 Elections: Staten Island; Secession is Approved; Next Move is Albany's", N.Y. Times, Nov. 3, 1993 | **1806** |
| | *Exhibit 76*: Maps (Reduced Size Versions) Generated by the DCP of Manhattan, Brooklyn, Bronx, Queens, and Staten Island indicating "Areas Where Adult Uses Would Continue to be Allowed Under the Proposal and Encumbered Property Within those Areas" filed in State Judicial Proceedings in Connection with the 1995 Resolution: <u>Amsterdam Video, Inc. v. City of New York</u>, Supreme Court, New York County, Index No. 103568/96, and <u>Hickerson v. City of New York</u>, Supreme Court, New York County, Supreme Court, New York County, Index No. 103569/96 | **1810** |
| | *Exhibit 77*: Excerpts from September 3, 1996 deposition testimony of Marilyn Mammano, Director of Zoning & Urban Design of the NYC Department of City Planning, in <u>Hickerson v. The City of New York</u>, New York County Index No. 103569/96 | **1816** |
| | *Exhibit 78*: Maps generated by the DCP depicting the reduction in permissible areas for adult businesses based on Zoning Changes between 1995 and 2001, filed in <u>For the People Theatres</u> on October 17, 2002, as Exhibit S to the Affidavit of David Karnovsky | **1838** |

| | **VOLUME 17**<br>**(pp. 1854--1881)** | |
|---|---|---|
| | ***Exhibit 79***: Excerpts from Affidavit of David Karnovsky filed in <u>For The People Theatres of N.Y., Inc., et al. v. The City of New York, et al.,</u> New York County Supreme Court Index No. 121080/02 | **1854** |
| | ***Exhibit 80***:  Excerpts from the DCP's Adult Entertainment Study, November 1994 | **1864** |
| | ***Exhibit 81***: 8/2/17 Stipulation and Agreement between Bookstore Plaintiffs and The City of New York | **1875** |

Dated:      New York, New York
            November 21, 2018

*Respectfully,*

**DANIEL A. SILVER**
**SILVER & SILVER**
One Liberty Square
New Britain, Connecticut 06050-0698
(860) 225-3518

- and -

**JENNIFER KINSLEY**
Kinsley Law Office
Post Office Box 19478
Cincinnati, Ohio 45219
(513) 708-2595

*Attorneys for Plaintiffs*
*725 Eatery Corp., etc., et ano.*

By:    s/Daniel A. Silver
          Daniel A. Silver

**EDWARD S. RUDOFSKY**
**ZANE and RUDOFSKY**
601 West 26th Street, # 1315
New York, New York  10001
(212) 245-2222

*Attorneys for Plaintiffs*
*59 Murray Enterprises, Inc., etc.*
*et al.*

By: ___s/Edward S. Rudofsky_____
        Edward S. Rudofsky

**JOHN H. WESTON**
**G. RANDALL GARROU**
**WESTON, GARROU & MOONEY**
12121 Wilshire Boulevard, Suite 525
Los Angeles, CA 90025-1176
(310) 442-0072

- and -

**ALAN M. ABRAMSON**
**ABRAMSON & MORAK**
35 Worth Street
New York, NY 10013
(212) 226-7098

*Attorneys for*
*Club At 60th Street, Inc., etc., et al.*

By: ___s/John Weston_____
        John Weston

**FAHRINGER & DUBNO**
767 Third Avenue, Suite 3600
New York, New York 10017
(212) 319-5351

*Attorneys for Plaintiff's*
*336 LLC, etc., et al.*

By: ___s/Erica T. Dubno_____
        Erica T. Dubno

20

# DECLARATION OF

# DR. ELLIOTT SCLAR

# IN SUPPORT OF

# PLAINTIFFS' MOTION FOR

# PRELIMINARY INJUNCTION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X

336 LLC, d/b/a "The Erotica", et al.,
                                  Plaintiffs,
              v.

THE CITY OF NEW YORK, et al.,
                                  Defendants.

--------------------------------------------------X

DECLARATION OF
DR. ELLIOTT D. SCLAR

Docket No.
1:18-cv-3732-WHP

I, ELLIOTT D. SCLAR, Ph.D., hereby declare pursuant to 28 U.S.C. § 1746:

1. I am Emeritus Professor of Urban Planning at Columbia University where I direct the Center for Sustainable Urban Development at the University's Earth Institute. I have been a member of the Columbia University faculty since 1978.

2. I submit this declaration in support of the Plaintiffs' motion for a preliminary injunction against enforcement of Text Amendment N 010508 ZRY of the Zoning Resolution of the City of New York (the "2001 Resolution"), which amends the zoning law relating to adult uses.

3. This declaration is based upon personal knowledge, research, analysis, and my review of documents pertinent to this proceeding. A copy of my curriculum vitae is attached as Exhibit 1.

4. I am one of the leading experts on zoning in New York City and the City's Zoning Resolution. The New York Court of Appeals and other courts have recognized me as an expert witness regarding the 2001 Resolution. <u>See For the People Theatres of N.Y., Inc. v. City of New York</u>, 6 N.Y.3d 63, 82, 810 N.Y.S.2d 381, 392 (2005).

5. I have authored several articles and book chapters on issues directly relating to urban planning in New York City. I wrote the article on "Midtown" in the <u>Encyclopedia of New York City</u>, Kenneth Jackson (ed.) New Haven: Yale University Press, 1995. I also co-authored, with Tony Schuman, "The Ideology of American Town Planning: From the Garden City to Battery Park City" in <u>Planning the Twentieth-Century American City</u>, Mary Corbin Sies and Christopher Silver (eds.) Baltimore: The Johns Hopkins Press, 1996. That chapter was based on a paper written for the Society for American City and Regional Planning History. The paper won the prize for the Best Paper in the Proceedings of the Fifth National Conference on American Planning History.

6. In 2000, I accepted the National Academy of Public Administration's <u>Louis Brownlow Award</u>. It is the highest annual award for excellence in the field of literature of public administration. I have received other academic awards including the <u>Charles H. Levine Book Prize</u>, in 2001,

1470

from the International Political Science Association for the best book in the fields of public policy and administration.

7. I am the senior co-author of a new zoning textbook to be published in late 2019 by the academic publisher, Routledge. Significant materials will come from New York City's zoning experience. The working title is <u>Zoning for the 21st Century Planning</u>.

8. Mayor David Dinkins appointed me to the New York City Economists Roundtable, Economic Policy Advisory Panel. From November 1992 to December 1993, I served on this panel, which was New York City's "council of economic advisors."

9. I have been recognized as an expert witness in state court and federal government proceedings. For example, I testified before the U.S. Senate Committee on Banking, Housing, and Urban Affair's Subcommittee on Housing, Transportation, and Community Development. I provided expert testimony on techniques for measuring indirect displacement impacts of large-scale urban development projects (September 1989).

1471

10. I am thoroughly familiar with the use of zoning to influence land use outcomes in New York City and elsewhere. Over more than 30 years I worked as a planning consultant to Community Boards and civic groups in New York City. I worked closely with the Department of City Planning ("DCP") in the early 1980s, when contextual zoning was pioneered for Manhattan Community Board #7.

11. From November 1985 to September 1995, I worked as a planning consultant for Manhattan Community Board #4, preparing development and zoning plans for the Chelsea and Clinton communities. I was the planning consultant to Community Board #4, which includes portions of the Times Square area, when it filed the City's first plan under Section 197-a of the New York City Charter.

12.  From September 1988 to June 1992, I provided technical assistance to Manhattan Community Board #2 in conjunction with development of a waterfront zoning plan for the western portion of Greenwich Village.

13.  From January 1991 to January 1993, I prepared a land use study for Manhattan Community Board #9 as the first step in developing a community land use and housing plan for West Harlem.

4

14.  I have degrees as a Bachelor of Arts (B.A.), Master of Arts (M.A.) and Doctor of Philosophy (Ph.D.) in economics. I am familiar with and have studied the workings of the real estate market in New York City and elsewhere. I have prepared econometric models of real estate value changes and completed a book length manuscript on the history of the Upper West Side of Manhattan, in which real estate market change and zoning are important subjects.

### The History of Zoning in New York City Related to Adult Businesses

15.  Prior to 1994, the Zoning Resolution of the City of New York (the "Zoning Resolution") made no distinction between adult entertainment uses and other commercial uses that did not have an adult character. While the City regulated several general classes of commercial establishments under the Zoning Resolution, adopted December 15, 1961, adult-oriented businesses had never been differentiated from other commercial uses.

16. On November 23, 1994, the New York City Council adopted application N 950113 ZRY, submitted by the DCP, for a text amendment to the Zoning Resolution to define the term "adult establishment" as a land use. The adopted application imposed a one-year moratorium prohibiting the establishment of new adult businesses, barred the extension or enlargement of

1473

existing adult businesses, and prohibited the change of any use to an adult enterprise in all areas of New York City.

17. In 1993 and 1994, the Department of City Planning undertook an "Adult Entertainment Study" to investigate, among other things, adult entertainment businesses in the City. Excerpts of relevant pages from the DCP Study from November 1994 (the "DCP Study") are reproduced in the Plaintiffs' Joint Appendix ("PJA"). (PJA.1864-1874).

18. At or about this time, the Office of the Mayor, through the Department of City Planning, prepared a proposed text amendment to the Zoning Resolution, which subjected currently existing adult uses to stringent regulations. Among other things, it required an adult establishment to be located 500 feet from a church or school; prevented adult uses from relocating within 500 feet of another adult establishment; and eliminated any "grandfather" rights for existing adult establishments.

19. On October 19, 1994, the New York City Council Land Use Committee drafted proposed regulations for adult uses which (a) allowed for the continued operation of existing adult establishments; (b) did not require an adult establishment to be located 500 feet from a church or school; and (c) did not require one adult establishment to be located 500 feet from another

1474

adult establishment. On or about March 21, 1995, the Land Use Committee withdrew its proposed text amendment and joined the DCP's proposed application.

## The 1995 Resolution

20. On September 18, 1995, the City Planning Commission ("CPC") approved a modified version of the text amendment by a narrow margin (7 to 6). On October 25, 1995, the City Council adopted the amendment (the "1995 Resolution").

21. The report issued by the CPC on September 18, 1995 ("1995 CPC Report") became an important part of the legislative history underlying the 1995 Resolution.

22. The 1995 Resolution defined "adult establishments" as a new category of land use and then subjected that land use to restrictive zoning provisions. An "adult establishment" was defined as a commercial business a "substantial portion" of which includes: An adult bookstore (including videostores); an adult eating or drinking establishment; an adult theater; or other adult commercial establishment (Z.R. § 12-10) (PJA.0351).

23. An adult establishment was further defined as a business where "a substantial portion" of its "stock-in-trade" is characterized by an emphasis on "specified sexual activities" or "specified anatomical areas," or a business which "regularly features" films or live performances that depict an emphasis on "specified sexual activities" or "specified anatomical areas" (Z.R. § 12-10) (PJA.0351-0352).

24. The definitions of "adult eating or drinking establishments," "adult theaters," and "other adult commercial establishments" included a provision that the establishment "is not customarily open to the general public during such features because it excludes minors by reason of age" (Z.R. § 12-10) (PJA.0351-0352). There was no age exclusion requirement in the definition of "adult book (and video) stores."

25. The 1995 Resolution relegated adult establishments to certain specific zones within the City. It barred the continued operation of an existing adult establishment within C1, C2, C3, C4, C5, C6-1, C6-2 or C6-3 Districts. (Z.R. § 32-01[a]) (PJA.0354). These are the primary commercial districts which are most suitable for retail stores in local and convenient areas.

1476

26. Prior to the adoption of the 1995 Resolution, bookstores with private viewing booths had been allowed in each of these commercial districts where other forms of retail establishments, including bars and taverns, have been permitted to operate -- and where the latter are still permitted to operate.

27. Under the 1995 Resolution, adult establishments were consigned to C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, C8, and Manufacturing Districts ("Permissible Districts"). These districts are, for the most part, distinct from the major and secondary shopping centers and retail areas, and include heavy manufacturing districts.

28. The 1995 Resolution also imposed the following limitations on adult establishments within the remaining available districts:

> (a) Adult establishments must be located at least 500 feet from a church, school, residential district, or certain commercial and manufacturing districts (Z.R. §§ 32-01(b), 42-01(b));
>
> (b) adult establishments must be located at least 500 feet from another adult establishment (Z.R. §§ 32-01(c), 42-01(c));
>
> (c) only one adult establishment can be located on a zoning lot (Z.R. §§ 32-01(d), 42-01(d)); and
>
> (d) adult establishments may not exceed 10,000 square feet of floor area and cellar space (Z.R. §§ 32-01(e), 42-01(e)). (PJA.0354-0357).

29. In connection with enactment of the 1995 Resolution, the DCP's Computer Information Services Division generated maps of the limited permissible areas where adult establishments could endeavor to locate. Copies of the City's maps are attached as Exhibit 2 (PJA.1539-1544).

30. On September 3, 1996, Marilyn Mammano, then the Director of Zoning and Urban Design for the DCP, gave a deposition in Rachel Hickerson v. City of New York, Index No. 103569/96 (Sup. Ct. N.Y. Co.), an action brought by the New York Civil Liberties Union on behalf of customers. There, Ms. Mammano explained the process by which the City's maps and determinations were made. Excerpts of pages from the Mammano deposition are reproduced at PJA.1816-1837.

31. Those maps indicate, in pink/magenta, areas zoned C6-4, C6-5, C6-6, C6-7, C6-8 and C6-9 where adult uses could locate. Areas indicated in light purple depict Permissible Areas in zones M1, C7 or C8. The darker purple sections depict areas zoned M2 or M3 where adult uses (other than bookstores) could endeavor to locate.

1478

32. Areas on the City's maps marked in yellow are within the proper zones but are considered encumbered -- and, thus, unavailable for adult uses -- because, inter alia, they include airports, utilities, fuel tank farms, transportation rights-of-way, large municipal facilities, certain large parcels of publicly-owned land, and areas characterized by wetlands.

33. Areas marked in brown depict proposed rezonings that would preclude adult uses.

34. The City's computer-generated maps excluded, from the permissible areas, churches, schools, and 500-foot buffer zones from those uses. The measurements made from "sensitive receptors," i.e., churches and schools, were done from the lot line -- not from the actual location of the church or school (Mammano Depo. at 114) (PJA.1833). The City's maps did not include existing adult establishments or the 500-foot buffer zone around them (Mammano Depo. at 151-152) (PJA.1835-1836).

35. The City's maps include a disclaimer that "Distances Depicted are Approximations" (PJA.1539-1544).

1479

36. The City estimated that 148 of the 177 existing adult businesses would have to close, move, or modify the nature of their business to come into compliance with the law with the 1995 Resolution (Karnovsky Aff. at 41) (PJA.1860).

37. The City estimated that approximately four percent of its total land area was available for adult uses (PJA.1446). The City also estimated that there were approximately 500 potential sites for adult establishments to relocate their businesses (PJA.1446).

38. In estimating 500 potential sites, the City took its computer-generated maps and "simply placed potentially at 500-foot intervals marks which indicated potential sites for adult establishments within the zones that they would be permitted" (Mammano Depo. at 47) (PJA.1828). In other words, the City estimated the number of potential locations for constitutionally protected bookstores, theaters, and clubs, by drawing little circles that would fit within the purple and pink areas of their maps.

39. There is no indication as to where these specific sites are located; there is nothing to disclose the physical condition of the locations; and nowhere is it revealed whether a site possesses any infrastructure, such as sidewalks, lighting or a sewage system. Indeed, the City "did not take into

1480

account whether there was development on any of the estimated sites" (Mammano Depo. at 37) (PJA.1824).

### The 2001 Resolution

40. In 2001, the City again sought to amend the Zoning Resolution relating to businesses offering adult information. This time, the City took aim at establishments that complied with the 60/40 Provision, which provides that any commercial establishment that has less than 40 percent of adult stock-in-trade, or allocates less than 40 percent of its accessible floor area to an adult use, would comply with the 1995 Resolution.

41. On October 31, 2001, the City enacted Text Amendment N 010508 ZRY to the Zoning Resolution (the "2001 Resolution") (PJA.0757-0774).

42. The "substantial portion" language of the 1995 Resolution was removed from the definition of "adult establishment" so that the 60/40 Provision no longer applies to theaters, eating or drinking establishments, or any use other than a "bookstore."

