EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

MLB ENTERPRISES CORP., etc., and CLUB 44, INC.,
etc.,

                                        Plaintiffs,

                -against-                                02 Civ. 4431 (AGS)

THE CITY OF NEW YORK, et al.,                           (Action No. 1)

                                        Defendants.


-------------------------------------------------------------------- x

59 MURRAY CORP. d/b/a "New York Dolls" and AAM
HOLDING CORP. d/b/a "Private Eyes,"

                                        Plaintiffs,
                                                        02 Civ. 4432 (AGS)
                -against-
                                                        (Action No. 2)
THE CITY OF NEW YORK, et al.,

                                        Defendants.
-------------------------------------------------------------------- x


PULSE NITE CLUB, INC., etc., and 30-30 CLUB CORP.,
etc.,

                                        Plaintiffs,    02 Civ. 6193 (AGS)

                -against-                               (Action No. 3)

THE CITY OF NEW YORK, et al.,

                                        Defendants.
-------------------------------------------------------------------- x


## DECLARATION OF DAVID KARNOVSKY

**DAVID KARNOVSKY**, declares under the penalties of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.  I am Counsel to the Department of City Planning ("DCP"), the city agency which provides staff assistance to the New York City Planning Commission ("Planning Commission"). The Planning Commission is generally charged with planning for the orderly growth, development and improvement of the City of New York ("the City"); its specific responsibilities include evaluating and giving preliminary approval to amendments of the New York City Zoning Resolution ("Zoning Resolution" or "Z.R."). See, New York City Charter ("Charter"), Chapter 8, §§ 191, et seq. I make this declaration in opposition to plaintiffs' motion for a preliminary injunction and in support of defendants' cross-motion for summary judgment declaring to be valid and enforceable an amendment to the Zoning Resolution which modified the definition of "adult eating or drinking establishment" so as to clarify its application to plaintiffs and others similarly situated.

2.  In 1995, the City amended its Zoning Resolution to include use regulations governing establishments that deal principally in sexually oriented adult entertainment ("the 1995 Adult Use Regulations" or "the 1995 regulations"). These regulations governed the location of commercial establishments with a predominant, on-going focus on sexually explicit materials or activities, including adult or "triple X" book and video stores (referred to in the zoning text as "adult book stores"); topless bars and strip clubs (referred to in the text as "adult eating or drinking establishments"), and theaters regularly offering X-rated movies or topless or nude entertainment (referred to in the text as "adult theaters").

3.  By way of amendments to the Zoning Resolution adopted by the Planning Commission on August 8, 2001 and finally approved by the New York City Council ("Council")

on October 31, 2001 ("the 2001 Adult Use Amendments" or "the 2001 amendments"), the 1995 Adult Use Regulations were amended to modify the definitions of "adult establishment," "adult book store" and "adult eating or drinking establishment" to close certain loopholes utilized by adult entertainment establishments to evade enforcement, and thus more accurately and completely express the legislative intent behind the 1995 regulations.

4.   The plaintiffs in the above-captioned actions are the operators of six different commercial establishments in Manhattan and Queens that regularly feature topless or nude entertainment (purportedly in less than 40% of the customer-accessible floor area). Notwithstanding their predominant ongoing focus on adult entertainment, these establishments have continued to operate at locations where adult uses are prohibited, as a result of court decisions which misread the 1995 definitions of "adult establishment" and "adult eating or drinking establishment" so as to exclude them.

5.   The 2001 Adult Use Amendments clarify that the 60%-40% "substantial portion" test is not applicable to adult eating or drinking establishments.  Rather, the plaintiffs and all other restaurants and bars which "regularly feature" adult entertainment are subject to the adult use regulations, no matter the amount of floor area devoted to adult entertainment.  Thus, under the 2001 amendments, plaintiffs will be required either to discontinue their topless/nude entertainment, or to move to a location where adult uses are permitted, by October 31, 2002.

6.   This declaration is intended to more fully explain the nature and basis of the 2001 Adult Use Amendments and the necessity for their adoption, matters about which I am fully familiar as counsel to DCP.  The text of the 2001 amendments is included at pp. 50-66 of

the report released by the Planning Commission when it approved the amendments ("2001 Report"), a copy of which is submitted as Exhibit A.[1]

**The DCP Study**

7.   In late 1993, in response to concerns expressed about the proliferation of sexually oriented adult establishments in the City, DCP undertook an "Adult Entertainment Study" ("the DCP Study").   A copy of the study, which was completed in September 1994, is submitted as Exhibit B.   The purpose of the DCP Study was to identify the nature and extent of the impact that adult establishments have on surrounding communities and, by so doing, to assist the Planning Commission in determining whether to adopt zoning regulations specifically applicable to adult establishments.   At that time, the Zoning Resolution did not distinguish between "adult" uses and other commercial uses.   Whether or not they featured adult materials or entertainment, all "book stores" and "eating or drinking establishments" (i.e. restaurants and bars) were classified as "retail or service establishments" and permitted in many zoning districts where residential uses were also permitted.   Z.R. §§ 32-00; 32-15.[2]

8.   The DCP Study focused on three types of adult establishments with a primary focus on sexually oriented materials or activities:   adult or "triple-X" video and book stores, topless bars and strip clubs, and adult theaters showing films or live entertainment.   The DCP Study included a description of how and where these businesses operated in the City at the time

---

[1] The exhibits identified in this declaration are submitted under separate cover in two volumes. Volume I consists of Exhibits A - E and G - P.   Volume II consists entirely of Exhibit F.

[2] Under the Zoning Resolution, there are three types of zoning districts:   residential districts, commercial districts, and manufacturing districts.   Generally, residential uses are permitted in residential districts, most commercial districts, and a few manufacturing districts containing loft dwellings.   Z.R. §§ 22-11, 32-11, 42-133.

the study was conducted, a review of trends in growth and development of adult uses prior to that time, a survey of adult entertainment studies performed by other communities and adult use zoning regulations adopted in other areas, a review of previous studies and reports on adult establishments in New York City, and DCP's own survey of the impact that isolated adult establishments had on several City communities.

9.  With respect to growth trends, the DCP Study found that the number of adult establishments in New York City had increased substantially between 1965 and 1976 and again between 1984 and 1993;[3] that adult uses were generally concentrated within certain neighborhoods (such as Times Square) or along certain major vehicular routes (such as Queens Boulevard or Third Avenue in Brooklyn); and that a large majority of the City's adult establishments were located in zoning districts that permit residential development.  DCP Study at 16-24.

