UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

| | | |
|---|---|---|
| 725 EATERY CORP., etc., *et ano.*, | : | |
| Plaintiffs, | | |
| | : | |
| - against - | | Civil Action No. |
| | : | 02 CV 4431 (LJL) |
| THE CITY OF NEW YORK, et al., | | |
| Defendants. | : | |

------------------------------------------------------------X

| | | |
|---|---|---|
| 59 MURRAY ENTERPRISES INC., etc., *et al.*, | : | |
| Plaintiffs, | | |
| | : | |
| - against - | | Civil Action No. |
| | : | 02 CV 4432 (LJL) |
| THE CITY OF NEW YORK, et al., | | |
| Defendants. | : | |

------------------------------------------------------------X

| | | |
|---|---|---|
| CLUB AT 60TH STREET, INC., etc., *et al.*, | : | |
| Plaintiffs, | | |
| | : | |
| - against - | | Civil Action No. |
| | : | 02 CV 8333 (LJL) |
| THE CITY OF NEW YORK, | | |
| Defendant. | : | |

------------------------------------------------------------X

_____

# DECLARATION OF DAVID M. TALLA IN SUPPORT OF CLUB PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

_____
**(28 U.S.C. § 1746)**

I, David M. Talla, hereby declare as follows:

1. I submit this Declaration in support of the Club Plaintiffs' Motion for Partial Summary Judgment and have personal knowledge of all the facts stated herein except any stated on information and belief.

1

2. I filed a previous declaration in this action as pages 227 – 247 in Plaintiffs' Joint Appendix filed on November 21, 2018, in support of the Club Plaintiffs' Motion for a Preliminary Injunction (filed in Civil Action No. 02 CV 8333 as part of Doc. No. 62), a copy of which is attached as Exhibit A to this declaration in support of the Club Plaintiffs' current Motion for Partial Summary Judgment. I attest that I have reviewed all the facts stated therein and affirm that they are still true except any as noted below. I supplement that declaration by the following additional sworn statements:

3. Sapphire temporarily closed due to the COVID pandemic, in compliance with all relevant governmental orders, but otherwise has continued in uninterrupted operation since it first opened.

4. For the reasons stated in Exhibit A of my prior declaration referenced above, even if the City's permitting system were revised to meet all constitutional requirements, because of the type of very upscale business we operate and our clientele, we would not consider relocating our business outside of Manhattan. If forced to close in Manhattan, Sapphire would not attempt to relocate.

5. Additionally, at all relevant times it has been my desire to acquire as many legally permissible sites for 100% adult eating or drinking establishments in Manhattan as possible. This is because my assessment of the market is that the demand for such businesses in that borough greatly outweighs its supply.

6. Consistent with my desire to acquire and operate the maximum number of lawful adult live entertainment establishments in Manhattan, while this lawsuit has been

pending, after constant searching, I was able to acquire and establish two lawfully located 100% adult eating and drinking establishments in Manhattan.

7. In our three Manhattan businesses (two 100% and the 60/40 which is one of the Club Plaintiffs herein), I have noticed no diminution of customer demand and would not expect such, since there are currently a total of only three 100% adult eating or drinking establishments (and five 60/40 eating or drinking establishments) in Manhattan, but I am informed and believe that in years past there were a great many more such businesses operating in Manhattan.

## MY OTHER TWO MANHATTAN ADULT BUSINESSES

### Sapphire 2

8. The first of my two 100% establishments in Manhattan is referenced in my prior declaration (Sapphire 2, located at 20 West 39th Street) and involved the acquisition and development of one of the very few legally permissible and commercially feasible locations for an adult business in Manhattan not already used for an adult business.

9. As documented in greater detail in ¶¶ 26-33 of my prior declaration, getting Sapphire 2 open required us to overcome two huge hurdles: (1) a mountain of time-consuming approvals from a wide variety of City officials (as well as from the State Liquor Authority), none of which seemed subject to any time limits for prompt action; and (2) far worse, overcoming the threat posed by a competitor business which challenged our right to vest due to its behind-the-scenes backing of the attempted creation of a nearby "church" created for the sole purpose, in my opinion, of attempting to block our permit applications.

10. Michael Berzak was our lead architect hired to ensure that Sapphire 2 obtained all the requisite permits and submitted all the requisite construction documents and permit applications necessary to vest the Sapphire 2 site as a lawful site for a 100% adult establishment and, thereafter to get the site remodeled in the manner we intended to operate it.

11. I have read the Declaration of Mr. Berzak which is being contemporaneously submitted in support of the Club Plaintiffs' Motions For Partial Summary Judgment. I believe it is entirely accurate and correctly describes the nightmare of seemingly endless problems and delays that were caused by the City in both getting the Sapphire 2 site vested for use as an adult business site and, thereafter, in getting all the building permits needed to start construction so we could develop it the manner we had originally intended when acquiring the site.

