UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

725 EATERY CORP., etc., *et ano.,*                    :
                                        Plaintiffs,
                                                      :
        - against -                                        Civil Action No.
                                                      :    02 CV 4431 (LJL)
THE CITY OF NEW YORK, et al.,
                                        Defendants.    :
-----------------------------------------------------------------X

59 MURRAY ENTERPRISES INC., etc., *et al.,*           :
                                        Plaintiffs,
                                                      :
        - against -                                        Civil Action No.
                                                      :    02 CV 4432 (LJL)
THE CITY OF NEW YORK, et al.,
                                        Defendants.    :
-----------------------------------------------------------------X

CLUB AT 60TH STREET, INC., etc., *et al.,*            :
                                        Plaintiffs,
                                                      :
        - against -                                        Civil Action No.
                                                      :    02 CV 8333 (LJL)
THE CITY OF NEW YORK,
                                        Defendant.     :
-----------------------------------------------------------------X

_____

# CLUB PLAINTIFFS' RENEWED JOINT
# MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS FOR PARTIAL SUMMARY JUDGMENT

_____

i

# Table of Contents

INTRODUCTION ........................................................................................................ v

**I   THE CITY'S MANDATORY TERMINATION PROVISIONS VIOLATE THE FIRST AND FOURTEENTH AMENDMENTS** ............................................. 2

  A. Introductory Statement ....................................................................... 2

  B. The Relevant Facts. ............................................................................ 8

  C. The Equitable Standards. .................................................................. 12

  D. The Equities. ..................................................................................... 13

    1. Plaintiffs and the Public will suffer irreparable injury if equitable relief is denied. ................................................................................. 13

    2. Plaintiffs have no adequate remedies at law to address their inequitable treatment. .......................................................................... 14

    3. The balance of hardships overwhelmingly favors Plaintiffs .......... 14

      a. The harm to Plaintiffs would be great absent equitable relief. ................. 14

      b. The harm to the City would be minimal at best if equitable relief is granted. ........................................................................ 15

    4. The public interest favors issuance of a permanent injunction ...... 17

  E. The Law. ........................................................................................... 18

    1. The Issue Presented By This Motion is One of First Impression ... 18

    2. "Grandfathering" is a constitutionally acceptable solution. ........... 18

    3. The Most Relevant Supreme Court First Amendment Decisions .... 19

      a. *Young v. American Mini Theatres, Inc.* ..................................... 19

      b. *City of Renton v. Playtime Theaters, Inc.* ................................ 21

      c. *City of Los Angeles v. Alameda Books* ..................................... 22

      d. *Reed v. Town of Gilbert* ........................................................... 26

      e. *City of Austin v. Reagan* .......................................................... 28

  F. The City's Mandatory Termination Provisions Are Facially Unconstitutional Under Each of Numerous Distinct Constitutional Tests ......................................... 31

    1. The City's Adult Business Mandatory Termination Provisions are Facially Unconstitutional Even Under the Now-Jettisoned Secondary Effects "Justification" Test utilized by both *Renton* and the Plurality in *Alameda Books* ............................................... 31

ii

2. The Mandatory Termination Provisions are Facially Unconstitutional Under Justice Kennedy's "How Speech Will Fare" and "Proportionality" Tests......32

a. The Mandatory Termination Provisions Fail the "How Speech Will Fare" Test. ..........................................................................................34

b. The Mandatory Termination Provisions Fail Justice Kennedy's "Proportionality" Test................................................................37

3. The Mandatory Termination Provisions are Facially Unconstitutional as Impermissible Content-Based Restraints on Expression Under the Tests of *Reed v. Town of Gilbert* and *Reagan v. City of Austin* ....................................39

4. The Mandatory Termination Provisions are Also Facially Unconstitutional Under The First Amendment Because They Are Impermissibly Underinclusive................................................................................................44

5. The City's Mandatory Termination Provisions Violate the 14th Amendment's Equal Protection Clause Because They Unjustifiably Discriminate Against Non-Conforming Adult Uses Compared to All Other Non-Conforming Uses ........................................................................................................47

II  IN THE ALTERNATIVE, THE CITY'S PERMITTING AND VESTING PROVISIONS ARE FACIALLY UNCONSTITUTIONAL AND DENY PLAINTIFFS A REASONABLE OPPORTUNITY TO RELOCATE, IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS ............50

A. Plaintiffs' Vesting and Permitting Challenges, if Successful, Would Entitle Them to Injunctive Relief Against Enforcement of the Mandatory Termination Provisions ......................................................................................................50

B. The City's Provisions for the *Vesting* of Adult Uses Are Facially Unconstitutional in Violation of the First and Fourteenth Amendments Due to Their Allowance of a "Sensitive Use Veto"..................................................................................51

C. The City's Zoning Approval Provisions for Adult Uses Are Also Facially Unconstitutional Because They Lack the Procedural Safeguards Needed to Prevent Censorship by Delay................................................................................60

1. Zoning Approval Requirements Which Apply in a More Onerous Way to Adult Uses Must Have Strict Procedural Safeguards to Protect Against the Possibility of Censorship by Delay.. ...............................................60

2. The City's Zoning Approval Process Applies in a More Onerous Way to Adult Uses and is Therefore Subject to Facial Challenge for Lacking Constitutionally Required Procedural Safeguards Against Delay .................63

iii

3.  The City's Zoning Approval Process For Adult Uses is Unconstitutional Because it Lacks The Required Procedural Safeguards to Prevent Censorship By Delay ...................................................................................................... 67

   a.  The permitting scheme for adult use applicants is facially unconstitutional because it has no time limits for issuance of any DOB permit needed to vest an adult use ......................................................................................... 67

   b.  The permitting scheme for adult use applicants is also facially unconstitutional for lack of time limits on any procedures to revoke or to rescind revocation of a permit ................................................................. 68

   c.  The permitting scheme for adult use applicants is also facially unconstitutional because it provides no effective remedy for enforcement of any time limits for giving zoning approval. ......................................... 69

D.  The City's Zoning Approval Process For Adult Uses is Also Unconstitutional Because it Affords DOB Officials *Substantive* Discretion in Deciding Whether to Revoke Already-Issued DOB Permits .................................................................. 71

**CONCLUSION** ............................................................................................................. 73

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*754 Orange Ave., Inc. v. West Haven,*
  761 F.2d 105 (2d Cir. 1985)...................................................................... 19

*Abusaid v. Hillsborough County Bd. of County Comm'rs,*
  637 F.Supp.2d 1002 (M.D. Fla. 2007)........................................................ 71

*ACLU v. Reno,*
  31 F. Supp. 2d 473 (E.D. Pa. 1999) ........................................................... 17

*Alameda Books v. City of Los Angeles,*
  631 F.3d 1031 (9th Cir. 2011) ................................................................... 33

*Arkansas Writers' Project, Inc. v. Ragland,*
  481 U.S. 221 (1987).................................................................................... 24

*Artistic Entertainment, Inc. v. City of Warner Robins,*
  223 F.3d 1306 (11th Cir. 2000) ................................................................. 71

*Ass'n of Club Executives of Dallas v. City of Dallas,*
  604 F. Supp. 3d 414, 437 (N.D. Tex. 2022) .............................................. 32

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011)................................................................................44-46

*Café Erotica, et al. v. St. Johns County,*
  143 F.Supp.2d 1331 (M.D. Fla. 2001)........................................................ 71

*Casanova Entertainment Group, Inc. v. City of New Rochelle,*
  165 Fed. Appx. 722, 2006 WL 238434 (2d Cir. Jan. 31, 2006) ................. 33

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)................................................................................... 36

*Center For Fair Public Policy v. Arizona,*
  336 F.3d 1153 (9th Cir. 2003) ................................................................... 33

*Child Evangelism Fellowship of N.J. v. Stafford Twp. Sch. Dist.,*
  233 F. Supp. 2d 647 (D.N.J. 2002) ............................................................ 17

v

*City of Austin v. Reagan National Advertising of Austin, LLC*,
___ U.S. ___, 142 S.Ct. 1464 (2022) ............................................................ 28-30, 39-44

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) .................................................................................................. 44-45

*City of Lakewood v. Plain Dealer Pub. Co.*,
486 U.S. 750 (1988) .................................................................................................. 70, 72

*City of Los Angeles v. Alameda Books, Inc.*,
535 U.S. 425 (2002) ........................................................... 22, 31-32, 34-35, 39

*City of New York v. Dezer Properties*,
95 N.Y.2d 771, 732 N.E. 2d 943 (2000) ............................................................ 10

*City of New York v. Les Hommes*,
94 N.Y.2d. 267, 724 N.E.2d 368 (1999) ............................................................ 10

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) ........................................... 21-24, 27-28, 30-33, 42, 50

*Clark v. Jeter*,
486 U.S. 456 (1988) ................................................................................................... 48

*Deeper Life Christian Fellowship, Inc. v. Bd. of Educ. of City of New York*,
852 F.2d 676 (2d Cir. 1988) ................................................................................... 13

*eBay Inc. v. Merc Exchange, L.L.C.*,
547 U.S. 388 (2006) ................................................................................................... 13

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................................................................... 13

*EMW Women's Surgical Ctr., P.S.C. v. Meier*,
373 F. Supp. 3d 807 (W.D. Ky. 2019) ................................................................ 17

*Encore Videos, Inc. v. City of San Antonio*,
310 F.3d 812 (5th Cir. 2002) ................................................................................ 33

*Encore Videos, Inc. v. City of San Antonio*,
330 F.3d 288 (5th Cir. 2003) ................................................................................ 43

*Erie Blvd. Triangle Corp. v. City of Schenectady*,
250 F.Supp.2d (N.D.N.Y. 2003) ........................................................................... 33

vi

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975) ................................................................................. 44, 45

*Fantasy Ranch Inc. v. City of Arlington,*
    459 F.3d 546 (5th Cir. 2006) ........................................................................ 43

*Fernwood Books v. City of Jackson,*
    601 F.Supp. 1093 (S.D. Miss. 1984) ............................................................ 17

*Florida Star v. B. J. F.,*
    491 U.S. 524 (1989) ..................................................................................... 45

*For the People Theatres of NY, Inc. v. City of New York,*
    38 Misc. 3d 663, 954 N.Y.S.2d 801 (Sup. Ct. N.Y. Co. 2009) ......................... 7, 15, 38

*For the People Theatres v. City of New York,*
    29 N.Y.3d 340 (2017) .............................................................................. 7, 38

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992) ................................................................................ 24, 72

*FW/PBS, Inc. v. City of Dallas,*
    493 U.S. 215 (1990) .................................................... 14, 60, 63, 66, 68, 72

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,*
    23 F.3d 1071 (6th Cir. 1994) ........................................................................ 17

*Harper v. Virginia Bd. of Elections,*
    383 U.S. 663 (1966) ..................................................................................... 48

*Illusions — Dall. Private Club, Inc. v. Steen,*
    482 F.3d 299 (5th Cir. 2007) ........................................................................ 43

*KH Outdoor, LLC v. Trussville,*
    458 F.3d 1261 (11th Cir. 2006) .................................................................... 17

*Ligon v. City of New York,*
    925 F.Supp.2d 478 (S.D.N.Y. 2013) ............................................................. 17

*Loving v. Virginia,*
    388 U.S. 1 (1967) ......................................................................................... 48

*Marks v. United States,*
    430 U.S. 188 (1977) .............................................................................. 20, 23, 32

vii

*Million Youth March, Inc. v. Safir,*
   18 F.Supp.2d 334 (S.D.N.Y. 1998)............................................................... 13

*Minneapolis Star & Tribune Co. v. Minn. Comm'r. of Revenue,*
   460 U.S. 575 (1983)................................................................................ 44, 46

*Morscott, Inc., v. City of Cleveland,*
   781 F.Supp. 500 (N.D. Oh. 1990)................................................................ 17

*N.W. Enters. Inc. v. City of Houston,*
   352 F.3d 162 (5th Cir. 2003) ...................................................................... 43

*N.Y.C. Transit Auth. v. Beazer,*
   440 U.S. 568 (1979)..................................................................................... 47

*New Albany DVD, Inc. v. City of Albany,*
   581 F.3d 556 (7th Cir. 2009) ...................................................................... 33

*Paulsen v. County of Nassau,*
   925 F.2d 65 (2d Cir. 1991)........................................................................... 13

*Peek-A-Boo Lounge of Bradenton v. Manatee County,*
   337 F.3d 1251 (11th Cir. 2003) .................................................................. 33

*PSINet, Inc. v. Chapman,*
   108 F. Supp. 2d 611 (W.D. Va. 2000) ......................................................... 17

*Public Citizen, Inc. v. Pinellas County,*
   321 F.Supp.2d 1275 (M.D. Fla. 2004) ........................................................ 71

*Railway Express Agency, Inc. v. New York,*
   336 U.S. 106 (1949).................................................................................... 46

*Reagan National Advertising v. City of Austin,*
   972 F.3d 696 (5th Cir. 2020) ..................................................................42-43

*Red-Eyed Jack, Inc. v. Daytona Beach,*
   165 F.Supp.2d 1322 (M.D. Fla. 2001) ........................................................ 17

*Redner v. Dean,*
   29 F.3d 1495 (11th Cir. 1994) .................................................................... 71

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015)................................................. 26, 28-29, 33, 39, 41-44

viii

*T & A's, Inc. v. Town Bd. of Town of Ramapo*,
109 F.Supp.2d 161 (S.D.N.Y. 2000) ..................................................... 14

*TJS of N.Y., Inc. v. Town of Smithtown*,
598 F.3d 17 (2d Cir. 2010) ................................................................... 33

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ............................................................... 30, 41-42

*White River Amusement Pub., Inc. v. City of Hartford*,
481 F.3d 163 (2d Cir. 2007) ................................................................ 33

*Williamson v. Lee Optical Co.*,
348 U.S. 483 (1955) ............................................................................ 45

*Young v. American Mini Theaters, Inc.*,
427 U.S. 50 (1976) ............................................................ 18-19, 21, 34

*Young v. City of Simi Valley*,
216 F.3d 807 (9th Cir. 2000) ....................................... 52-53, 55, 59

## Constitutional Provisions

First Amendment ............................................................................ *passim*

Fourteenth Amendment ......................................................... 2, 47-51

New York State Constitution ............................................................ 16

## Ordinances, Rules and Administrative Provisions

N.Y.City Zoning Resolution

ZR § 11-61 ......................................................................................... 14

ZR § 12-10 ............................................................................................ 9

ZR § 12-10-1(b) ................................................................................. 10

ZR § 32-01(b) ..................................................................................... 51

ZR § 32-01(e) ....................................................................................... 8

ZR § 32-69 ........................................................................................ 6, 8

ZR § 41A-5(a)(6) .................................................................................................... 62

ZR § 42-01(b) ........................................................................................................ 51

ZR § 42-01(e) .......................................................................................................... 8

ZR § 42-33 ............................................................................................................ 6, 8

ZR § 52-11 ........................................................................................................ 11, 47

ZR § 52-61 ........................................................................................................ 11, 47

ZR § 52-77 .................................................................................................... 1, 11, 12

ZR § 72-41 .................................................................................................... 1, 11, 12

Dallas City Code § 51-1.104 (1988) ...................................................................... 62

N.Y. City Admin. Code § 28-104.2.7 ................................................... 65, 67, 69, 71

N.Y. City Admin. Code § 27-144 (repealed) ......................................................... 71

1 RCNY § 9000-01 ...................................................................................... 51-53, 66

**Other Authorities**

*Amsterdam Video v. City of New York*,
   S.D.N.Y. No. 96-cv-02204-MGC ....................................................................... 9

# INTRODUCTION

The Club Plaintiffs[1] (variously hereafter simply "the Plaintiffs") own or operate what have come to be known as "60/40" eating or drinking establishments in New York City, presenting constitutionally protected live adult entertainment on less than 40% of their floor space, at sites which have been continuously so used since prior to enactment of amendments to the New York City Zoning Resolution (ZR) in 2001 (the "2001 Amendments") which changed the ZR to *make* those uses non-conforming. But unlike the City's treatment of virtually every *other* type of non-conforming use, which may continue at their locations indefinitely absent abandonment of the use, mandatory termination was required of all *adult entertainment* non-conforming uses, and in the absence of any evidence that *adult entertainment* non-conforming uses have greater adverse secondary effects than all other types of non-conforming uses.