43. Z.R. § 12-10 still requires a bookstore to devote less than a substantial portion (40 percent) of its stock and accessible floor area to adult material  (PJA.0762). However, the 2001 Resolution includes nine other features that building inspectors can consider in determining whether a business that complies with the 60/40 floor space and stock requirements is an impermissible adult establishment because its non-adult material is a "sham." Under the 2001 Resolution, a bookstore's non-adult "printed or visual material" (non-adult stock) "shall not be considered stock-in-trade" for purposes of a "substantial portion" (60/40) analysis where the store has "one or more of the following features":

    a. An interior configuration and lay-out which requires customers to pass through an area of the store with "adult printed or visual material" in order to access an area of the store with "other printed or visual material" (Z.R. § 12-10[2][d][aa]);

    b. one or more individual enclosures where adult movies or live performances are available for viewing by customers (Z.R. § 12-10[2][d][bb]);

    c. a method of operation which requires customer transactions with respect to "other printed or visual material" to be made in an area of the store which includes "adult printed or visual material" (Z.R. § 12-10[2][d][cc]);

    d. a method of operation under which "other printed or visual material" is offered for sale only and "adult printed or visual material" is offered for sale or rental; (Z.R. § 12-10[2][d] [dd]);

1482

e.  a greater number of different titles of "adult printed or visual material" than the number of different titles of "other printed or visual material" (Z.R. § 12-10[2][d][ee]);

f.  a method of operation which excludes or restricts minors from the store as a whole or from any section of the store with "other printed or visual material" (Z.R. § 12-10[2][d][ff]);

g.  a sign that advertises the availability of "adult printed or visual material" which is disproportionate in size relative to a sign that advertises the availability of "other printed or visual material", when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials (Z.R. § 12-10[2][d][gg]);

h.  a window display in which the number of products or area of display of "adult printed or visual material" is disproportionate in size relative to the number of products or area of display of "other printed or visual material", when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials (Z.R. § 12-10[2][d][hh]); or

i.  other features relating to configuration and layout or method of operation, as set forth in rules adopted by the Commissioner of Buildings, which the Commissioner has determined render the sale or rental of "adult printed or visual material" a substantial purpose of the business conducted in such store (Z.R. § 12-10[2][d][ii]). (PJA.0763-0765).

44. The 2001 CPC Report, which formed part of the legislative history for the 2001 Resolution, is reproduced at PJA.0708-0834. According to the 2001 CPC Report, in 2000 there were 136 establishments that the City identified as "adult establishments" (2001 CPC Report at 6) (PJA.0714). That list includes 35 bookstores, with 29 operating as 60/40 establishments. The City also identified 44 theaters, with 36 operating as 60/40 establishments. And, the City identified 57 eating and drinking businesses, with 36 operating as 60/40 establishments (2001 CPC Report at 6) (PJA.0714).

45. Upon information and belief, in enacting the 2001 Resolution, the City did not conduct any new studies of existing businesses. It also never generated any new maps showing the new permissible areas for adult establishments.

**The City Changed its Zoning Between 1995 and 2001, Which Further Reduced the Permissible Space for Adult Businesses**

46. Between 1995 and 2001, when the City enacted the 2001 Resolution, there were 13 zoning changes, which rezoned certain areas where adult uses had been permitted. Maps generated by the DCP, which depict zoning changes between 1995 and 2001 affecting permissible areas for adult establishments, are attached as Exhibit 3 (PJA.1545-1560).

47. According to the City, these map changes "reduced the amount of unencumbered land area available to adult establishments by about 200 acres" (Karnovsky Aff., ¶ 87) (PJA.1860). The City acknowledged that "since 1995, changes in the number and location of 'sensitive receptors' [churches and schools] have further reduced the land area available to adult establishments by another 65 acres, again reducing the number of potential development sites." Id. The City stated that "the estimated number of potential sites for adult businesses in New York City decreased by 9% between 1995 and 2000." Id. at ¶ 88 (PJA.1861).

1485

**Nearly 40% of the City was Rezoned Between 2001 and 2012, Which Significantly Reduced the Amount of Permissible Areas for Adult Establishments**

48. One of the hallmarks of Mayor Michael Bloomberg's administration was to "remake the city's landscape for the 21st century, pushing for higher-density development and higher-quality design and opening up the city's vast waterfront to new residential, recreational and commercial uses." Charles V. Bagli, "Going Out With a Building Boom, Mayor Pushes Billions in Projects", N.Y. Times, Dec. 15, 2013, reproduced at PJA.1795.

49. Indeed, nearly 40 percent of the City was rezoned during the Bloomberg administration (2002 to 2013). Attached collectively as Exhibit 4 are reports issued by the DCP and information in the press confirming the effectiveness of the Bloomberg administration in radically rezoning the City (PJA.1561-1574).

1486

50. Much of that rezoning was in manufacturing areas, which include many of the limited permissible areas for adult uses. Attached as Exhibit 5 is a report issued by the DCP, which details the reduction of manufacturing districts between 2002 and January 2012 (PJA.1575).

51. According to the Department of City Planning,

> [b]etween 2002 and January 2012, the City Planning Commission and City Council approved rezonings of manufacturing districts to reflect local characteristics better and to guide new investment.
>
> The modifications to manufacturing districts are diverse, in cases permitting new residential neighborhoods to grow in post-industrial areas.... These modifications are also widely dispersed, encompassing every borough.[1] (PJA.1301).

52. According to the DCP, from 2002 to January 2012, Manufacturing districts decreased from 21,653 acres to 20,450 acres, a reduction of 1,152 acres (approximately 5.2% reduction) across the City (PJA.1301-1302).

---

[1] See http://www1.nyc.gov/site/planning/zoning/districts-tools/mfg-districts-2002-2012.page.

53. In Manhattan, "[a]pproximately 26% of lot area zoned for manufacturing, or 265 acres, were mapped into another district" (PJA.1301).

54. In Brooklyn, 149 acres were rezoned from Manufacturing Districts to Residence Districts. Similarly, in Queens, 109 acres were rezoned from Manufacturing Districts to Residence Districts. The Bronx lost 49 acres of Manufacturing Districts to Residence Districts through rezoning. 41 acres of Manufacturing Districts were rezoned to Residence Districts in Staten Island. And, in Manhattan 31 acres were rezoned to residential from Manufacturing Districts (PJA.1302).

55. The City has not released updated statistics on the amount of Manufacturing acreage lost to rezoning 2001 to the present. However, in view of the amount of extensive rezonings that have occurred over the last 17 years, that acreage amount is substantial.

1488

56. Between January 2002 and September 2018, there were 509 adopted rezonings across New York City. Attached, as Exhibit 6, is a map generated from data files created by the City's Department of City Planning[2] depicting some of the many zoning changes in New York between 2002 and the present (PJA.1594).

57. Of the total adopted rezonings, 166, or one-third, involved a conversion of Manufacturing to another form of use. Working off the City's data[3], we generated Table 1, which is a list of adopted rezonings that impacted manufacturing use. Table 1 is attached as Exhibit 7 (PJA.1596).

58. Since the 2001 Resolution was enacted, the City substantially rezoned portions of (and/or created special zoning districts in) College Point, Queens; Hunters Point, Queens; Long Island City, Queens; Willets Point, Queens; Sunset Park, Queens; DUMBO, Brooklyn; Greenpoint, Brooklyn; Williamsburg, Brooklyn; Manhattan's West Side; and Hunts Point, The

---

[2] NYC Department of City Planning. 2018. "NYC GIS Zoning Features." https://www1.nyc.gov/site/planning/data-maps/open-data.page#zoning_related

[3] Id.

Bronx, among other areas. Upon information and belief, these rezonings all affect areas that were permissible for adult establishments.

59. Rezonings adopted between 2002 and 2018, which converted manufacturing areas to some other use, include Van Cortland Center, The Bronx; Pelham Pkwy/Indian Village, The Bronx; Wakefield/Eastchester, The Bronx; Lower Concourse, The Bronx; Lower Concourse North, The Bronx; Jerome Avenue, The Bronx; Park Slope, Brooklyn; Bridge Plaza (Brooklyn Navy Yard), Brooklyn; Downtown Brooklyn, Brooklyn; Bay Ridge, Brooklyn (2005 and 2007); Dyker Heights/Ft. Hamilton, Brooklyn; Fort Greene/Clinton Hill, Brooklyn; Bedford-Stuyvesant South, Brooklyn; Columbia Hicks Project, Brooklyn; Dumbo, Brooklyn; Navy Green, Brooklyn; Broadway Triangle, Brooklyn; East New York, Brooklyn; East Harlem, Manhattan (2002 and 2017); Hudson Square, Manhattan; Hudson Yards, Manhattan; West Chelsea/High Line, Manhattan; Far West Village, Manhattan; Madison Park West, Manhattan; Tribeca North, Manhattan (2006 and 2010); Manhattanville, Manhattan; 125th Street Corridor, Manhattan; Hudson Square North, Manhattan; West Clinton, Manhattan; Inwood, Manhattan; Kew Gardens-Richmond Hill, Queens; East Flushing, Queens; Maspeth-Woodside, Queens; Silvercup West, Queens; The Jamaica Plan,

1490

Queens; Dutch Kills, Queens; Willets Point, Queens; Middle Village/Glendale/Maspeth, Queens; South Jamaica, Queens; Sunnyside-Woodside, Queens; Woodhaven/Richmond Hill, Queens; Ozone Park, Queens; Downtown Far Rockaway, Queens, and Southeast Mid-Island, Staten Island; New Stapleton Waterfront Development, Staten Island; Charleston Mixed-Use Development, Staten Island.

60. Adult establishments are not allowed in Residence Districts <u>or</u> within 500 feet of Residence Districts (Z.R. §§ 32-01(b), 42-01(b)). Thus, by rezoning Manufacturing Districts to Residence Districts the bookstores lose potentially permissible areas. The limited areas are further decreased by the large 500-foot buffer zone that surrounds Residence Districts. The same is true for C1, C2, C3, C4, C5-1, C6-1, C6-2 and C6-3 Districts. Each 500-foot buffer zone around a zoning district decreases the permissible areas by at least 18.03 acres (an area of 785,398 square feet).

61. Even within Manufacturing Districts, adult establishments are not permitted within "Mixed Use" Districts, which mix residential and non-residential uses (Z.R. § 42-01(a)). Since 2002, the City has rezoned at least 324 acres from Manufacturing Districts, where adult establishments might be permissible, to Mixed Use Districts, which bar adult uses. And, adult

1491

establishments are not permitted within a 500-foot radius of Mixed Use Districts (PJA.1302).

62. Since the 2001 Resolution was enacted, the City has also rezoned at least 213 acres from Manufacturing Districts to new parks, public open spaces, or preserved natural areas. Indeed, at least 113 acres on Staten Island that the city may have identified as permissible for adult establishments were rezoned to parkland[4] (PJA.1302). Adult establishments are prohibited in each of those areas, which are traditionally deemed to be "encumbered" by the City.

## The City is Continuing to Rezone Areas

63. As of September 2018, there are 29 certified rezonings that have yet to be adopted. Of those, six, or 21%, will involve a conversion of manufacturing to some other use. Based on shape-files generated by the City, and the City Planning Commission's Reports, we created a list of certified rezonings that impact manufacturing use. Table 2 is attached as Exhibit 8 (PJA.1603).

---

[4]     https://www1.nyc.gov/site/planning/zoning/districts-tools/mfg-districts-2002-2012.page

1492

64. A hallmark of Mayor Bill de Blasio's Housing New York Plan involves a mandate for inclusionary zoning to create affordable housing, called Mandatory Inclusionary Housing (MIH). Since its adoption by the City Council in 2016, there have been 66 adopted rezonings under MIH.

65. There is an additional major MIH rezoning currently undergoing City approval on Staten Island. Upon information and belief, some of these neighborhood rezonings either overlap with or border areas where adult establishments can currently locate.

66. There are five anticipated neighborhood rezonings under the MIH plan: Chinatown in Manhattan; Gowanus and Bushwick in Brooklyn; Long Island City in Queens; and Southern Boulevard in the Bronx.[5] A map of anticipated MIH rezonings is attached as Exhibit 9 (PJA.1605). These anticipated proposals may have the potential to impact areas that allow adult establishments.

67. In sum, all the 11 adopted, in-process, and/or anticipated neighborhood rezonings that have or will occur under MIH, have already or

---

[5] https://citylimits.org/series/zonein/ -- visited November 9, 2018.

may have the potential to impact the amount of land adult establishments can access.

68. Based on my extensive experience as an expert regarding the impact of zoning on real estate, and my experience for more than 10 years as a member of the Board of Directors of a bank that provided lending for commercial purpose, I believe the existence of proposed or anticipated zoning changes render the land within that area effectively unavailable for certain prospective businesses. Virtually no rational business person would invest, enter into long term leases, develop real estate, or take other costly steps to open a video store, with substantial and expensive booths, without any assurance that (1) the area is permissible for adult establishments and (2) the area will remain permissible with sufficient time to achieve a reasonable return on invested capital.

1494

69. Adult businesses are also not allowed to be located within 500 feet of each other. Therefore, the existence of one adult use makes ineligible, for relocation, any other site within an area of at least 18.03 acres, at a minimum.

**The 2001 Resolution Contains Other Locational Restrictions that Further Burden and Preclude Bookstores from Operating**

70. The 2001 Resolution provides that adult establishments shall be located at least 500 feet from certain Manufacturing Districts in which new residences, new joint living-work quarters for artists or new loft dwellings are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization. Z.R. §§ 32-01(b), 42-01(a). (PJA.0766-0770). This 500-foot buffer applies regardless of whether such a special permit or authorization requires an assessment of the impact of new residences, new joint living-work quarters for artists or new loft dwellings on commercial or manufacturing uses within the Manufacturing Districts. Z.R. §§ 32-01(b), 42-01(a).

1495

71. During the last 17 years, the City has created many new Mixed Use Districts ("MX") in Manufacturing Districts. As indicated by the DCP, "industrial areas, like SoHo and NoHo in Manhattan, have changed significantly as obsolete industrial buildings within M1-5A, M1-5B, M1-5M and M1-6M districts are converted to residential use by special permit."[6] (PJA.1873-1874).

72. Upon information and belief, in the 17 years that have elapsed since the 2001 Resolution was enacted, the City never studied or ascertained the effects and/or consequences of these restrictions on adult establishments even though the City was, during this time, creating additional mixed uses in Manufacturing Districts.

73. This may be, in part, because of the nature of the City's rezoning process. The City rezones, not on the basis of a systematic pre-existing written plan, but on the basis of a "well-considered plan" (PJA.1772).[7] A well-considered plan has come to mean only that the process through which the

———————————————————

[6] https://www1.nyc.gov/site/planning/zoning/districts-tools/mfg-districts.page

[7] New York Consolidated Laws, General City Law §20 (25) https://www.dos.ny.gov/lg/publications/Zoning and the Comprehensive Plan.pdf

rezoning took place is a documented and thoughtful consideration of the issues leading to the need for zoning change. In response to this, and the complexity of such a large and diverse place like New York, the City has increasingly relied on the device of special purpose districting to meet the challenges it faces.

74. Zoning on the basis of well-considered planning is inherently a reactive process, undertaken in response to ever-changing conditions, the interests considered are the ones that dominate at the moment of consideration. Other interests, regardless of merit, fade from view. Thus, the permissible areas for legal businesses that are devalued -- such as adult establishments -- disappear, as has been documented here.

75.  In light of the substantial rezonings that have occurred since 2001, and changes in sensitive receptors, the City must revisit and reconsider the locational restrictions for current adult businesses.

**"Zoning is Never Final; it is Renewed Constantly in Response to New Ideas -- and to New Challenges"**

76. New York City is a very different place in 2018 than it was when the City's maps were created 23 years ago. As recognized by the Department of City Planning, "[t]ime passes, land uses change, and zoning policy accommodates, anticipates and guides these changes. In a certain sense, zoning is never final; it is renewed constantly in response to new ideas -- and to new challenges." The DCP's report on city planning history (excerpted) is attached as Exhibit 10.[8]  (PJA.1607).

77. Most of the permissible areas identified by the City back in 1995, are along the City's coastlines (PJA.1540-1544). However, the actual physical profile of the City is changing due to coastal erosion and climate change. "Coastal erosion plays a significant role in New York City's retreating coastlines."[9] (PJA.1747).

_____

[8] https://www1.nyc.gov/site/planning/about/city-planning-history.page

[9] NYC's Risk Landscape: A Guide to Hazard Mitigation (November 2014) https://www1.nyc.gov/assets/em/downloads/pdf/hazard mitigation/nycs risk landscape a guide to hazard mitigation final.pdf

This guide "was developed by NYC Emergency Management in partnership with the NYC Department of City Planning and in close collaboration with the NYC Mayor's Office of Recovery and Resilience."

78. In the aftermath of Superstorm Sandy, which devastated parts of Staten Island and other coastal areas, and other increasingly powerful storms, there is added urgency for the City to generate new maps that show currently permissible areas for adult businesses. Those maps should consider changed information including, among other things, (1) new churches and schools; (2) zoning changes; (3) prospective zoning changes; and (4) coastal erosion.

### The 2001 Zoning Resolution Fails to Consider Whether Bookstores, as a Use, can Operate within the Limited Permissible Districts

79. The 2001 Resolution consigns adult bookstores mostly to limited remote areas of the City, without considering whether such areas could support or are suitable for the displaced uses. These districts are, for the most part, distinct from general commercial areas where small bookstores are located.

80. For instance, adult establishments are nominally allowed in C7 Districts. However, C7 Districts are only "designed to permit large open amusement parks", such as Coney Island in Brooklyn, and are "mapped in only a few areas." Z.R. § 31-17. (PJA.0396). Bookstores -- which usually operate within what is called Use Group 6 for retail -- are not even permitted to be located within C7 Districts.

31

1499

81. Adult establishments are also nominally allowed in C8 Districts. These Zoning Districts provide for automotive and other heavy commercial services that often require large amounts of land. According to the Zoning Resolution, "[s]ince these service establishments often involve objectionable influences, such as noise from heavy service operations and large volumes of truck traffic, they are incompatible with both residential and retail uses." Z.R. § 31-18. (PJA.0396).