10. The DCP Study also considered the extent to which adult establishments have secondary impacts such as the reduction in the value of surrounding properties and the increase in neighborhood crime.  As part of this analysis, DCP examined studies of adult uses previously conducted by nine communities located throughout the country, recognizing that "a municipality may rely on the experiences of other jurisdictions that have determined that adult uses have secondary impacts."  DCP Study at iii.  In this regard, DCP noted that while "[t]he term 'adult use' is technically defined differently from municipality to municipality," it "generally refers to a

---

[3] In 1965, there were nine adult entertainment establishments in the City.  By 1993, that number had increased to 177.  Between 1984 and 1993, the number of adult book stores, peep shows and video stores increased from 29 to 86, and the number of topless bars and strip clubs increased from 54 to 68.  DCP Study at 20, 21.

commercial establishment that purveys materials or services of a sexual nature." DCP Study at 2.

11. In its study of adult uses conducted in 1980, the Town of Islip found that adult establishments located in downtown areas tended to create a "dead zone" which shoppers and other pedestrians avoided. Adult businesses located near residential areas were found to cause parking impacts, noise, and excessive night-time activity. DCP Study at 3-4. A 1978 study by the City of Whittier, California found higher turnover rates in commercial and residential areas adjacent to adult uses, numerous reports of excessive noise, drunkenness and pornographic litter connected with adult businesses, and far higher crime rates in areas containing adult businesses than in the city as a whole. DCP Study at 6. A study conducted in 1986 by the City of Austin, Texas found that the rate of sex-related crimes was substantially higher in areas housing adult businesses than in areas containing similar land uses but no adult businesses. The Austin study included a survey of real estate brokers and appraisers, a large majority of whom believed that the addition of an adult business would produce a decrease in the value of property on the same block as the adult business. DCP Study at 7.[4]

12. DCP also looked at several studies of adult uses conducted by larger cities. A 1977 Los Angeles study included a survey of real estate professionals and business persons. Those surveyed believed that a concentration of adult establishments had an adverse impact on

---

[4] DCP also examined studies conducted by Manatee County, Florida and New Hanover County, North Carolina. In considering whether to adopt adult use regulations, these counties relied exclusively on studies of adult uses performed by other municipalities. According to the reports issued by these counties, the studies that were examined identified a number of impacts associated with adult establishments, including increased crime, declining neighborhood conditions, a decrease in the value of residential property in areas with multiple adult establishments, and a decline in neighborhood-oriented businesses. DCP Study at 8-9.

the value of surrounding commercial and residential property, made it more difficult to rent office space and retain commercial tenants in the area, and made it harder for area businesses to attract and retain customers. DCP Study at 4. A 1984 study conducted for the City of Indianapolis found higher crime rates in areas containing at least one adult establishment than in similar areas without adult uses. The Indianapolis study also included a nationwide survey of real estate appraisers. A large majority of the appraisers indicated that, in their professional opinions, an adult book store would have a negative effect on the value of both residential and commercial properties located within a one block radius of the store. DCP Study at 5.

13. In 1979, Phoenix, Arizona conducted a study of adult businesses and arrests for sex-crimes. The study found that the sex-crime arrest rate for several areas containing adult businesses was six times higher than the rate for similar control areas that did not contain adult uses. DCP Study at 7. In a 1989 report, the Minnesota Attorney General reviewed various adult use studies performed within that state, including one conducted in 1980 by Minneapolis and one conducted in 1978 by St. Paul. The Minneapolis study found that the opening of even a single adult establishment within a census tract area resulted in a significant increase in the crime rate for that area. The St. Paul study found lower housing values and higher crime rates in areas with multiple adult businesses in comparison with areas containing no more than one such business. DCP Study at 8.

14. The DCP Study noted that, as a result of these and other studies, numerous cities and towns have adopted zoning regulations that place restrictions on adult uses including Boston, Phoenix, Detroit, Seattle, Atlanta, Kansas City, Los Angeles, San Diego, Chicago, and the Long Island communities of Islip, Brookhaven, Smithtown, Babylon, and Huntington. The

regulations in these municipalities generally are designed either to restrict all adult uses to a designated area, or to prevent adult uses from concentrating.  DCP Study at 9-11.

15. In addition to reviewing studies conducted by other municipalities, the DCP Study also examined several prior studies which had been conducted in New York City.  In 1977, the Planning Commission preliminarily approved several zoning amendments concerning adult establishments, but the amendments were not given final approval by the Board of Estimate.  In connection with the proposed zoning amendments, the Commission reported that there was substantial evidence that the Times Square area had experienced significant negative impacts as a result of the proliferation of adult uses in the area.  For example, during a two-year period in the early 1970's, sales tax revenues in the area declined by 43 percent compared to an 11 percent increase citywide.  Using crime data for 1975 and comparing midtown police posts with one or more adult uses to posts without an adult use, complaints for felonious assault were 142 percent higher, grand larceny complaints were 89 percent higher, and rape complaints were 185 percent higher in the posts with one or more adult uses.  DCP Study at 34-35.

16. In 1983, the Mayor's Office of Midtown Enforcement ("OME") issued an annual report which surveyed recent trends regarding sex-related businesses in the Times Square area.  The report noted that in the early and mid-1970's, that area was filled with more than a hundred sex-related businesses and was overrun with prostitutes, pimps, drug addicts, and muggers.  Using a variety of law enforcement strategies and with the assistance of crucial legislative changes, OME obtained the closure of almost half of the sex-related businesses in Times Square by 1983.  The OME report noted a corresponding drop in arrests for sex-related offenses such as prostitution and an increase in investment and development for the area.  DCP Study at 35-36.

17. In 1993, the Borough President of Manhattan formed a Task Force on the Regulation of Sex-Related Businesses in response to community concerns about increasing concentrations of sex-related businesses in Manhattan.  At a public hearing conducted by the Task Force in October 1993, a number of persons testified about the impacts caused by adult uses, such as noise, littering, late night operations, offensive signage, and a perceived decline in street or neighborhood character.  DCP Study at 38-39.

18. Also in 1993, the Chelsea Action Coalition and Manhattan Community Board 4 prepared a study of the effects that sex-related establishments have on other businesses in the Chelsea section of Manhattan.  The study included a survey of 100 Chelsea businesses located near one of the triple-X video stores and peep shows that had opened in the neighborhood.  A majority of the survey respondents indicted that adult uses had a negative impact on their businesses and on the economic viability of the community as a whole.  DCP Study at 37-38.

19. In April 1994, the Times Square Business Improvement District released a study of adult uses in Times Square.  The study compared two study areas where adult uses have concentrated with several nearby control areas without adult uses.  It found that, between 1986 and 1994, the aggregate assessed value of property in the study areas increased at a lower rate than did the value of property in the control areas.  The study also examined crime statistics and found that criminal complaints were approximately twice as high in the study areas as in the control areas.  DCP Study at 40-41.

20. As part of its study, DCP also conducted its own survey of street and signage conditions, local organizations and businesses, real estate brokers, and police and sanitation officers, and analyzed criminal complaint and property assessment data to obtain information

about the impacts of adult entertainment establishments in six areas in New York City.[5]  The

study areas were mostly in the outer boroughs in areas with lesser concentrations of adult uses.