12. As detailed in the Berzak Declaration, the City initially delayed granting issuance of our no-work permit application for several months, first based on upon an administrative mistake by the Department of Buildings objecting to the application based on the entirely irrelevant assertion that we hadn't demonstrated we qualified as a 60/40 business (ignoring the fact that we hadn't *applied* for a no-work permit as a 60/40 use). When that didn't work, they changed their approach and then said we were disqualified because our site was too near one or more other adult businesses and also too near a so-called church. However, after an additional review was requested, subsequent re-measurements by DOB confirmed that our site was *not* within 500 feet of any other adult

business, and that the so-called disqualifying "church" was not in fact a church and had neither a no-work permit or a certificate of occupancy recognizing it as a legitimate house of worship. Since a church could only have disqualified us if it had either a no-work permit or a certificate of occupancy as a house of worship, and since those things could and should have been easily determined by DOB *before* issuing us a Notice of Objections to our no-work permit application, it became clear to me that the City had no concern with how long they might delay our project and our ability to vest our site for an adult use.

13. Thereafter, as noted in the Berzak Declaration, several months after the City had finally issued our no-work permit, it *once again* made the same groundless assertion that we were too near that same so-called church, even though it had no new evidence of that "church" having obtained any no-work permit or Certificate of Occupancy to operate a house of worship. As documented in the Berzak declaration, this assertion by DOB appears to have been based on an anonymous complaint on the DOB website which I believe was filed by our competitor in an effort to defeat our application. It then forced substantial additional delays in our plans to develop the property until we could finally get the City to rescind its revocation of our no-work permit after it concluded, once again, that the objection was baseless because the so-called "church" had not obtained a no-work permit or certificate of occupancy as a house of worship use.

14. Incredibly, as noted in the Berzak Declaration, three days after the City rescinded its revocation of our no-work permit, that so-called "church" applied for a no-work permit as a house of worship. And then, once again, when we attempted to obtain

our building permits, DOB examiners asserted that our permits should be denied because of proximity to that so-called church. Again, much more time was consumed to finally defeat those objections, and the reason was the same as always: Sapphire 2 had its no-work permit before the "church" had obtained its no-work permit. Again, this was something that could have been easily checked in the City's records before ever forming the basis for an objection to our building permit applications.

15. I am informed and believe that the so-called "church" use never followed through to get a certificate of occupancy as a house of worship, nor did it continue to renew its no-work permit, nor did it ever conduct itself as a house of worship. This was no-doubt because it gave up after it realized that it could not succeed in stopping the establishment of Sapphire 2.

16. All told, the various delays caused by the City's numerous unsupportable repeated objections were financially devastating as we were not only paying massive rent on an idle location, but were paying several professionals (attorneys and land use experts) to help us fend off the numerous vesting challenges. As a result, we lost *very* substantial amounts of *both* time and money, but did not abandon the project as we were already heavily invested.

17. *Most* frightening is the fact that we *ultimately* prevailed *only* because of the *very* fortunate circumstance that the so-called "church's no-work permit application was not filed until after our permit had been *granted*.

18. Had our competitor found out about our application just a little bit earlier, and succeeded in getting its so-called "church" to file its bogus application for vesting priority before our long-pending permit applications had been granted, I believe the City would have ruled in *their* favor, not ours, because the City's vesting scheme provisions do not require vesting to be deemed to occur at the time an adult business first *files* its permit application(s) but only after its permits are *granted*. For this reason, unless and until the City changes its rules governing vesting priority, I would never again seek to establish an adult establishment in New York City on a site which had not previously been approved for adult use.

### Sapphire Times Square

19. Our other 100% adult business in Manhattan is Sapphire Times Square, located at 1674 Broadway. It was established at the site of a recently closed 100% adult eating and drinking establishment (formerly known as "Flashdancers"). Because I continue to believe that the demand for such uses far exceeds the supply, and a properly run business would be profitable, I was motivated to, and did, have my company take over the site of that former 100% adult eating and drinking establishment because it had already been guaranteed the required vesting of the site for an adult use.

20. If the Court allows the City to enforce its mandatory termination provisions against the five remaining 60/40 eating or drinking establishments in Manhattan, this will unquestionably result in a significant drop in the already very low number of eating or drinking establishments in Manhattan presenting *any* adult entertainment (which I'm told

is currently only eight, five 60/40s and three 100% clubs). I strongly believe the free market in Manhattan easily supports not only the existing eight businesses presenting any type of live adult entertainment, but would support *far* more such businesses.

    I declare under penalty of perjury that the foregoing is true and correct. Executed this ____ day of September, 2022, within the United States of America.

_____
DAVID M. TALLA

is currently only eight, five 60/40s and three 100% clubs). I strongly believe the free market in Manhattan easily supports not only the existing eight businesses presenting any type of live adult entertainment, but would support *far* more such businesses.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of September, 2022, within the United States of America.

_____
DAVID M. TALLA