The Club Plaintiffs have each filed a single document noticing two distinct motions for partial summary judgment. They are filed in the alternative because, if relief is granted on the first of the motions, a determination of the second motion will become moot as Plaintiffs will have obtained all the relief they require.

Specifically, Plaintiffs' first motion (briefed in Part I of this Memorandum) is for a determination that the unique adult business mandatory termination provisions of Zoning Resolution ("ZR") §§ 52-77 and 72-41 (attached as exhibits hereto) are content-based,

---

[1] The term "Club Plaintiffs" shall be used throughout to distinguish these plaintiffs, who operate cabaret type businesses, from those in the fourth case presently before this Court, *i.e.*, the "Bookstore plaintiffs".

impermissibly discriminatory, and facially unconstitutional in violation of the Free Speech and Equal Protection guarantees of the First and Fourteenth Amendments. Their second motion (briefed in Part II of this Memorandum) is presented only in the alternative in the event the first motion is unsuccessful, and seeks a determination of the unconstitutionality of the City's various permitting and vesting provisions for adult businesses with which they would need to comply if forced to leave their present locations and relocate elsewhere, along with corresponding injunctive relief to prevent enforcement of the mandatory termination provisions against them until such time as the City has proven that its permitting and vesting problems have all been cured.

If the Club Plaintiffs obtain the requested injunction on their first motion, they will not require permits to remain at their current locations as they presently have all required permits. Consequently, they would have neither the need nor, in fact, any *standing* to challenge the City's various permitting and vesting provisions. For that reason, the second motion is filed only in the alternative.

# I

## THE CITY'S MANDATORY TERMINATION PROVISIONS VIOLATE

## THE FIRST AND FOURTEENTH AMENDMENTS

### A.    Introductory Statement

In 1995, when the City of New York (City) enacted its initial permanent[2] restrictions

---

[2] The City had enacted a *temporary* moratorium on the opening of new adult businesses which was in place for approximately a year before enactment of the 1995 permanent restrictions.

specifically targeting the permissible locations for adult entertainment businesses (the "1995 Amendments"), there were then 177 regulated "adult establishments" in the City.[3] After the City's vigorous enforcement of the 1995 Amendments, by 2000 the number of businesses presenting *any* adult performances or materials had been reduced to 136 (CSF ¶ 161).  One hundred and one of those remaining businesses significantly modified their operations to eliminate or reduce their focus on adult entertainment or material (*id.*). These are referred to as "60/40" businesses, because they reduced their adult entertainment and/or material to less than 40% of their floorspace and/or stock, in compliance with a formal notice issued by the City's Department of Buildings (DOB) in 1998 (*see* 2022 JNR[4] Vol. 1, Ex. 11) stating that formerly exclusively adult businesses would be deemed "non-adult" so long as a "substantial portion" (defined as 60% or more) of the business was not dedicated to adult material or performances. Only 35 *exclusively* adult businesses (referred to herein as "100%" adult businesses), which were the type studied by the City in enacting its 1995 Amendments and alleged to cause adverse secondary effects, remained in New York City by 2000 (CSF ¶ 161), a reduction of 80% of such businesses.

---

[3] *See* ¶ 160 of the Consolidated Statement of Facts (hereafter "CSF") filed in all four cases on May 19, 2023.

[4] "2022 JNR" refers to the Joint Request and Stipulations Regarding the Taking of Judicial Notice filed in all four cases herein on May 9, 2022. All the Exhibits in that document are bookmarked for the convenience of Court and counsel. As the size of that document required putting its exhibits into multiple volumes, the volume number of each exhibit is also referenced herein throughout.

PRG8619                    (renewed copy of PRG8599)

Today, there are only 10 100% adult businesses of *any* type in the entire City, a **dramatic** reduction even from 2000. (S*ee* CSF ¶ 167.) Nevertheless, the City seeks to enforce its 2001 Amendments (reproduced in full as 2022 JNR, Vol. 1, Ex. 3) against the few remaining 60/40 Club and Bookstore businesses that complied with the 1995 Amendments.[5]

The 2001 Amendments essentially repealed the 60/40 method of compliance, rendering all of those 60/40 businesses non-conforming uses and, worse, subjecting them to mandatory termination requirements *not imposed on any other types of non-conforming uses*. (CSF ¶¶ 40-43.) These mandatory termination provisions require non-conforming 60/40 businesses to cease operations within one year of the non-conformity. Moreover, under the Zoning Resolution, nonconforming adult businesses are subject to closure, nuisance abatement proceedings, and criminal charges punishable by up to one year in jail. Remarkably, virtually no other type of non-conforming business in the City suffers such harsh treatment. To the contrary, all other kinds of non-conforming businesses – from gas stations to sporting venues to convenience stores to dry cleaning business, etc. – may remain in non-conforming locations. Only 60/40 businesses are required to close.

---

[5] And, at least in the case of Clubs, compliance was frequently the result of major and very costly changes to expand their non-adult presentations and materials and reduce their floorspace devoted to adult performances. *See* CSF ¶¶ 53-58. For example, the CEO of Plaintiff Club at 60th Street, in his former capacity CEO and Director of Sports Club, Company, Inc. had Sports Club expend $60 million to acquire a lease and renovate a building which formerly housed a 100% adult club so it could be used as an upscale and fully compliant 60/40 Club, including a sports bar and a full-service restaurant with kitchen facilities. CSF ¶¶ 58-l through 58-n.

4

This inequitable treatment would be concerning enough if the City singled out just one type of non-conforming business for far harsher treatment, but since it will have a devastating and immediate adverse impact on the availability of *protected expression*, the magnitude of constitutional concern is exponentially greater. If the Court upholds the Zoning Resolution's mandatory termination requirements for previously lawful 60/40 businesses rendered non-conforming by the 2001 Amendments, only those 10 existing 100% businesses will be allowed to remain in all of New York City. This would be a reduction of 167 (*i.e.*, 94 %) from the numbers of adult businesses that existed when the initial 1995 adult zoning provisions were enacted, leaving only 6%.

Moreover, absent injunctive relief from the Court, the impact on the public's access to live adult entertainment in *Manhattan* will be particularly severe. The total number of adult clubs in 1993 in Manhattan was 21 (CSF ¶ 166). While the sum total of all 100% and 60/40 clubs in Manhattan is currently just 9 (*see* CSF ¶¶ 168 and 174), absent injunctive relief, that number will immediately drop to just 3, an immediate further reduction of 66%! (CSF ¶ 168).

The relief sought here by the Club Plaintiffs would merely allow those few still-existing clubs which lawfully converted to 60/40 businesses prior to the 2001 Amendments (or their successors at the same locations) to continue to operate as lawful non-conforming 60/40 businesses, under the same restrictions as all other non-conforming uses.

What is more, in 1993 there were very large *concentrations* of adult businesses of *all* types, particularly in Manhattan where there was a total of 107 adult businesses (CSF

¶ 166). Today, counting *both* 100% and 60/40 businesses, there are a total of only 23 adult bookstores and clubs remaining in Manhattan (*see* CSF ¶¶ 168 and 173).

In essence, the 1995 Amendments drastically changed *both* the concentration *and* number of adult businesses. Enforcement of the 2001 Amendments, and particularly their mandatory termination provisions, would surely be a gross overkill in terms of the City's legitimate needs compared to the impact of those provisions on expression.

Also, as will be discussed below, substantial evidence suggests that the 60/40 businesses do not cause the types of problems which the City attributed to the 100% businesses extant when it adopted its initial adult business zoning regulations. For example, gaudy lighting and graphic signage were identified as significant problems addressed by the 1995 Amendments (CSF ¶ 32).[6] A City DOB Building Inspector, Robert Iulo, testified in a later proceeding that, in response to the 1995 Amendments, the signage had been "toned down quite a bit" such that, "with respect to . . . quite a few of the eating and drinking establishments, you wouldn't even know what it was from the outside." (CSF ¶ 200.) He also said that "you don't see any more signs like "Triple X" or "Girls, Girls, Girls". *Id.*

Independent studies of the 60/40 businesses and business model, conducted by several experts, each concluded that the 60/40 businesses and business model were not causing significant adverse secondary effects. *See, e.g.,* 2022 JNR Exhibits 62 through 64

---

[6] The 1995 Amendments added ZR §§ 32-69 and 42-33 which restricted the appearance of signs on adult businesses, including limiting their size and illumination and prohibiting flashing signs.

found in Volume 9 of the 2022 JNR.[7] Moreover, at a heavily contested state court evidentiary trial where these same studies were presented, the trial judge made extensive findings of fact to the effect that the 60/40 businesses were not causing significant problems for the City.[8]

In short, by the time the City considered enacting the 2001 Amendments, the problems it was trying to address in 1995 had ceased to exist. There was not only a drastic reduction in both the number and concentration of adult businesses, but also a significant reduction or elimination of any asserted secondary effects attributed to those surviving businesses which complied with the City's announced 60/40 rule. As a result, there was no *need* for the 2001 Amendments.

However, *this* motion does not seek invalidation of the 2001 Amendments *en toto*. Rather, the Club Plaintiffs' current motions merely seek invalidation only of the ZR's discriminatory mandatory termination provisions. Moreover, this motion is very limited as it would seek injunctive relief only for those 60/40 eating and drinking establishments

---

[7] In contrast to these studies put in the record by Plaintiffs, the City concedes that it has conducted *no* studies of what adverse secondary effects, if any, have been caused by New York's 60/40 businesses. (CSF ¶¶ 34 and 188.)

[8] See trial court Judge York's opinion in *For the People Theatres of NY, Inc. v. City of New York,* 38 Misc. 3d 663, 672-673, 954 N.Y.S.2d 801, 807-808 (Supreme Court, New York County 2009), *reversed* (*For the People Theatres v. City of New York*, 29 N.Y.3d 340; 79 N.E.3d 461 (2017)), based on the Court of Appeals' assumption that 60/40 businesses had the same secondary effects as the 1994 100% business and, therefore, the City did not need to put on any evidence of secondary effects of 60/40 businesses in response to the substantial evidence to the contrary presented by the plaintiffs in that case. These studies are discussed in more detail *infra*.

7

which could validly claim lawful nonconforming use status because they operate on sites which lawfully converted to 60/40 businesses prior to the 2001 Amendments.

In short, the Club Plaintiffs merely seek recognition of their constitutional right to be treated no differently than all other non-conforming uses in New York. There were no circumstances in 2001 to justify imposing that discriminatory treatment on Plaintiffs, and indeed even far less today. As Judge Pauley observed in his preliminary injunction ruling herein (*725 Eatery Corp. v. City of* New York, 408 F.Supp.3d 424, 470 (S.D.N.Y. 2019)):

> The adult-use regulations that are the subject of these now-revived constitutional challenges are a throwback to a bygone era. The City's landscape has transformed dramatically since Defendants last studied the secondary effects of adult establishments twenty-five years ago. As Proust might say, the "reality that [the City] had known no longer existed," and "houses, roads, [and] avenues are as fugitive, alas, as the years." Marcel Proust, Swann's Way, in Remembrance of Things Past (C.K. Scott Moncrieff trans., 1922) (1913).

## B.    The Relevant Facts.

The City's 1995 Amendments (reproduced in full as 2022 JNR Ex.1) defined "adult establishments," prohibited them from being located in all residential zoning districts and a majority of the commercial districts, within certain manufacturing districts where residential uses were allowed, and within 500 feet of all those zoning districts, as well as within 500 feet of any school, church, or other adult establishment.  CSF ¶ 3.  The 1995 Amendments also imposed a 10,000 sq. ft. size limitation (*see* ZR §§ 32-01(e) and 42-01(e)) and signage restrictions (*see* §§ 32-69 and 42-33, and CSF ¶ 2) which apply only to adult establishments.

The 1995 Amendments in ZR §§ 12-10 defined an "adult establishment" as "a commercial establishment where '*a substantial portion*' of the establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, or other commercial establishment, or any combination thereof." (Emphasis added.) (CSF ¶ 3.)

Following enactment of the 1995 Amendments, three years of litigation involving more than 100 plaintiffs in multiple cases was conducted in the state and federal courts challenging the constitutionality of the 1995 Amendments. (CSF ¶ 7.)

To eliminate a vagueness challenge to, *inter alia,* the term "substantial portion," which was raised in this Court in one of those cases (*Amsterdam Video v. City of New York,* S.D.N.Y. No. 96-cv-02204-MGC), two days before the federal court hearing on the plaintiffs' motion challenging the 1995 Amendments, the City's Department of Buildings ("DOB") issued Operations Policy and Procedure Notice ("OPPN") # 4/98 (2022 JNR Vol. 1, Ex. 11) which explained, *inter alia,* that an establishment would be deemed an adult eating and drinking establishment by virtue of having a "substantial portion" of the establishment devoted to an adult use if the establishment had "at least 40 percent of the floor and cellar area that is accessible to customers available for adult performance and viewing purposes."[9] Eating and drinking establishments having less than 40% of their floor space so devoted were deemed not subject to the zoning restrictions. This became known as the "60/40 Rule."[10] (CSF ¶¶ 9 and 10.)  In response to the City's eleventh-hour adoption

---

[9] That OPPN created a similar, though not identical, rule for bookstores.

[10] The businesses complying with that Rule are referred to herein as "60/40 Businesses."

of that "clarification" to save its adult zoning scheme, the federal plaintiffs then withdrew their vagueness challenges to that definition.  (CSF ¶10-12.)

Several adult businesses permanently closed following adoption of the 1995 Amendments (CSF ¶ 14). However, other adult businesses, in response to the City's adoption of the 60/40 Rule (and including those operating at the sites of all the Club Plaintiffs herein), complied by reducing their floor space and/or stock in trade devoted to the presentation of adult entertainment (CSF ¶ 15), and also made significant changes to "tone down" their lighting and signage (CSF ¶¶ 15 and 200) which, in many instances, had been complained of as being gaudy and garish (CSF ¶ 32).  These changes worked.[11]  The City agrees that "signage on currently existing 60/40 businesses has not been a significant source of complaints." CSF ¶ 33.

In the cases of *City of New York v. Dezer Properties,* 95 N.Y.2d 771, 732 N.E. 2d 943 (2000), and *City of New York v. Les Hommes,* 94 N.Y.2d. 267, 724 N.E.2d 368 (1999), the New York Court of Appeals held that the City was bound by its 60/40 Rule and that any businesses complying with it could safely rely on it and could not be prosecuted for violation of the City's adult zoning restrictions.

On October 31, 2001, the City adopted its 2001 Amendments (reproduced in full as 2022 JNR Vol. 1, Ex. 3), eliminating the 60/40 Rule and significantly expanding the type of businesses subject to the adult zoning requirements. In particular, it enacted ZR § 12-

---

[11] Particularly see the Focus Probe study (JNR Ex. 64) which analyzed the impact of these changes in signage and outward appearance on perceived secondary effects.

10

10-1(b) stating that an "adult eating and drinking establishment" would now include *any* business which "regularly features" adult performances, even if in only less than 40% of its floor space. (CSF ¶ 25.)