### Bookstore -- Even those with Booths -- Are Not Permitted in M2 and M3 Manufacturing Districts

82. Under the 1995 and 2001 Resolutions, adult establishments may, subject to limitations and restrictions, generally operate in Manufacturing Districts (M1, M2, and M3). The maps generated by the City back in 1995 indicate, in dark purple, M2 and M3 permissible areas for adult uses (PJA.1539-1544). These comprise most of the permissible areas -- especially in the outer boroughs.

83. However, there are additional Use Group restrictions under the Zoning Resolution on bookstores, which prevent them from operating in heavy manufacturing areas (M2 and M3).

1500

84. Z.R. § 12-10 provides that a "use" is "(a) any purpose for which a #building or other structure# or an open tract of land may be designed, arranged, intended, maintained or occupied; or (b) any activity, occupation, business or operation carried on, or intended to be carried on, in a #building or other structure# or on an open tract of land" (PJA.0058).

85. The Zoning Resolution establishes Use Groups to identify types of uses based upon the similarity and compatibility of their functions. A copy of the City's explanation of Use Groups[10] is reproduced at PJA.1702. Uses with similar functional characteristics and/or nuisance impacts which are generally compatible with each other are divided into 18 Use Groups. Id. The notion behind Use Groups is that certain types of uses should be able to coexist harmoniously within the same areas or zoning districts.

86. Z.R. § 42-01 provides that adult establishments within Manufacturing Districts are still subject to the "applicable regulations for the #uses# listed in the permitted Use Group" (PJA.0389-0390).

_____

[10] https://www1.nyc.gov/site/planning/zoning/districts-tools/use-groups.page

87. The DCP Study provides, in relevant part, that under the City's Zoning Resolution,

> [b]ookstores are listed in Use Groups 6C and 12B. They are allowed as-of-right in most commercial districts and in M1 (Light Manufacturing) Districts. Bookstores are not allowed in C3 Districts, and in M2 (Medium Manufacturing) and M3 (Heavy Manufacturing) Districts. Video stores have been treated as bookstores for zoning purposes. DCP Study at 30 (PJA.1874).

88. The exclusion of bookstores from these Manufacturing Districts makes sense. Such retail uses, which offer expression to the public, are generally not compatible with the types of uses allowed in M3 Districts, which are "designated for areas with heavy industries that generate noise, traffic or pollutants. Typical uses include power plants, solid waste transfer facilities and recycling plants, and fuel supply depots."[11]  (PJA.1297).

89. During the State court challenge to the 2001 Resolution David Karnovsky, former Counsel to the DCP, conceded that "[b]ookstores are not permitted uses in M2 and M3 zoning districts. Z.R. § 42-13." Karnovsky Aff. ¶ 87 n.26.   (PJA.1861). Nevertheless, he urged that "under the 2001 amendments (and the 1995 regulations) a book/video store which includes one

---

[11] http://www1.nyc.gov/site/planning/zoning/districts-tools/m3.page

or more peep booths is classified as an adult theater. Z.R. § 12-10, definition of 'adult establishment,' ¶ 1(c)." Id. Mr. Karnovsky believed that "[s]ince theaters are a permitted use in M2 and M3 districts," bookstores with booths may "relocate to any of the zoning districts in which adult establishments are permitted, including M2 and M3 districts." Id.

90. However, the Zoning Resolution does not define bookstores with booths as theaters, which belong in a distinct type of Use Group. Instead, the definition of an "adult establishment" contained within Z.R. § 12-10, merely provides that an "adult theater", which is a term of art, shall include commercial establishments where adult films or performances are "viewed from one or more individual enclosures." Z.R. § 12-10, definition of "adult establishment," ¶ (1)(c). (PJA.0048).

91. The term "adult theater" relates to commercial establishments that regularly feature adult films or performances. It is distinct from actual movie theaters, or theaters with live performances, which are in Use Group 8.

92. The Zoning Resolution does not say that the presence of booths changes a bookstore (Use Group 6) into a theater (Use Group 8) for Use Group purposes. I believe that for purposes of determining Use Groups and zoning districts, a bookstore/videostore is a bookstore/videostore under its common interpretation.

93. Private viewing booths, by their very nature, are intended to enable a single patron to view something in private. In contrast, theaters traditionally require seats in tiers or other configuration to create a shared experience. The City's Building Department ("DOB") identifies theaters (as well as sports arenas and churches) in its listing of Places of Assembly where "large groups of people gather for any activity"[12] (PJA.1758).

94. The State's Public Health Law defines a "theater" as a "motion picture theater, concert hall, auditorium or other building used for, or designed for the primary purpose of, exhibiting movies, stage dramas, musical recitals, dance or other similar performances." NY Pub. Health § 3000-d. (PJA.1793).

---

[12]     https://www1.nyc.gov/assets/buildings/pdf/code     notes     place-of-assembly.pdf

1504

95. Theaters, unlike bookstores, are subjected to significant safety regulations. For instance, under State Public Health Law § 3000-d, theaters are defined as "public places" and must have cardiopulmonary resuscitation equipment. Id.

96. Theaters are also subjected to distinct fire safety inspections and Fire Code regulations. These include concerns regarding egress and announcements regarding fire exits, A "fire safety inspection shall be conducted in a performing arts or motion picture theater on any day on which the theater is to be used and occupied for a performance or other audience event."[13] (PJA.1762). Theater owners, unlike bookstores and other retail uses, must maintain a logbook documenting compliance with fire safety inspections (PJA.1763).

97. If a bookstore with booths is now to be considered a theater, it may be further limited in the types of buildings within permissible areas where it can operate. Most buildings have Certificates of Occupancy, which indicate the types of uses that are permissible within the building. As indicated, bookstores are, traditionally, within Use Group 6. Such uses are, typically,

─────────────────

[13] https://www1.nyc.gov/assets/fdny/downloads/pdf/about/fdny-rules.pdf

1505

operated within buildings that are designed for retail use. On the other hand, theaters, within Use Group 8, are traditionally located within buildings that are specifically designed to be theaters.

98. If forced to relocate, bookstores with booths may have profound difficulty -- especially in the outer boroughs -- finding suitable retail buildings within permissible areas where the building's Certificate of Occupancy allows for theaters.

99. The DCP Study, which formed part of the legislative history of the 1995 and 2001 Resolutions, considers theaters (which include movie houses and motion picture theaters) as a distinct class of commercial establishment from bookstores and video stores with booths. DCP Study at 29 (PJA.1873). In defining types of adult uses, the DCP Study classifies "[b]ookstores/peep shows/videostores" differently than "[a]dult movie and live theaters." DCP Study at 22 (PJA.1866).

100. Section 12-10 provides that an "accessory use"

> (a) is a #use# conducted on the same #zoning lot# as the principal #use# to which it is related (whether located within the same or an #accessory building or other structure#, or as an #accessory use# of land), except that, where specifically provided in the applicable district regulations or elsewhere in

1506

this Resolution, #accessory# docks, off-street parking or off-street loading need not be located on the same #zoning lot#; and (b) is a #use# which is clearly incidental to, and customarily found in connection with, such principal #use#; and (c) is either in the same ownership as such principal #use#, or is operated and maintained on the same #zoning lot# substantially for the benefit or convenience of the owners, occupants, employees, customers, or visitors of the principal #use#.

101. A consistent interpretation of the Zoning Resolution is that bookstores with booths continue to be bookstores with accessory booths (rather than theaters with accessory bookstores). The booths are accessory uses "for the benefit or convenience of the owners, occupants, employees, customers, or visitors of the principal use."

102. Viewing booths are accessory uses for videostores and bookstores. Record stores historically had booths or listening areas where customers could preview the records. Under the original 60/40 Provision, booths could not occupy more than 40 percent of the total floor space accessible to customers. And, in most 60/40 bookstores the booths now only occupy approximately 10 to 20 percent of the total floor space accessible to customers (PJA.1625).

1507

**Permissible Areas for Adult Establishments Should be Considered on a County by County Basis**

103. According to the Department of City Planning, there has been an overall reduction of 1,202 acres of M zone land between 2002 and 2012. But, the loss is not uniform across the five boroughs of New York City. The loss in Manhattan amounts to almost one-quarter of all M zone reductions.

104. Each borough (county) should be considered as an independent constituency in assessing whether or not the 2001 Resolution, as applied now, provides sufficient locations for adult businesses.

105. The State recognizes each borough of the City as a different county. The counties are distinct geographical and demographic units. Each county differs significantly from the others in terms of characteristics such as ethnicity, ancestry, economic background, race, national origin, residential patterns, occupational structure, household and marital patterns, cultural traditions and attributes, patterns of leisure use, and other elements of social structure. Each county has its own courthouses, police precincts, seat of government, and other services that are unique to the particular county.

1508

106. In 1993, Staten Island (Richmond County), acting as an independent entity, attempted to secede from New York City because of a sense of independence and a recognition of certain demographic and economic differences that alienate it from the other four boroughs. See "The James Dao, "1993 Elections: Staten Island; Secession is Approved; Next Move is Albany's", N.Y. Times, Nov. 3, 1993 (PJA.1806).

107. Each borough has its own president, who is authorized to review and comment on major land use decisions and propose sites for facilities within their respective boroughs, as well as engage in strategic planning for their respective boroughs. Each borough has its own board, "which shall consist of the borough president and the district council members from such borough, and the chairperson of each community board in the borough. The borough president shall be the chairperson of such board, which shall hold public hearings at stated intervals in the borough and report to the council, the mayor and the city planning commission on borough programs and proposed borough capital projects." NYC Charter § 85(a). The borough board prepares "comprehensive and special purpose plans for the physical growth, improvement and development of the borough." NYC Charter § 85(b)(5). (PJA.1700).

1509

108. Bookstores -- especially those in Manhattan -- should not be required to move to a different county to exhibit protected expression in booths. Manhattan is sui generis. There is no place like it in the world. It is also quite distinct from the other counties of New York City. The uniqueness of the various parts and neighborhoods of New York City contributes to what former Mayor David Dinkins termed the "gorgeous mosaic."

109. Virtually everywhere in Manhattan is readily accessible by public transportation. That is not the case for the outer boroughs -- especially Staten Island. Attached, as Exhibit 11, is the MTA's current Staten Island Railway map.[14] (PJA.1612). We took that map and superimposed the railway route onto the City's map of permissible areas in Staten Island from 1995. See Exhibit 12 (PJA.1614). It is immediately apparent that the limited permissible areas for bookstores (pink and light purple) are on the opposite side of the county from the railway, which is the primary transportation artery. And, the limited permissible areas at the southern tip of Staten Island are more than a 40-minute railway ride from the Staten Island Ferry Terminal. See Exhibit 11.

---

[14] http://web.mta.info/nyct/maps/simap.htm

110. The DCP recognizes that "Community-based planning is essential to the city's vitality."[15] (PJA.1716). Community-based planning studies "vary to respond to the distinct needs of individual communities." (PJA.1716). The City is "divided into 59 community districts, each represented by a community board." Id.

111. Section 197-a of the New York City Charter authorizes any Borough President, among others, to "sponsor plans for the development, growth, and improvement of the city, its boroughs and communities." Id. (PJA.1717). The City has increasingly moved to special purpose districts because it recognizes that businesses and individuals within a specific community have special needs.

112. There are currently 76 distinct special purpose districts across New York City. Special purpose districts are generally used to create "vibrant" mixed-use commercial districts.[16] (PJA.1725). They promote a more localized, fine grained approach to zoning.

---

[15]      https://www1.nyc.gov/site/planning/community/community-based-planning.page

[16] https://www1.nyc.gov/site/planning/zoning/districts-tools/special-purpose-districts-citywide.page

1511

113. According to the DCP: "The City Planning Commission has been designating special zoning districts since 1969 to achieve specific planning and urban design objectives in defined areas with unique characteristics. Special districts respond to specific conditions; each special district designated by the Commission stipulates zoning requirements and/or zoning incentives tailored to distinctive qualities that may not lend themselves to generalized zoning and standard development."[17] (PJA.1731).

114.  The first special purpose district was adopted in 1969. In the 31 years from 1969 until 2000, 30 of these districts were adopted, about one per year. In the 18 years from the turn of the century (2000) to the present, the remaining 46 -- or about 2.5 per year -- were put in place. This is a sharp uptick in this specialized, borough- and community-specific form of zoning since 2001.The acceleration in the number of special purpose districts since 2001 is not surprising. The notion that a singular zoning ordinance could cover all the needs and purposes of a large, diverse and hence, complex, city like New York is simply not workable.

---

[17] https://www1.nyc.gov/site/planning/zoning/districts-tools/special-purpose-districts.page

115. Without detailed maps prepared by the City showing the current permissible areas for adult businesses, there is no accurate way for displaced bookstores to know where they can locate.

116. Because adult bookstores offer information to the public that is protected by the First Amendment, concern arises as to whether the ordinance the City seeks to enforce will impose a significant burden on people who wish to access this information. I believe there is no definitive way to answer these questions at this time without updated information from the City. However, at this point I believe adult expression in New York City from bookstores, especially those with booths, will be devasted.

117. Concerns regarding how speech will fare exacerbated by the additional burdens the 2001 Resolution imposes on bookstores. These include limitations on the number and variety of adult titles a bookstore may have (PJA.0050).

118. The 2001 Resolution also allows building inspectors to regulate speech based upon "other features relating to configuration and layout or method of operation, as set forth in rules adopted by the Commissioner of Buildings, which the Commissioner has determined render the sale or rental

1513

of 'adult printed or visual material' a substantial purpose of the business conducted in such store (Z.R. § 12-10[2][d][ii]). (PJA.0050).

119. Granting unbridled discretion to the Building Commissioner to determine the "substantial purpose" of a bookstore could inevitably lead to the closure of the few 60/40 bookstores (without booths) that will be able to comply with the new rules to remain in their current location.

120. For all the foregoing reasons, I urge the Court to grant the relief sought by the Plaintiffs.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 13, 2018

_____

Elliott D. Sclar, Ph.D.

# SCLAR DECLARATION

# EXHIBIT 1

# ELLIOTT D. SCLAR

*Home:*

76 Stuyvesant Avenue
Larchmont, NY 10538

Tel:  (914) 834-7355

*Office:*
Earth Institute, Columbia University
Interchurch Center
Suite 520
475 Riverside Drive
New York, New York 10115

Tel: (212) 854-3548
Fax: (212) 854-3748
E Mail: eds2@columbia.edu

**Professor Emeritus of Urban Planning Columbia University**
Faculty of the Graduate School of Architecture, Planning, and Preservation
Faculty of The Earth Institute at Columbia University
Since July, 2016

**Founding Director, Center for Sustainable Urban Development, The Earth Institute at Columbia University** Since 2005

## Previous Academic and Research Positions

***At Columbia University, New York, NY.***

Professor of Urban Planning, Faculty of the Graduate School of Architecture, Planning, and Preservation 1984 to 2016

Professor of Urban Planning, Faculty of the Earth Institute 2006 to 2016

Professor of International Affairs, School of International and Public Affairs, Columbia University July 2001 to June 2008

Associate Professor of Urban Planning, Division of Urban Planning, Graduate School of Architecture, Planning, and Preservation, Columbia University. September 1978 to January 1984.

Director of Graduate Planning Programs, Graduate School of Architecture, Planning and Preservation, Columbia University, 1998-2007

 Director of Urban Policy Concentration, School of International and Public Affairs 2002-2008

***At Brandeis University, Waltham, MA.***

Senior Research Associate, Levinson Policy Institute, Florence Heller Graduate School for Advanced Studies in Social Welfare. September 1971 to August 1978.

Assistant Professor of Urban Economics, The Florence Heller Graduate School for Advanced Studies in Social Welfare. September 1972 to August 1978.

*At the Veterans Administration Outpatient Clinic, Boston, MA.*

Chief, Economic Research and Health Planning, Geriatric Research, Education and Clinical Center. March 1975 to June 1978.

*At Lynn Economic Opportunity, Lynn, MA*

Community Economic Development Economist. August, 1970 to August, 1974.

*At the Center for Community Economic Development, Cambridge, MA.*

Research Economist. September 1969 to July 1970.

*At Salem State College, Salem, MA.*

Assistant Professor of Economics. September 1967 to August 1969.

Instructor, Economics.  September 1965 to August 1967.

# Corporate Board Positions

Trillium Asset Management, Boston Massachusetts, Founding Board Chairman (1982 to 1991), Board Member 1982 to 2010. Trillium was the pioneer asset management firm dealing exclusively in socially responsible portfolio investing.

Wainwright Bank and Trust Company, Boston Massachusetts, (1998 to 2010) Member Board of Directors, Member Executive Committee & Audit Committee. Wainwright was the leading Massachusetts Bank in community lending. Wainwright Bank was sold in 2010 to Eastern Bank.

# Selected Recent External Appointments

Advisory Board Member, Centro de Desarrollo Urbano Sustenable (CEDEUS) A Chilean research institute devoted to research in sustainable urban development in Chile. CEDEUS is organized as a joint research effort of the Pontifical Catholic University of Chile (Santiago) and the University of Concepcion, funded by the Chilean National Government. Board member since January 2013. (CEDEUS is CSUD's counterpart center.)