Within each study area, DCP selected a "survey" block front, containing one or more adult

establishments, and a "control" block front, which had similar land uses but no adult

establishments.  DCP Study at 47.  DCP's survey identified a strong body of opinion that adult

entertainment uses were having negative impacts and that a further proliferation of these uses in

the community would bring about a decrease in property values and a general economic decline.

DCP Study at vi, 47-51.

      21. On the basis of its own findings and that of other organizations and localities,

DCP concluded that adult entertainment establishments, particularly in concentration, produce

negative secondary impacts upon the communities in which they are located and that the Zoning

Resolution should therefore regulate adult establishments more closely than other commercial

uses.  Although a specific set of zoning proposals was beyond the scope of the DCP Study, DCP

generally recommended that the Planning Commission consider adopting amendments to the

Zoning Resolution that would place restrictions on the proximity of adult uses to residential

areas, schools, houses of worship, and other adult establishments.  DCP Study at 65.

**The Moratorium**

      22. On November 7, 1994, the Planning Commission approved a proposed

amendment to the Zoning Resolution which established a one-year moratorium on the operation

---

[5] For purposes of its survey, DCP defined "adult entertainment establishment" as "a commercial use that defines itself as such through exterior signs and other advertisements."  Under this definition, "triple-X or XXX" video stores were included in the survey, while "neighborhood video stores that devote a small area to triple-X videos" were not. DCP Study at 1.  The survey also included "topless or nude bars" without regard to the amount of floor area devoted to topless or nude dancing Id. at 2.

of new adult establishments (and the extension or enlargement of existing establishments).  At

that time, the Planning Commission released a report, a copy of which is submitted as Exhibit C,

describing the nature of the moratorium regulations and the reasons therefor ("Moratorium

Report").  The moratorium regulations received final approval from the Council on November

23, 1994.

        23. Adopted as a preliminary response to the DCP Study, the moratorium

regulations sought to contain the proliferation of adult uses in the City while allowing sufficient

time for DCP to develop permanent regulations governing such uses (as recommended by the

DCP Study), and to allow for public review of the proposed regulations prior to their

consideration by the Planning Commission and the Council.  Moratorium Report at 1, 29-30.

The moratorium was intended to apply only to the three types of adult establishments which

were evaluated in the DCP Study and found to have adverse secondary effects:  "adult

book/video stores, topless/nude bars, and adult movie or live theaters."  Moratorium Report at 2,

30.

        24. The moratorium regulations applied to any "adult establishment," defined as

any "use" which "includes" an "adult book store," an "adult eating or drinking establishment," or

an "adult theater."  These latter terms were defined by their customary exclusion of minors,

inasmuch as "the New York Penal Code prohibits the sale of adult materials and the presentation

of adult entertainment for a fee to minors."  Moratorium Report at 30-31, 36-37.  In addition, the

terms "adult eating or drinking establishment" and "adult theater" were further defined by their

customary presentation of "topless or nude dancers, strippers or similar entertainments."  Id.

Modeled after language used by other municipalities, these definitions sought to confine the

application of the moratorium to the three types of establishments studied by DCP and "found to produce adverse secondary effects." Id. at 30-31.

## The 1995 Adult Use Regulations

25. On March 21, 1995, while the one-year moratorium was in effect, DCP and the Council's Land Use Committee filed a joint application to amend the Zoning Resolution to create a set of permanent regulations governing the types of adult establishments which were the subject of the DCP Study and the moratorium. In accordance with Charter §§ 200 and 201, the proposed regulations were referred to the City's community and borough boards and the borough presidents for review and comment, and the Planning Commission held public hearings on the proposed amendments on July 26 and 27, 1995.

26. On September 18, 1995, the Planning Commission approved the proposed adult use regulations, with certain minor modifications. At that time, the Planning Commission released a report, a copy of which is submitted as Exhibit D, describing the proposed regulations and explaining the planning considerations behind them ("1995 Report"). The proposed regulations were then considered by the Council, in accordance with Charter §§ 197-d and 200. After the conduct of additional public hearings and committee meetings, the Council gave final approval to the adult use regulations on October 25, 1995, at which time they became effective. The text of the 1995 Adult Use Regulations appears in the 1995 Report at 67-77.

27. The 1995 Adult Use Regulations rescinded the temporary moratorium regulations and replaced them with comprehensive permanent regulations designed to "minimize the potential for adverse secondary effects throughout the city" and to protect those areas and uses "particularly vulnerable to the negative effects of adult use." 1995 Report at 5, 42. Essentially, the 1995 regulations provided that adult establishments are prohibited in residential

zoning districts and commercial and manufacturing districts where residential uses are permitted. In addition, the regulations required that any adult establishment be located at least 500 feet from a school or day care center, a house of worship, another adult establishment, or a zoning district where adult uses are prohibited.  1995 Report at 7-8; Z.R. § 32-01, 42-01.

28. Like the moratorium regulations, the 1995 regulations were intended to cover only those types of establishments which were the focus of the DCP Study.  In that regard, the Planning Commission stated as follows:

> As a general matter, [these zoning regulations] are intend[ed] to [cover] only those establishments similar in nature to the types of enterprises described and studied in the DCP Study, namely book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a predominant, on-going focus on sexually explicit materials or activities.  These are the establishments analyzed in the DCP [S]tudy and found to have adverse secondary effects and as such are the only establishments covered by the adult use regulations.

1995 Report at 49 (emphasis added).

29. The 1995 regulations defined the term "adult establishment" as a commercial establishment, a "substantial portion" of which is used as an "adult book store," "adult eating or drinking establishment," "adult theater" and/or "other adult commercial establishment."  1995 Report at 67.  Although not used in the moratorium definitions, the "substantial portion" language was added to the 1995 definition of "adult establishment" to deal with the possibility of a bona fide mixed-use establishment consisting of both adult and non-adult uses (for example, a commercial establishment consisting of an adult eating or drinking establishment and a non-restaurant use, such as a bowling alley).  2001 Report at 38.  However, as will be discussed further below, the inclusion of the "substantial portion" language to address the potential for

multi-use establishments resulted in an ambiguity in the text that was seized upon by the operators of single-use adult eating or drinking establishments:  they argued, over the City's objection, that the "substantial portion" language applied to single-use establishments as well as multi-use establishments.