Most of the Club Plaintiffs' businesses, and all the *sites* of the Club Plaintiffs' businesses involved in the present case, were in fact being operated as 60/40 Businesses at the time of adoption of the 2001 Amendments.[12] (CSF ¶¶ 38, 39, 53a, 54a, 55a, 56a and 57a.)   The effect of the 2001 Amendments was to immediately render all the Club Plaintiffs' businesses "non-conforming uses."

Under the City's Zoning Resolution (*see, e.g.,* ZR §§ 52-11 and 52-61), the near-universal rule is that non-conforming uses may continue indefinitely absent a discontinuance of the use for a period of two or more years, or a significant increase in intensity (CSF ¶¶ 40-44). It is uncontroverted that the sites of all the Club Plaintiffs' businesses meet those standards. (CSF ¶¶ 53e, 54e, 55e, 56e, 57c, and 58h.)

However, in ZR §§ 52-77 and 72-41 (the adult business "mandatory termination provisions," enacted by the 1995 and 2001 Amendments respectively), the City expressly denied non-conforming adult establishments the same non-conforming use rights granted

---

[12] Under long-standing application and practice, the City interprets its non-conforming use provisions such that once a site has become non-conforming and achieved "grandfather" status, that grandfather status runs with the land, and not merely with the particular business that was in operation at the time the site became non-conforming. (CSF ¶ 44.)

to almost every other type of non-conforming use[13] by requiring non-conforming *adult* uses to terminate after one year of becoming non-conforming (or a slightly longer period on a showing of adequate need). [14] (CSF ¶ 41.)

In their motion challenging the "mandatory termination" provisions, Plaintiffs do not contest the City's right to label their uses as "non-conforming uses," nor do they assert that the City granted too short an amortization period. Rather Plaintiffs' motion is based solely on the fact that the ZR's mandatory termination provisions discriminatorily treat them differently and more harshly than virtually every other type of non-conforming use in the City of New York, and that ZR §§ 52-77 and 72-41 are facially unconstitutional in violation of Plaintiffs' First Amendment and Equal Protection rights.

## C.    The Equitable Standards.

Because a permanent injunction and declaratory judgment are both equitable remedies, the applicable legal standards include not only a determination of the law, but also of the relevant equities. "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary

---

[13] The sole exceptions are for non-conforming signs, certain non-conforming uses in residence districts, and some non-conforming uses which may remain in place only if walls are built around them (e.g., salvage yards). (CSF ¶ 43.)

[14] Copies of all currently existing ZR sections are available online, including those two provisions. *See* 2022 JNR-Part II (Stipulation) at JNR 000011-12.  Because of their availability online, the City declined Plaintiffs' proposal to also include in the JNR all the relevant current ZR sections. Nonetheless, because of their pivotal significance here, Plaintiffs have attached copies of ZR §§ 52-77 and 72-41, the mandatory termination provisions, as exhibits to this Memorandum.

damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. Merc Exchange, L.L.C.*, 547 U.S. 388, 391 (2006). The Club Plaintiffs easily satisfy each of these standards.

## D. The Equities.

### 1. Plaintiffs and the Public will suffer irreparable injury if equitable relief is denied.

Plaintiffs' and the public's rights to free speech will be irreparably harmed absent an injunction. Even the *temporary* deprivation of First Amendment rights constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir. 1991); *Deeper Life Christian Fellowship, Inc. v. Bd. of Educ. of City of New York*, 852 F.2d 676, 679 (2d Cir. 1988); *Million Youth March, Inc. v. Safir*, 18 F.Supp.2d 334, 339 (S.D.N.Y. 1998). The 2001 Amendments mandate the termination of all 60/40 businesses in New York City and, as noted *supra,* they constitute 50% of the outlets for live adult entertainment in the entire City,[15] including an even higher percentage (67%) of such outlets in Manhattan (*see* CSF ¶¶ 168 and 174). Consequently, not only will the 2001 Amendments drastically affect *these Plaintiffs'* First Amendment rights by

---

[15] There are currently eight 60/40 eating and drinking establishments (2022 JNR Ex. 73) and eight 100% adult eating and drinking establishments in the entire City (CSF ¶167).

forcing them to cease operating as adult establishments,[16] but will also certainly have a great and immediate effect in reducing *the public's* First Amendment right of access to such expression. Plaintiffs and their patrons will therefore be irreparably harmed absent permanent equitable relief.

### 2. Plaintiffs have no adequate remedies at law to address their inequitable treatment.

Because the City has threatened to enforce the Zoning Resolution's mandatory termination provisions (which necessarily includes the possibility of multiple misdemeanor prosecutions[17]), the only remedy which would be adequate to remove this chill on Plaintiffs' rights of expression is equitable relief permanently preventing enforcement of these provisions.

### 3. The balance of hardships overwhelmingly favors Plaintiffs

#### a. The harm to Plaintiffs would be great absent equitable relief.

As noted above, the harm to Plaintiffs should an injunction be denied would be both great, immediate, and irreparable, and their patrons would also suffer irreparable injury by denial of access to Plaintiffs' expression.

---

[16] See, e.g., *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 224 (1990), and *T & A's, Inc. v. Town Bd. of Town of Ramapo*, 109 F.Supp.2d 161, 169-70 (S.D.N.Y. 2000) (holding that live adult entertainment is protected speech).

[17] *See, e.g.,* ZR § 11-61 making all Zoning Resolution violations punishable as misdemeanors.

**b. The harm to the City would be minimal at best if equitable relief is granted.**

Allowing the few remaining 60/40 Club Plaintiffs to be treated the same as every other type of nonconforming use in New York would not cause the City any significant harm. These Plaintiffs have all been operating for over 21 years (and most for more) as 60/40 businesses with toned down signage. The frequent orders of interim judicial relief preventing enforcement of the 2001 Amendment over the years attest to the lack of any evidence of great harm the City is suffering by their continued existence.[18]

Additionally, since converting to 60/40 Businesses prior to the adoption of the 2001 Amendments, none of the sites of the 60/40 Businesses presently operated by Plaintiffs have been the subject of any public nuisance actions other than pre-2001 public nuisance actions which unsuccessfully asserted that they were operating an "Adult Establishment" in a location not permitted by the Zoning Resolution. (CSF ¶ 36.)

Also, the numerous studies of 60/40 Businesses discussed *supra,* the facts and conclusions of which were adopted as findings of fact in the previously mentioned state trial court proceedings,[19] *unanimously* concluded that:

---

[18] At several times over the last 22 years, enforcement of the 2001 Amendments has been enjoined solely by virtue of court order. At other stages it was postponed by litigation agreements with the City to temporarily preserve the status quo. Plaintiffs do not seek to benefit or rely here on the City's own agreements to temporarily withhold enforcement but refer here only to the several various contested *judicial* orders preventing enforcement and/or maintaining in place prior such judicial orders.

[19] *See For the People Theatres of NY, Inc. v. City of New York, supra,* 38 Misc. 3d at 672-673, 954 N.Y.S.2d at 807-808.  Again, none of these specific findings were overturned on appeal. Rather, the Court of Appeals implicitly concluded that they could not be considered because, in its view,

a.      the overall quality of life associated with areas in which 60/40 clubs were located was better than the overall quality of life associated with areas in which 100% clubs (permitted under the 1995 Amendments) were located;

b.      the neighborhoods in which 60/40 clubs were located were safer than the neighborhoods in which 100% clubs were located;

c.      the neighborhoods in which 60/40 clubs were located were preferable places to live and in which to shop than the neighborhoods in which 100% clubs were located;

d.      60/40 clubs were not associated with negative secondary crime effects;

e.      60/40 clubs were not "hot spots" for crime in their neighborhoods;

f.      crimes did not increase with the opening of a 60/40 club and did not decrease after the closing of a 60/40 club;

g.      the proximity of a 60/40 club does not result in a diminution of residential property values;

h.      close proximity to a 60/40 club tended to increase property values;

i.      since the adoption of the 1995 Amendments the numbers of adult establishments had dramatically declined;

j.      since the adoption of the 1995 Amendments the location of adult clubs had become far more widely dispersed;

k.      the signage for 60/40 clubs was less garish, more subdued; and

---

they were legally irrelevant to the challenge made there solely under the New York State Constitution.

16

l.      frequently the non-adult portion of 60/40 clubs was equally or more prominent than the adult portion.

For all these reasons, and particularly given the small number of surviving 60/40 Clubs, even-handed application of the City's non-conforming use provisions to allow the Club Plaintiffs the same rights under the City's zoning law as all other non-conforming uses, would not cause the City any significant harm.

### 4.  The public interest favors issuance of a permanent injunction

"The public has no interest in enforcing an unconstitutional ordinance." *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006); *accord Child Evangelism Fellowship of N.J. v. Stafford Twp. Sch. Dist.*, 233 F. Supp. 2d 647, 667 (D.N.J. 2002); *PSINet, Inc. v. Chapman*, 108 F. Supp. 2d 611, 627 (W.D. Va. 2000) (citing *ACLU v. Reno*, 31 F. Supp. 2d 473, 497-98 (E.D. Pa. 1999)); and *EMW Women's Surgical Ctr., P.S.C. v. Meier*, 373 F. Supp. 3d 807, 826 (W.D. Ky. 2019).  An injunction is in the public interest when it enforces the Constitution.  *Ligon v. City of New York*, 925 F.Supp.2d 478, 541 (S.D.N.Y. 2013); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *see also Red-Eyed Jack, Inc. v. Daytona Beach,* 165 F.Supp.2d 1322, 1330 (M.D. Fla. 2001) (adult business case); *Morscott, Inc., v. City of Cleveland*, 781 F.Supp. 500, 506 (N.D. Oh. 1990) (same); and *Fernwood Books v. City of Jackson*, 601 F.Supp. 1093, 1101 (S.D. Miss. 1984) (same).

Because enforcement of the Zoning Resolution's mandatory termination provisions will have an immediate impact not only on Plaintiffs' protected First Amendment rights,

but also on the public's corresponding First Amendment right of access to such expression and because the public has no valid interest in the enforcement of unconstitutional laws, the public interest clearly weighs in favor of a limited permanent injunction preventing enforcement of the City's mandatory termination provisions against these plaintiffs.

## E.     The Law.

### 1.   The Issue Presented By This Motion is One of First Impression

Somewhat surprisingly, although there have been hundreds of "adult zoning" cases in the state and federal courts since the Supreme Court's initial decision some 45 years ago in *Young v. American Mini Theaters, Inc.*, 427 U.S. 50 (1976), and those decisions have established that a city may create zoning restrictions that apply only to "adult" businesses (and several have concluded they may also apply to make *pre-existing* adult businesses non-conforming uses), to the knowledge of Plaintiffs' counsel, there has not been a single case that ruled on the significant and decidedly different question presented by the current motion, *i.e.*, if a city passes adult zoning restrictions that apply to pre-existing lawfully located adult businesses, thereby rendering them non-conforming uses, may it then go to the additional step of treating non-conforming *adult* expressive uses far more severely than all *other* types of non-conforming uses?

### 2.   "Grandfathering" is a constitutionally acceptable solution.

In a conference colloquy with Court and counsel, the Court previously inquired whether a decision in Plaintiffs' favor striking the mandatory termination provisions might

18

give them an unfair advantage over other entrepreneurs seeking to open adult businesses. The Second Circuit, however, has in fact *recommended* the option for municipalities to grandfather pre-existing adult uses as a way of avoiding constitutional challenges. *See 754 Orange Ave., Inc. v. West Haven,* 761 F.2d 105, 114 (2d Cir. 1985). And, under New York's existing grandfathering provisions for all *other* nonconforming uses, such uses already enjoy that same protection, with no suggestion that grandfathering protections, *per se*, might be unconstitutional.

### 3. The Most Relevant Supreme Court First Amendment Decisions

Because this is an issue of first impression and will require application of basic First Amendment principles, Plaintiffs briefly review below the Supreme Court's five primary First Amendment decisions addressing either adult zoning laws or the so-called "secondary effects" justification doctrine.

#### a. *Young v. American Mini Theatres, Inc.*

The Court's first adult zoning decision, its 1976 ruling in *Young*, *supra*, addressed the nation's initial adult zoning law, a Detroit ordinance which had no application to pre-existing adult uses, and which was strictly an "anti-concentration" ordinance, prohibiting new adult uses from locating within 1,000 feet of any two other adult uses.[20]

The Court rejected plaintiffs' challenges asserting that the First Amendment and Equal Protection clauses prohibited the 1,000-foot anti-concentration provision being

---

[20] The ordinance also prohibited new adult uses from locating within 500 feet of a residential dwelling but that provision was not challenged in the proceedings before the Supreme Court. *See Young,* 427 U.S. at 52, n.3.

applied to new businesses seeking sites, but only after taking pains to point out the important limitations on its decision.  In his Plurality opinion for four members of the Court, Justice Stevens stated:

> "There is no claim that distributors or exhibitors of adult films are denied access to the market or, conversely, that the viewing public is unable to satisfy its appetite for sexually explicit fare. Viewed as an entity, the market for this commodity is essentially unrestrained."

*Id.* at 61.

He further recognized that the ordinance had only a prospective application:

> The situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech. Here, however, the District Court specifically found that **"(t)he Ordinances do not affect the operation of existing establishments but only the location of new ones**."

*Id.* at 71, n.35 (emphasis added.)

In his concurring opinion (constituting the holding of the Court under the doctrine of *Marks v. United States,* 430 U.S. 188 (1977)), Justice Powell carefully limited the scope of the Court's holding:

> The primary concern of the free speech guarantee is that there be full opportunity for expression in all of its varied forms to convey a desired message. Vital to this concern is the corollary that there be full opportunity for everyone to receive the message.
>
> ***
>
> In this case, there is no indication that the application of the Anti-Skid Row Ordinance to adult theaters has the effect of . . ., to any significant degree, restricting access to adult movies.
>
> ***

20

> "Nor is there any significant overall curtailment of adult movie presentations, or the opportunity for a message reach an audience. . . . [I]t appears that if a sufficient market exists to support them the number of adult movie theaters in Detroit will remain approximately the same …."

*Id.* at 76, 77, 79.

While not necessarily controlling herein, it is worth observing that there is a *great* difference between the limiting observations which accompanied the Court's upholding of the adult zoning regulation in *Young,* and the facts of the present case.[21]

### b.  *City of Renton v. Playtime Theaters, Inc.*

In *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41 (1986), the Court upheld an adult zoning ordinance which differed from the one in *Young* in that it did not have an anti-concentration provision but, instead, *mandated* concentrating adult businesses in specified areas by prohibiting them from locating within a specified proximity (1,000 feet) of churches, schools, parks, residential zones and single or multi-family dwellings (*id.* at 52). At the time of its enactment there were no *then-existing* adult businesses in *Renton* so, as in *Young,* it only applied to *new* not-yet-built adult businesses.

The *Renton* court held that an adult zoning restriction, even though indisputably content-based on its face, should be analyzed as a content-neutral time, place and manner

---

[21] As noted *supra,* between the time of the 1995 and 2001 Amendments, there was a net reduction of 41 adult businesses of all types in New York, dropping from 177 in 1994 (CSF ¶ 160) to 136 in 2001 (CSF ¶ 161). And if the mandatory termination provisions are allowed to take effect, astonishingly, there will then remain a total of only 10 adult establishments in the entire City. (CSF ¶ 167.) If those provisions are upheld, there will have been a reduction specifically of adult *eating or drinking* establishments from 68 in 1993 (CSF ¶ 160) to 57 in 2001 (CSF ¶ 161) to a total of only eight (CSF ¶ 167).

restriction if it is successfully *justified* based on so-called content-neutral "secondary effects" attributed to adult businesses.[22] The Court then made two pertinent observations: (1) the Renton ordinance still allowed *five percent* of the entire land area of Renton for use by adult businesses (*id.,* at 53); and (2) it held that the First Amendment *did* require that any adult zoning ordinance must allow "a *reasonable opportunity* to open and operate an adult [business] within the city." *Id.* at 54 (emphasis added.)