Fulbright Specialist to New University, Lisbon Portugal Lectured on Urban Poverty and Urban Development, Conducted a master class for Ph.D. students in research design and approaches to research methodology. May 2011

Member of the Advisory Board of the Global Research Network on Human Settlements (HS-NET), UN-HABITAT, May 2007-September 2010

Member of the World Economic Forum's Global Agenda Council on Urban Management June 2008-September 2010

Co-Coordinator UN Millennium Project, Task Force on Improving the Lives of Slum Dwellers. January 2002 – September 2005

## Education

| | | |
|---|---|---|
| Hofstra University, Hempstead, New York | B.A. | 1963-Economics |
| Tufts University, Medford, Massachusetts | M.A. | 1966-Economics |
| Tufts University, Medford, Massachusetts | Ph.D. | 1972-Economics |

## Professional Awards

*Visionary for Thriving Communities,* awarded by Lynn Economic Opportunity, of Lynn Massachusetts; Honoree award given at the organization's 50th Anniversary celebration on **October 15, 2015** in Nahant, Massachusetts. Award granted for lifelong outstanding work in community economic development planning.

Winner (in opposition): *The Economist* On-line debate: "Is it time for governments to launch a new wave of privatizations?" **February 2014**

**First Runner Up**: Competition for a plan for Nairobi Metro 2030: A World Class African Metropolis **Our Entry Title**: *Nairobi Metropolitan Region: Networking the Sustainable African Metropolis* **Partners** Center for Urban and Regional Planning and Associates, Kenya; Department of Urban and Regional Planning, University of Nairobi, Kenya; *Center for Sustainable Urban Development, Earth Institute, Columbia University*, United States of America; Department of Architecture, Urbanism and Planning, University of Leuven, Belgium; OMGEVING, Belgium; EURO IMMO STAR, Belgium; Latitude, Platform for Urban Research and Design, Belgium and Italy **April 2010**

*Humanitarian Award* from the International Society for Urban Health. Given at the sixth annual conference in Baltimore, MD, on **November 2, 2007**. The humanitarian award honors "individuals who have made an outstanding contribution to improving the health of urban populations."

*The Charles H. Levine Book Prize* from the International Political Science Association for the best book in the fields of public policy and administration published in the previous year that makes a contribution of considerable theoretical and or practical significance to the fields of public policy and administration, takes an explicitly comparative perspective or produces findings whose implications for comparative research are highly significant and appears in an accessible writing style and form so that both scholars and practitioners might find it valuable to their research and work. **Prize awarded August 2001**. (*You Don't Always Get What You Pay For: The Economics of Privatization*, Cornell Univ. Press, 2000)

*The Louis Brownlow Book Award* from the National Academy of Public Administration "for outstanding contributions to the literature of public administration," It is the highest annual Award issued for excellence in this field. **Prize awarded November 2000**. (*You Don't Always Get What You Pay For: The Economics of Privatization*, Cornell Univ. Press, 2000)

*Theodora Kimball Hubbard Prize* from the Society for American City and Regional Planning History for the Best Paper in the Proceedings of the Fifth National Conference on American Planning History "The Enterprise of American City Building: The Exceptional Case of Columbia, Maryland," written with Tony Schuman. **Prize awarded October 1995**.

American Institute of Certified Planners Award for Best Student Project for spring, 1986 Studio "Chelsea Today, Chelsea Tomorrow". (Studio Director) Presented at the Annual Meeting of the American Planning Association, New York, **April 1987**.

# Major Lectures (since 2002)

*Robert Bailey Annual Memorial Lecture,* Department of Public Policy and Administration, Rutgers the State University of New Jersey - Camden Lecture Title: "Privatization and the Limits of Public Private Partnerships," delivered April 5, 2018

*Panel Discussion,* Columbia University Global Center, Santiago Chile, "Promoting Equality through Sustainable Urban Public Transportation," June 27, 2017 Hotel Crowne Plaza Santiago, Chile

*Keynote Lecture*, Ninth Annual Donald Krueckeberg Doctoral Conference in Urban Studies, Urban Planning, and Public Policy, the E.J. Bloustein School of Planning and Public Policy, Rutgers, the State University of New Jersey. Lecture Title: "Does big data answer big questions? The enduring importance of institutional analysis for planning scholarship," delivered March 9, 2017

*Keynote Lecture,* Center for Global Advancement and International Affairs Rutgers, the State University of New Jersey Biennial Conference on Global Urbanism. Lecture Title: "What Not to Do: Notes from the 20th Century Urbanization Experience for 21st Century Planners," delivered October 21, 2015.

*Keynote Lecture*, CEDEUS University of Conception, Conception Chile "Some political and economic considerations in the governance of sustainable urban transport infrastructure," delivered March 26, 2015.

*Keynote Lecture*, Transportation Center, Northwestern University "Paying for Access, Getting Mobility," delivered October 3, 2014.

*Keynote Lecture*, CEDEUS Inauguration, Pontifical Catholic University of Chile, Santiago de Chile, "Urban Access for the 21st Century," delivered January 22, 2014

*Keynote Lecture,* Wayne State University, Law School conference *Michigan in Transition; The Restructuring of Government*, Lecture title "Putting Privatization in Context," delivered March 23, 2012

*Keynote Lecture*, Urban China Initiative, Tsinghua University, Beijing. Lecture title: "The Future of Chinese Cities," delivered October 22, 2011 *The Urban China Initiative is a joint project of Tsinghua University, McKinsey Consulting and Columbia University*

*University Lecture,* Wuhan University "Urbanization, Urbanism and the Challenge of 21st Century Urban Mobility," delivered July 4, 2011 in the University Library of Wuhan University.

*UN Habitat Brian Williams Memorial Lecture:* "The Challenge of Urban Mobility in the 21st Century," delivered May 3, 2011 at Columbia University.

*Fulbright Lecture*, New University, Lisbon, Portugal. Lecture Title: "**The Methodological Challenge of Complexity: Case Studies and Creation of Social Narrative**," delivered May 10, 2010.

*Keynote Lecture*, "Urban Planning and Urban Health: The Reinvention of a Shared Mission," delivered at the *8th International Conference on Urban Health*, Nairobi, Kenya, October 22, 2009

*Major Lecture,* Graduate School of Architecture, Planning and Preservation, Columbia University "Nairobi Metro 2030 and the future of Nairobi Kenya," part of Ecogram: The Sustainability Question symposium, delivered October 25, 2008.

*Major Lecture,* Woodrow Wilson School, Princeton University. Lecture Title "The Urban Transformation of the World and the Transformation of Urban Professionals; The Professionals Challenges of a New Century," delivered February 27, 2008.

*Major Lecture*, "Public Responsibility for Public Services: Moving Beyond the Limits of the Privatization Debate" delivered at World Bank Conference; *New Frontiers of Social Policy: Development in a Globalizing World*, held in Arusha, Tanzania December 15, 2005.

*Remarks*, World Habitat Day, 2005 "The Millennium Development Goals and the City", New York City October 3, 2005.

*Keynote Lecture*, Simmons College School of Social Work Centennial Celebration. Lecture Title: "Future Trends and Future Challenges of Urbanization," delivered April 3, 2004

*Irwin Pollishook Lecture: Annual Meeting of the American Federation of Teachers, Chicago, Il. May 2002.*

## Editorial Responsibilities

**Journal referee:**
**American Journal of Public Health,**
**Journal of Political Economy,**
**Journal of the American Planning Association**
**Review of Radical Political Economics**

## Scholarship

*Books:*

1. Sclar, Elliott, Mans Lönnroth and Christian Wolmar editors (2016) *Improving urban access; new approaches to funding transport investment*, London: Routledge

2. Sclar, Elliott, Mans Lönnroth and Christian Wolmar editors (2014) *Urban Access for the 21st Century: Finance and governance for transport infrastructure*, London: Routledge

3. Sclar, Elliott, Nicole Volavka-Close and Peter Brown editors (2012) *The Urban Transformation: Health, Shelter and Climate Change*, London: Routledge

4. Garau P, Sclar ED. and Carolini GY. (2005). A Home in the City: Task Force on Improving the Lives of Slum Dwellers. UN Millennium Project Earthscan: London.

5. Sclar Elliott D. (2000) *You Don't Always Get What You Pay For: The Economics of Privatization*, Cornell University Press and The Century Foundation, Ithaca, NY. (Winner of the Louis Brownlow Award for 2000 from the National Academy of Public

Administration and the 2001 Charles Levine Prize from the International Political Science Association).

6. Edel M, Sclar ED and Luria D. (1984). *Shaky Palaces: Home Ownership and Social Mobility in Boston Suburbanization*. New York: Columbia University Press.

7. Schaeffer KH. and Sclar E. (1975). *Access for All: Transportation and Urban Growth.* London: Penguin Books. (Revised Edition published by Columbia University Press, 1980.)

8. Schulz J, Carrin G, Krup H, Peschke M, Sclar E and Van Steenberge J. (1974). *The Search for Retirement Income Adequacy*. Waltham, Mass.: Brandeis University Press.

9. Chapman J, Sclar E and Torto R. (1974). *The Rich Get Richer and the Rest Pay Taxes: A Massachusetts Tax Primer.* Lynn, Mass.: Massachusetts Public Finance Project.

## *Monographs:*

1. Sclar ED. (2003). Amtrak Privatization: The Road to Failure. Washington DC: The Economic Policy Institute.

2. Sclar ED. (1997). The Privatization of Public Services: Lessons from Case Studies. Washington DC: The Economic Policy Institute.

3. Persky J, Sclar E and Wiewel W. (with the assistance of Walter Hook, 1992). Does America Need Cities? An Urban Investment Strategy for National Prosperity. Washington, DC: The United States Conference of Mayors and the Economic Policy Institute.

4. Sclar ED, Schaeffer KH.,and Brandwein R. (1989). The Emperor's New Clothes: Transit Privatization and Public Policy. Washington DC: The Economic Policy Institute.

5. Torto R and Sclar E. (1970). State and Local Taxes: Their Impact on Low-Income Families. Lynn, MA: Lynn Economic Opportunity, Inc.

## *Chapters in Books:*

1. Sclar E and Lönnroth M. (2016) Sustainability and social inclusion: the complexity of financing urban access. In Sclar, Elliott, Mans Lönnroth and Christian Wolmar editors (2016) *Improving urban access; new approaches to funding transport investment*, London: Routledge

2. Sclar E and Lönnroth M. (2016) A field guide to the challenge of financing urban access. In Sclar, Elliott, Mans Lönnroth and Christian Wolmar editors (2016) *Improving urban access; new approaches to funding transport investment*, London: Routledge

3. Fischer L and Sclar E (2016) Value Capture: why we may be disappointed. In Sclar, Elliott, Mans Lönnroth and Christian Wolmar editors (2016) *Improving urban access; new approaches to funding transport investment*, London: Routledge

4. Sclar E and Lönnroth M. (2016) Measuring access, not mobility: a technical challenge. In Sclar, Elliott, Mans Lönnroth and Christian Wolmar editors (2016) *Improving urban access; new approaches to funding transport investment*, London: Routledge

5. Sclar E and Lönnroth M. (2016) "What is past is prologue": stepping into the future. In Sclar, Elliott, Mans Lönnroth and Christian Wolmar editors (2016) *Improving urban access; new approaches to funding transport investment*, London: Routledge

6. Sclar E and Lönnroth M. (2014) An Introduction to the challenge of financing urban access. In Sclar, Elliott, Mans Lönnroth and Christian Wolmar editors (2014) *Urban Access for the 21st Century: Finance and governance for transport infrastructure*, London: Routledge

7. Sclar E. (2014) Towards a political-economics of finance for urban access. In Sclar, Elliott, Mans Lönnroth and Christian Wolmar editors (2014) *Urban Access for the 21st Century: Finance and governance for transport infrastructure*, London: Routledge

8. Sclar E and Lönnroth M. (2014) Conclusions: the end of the paradigm. In Sclar, Elliott, Mans Lönnroth and Christian Wolmar editors (2014) *Urban Access for the 21st Century: Finance and governance for transport infrastructure*, London: Routledge

9. Sclar, E. 2013. "The Economics of Sustainable Urban Transport," chapter in *Planning and Design for Sustainable Urban Mobility: Global Report on Human Settlements 2013; Sustainable Urban Transport*. UN Habitat 2013

10. Sclar E and Volavka-Close N. (2012) Understanding the twenty-first century urban transformation: A Global South Perspective. In Sclar, Elliott, Nicole Volavka-Close and Peter Brown editors (2012) *The Urban Transformation: Health, Shelter and Climate Change*, London: Routledge

11. Sclar E and Volavka-Close N. (2011). Urban Health; An Overview. *Encyclopedia of Environmental Health*. Burlington: Elsevier, 5, 556–564

12. Volavka-Close N and Sclar E., (2010). Improving Population Health in a Rapidly Urbanizing World. In D.Vlahov, J.I. Boufford, C. Pearson, & L. Norris (Eds.), *Urban Health Global Perspectives*. San Francisco: Jossey-Bass.

13. Sclar, E. and Touber, J. (2009). Economic Fall-Out of Failing Urban Transport Systems: An Institutional Analysis. In H. Dimitrou, R. Gakenheimer (Eds.) *Urban Transport in the Developing World: Perspectives from the First Decade of the Millennium,* 174-195. Cheltenham, UK: Edward Elgar Publishing Limited.

14. Schank J and Sclar E. (2009).  The New Suburban Flight: A Tale of Three Airports: Stewart, Westchester and Islip. In D. Rubey (Ed.), *Redefining Suburban Studies: Searching for New Paradigms*. Hempstead: National Center for Suburban Studies (Hofstra University).

15. Northridge ME, Sclar ED, Feighery A, Fiebach MZ and Kurtz EK. (2009). Reinventing Healthy and Sustainable Communities: Reconnecting Public Health and Urban Planning. In S. J. Babones (Ed.), *Social Inequality and Public Health.*  Bristol: UK.

16. Sclar ED. (2008). Urbanization.  In W.A. Darity, Jr. (Ed.) *International Encyclopedia of the Social Sciences,* 8, 545-548. Detroit: Macmillan Reference USA.

17. Schuman T and Sclar E. (2008). The Impact of Ideology on American Town Planning.  In D. Kelbaugh and K. K. McCullough (Eds), *Writing Urbanism: A Design Reader*. New York: Routledge.

18. Touber, J., and Sclar, E.D.  (2008). A University Partnership for Metropolitan Planning: Ruiru Kenya. In P. Garau (Ed.), *Barefoot and Prada*. Italy: Officina Edizioni.

19. Sclar ED. (2005). Passenger Rail.  In R. R. Nelson (Ed.),*The Limits of Market Governance*. New York: Russell Sage Foundation.

20. Schaeffer KH. and Sclar E. (2002). Limits of Economics. In A. Root (Ed.), *Delivering Sustainable Transport: A Social Science Perspective*. Amsterdam: Pergamon Press (Excerpted from *Access for All*).

21. Schaeffer KH. and Sclar E. (2002). The Automobile Era: A Cultural Analysis. In A. Root (Ed.), *Delivering Sustainable Transport: A Social Science Perspective*. Amsterdam: Pergamon Press (Excerpted from *Access for All*).

22. Sclar E. (2000). One More Chance: Cities and the 21st Century Economy. In R. Marshall (Ed.), *Restoring Broadly Shared Prosperity*. Armonk NY: M.E. Sharpe.

23. Schuman T. and Sclar E. (1996). The Ideology of American Town Planning: From the Garden City to Battery Park City. In M.C. Sies and C.S. Silver (Eds.), *Planning the Twentieth-Century American City.* Baltimore: The Johns Hopkins Press.

24. Sclar E. (1996). Urban Revitalization: The Short Road to Long-Term Growth. In T. Schafer and J. Faux (Eds.), *Reclaiming Prosperity: A Blueprint for Progressive Economic Reform*. Armonk NY: M.E. Sharpe.

25. Sclar E. (1995). Articles on Midtown, Manhattan Valley, and Taxpayers. In K. Jackson (Ed.), *The Encyclopedia of New York City*. New Haven: Yale University Press.

26. Sclar E. and Hook W. (1993). The Importance of Cities to the National Economy. In H.G. Cisneros (Ed.), *Interwoven Destinies: Cities and the Nation*. New York: W.W. Norton & Co. (This chapter is based upon the two papers prepared for the American Assembly Volume cited below.)

27. Sclar E. and Hook W. (1993). The Importance of Cities to the National Economy. In H.G. Cisneros (Ed.), *Interwoven Destinies: Cities and the Nation*. New York: The American Assembly-Columbia University.

28. Sclar E. and Hook W. (1993). Towards a New Urban Policy. In H.G. Cisneros (Ed.) *Interwoven Destinies: Cities and the Nation*. New York: The American Assembly-Columbia University.

29. Edel M and Sclar E. (1984). Taxes, Spending and Property Values: Supply Adjustment in a Tiebout-Oates Model. In W.P. Beaton (Ed.), *Municipal Needs Services and Financing*. New Brunswick, N.J.: The Center for Urban Policy Research, Rutgers University (Reprinted from *Journal of Political Economy*, Vol. 82, No. 5.)

30. Sclar E. (1982). Social Cost Minimization; A National Policy Approach to the Problems of Distressed Economic Regions. In F.S. Redburn and T. Buss (Eds.),  *Public Policies for Distressed Regions*. Lexington, Mass.: D.C. Heath (Reprinted from *Policy Studies Journal*, Vol. 10 No. 2.).

31. Sclar E. (1980). Aging and Economic Development. In E. Markson and G. Batra (Eds.), *Public Policies for an Aging Population*. Lexington, Mass.: D.C. Heath.