30. The 1995 regulations refined the definitions of the terms "adult book store," "adult eating or drinking establishment," and "adult theater" previously set forth in the moratorium regulations so as to "specifically detail the[ir] distinguishing characteristics." 1995 Report at 6.  More specifically, an "adult book store" was defined as "a book store which has as a substantial portion of its stock in trade" printed or visual material that is "characterized by an emphasis upon the depiction or description of 'specified sexual activities or specified anatomical areas.'"[6]  Id. at 67-68.  An "adult eating or drinking establishment" was defined as an eating or drinking establishment that "regularly features" live performances or films characterized by an emphasis on "specified sexual activities" or "specified anatomical areas" (or employees who, as part of their employment, "regularly expose to patrons 'specified anatomical areas'") and that customarily excludes minors.  Id.  Similarly, an "adult theater" was defined as a theater that

---

[6] "Specified sexual activities" are "(i) human genitals in a state of sexual stimulation or arousal; (ii) actual or simulated acts of human masturbation, sexual intercourse or sodomy; or (iii) fondling or other erotic touching of human genitals, pubic region, buttock, anus or female breast."  "Specified anatomical areas" are "(i) less than completely and opaquely concealed: (a) human genitals, pubic region, (b) human buttock, anus, or (c) female breast below a point immediately above the top of the areola; or (ii) human male genitals in a discernibly turgid state, even if completely and opaquely concealed."  Id.  at 68-69; Z.R. § 12-10 (definition of "adult establishment").

"regularly features" live performance or films characterized by an emphasis on "specified sexual activities" or "specified anatomical areas" and that customarily excludes minors. Id. at 68.[7]

31. As explained in the 1995 Report, the definitional phrase "characterized by an emphasis upon specified sexual activities or specified anatomical areas" was used in the definitions of "adult book store," "adult eating or drinking establishment" and "adult theater" with "the intent of regulating those performances, videos and materials that have a principal focus on sexual activities or anatomy as entertainment," inasmuch as the Adult Use Regulations were "not intended to regulate performances or films displaying incidental nudity." 1995 Report at 51-52.

32. The phrase "substantial portion" was used in the definition of "adult book store" to indicate that the 1995 regulations were intended to cover book and video stores with a predominant, ongoing focus on adult material, and not neighborhood or general interest book and video stores offering only a modest amount of adult material. 1995 Report at 50-51. The 1995 regulations listed three factors to be considered in determining whether a bookstore has a "substantial portion" of its stock in adult materials: 1) the amount of adult stock accessible to customers as compared to the total stock accessible to customers; 2) the amount of accessible floor area devoted to adult stock; and 3) the amount of accessible floor area devoted to adult stock as compared to the total accessible floor area. Id. at 50-51, 69. These factors were thought to be objective indicators of whether a bookstore had a predominant ongoing focus on adult material. Id. at 51.

---

[7] An "other adult commercial establishment" was defined as any type of establishment (other than an eating or drinking establishment, bookstore or theater) that "features employees who as part of their employment, regularly expose to patrons 'specified anatomical areas'" and that customarily excludes minors (such as a topless car wash). 1995 Report at 67-68.

33. The "substantial portion" language was not used in the definitions of "adult eating or drinking establishment" or "adult theater."  Rather, those adult uses were defined through the use of the phrases "regularly features" and "regularly expose."  These phrases were used to indicate that the 1995 regulations were intended to apply to all restaurants, cabarets and theaters "which offer adult entertainment on a frequent, ongoing basis" and not to "establishments which offer adult entertainment "on an occasional basis, such as a monthly live performance or a nightly midnight showing at a movie theater." 1995 Report at 51-52.

34. In its 1995 Report, the Planning Commission noted that it would be important to monitor the location of adult establishments under the new regulations to make certain that the legislative goals had been achieved, stating as follows:

> Because of the Commission's concern that the regulations provide effective and comprehensive protection against the adverse secondary effects of adult establishments, it believes that it is important to monitor the location and operation of adult uses under the proposed regulations to ensure that the goal of comprehensive protection is achieved.

1995 Report at 62. Accordingly, the Planning Commission directed DCP to report back "in two years time on the effect and enforcement of the adult use regulations." Id.

**Implementation**

35. Immediately after their adoption, the 1995 Adult Use Regulations were challenged in three separate lawsuits.[8]  Although not formally consolidated, these lawsuits were

---

[8] Commenced by one topless cabaret, Stringfellow's of New York, Ltd. v. City of New York, Index No. 113049/96 (Sup. Ct. N.Y. Co), challenged the 1995 regulations under the state constitution only. Amsterdam Video, Inc. v. City of New York, Index No. 103568/96 (Sup. Ct. N.Y. Co.), was commenced by approximately 100 adult establishments and raised federal and state constitutional claims. Hickerson v. City of New York, Index No. 103569/96 (Sup. Ct. N.Y. Co.), was brought by patrons of adult establishments and likewise raised federal and state claims. Continued...

decided by way of a single decision granting the City summary judgment upholding the regulations on their face under the state constitution. See, Stringfellow's of New York, Ltd. v. City of New York, 91 N.Y.2d 382, 671 N.Y.S.2d 406 (1998), aff'g, 241 A.D.2d 360, 663 N.Y.S.2d 812 (1st Dept. 1997), aff'g, 171 Misc.2d 376, 653 N.Y.S.2d 801 (Sup. Ct. N.Y. Co. 1996).  A copy of relevant portions of the joint appendix submitted to the Appellate Division in Amsterdam Video and Hickerson ("1995 Appendix") is provided as Exhibit E; a copy of the City's supplemental appendix including maps submitted to Court of Appeals in all three cases ("1995 Map Appendix") is provided as Exhibit F.[9]

36. Applying state constitutional standards, the New York Court of Appeals determined, based on the legislative record which included the DCP Study, that the 1995 regulations were "not an impermissible attempt to regulate the content of expression but rather [were] aimed at the negative secondary effects caused by adult uses, a legitimate governmental purpose."  91 N.Y.2d at 399.  The Court of Appeals further found that the 1995 regulations "represent[ed] a coherent regulatory scheme designed to attack the problems associated with adult establishments" and were "no broader than necessary" to effectuate that purpose.  91 N.Y.2d at 400.

---

After the City removed Amsterdam Video and Hickerson to this Court, the state constitutional claims were remanded to state court (and the federal claims were held in abeyance).

[9] Submitted from the 1995 Appendix as Exhibit E are the affidavits of Joseph Rose, William Bernstein and Andrew S. Lynn, which discuss the number of potential sites and the amount and character of the land area available for adult use, and DCP's analysis of transit access to those areas.  The 1995 Map Appendix submitted in a separate volume as Exhibit F includes two sets of maps:  one set showing the amount of unencumbered land in each borough available for adult uses in 1995, and the other set showing the accessibility of those areas by public transportation.

37. Finally, the Court held that the 1995 regulations assured reasonable alternative avenues of communication for the plaintiffs, insofar as there was sufficient land area open for use by adult businesses. Id. at 402. Moreover, this available land area was zoned to "permit a wide mix of commercial, retail, entertainment and manufacturing uses" and, in most instances, was "within a 10-minute walk from a subway line or major bus route." Id.