### c. *City of Los Angeles v. Alameda Books*

In *City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425 (2002),* the Court announced new tests for analyzing the constitutionality of adult zoning ordinances and remanded a Ninth Circuit adult zoning decision for application of those tests to an adult zoning law which prohibited multiple *defined* adult "uses" (*e.g.,* an adult "*bookstore*" and an adult "*video*" store) from operating as a *single* business.[23]  Significantly though, a majority of the Court (consisting of the four dissenters and the concurring opinion of Justice Kennedy,) rejected the Plurality's reliance on *Renton's* assertion that adult zoning ordinances are content-neutral. ("These ordinances are content based, and we should call them so." Concurring Opinion of J. Kennedy, *id.* at 448.)

---

[22] Notably, *Renton* was the Supreme Court's first case of *any* type stating that facially content-based laws could be justified by pointing to content-neutral "secondary effects."

[23] Although that ordinance applied to existing uses, there was no issue of a *discriminatory* non-conforming use provision as is the case here.

Additionally, the Court's various opinions in *Alameda* established *two* revised tests for determining their constitutionality, both of which a municipality must meet in order for an adult zoning ordinance to be sustained.

First, the Plurality would have remanded for trial under a modified version of the *Renton* secondary effects "justification" test where the trial court would apply the following three-part burden-shifting test for analyzing a city's asserted justification:

> This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Id.* at 438-39.[24]

However, Justice Kennedy, whose concurring opinion provided the necessary fifth vote for the judgment (and which, under the rule of *Marks v. U.S., supra,* constitutes the holding of the Court), added an additional component test which must *also* be applied on remand, described below and referred to herein alternatively as either the "proportionality test" or the "how speech will fare" test.

---

[24] Justice Kennedy concurred in application of this burden-shifting test so it is binding precedent.

First, Justice Kennedy interpreted *Renton* differently than did the Plurality:

> [I]n my view, the plurality's application of Renton might constitute a subtle expansion, with which I do not concur.

*Id.* at 445.

He then described the basis for his new additional test in various ways:

> If a city can decrease the crime and blight associated with certain speech by the traditional exercise of its zoning power, and at the same time leave the quantity and accessibility of the speech substantially undiminished, there is no First Amendment objection.

*Id.* at 445.

> On the other hand, a city may not regulate the secondary effects of speech by suppressing the speech itself. A city may not, for example, impose a content-based fee or tax. See *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 230 (1987) ("[O]fficial scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press"). **This is true even if the government purports to justify the fee by reference to secondary effects.** See *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 134-135 (1992). Though the inference may be inexorable that a city could reduce secondary effects by reducing speech, this is not a permissible strategy. The purpose **and effect** of a zoning ordinance **must be** to reduce secondary effects and **not to reduce speech**.

> A zoning measure can be consistent with the First Amendment if it is likely to cause a *significant* decrease in secondary effects and a trivial decrease in the quantity of speech.

*Id.* at 445 (emphases added).

While agreeing that "the ordinance is not so suspect that we must employ the usual rigorous analysis that content-based laws demand in other instances" (*id.* at 447), he nonetheless concluded that a heightened type of "intermediate scrutiny" should apply pursuant to which

24

a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact.

*Id.* at 449.

He next introduced a critical new element to be applied in analysis of all adult zoning laws: an analysis of "how speech will fare":

The plurality's statement of the proposition to be supported is somewhat different. It suggests that Los Angeles could reason as follows:  (1) "a concentration of operations in one locale draws ... a greater concentration of adult consumers to the neighborhood, and a high density of such consumers either attracts or generates criminal activity"; (2) "having a number of adult operations in one single adult establishment draws the same dense foot traffic as having a number of distinct adult establishments in close proximity"; (3) "reducing the concentration of adult operations in a neighborhood, whether within separate establishments or in one large establishment, will reduce crime rates." *Ante*, at 1735.

These propositions all seem reasonable, and the inferences required to get from one to the next are sensible. Nevertheless, this syllogism fails to capture an important part of the inquiry. **The plurality's analysis does not address how speech will fare under the city's ordinance**.

*Id.* at 450 (emphasis added).

Another component to his test is that

A city may not assert that it will reduce secondary effects by reducing speech *in the same proportion*.

*Id.* at 449 (emphasis added).

It is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech.

The analysis requires a few more steps. If two adult businesses are under the same roof, an ordinance requiring them to separate will have one of two results:  One business will either move elsewhere or close. *The city's premise cannot be the latter*. It is true that cutting adult speech in half would probably

reduce secondary effects proportionately. But again, a promised proportional reduction does not suffice. Content based taxes could achieve that, yet these are impermissible.

**The premise, therefore, must be that businesses - even those that have always been under one roof - will for the most part disperse rather than shut down.**

*Id.* at 450-51 (emphases added.)

The claim, therefore, must be that this ordinance will cause two businesses to split rather than one to close, that the quantity of speech will be substantially undiminished, and that total secondary effects will be *significantly* reduced. This must be the rationale of a dispersal statute.

*Id.* at 451 (emphasis added).

Plaintiffs believe that application of these tests would invalidate the City's 2001 Amendments' expansion of the definition of an "adult" establishment, even though that is not an issue not before the Court on the present motions. But regardless of whether *that* is a correct assessment, as will be shown *infra,* application of these balancing tests unquestionably invalidates the City's *mandatory termination* provisions.

### d. *Reed v. Town of Gilbert*

In *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), the Court addressed a zoning ordinance imposing more stringent restrictions on three different types of signs than on signs conveying other messages. The restrictions applied to the following three types of signs:

(1) The first provision regulated "Ideological Signs," including any "sign communicating a message or ideas for non-commercial purposes" that is not one of the other defined types of signs under the ordinance. It gave those signs

26

favorable treatment by allowing them to be placed in all zoning districts without time limits and to be up to 20 square feet in area. *Id.* at 159.

(2)   The next provision regulated "Political Signs" and treated them less favorably than ideological signs. Political signs could not exceed 16 square feet on residential property. Moreover, there were time restrictions on when they could be displayed, *e.g.*, no more than 60 days before a primary election and no more than 15 days after a general election. *Id.* at 160.

(3)   The final provision regulated "Temporary Directional Signs Relating to a Qualifying Event" and treated them less favorably than political signs. These types of signs would direct motorists and other passersby to what the ordinance called a "qualifying event," defined as including any "assembly, gathering, activity, or meeting sponsored, arranged or approved, or promoted by a religious, charitable, community service, educational, or other similar non-profit organization." *Id.* Temporary directional signs could be no larger than six square feet and were subject to other restrictions, including time of display restrictions.

The Court held that all three sets of restrictions should be deemed content-based and subject to strict judicial scrutiny, regardless of whether they were supported by content-neutral justifications. *Id.* at 172.  In doing so, it disapproved of the so-called "secondary effects justification" doctrine, the doctrine which originated in and underpinned *Renton, supra.*

27

Specifically, Gilbert asserted that it "did not adopt its regulation of speech because it disagreed with the message conveyed" and that its "interests in regulat[ing] temporary signs are unrelated to the content of the sign." *Id.* at 162. The Court did not dispute Gilbert's assertion that it enacted its law for content-neutral reasons, but held that those content-neutral justifications were immaterial to determining whether the ordinance should be deemed content-based for purposes of determining whether strict scrutiny should be applied, necessarily jettisoning the "secondary effects" doctrine first articulated in *Renton*:

> A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of "animus toward the ideas contained" in the regulated speech.

*Id.* at 165.

> On its face, the Sign Code is a content-based regulation of speech. *We thus have no need to consider the government's justifications or purposes* for enacting the Code to determine whether it is subject to strict scrutiny.

*Id.* at 164-65 (emphasis added).

### e. *City of Austin v. Reagan*

In its opinion released this past term in *City of Austin v. Reagan National Advertising of Austin, LLC*, ___ U.S. ___, 142 S.Ct. 1464 (2022), the Court reassessed and reaffirmed the core holding of *Reed*, while refining its articulation of the appropriate test for determining whether a law should be treated as content-based or content-neutral. Unlike *Reed*, where the primary issue was whether a content-neutral justification allowed a content-based ordinance to escape strict scrutiny, the issue in *Austin* was the threshold one of whether, *on its face*, an ordinance is *in fact* content-based. The ordinance in *Austin*

subjected off-premises signs to greater restrictions than on-premises signs (*e.g.*, it prohibited off-premises digital signs while allowing on-premises digital signs). It was, however, "agnostic" as to the *content* of those signs. *Id*. at 1471.

The parties challenging Austin's sign ordinance asserted that it was content-based because it was necessary to read the content of the sign to determine whether it was an on-premises or off-premises sign. Relying on *Reed,* the Court rejected that argument, stating:

> A regulation of speech is facially content based under the First Amendment if it "target[s] speech based on its communicative content"—that is, if it "applies to particular speech because of the topic discussed or the idea or message expressed. *Reed*, 576 U.S. at 163.

*Id.* at 1471.

Necessarily distinguishing zoning restrictions aimed uniquely at adult entertainment businesses, the Court said:

> Unlike the sign code at issue in *Reed*, however, the City's provisions at issue here do not single out any topic or subject matter for differential treatment.

*Id.* at 1472.

In contrast, New York imposes differential treatment on nonconforming adult entertainment uses by treating them far more harshly than all other nonconforming uses. Consequently, the City's mandatory termination provisions for only *adult* nonconforming uses is beyond doubt a content-based distinction under the holdings of both *Reed* and *Austin.*

Moreover, the test adopted in *Austin* was clearly intended to apply to *all* time, place and manner restrictions and not just sign restrictions. This is evidenced by the Court going

29

out of its way to distinguish the holding in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), the primary post-*Renton* opinion applying the secondary effects justification doctrine. *Ward* had held that a sound amplification ordinance was a content neutral time, place and manner restriction and was thus subject only to intermediate scrutiny, due, in part, to the fact that it had a content-neutral purpose or justification. *City of Austin,* however, explained that the sound amplification ordinance in *Ward* was content-neutral *on its face,* and that the only reason the Court looked at the justification for the ordinance was because even a facially content-neutral ordinance can be subject to strict scrutiny if it was nonetheless enacted for a content-based *purpose.* 142 S.Ct. at 1482 n. 2. In short, *Austin* teaches that *Ward's* examinations of justification for a facially content-neutral time place and manner ordinance can have no application to a facially content-*based* ordinance, the type of ordinance presently before the Court.

 *City of Austin* also articulated the standard of judicial review which should apply once an ordinance is *found* to be content-based. A majority of five of the Justices in *Austin* concluded that the ordinance there was content-neutral because it didn't discriminate based on the content of any message the sign conveyed. In contrast, the four dissenters concluded that the ordinance was content-based because one must read the sign to determine if it was an on-premises or off-premises sign. However, *eight* of the nine Justices concluded that *if* an ordinance is found to be content-based, it must then be subjected to a test of strict judicial scrutiny where the city must demonstrate the ordinance is needed to support a *compelling*

government interest and that the ordinance is the least restrictive means which could serve that interest.[25]

### F.   The City's Mandatory Termination Provisions Are Facially Unconstitutional Under Each of Numerous Distinct Constitutional Tests

   **1.**   The City's Adult Business Mandatory Termination Provisions are Facially Unconstitutional Even Under the Now-Jettisoned Secondary Effects "Justification" Test utilized by both *Renton* and the Plurality in *Alameda Books*

Judge Pauley concluded that Plaintiffs were not likely to prevail in seeking a determination that the 2001 Amendments were facially unconstitutional and unenforceable solely based on the assertion that there was insufficient "justification" to support them.  In so ruling, the Court was looking only at whether there was adequate content-neutral justification under the secondary effects doctrine of *Renton* and the *Alameda* Plurality for the City to treat 60/40 uses like 100% uses. For purposes of the *present* motion only, Plaintiffs do not necessarily need to quarrel with *that* conclusion.

However, unlike what was before Judge Pauley, the present motion challenges *only* the City's discriminatory mandatory termination provisions. Unless the City meets its burden to show that it relied on content-neutral "data or reasoning" to show that *adult* non-conforming uses cause significantly greater secondary effects than all *other* types of non-

---

[25] Only Justice Breyer, who joined the majority opinion but separately concurred, concluded that a content-based law might be subject to a less demanding test than the strict scrutiny. He would have, instead, adopted a balancing test (somewhat similar to Justice Kennedy's proportionality test in *Alameda*) under which one asks whether "the regulation at issue work[s] harm to First Amendment interests that is disproportionate in light of the relevant regulatory objectives." *Id.* at 1476.

conforming uses, *e.g.,* nonconforming bars, gas stations, convenience stores, dry cleaning establishments, etc., those specific provisions must be found impermissibly content-based even under a *Renton*/*Alameda* plurality secondary effects analysis.

Because the City's 1994 Study examined the asserted secondary effects of adult uses in certain locations, but never examined or compared them to the secondary effects of the myriad *other* types of uses it has made non-conforming in their current locations (*e.g.,* non-conforming gas stations, conveniences stores or (non-"adult") movie theaters), as a matter of law, it has not proven a content-neutral secondary effects justification for its discriminatory treatment of only *adult* non-conforming uses. *Compare, e.g., Ass'n of Club Executives of Dallas v. City of Dallas,* 604 F. Supp. 3d 414, 437 (N.D. Tex. 2022) noting:

> Because the City provided no non-SOB comparison data indicating that the problems of which the City complains are particularly associated with SOBs, the Ordinance amounts to a targeted and unjustified restriction on protected speech.

Consequently, the City's uniquely harsh treatment of only *adult* non-conforming uses cannot withstand scrutiny even under the comparatively lax secondary effects justification tests of either *Renton* or the *Alameda* plurality.

2.    **The Mandatory Termination Provisions are Facially Unconstitutional Under Justice Kennedy's "How Speech Will Fare" and "Proportionality" Tests.**

Since Justice Kennedy's concurrence in *Alameda Books* was necessary to get a majority, and was the narrowest opinion concurring in the judgment, its requirements are binding as the holding of the Court under the test of *Marks,* 430 U.S. 188, and his opinion

has been so recognized by most[26] of the courts to specifically address the issue, including the Ninth Circuit itself on remand. *See, e.g., Alameda Books v. City of Los Angeles,* 631 F.3d 1031, 1037 (9th Cir. 2011); *New Albany DVD, Inc. v. City of Albany,* 581 F.3d 556, 561 (7th Cir. 2009); *Erie Blvd. Triangle Corp. v. City of Schenectady,* 250 F.Supp.2d (N.D.N.Y. 2003); and *Peek-A-Boo Lounge of Bradenton v. Manatee County,* 337 F.3d 1251, 1264 (11th Cir. 2003).[27]  *See also Center For Fair Public Policy v. Arizona,* 336 F.3d

---

[26] A minority of courts that have addressed the issue have been unwilling to accept Justice Kennedy's re-formulation of the standard to be applied, and have engaged in jurisprudential contortions to avoid that obvious result.  *See, e.g., Encore Videos, Inc. v. City of San Antonio,* 310 F.3d 812, 822 n.17 (5th Cir. 2002) (characterizing Justice Kennedy's concurrence as the "stand alone opinion" of "only one justice").