32. Sclar E. (1979). The Economics of Deinstitutionalization. In W.G. Bell (Ed.), *Returning the Institutionalized Elderly to the Community Conference Proceedings*. Florida State University Center of Gerontology.

33. Sclar E. (1978). Land Use and Transportation. In M.G. Raskin (Ed.), *The Federal Budget and Social Reconstruction: The People and the State.* New Brunswick, N.J.: Transaction Books.

34. Sclar E. (1976). Aging and Residential Location. In P. Lawton, R. Newcomer and T. Byerts (Eds.), *Community Planning for an Aging Society*. Stroudsburg, Penn.: Dowden, Hutchinson and Ross.

35. Sclar E. (1974). The Community Basis for Economic Development: Some Unexamined Assumptions. In S. Doctors (Ed.), *Whatever Happened to Minority Economic Development?* Hinsdale, Ill.: Dryden Press.

36. Schank J. and Sclar E. (2009). The New Suburban Flight: A Tale of Three Airports: Stewart, Westchester and Islip. In D. Rubey (Ed.),  *Redefining Suburban Studies: Searching for New Paradigms*. The National Center for Suburban Studies at Hofstra University.

*Articles:*

1. Sclar, E. (2018) Rent Is Too Damn High: The Reemergence of Rent Theory in Urban Economics, *Review of Radical Political Economics*, https://doi.org/10.1177/0486613418764727

2. Sclar, E (2015) The political economics of investment Utopia: public–private partnerships for urban infrastructure finance, *Journal of Economic Policy Reform*, 18:1, 1-15, DOI: 10.1080/17487870.2014.950857

3. Rizvi, A. and Sclar, E. (2014) Implementing bus rapid transit: A tale of two Indian cities, *Research in Transportation Economics*, http://dx.doi.org/10.1016/j.retrec.2014.09.043

4. Klopp J., Chanin J., Ngau P. and Sclar E. (2014). "Globalization and the Urban Studio: Evaluating an Inter-University Studio Collaboration in Nairobi" *International Development Planning Review* 36 (2)

5.  Sclar, E. (2013) "Looting the Urban Commonwealth: Privatization and the Politics of Austerity," *New Labor Forum*, 22:3 46-53

6.  Kinney, P.L., Gatari Gichuru, M., Volavka-Close, N., Ngo, N., Ndiba, P.K., Law, A., Gachanja, A., Gaita, S.M., Chillrud, S.N. and Sclar, E. (June 2011). Traffic impacts on $PM_{2.5}$ air quality in Nairobi, Kenya. *Environmental Science and Policy*, 14(4), 369-378.

7.  Klopp, J., Ngau, P. and Sclar, E. (2011). University/City Partnerships: Creating Policy Networks for Urban Transformation in Nairobi. Special Issue on International Perspectives on Community-University Partnerships. *Metropolitan Universities*, 22(2), 131-142

8.  Rosenthal JK, Sclar ED, Kinney PL, Knowlton K, Crauderueff R, Brandt-Rauf PW. (2007) "Links Between the Built Environment, Climate and Population Health: Interdisciplinary Environmental Change Research in New York City". *Annals Academy of Medicine,* 2007; 36 (10).

    Reprinted in Vol. IV of *Urban Landscape: Critical Concepts in the Built Environment*, edited by Anita Berrizbetia London: Routledge, 2015.

9.  Spielman S, et. al. (2006) Interdisciplinary Planning for Healthier Communities: Findings from the Harlem Children's Zone Asthma Initiative. *Journal of the American Planning Association*, Winter 2006; 72 (1): 100-108.

10. Sclar E, Garau P and Carolini G. (2005) The 21st Century Health Challenge of Slums and Cities. *The Lancet*, 5 March 2005; 365: 901-903.

11. Garau P, Sclar E and Carolini G. (2004) You Can't Have One Without the Other: Environmental Health is Urban Health (Editors Choice). *American Journal of Public Health*, November 2004; 94, (11): 1848.

12. Krieger N, Northridge M, et. al. (2003) Assessing Health Impact Assessment: Multidisciplinary and International Perspectives. *Journal of Epidemiology Community Health,* 2003; 57: 659-662.

13. Northridge ME, Sclar ED. and Biswas, P. (2003) Sorting Out the Connections between the Built Environment and Health: A Conceptual Framework for Navigating Pathways and Planning Healthy Cities. *Journal of Urban Health*, 2003; 80 (4): 556-568.

14. Northridge ME. and Sclar E. (2003) A Joint Urban Planning and Public Health Framework; Contributions to Health Impact Assessment. *American Journal of Public Health*, January 2003; 93 (1): 118-121.

15. Northridge ME. and Sclar E. (2002) Housing and Health (Editors Choice). *American Journal of Public Health*, May 2002; 92 (5): 701.

16. Sclar E. and Northridge M. (2001) Property, Politics and Public Health. *American Journal of Public Health*, July 2001; 91 (7): 1013-1015.

17. Schank J. and Sclar E. (2000) Flying on the Turnpike: The New Jersey Turnpike and the History of Newark Airport. *New Jersey History*, Fall/Winter 2000; 118 (3-4): 51-59.

18. Aries N. and Sclar E. (1998) The Economic Impact of Biomedical Research: The Case of Metropolitan New York. *Journal of Health Policy, Politics and Law*, February 1998.

19. Schuman T and Sclar E.  (1996) Race and the City: Review Essay.  *Journal of Architectural Education*, May 1996; 49 (4): 250-263.

20. Sclar ED. (1994) Two Tales of the City.  *The Sciences*, 3 July/August 1994; 4, (4): 38-43.

21. Sclar ED. Public Service Privatization: Ideology or Economics? *Dissent*, Summer 1994; 323-329.

22. Sclar ED. Plan Watch: People's Choice. *City Limits*, May 1994; XIX, (5): 22-23.

23. Sclar ED.  Industry: A Critical View of New York City's Comprehensive Waterfront Plan. *The Livable City*, Spring 1993; 17/1: 4.

24. Sclar ED and Aries, N. Pulse of the City: Is the Urban Experience Dying of Neglect? *The Sciences*, November/December 1992; 44-49. (Review essay: Books reviewed – Spiro Kostof, *The City Shaped: Urban Patterns and Meanings Through History* and Joel Garreau – *Edge City: Life on the Urban Frontier*)

25. Sclar ED. Back to the City. *Technology Review*, Aug./Sep. 1992; 95 (6): 29-33.

26. Sclar ED.  Homelessness and Housing Policy: A Game of Musical Chairs.  *American Journal of Public Health*, September 1990; 80 (9): 1039-1040.

27. Sclar E. Grava, S. and Downs, C. Nonmedallion Car Service in New York City. *City Almanac*, Vol. 20, No. 3 Fall 1988: 16-22.

28. Sclar E. Can Principles and Profits Mix? *Social Policy,* Fall, 1986; 17 (2): 45-48.

29. Sclar E. A Health Planner's Perspective on For-Profit Medicine. *The Bulletin of the New York Academy of Medicine*, Jan.-Feb., 1985; 61 (1): 60-68. Paper originally presented at the Annual Meeting of the New York Academy of Medicine, May 1984.

30. Sclar E. Creating Visions of A Better World: A Strategy to Move Progressives to the Political Offense. *Catalyst*, 1982; 4 (2): 11-18.

31. Sclar E. Social Cost Minimization: A National Policy Approach to the Problems of Distressed Economic Regions. *Policy Studies Journal,* December, 1981; 10 (2): 235-247.

32. Sclar E. Stathopolous, P. and  Strelnick, H.  Mental Health is Hard Work. *Health PAC Bulletin*, January/February, 1981; 12 (3): 9-35.

33. Sclar E. Community Economic Structure and Individual Well Being: A Look Behind the Statistics.  *International Journal of Health Services,* October, 1980; 10 (4): 563-579.

34. Sclar E. Up Against the Limits: Economic Strategies through Overconsumption. *Social Development Issues*,  Spring 1978; 2 (1): 1-8.

35. Sclar E. Alternative Frustrations: Some Contradictions of Community Care. *Journal of Alternative Human Services,* Spring 1977; 3 (1): 9-13.

36. Edel M and Sclar E. The Distribution of Real Estate Value Changes: Metropolitan Boston, 1870-1970.  *Journal of Urban Economics*, 1975; 2: 366-387.

37. Edel M and Sclar E. Taxes, Spending and Property Values: Supply Adjustments in a Tiebout-Oates Model.  *Journal of Political Economy,* Sept.-Oct. 1974; 82 (5).

38. Sclar E, Torto R, Edid M and Behr T. Taxes, Taxpayers and Social Change: The Political Economy of the State Sector. *Review of Radical Political Economics*, Spring 1974; 6  (1).

### *Edited Works***:**

1. Sclar E.  Privatization and Its Discontents. Guest Editor for a Special Section of *New Labor Forum*, Spring/Summer 1999; 4: 67-101.

## Op Eds and Letters

Sclar, E. (2015, 8 October) Uber in danger of running out of road in London. *Financial Times*. http://www.ft.com/intl/cms/s/0/602a84dc-6b71-11e5-aca9-d87542bf8673.html#axzz3sGReTVV4
Sclar, E. (2010, 20 March) Canada ought to help its neighbor first.  *Financial Times*. http://www.ft.com/intl/cms/s/0/7954cc9a-33c0-11df-8b99-00144feabdc0.html#axzz1qcjrvldP
Sclar, E.  (2011, 4 April) When Ideology Drives Decisions.  *The New York Times*. http://www.nytimes.com/roomfordebate/2011/04/03/is-privatization-a-bad-deal-for-cities-and-states/when-ideology-drives-decisions
Sclar, E. (2011 November) A pitch for long-distance trains.  *Planning*. http://www.planning.org/planning/2011/nov/
Sclar, E. and Paaswell, R. (2010, 24 September) Vans on the Run.  *The New York Times*. http://www.nytimes.com/2010/09/25/opinion/25sclar.html?_r=3&scp=1&sq=vans%20on%20the%20run&st=cse

### *Book Reviews:*

1. Dreier P, Mollenkopf J, and Swanstrom T. Place Matters Somewhat, But Social Class Matters Even More. Review of *Place Matters: Metropolitics for the Twenty-First Century*, (University of Kansas Press, 2001), Dissent, Spring, 2002; 121-123.

2. Kayden JS, *et. al*. *Privately Owned Public Spaces: The New York City Experience.* (New York: John Wiley and Sons, 2000.) *Journal of Planning, Education and Research,* Spring 2002; 21 (3):  343-345.

3. Spann EK. *Designing Modern America: The Regional Planning Association of America and Its Members*. (Urban Life and Landscape Series) Columbus OH: Ohio State University Press, 1996. *Urban History Review / Revue d'historie urbaine*, October 1998; XXVII, (1), 72-73.

4. Tennenbaum R, editor. *Creating a New City: Columbia, Maryland,* Partners in Community Building and Perry Publishing, Columbia, Maryland, 1996. *Journal of the American Planning Association* Winter 1998; 64 (1): 106-107.

5. Gomez-Ibanez JA and Meyer J. *Going Private: The International Experience with Transport Privatization.* (Washington DC: The Brookings Institution, 1993) "Privatization: Half a Loaf My Be Worse Than None at All," review in *Forum for Applied Research and Public Policy*, Fall 1995; 10 (3): 142-143.

6. Salomon and Lunds, eds.:*The Reagan Presidency and the Governing of America*; Hulten and Sawhill, eds.:*The Legacy of Reaganomics: Prospect for Long-Term Growth*; Eads and Fix, eds.:*The Reagan Regulatory Strategy: An Assessment,* all Washington D.C.: The Urban Institute, 1984 in the *Journal of the American Planning Association*, Autumn, 1985;  51(4): 532-533.

7. Sternlieb G and Hughes JW. *The Atlantic City Gamble: A Twentieth Century Fund Report*, Cambridge, MA: Harvard University Press, 1983 in the *Journal of the American Planning Association,* Autumn, 1984; 50 (4): 538- 539.

*Policy Papers, Planning Reports and Major Consultant Reports:*

1. Seaman M, Cohen S, Corbin-Mark CD, Sclar E, Plunz R, et al. *Northern Manhattan and the Congestion Pricing Plan*: *A Comprehensive Look at the City-wide Plan from a Community Perspective,* prepared by the Center for Sustainable Urban Development and the Urban Design Lab at the Earth Institute of Columbia University in collaboration with WE ACT for Environmental Justice, March 2008.

2. Sclar E, Northridge M and Karpel E. *Promoting Interdisciplinary Curricula and Training in Transportation, Land Use, Physical Activity and Health*, TRB Special Report 282, Paper prepared for the Transportation Research Board and the Institute of Medicine Committee on Physical Activity, Health, Transportation and Land Use, National Academy of Sciences; Washington DC 2004.

3. Sclar E. *Pitfalls of Air Traffic Control Privatization*, prepared for the National Air Traffic Controllers Association, Washington DC: 2003.

4. Sclar E and Aries N. *Biomedical Research and the New York State Economy*, prepared for the Council on Biomedical Research and Development at The New York Academy of Medicine, March 2000.

5. Briffault R, Sclar E and Hook W. *Fairness and the Fare: Equity and Adequacy in the Financing of the Operating Agencies of the Metropolitan Transportation Authority*, A study and Report Undertaken Pursuant to the Agreement in New York Urban League v MTA, The Legislative Drafting Research Fund of the Columbia Law School. February 1998.

6. Sclar E. *The Future of Philadelphia Transportation: An Analysis of the SEPTA Business Audit*, prepared for Transportation Workers Union of Philadelphia, AFL-CIO Local 234. October 1997.

7. Sclar E. *Paratransit Privatization Issues in Toronto, Ontario*, prepared for Amalgamated Transit Union, AFL-CIO/CLC, June 1997.

8. Sclar E. *Spending More, Getting Less: An Analysis of Denver's Bus Privatization 1990-1995*, prepared for Amalgamated Transit Union, AFL-CIO/CLC, May 1997.

9. Sclar E and Hook W. *A Cost/Benefit Analysis of the ATU Plan to Improve Express Bus Service on Staten Island*, prepared for Amalgamated Transit Union, AFL-CIO/CLC, December, 1996.

10. Sclar E and Watkins M. *Urban Bus Transit Privatization (in Canada): A Look at the Record*, prepared for Amalgamated Transit Union, AFL-CIO/CLC, May 1994.

11. Sclar E. *The Policy Issues in Privatizing MBTA Bus Routes*, prepared for ATU Local 589 - Boston, January 1994

12. Sclar E. *A Cost Analysis of the COMSIS Privatization Proposal*, prepared for ATU Local 589 - Boston, January 1994.

13. Sclar E and Most J. *Report on Land Use and Economic Activity in Western Chelsea*, prepared for Manhattan Community Board #4, October 1993.

14. Aries N and Sclar E. *Report on the Impact of Non-Profit Sector Sponsored Biomedical Research in the Metropolitan New York Region*, prepared for the Commission on Biomedical Research and Development, July 1992.

15. Sclar ED. *You Won't Often Get What You Want: An Update of Colorado's Experiment With Transit Privatization*, prepared for the Amalgamated Transit Union, July 1992.

16. Sclar ED. *Transit Privatization: True Savings or False Economies?*, prepared for the Transport Workers Union of America, California State Conference, April 1992.

17. Sclar ED, Silodor DC and Most J. *Planning Overview and Survey-Community District Nine, Manhattan*, prepared for Manhattan Community Board #9, June 1991.

18. Sclar ED, Most J and Zicklin A. *Analysis of Western Clinton Study Area*, prepared for the Clinton Preservation and Planning Committee of Manhattan Community Board #4, May 1991.

19. Sclar ED. *Less Than Meets the Eye: Colorado's Costly Experience With Transit Privatization*, prepared for the Economic Policy Institute, Washington D.C., January 1991.

20. Sclar E, Gaber J and Most J. *Clinton South: A Plan for a Better Future*, prepared for the Clinton Preservation and Planning Committee of Manhattan Community Board #4, November 1989.

21. Sclar E, Brandwein R and Schaeffer KH. *Privatization and Public Transit: Public Policy Implications*, prepared for the Economic Policy Institute, Washington D.C. July 1989.

22. Sclar E and Rosen A. *The Clinton South Study Area: Initial Planning Study*, prepared for the Clinton Preservation and Planning Committee of Manhattan Community Board #4, June 1987.

23. Sclar E and McClain J. *Chelsea Community Plan: A Zoning Plan for Preservation and Development*, prepared for the Chelsea Preservation and Planning Committee of Manhattan Community Board #4, May 1987.

24. Grava S, Sclar E and Downs C. *The Potentials and Problems of Private Sector Transportation Services: Activities in the New York Region,* Final Report to the U.S. Department of Transportation, Urban Mass Transportation Administration, January 1987.

25. Columbia University, Graduate School of Architecture, Planning and Preservation, *Chelsea Today, Chelsea Tomorrow: A Plan for Preservation and Development*, June 1986.

26. Wilder DE and Sclar ED. *Housing for the Elderly in Orange County, New York*, consultant report prepared for the Orange County Office for the Elderly and the New York State Office for the Elderly, April 1986.

27. Sclar E. *The Framework of World-Wide Motor Vehicle Demand in the 1980s,* consultant report prepared for the Transportation Systems Center, U.S. Department of Transportation, Washington, D.C. October 1981.