38. The Amsterdam Video and Hickerson plaintiffs subsequently attempted to pursue their federal claims in this Court. However, their facial First Amendment claims were rejected on collateral estoppel grounds, inasmuch as the issues that were dispositive of these claims had already been decided against them in state court. That decision was affirmed by the United States Court of Appeals for the Second Circuit, and thereafter the United States Supreme Court declined review. See, Hickerson v. City of New York, 146 F.3d 99 (2d Cir. 1998), cert. denied, 525 U.S. 1067 (1999). In addition, the Second Circuit had previously affirmed the grant of summary judgment to the City in a federal action challenging, on First Amendment and equal protection grounds, the differential treatment of male and female toplessness in the 1995 Adult Use Amendments. See, Buzzetti v. City of New York, 140 F.3d 134 (2d Cir. 1998).

39. The 1995 regulations were not implemented until the latter part of 1998, when judicial stays of enforcement were lifted. Prior to their implementation, the City's Department of Buildings ("DOB") issued several Operation Policy & Procedure Notices ("OPPN's") to provide administrative guidelines regarding the meaning of certain terms and phrases used in the regulations.

40. OPPN 6/98, a copy of which is submitted as Exhibit G, set forth criteria for determining whether a book or video store has a "substantial portion" of its stock in adult

materials and is thus an "adult book store." OPPN 6/98 also addressed the application of the "substantial portion" test to multi-use commercial establishments.

41. Issued on August 13, 1998, OPPN 6/98 superseded OPPN 4/98 which had been issued three weeks earlier on July 22, 1998. OPPN 4/98 was rescinded because its drafters had misread the text due to the ambiguity in the definition of "adult establishment" discussed above: they mistakenly read the text to require application of the "substantial portion" test to single-use adult eating or drinking establishments and adult theaters. OPPN 6/98 clarified that the "substantial portion" test applied only to adult book stores and to multi-use commercial establishments "with one or more uses, at least one of which is not a book store, an eating or drinking establishment, a theater or an 'other adult commercial establishment'" (emphasis added).[10]

42. As to adult book stores, OPPN 6/98 stated that, for purposes of enforcing the 1995 Adult Use Regulations, a book/video store should be considered an "adult book store" if 1) at least 40 percent of the total accessible stock for sale or rent to customers is comprised of adult materials, 2) at least 40 percent of the total accessible floor area and cellar space contains stock in adult materials, or 3) 10,000 or more square feet is occupied by adult materials. As to multi-use commercial establishments with at least one bona fide non-adult use, OPPN 6/98 stated that such an establishment should be considered an "adult establishment" where it has "at least 40

---

[10] Before it was rescinded, OPPN 4/98 was included in papers submitted to this Court in Amsterdam Video to address the plaintiffs' remaining vagueness claim. In their complaint, the Amsterdam plaintiffs had contended that the terms "substantial portion" and "regularly feature" were vague. The plaintiffs withdrew that claim after DOB issued OPPN 4/98 and OPPN 5/98, setting forth administrative guidelines as to the meaning of those terms. OPPN 4/98 was clarified and replaced by OPPN 6/98 shortly thereafter.

percent of the floor and cellar area that is accessible to customers available to adult use" or 10,000 or more square feet occupied by an adult use.

43. The 60%-40% "substantial portion" test set forth in OPPN 6/98 was in keeping with the general guideline set forth by the Planning Commission when approving the 1995 regulations.  In that regard, the 1995 Report stated as follows:

> As a general guideline, the Commission believes that an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied in the DCP Study and thus be an "adult establishment" or an "adult book store."  However, there may be exceptions to this general guideline.

1995 Report at 50.

### Successful Efforts to Evade Enforcement

44. During the next two years, the City commenced a comprehensive initiative to enforce the 1995 Adult Use Regulations which included the commencement of civil enforcement actions against approximately 100 adult establishments operating at prohibited locations.  In most instances, the City was initially successful in obtaining court orders requiring the closure of these establishments.

45. Following these initial closures, however, the adult entertainment industry responded to the City's enforcement efforts with widespread and ultimately successful attempts to evade enforcement through sham compliance.  To pass the 60%-40% "substantial portion" test, numerous triple-X book and video stores sought to increase the percentage of non-adult

stock and floor area without having any reasonable expectation that the non-adult stock would attract customers.[11]

46. As to adult eating or drinking establishments, numerous topless bars and strip clubs operating at prohibited locations erected partitions so as to limit their regularly featured adult entertainment to less than 40 percent of the total floor area accessible to customers. Seizing upon the aforementioned ambiguity in the text, they argued over the City's objection that the "substantial portion" test was applicable to adult eating or drinking establishments. 2001 Report at 35-36.

47. During court proceedings to enforce the 1995 regulations, the City explained, that, as discussed above, the "substantial portion" analysis applied only to adult book stores and multi-use commercial establishments. It did not apply to single-use eating or drinking establishments that regularly feature adult entertainment.

48. As intended, the 1995 regulations required a two-step analysis to determine whether a single use eating or drinking establishment, or a single use book/video store, was an "adult establishment." Under the first step of the analysis, an "eating or drinking establishment"

_____

[11] Because it was apparent that the presence of non-adult materials in these book/video stores did not alter their essential nature as sexually oriented adult establishments, several courts determined that their compliance efforts were a sham and that they remained in true nature adult establishments subject to the 1995 Adult Use Regulations. Indeed, the "mechanical application of the 60/40 rule" was rejected by one court as an absurd "Pavlovian approach" which "does not comport with the history or spirit of the Zoning Resolution and, in fact, makes a mockery of the legislation." See, City of New York v. Show World, 178 Misc.2d 812, 824, 683 N.Y.S.2d 376 (Sup. Ct. N.Y. Co. 1998) (denying preliminary injunction on other grounds). Nonetheless, the New York State Court of Appeals ultimately rejected this position in City of New York v. Les Hommes, 94 N.Y.2d 267, 273, 702 N.Y.S.2d 576 (1999), rev'g, 258 A.D.2d 284, 685 N.Y.S.2d 49 (1st Dept.), holding that the 1995 regulations and the administrative guidelines set forth in OPPN 6/98 explicitly limited the inquiry to the percentage of stock and floor area devoted to adult and non-adult materials and "must be enforced as written," even where the inclusion of non-adult materials was found to be a sham.

would qualify as an "adult eating or drinking establishment" if it "regularly featured" entertainment characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas" and customarily excluded minors (thus distinguishing it from a restaurant/bar which featured adult entertainment only occasionally). A book/video store would qualify as an "adult book store" if a "substantial portion of its stock-in-trade" was devoted to adult materials (thus distinguishing it from a neighborhood book/video store which offered only a modest amount of adult materials).

49. Under the second step of the analysis, a determination was then to be made as to whether the adult eating or drinking establishment, or the adult book store, occupied a "substantial portion" of the commercial establishment in question, so as to render that establishment an "adult establishment." As explained above, the "substantial portion" test was included in this context to deal with multi-use commercial establishments. But where the commercial establishment in question consisted entirely of a single-use adult eating or drinking establishment, or a single use adult book store, 100% of the establishment was an adult establishment and the "substantial portion" test was clearly met.