[27] The Second Circuit has had only three post-*Alameda* adult zoning cases, and none have been presented with challenges based on the tests articulated by Justice Kennedy in *Alameda. See, e.g., TJS of N.Y., Inc. v. Town of Smithtown,* 598 F.3d 17 (2d Cir. 2010); *White River Amusement Pub., Inc. v. City of Hartford,* 481 F.3d 163 (2d Cir. 2007); and *Casanova Entertainment Group, Inc. v. City of New Rochelle,* 165 Fed. Appx. 722, 2006 WL 238434 (2d Cir. Jan. 31, 2006). Although both *TJS* and *White River* referenced the *Alameda* opinion, neither court was asked to consider, nor did they express an opinion on, whether Justice Kennedy's "how speech will fare" and "proportionality" tests should be applied.

The challenge in *TJS* was only whether the ordinance allowed enough "alternative sites," applying the test that had existed since *Renton*, and whether those sites should not only be measured at the time of enactment, but also at the time of the challenge. Consequently, it analyzed the case only under the prior *Renton* standard. Likewise, it rejected the suggestion to examine the commercial feasibility of the proposed sites, but that also was consistent with prior law under *Renton* and it was not asked to address whether Justice Kennedy's "how speech will fare" or "proportionality" tests might change that analysis.

Similarly, *White River Amusement* was concerned only with the issue of whether a city facing an adult zoning challenge may rely on *post-enactment* evidence of secondary effects. No challenge was presented based on Justice Kennedy's two-pronged tests in *Alameda. Casanova,* like *TJS,* involved only a traditional "alternative sites" challenge and did not even *mention Alameda Books.* Given that the issue of the applicability of Justice Kennedy's tests was neither presented to nor addressed by the court in any of these cases, it is an open question in this Circuit, and particularly now, since all three cases were decided prior to both *Reed* and *City of Austin.*

(renewed copy of PRG8599)

1153, 1161 (9th Cir. 2003) (recognizing that Justice Kennedy's concurrence is the "controlling opinion" in *Alameda,* and that his proportionality test applies to all adult *zoning* laws, *i.e., place* restrictions, but declining to apply it to time or manner restrictions.

### a. The Mandatory Termination Provisions Fail the "How Speech Will Fare" Test.

No one disputes that the 1995 and 2001 Amendments greatly reduced the permissible locations in the city for new adult businesses. But whether that impact impermissibly restricts the sites for *new* adult businesses is not an issue before the Court at this time. What is now before the Court is the impact *specifically* of only the City's adult business *mandatory termination provisions* on constitutionally protected expression in New York.

Among other things, Justice Kennedy's Alameda concurrence, echoing the premise and promise of *Young*, 26 years earlier, says that the "*effect* of a zoning ordinance must be … *not to reduce speech*." *Alameda Books*, 535 U.S. at 445 (emphasis added). This is the essence of his "how speech will fare" test. There have been 27 years to evaluate the effect of the 1995 Amendments and 21 years to evaluate the effect of the 2001 amendments. As noted *supra*, the number of adult eating and drinking establishments in the entire City of New York (counting *both* 60/40 clubs *and* 100% clubs) dropped from 68 in 1994 (CSF ¶160) to 57 in 2001 (CSF ¶ 161) to just 16 currently (eight 100% clubs - *see* CSF ¶¶ 167 – and eight 60/40 clubs – *see* 2022 JNR Vol. 10, Ex. 73.) The number of eating and drinking establishments specifically in *Manhattan* (counting *both* 100% and 60/40 clubs), has dropped from 21 in 1994 (CSF ¶ 166) to 14 in 2001 (CSF ¶ 163) to just eight currently.

(CSF ¶¶ 168 and 174.) If the mandatory termination provisions are allowed to take effect there will be only eight 100% clubs in the entire City and only three in Manhattan (CSF ¶168).

Justice Kennedy was also very clear that it was the *City's burden* to demonstrate that the effect has not been to reduce speech:

> At the outset, we must identify the claim *a city must make* in order to justify a content based zoning ordinance. As discussed above, *a city must advance* some basis to show that its regulation has the purpose *and effect* of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact.

*Alameda Books,* 535 U.S. at 449 (emphases added).

While there may arguably be some co-factors leading to the drastic reductions in the numbers of adult eating or drinking establishments in New York, the City cannot possibly meet its burden of proof to demonstrate that the effect of enforcing its provisions for termination of non-conforming adult uses, would not lead to a drastic further reduction in the number of these businesses and in the public's access to such constitutionally protected expression. [28]

---

[28] The drastic reduction in the total number of *all* types of adult businesses is not relied upon for this argument as changes in technology and consumer habits would obviously play a much greater role in the reduction of the numbers of *other* types of adult uses, *e.g.* adult theaters and adult bookstores. Availability of adult films via the Internet has likely had a significant impact on the demand for those *other* types of adult uses. But those technology changes are not likely to have had a significant impact, if any, in reducing the demand for adult *live entertainment* establishments. Given that the burden of proof is on the City to justify its ordinances which regulate expression, Plaintiffs believe the City will not be able to meet its burden of proof to show that its mandatory termination provisions will not have the effect of significantly reducing the public's access to constitutionally protected live adult entertainment.

Moreover, Justice Kennedy said that the Los Angeles ordinance should be found invalid on remand under the "how speech will fare" test unless the businesses forced to close "will for the most part disperse rather than shut down." *Id.* at 451. All but one of the Club Plaintiffs are located in Manhattan, a borough where the City admits there are not even enough *legally permissible* relocation sites much less *commercially feasible* ones. [29]

Further, all the Club Plaintiffs in Manhattan have filed sworn declarations that they would not relocate outside Manhattan if the 2001 Amendments were enforced against them, and, according to Plaintiff's expert, Michael Berzak, no more than *three* legally permissible and commercially feasible relocation sites could simultaneously be developed to relocate all the 60/40 eating and drinking establishments in Manhattan which would be forced to close or relocate.[30] Thus, the impact upon expression, and the public's access to

---

[29] The City concedes that there are not enough legally permissible relocation sites in Manhattan (only 13 according to the City, 9 according to plaintiffs – *see* CSF ¶ 143) for simultaneous occupation by the 19 60/40 businesses to be displaced there (*see* CSF ¶ 173). And the Club Plaintiffs would be in competition with all the displaced 60/40 bookstores for those sites as well.

[30] Plaintiffs' expert, Michael Berzak, has examined all the City's proposed alternative sites in Manhattan and concluded that no more than three of them would be both potentially feasible for development by a live adult entertainment business and could exist simultaneously, and that is without even looking at whether they are currently actually available. (*See* paragraph 37 of the Declaration of Michael Berzak Regarding Adult Business Sites in Support of Plaintiffs' Motions For Preliminary Injunction at p. 15 of Volume 1 of Plaintiffs' Joint Appendix filed in all four cases on November 21, 2018). Although the City disputes this number, it has presented no evidence that it has examined any of the sites it finds "legally permissible" to see how many, if any, are commercially feasible for establishment of a live adult entertainment business. Justice Kennedy made clear that the burden of proof on "how speech will fare" is on the *City*, and it has that same burden of proof on a motion for summary judgment (*see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)) (holding that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

expression, is not only evidenced by the huge decreases in the total number of such businesses *over the time these ordinances have been in effect*, but also as evidenced by what will be their devastating impact *prospectively* if the mandatory termination provisions are allowed to take effect.[31]

> **b. The Mandatory Termination Provisions Fail Justice Kennedy's "Proportionality" Test.**

Neither can the mandatory termination provisions survive the *other* of Justice Kennedy's requirements, his "proportionality" test, i.e., that the purpose and effect of the ordinance in reducing secondary effects will significantly outweigh its impact on expression. "[A] promised proportional reduction does not suffice." 535 U.S. at 451.

The City admits it has never directly studied whether the 60/40 businesses it now wants to eliminate cause significant adverse secondary effects (CSF ¶ 188), relying, instead, solely, on the studies it conducted in 1993 and 1994 on the 100% adult businesses which, at that time, were far more densely clustered and characterized by garish exteriors

---

which that party will bear the burden of proof at trial"). It appears clear that the net impact of the challenged mandatory termination provisions on how speech will fare will unquestionably be devastating and the City cannot meet its burden of proof to demonstrate otherwise.

[31] The fact that the number of live adult entertainment businesses in New York has precipitously declined in the years since the City began limiting their permissible locations is prima facie evidence that the number of such businesses forced to terminate are not likely to be replaced by a comparable number of new ones in the future. If the zoning restrictions were not unduly impacting expression, one would expect that in the last 27 years since these restrictions were first imposed, a great many more adult live entertainment businesses would have opened outside of Manhattan. The fact that they haven't is prima facie evidence of the adverse impact of these restrictions on how speech will actually fare, *regardless* of the number of so-called legally permissible relocation sites (of undemonstrated commercial feasibility) the City can point to outside of Manhattan.

no longer present.   However, as noted and detailed in Point D-3-b *supra,* substantial evidence now exists from studies showing that 60/40 businesses do not cause significant problems and particularly in comparison to their 1994 100% counterparts.   And these studies were found to be sufficiently persuasive evidence to cause them to be adopted as Justice York's findings of fact in the previously-referenced heavily contested prior state court challenge to the 2001 Amendments.[32].

The point is that Plaintiffs have submitted substantial evidence that their 60/40 businesses do not cause the types of secondary effects attributed to their 100% predecessors, and the City, which has the burden of proof on this point, admits that it has conducted no studies of its own.

Moreover, as noted *supra,* there have been no public nuisance actions brought against Plaintiffs' businesses in all the many years of their existence, other than those prior to the 2001 Amendments which asserted that they were adult businesses in the wrong location.

---

[32] As noted *supra,* those studies are included in the current record as Exhibits 62-64 in Volume 9 of the 2022 JNR and are also the bases for Justice York's findings of fact in *For the People Theatres of NY, Inc. v. City of New York,* 38 Misc.3d 663, 672-673, 954 N.Y.S.2d 801, 807-808 (2012).   The New York Court of Appeals ultimately upheld those amendments against state constitutional challenges based upon its legal *presumption* that the secondary effects of 60/40 businesses would be the same as those of the 100% businesses notwithstanding that the actual findings of fact by the trial court were to the contrary. *For the People Theatres of NY, Inc. v. City of New York,* 29 N.Y.3d 340, 79 N.E.3d 461 (2017). It is also worth mentioning that, although the state Court of Appeals rejected the constitutional challenges to the 2001 Amendments that were presented by the plaintiffs in that case, no party asserted the claim made here, *i.e.*, that the adult zoning scheme is enforced by discriminatory mandatory termination requirements. Consequently, those provisions could be invalidated without directly conflicting with the ruling of the state Court of Appeals.

In sum, whether based upon the "how speech will fare" component of Justice Kennedy's proportionality test, or based upon whether the City has made a sufficient showing of *need* for enforcing the mandatory termination provisions against the Club Plaintiffs' 60/40 businesses, and certainly when balancing these two factors proportionately against each other, it is clear that the City's mandatory termination provisions cannot survive under the tests articulated by Justice Kennedy in his controlling opinion in *Alameda Books*.

### 3. The Mandatory Termination Provisions are Facially Unconstitutional as Impermissible Content-Based Restraints on Expression Under the Tests of *Reed v. Town of Gilbert* and *Reagan v. City of Austin*

As discussed at length, *supra, Reed* and *Austin* radically changed the jurisprudence regarding evaluation of time, place and manner restrictions, holding that "a court must determine whether a law is content neutral on its face *before* turning to the law's justification or purpose." *Reed,* 576 U.S. at 166 (emphasis in original).  In so doing, it abrogated the "secondary effects" doctrine which would allow examination of governmental purposes even where a law, on its face, is content-based.

As noted *supra,* eight Justices in *Austin* agreed that *if* a law *is* content-based it is subject to strict, not intermediate, scrutiny, and that under such a test, content-based time, place or manner restrictions are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve *compelling* state interests." *Reed,* 576 U.S. at 163.

Further, in *Austin,* all *nine* justices agreed that a law is content-based if it is content-based *on its face,* regardless of whether it is supported by content-neutral justifications. That is consistent with the opinion of a majority of the Justices even in *Alameda,* who agreed with the rather obvious proposition that adult zoning ordinances are content-based because they are content-based *on their face.*

Given the foregoing, unless the Court were hereafter to carve out an *exception* to its now-established time, place or manner jurisprudence, any ordinance singling out adult entertainment business for unique time, place or manner restrictions, can be upheld only if found to be narrowly tailored to accomplish a *compelling* governmental interest.

Clearly that test cannot be met here. The City has no *compelling* interest in requiring termination of the nonconforming 60/40 Businesses, and it has never claimed that it has one.

And even if the City could somehow demonstrate that it *had* a compelling interest in selecting *adult* non-conforming uses for unique discriminatory treatment compared to all other nonconforming uses, its mandatory termination provisions for those businesses would not be the least restrictive means of preventing any presumed secondary effects from such businesses. Enforcement of public nuisance laws would guarantee removal of any "bad apples." And since the current businesses have not been causing any significant problems, a less restrictive alternative would certainly be to merely enforce the 2001 Amendments only against those trying to establish or operate uses at locations where such use did not pre-date the 2001 Amendments.

40

The real issue here is one of predicting whether the Court will hereafter create a "secondary effects" exception to its new time, place and manner jurisprudence solely applicable to adult businesses. Nothing in either the *Reed* or *Austin* opinions suggests that it contemplates doing so. The inconsistency between *Reed* and the Supreme Court's previous adult zoning jurisprudence was specifically brought to the Court's attention in the Brief of Respondent Reagan (at pp. 31-32) and the Amicus Brief of the United States (at pp. 12-13) filed in the Supreme Court in *Austin,* and the application of the "secondary effects" doctrine to adult entertainment businesses was also the subject of oral argument (No. 20-1029, November 10, 2021, at pp. 31-32).  However there is not even a footnote in either opinion suggesting that there should be any exception to the clear rule of *Reed* and *City of Austin* only for adult business regulations.[33]  Consequently, it is clear the Court was aware that *Reed* was inconsistent with prior "secondary effects" cases, but consciously elected not to distinguish those cases.

Nor was there even a footnote in either *Reed* or *Austin* suggesting that its abrogation of the "secondary effects" doctrine for time, place and manner restrictions was anything other than across the board. To the contrary, and as noted *supra*, *Austin* provided a footnote distinguishing *Ward v Rock Against Racism* which, up until then, had been deemed an endorsement of the "secondary effects" doctrine.   In *Ward's* evaluation of the

---

[33] Indeed, such an exception would be, itself, the epitome of content-based discriminatory treatment.

constitutionality of New York City's time, place or manner ordinance restricting sound levels in public parks, it stated:

> Our cases make clear, however, that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are *justified without reference to the content of the regulated speech*, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

491 U.S. at 791 (emphasis added).

The language highlighted above from *Ward* had been used by many courts as a reaffirmation of the "secondary effects" doctrine first articulated in *Renton.* However, *Austin* clarified that *Ward* stood for nothing of the sort and that the only reason *Ward* looked at the ordinance's justifications was because that particular ordinance was content-neutral *on its face*, but could still be invalidated if found to have been enacted for a content-based *purpose*. 142 S.Ct. at 1482 n. 2. This clarified that the Court intended its abrogation of the secondary effects doctrine in *Reed* and *Austin* to apply to *all* time, place and manner regulations and not just those involving signs.

In short, a straightforward application of *Reed* and *Austin* compels the conclusion that the City's mandatory termination provisions are content-based and subject to a test of strict scrutiny which they cannot possibly meet.