28. Gerontological Society of America, *Development of a Research Agenda for Elderly Housing and Related Services*, contract from the U.S. Department of Housing and Urban Development. Prepared the background bibliography and paper on housing-related services. 1980-1981.

29. Massachusetts Labor Research Group (Sclar E, Director), *A Critique of the Cooper-Lybrand Reasonable Expectancies*. Consultant report prepared for Local 509, Service Employees International Union, Boston, Massachusetts, October, 1979.

30. Sclar E. *The Social Implications of Community Economic Development Dynamics*. Prepared for the National Center for Economic Alternatives, Washington, D.C., July 1979.

31. Sclar E and Hoffman V. *Planning Mental Health Services for a Declining Economy*. Final Research Report prepared for the National Center for Health Services Research, January 1978.

32. Sclar E, Stathopolous P, and Hoffman V. *Evaluation of Mental Health Services in Fitchburg, Massachusetts*. Prepared for North Central Massachusetts Mental Health Association, May, 1976.

33. Sclar E. *Alternative Housing Environments for the Elderly*. (Levinson Policy Institute, Brandeis University), prepared for American Association of Retired Persons, May 1972.

34. Sclar E and Edel M. *Some Pitfalls of Suburbanization Policy*. U.S. Civil Rights Commission and Massachusetts Commission Against Discrimination, U.S. Government Printing Office, 1971.

35. Sclar E. *The Effects of MBTA, MDC and County Assessments upon the City of Lynn, Massachusetts*. Prepared for Lynn Economic Opportunity, Inc., November 1970.

36. Sclar E and Perry S. *A Field Experiment to Simulate Anti-Poverty Tax Incentives*., Center for Community Economic Development, Cambridge, Massachusetts, January 1970; prepared for U.S. Office of Economic Opportunity.

### *Papers Prepared for Professional Meetings Not Elsewhere Published:*

1. Sclar E. *Urban Renewal and Urban Social Change: The Transformation of the Upper West Side*. Presented at the Seventh Annual Meeting of the Society of American City and Regional Planning History, Seattle, Washington, October 1997.

2. Schuman T and Sclar E. *Race, Class and Space: Physical and Social Planning in the Three Regional Plans for New York*. Presented at the Sixth Annual Meeting of the Society of American City and Regional Planning History, Knoxville, Tennessee, October 1995.

3. Schuman T and Sclar E. *The Enterprise of American City Building: The Exceptional Case of Columbia, Maryland*. Presented at the Fifth Meeting of the Society of American City and Regional Planning History, Chicago, Illinois, November 1993.

4. Sclar ED. *Robert Moses on the Upper West Side.* Presented at the Robert Moses' New York Conference held at the Graduate School of Architecture, Planning and Preservation, Columbia University, New York, February 1989.

5. Rodriguez CE and Sclar E. *The South Bronx: A Failure or A Success of Public Policy and Management*. Presented at the Annual Research Conference of the Association for Public Policy Analysis and Management, Philadelphia, Pennsylvania, October 1983.

6. Sclar E. *Changing Patterns of Land Use in American Cities: Some Hypotheses about the Causes and Policy Implications*. Presented at the Annual Meeting of the Association of Collegiate Schools of Planning, San Francisco, California, October 1983.

7. Messeri P and Sclar E. *Estimating the Long-Term Impact of Economic Stagnation Upon the Mental Health of a Local Community*. Presented at the Annual Meeting of the American Sociological Association, Toronto, Ontario, August 1981.

8. Sclar E and Stathopolous P. *Age and Mental Hospital Admission*. Presented at Annual Meeting of the Gerontological Society, Dallas, Texas, November 1978.

9. Sclar E and Hoffman V. *Polynomial Distributed Lag Models and Mental Health Service Planning*. Presented to the Statistics Section, Annual Meeting of American Public Health Association, Los Angeles, California, October 1978.

10. Edel M and Sclar E. *Up the Down Escalator: Household Asset Devaluation and the Maintenance of Inequity*. Presented at Annual Meeting of Eastern Economics Association, Hartford, Connecticut, April 1977.

11. Edel M, Sclar E, and Luria D. *Not Blaming the Victim in Studies of Suburban Growth*. Presented at Annual North American Meeting of the Regional Science Association, Toronto, Ontario, November 1976.

12. Sclar E and Podolsky S. *Ambulatory Care of Aging Diabetic Veteran*s. Presented at Annual Meeting of the Gerontological Society, New York City, October 1976.

13. Sclar E. *The Historic Roots of the Urban Crisis.* Presented to the Staff of the National Institute of Mental Health, Rockville, Maryland, February 1976.

14. Edel M and Sclar E. *Differential Taxation, Transportation and Land Values in a Metropolitan Area*. Presented at Econometric Society Meeting, New Orleans, December 1971.


***Unpublished M.A.Thesis and Ph.D. Dissertation:***

1. *A Pilot Study in Neighborhood Food Price Discrimination in the Greater Boston Area*, Unpublished Master's Thesis, Tufts University, 1966.

2. *The Public Financing of Transportation in the Greater Boston Area.* Unpublished Ph.D. Dissertation, Tufts University, 1971.

***Journal Referee:***
*Journal of Political Economy*, From 1974 to 1982.
*Journal of Gerontology*, From 1974 to 1976.
*American Journal of Public Health,* From 1980 to 2008.


***Exhibition:***

Prepared photo and map exhibition on the historic development of Manhattan's Upper West Side for display at the Municipal Arts Society's Urban Center, the Goldome Bank Lobby and Columbia University's Avery Gallery.  Fall of 1983 and Winter of 1984. Funded by local business and civic groups. (Prepared jointly with Richard L. Schaffer)


# Selected Consultancies

New York Academy of Medicine, New York, NY. Prepare an economic impact assessment of the Academy's programs on the metropolitan New York economy. November 2002 January 2003.

Milwaukee Public Schools, Milwaukee, WI. Prepare a comparative cost study of contracted and publicly supplied school bus services for the Milwaukee Public School System. May 2002 to December 2003.

National Association of Air Traffic Controllers, Washington DC. Analyze the problems and potentials of privatization of air traffic control functions. February 2001 to present.

Council on Biomedical Research and Development at The New York Academy of Medicine, New York, NY. Prepared a report on the economic impact of biomedical research on New York State. May 1999 – March 2000.

Annie E. Casey Foundation, Baltimore, MD. Participated a national study of contracting practices in children and family services and assisted in preparation of a manual of best practices and organizational forms for the public contracting of children and family services. June 1997 – July 1999.

Transportation Workers Union, New York, NY. Advise the union leadership on public policy and management issues pertaining to transit operations around the country. Since May 1997.

Amalgamated Transit Union, Washington, DC. Advise the union leadership on public policy issues pertaining to transit privatization in the United States and Canada. Since September 1989.

Urban Technical Assistance Center, Columbia University, New York, NY. Prepared an economic development plan for the Camden, New Jersey Empowerment Zone for the United States Department of Housing and Urban Development. June 1997-February 1998.

Public Employee Department, AFL-CIO, Washington DC. Prepared case studies of long term privatization experiences at selected sites around the country. January 1996-June-1997.

The New York Commission on Biomedical Research and Development. Analyzed the economic impact of biomedical research activity on New York City and the Metropolitan New York Region. Advised on strategy to expand private investment in local biotechnology. January 1992-August 1996.

Manhattan Community Board #4 (Chelsea and Clinton) Planning Consultant. Work involved the preparation of development and zoning plans for the Chelsea and Clinton communities. November 1985 to September 1995.

Ohio Civil Service Employees Association. Prepared a comparative cost analysis on the differences between in house highway construction inspection and inspections performed by outside contractors. August 1993 to October 1993.

The City of Reading Pennsylvania. Preparing Economic impact studies on the loss of federal offices from the central business district and affidavit for lawsuit against the federal government (with Arnold & Porter, Washington DC). August 1992 to July 1993.

Manhattan Community Board #9. (West Harlem) Preparing a Land Use Study of the District as the first step in developing a community land use and housing plan. January 1991 to January 1993.

Transport Workers Union of America, California State Conference. Analyzing the costs and benefits of private contracting for the San Francisco Municipal Railway System. March 1992 to June 1992.

New York Lawyers for the Public Interest, New York. Planning consultant for work undertaken by firm in Clinton neighborhood of Manhattan as part of their contract with New York State. Prepared affidavits related to major environmental and land use law cases. April 1986 to May 1990.

Manhattan Community Board #2. (Greenwich Village) Providing technical assistance to the Board in conjunction with development of a waterfront zoning plan for the western portion of Greenwich Village. September 1988 to June 1992.

Jackson Homestead, Newton, Massachusetts. Consultant to the Jackson Homestead as part of a research project and exhibition funded by the National Endowment for the Humanities to develop both a permanent and traveling exhibition entitled "Newton Massachusetts, Classic American Suburb" January 1985 to March 1986.

Orange County, New York Office on Aging. Prepared a county wide housing needs assessment preliminary to the develop of a housing plan for the county's aging population. September 1984 to March 1986.

U.S. Department of Transportation, Transportation Systems Center, Cambridge. Massachusetts. Prepared a technical forecast of world-wide motor vehicle demand for the decade of the 1980s. April 1981 to October 1981.

National Center for Economic Alternatives, Washington, D.C. Work involved advising NCEA on the design of an evaluation study of community development corporations for the Economic Development Administration of the U.S. Department of Commerce. April 1979 to March 1980.

Department of Elder Affairs, City of Boston, Massachusetts. Advised the Department on matters of research design for a citywide survey of the elderly which they were in the process of purchasing from an outside contractor. April 1978.

Office of the Secretary for Elder Affairs, Commonwealth of Massachusetts; conducted training sessions on the Economics of Aging for service providers to the elderly throughout Massachusetts under the Title XX Program. March 1978 to June 1978.

Service Employees International Union, Local 509, Boston, Massachusetts. Consulted with union on questions of research design in preparation for an arbitration hearing with the Commonwealth of Massachusetts. April 1978 to December 1979.

North Central Massachusetts Mental Health Association. Work involved the design and execution of an evaluation study of mental health services in Fitchburg, Massachusetts. Work done under a contract to the Levinson Policy Institute. January 1975 to December 1976.

Institute of Public Administration, Washington, D.C. Consulted on project for the Administration on Aging, U.S. Department of Health, Education and Welfare, on transportation for older Americans. September 1974.

Social Welfare Regional Research Institute, Boston College, Chestnut Hill, Massachusetts. Worked with SWRRI staff in helping the Community Service Administration, Department of Health, Education and Welfare, develop their research and development program for fiscal 1974. May 1973.

Prepared a draft Income Security Plan for the Commonwealth of Massachusetts' State Senate's legislative consideration. August 1971.

Board of Selectmen of the Town of Marblehead, Massachusetts, consultant on problems of metropolitan transportation. 1971- 72.

Champlain Valley Transportation Corporation, Burlington, Vermont, an OEO-funded rural transportation project. Consulted on issues of transportation finance. April 1970.

## Major Past Research Projects

Co-Principal Investigator on inquiry into the equity and adequacy of fares and subsidies at the New York Metropolitan Transportation Authority. The research was funded by an out of court settlement between the New York Urban League and the Metropolitan Transportation Authority. The work was carried out under the auspices of the Legislative Drafting Research Fund of the Columbia Law School. February 1997 to February 1998.

Co-Principal Investigator on "The Potentials and Problems of Private Sector Transportation Services: Activities in the New York Region", research funded by the Urban Mass Transit Administration of the U.S. Department of Transportation. The study examined the private aspects of transportation provision in the New York Metropolitan Region. Among the modes studied were express bus service, jitney van service and non-medallion taxi operations. February 1986 to January 1987.

Director, New York Neighborhood History Project. Project involved the ongoing production and distribution of working papers and exhibits related to the history and development of New York City neighborhoods. Project initially funded by the National Endowment for the Humanities. January 1981 to December 1986.

Principal Investigator on study of the relationship between community economic development and utilization of mental health services. Project funded by research grants from the National Institute of Mental Health and the National Center for Health Services Research. September 1976 to June 1982.

Principal Investigator on a study of the process of suburban expansion and its impact on social mobility as it occurred in metropolitan Boston during the past century. The study was funded by the the National Institute of Mental Health and the National Science Foundation. September 1972 to August 1974.

Principal co-investigator-The Massachusetts Public Finance Project. Directed staff of five in production of a series of 37 working papers relating public finance and public services to urban poverty. Research funded by a grant from the U.S. Office of Economic Opportunity to Lynn Economic Opportunity. September 1972 to August 1974.

Research Economist, Center for Community Economic Development, a federally-funded (U.S. Office of Economic Opportunity) research center mandated to provide technical assistance to community development corporations (CDCs). I designed a series of tax incentives which would foster economic development in the inner city and a cash payment simulation scheme to test the efficacy of these incentives;

## Miscellaneous Related Professional Experience

Member of Fulbright Specialist Roster, March 2009-present.

Member, ACET (VREF African FUT CoE for Studies in Public and Non-motorised Transport) Scientific Advisory Board. October 2008-present.

Research Associate, Economic Policy Institute (EPI), Washington DC. 1995-present.

Publisher, *Investing for a Better World* a monthly investment advisory publication that regularly monitors publicly traded companies on financial and social performance. March 1984 – January 2005.

Panel Member for the National Academy of Sciences – Transportation Research Board to study the extent and impact of transit contracting for the United States Congress. September 2000-May 2001.

Member, Board of Directors, Institute for Transportation Development Policy, New York City. April 1993 – January 2000

Expert Witness, U.S. House of Representatives, Subcommittee on Government Management, Information, and Technology of the Committee on Government Reform and Oversight. Provided expert testimony on public contracting for private services. August 1998.

Panel Member, State of Maryland Advisory Committee on Transit Privatization at the Maryland Mass Transportation Administration. August 1997-December 1997.

Panel Member, Transportation Research Board, Washington DC, Transit Cooperative Research Program . Advise Transportation Research Board on Transit Policy Research Issues. August 1994 to September 1996.

New York City Economists Roundtable, Economic Policy Advisory Panel appointed by Mayor David Dinkins. November 1992 - December 1993.

Community Capital Bank, Financial Advisory Board, Brooklyn, New York. January 1986 to August 1993.

New York City Department of Environmental Protection. Technical Advisory Committee for the Greenpoint/Williamsburg Environmental Benefit Program. November 1991 to February 1993.

Office of the Mayor, City of New York - Agenda for Children Tomorrow (ACT) Economic Development and Infrastructure Work Group. November 1991 to June 1992.

Advisory Board Member, Campaign for New Transportation Priorities, Washington DC. October 1991 to December 1993.

Expert Witness, U.S. House of Representatives, Subcommittee on Housing and Community Development of the Committee on Banking, Finance and Urban Affairs. Provided expert testimony on techniques for measuring indirect displacement impacts of large scale urban development projects. September 1989.

Member, occasional taskforces of the Citizens Housing and Planning Council, New York City. Taskforces reviewed proposed changes in zoning, land use and major development projects and recommended changes to the relevant government agencies. Taskforces: Upper West Side and Upper East Side Rezoning, Union Square Rezoning and the Convention Center. January 1984 to September 1987.

Member, Board of Directors, Environmental Task Force, Washington, D.C., a small nonprofit agency which provided information and technical assistance to local and national environmental groups. November 1981 to March 1986.

Member, Review Panel, National Institute of Mental Health. Reviewed proposals of research investigators for work in the social and mental health problems of the elderly. May 1980.

Gerontological Society of America, Washington, D.C. Member of Steering Committee established by Gerontological Society to oversee a research contract from the U.S. Department of Housing and Urban Development to establish a three- to five-year research agenda for HUD in the field of housing and related services for the elderly.  April 1980 to October 1981.

Member of the Professional Advisory Committee to Secretary of Elder Affairs, Commonwealth of Massachusetts. December 1977 to June 1978.

Expert Witness, U.S. House of Representatives Select Committee on Aging on topic of mandatory retirement. May 1977.

Lecturer on the Political Economics of Aging, Boston University, Boston, Massachusetts. Conducted a one-week seminar on political and economic issues in the field of aging under the auspices of the Summer Institute on Aging sponsored by the Boston University Gerontology Center. July 1976 to August 1981.

Faculty member, week-long Institute on Research in Aging at University of Chicago, sponsored by Administration on Aging. The purpose of the Institute was to introduce scholars not familiar with the field to research issues in aging. June 1976.

Member, Review Panel of the Center for Health Services Research, U.S. Department of Health, Education and Welfare. May 1975.

Panel Member, Department of Mental Health, Commonwealth of Massachusetts. Work involved advising the department on its disposition of excess landholdings throughout the state. September 1971 to February 1974.

Chairman, the Ad Hoc Committee for Fair Taxation. The Committee was formed to stimulate reform of the Massachusetts tax structure, with special regard to redressing the over- reliance

upon the property tax and securing a progressive income tax for the state, October 1970 to August 1973.

Fellow, Cambridge Institute, Cambridge, Massachusetts. Worked on task force which prepared alternative conceptions of community-based regional economic development. September 1969 to January 1971.

Research Associate, Urban Planning Aid, Inc., Cambridge, Massachusetts. Did research on transportation finance relative to UPA's work with community groups opposed to certain highway construction projects. Summer 1969.