50. This two-step approach was contemplated by the Planning Commission, which recognized that, in most instances, the commercial establishment in question would consist entirely of one or more adult uses. See, 1995 Report at 6 (noting that "the proposed regulations would define "adult establishments and four types of facilities -- adult book stores, adult eating or drinking establishments, adult theaters, and other adult commercial establishments -- which alone or in combination would constitute an adult establishment.") Indeed, were this not so, then in the case of adult book stores, the inclusion of the "substantial

portion" test in both the definition of "adult establishment" <u>and</u> the definition of "adult book store" would have been superfluous.

51. Moreover, it would have made little sense for the Planning Commission to apply the "substantial portion" test to adult eating or drinking establishments, as there would have been no basis in the legislative record to conclude that the negative secondary impacts of a topless bar or strip club are any less present where the topless or nude dancers frequent only part of the customer-accessible floor space.   Indeed, the moratorium regulations defined adult establishment so as to include <u>any</u> establishment presenting "topless or nude dancers, strippers or similar entertainments," Moratorium Report at 36-37, and we know of no other jurisdiction which applies a "substantial portion" analysis to establishments featuring topless or nude entertainment.

52. The City's position in this regard was accepted by some courts.  For example, in <u>City of New York v. J & J Tummy Yummies d/b/a/ Naked City</u>, 179 Misc.2d 527, 528-30, 679 N.Y.S.2d 807 (Sup. Ct. Queens Co. 1998), the court rejected an argument that a strip club erecting a 10-foot high double curtain between its restaurant and stage areas to allegedly limit adult entertainment to less than 40% of the customer-accessible floor area was not an adult establishment, stating as follows:

> By these definitions, the "Naked City" is an adult establishment since there was demonstrated by testimony … that almost every defined sex activity was openly conducted and displayed publicly to customers of the place. …  The very name of the establishment says it all: NAKED CITY. …

> Moreover, the advertising of the business proclaims that it holds itself out to the public as an adult establishment.  Customers are given a business card which reads in part:  "Over 200 Beautiful NUDE Girls"  "LESBIAN  Shows  Every  Friday  & Saturday" "Doors Unzip: Mon-Sat, 6 pm-4 am." In

> evidence is a magazine dealing in sexual subjects, "Xtreme," in which Naked City has a full page ad, in part which reads "The Greatest Nude Club in New York." ...

> The court does not accept the contention that the restaurant area in this case can be considered as a separate use from the live entertainment ....

See also, City of New York v. Dezer Properties, 259 A.D.2d 116, 121, 697 N.Y.S.2d 41 (1st Dept. 1999) (rejecting as "a sham" the VIP Club's "attempt to comply with the 60-40 rule" by separating its restaurant and topless dancing areas, and finding that "the VIP Club is still essentially a topless bar," there being "no conceivable reason why anyone uninterested in topless dancing would choose [that] club over the many other nightclubs, bars and restaurants in the Flatiron district ...."), rev'd, 95 N.Y.2d 771, 710 N.Y.S.2d 836 (2000).

53. Nonetheless, the contrary position, urged by topless bars and strip clubs, was ultimately adopted by the New York State Court of Appeals, which held in Dezer Properties, supra, that an eating or drinking establishment devoting less than 40 percent of its floor area to regularly featured adult entertainment was not an adult establishment subject to the 1995 regulations.[12]   As a result, restaurants and clubs that regularly featured topless or nude entertainment in a portion of their premises evaded classification as adult establishments and continued to operate at prohibited locations.

---

[12] The analysis of the Court of Appeals in Dezer Properties stemmed from a misreading of the 1995 regulations, as a result of the aforementioned ambiguity in the definition of "adult establishment."   As explained above, the 1995 regulations required a two-step analysis to determine whether an eating or drinking establishment was an "adult establishment": if a single-use eating or drinking establishment regularly featured adult entertainment, it was an adult eating or drinking establishment, and thus an adult establishment.   The Court of Appeals collapsed this two-step analysis into one step, thus mistakenly requiring a comparison of the adult and non-adult areas of an eating or drinking establishment to determine whether a "substantial portion" of the floor area was dedicated to adult entertainment.   96 N.Y.2d at 773.

The 2001 Application

54. As of 2000, according to information compiled by DCP, there were 101 "60/40 establishments" operating in locations where adult uses are prohibited, including triple-X book and video stores, topless bars and strip clubs, and theaters offering adult entertainment. 2001 Report at 6, 10.  Of these 101 establishments, approximately 75 were pre-existing establishments that adopted 60/40 configurations in response to the 1995 regulations; the other 26 were new establishments which opened on a 60/40 basis after implementation of the 1995 regulations, with one going by the name "Sixty/Forty Video." Id. at 10.[13]

55. After "monitor[ing] the location and operation of adult uses under the [1995] regulations" and recognizing that "the goal of comprehensive protection" from adverse secondary effects had not been achieved, 1995 Report at 62, DCP filed a Land Use Review Application seeking to amend the 1995 Adult Use Regulations on March 23, 2001 ("2001 Application").  The 2001 Application proposed changes in the definitional language to better and more completely reflect the legislative intent behind the 1995 regulations to address the proliferation of 60/40 establishments operating at prohibited locations notwithstanding their continued predominant and ongoing focus on adult materials or entertainment.

56. On March 26, 2001, the 2001 Application was referred to the City's community and borough boards and the borough presidents for review and comment in

---

[13] Of the 101 "60/40 establishments," 56 were located in Manhattan, 29 in Queens, nine in Brooklyn, six in the Bronx, and one in Staten Island." 2001 Report at 6.  Citywide, they consisted of 36 eating or drinking establishments, 29 bookstores, and 36 theaters.  Id.  In this regard, video stores with "peep booths" were categorized as theaters rather than bookstores, since the definition of "adult theater" set forth in the 1995 regulations included commercial establishments where regularly featured adult entertainment was "viewed from individual enclosures."  1995 Report at 68.

accordance with Charter §§ 200 and 201.  2001 Report at 19-20.  Three of the five borough boards submitted recommendations to the Planning Commission regarding the proposed amendments:  the Brooklyn and Queens Borough Boards voted in favor of the application and the Manhattan Borough Board voted against the application.  Copies of the recommendations of the borough boards are submitted as Exhibit H.

57. In addition, two borough presidents commented on the proposal:  the Queens Borough President recommended approval of the proposed amendments and the Manhattan Borough President recommended disapproval.  Copies of the recommendations of the borough presidents are submitted as Exhibit I.

58. The Planning Commission also received comments and recommendations from 20 community boards covering all of the five boroughs.  Fourteen community boards recommended adoption of the proposed amendments, and five boards voted against approval.[14] Copies of the recommendations of the community boards are submitted as Exhibit J.