Though some courts, in *dictum,* have rejected the idea that *Reed* and *Austin* must apply to adult business regulations, others believe them to be fully applicable. A thorough discussion of these cases was presented in the Fifth Circuit's opinion in *Austin* before it was reviewed in the Supreme Court. *See Reagan National Advertising v. City of Austin,*

42

972 F.3d 696, 702-04 (5th Cir. 2020), *reversed on other grounds*, *Austin*, 142 S.Ct. 1464. In the Fifth Circuit's decision in *Austin*, it reviewed the opinions of courts around the country on the impact of *Reed* and agreed with those which found that *Reed* created a "sea change in the traditional test for content-neutrality." *Austin,* 972 F.3d at 702. Consequently, it concluded that the secondary effects doctrine was no longer applicable in the Fifth Circuit and it then specifically abrogated that court's several prior cases decided on the basis of secondary effects, *which included several decisions which had upheld adult business regulations*. *See id.* at 703 n. 2 and accompanying text. These specifically-abrogated adult business cases included *Illusions — Dall. Private Club, Inc. v. Steen*, 482 F.3d 299, 308 (5th Cir. 2007); *Fantasy Ranch Inc. v. City of Arlington,* 459 F.3d 546, 554-56 (5th Cir. 2006); *N.W. Enters. Inc. v. City of Houston,* 352 F.3d 162, 174 (5th Cir. 2003); and *Encore Videos, Inc. v. City of San Antonio,* 330 F.3d 288, 292 (5th Cir. 2003).

Finally, the limited provisions challenged by the present motion (*i.e.*, the discriminatory mandatory termination provisions) raise an issue of first impression which does not necessitate *any* evaluation of secondary effects because it is Plaintiffs' position that wholly apart from whether 60/40 businesses may have any adverse secondary effects on their surrounding neighborhood (an issue which remains in dispute), the present motion asserts that *all* nonconforming uses are deemed to have adverse secondary effects in their current locations (otherwise they would not have been *made* nonconforming), and there is no evidence that any presumed secondary effects from non-conforming 60/40 uses are

greater, or substantially greater, than the secondary effects of all other nonconforming uses, *e.g.,* nonconforming bars, convenience stores, gas stations, etc.

As a result, regardless of whether the "secondary effects" doctrine should be applied as a unique exception to the doctrine of *Reed* and *Austin* in an appropriate case, it has no valid application to the very limited challenge presented by the current motion, involving provisions which, solely based on content and nothing else, distinguish between adult nonconforming uses and all others.

### 4.   The Mandatory Termination Provisions are Also Facially Unconstitutional Under The First Amendment Because They Are Impermissibly Underinclusive

The Supreme Court has repeatedly concluded that laws restricting First Amendment rights may be stricken on grounds of underinclusiveness, *i.e*., that they single out certain types of expressive activity for regulations not applicable to other uses which assertedly cause similar concerns. *See, e.g, Erznoznik v. City of Jacksonville,* 422 U.S. 205, 215 (1975) (ban on display of nudity at drive in theaters stricken due, in part, to underinclusiveness); *City of Ladue v. Gilleo,* 512 U.S. 43, 51 (1994) (underinclusiveness recognized as a proper First Amendment ground of challenge in case involving restrictions on residential signs compared to non-residential signs) and *Brown v. Ent. Merchs. Ass'n,* 564 U.S. 786, 801-802 (2011) (striking restrictions on video games as underinclusive in violation of the First Amendment). And *see also Minneapolis Star & Tribune Co. v. Minn. Comm'r. of Revenue*, 460 U.S. 575 (1983) (striking underinclusive discriminatory taxation scheme).

44

As the Court stated in *Erznoznik*, 422 U.S. at 215:

> This Court frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it. *See, e.g., Williamson v. Lee Optical Co.*, 348 U.S. 483, 488-489 (1955). This presumption of statutory validity, however, has less force when a classification turns on the subject matter of expression. '(A)bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' Thus, 'under the Equal Protection Clause, not to mention the First Amendment itself,' *id.*, at 96, even a traffic regulation cannot discriminate on the basis of content unless there are clear reasons for the distinctions.

More recently, in *Brown,* the Court observed:

> Of course, California has (wisely) declined to restrict Saturday morning cartoons, the sale of games rated for young children, or the distribution of pictures of guns. The consequence is that *its regulation is wildly underinclusive when judged against its asserted justification*, which in our view is alone enough to defeat it. Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint. *See City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994); *Florida Star v. B. J. F.*, 491 U.S. 524, 540 (1989). Here, California has singled out purveyors of video games for disfavored treatment—at least when compared to booksellers, cartoonists, and movie producers—and has given no persuasive reason why.

*Brown,* 564 U.S. at 801-802 (emphasis added).

Here, the City has singled out adult nonconforming uses for disfavored treatment, i.e., mandatory termination, compared to all other nonconforming uses. Its legislative history not only provided no "persuasive" reason why it treated adult nonconforming uses differently than all other nonconforming uses, but didn't address this issue *whatsoever*. If the City's justification is (as it must be) that uses are made nonconforming because they are deemed to cause adverse effects in the neighborhoods where they are located, then the

City's mandatory termination provisions for only *adult* nonconforming uses are necessarily underinclusive.  That is particularly unjustifiable here because the City conducted no studies to compare the adverse effects of different kinds of nonconforming uses.  In short, under the standard of *Brown*, the City's adult business mandatory termination provisions are underinclusive and cannot stand.

Also relevant to this point are the Court's several observations in *Minneapolis Star*, which struck down a use tax on pen and ink products because certain businesses engaged in a particular kind of expression (e.g., certain morning newspapers) were no longer granted the same exemption from that tax that other businesses using those same pen and ink products were granted. That is likewise analogous to the present case where virtually all other nonconforming uses may remain at their locations indefinitely, but only *adult* nonconforming uses are subject to the mandatory termination requirements:

> When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency. *See Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 112-113 (1949) (Jackson, J., concurring). When the State singles out the press, though, the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes becomes acute.
>
> * * *
>
> We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency.

*Minneapolis Star,* 460 U.S. at 585.

46

Likewise here, even though not a taxation case, if the City subjected *all* nonconforming uses to the same mandatory termination provisions, their application to adult businesses could not be challenged as being discriminatory. But the City may not single out only *adult* nonconforming uses for mandatory termination absent a demonstration of *compelling* interests and only after showing that adult nonconforming uses create significantly greater problems than all other types of nonconforming uses.

> **5.** **The City's Mandatory Termination Provisions Violate the 14th Amendment's Equal Protection Clause Because They Unjustifiably Discriminate Against Non-Conforming Adult Uses Compared to All Other Non-Conforming Uses**

The City's adult business mandatory termination provisions are also invalid under longstanding equal protection doctrine where a challenged law is alleged to deny equal protection to those engaged in fundamental rights. As stated in *N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 587-88 (1979):

> The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." The Clause announces a fundamental principle: the State must govern impartially. General rules that apply evenhandedly to all persons within the jurisdiction unquestionably comply with this principle. Only when a governmental unit adopts a rule that has a special impact on less than all the persons subject to its jurisdiction does the question whether this principle is violated arise.

Here, the City has laws of general application, ZR § 52-11 and 52-61, which provide the near-universal rule that non-conforming uses in commercial and manufacturing zones may continue indefinitely absent a discontinuance of the use for a period of two or more years, or a significant increase in intensity (CSF ¶¶ 40-44

). The benefits of those generally applicable laws are denied, however, only to those commercial businesses defined by the content of their expression, *i.e.,* to businesses engaged in the exercise of fundamental constitutional rights. Where that is the case, the law must be subjected to strict judicial scrutiny:

> In considering whether state legislation violates the Equal Protection Clause of the Fourteenth Amendment . . . we apply different levels of scrutiny to different types of classifications. At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose. Classifications based on race or national origin, *e. g., Loving v. Virginia*, 388 U.S. 1, 11 (1967), *and classifications affecting fundamental rights*, *e. g., Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 672 (1966), are given the most exacting scrutiny.

*Clark v. Jeter*, 486 U.S. 456, 461 (1988) (some citations omitted, emphasis added).

This unequal treatment would also be *doubly* unfair to Plaintiffs in the event they were forced to close or attempt to relocate to a new site. One desiring to establish an adult entertainment business at a new, currently perfectly lawful, properly zoned site, faces uncertainties and potential debilitations faced by no others attempting to open a commercial business, specifically, the possibility that its business could yet again be *permanently eliminated* in the event of any of a number of possible *future* zoning changes, including not only in the district it is in, but in any surrounding districts within 500 feet.

The unfair and unequal effect on the ability of an adult business entrepreneur to rely on the grandfathering provisions of the zoning resolution in the same way as any other entrepreneur is perhaps most dramatically demonstrated by the example of former plaintiff Sports Club. It looked at the zoning requirements of the 1995 Amendments and then spent $60 million to purchase a master lease on a building which it thought would be ideal for a

fully lawful 60/40 live entertainment site, only to find that the City, thereafter changed the permissible zoning again by adopting the 2001 Amendments, thus rendering its location nonconforming. (CSF ¶ 58-n). Because of the City's unique adult business mandatory termination provisions, this process could be repeated endlessly so as to make any *new* location just as illegal.

In contrast, one investing in a site to house, *e.g.*, a gas station or an oil refinery, or any other type of use with potentially adverse effects, may make their investments with the certainty that should a subsequent ordinance change render their use non-conforming, it may nonetheless continue indefinitely absent any change in the use. This is starkly unfair and unequal treatment of entities in the same class, *i.e.*, the class of all non-conforming uses, and, worse, application of that more harsh treatment is triggered solely by the content of the expression provided.

For each and all of the reasons above, the City's mandatory termination provisions for adult nonconforming uses violate numerous guarantees of both the First and Fourteenth Amendments and Plaintiffs are entitled to the very limited relief they seek of invalidating application of just those particular provisions against them.

## II

## IN THE ALTERNATIVE, THE CITY'S PERMITTING AND VESTING PROVISIONS ARE FACIALLY UNCONSTITUTIONAL AND DENY PLAINTIFFS A REASONABLE OPPORTUNITY TO RELOCATE, IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS

As noted at the outset, the Club Plaintiffs seek summary judgment on the City's vesting and permitting provisions for adult businesses only in the event their primary motion, *i.e.*, their direct challenges to the mandatory termination provisions, are unsuccessful. If the Club Plaintiffs prevail on any of their direct challenges to the mandatory termination provisions, they will have neither the need nor standing to challenge the permitting and vesting provisions as their current sites have all required permits.

### A.  Plaintiffs' Vesting and Permitting Challenges, if Successful, Would Entitle Them to Injunctive Relief Against Enforcement of the Mandatory Termination Provisions

In *Renton, supra,* the Supreme Court established the benchmark First Amendment principle that adult businesses are entitled to a "reasonable opportunity to open and operate." *Renton,* 475 U.S. at 54.

Should Plaintiffs' direct challenges to the mandatory termination provisions be rejected, they would either have to cease operating their adult establishments or find a relocation site where they could do so. But if the permitting and vesting provisions are unconstitutional, they will not have a reasonable opportunity to relocate. Consequently, if the permitting or vesting provisions are found unconstitutional, Plaintiffs would

50

alternatively be entitled to an injunction preventing enforcement of the mandatory termination provisions until such time, if ever, that the City has successfully moved to vacate that injunction upon proof that it has cured all the constitutional deficiencies in its vesting and permitting provisions applicable to adult businesses.

**B.   The City's Provisions for the *Vesting* of Adult Uses Are Facially Unconstitutional in Violation of the First and Fourteenth Amendments Due to Their Allowance of a "Sensitive Use Veto"**

The City's adult zoning provisions prohibit adult businesses from locating within 500 feet of any existing "school" or "house of worship" (hereafter "sensitive use") or any existing adult business (*see* ZR §§ 32-01(b) and 42-01(b)).[34] To resolve disputes over which came first, the City enacted 1 New York City Rules (RCNY) § 9000-01 (the "Rule") (reproduced as Exhibit 75 in Volume 10 of the 2022 JNR filed in all cases herein on May 9, 2022). Under § 9000-01(b) of that Rule, whenever an adult use or a sensitive use obtains "an appropriate Department permit," that qualifies to establish its vesting priority. The Rule expressly recognizes either a building permit or what the Rule refers to as a "no-work" permit as an "appropriate Department permit."[35] While the presence of an adult use (permitted or otherwise) does not disqualify a nearby sensitive use from lawfully establishing or operating, a permitted sensitive use (or other previously permitted adult

---

[34] The City has often referred to *both* adult uses *and* sensitive uses collectively by the confusing term of "sensitive receptors." For clarity and to prevent perpetuation of this misnomer, Plaintiffs will not use that term but, instead, will refer to these uses as either "adult" uses or "sensitive" uses or, if addressing them collectively, as "disqualifying receptors.".

[35] Presumably, an "appropriate Department permit" would also include a Certificate of Occupancy.

use) within 500 feet *does* disqualify any new *adult* business from opening or operating. (*C.f.* CSF ¶ 95.)

However, contrary to the constitutional mandate articulated by the only case to have considered this issue, *Young v. City of Simi Valley*, 216 F.3d 807, 814 (9th Cir. 2000), the City's Rule states that vesting occurs only after the City has *issued a permit* recognizing the lawfulness of the use, rather than at the time the application for the permit is first submitted. *See* § 9000-01(b) of the Rule, stating:

> (b)     [T]he date of establishment of an adult establishment, house of worship, or school shall be the *date of issuance* of an appropriate department permit.

(Emphasis added.)

As will be shown below, that is a fatal defect which renders the mandatory termination provisions unenforceable because it denies the Club Plaintiffs a reasonable opportunity to relocate.

*Simi Valley* involved facts eerily similar to those described in Plaintiffs' contemporaneously filed Declaration of Michael Berzak in Support of Plaintiffs Motions For Partial Summary Judgment (hereafter "Berzak PSJ Dec."). In *Simi Valley* the City's adult zoning ordinance required a use permit approving a site for an adult use before an adult use could lawfully operate. That is the same in New York City, where, under the

Rule, the right to operate an adult use will not vest until either a building permit or so-called "no-work" permit is issued for an adult use.  (*See also* CSF ¶ 209[36])

In both cities, the prospective adult use's permit is approved, any nearby sensitive use could defeat the prospective adult use's application if it gets its permit granted first, even if it filed its application long after the adult business did. And in both cities, a sensitive use like a church could (and did) get its permit approved and/or issued in no more than three days after it filed its application.  In *Simi Valley* a "newly established religious organization, the Joshua Institute," was granted a zone clearance one day after it filed its application.  216 F.3d at 813. In New York, as detailed in ¶ 28 of the Berzak PSJ Dec., a so-called "house of worship" got its approval under the Rule just three days after it filed its application with DOB for a no-work permit, and the permit issued just three days later.[37]

In both cases the sole *purpose* of the filing by the so-called church was to defeat the permit application of the adult use applicant.[38]  See Simi Valley at 813 and ¶¶ 27 and 43 of

---

[36]  Footnote 36 in the original Memorandum filed on September 16, 2022, has been deleted as no longer relevant. This footnote is just a placeholder, so the footnote numbers of the prior and current Memorandum remain the same.

[37]  As discussed in greater detail in Point II-C, *infra,* obtaining vesting of zoning rights in New York City is a two-step process.  One must first get zoning approval of their construction documents.  (CSF ¶ 208.)  Thereafter one seeks to obtain the actual *issuance* of their permit.  While there used to be a 40-day time limit on getting initial approval and a separate 40-day time limit on thereafter getting the permit actually *issued,* the City repealed the latter requirement and has not replaced it (CSF ¶¶ 100-103) so, now, there is no time limit whatsoever for getting the permit actually issued, and, under § 9000-01(b) of the Rule, it is only *issuance* which creates the vesting right.