## Dissertation Sponsorships (1981 – 2015)

Tarirai Isaac. (1981) *Housing Policies in Zambia 1960 to 1981: A Critical Perspective.*
Ignacio Armillas (1983). *The Origins of Urbanism in Ancient Mexico.*
Wadih K. Kanbar. (1984). *Continuity and Spatial Change in Arab-Islamic Cities.*
Dawn Laura Leger. (1985). *Planning Shelter Services for Battered Women.* Sponsor:
William Maury Jones. (1986). *The Political Economy of Natural Resources: Water Scarcity in the High Plains Region of the U.S.* Sponsor: Elliott Sclar
Jill Mae Hamberg *(1994). The Dynamics of Cuban Housing Policy.*
Corrine Rhesa Stoewsand. (1996). *Women Building Cities: A Study of Women and Gender in Real Estate Development.*
Walter Brian Hook. (1996*). The Competitive City: The Impact of Transport and Land Policy on Japan's Economic Growth and Development.*

Lynne Edwards Engelskirchen. (1997). *Meeting the Challenges of Economic Development: Productivity, Efficiency, and Participation in Employee Owned Firms in NY State.*
Matthew Dalbey (1999). *Regional Vision Versus Metropolitan Reality: Putting Parkway in the Region, 1921-1936.*
Anne Lee Degnan. (2001). Microenterprise Development in the New York City Housing Authority, 1992-1994: A contextual Assessment and Case Study.
John James Chin. (2001). *Nonprofit Organizations, Community Participation, and Health and Human Services Planning in the Post-Industrial Period: A Case Study of the New York HIV Planning Council.*
Kil Huh. (2003*). The Elements of Policy Change: Community Capacity and the Empowerment Zone.*
Joshua Levi Schank. (2004). *Examining the Effectiveness of Market-Based Policies: The Case of Airside Airport Congestion.*
Yiu Por Chen. (2004). *Labor, Institutions, and Urbanization: The Emergence of China's Labor Market and its Impacts on Urbanization Policies.*
Eric William Allison. (2005) *Gentrification and Historic Districts: Public Policy Considerations in the Designation of Historic Districts in New York City.*
*Ebru Ayse Gencer. (2007). The Interplay Between Natural Disasters, Vulnerability, and Sustainable Development: Studying from Global to Local.*
Milena Gomez (2009), *New Doors to Development: Remittances and the Housing Industry in Colombia.*
Lei Wang (2009). *Understanding Foreign Direct Investment in the Context of Entrepreneurial China.*
Joyce Klein Rosenthal (2010), *Evaluating the Impact of the Urban Heat Island on Public Health: Spatial and Social Determinants of Heat-Related Health Outcomes in New York City.*
Andrea Rizvi (2013), *A Tale of Two Indian Cities: Bus Rapid Transit Planning Processes in Delhi and Ahmedabad*
Alexis F. Perrotta (2015) *How the Poor Afford Public Transportation; The Case of New York City*

# SCLAR DECLARATION

# EXHIBIT 2

Case 1:02-cv-08333-LJL   Document 71   Filed 11/21/18   Page 93 of 127

Department of City Planning
Computer Information Services
22 Reade Street
New York, N.Y. 10007

Source of Data: DCP Zoning File, March 1995
    DCP Zoning File, January 1995
    DCP RPAD File, July 1994
    DCP Selected Facilities, Locations File, October 1994
    Trades and Adult Entertainment, October 1994
    NY State Education Dept. File, 1993-94 School Year
Base Map: DCBA, Tax Lot Geography as of April 1993
    Clipped for Shoreline
Scale: 1 inch = 2000 feet
NOTE: Boldstreets Depicted are Approximations



1540

... Adult Establishment Uses would
Continue to be Allowed under the Proposal*
and Encumbered Property within those Areas

The Bronx

* Restrictions from existing adult establishment uses not shown.



1541



1542

Continue to be Allowed under the Proposal*
and Encumbered Property within those Areas

Queens

* Reductions from existing whole infrastructural area will show



1543



Areas where Adult Entertainment Uses would
Continue to be Allowed under the Proposal*
and Encumbered Property within those Areas

Staten Island

* Restrictions from existing adult entertainment uses not shown

# SCLAR DECLARATION

# EXHIBIT 3



Chelsea Rezoning Area

500 ft

Rezoning

Decrease in available land area

City of New York --- Department of City Planning



Downtown Flushing Rezoning Area

500 ft

Rezoning

Decrease in available land area

City of New York — Department of City Planning



## DUMBO Rezoning Area

Rezoning

Decrease in available land area

500 ft

City of New York — Department of City Planning



Durst Rezoning Area

City of New York — Department of City Planning

Rezoning

Decrease in available land area

500 ft



Flushing Bedford Rezoning Area

Rezoning

Decrease in available land area

500 ft

City of New York — Department of City Planning



Greenpoint Rezoning Area

500 ft

Rezoning

Decrease in available
land area

City of New York -- Department of City Planning



**Hostos Rezoning Area**

Rezoning

Decrease in available land area

500 ft

City of New York — Department of City Planning



Long Island City Rezoning Area

Rezoning

Decrease in available land area

500 ft

City of New York -- Department of City Planning



Lynch Rezoning Area

City of New York — Department of City Planning

Rezoning

Decrease in available land area

500 ft



## Mill Basin Rezoning Area

Rezoning

Decrease in available land area

500 ft

*City of New York — Department of City Planning*



### Northside Rezoning Area

Rezoning

Decrease in available land area

*City of New York — Department of City Planning*



**Port Morris Rezoning Area**

500 ft

Rezoning

Decrease in available land area

City of New York — Department of City Planning



### Steinway Rezoning Area

500 ft

Rezoning

Decrease in available land area

City of New York — Department of City Planning

1558



# Vinegar Hill Rezoning Area

500 ft

Rezoning

Decrease in available land area

City of New York → Department of City Planning

1559



Williamsburg Bridge Rezoning Area

City of New York --- Department of City Planning

# SCLAR DECLARATION

# EXHIBIT 4



# DEPARTMENT OF CITY PLANNING
Amanda M. Burden, Director

## Key Public Service Areas
✓ Promote strategic growth, transit-oriented development and sustainable communities in the City.
✓ Conduct land use and environmental reviews.

## Critical Objectives
- Strengthen housing and economic development throughout the City.
- Enhance the City's neighborhoods, urban design and public spaces, including use of the waterfront and waterways.
- Provide effective planning information and analysis.
- Process land use and environmental review applications efficiently.

## Scope of Agency Operations
The Department of City Planning (DCP) promotes strategic growth, transit-oriented development and sustainable communities to enhance quality of life in the City, in part by initiating comprehensive, consensus-based planning and zoning changes for individual neighborhoods and business districts, as well as establishing policies and zoning regulations applicable citywide. It supports the City Planning Commission and each year reviews approximately 450 land use applications for actions such as zoning changes, special permits and other discretionary approvals. The Department assists both government agencies and the public by providing policy analysis and technical assistance relating to housing, transportation, community facilities, demography, waterfront and public space.

**DCP Rezoning:2002 - Present**



*Since 2002 DCP has initiated or completed 119 rezonings citywide, about 36% of the City's land area. Visit the DCP website for more information on rezonings and other initiatives.*

## Performance Report
✓ **Promote strategic growth, transit-oriented development and sustainable communities in the City.**

- During Fiscal 2012 DCP completed 43 planning projects and proposals spanning all five boroughs. Typically these proposals analyze a wide range of land use, housing, urban design, transportation and economic development issues, and recommend



strategies to achieve specific planning goals. The proposals are developed in consultation with key stakeholders and often result in zoning changes, which require a formal public land use and environmental review, including continued public outreach and review, approval by the City Planning Commission (CPC) and adoption by the City Council. Planning proposals and technical analyses that do not require zoning changes or formal land use review, such as transportation plans and demographic studies, are typically released as public reports and made available on DCP's website.

- As part of the Mayor's commitment to better assist New Yorkers doing business with the City and improve customer service, DCP publicly announced its launch of BluePRint, a business process reform initiative that simplifies and streamlines the Agency's review of land use applications prior to the formal start of the Uniform Land Use Review Procedure (ULURP), the City's land use review process. Developed in partnership with industry professionals, BluePRint's goal is to reduce the time most projects spend in pre-certification by having a clear and predictable review process for both applicants and Agency staff. When fully implemented, City Planning will be able to review two-thirds of all applications 25 to 50 percent faster, saving property owners seeking to improve or develop their property hundreds of millions of dollars in soft and carrying costs.

Department of City Planning | 157

| | | | Actual | | | Target | | 5 Yr. Trend |
|---|---|---|---|---|---|---|---|---|
| Performance Statistics | FY08 | FY09 | FY10 | FY11 | FY12 | FY12 | FY13 | |
| Projects and proposals completed and presented to the public | 34 | 35 | 35 | 32 | 43 | * | * | Upward |
| Economic development and housing proposals | 7 | 11 | 9 | 9 | 11 | * | * | Upward |
| Neighborhood enhancement proposals | 16 | 16 | 15 | 8 | 4 | * | * | Downward |
| Planning information and policy analysis | 11 | 8 | 11 | 15 | 28 | * | * | Upward |
| ★ Number of significant milestones achieved for DCP facilitated projects related to Lower Manhattan | 6 | 6 | 6 | 6 | 8 | * | * | Upward |
| ★ Number of significant milestones achieved for DCP facilitated projects related to Hudson Yards | 11 | 12 | 11 | 2 | 3 | * | * | Downward |
| ★ Number of significant milestones achieved for DCP facilitated projects related to significant open space proposals | 5 | 5 | 5 | 5 | 7 | * | * | Upward |

★ Critical Indicator    "NA"  means Not Available in this report

#### ✓ Conduct land use and environmental reviews.

- The Department referred 465 land use applications for public review, a nearly 5 percent increase from last fiscal year. Seventy-four percent of applications were referred within six months, similar to Fiscal 2011 and better than the established target of 70 percent. The median time to refer applications rose by 6 days to 43 days, reflecting a higher proportion of more complex applications requiring interagency review.

- Many land use actions considered by the City Planning Commission are subject to the City Environmental Quality Review (CEQR) process which identifies any potential adverse environmental effects of proposed actions as well as measures to mitigate significant impacts. In Fiscal 2012 the Department completed 199 environmental review applications with 87 percent of reviews completed within six months, a 13 point



**Land Use Applications Referred**

improvement over the prior fiscal year. The median time to complete an application decreased by 27 days to 12 days as fewer projects required extensive environmental review.

| | | | Actual | | | Target | | 5 Yr. Trend |
|---|---|---|---|---|---|---|---|---|
| Performance Statistics | FY08 | FY09 | FY10 | FY11 | FY12 | FY12 | FY13 | |
| Land use applications referred | 636 | 557 | 459 | 444 | 465 | * | * | Downward |
| ★  Within 6 months (%) | 74% | 79% | 80% | 74% | 74% | 70% | 70% | Neutral |
| Within 6 12 months (%) | 10% | 6% | 7% | 12% | 9% | * | * | Upward |
| Within 13 months or more (%) | 16% | 15% | 13% | 14% | 17% | * | * | Neutral |
| ★ Median time to refer land use applications (days) | 48 | 33 | 28 | 37 | 43 | * | * | Neutral |
| Environmental review applications completed | 288 | 224 | 249 | 208 | 199 | * | * | Downward |
| ★  Within 6 months (%) | 71% | 71% | 61% | 74% | 87% | * | * | Upward |
| Within 6 12 months (%) | 8% | 8% | 7% | 6% | 2% | * | * | Downward |
| Within 13 months or more (%) | 21% | 21% | 32% | 20% | 11% | * | * | Downward |
| ★ Median time to complete environmental review applications (days) | 46 | 22 | 47 | 39 | 12 | * | * | Downward |

★ Critical Indicator    "NA"  means Not Available in this report

## Agency Customer Service

| Performance Statistics | | Actual | | | | Target | | 5 Yr.Trend |
|---|---|---|---|---|---|---|---|---|
| Customer Experience | FY08 | FY09 | FY10 | FY11 | FY12 | FY12 | FY13 | |
| Percent of e mails responded to in 14 days | NA | NA | 95 | 96 | 75 | NA | 85 | NA |
| Percent of letters responded to in 14 days | NA | NA | 42 | 70 | 52 | NA | 50 | NA |
| Completed customer requests for interpretation | NA | NA | 4 | 3 | 1 | NA | NA | NA |
| CORE customer experience rating (0 100) | NA | NA | 83 | 81 | 83 | NA | 80 | NA |

## Agency Resources

| | | Actual | | | | Plan[1] | | 5 Yr.Trend |
|---|---|---|---|---|---|---|---|---|
| Resource Statistics | FY08 | FY09 | FY10 | FY11 | FY12 | FY12 | FY13 | |
| Expenditures ($ millions)[2] | $24.4 | $26.9 | $26.2 | $23.7 | $25.9 | $24.7 | $22.7 | Neutral |
| Revenues ($ millions) | $2.3 | $3.3 | $2.7 | $1.7 | $2.4 | $3.0 | $2.7 | Downward |
| Personnel | 324 | 311 | 284 | 263 | 253 | 277 | 269 | Downward |
| Overtime paid ($ thousands) | $39 | $38 | $38 | $40 | $15 | $17 | $15 | Downward |

[1] Authorized Budget Level        "NA"   Not Available in this report
[2] Expenditures include all funds.

## Noteworthy Changes, Additions or Deletions

- Beginning with the Fiscal 2013 Preliminary Mayor's Management Report, the MMR will be restructured to focus on the goals that the agency intends to achieve during the fiscal year.  Each goal will be accompanied by a performance measure or measures that will quantify the agency's progress toward achieving that goal. For Fiscal 2013 the Department of City Planning's services and goals are:

  Service 1:   Shape the use and development of land in the City's neighborhoods, business districts and waterfront through participatory planning and zoning changes.
  Goal 1a:   Advance economic development, housing and neighborhood enhancement land use projects and proposals for public review.

  Service 2:   Manage land use and environmental review processes to assure consistency with applicable City policies and regulations.
  Goal 2a:   Ensure that discretionary land use and environmental review actions subject to City Planning Commission review are consistent with sound planning principles.
  Goal 2b:   Conduct timely and thorough review of land use and environmental applications.

  Service 3:   Prepare information and policy analysis for other government agencies, elected officials and the public.
  Goal 3a:   Provide quality technical expertise and planning to other City agencies and the public to support decision making.

- Also beginning in Fiscal 2013, performance targets were added for select customer service indicators.  For DCP, performance targets were added to three such indicators.

For more information please visit the website at: www.nyc.gov/dcp

**About Us > Press Releases**

**FOR IMMEDIATE RELEASE**
November 15, 2011

**CONTACT:**
Rachaele Raynoff / Jovana Rizzo (City Planning) – (212) 720-3471

### Mayor Michael Bloomberg's Remarks at Zoning the City Conference, as Delivered
### By Deputy Mayor Robert K. Steel

I think that the Mayor would want to tell you that when he thought about this ten years ago, that basically people weren't sure about the position of New York.

It was ten years ago that Amanda Burden joined the administration, when New York City was still reeling after the 9/11 attacks.

And basically what we've seen is at that time people thought all over that New York might never recover. And in fact Mayor Bloomberg said at the time that he would rather have New York's hand to play than anyone else's. And some people thought he was boastful, but I'd like to say I think instead he's proven to be prescient.

And a good person who was side by side with the Mayor throughout all of this was Amanda Burden and the City Planning group.

Many people have seen that New York has not only survived but really prospered, and the evidence is all around you. The commercial real estate market in New York is the strongest in the nation. We've regained 90% of the jobs lost during the national recession. And people are voting for New York – with their feet. We see people want to live, work and visit in New York and the evidence is all around us.

The population today is at an all-time high of 8.4 million – and we see and are beginning to plan for another million people moving to New York by 2035.

What Amanda and her team at City Planning have done to frame all of this and help us think about it has been critical. They all understand New York and all great cities have to have things in common. They grow and change with changing times. And in that spirit, they've used the 1961 Zoning Resolution – whose birthday we're here celebrating – to carefully and creatively re-sculpt the city.

To date, they have steered 114 rezonings through New York City's "uniform land use review procedure," known as "ULURP," and with great success.

These rezonings, and other major projects they've accomplished, cover almost 37% of the land area of all five boroughs. By far the most extensive re-shaping of the city in the last 50 years. And that's really an astonishing accomplishment, in and of itself, almost 40% of the city having been rezoned.

And what's more striking is not just the fact of the rezonings but what that's done to basically change and adjust to make New York more competitive in the future. And the way we think about it is it's not just each individual aspect, but the sum of the parts and what is created is even more important.

Because of these efforts, we've dramatically re-cast the future of the entire city in four major ways that today's conference will address: Making New York more economically competitive; more equitable; more aesthetically pleasing; and more sustainable.

And that's all continuing today. Because today also the Mayor plans to announce a comprehensive new set of "green zoning" proposals – which we'll talk about a bit more in a few minutes.

Now in terms of economically competitive, what we mean is a better home for people of all income levels, improving the quality of life, and also increase the environmental sustainability for the years ahead.

But the past is prologue – so let's talk about what we intend to do and how we think about our accomplishments to date.

And that really starts with how we're making New York a far more competitive city – one that's better equipped to succeed in the rough-and-tumble world which we've all seen is the reality of today's global economy.

To do that, we've zeroed in on what we view is long under-used land throughout the city, and – combining zoning policy with targeted public investment – have begun unlocking this potential of this property to create jobs and make the economy continue to grow. This means jobs in restaurants and entertainment, offices and shops, and, of course, jobs in construction.