59. The Planning Commission held a public hearing on the proposed amendments on May 23, 2001.  Eighteen people spoke at the hearing, with five expressing support for the proposal and thirteen expressing opposition.  2001 Report at 24.  A transcript of the public hearing is submitted as Exhibit K.

60. Following the public hearing, DCP proposed modifications to the proposed amendments to eliminate perceived ambiguities and to address certain concerns raised during the

---

[14] In addition, one community board from Staten Island expressed opposition only to proposed language that would clarify that adult establishments are not permitted in or within 500 feet of manufacturing districts where residential use is permitted as of right or by special permit or authorization, see infra at fn. 15, because such an amendment would allegedly allow more residential development in Area M of the Special South Richmond Development District, a manufacturing district where residential use is permitted by special permit.

public review process.  2001 Report at 41-48.  These modifications included the addition of a provision establishing a one-year amortization period for those existing establishments that made financial expenditures in reliance upon the 60%-40% "substantial portion" test.  Id. at 42-44.

61. On August 8, 2001, the Planning Commission approved the proposed amendments as modified by DCP.  The proposed amendments were then referred to the Council for consideration.  The Council's Subcommittee on Zoning and Franchises conducted a public hearing on the proposed amendments on October 1, 2001.  A transcript of the Subcommittee hearing is submitted as Exhibit L.

62. On October 25, 2001, both the Subcommittee on Zoning and Planning and the full Land Use Committee approved the amendments at regularly scheduled meetings. Transcripts of these meetings are submitted as Exhibits M and N, respectively.  On October 31, 2001, the full Council gave final approval to the amendments, in accordance with Charter §§ 197-d and 200.  A copy of the Council Resolution No. 2096 approving the 2001 Adult Use Amendments is submitted as Exhibit O.

**The 2001 Adult Use Amendments**

63. When the Planning Commission approved the 2001 Adult Use Amendments, it released a report, previously referred to as the "2001 Report" (Exhibit A), describing the proposed amendments and explaining the planning considerations behind them.  As indicated in the 2001 Report, the 2001 amendments were "limited in nature" and were principally intended "to clarify certain definitions in the [1995 regulations] in order to effectuate the [Planning] Commission's original intent in response to efforts by the operators of adult establishments to undermine implementation of the 1995 regulations."  2001 Report at 29.

64. To accomplish this purpose, the definition of "adult eating or drinking establishment" was amended to make clear that it covers <u>any</u> eating or drinking establishment where adult entertainment is regularly featured, no matter the amount of floor area devoted to the adult entertainment. In this regard, the Planning Commission stated as follows:

> In the case of "adult eating or drinking establishments," court rulings have mistakenly applied an analysis under which, once it is found that an eating or drinking establishment "regularly features" adult entertainment, it must then be determined whether a "substantial portion" of the floor area of the establishment is dedicated to adult entertainment. … This approach has led to artificial separation of adult eating or drinking establishments into purportedly "adult" and "non-adult" sections … [resulting in] "60/40" eating or drinking establishments [which] have continued in operation.

> The concept that only the specific area where adult entertainment is offered in an "eating or drinking establishment" constitutes the "adult eating or drinking establishment" is plainly inconsistent with the intent of the 1995 Adult Use Regulations. Under the proposed amendments, the definition of "adult eating or drinking establishment" would be modified to provide that such an establishment is an "eating or drinking establishment" which regularly features live performances or films in "any portion of the establishment," thereby affirming the intent of the 1995 Adult Use Regulations that it is immaterial how much floor space in the eating or drinking establishment is used for the presentation of adult entertainment, such as topless dancing.

2001 Report at 35-37.

65. Thus, the amended definition provides that an "adult eating or drinking establishment" is an "eating or drinking establishment which regularly features <u>in any portion of such establishment</u>" live performances or films characterized by an emphasis on "specifie sexual activities" or "specified anatomical areas" (or employees who, as part of th

employment, "regularly expose to patrons to 'specified anatomical areas'") and that customarily excludes or restricts minors.    2001 Report at 51-52; Z.R. § 12-10, definition of "adult establishment," ¶ 1(b) (emphasis added).

66. As to the definition of "adult book store," it was amended to address the proliferation of book and video stores which have evaded enforcement despite their primary focus on adult materials.  It now goes beyond a mechanistic analysis of stock and floor area to include additional objective criteria common among and exclusive to stores having a predominant focus on sexually explicit material.[15]

67. Finally, the definition of "adult establishment" set forth in the Zoning Resolution was amended to clarify that an "adult establishment" is any "commercial establishment which is or includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof as defined below."  2001 Report at 50; Z.R. § 12-10, definition of "adult establishment, ¶ 1 (emphasis added).

68. Similar to the language used initially in the moratorium regulations, the phrase "which is or includes" replaced the phrase "where a substantial portion of the establishment includes" used in the 1995 regulations.  Initially intended to apply to multi-use establishments,

---

[15] Under the amended definition, an "adult book store" is a book or video store that offers adult materials as a "substantial portion" of its stock-in-trade.  2001 Report at 50; Z.R. § 12-10, definition of "adult establishment," ¶ 1(a).  As before, the "substantial portion" analysis looks to customer-accessible stock and floor area.  2001 Report at 54-55; Z.R. § 12-10, definition of "adult establishment," ¶ 2(d).  However, to include those establishments which have superficially complied with the "substantial portion" test but are still essentially adult establishments, the amended definition includes a proviso clarifying that non-adult material shall not be considered stock-in-trade for purposes of the "substantial portion" comparative analysis where one or more of eight specified physical or operational features are present.  Id.

the "substantial portion" language was eliminated to remove the ambiguity in the text that

allowed single-use eating or drinking establishments to evade enforcement, as discussed above.[16]

Thus, as relevant here, the amended definition clarifies that an "adult establishment" is any

establishment which is or includes an adult eating or drinking establishment.[17]

       69. As noted above, the 2001 amendments include an amortization provision for

adult establishments that made investments to comply with the 60%-40% substantial portion test.

The amended text provides that any establishment in existence as of August 8, 2001 which (i)

"made financial expenditures so as to avoid becoming subject to the [1995 regulations]" and (ii)

is defined as an adult establishment pursuant to the 2001 amendments, shall terminate as an adult

establishment within one year of the effective date of the 2001 amendments -- that is, by October

31, 2002.  2001 Report at 63-65; Z.R. § 72-41.  Moreover, where the establishment "has not

---

[16] As noted above, the 1995 language "anticipated the possibility of a bona fide 'mixed use' establishment consisting of both an adult and a non-adult use, although no such uses were identified in the DCP Study."  2001 Report at 38.  However, some operators of adult establishments "claimed 'mixed use' status through artificial separation of an adult establishment into multiple components, e.g. a topless bar and a 'cigar lounge.'"  Id.  Because the "inspection and enforcement history demonstrate[d] that these so-called 'mixed use' establishments function[ed] as integrated adult establishments," the Planning Commission determined that the "substantial portion" language was unnecessary in this context.  Id.