[38]  The Berzak PSJ Declaration describes the problems which beset the DOB permit applications of a 100% adult business called Sapphire 2, located at 20 W. 39th Street in Manhattan.  Just to

53

the Berzak PSJ Dec. In both cases the permit application of the prospective adult use took *much* longer to process. In the New York situation detailed in Berzak's PSJ Dec. ¶¶ 4-14, it took DOB 2 ½ months to initially issue the prospective adult use's no-work permit (which DOB later improperly revoked[39]) but since there is no *time limit* for issuing such permit (as explained in the margin, *supra*), the amount of time for permit issuance which might actually occur could potentially be even far greater.[40]   And, ultimately, following resolution of seemingly endless complaints apparently triggered by an adult business competitor which likely sponsored disqualification efforts by a "house of worship" permit applicant,[41] it took over 2 *years* before the adult business' building permits were finally issued, and approximately 5 ½ months of that time appears to have been caused by the

---

prevent any understandable confusion, that is an entirely different business, at a different address, from Plaintiff Jacaranda's 60/40 business herein, which alternately goes by the name "Sapphire Manhattan" or just "Sapphire."

[39] *See* Berzak's PSJ Declaration ¶¶ 15-21.

[40] The least hazardous way for a new adult business to get established with vesting rights where there is no prior adult use present, is to first acquire a site used by a non-adult cabaret providing live entertainment, and then seek an initial "no-work" permit as an adult cabaret.  Then, it can temporarily operate the site by presenting "regular" adult entertainment (so as not to lose its vesting rights) while it commences the far more time-consuming process of putting together the architectural and other plans and "construction documents" needed to apply for the requisite building permits to remodel the site in the manner contemplated when it was acquired.  In the case of Sapphire 2, it took 2 ½ months just to get the *initial* (presumably simple) no-work permit.  Had Sapphire 2 attempted, instead, to acquire a site *not* previously approved for a live entertainment type use (which is most of them), it would have taken *much* longer, after acquiring its site, to get the requisite DOB permit conferring vesting, and that would have given competitors or opponents an even longer time to gear up their efforts to get a permit for some type of disqualifying nearby use.

[41] *See* Berzak PSJ Dec. ¶¶ 16, 22, 26-27.

interference from the so-called "sensitive use."  Berzak PSJ Dec. ¶ 42.  In *Simi Valley* the permit was never granted because, during the lengthy approval process, a different sensitive use, a karate school, was ultimately discovered.

In both cases, the bogus "church" use did not actually cause the ultimate defeat of the adult use application (in *Simi* it would have but for the City's late discovery of a karate school within 500 feet, and in New York, it would have but for the fact that, after additional *months* of delay, DOB concluded that the "church" didn't defeat the adult use because it didn't even *file* its no-work permit application until *after* the adult use already received *approval* for its application, Berzak PSJ Dec. ¶¶ 38-40).

In both cases the applicable procedures insured that the time needed to be issued the permit which provided vesting would be substantially greater for an adult use than a sensitive use.[42]

The *Simi Valley* opinion concluded that "the deterrent effect [of a potential sensitive use veto] is both 'real and substantial'." 216 F.3d at 818-819. For that reason it concluded that an adult zoning scheme which deems a prospective adult use's right to vest only as of the date its permit application is *granted,* rather than the date it is *filed,* creates the

---

[42] This is discussed in greater detail in Point II-C, *infra.*  However, as demonstrated by the Berzak PSJ Dec., a no-work permit application by a church would not have to prove zoning compliance and could, and *did,* get zoning approval in just three days (and an issued permit just three days later), whereas it took the adult use 2 ½ months.  This is because it is only the adult use that must prove that there is no disqualifying receptor within 500 feet.  And, as discussed in Point II-C, and later in this Point II-B, DOB examiners of adult business permit applicants tend to err *dramatically* on the side of caution, being unwilling to approve an adult use unless any and every *possible* objection is met, no matter how unsubstantiated.

possibility of an unconstitutional "sensitive use veto" (*id.* at 814 n. 8) which denies a "reasonable opportunity to open and operate" (*id.* at 817), thereby rending the adult zoning scheme unconstitutional "***on its face***" (*id.* at 820).  (Emphasis added.)

### The sensitive use threat is both "real" and "substantial"

The potential for disqualification by an after-arriving sensitive use has been clearly demonstrated by the Berzak PSJ Declaration to be "both real and substantial" in New York City.

Berzak noted that when Sapphire 2 sought its no-work permit, DOB inspectors filed objections asserting (incorrectly) both that the Sapphire 2 site was too near other adult businesses, and also asserted (incorrectly) that its site was too near a sensitive receptor, a so-called "house of worship" use at 12 West 40th Street.  Berzak PSJ Dec. ¶¶ 9-12.  After conducting an on-site inspection, and after getting feedback from a lawyer in the DOB's General Counsel's office (who initially objected as well), DOB withdrew those objections, *but,* without explanation, *still took more than three weeks more* before it issued the no-work permit.  All told, it took Sapphire 2 two and a half months just to get its initial no-work permit.

But Sapphire 2's problems did not end there.  Three months after it issued the no-work permit, DOB conducted another so-called audit (but with no new hard evidence), apparently based on an anonymous "complaint" shown on its website, reasserting the same rejected argument that there was a "house of worship" use at 12 West 40th Street.  (Berzak PSJ Dec. ¶¶ 16-18 and 22-23.)  The "complaint" is reasonably believed to have been filed

by an adult business competitor of Sapphire 2 who appears to have persuaded the owners of a Seventh Day Adventist bookstore (not a "house of worship") to object, raising the same objection already rejected by DOB and its General Counsel several months earlier.

Because the Rule clearly states that a "sensitive use" only disqualifies an adult business permit applicant if that sensitive use has an "appropriate Department permit" to operate as a house of worship or school, and because there was no such permit on file with DOB, DOB should have instantly rejected this latest complaint out of hand.  However, it did not do so and, instead, on September 10, 2014, issued Sapphire 2 a Notice of Intent to Revoke its no-work permit, and then, 15 days later, proceeded to revoke it.  Berzak PSJ Dec. ¶¶ 18 and 21.  Fortunately for Sapphire 2, after Berzak pointed out (again) its repetition of its same mistake, DOB later rescinded its revocation.  Berzak PSJ Dec. ¶ 25.  But that all took extra time and money.

But, astonishingly, even *this* was not the end of the "sensitive use" saga.  Three days after DOB rescinded its revocation of Sapphire 2's no-work permit, the bookstore, with help from an architect known to work for Sapphire 2's competitor, filed its own no-work permit application to establish the right of the bookstore site to operate a "house of worship" (but only on its two upper floors) where, previously, it only had a first-floor bookstore and two upper floors devoted to "storage" and "office space."  That permit was approved in three days and was issued just three days later.  See Berzak PSJ Dec. ¶¶ 27-28.

Thereafter, when Sapphire 2 was finally ready to file all its construction documents in support of its building permit application, DOB inspectors, astonishingly, *once again*, took the position that the Sapphire 2 site was too near one or more disqualifying receptors (Berzak PSJ Dec. ¶ 36 and Exhibit J thereto) and, once again, did not back off that position until DOB General Counsel, *once again*, reminded DOB that the relevant rule awards priority to the first use to *obtain* its DOB permit (Berzak PSJ Dec. ¶ 38 and Exhibit K thereto), and since the "house of worship" permit didn't issue until after Sapphire 2 already had its no-work permit, it couldn't disqualify Sapphire 2's building permit application.  It is not clear if DOB General Counsel would have taken that position if the asserted "sensitive use" had obtained its permit a few days earlier, before DOB had rescinded its revocation of Sapphire 2's permit, but that is really irrelevant because, had that asserted "house of worship" been issued its permit at any point during the 2 ½ months that Sapphire 2's no-work permit application was initially pending, it would have defeated Sapphire 2 without question, and even if the sensitive use did not follow through or ever get a building permit or a certificate of occupancy as a house of worship.  The mere granting of its application would have been enough to stop Sapphire 2 in its tracks.

Finally, it is significant to note that *all* DOB permit applications (including no-work permit applications) are *publicly posted* on DOB's website.  (CSF ¶¶ 97-98.)  And, it is also significant that those working in the same industry, as well as their architects and other employees are uniquely positioned to learn, at an early date, of permit application filings by potential nearby competitors.  For this reason there is a "substantial basis" for those

58

seeking new adult sites to reasonably fear similar efforts to those which beset Sapphire 2. In short, the threat has unquestionably been proven to be both "real and substantial."

**Chilling Effect**

Here, declarant Talla, who has a controlling interest in one of the Club Plaintiffs herein (*e.g.,* Jacaranda, which operates the 60/40 business known alternatively as either "Sapphire Manhattan" or simply "Sapphire"), and also in Sapphire 2, was the very one victimized by this attempted sensitive use veto.  He has indicated that, based on his experience, although he continues to desire to acquire sites for new adult Clubs, he would no longer attempt to convert any new site to an adult use so long as those seriously flawed vesting procedures remain in place. Declaration of David M. Talla in Support of Club Plaintiffs' Motions For Partial Summary Judgment, ¶ 17, filed contemporaneously herewith.

Likewise, the declarations filed by owners on behalf of all the other Club Plaintiffs attest that they are familiar with the circumstances described in the Berzak PSJ Declaration and that they, as well, are in fact chilled and deterred from attempting to acquire and convert any new site to an adult use because of the very real risk that such attempt might be defeated, after the investment of a great detail of time and expense, by a sensitive use veto.

Accordingly, for all the same reasons as in *Simi Valley*, so long as the Rule continues to determine vesting by the date of permit *approval* rather than *filing*, the Plaintiffs are

59

denied a reasonable opportunity to relocate and enforcement of the mandatory termination provisions should be enjoined for that reason.[43]

## C. The City's Zoning Approval Provisions for Adult Uses Are Also Facially Unconstitutional Because They Lack the Procedural Safeguards Needed to Prevent Censorship by Delay

### 1. Zoning Approval Requirements Which Apply in a More Onerous Way to Adult Uses Must Have Strict Procedural Safeguards to Protect Against the Possibility of Censorship by Delay.

In *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990), the Supreme Court held that licensing requirements for adult entertainment businesses are prior restraints on expression and are *facially* unconstitutional unless they contain *procedural safeguards* preventing even the *possibility* of their being used to censor by delay; proof of actual delay is not required.[44]

Framing the issue, the Court stated:

Petitioners involved in the adult entertainment industry and adult cabarets argue that the licensing scheme fails to set a time limit within which the licensing authority must issue a license and, therefore, creates the likelihood of arbitrary denials and the concomitant suppression of speech. … [W]e conclude that the city's licensing scheme lacks adequate procedural safeguards.

*Id.* at 223.

---

[43] A corrected rule could provide that, although vesting is determined by the date of *filing* (rather than the date of issuance), vesting can be lost in the absence of proof of steady progress in developing the site for the proposed use, pursuant to whatever criteria DOB feels it would need to articulate. *Compare* CSF ¶ 99.

[44] The Court re-iterated its prior holdings that a licensing scheme challenged as lacking adequate procedural safeguards to prevent against censorship by delay may be challenged *on its face* and without first proving any exercise of the power to censor. It is the *potential* for such exercise which renders the scheme facially invalid: "We, therefore, hold, as a threshold matter, that petitioners may raise a facial challenge to the licensing scheme." *FW/PBS,* 493 U.S. at 225.

60

> [A] prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible. . . . Like a censorship system, a licensing scheme creates the possibility that constitutionally protected speech will be suppressed where there are inadequate procedural safeguards to ensure prompt issuance of the license. . . . A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech.

*Id.* at 226.

The Court held that the following procedural requirement, *inter alia,* is mandatory in such circumstances:

> [T]he licensor must make the decision whether to issue the license within a *specified* and reasonable time period . . . .

*Id.* at 228 (emphasis added).

What is even more relevant is that the Dallas adult business licensing scheme was not lacking in any specified brief time limits for action by the chief of police to grant or deny the license. It required that such a license be granted or denied by the Chief within 30 days. *Id.* at 227. However, the Court noted that an adult business could not *qualify* for that license unless it first received, *e.g.*, zoning[45] and other approvals from the relevant city authorities (including the "building official"), but there were no time limits for those other city authorities to complete their investigations and grant or deny their approvals. In other words, it was the need for approval by these *other* City agencies (not by the Chief of

---

[45] "The ordinance regulates sexually oriented businesses through a scheme incorporating zoning, licensing, and inspections." *Id.* at 220-21 (emphases added).

Police), combined with the lack of time limits for such approvals, that triggered the invalidation of the entire scheme.

In Dallas, like here, the problem was not specifically in the adult business license requirement (indeed, New York doesn't even have such a license requirement), but rather in the zoning and other approvals that were necessary in order to allow the business to operate:

> Although the ordinance states that the "chief of police shall approve the issuance of a license by the assessor and collector of taxes to an applicant within 30 days after receipt of an application," the license may not issue if the "premises to be used for the sexually oriented business have not been approved by the health department, fire department, *and the building official* as being in compliance with applicable laws and ordinances." § 41A-5(a)(6). Moreover*, the ordinance does not set a time limit within which the inspections must occur. The ordinance provides no means by which an applicant may ensure that the business is inspected within the 30-day time period within which the license is purportedly to be issued if approved.*

*Id.* at 227 (emphases added).

The Court went on to point out that it is not *all* zoning or building approval requirements that trigger scrutiny as prior restraints. Zoning or building requirements which are no more onerous for adult businesses than nonadult businesses are not subject to facial challenges. But, if the challenger can point to some way in which those seemingly content-neutral requirements affect adult businesses in a more onerous manner, then the permit approval process is subject to facial challenge as a prior restraint:

> The city asserted at oral argument that it requires every business - without regard to whether it engages in First Amendment-protected speech - to obtain a certificate of occupancy when it moves into a new location or the use of the structure changes. Tr. of Oral Arg. 49; see also App. 42, Dallas City Code § 51-1.104 (1988) (certificate of occupancy required where there

is new construction or before occupancy if there is a change in use). Under the challenged ordinance, however, inspections are required for sexually oriented businesses whether or not the business has moved into a new structure and whether or not the use of the structure has changed. Therefore, even assuming the correctness of the city's representation of its "general" inspection scheme, *the scheme involved here is more onerous with respect to sexually oriented businesses than with respect to the vast majority of other businesses*. For example, inspections are required whenever ownership of a sexually oriented business changes, and when the business applies for the annual renewal of its permit. We, therefore, hold, as a threshold matter, that petitioners may raise a facial challenge to the licensing scheme, and that as the suit comes to us, the businesses challenging the scheme have a valid First Amendment interest.

*Id.* at 225 (emphasis added).

As Plaintiffs will demonstrate below, the procedures by which the City of New York investigates and processes applications seeking zoning approval are decidedly more onerous for adult businesses than all others and, consequently, under the holding of *FW/PBS,* are subject to facial challenge as prior restraints.

> **2.    The City's Zoning Approval Process Applies in a More Onerous Way to Adult Uses and is Therefore Subject to Facial Challenge for Lacking Constitutionally Required Procedural Safeguards Against Delay**

Unlike many cities, New York does not have an ordinance requiring something specifically called an "adult business permit." Instead, as noted *supra,* it prohibits new adult entertainment uses from becoming vested until they have first obtained "an appropriate DOB permit" evidencing DOB's approval of their site as being in compliance

63

with the City's zoning and other locational restrictions on adult businesses.  (*E.g.*, either some type of building permit,[46] a no-work permit or a certificate of occupancy.)

In at least two distinct respects, the zoning scheme challenged here unquestionably operates in a manner more onerous with respect to adult businesses than other businesses.