Our work has ranged from Willets Point to Downtown Brooklyn, and from Coney Island to an area where an important engine of New York's future is moving into high gear: And that's Hudson Yards on Manhattan's Far West Side.

Six years ago, the City Council approved our proposed extensive rezoning of more than 60 square blocks around the Hudson Yards: The first step toward making it a vibrant new mixed-use community, and an extension of Midtown's central business district.

Because we know that when new mass transit blazes the way, private development follows, we've also financed and begun building the first major addition to our subway system in many, many years. The extension of our Number 7 line from Times Square right into the Hudson Yards area – is set for completion about two years from today. I know because I have been down seen the cavern and the new station all look terrific and the Mayor is excited about taking a ride on this new train before he leaves office.

The result is clear.

Last week, we broke ground on $555 million worth of new housing that's going to go up on a tract of the West Side that's been vacant for more than 45 years. And the week before, we announced plans for the first major office tower to go up in the Hudson Yards area. 1.8 million square feet of a fantastic new building. Together, these projects will produce thousands of construction jobs in the very near future.

The leading edge of thousands more jobs to come, in an entirely new community – and the largest transit-oriented new development in the nation – that's going to help to define New York City's future.

Second, we're also making New York a more equitable city. Most of you know that New York is in the midst of the largest affordable housing initiative ever undertaken by any American city: A commitment to create and preserve enough housing for half a million people by the year 2014.

Our goal is to keep New York a city for people of all income levels. And zoning – specifically inclusionary zoning – has been a key element of our strategy to accomplish just that. In a nutshell, inclusionary zoning doesn't impede the private housing market; instead we believe it incentivizes the market. It allows developers to build more – so long as producing more affordable housing is part of the bargain.

In some communities where inclusionary zoning has been employed – such as Greenpoint and Williamsburg – affordable units now make up as much as a third of new housing that's been built or planned. That creates affordable housing where it might not otherwise exist. And it promotes the kind of ethnic and economic diversity that defines urban living at its best.

Third, we've used rezoning to make New York a more physically attractive and inviting city – one with an unsurpassed quality of life.

A few minutes ago, I spoke about unlocking the economic potential of long-overlooked parts of our city. The same can be said about tapping into the neglected recreational and aesthetic potential of all of the city's assets. That certainly includes much of New York's beautiful, and often sorely mistreated, 520 miles of shoreline along the bays and rivers.

When people first came to New York, they dreamed of moving inland and upward in the island of Manhattan. Today, our goal is to take them back to the edge of the water to live and enjoy, and also have a viable commerce at the same place.

Opening up our waterfront to the public is one of Amanda's great passions. And all of the administration is looking forward to following her. On our watch, we have created more than 370 acres of new waterfront parks and some 20 miles of new shoreline greenways along, for example, the rezoned East River waterfront of Greenpoint and Williamsburg.

In the same vein, we have, through rezoning, led the reclamation of what just 10 years ago was considered a derelict eyesore – A rusting relic of the past that everyone thought absolutely needed to be demolished.Of course, I'm speaking of the High Line.

It is to Amanda's ever-lasting credit, and we all enjoy it whenever we go, that when she looked at the High Line, she saw something that could be better and infinitely more exciting for the whole area.

She took the lead in transforming it into what it is today: The most visually stimulating and most widely discussed new

city park, not just in New York, but in the country and outside the borders of the United States.

It's done everything a park should do, and even more. It's catalyzed some $2 billion in new private investment along its path; 30 projects, 22 of which are built, 4 of which are coming out of the ground and four on the drawing board are what's going on right now in that area.
It's also become an international destination, and burnished New York's reputation as the place you come to see the future.

The Fourth point I want to mention and finally, our rezonings are also creating a more sustainable city.

And that really illustrates how we thoroughly modified the 1961 Zoning Resolution – which envisioned a future of automobile-dependent development in New York City's periphery. Instead – and in keeping with our PlaNYC sustainability agenda – we're now encouraging transit-oriented development.

Hudson Yards, which I previously mentioned, is a gold-star example of that plan. We've also pursued that goal through rezonings of Coney Island, along Harlem's 125th Street and in the St. George area of Staten Island.

And in what's destined to become one of New York City's largest middle-income communities, in the long-abandoned industrial area of Hunters Point, on the East River waterfront of Queens.
In fact, the new ferry service launched earlier this year that serves Hunters Point has already proved wildly popular with residents all along the East River in Queens and Brooklyn.
Transit-oriented development is good policy, both environmentally and economically. And so are the City's comprehensive new "green zoning" proposals, which will go out for public review next month.

They'd remove current regulations that impede new construction of "green buildings" and also, very importantly, discourage or prevent energy-efficient retro-fits in existing buildings. Installing solar panels and sun-control shades and awnings; creating green roofs; building roof-top greenhouses where fresh local produce can be grown: All would become easier for developers and current building owners.

And that would not only further shrink our carbon footprint: It would create construction jobs in making building upgrades. It would improve the quality of the air we breathe by reducing our dependence on electricity generated by using fossil fuels, and also cut energy costs for businesses, residential landlords, and individual homeowners too.

That's a good note for me to make my final point for this morning: That the rezoning goals I've just ticked through – making New York more competitive, equitable, aesthetically pleasing, and environmentally sustainable – And in no way are these four ambitions mutually exclusive. Instead they come together and support each other. This is what we are focused on in this administration.
Keeping New York a livable city with a strong quality of life; Diversifying our economy; And replacing a "Manhattan-centric" economic focus with a strategy that builds on assets and creates jobs in all five of our boroughs.

That's the plan we're charting for New York's future.

## Department of City Planning

The Department of City Planning (DCP) promotes strategic growth, transit-oriented development, and sustainable communities in the City, in part by initiating comprehensive, consensus-based planning and zoning changes for individual neighborhoods and business districts, as well as establishing policies and zoning regulations applicable citywide. It supports the City Planning Commission and each year reviews more than 500 land use applications for actions such as zoning changes and disposition of City property. The Department assists both government agencies and the public by providing policy analysis and technical assistance relating to housing, transportation, community facilities, demography, waterfront and public space.

- In March 2012 revisions to New York City's Waterfront Revitalization Program (WRP) were referred for public review by the Department. The revisions aim to improve projects within the coastal zone by promoting climate resilient designs, increasing public access to the waterfront, facilitating economic development while protecting natural resources and improving interagency coordination to foster a clear, predictable development process. These revisions will advance and complement Vision 2020: NYC Comprehensive Waterfront Plan, released in 2011, and the City's Waterfront Vision and Enhancement Strategy (WAVES), a sustainable blueprint for NYC's waterfront and waterways.

- In April 2012 the City Council adopted Zone Green, the Department's citywide zoning text amendment that removes zoning impediments to allow for more energy-efficient buildings throughout New York City.  Zone Green will help facilitate green investment, such as generating solar energy on rooftops, and has the potential to greatly increase energy savings for property owners through building improvements.  Building on PlaNYC objectives, Zone Green is one of several DCP green initiatives that promote sustainable communities throughout New York City.

- Following extensive outreach with community partners, the Department advanced for public review four rezoning initiatives to reinforce and preserve the existing built character of residential neighborhoods across the City; these include Manhattan's West Harlem; Woodhaven and Richmond Hill, Queens; and Bedford Stuyvesant North, Brooklyn. The Department's Upper West Side Neighborhood Retail Streets Initiative, adopted by the City Council in June 2012, identified zoning solutions to reinforce existing local retail character and support a lively, pedestrian friendly environment along main shopping corridors.

- In September 2011 DCP launched ZoLa, the Zoning and Land Use web application, providing a new and simple way for the public to access a wide range of land use and zoning information in an interactive, highly readable map format. ZoLa provides an easy way to see the zoning changes that have been adopted or proposals under consideration in a neighborhood or citywide and is a part of NYC Simplicity, Mayor Bloomberg's plan that harnesses technology to make government more transparent, customer-focused, innovative and efficient.

- The Department, in conjunction with the New York City Economic Development Corporation, released North Shore 2030: Improving and Reconnecting the North Shore's Unique and Historic Assets in December 2011. This report outlines a twenty year vision for Staten Island's North Shore through four strategies: promote jobs that strengthen maritime and industrial businesses; reconnect people with the working waterfront through increased public access; support and create neighborhood centers through more local retail, services and housing options; and improve connections and mobility for residents and businesses through coordinated transportation improvements. The plan will be accompanied by the North Shore 2030 Action Agenda that highlights new and on-going commitments of City and regional agencies.

- In June 2012 the Department referred a zoning text amendment that modifies parking requirements in Downtown Brooklyn to simplify regulations, encourage affordable and mixed-income housing by eliminating parking requirements for affordable housing units, and provide more opportunities for use of existing parking spaces by residents, employees and visitors.  This innovative policy proposal to reduce parking regulations in an area well served by mass transit was developed in consultation with public stakeholders who called for revising regulations to better reflect actual demand in the high-density civic center.

- DCP continued to collaborate with government agencies and stakeholders during Fiscal 2012 to advance projects and proposals in Lower Manhattan and the Hudson Yards area, as well as for significant open spaces throughout the five boroughs.  These include:
    - In Lower Manhattan, Pier 15 of the East River Waterfront esplanade was completed and opened to the public introducing new public seating areas and landscaping.  Four new storefront improvements were completed under the Fulton-Nassau Crossroads program, and completion of the Pearl Street Playground and Fulton Street sidewalk improvements conclude the Fulton Open Spaces Project.
    - In Manhattan's Hudson Yards area, text amendments affecting implementation of the Eastern Rail Yard and the Highline were approved by the City Planning Commission.
    - A new 2.26-acre waterfront park was mapped as part of the Department's Lower Concourse rezoning in the Bronx. The new park would provide easily-accessible open space and much-needed active recreational opportunities for existing and new residents.



𝕿 **Metropolitan** | THE BLOOMBERG YEARS: RESHAPING NEW YORK

## A Third of the City Rezoned

Mr. Bloomberg and Amanda M. Burden, director of the Department of City Planning, rezoned 37 percent of the city and claimed credit for creating opportunities for high-density growth along subway corridors while preserving low-density neighborhoods. Critics said that this simply cleared the way for gentrification and that the city fell behind on building affordable housing for lower-income New Yorkers. An often-cited example is the dilapidated industrial waterfront in Williamsburg, now the city's nascent fifth skyline. Whether the luxury high-rises of Williamsburg are good or bad for the city is a matter of continuing debate among city politicians and residents, and is even a plot line in the HBO series "Girls."

Areas that were rezoned during Mr. Bloomberg's tenure as mayor.

**News**Room

12/17/13 Int'l N.Y. Times 3
2013 WLNR 31428296

International New York Times
Copyright © 2013 International New York Times

December 17, 2013

Going out in building boom, New York mayor pushes plans

CHARLES V. BAGLI

Bloomberg administration officials are determined to finish public reviews for a number of "legacy projects" before Mayor Michael R. Bloomberg leaves office.

The Bloomberg administration has been pushing through more than $12 billion worth of real estate projects in its waning days, trying to solidify the mayor's claim to having transformed the face of New York City and lock in plans before Bill de Blasio takes over on Jan. 1.

The gusher of projects recently approved or on track for approval in Mayor Michael R. Bloomberg's final days include an outlet mall and a giant observation wheel on Staten Island, totaling $580 million, and a relatively modest $16 million building in Manhattan with 55 experimental micro-apartments, as well as a $2 billion residential complex on the Brooklyn waterfront and the country's largest indoor skating complex, to be built in the Bronx.

Mr. Bloomberg has sought to remake the city's landscape for the 21st century, pushing for higher-density development and higher-quality design and opening up the city's vast waterfront to new residential, recreational and commercial uses. Nearly 40 percent of the city has been rezoned during the mayor's 12 years in office.

The man spearheading the efforts, the deputy mayor Robert K. Steel, and other officials have made it clear to the City Council, as well as to the real estate and

construction industries, that they are determined to finish public reviews for a number of "legacy projects" before Mr. Bloomberg leaves office.

The projects, which will begin construction well after Mayor-elect de Blasio takes office in January, also bind the new mayor to the old mayor's agenda, at least for a while. By Dec. 31, some projects, like a $1.2 billion Hudson Yards office tower complex and a $1.7 billion Hunter College and Memorial Sloan-Kettering Cancer Center complex, will have reached the point that they cannot be stopped or modified.

Others, like a soccer stadium in the Bronx, a Coney Island amphitheater and a residential complex at the former Domino sugar factory in Brooklyn, could still be halted or changed. The Domino project has won widespread support, but Mr. de Blasio has expressed "serious concerns" about a proposed $350 million soccer stadium near Yankee Stadium because the Bloomberg administration planned to provide the soccer team's wealthy owners with public resources, including tax exemptions.

The Bloomberg administration has also granted tax breaks worth tens of millions of dollars for the first phase of the $3 billion Willets Point project in Queens, for a proposed office tower on the West Side of Manhattan and for the outlet mall on Staten Island.

"They made no secret about the fact that they're working very hard to lock in a number of major projects for the future," said Brad Lander, a councilman from Brooklyn. "De Blasio said everything will be reviewed. But some things can be reviewed and changed more than others."

For his part, Mr. de Blasio, who was the city's public advocate before being elected mayor, opposed few projects during the Bloomberg era and embraced the notion of high-density development near transit centers. But he has made it clear that he will drive a harder bargain with developers to get the best deal for taxpayers. During his mayoral campaign, Mr. de Blasio also vowed "wholesale reform of our city's tax incentive policies that give hundreds of millions of dollars to office towers on Park Avenue and unaccountable one-shot subsidies to companies who can do without them."

Real estate developers and investors, who had a familiar ally in Mr. Bloomberg, will be watching for early signs of Mr. de Blasio's agenda. A spokesman for Mr.

de Blasio, Lis Smith, said he would "review every project with an eye toward maximizing affordable housing, good jobs and value for taxpayers."

Only one so-called legacy project      the rezoning of 73 blocks surrounding Grand Central Terminal for taller towers      failed, when the Bloomberg administration could not win the Council's support last month.

Even though the Council approved the Willets Point proposal to build a retail mall and housing next to Citi Field in Queens, the project still has critics, and Mr. de Blasio could make it difficult for developments like Willets Point by slowing approval of construction permits or delaying the use of government funds.

The Bloomberg administration has also pushed many small initiatives that critics contend should have been left for the next administration. The city recently solicited bids from private developers for a commercial complex within the Bedford Union Armory in Brooklyn, committed $51.5 million in public funds to the restoration of the Loew's Kings Theater, which has been largely vacant for decades, and directed $50 million to a cultural center at Hudson Yards that has yet to be designed.

Mr. Bloomberg has laid the groundwork for the transformation of New York by aggressively rezoning more than 12,000 blocks, almost 40 percent of the city, primarily for dense high-rise development. The Council recently approved the administration's 124th and last rezoning, in Ozone Park, Queens.

Many projects are rooted in the early days of Mr. Bloomberg's 12-year tenure and were steered by his first deputy mayor and chief development architect, Daniel L. Doctoroff. More than once, Mr. Bloomberg has said that Mr. Doctoroff, and by extension himself, had a "greater impact on this city, I think, than Robert Moses."

New York mayors have traditionally rushed through favored projects in the closing days of their administrations, and rarely has a new mayor upended his predecessor's work.

Before leaving office in 2001, Mayor Rudolph W. Giuliani signed a secret deal to build new stadiums for the city's two professional baseball teams, the Yankees and the Mets. Less than a month later, Mayor Bloomberg effectively scuttled the agreement, citing the city's more pressing civic needs after the terrorist attack on the World Trade Center.

But the Yankees and the Mets did get new stadiums, replete with city subsidies worth tens of millions of dollars.

Mr. Giuliani himself railed for years about Mayor David N. Dinkins's last-minute deal to build a new stadium at the National Tennis Center in Queens. But he did nothing to stop the project, other than bar his senior officials from attending the U.S. Open there.

"We haven't tried anything wacky at the last minute," Mr. Steel said. "We've worked hard to get a lot of things done. My focus, and the mayor's focus, has been on jobs and housing. And lots of private money."

Besides, Mr. Steel added, "there'll be lots of things that we began that the next mayor will reap. Projects we put in the oven will come out with the next administration, like Domino."

The City Planning Department has certified for public review a $1.5 billion plan by Two Trees Management to transform the former Domino Sugar mill on the East River into an 11-acre residential complex with office space, a park and 2,100 apartments, 660 for moderate- and middle-income tenants. There may be some additional bargaining over concessions from the developer before the Council votes on the project.

Mr. de Blasio, who has named only a few of his top officials, has yet to announce who will serve as his administration's point person on economic development.


---- Index References ----


News Subject: (Government (1GO80); Local Government (1LO75))

Industry: (Commercial Construction (1CO15); Construction (1CO11); Housing (1HO38); Real Estate (1RE57); Zoning (1ZO58))

Region: (Americas (1AM92); New York (1NE72); North America (1NO39); U.S. Mid-Atlantic Region (1MI18); USA (1US73))

Language: EN

Other Indexing: (Bill de Blasio; Rudolph Giuliani; Steel; Daniel Doctoroff; David Dinkins; Michael Bloomberg; Brad Lander)

Word Count: 1199

**End of Document**

© 20 8 Thomson Reuters. No c a m to or g na  U.S. Government Works.

**News**Room

1574