[17] In addition to amending the foregoing definitions, the 2001 Adult Use Amendments added language affirming that adult establishments are not permitted in any manufacturing districts in which residences, joint living-work quarters for artists or loft dwellings are allowed as-of-right or by special permit or authorization, nor are they permitted within 500 feet of such districts, even where the special permit or authorization determination requires an assessment of the impact of residences on commercial or manufacturing uses.  2001 Report at 58-61; Z.R. §§ 32-01(b), 42-01(a),(b).  The 2001 amendments also added language clarifying which adult establishment has priority rights, for purposes of enforcing the provision prohibiting an adult establishment from locating within 500 feet of another adult establishment.  In this regard, the amended text provides that an adult establishment is "established upon the date of a permit issued by the [D]epartment of [B]uildings therefor," subject to DOB rules regarding the failure to perform authorized work or to operate under the permit.  2001 Report at 41, 59-60, 62; Z.R. §§ 32-01, 42-01.

recovered substantially all such financial expenditures," the Board of Standards and Appeals ("BSA") may extend the amortization period beyond one year, upon application filed "at least 120 days prior to the date on which such establishment must terminate." Id. I am informed that no adult establishment currently operating at a prohibited location on a 60/40 basis filed an application with the BSA for an extension of the amortization period (and such an application would no longer be timely).

70. As of 2000, there were 101 60/40 establishments that will be required to relocate by October 31, 2002, including 36 60/40 eating or drinking establishments. 2001 Report at 10.  Like the 1995 regulations, the 2001 amendments make available ample land area to accommodate these relocating establishments and any new adult establishments.  When the 1995 regulations were adopted, DCP conducted an analysis of potential development sites available for adult uses.  To make this assessment, DCP staff studied maps of the zoning districts where adult uses were permitted (approximately 11% of the City's overall land area), and excluded from the analysis any "encumbered properties" unlikely to be developed for commercial use (such as sites occupied with public utilities or oil storage facilities, airports and large tracts of publicly owned vacant property) and any sites located within 500 feet of any "sensitive receptors" (i.e., houses of worship, schools and day care centers).  Affidavit of Andrew S. Lynn sworn to September 17, 1996 ("Lynn Aff.") at ¶ 6 [1995 Appendix at A 1679-80]; Borough Maps Showing Permitted Areas [1995 Map Appendix].

71. DCP determined that, in 1995, there were nearly 5,000 acres of unencumbered land available for adult uses, which allowed for the operation of more than 500 adult establishments, each having up to 10,000 square feet of usable floor area (far more than that occupied by most adult establishments).  Affidavit of Joseph Rose sworn to August 20, 1996

("Rose Aff.") at ¶ 48 [1995 Appendix at A 498].  At that time, there were approximately 177 adult establishments, 29 of which were already operating at permitted locations and 148 of which would be required to relocate in order to continue their adult uses.  2001 Report at 9.[18]  As recognized by the New York State Court of Appeals in Stringfellow's, and the United States Court of Appeals in Buzzetti, this available land area was more than enough to accommodate the 148 establishments that were required to relocate.

72. Since 1995, there have been 13 changes in the zoning map which have rezoned certain areas where adult uses had been permitted.  These map changes have reduced the amount of unencumbered land area available to adult establishments by about 200 acres.  Maps showing the land area eliminated as a result of these zoning map changes are submitted as Exhibit P.  In addition, since 1995, changes in the number and location of "sensitive receptors" have further reduced the land area available to adult establishments by about another 65 acres, again reducing the number of potential development sites.  Using the same approach as used in the 1995 analysis, DCP estimates that there are now approximately 4,800 acres of unencumbered land available for adult uses, allowing for the operation of approximately 450 adult establishments, each having up to 10,000 square feet of usable floor area (far more than typically required).[19]

---

[18] When DCP determined that there were approximately 148 adult establishments that would be required to relocate when the 1995 regulations were implemented, DCP did not anticipate that a large percentage of these establishments would be permitted to evade enforcement and remain at their current locations through sham compliance.

[19] DCP initially calculated the reduction of land area available for adult uses during its environmental assessment of the 2001 amendments.  At that time, 11 post-1995 zoning map changes had been adopted, and four more had been proposed.  Those calculations were recently updated, as two of the proposed map changes were not ultimately adopted, and the land area covered by a third was reduced by the Council.

73. As of 2000, the number of adult establishments citywide had decreased from 177 in 1993 to 136, with 101 operating at prohibited locations on a 60/40 basis (including 36 eating or drinking establishments) and 35 operating at permissible locations.[20]  2001 Report at 6, 10.  Consequently, notwithstanding the slight decrease in available land, there remains more than sufficient land area to accommodate the 101 establishments required to relocate.  In fact, DCP determined that the estimated number of potential sites for adult business in New York City decreased by 9% between 1995 and 2000, while the number of nonconforming adult businesses required to relocate decreased by 32% during the same period (from 148 in 1995 to 101 in 2000).

74. Moreover, the character of the areas where adult uses are permitted, and the accessibility of these areas, have not changed since 1995.  As before, the zoning districts permitting adult uses are zoned for and developed with a wide variety of commercial uses, including retail, office, service and entertainment, in addition to manufacturing and industrial uses.  See, Lynn. Aff. at ¶ 2-4 [1995 Appendix at A 1677-79]; Affidavit of William Bernstein sworn to August 21, 1996 ("Bernstein Aff."), at ¶¶ 4-14 [1995 Appendix at A 502-508].  And as before, these areas are largely accessible by public transportation.  See, Rose Aff. at ¶ 47 [1995 Appendix at A 498); Bernstein Aff. at ¶ 3 [1995 Appendix at A 502]; DCP Transit Analysis [1995 Appendix at A 819-22)]; Transit Access Maps [1995 Map Appendix].

75. It is therefore apparent that, as challenged here, the 2001 Adult Use Amendments were adopted to clarify the 1995 text so as to further effectuate its legislative

---

[20] Of the 35 establishments at permissible locations, nine existed in 1993 and 26 were established during or after 1998, following implementation of the 1995 regulations.  2001 Report at 9-10. Three of the 36 establishments have since been rendered non-conforming by a zoning map change affecting Long Island City, which became effective in July 26, 2001.  Under the 1995 regulations, these establishments had one year from the effective date of the map change to convert to a conforming use or to relocate.  Z.R. § 52-77.

purpose.  Thus, like the 1995 regulations, the 2001 amendments are a legitimate attempt to address the adverse secondary impacts of adult entertainment establishments that fully complies with constitutional standards.  Plaintiffs' facial challenge to the amended definitions of "adult establishment" and "adult eating or drinking establishment" should therefore be rejected on the merits.

Dated:      New York, New York
            September 4, 2002

                                        _____
                                        DAVID KARNOVSKY