### More Onerous in Getting Initial Approval and Permit Issuance

Before adult uses can obtain zoning approval, DOB personnel first require them to submit a "survey" showing all uses within 500 feet (*see* Berzak PSJ Dec. ¶ 6 and *see* p. 2 of OPPN 6/96[47] – referring to the required survey as an "area diagram"). This is not required of non-adult uses.

DOB then conducts exhaustively long examinations of those surveys not imposed on non-adult applicants, including in some instances on-site investigations, to determine: (a) whether any potentially disqualifying site that appears on the survey to possibly be within 500 feet is in fact within 500 feet when correct measuring points are applied; and (b) whether potentially disqualifying uses within 500 feet of the site of the adult business applicant are in fact either an adult establishment or a sensitive use and, if so, whether they are permitted as such.  Berzak PSJ Dec. ¶¶ 6-10.

Moreover, as shown in Berzak PSJ Dec. ¶¶ 12-13, 23 and 36, DOB will file time-consuming objections to an application before even checking its own records to see if the

---

[46] "If an applicant proposes a new use (either for a new building or via an alteration to an existing building), the applicant must submit a building permit application to DOB." CSF ¶ 107.

[47] OPPN 6/96 is reproduced in 2022 JNR Volume 1, as Exhibit 8.

asserted disqualifying use is either within 500 feet, or in fact has the requisite "appropriate Department permit" to qualify it as a disqualifying use.  And the net effect is that even mere "no-work" permit applications can take months longer for adult uses than non-adult uses.[48]  Non-adult applicants are not subject to these time-consuming procedures.[49]

The City may respond by saying that all requests for approval of "construction documents" are subject to a 40-day time limit under NY Admin. Code § 28-104.2.7. However, that does not change the fact that it is only the adult applicant which faces the time-consuming problems noted above.  Also, as shown in the case of Sapphire 2, the City does not *honor* this 40-day time limit, having taken over 2 ½ months just to rule on its mere no-work permit application, the last month of which took place after all objections had already been resolved by General Counsel.[50]

Moreover, the harm caused by these significant gaps in processing times is not only the unconstitutional one of causing adult use applicants far greater *delay* in opening, but,

---

[48] Again, the asserted "house of worship" use near Sapphire 2 received its no-work permit approval three days after it filed its application and the permit actually issued just three days later.  In contrast, the issues of proximity to potential disqualifying uses caused issuance of *Sapphire 2's* permit application to take over two and a half months.

[49] There would be no different result if an adult use were allowed to professionally certify its permit application.  Buildings Bulletin 2016-010 ¶ 4-A-i (reproduced in Volume 1 of 2022 JNR as Ex. 16) explains that all applications for new building and alteration permits are still subject to a mandatory "Zoning Audit" prior to acceptance of the application and the same delays for adult use applicants compared to others are present as in the case of non-certified applications, since zoning must still be proven by the applicant in responding to a Zoning Audit.

[50] Notably, as discussed *supra,* the 40 day "time limit" for approving construction documents does not apply to the only *relevant* time period, *i.e.*, the time to actually issue the permit.  The City *removed* that time limit a few years ago.  CSF ¶¶ 100-101.

coupled with the unconstitutional vesting provisions of 1 RCNY § 9000-1 which deem vesting to occur only when a permit application is *granted*, rather than when it is *filed*, these delays are potential *existential* threats which might prevent the adult business from *ever* opening!

In short, the City's scheme for issuing permits to adult establishments is significantly more onerous for adult businesses than non-adult businesses and, for that reason, is subject to *facial* challenge for any failure to provide the procedural safeguards against delay mandated by *FW/PBS*.

### More Onerous in Post Issuance Delays

Additionally, even after a no-work or building permit issues, DOB claims discretion (which it agrees it exercises not infrequently[51]) to file post-issuance notices to revoke such permits if any matter comes to its attention that *might* suggest that zoning approval should not have issued.  CSF ¶ 218.  This even includes unsubstantiated anonymous complaints filed by competitors just trying to stall or defeat an application.  *See* Berzak PSJ Dec., *supra,* at ¶¶ 16, 22, 27 and 43.  And, in the case of any post-issuance audit, the City concedes there are *no* time limits for it to be completed and/or resolved.  CSF ¶ 219.[52]

For all the reasons above, it is clear that the City's scheme for obtaining and keeping zoning approval for adult businesses is, both on its face and in practice, far more onerous

---

[51] CSF ¶ 220.

[52] And the facts involving Sapphire 2 establish that such post-issuance audits and revocations can occur many months after permit issuance and that the basis, certainly in that case, was an assertion (later refuted) of proximity to some disqualifying use.  Non-adult uses don't face that problem.

in its potential application to adult uses than others and, for this reason, is subject to facial challenge under all applicable First Amendment tests for laws licensing expression.

> **3.   The City's Zoning Approval Process For Adult Uses is Unconstitutional Because it Lacks The Required Procedural Safeguards to Prevent Censorship By Delay**
>
> > **a. The permitting scheme for adult use applicants is facially unconstitutional because it has no time limits for issuance of any DOB permit needed to vest an adult use.**

Although the City has a 40-day time limit (which DOB can unilaterally extend for an additional 20 days) for granting or denying approval of construction documents (NYC Admin. Code § 28-104.2.7), it repealed the similar time limit it once had for granting or denying issuance of a permit. CSF ¶¶ 100-101. And since it is only permit *issuance,* and not construction document approval, which can confer vesting of an adult establishment, there is *no* time limit for the City to grant or deny the only permit which can confer vesting on the adult use. Consequently, as applied to adult establishments, the City's zoning approval process is facially unconstitutional.

Moreover, for a *second* reason there is a constitutional defect in the permit issuance process. Prior to its issuance of Buildings Bulletin 2020-005 in response to this lawsuit, the City required all DOB permit applications by adult uses to first be approved by its office of General Counsel, and there were no time limits for that approval. (CSF ¶ 116). BB 2020-005 only partially fixed that problem. It repealed the former requirement, but only by saying that such pre-review by General Counsel would not be mandatory in every case. It did not, however, prohibit that review, nor impose any time limits for such review to be

67

completed.   Paragraph I and the last sentence of Paragraph III of the 2020 Buildings Bulletin say, in pertinent part that "upon the date the 2001 Zoning Resolution Amendments become enforceable" "[a]pplications that propose Adult Establishments *need not* be subject to *routine* review by the Department's General Counsel's Office." (Emphases added.)

Because it still leaves open the option for prior permit review by General Counsel, and imposes no time limits for that review, it is as unconstitutional as the permit requirement in *FW/PBS* which had a 30-day time limit for the Chief of Police to grant or deny a permit, but imposed no time limit on other agencies whose approval might be required.

Accordingly, for *both* of the two above-stated reasons, (*e.g.,* the lack of time limits for issuance of a permit and the lack of time limits for completion of any discretionary review by General Counsel), the permitting scheme is facially unconstitutional to the extent it applies to adult establishments.

   **b. The permitting scheme for adult use applicants is also facially unconstitutional for lack of time limits on any procedures to revoke or to rescind revocation of a permit**

As demonstrated both by the Berzak PSJ Declaration and by the Supplemental Joint Statement of Facts, even after a no-work permit (or *any* permit for that matter) is issued, DOB reserves the option to revoke the permit at any time even if it only believes that the permit *might* have issued in error.  CSF ¶ 218.  The City also agrees that it is "not rare" for DOB to initiate actions announcing its intent to revoke a previously-issued DOB permit.

68

CSF ¶ 220.  Finally, the City agrees that there are no written standards its personnel must meet in order to issue a notice of a revocation.  CSF ¶ 218.

While the City is certainly at liberty to revoke a previously-issued DOB permit if it has good cause to believe the permit issued in error[53], it may not do so, constitutionally, absent procedures imposing reasonable but specific time limits for it to investigate and rule upon any notices of intent to revoke a previously-issued permit.  Absent such a procedural safeguard, the system provides no more of a guarantee against censorship by delay than the aspect of its scheme which provides no time limit for the initial issuance of a DOB permit to an adult establishment.

### c. The permitting scheme for adult use applicants is also facially unconstitutional because it provides no effective remedy for enforcement of any time limits for giving zoning approval.

To the extent the City has *any* time limits for any aspect of its obligation to review construction documents in support of building permit applications, those time limits are meaningless because there is no administrative remedy if the City violates its own time limits. For example, New York City Administrative Code ("NYCAC") Title 28, Article 104 (Construction Documents) section 28-104.2.7 states:

> Completed construction documents complying with the provisions
> of this code and other applicable laws and rules shall be approved
> by the Commissioner and written notice of approval shall be given

---

[53] And, in the case of the revocation of Sapphire 2's permit, the City didn't even show good cause to believe that the permit had issued in error.  The failure to have such a "good cause" requirement articulating what does or doesn't constitute "good cause," is, alone, a basis for finding the permitting scheme facially unconstitutional and Plaintiffs assert that in the final point below.

the applicant promptly and no later than 40 calendar days after the submission of a complete application.

**Exceptions:**

1.  On or before the fortieth day, the commissioner may, for good cause shown and upon notification to the applicant, extend such time for an additional 20 calendar days.

However, there are no administrative remedies in the event DOB does not meet its obligation to issue such notice of approval within the prescribed 40+20 days.[54] CSF ¶ 106.

Even if the City's 40+20 day time limit for construction document approval were deemed reasonable, without an effective remedy to redress the City's failure to *comply* with its express time limits and procedures, the permitting scheme is facially invalid.  The mere right to seek mandamus is not an effective remedy.  As made clear in *Plain Dealer*:

[A]n application could languish indefinitely before the Council, with the Newspaper's only judicial remedy being a petition for mandamus. *Cf. Freedman, supra*, at 54-55, 59. Even if judicial review were relatively speedy, such review cannot substitute for concrete standards to guide the decisionmaker's discretion.  486 U.S. at 771 (emphases added).

As noted in ¶ 17 of the Declaration of Michael Berzak in Support of Permitting Issues Presented in Plaintiffs' Motion for a Preliminary Injunction (filed in all these actions on November 21, 2018, at p. 113 of the Plaintiffs' Joint Appendix[55]), the City routinely

---

[54] And, as noted above, approval of construction documents does not equate to issuance of the all-important DOB *permit*, which establishes the date that an adult use vests.

[55] This was filed on that date in all four cases and is document no. 62 in case no. 02-cv-8333.

70

takes longer to review adult business applications than the 40+20 days allowed to it.[56]  This consistent violation of its own requirements is attributable to the lack of a meaningful code-provided remedy.

The evidence above provides a dramatic example of why there is a constitutional requirement for time limits for adult business permit issuance to not only *exist*, but to provide effective remedies if they are *violated.  See, e.g., Redner v. Dean*, 29 F.3d 1495, 1500-1501 (11th Cir. 1994); *Artistic Entertainment, Inc. v. City of Warner Robins,* 223 F.3d 1306, 1310-1311 (11th Cir. 2000); *Café Erotica, et al. v. St. Johns County,* 143 F.Supp.2d 1331, 1335 (M.D. Fla. 2001); *Abusaid v. Hillsborough County Bd. of County Comm'rs*, 637 F.Supp.2d 1002 (M.D. Fla. 2007); and *Public Citizen, Inc. v. Pinellas County,* 321 F.Supp.2d 1275, 1294-1295 (M.D. Fla. 2004).

**D.**    **The City's Zoning Approval Process For Adult Uses is Also Unconstitutional Because it Affords DOB Officials *Substantive* Discretion in Deciding Whether to Revoke Already-Issued DOB Permits**

As noted in the prior point, under current DOB procedures, DOB employees may unilaterally institute proceedings to revoke already-issued DOB permits and the City concedes there are no written standards articulating the criteria they must find are met before instituting such proceedings. CSF ¶ 218.  Instead, the City agrees that DOB officials may institute such proceedings even if they merely think that a permit *might* have issued in error.  *Id.*

---

[56] At (or slightly prior) to the time that earlier Berzak declaration was filed, the 40+20 day time limit was found in NYC Admin. Code § 27-144.  It was later moved to current § 28-104.2.7.

And the problem of such a standardless procedure is well illustrated by the revocation of Sapphire 2's no work permit.  The basis for that revocation was the assertion that the permit shouldn't have issued because there was a house of worship use near Sapphire 2.  However, the DOB official didn't even bother to check whether the asserted house of worship even had a permit to so operate (which it didn't) and didn't even check the prior file in this very case where both a DOB examiner and one of its General Counsel already concluded that the so-called church was not a disqualifying use.  Instead, it appears that the revocation procedure was initiated solely because DOB had received an anonymous complaint that Sapphire 2's use was disqualified by that asserted "house of worship" use.  And the slightest investigation would have shown that not only wasn't the so called "house of worship" in fact operating as a house of worship, but it didn't even have a permit to do so, so it legally *could not* have disqualified Sapphire 2's application.

While proof of an abuse of discretion is not required to challenge a scheme affording licensing officials excessive discretion in acting on permit applications for businesses engaged in First Amendment activity,[57] here, the Sapphire 2 situation provides a perfect example of why these procedural requirements exist.

---

[57] Proof of an actual abuse of discretion is not necessary in a facial challenge to a licensing scheme if it affords City officials discretion to deny the issuance of a permit.  *See, e.g., Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992).  *Accord City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, at 756-757 (1988); *FW/PBS, supra,* 493 U.S. at 225.

For all the reasons above, the City's permitting and vesting scheme for adult businesses is facially unconstitutional and would not provide Plaintiffs a reasonable opportunity to relocate.

## CONCLUSION

For all the reasons above, the Club Plaintiffs' primary motion, seeking facial invalidation of the City's mandatory termination provisions should be granted.

Only in the event the Club Plaintiffs' primary motion is denied, will the Club Plaintiffs have standing to raise their alternative motion seeking to enjoin the City's mandatory termination provisions on the ground that the City's various provisions for permitting and vesting of adult uses are facially unconstitutional. However, should the Court deem it necessary to address that alternative motion, Plaintiffs are entitled to a permanent injunction preventing enforcement of the mandatory termination provisions because the City's provisions for vesting and permitting of adult businesses are facially unconstitutional and, as a matter of law, deny them a reasonable opportunity for relocating and reopening an adult business.

Respectfully submitted,

G. Randall Garrou
randygarrou@wgdlaw.com
Of Counsel to Weston Garrou & Mooney
12121 Wilshire Blvd. Suite 525
Los Angeles CA 90025
(310) 749-6069
randygarrou@wgdlaw.com

Jerome H. Mooney
jerrym@mooneylaw.com

73

Weston Garrou & Mooney
12121 Wilshire Blvd. Suite 525
Los Angeles CA 90025
(310) 442-0072

Alan M. Abramson
alanabramson@abramsonmorak.com

ABRAMSON & MORAK
35 Worth Street
New York, NY 10013
(212) 226-7098

by   /s/ G. Randall Garrou
G. RANDALL GARROU

Counsel for Plaintiffs Club at 60th St., Inc. and
Jacaranda Club, LLC

*On The Brief:*

/s/ Jeffrey M. Nye
JEFFREY M. NYE, ESQ.
*Lead Counsel for Plaintiffs in 02 Civ 4431 (LJL)*
Stagnaro, Saba & Patterson Co., LPA
7373 Beechmont Avenue
Cincinnati, OH 45230
(513) 533-6714
jmn@sspfirm.com

/s/ Edward S. Rudofsky
EDWARD S. RUDOFSKY, ESQ.
*Counsel for Plaintiffs in 02 Civ 4432 (LJL)*
Zane and Rudofsky
Five Arrowwood Lane
Melville, NY 11747
(917) 913-9697
ed@rudofskylaw.com

74