UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

725 EATERY CORP., etc., *et ano.,*                    :
                              Plaintiffs,

                                                      :

        - against -                                   :        Civil Action No.
                                                      :        02 CV 4431 (LJL)
THE CITY OF NEW YORK, et al.,
                              Defendants.             :
----------------------------------------------------------------X

59 MURRAY ENTERPRISES INC., etc., *et al.,*           :
                              Plaintiffs,

                                                      :

        - against -                                   :        Civil Action No.
                                                      :        02 CV 4432 (LJL)
THE CITY OF NEW YORK, et al.,
                              Defendants.             :
----------------------------------------------------------------X

CLUB AT 60TH STREET, INC., etc., *et al.,*            :
                              Plaintiffs,

                                                      :

        - against -                                   :        Civil Action No.
                                                      :        02 CV 8333 (LJL)
THE CITY OF NEW YORK,
                              Defendant.              :
----------------------------------------------------------------X

_____

# CLUB PLAINTIFFS' RENEWED JOINT
## MEMORANDUM OF LAW IN SUPPORT OF THEIR RENEWED
## ALTERNATIVE CROSS MOTION FOR SUMMARY JUDGMENT AND
## RESPONSE IN OPPOSITION
## TO CITY'S MOTION FOR SUMMARY JUDGMENT

_____

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ........................................................................................................ 1

I    THE CLUB PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE
     VALIDITY OF THE DEFINITIONAL CHANGES IN THE 2001 AMENDMENTS
     BECAUSE THE CITY HAS THE BURDEN OF PROOF TO DEMONSTRATE THE
     CONSTITUTIONALITY OF THOSE AMENDMENTS, AND IT HAS FAILED TO
     MEET THAT BURDEN OF PROOF ........................................................................ 3

     A.    The burden is on the City to prove that the 2001 Amendments survive all
           constitutional challenges and any failure to meet that burden requires the grant of
           summary judgment ................................................................................................. 3

     B.    The City has failed to prove that the 2001 Amendments survive the "how speech
           will fare" and "proportionality" requirements for adult zoning laws articulated by
           Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books*.  4

           (1)    The City has failed to show that secondary effects will be significantly
                  reduced by enforcement of the 2001 Amendments. .................................. 5

           (2)    The City has failed to show that the 2001 Amendments will leave the
                  "quantity and accessibility" of speech "substantially intact." .................... 8

                  (a)    The City has failed to prove that the 2001 Amendments will leave
                         the *quantity* of speech "substantially intact."................................. 8

                  (b)    The City has also failed to prove that the 2001 Amendments will
                         leave the *accessibility* of speech substantially intact. .................. 14

     C.    The City has failed to prove that the 2001 Amendments survive even the more lax
           justification test imposed by the *Alameda* plurality ............................................. 16

     D.    The City has failed to prove that the changes effected by its 2001 Amendments
           guaranteed a "reasonable opportunity" for establishment and relocation of adult
           businesses even under the pre-*Alameda* adequate alternative sites test................ 19

           (1)    The City has failed to meet its burden to prove that *any* of its proposed
                  alternative sites are in fact legally permissible. ....................................... 20

                  (a)    The City created its list of potential alternative sites in several
                         phases. ........................................................................................... 20

(i)    The "zoning district" phase correctly eliminated the majority of lots as alternative sites by using data about the lots from the City's "MapPluto" software. ................................................ 21

(ii)    The "sensitive receptors" phase relied in part on inexact proxies, rather than actual information about the location of sensitive receptors. ............................................................. 22

(iii)   The "review" phase eliminated only individual lots from what remained after the first two phases. ...................................... 24

(b)    The City list of "available sites" is inaccurate because the City failed to create 500-foot buffer zones around all sensitive receptors, and failed to eliminate all lots within those buffer zones from its list of alternative sites. ........................................................................... 25

(i)    The City did not buffer around sensitive receptors in the "review" phase. ................................................................ 25

(ii)    The City did not buffer around mixed-use lots that had houses of worship. ........................................................................... 26

(c)    The City's methodological errors make it impossible to know whether there are *any* alternative sites available under the 2001 Amendments. ....................................................................... 31

(2)    The City has failed to meet its burden to prove that its proposed alternative sites present a "reasonable opportunity" for establishment of an adult business. ...................................................................................... 33

E.    The City has failed to prove that its ordinances meet the compelling interest test required of all content-based restraints on expression as required by *Reed v. Town of Gilbert* and *City of Austin v. Reagan National Advertising*............................. 35

II   PLAINTIFFS' RESPONSES TO ISSUES RAISED IN CITY'S MOTION FOR SUMMARY JUDGMENT TO THE EXTENT NOT ALREADY ADDRESSED ABOVE OR IN PLAINTIFFS' MEMORANDUM OF LAW FILED IN ALL CASES ON SEPTEMBER 16, 2022, IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT ...................................................................... 37

A.    Supplemental Responses to City's Preliminary Statement .................................... 37

B.    Supplemental Responses to City's Statement of Material Facts .......................... 40

D.    Supplemental Responses to City's Discussion of its "Recent Analysis" of alternative sites. ................................................................................................ 43

E.    Supplemental Responses to City's Argument Point I-A (the assertion that adult zoning laws are presumptively valid) .................................................................. 43

iii

F.     Supplemental Responses to City's Point I-B (the City's discussion of the state court rulings upholding the 1995 Amendments) ................................................... 45

G.     Supplemental Responses to City's Point I-C (the City's discussion of asserted sham compliance) ................................................................................................... 46

H.     Supplemental Responses to City's Point I-D (the assertion that courts have concluded that Justice Kennedy's *Alameda* concurrence makes no meaningful change in the required analysis of adult zoning laws) ......................................... 46

I.     Supplemental Responses to City's Point I-D-1 (the assertion that the 2001 Amendments are content-neutral)......................................................................... 52

J.     Supplemental Responses to City's Point I-D-2 (the assertion that the 2001 Amendments are narrowly tailored to achieve a substantial governmental interest) ........................................................................................................................... 54

K.     Supplemental Responses to City's Point I-D-3 (the assertion that the 2001 Amendments afford ample alternative means of communication)..................... 55

L.     Supplemental Responses to City's Point I-D-4 (the assertion that the cases of *Reed* and *Ward v. Rock Against Racism* are not persuasive)............................... 56

M.     Supplemental Responses to City's Point II (the assertion that the City's permitting procedures are constitutional)............................................................... 57

N.     Supplemental Responses to City's Point II-A (the assertion that Plaintiffs' Permitting Challenges are Moot).......................................................................... 60

O.     Supplemental Responses to City's Point II-B (the assertion that Plaintiffs' lack standing to bring a facial challenge to the permitting and vesting procedures).... 63

P.     Supplemental Responses to City's Point II-C-1 (the assertion that the City's permitting procedures are not subject to strict scrutiny)....................................... 67

Q.     Supplemental Responses to City's Point II-C-2 (the assertion that the City's permitting procedures need not include time limits on their face to the extent they apply to adult businesses) ................................................................................... 69

R.     Supplemental Responses to City's Point II-C-3 (the assertion that the City's permitting procedures satisfy *FW/PBS's* time limit requirements) ..................... 72

S.     Supplemental Responses to City's failure to demonstrate any effective ordinance-provided remedy if DOB fails to meet what few time limits it has. .................... 74

T.     Supplemental Responses to City's Point II-D (the assertion that the City's permitting procedures do not create the possibility of a sensitive use veto) ........ 75

1.      The City's asserted facts are refuted by the uncontroverted evidence.......... ................................................................................................ 75

2.      The City's *legal* assessment of the *Simi Valley* decision is also 100% incorrect. ................................................................................... 79

U.      Supplemental Responses to City's Point II-E (the assertion that the City's permitting procedures do not violate Plaintiffs' right to equal protection) .......... 80

V.      Supplemental Responses to City's Point III (the City's assertion that due process did not entitle Plaintiffs to notice of the City's consideration of the adoption of the 2001Amendments).............................................................................. 81

W.      Supplemental Responses to City's assertion in its Point IV that its requirement of mandatory termination for *adult* non-conforming uses and no others is constitutional..................................................................................... 81

III  BECAUSE IT IS UNDISPUTED THAT ANY FINAL JUDGMENT UPHOLDING THE 2001 AMENDMENTS WOULD, AT *LEAST* FOR THE SHORT TERM, IMMEDIATELY AND SEVERELY LIMIT THE PUBLIC'S ACCESS TO THE TYPE OF EXPRESSION PROVIDED BY PLAINTIFFS, AND BECAUSE THE CITY HAS THE BURDEN TO SHOW THAT THE PUBLIC'S ACCESS WOULD NOT BE SO AFFECTED, ITS FAILURE TO MEET THAT BURDEN ALTERNATIVELY COMPELS ISSUANCE OF A TEMPORARY INJUNCTION OF *AT LEAST* ONE YEAR PREVENTING ENFORCEMENT OF THE 2001 AMENDMENTS FOLLOWING ANY FINAL JUDGMENT ................................. 85

CONCLUSION ........................................................................... 88

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

### U.S. SUPREME COURT

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ................................................................. 3, 45

*Barnes v. Glen Theatre, Inc.,* 501 U.S. 560 (1991) ......................................................... 48

*Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469 (1989) .......................................... 3

*Brockett v. Spokane Arcades*, 472 U.S. 491 (1985) .......................................................... 2

*Celotex v. Catrett,* 477 U.S. 317 (1986) ........................................................ 3, 19, 32, 35

*City of Austin v. Reagan National Advertising,* __ U.S. __, 142 S.Ct. 1464 (2022) .. 35, 45, 53, 56

*City of Erie v. Pap's AM,* 529 U.S. 277 (2000) .......................................................... 48

*City of Los Angeles v. Alameda Books,* 535 U.S. 425 (2002) .............................................. *passim*

*City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41 (1986) .......................................... *passim*

*Cox v. Louisiana,* 379 U.S. 536 (1965) .................................................................. 68

*Elrod v Burns,* 427 U.S. 347 (1976) .................................................................... 86

*Freedman v. Maryland,* 380 U.S. 51 (1965) .............................................................. 68

*FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215 (1990) .................................................. *passim*

*Kunz v. New York,* 340 U.S. 290 (1951) ................................................................. 68

*Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750 (1988) .......................................... 68

*New York Times Co.  v. United States*, 403 U.S. 713 (1971) ............................................. 87

*Niemotko v. Maryland,* 340 U.S. 268 (1951) ............................................................. 68

*Northwest Austin Municipal Util. Dist. No. One v. Holder,* 557 U.S. 193 (2009) ....................... 6

*Reed v. Town of Gilbert,* 576 U.S. 155 (2015) ....................................................... *passim*

*Saia v. New York*, 334 U.S. 558 (1948) .................................................................. 68

*Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947 (1984) ........................ 68

*Shelby County v. Holder,* 570 U.S. 529 (2013) ...................................................... 6, 7, 8

*Staub v. City of Baxley,* 355 U.S. 313 (1958) .......................................................... 68

*Steel Co. aka Chicago Steel v. Citizens for a Better Environment,* 523 U.S. 83 (1988) ............... 1

*Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002) .............................................. 69, 70, 71

*Turner Broadcasting System, Inc. v. F.C.C.,* 520 U.S. 180 (1997) ..................................... 54

*U.S. v. Playboy Entertainment Group, Inc.,* 529 U.S. 803 (2000)........................................ 3, 4, 44

*U.S. v. Thirty-Seven Photographs,* 402 U.S. 363, 369 (1971) ..................................................... 58

*United States v. Stevens,* 559 U.S. 460 (2010)............................................................................ 74

*Vance v. Universal Amusement Co.,* 445 U.S. 308, 316 (1980) ................................................. 68

*Virginia v. American Booksellers Assn.,* 484 U.S. 383 (1988)................................................... 86

*Ward v. Rock Against Racism,* 491 U.S. 781 (1989) .................................................................. 57

*Young v. American Mini Theaters, Inc.,* 427 U.S. 50 (1976) ................................................ 52, 86

## U.S. COURTS OF APPEALS

*Alameda Books, Inc. v. City of Los Angeles,* 631 F.3d 1031 (9th Cir.2011) ............................... 49

*Annex Books, Inc. v. Indianapolis,* 581 F.3d 460 (7th Cir. 2009)............................................... 51

*BBI, Inc. v. City of Angola,* 809 F.3d, 317 (7th Cir. 2015) ......................................................... 56

*Ben's Bar, Inc. v. Village of Somerset,* 316 F.3d 702 (7th Cir. 2003) ................................... 47, 48

*Center For Fair Public Policy v. Maricopa County,* 336 F.3d 1153 (9th Cir. 2003)........ 47, 49, 53

*Covenant Media of S.C. v. City of South Charleston,* 493 F.3d 421 (2007)................................. 71

*Entertainment Productions, Inc. v. Shelby County,* 721 F.3d 729 (6th Cir 2013).................. 47, 48

*Field Day, LLC v. County of Suffolk,* 463 F.3d 167 (2d Cir. 2006)........................................ 66, 70

*Free Speech Coal. Inc. v. AG United States,* 825 F.3d 149 (3d Cir. 2016) ................................. 56

*Granite State Outdoor Adver., Inc. v. City of St. Petersburg,* 348 F.3d 1278 (11 Cir. 2003) ...... 70

*H.D.V.-Greektown, LLC v. City of Detroit,* 568 F.3d 609 (6th Cir. 2009) ...................... 69, 70, 71

*Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358 (11th Cir. 1999).................... 69, 70

*New Albany DVD, LLC v. City of New Albany,* 581 F.3d 556 (7th Cir. 2009)............................. 50

*R.V.S., L.L.C. v. City of Rockford,* 361 F.3d 402 (7th Cir. 2004) ............................................... 50

*Reagan National Advertising v. City of Austin,* 972 F.3d 696 (5th Cir. 2020)............................ 56

S.*Or. Barter Fair v. Jackson County,* 372 F.3d 1128 (9th Cir. 2003) ......................................... 71

*Solantic, LLC v. City of Neptune* Beach, 410 F3d 1250, 1266 (11th Cir. 2005) ......................... 72

*Young v. City of Simi Valley,* 216 F.3d 807 (9th Cir. 1999) .................................................. 79, 80

## U.S. DISTRICT COURTS

*725 Eatery Corp. v. City of New York,* 408 F.Supp.3d 424 (S.D.N.Y. 2019) ......................... 7, 38

*Amsterdam Video v. City of New York,* S.D.N.Y. No. 96-cv-2204-MGC .................................... 41

vii

*Association of Club Executives of Dallas. v. City of Dallas*,

    604 F. Supp. 3d 414 (N.D. Tex. 2022) ................................................................................ 84

*Christian Fellowship Ctrs. of N.Y., v. Vill. of Canton*, 377 F.Supp. 3d 146 (N.D.N.Y. 2019) ..... 44

*Dean v. Town of Hempstead*, 527 F.Supp.3d 347, 410 (E.D.N.Y. 2021) .................................... 66

*Family Planning Clinic v. Cleveland,* 594 F.Supp. 1410 (N.D. Ohio 1984) .............................. 44

*Marin v. Town of Se.*, 136 F.Supp. 3d 548 (S.D.N.Y. 2015) ....................................................... 44

## STATE COURTS

*City of New York v. Dezer Props, Inc.,* 95 N.Y.2d 771 (2000) .................................................... 42

*City of New York v. Les Hommes,* 94 N.Y.2d 267 (1999) ............................................................ 41

*City of New York v. Show World, Inc.,* 683 N.Y.S.2d 376 (Sup. Ct. N.Y. Co. 1998) ................. 42

*For the People Theatres of NY, Inc. v. City of New York,* 131 A.D.3d 279, 14 N.Y.S.3d 338

    (1st Dept. 2015) ................................................................................................................ 18

*For the People Theatres of NY, Inc. v. City of New York,* 29 N.Y.3d 340;

    79 N.E.3d 461 (2017) ....................................................................................................... 18

*For the People Theatres of NY, Inc. v. City of New York,* 38 Misc. 3d 663, 954 N.Y.S.2d 801

    (Supreme Court, New York County 2012) ............................................................. 18, 42, 43

Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County, Index No. 121197

    /2002) ................................................................................................................................. 18

*Town of Islip v. Caviglia,* 73 N.Y.2d 544 (1989) ................................................................ 45, 81

## CONSTITUTIONAL PROVISIONS

First Amendment ............................................................................................................ *passim*

## FEDERAL RULES

Federal Rules of Civil Procedure  Rule 56(c) ............................................................................. 3

## NYC ZONING RESOLUTION

1995 Amendments ................................................................................................... 40, 46

1995 AZR § 12-10 ......................................................................................................... 40

2001 Amendments ................................................................................................... *passim*

ZR § 32-01(b) ............................................................................................................... 26

ZR § 42-01(b) ............................................................................................................... 26

ZR § 52-77 ............................................................................................................ 1

ZR § 72-41 ............................................................................................................ 1


**NYC RULES**

1 RCNY § 9000-1 ...................................................................... 64, 76, 77

1 RCNY § 9000-01(b) .......................................................................... 66

**NYC DOB OPPNS**

OPPN # 4/98 ................................................................................. 41, 42

OPPN # 6/98 ........................................................................................ 42

**NYC DOB BUILDINGS BULLETINS**

BB 2020-005 .................................................................................. *passim*

**NYC ADMINISTRATIVE CODE**

New York City Administrative Code § 27-144 ........................................... 73

**MISCELLANEOUS**

https://edc.nyc/manhattan ..................................................................... 15

https://www.nycgo.com/boroughs-neighborhoods/manhattan ..................... 15

Study by Focus Probe, Inc., "Perceived Differences Between Adult Entertainment Clubs With '
    Subdued Facades ' vs. 'Loud Facades'), with photographs....................... 18

Study by Freeman, "Examining The Relationship Between Businesses That Comply With the
    '60/40' Zoning Regulations and Surrounding Property Values in New York City" (2008)...... 18

Study by Linz and Paul, "Measuring the Secondary Effects of 60/40 Businesses in New York
    City: A Study of Calls For Service to the Police", including Figures and Tables (2005)......... 17

# INTRODUCTION

On September 16, 2022, the Club Plaintiffs submitted their Joint Memorandum of Law in Support of Their Motions for Partial Summary Judgment, challenging the City's mandatory termination provisions for adult establishments (*i.e.,* Zoning Resolution ["ZR"] §§ 52-77 and 72-41) and alternatively additionally challenging the City's provisions for permitting and vesting of adult establishments.

If the Court grants summary judgment on either of those grounds of challenge, there will be no need to address the additional grounds of challenge to the 2001 Amendments[1] raised by Plaintiffs' Cross Motion for Summary Judgment briefed herein as the Club Plaintiffs will no longer have any standing to challenge the balance of claims raised in their complaints. Without a continuing need for relief, the Court would lack jurisdiction to address any remaining issues. *See, e.g. Steel Co. aka Chicago Steel v. Citizens for a Better Environment,* 523 U.S. 83, 94 (1988), where the Court rejected the Ninth Circuit's assumption of "hypothetical jurisdiction" in order to address the merits, stating:

> We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers. This conclusion should come as no surprise, since it is reflected in a long and venerable line of our cases. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle,* 74 U.S. 506, 7 Wall. 506, 514, 19 L. Ed. 264 (1869). "On every writ of error or appeal, the first and fundamental question

---

[1] The term "2001 Amendments" is a reference to the adult zoning amendments to the New York Zoning Resolution enacted on October 31, 2001, reproduced as Exhibit 3 in Volume 1 of Exhibits to Joint Request and Stipulations Regarding the Taking of Judicial Notice, filed under different document numbers in all four actions herein on May 9, 2022.

is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." (Citation omitted.)

Additionally, once they have received all the relief they require, addressing the merits of Plaintiffs' constitutional challenges would violate the concept that federal courts should avoid deciding the constitutionality of state laws unless there is no other option. *See, e.g., Brockett v. Spokane Arcades, 472 U.S. 491, 501 (1985)* ("Never … anticipate a question of constitutional law in advance of the necessity of deciding it").

Based on the foregoing, the current Cross Motion for Summary Judgment seeks summary judgment only on all of Plaintiffs' claims in this case *other than* those raised in their previously filed Motions for Partial Summary Judgment and are asserted only in the event those other claims are unsuccessful.

By prior agreement of the Parties, this Memorandum is also to serve as Plaintiffs' Response in Opposition to the City's Motion for Summary Judgment (which addresses *all* the issues in this case, including those raised in Plaintiffs' Motion for Partial Summary Judgment).  Accordingly, Plaintiffs have included a separate section below (Point II) entitled "Responses to City's Motion For Summary Judgment."

To prevent the need to read duplicative briefing, that separate section will present only any arguments Plaintiffs may have in opposition to the City's Summary Judgment Motion *in addition to the* arguments already presented in Point I of this brief or in the Memorandum Plaintiffs filed on September 16, 2022, in support of their Motions for Partial Summary Judgment, and all of those arguments will be incorporated herein.

PRG8622.docx

**I**

**THE CLUB PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE VALIDITY OF THE DEFINITIONAL CHANGES IN THE 2001 AMENDMENTS BECAUSE THE CITY HAS THE BURDEN OF PROOF TO DEMONSTRATE THE CONSTITUTIONALITY OF THOSE AMENDMENTS, AND IT HAS FAILED TO MEET THAT BURDEN OF PROOF**

**A. The burden is on the City to prove that the 2001 Amendments survive all constitutional challenges and any failure to meet that burden requires the grant of summary judgment.**

As held in *Celotex v. Catrett,* 477 U.S. 317 (1986), "[Federal Rules of Civil Procedure]  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

The case law is clear that the City has the burden of proving at trial that its challenged ordinances are constitutional in all respects.  As the Court stated in *U.S. v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 818 (2000), "When First Amendment compliance is the point to be proved, the risk of non-persuasion – operative in all trials – must rest with the Government, not with the citizen.; *Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480 (1989) ('[T]he State bears the burden of justifying its restrictions ...')."  As likewise stated in *Ashcroft v. ACLU,* 542 U.S. 656, 660 (2004) "the Constitution demands that content-based restrictions on speech be presumed invalid . . . and that *the Government bear the burden of showing their constitutionality*." (Emphasis added.)

**B.   The City has failed to prove that the 2001 Amendments survive the "how speech will fare" and "proportionality" requirements for adult zoning laws articulated by Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books*.**

In his controlling concurring opinion in *Alameda Books,* Justice Kennedy made clear that the principle of the government having the burden of proof in First Amendment facial challenges applies equally to challenges to adult zoning laws, including that the City had the burden to show: (1) "how speech will fare" (*City of Los Angeles v. Alameda Books, 535 U.S. 425, 450 (2002)* (J. Kennedy concurring), something he referred to as an "important part of the inquiry" which the Plurality left out of its opinion (*id.*), and (2) that any zoning restrictions on adult uses would have a minimal impact on expression while having a significant impact in reducing secondary effects (referred to herein as his "proportionality" test.[2]).  Specifically, "a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." *Id.* at 449.  To the same effect, he held: "The claim, therefore, must be that . . . the quantity of speech will be substantially undiminished, and that total secondary effects will be significantly reduced.  This must be the rationale of a dispersal statute." *Id.* at 451.  Since "Government bear[s] the burden of showing the[] constitutionality" of speech restrictions (*Playboy, supra*), the City likewise bears the burden of proving its claim that total secondary effects will be "significantly reduced," and that "the quantity and accessibility" of speech will be left "substantially intact."

---

[2] "A city may not assert that it will reduce secondary effects by reducing speech in the same proportion." 535 U.S. at 449.

PRG8622.docx

**(1) The City has failed to show that secondary effects will be significantly reduced by enforcement of the 2001 Amendments.**

The City has put forth no evidence that, as of 2001 when the City added 60/40 businesses to the list of regulated uses, this change in the Zoning Resolution would "significantly reduce" secondary effects and, to the contrary, the opposite is demonstrated by both the well-documented (and stipulated) greatly reduced concentrations of adult businesses by 2001, as well as the evidence Plaintiffs presented that the 60/40 businesses were *not* causing significant secondary effects (*see* n. 19, *infra*).

Specifically, it is stipulated that there were 177 known 100% adult businesses in New York in 1994 but only 136 businesses in 2000 (including both 100% and 60/40). *See* Consolidated Statement of Stipulated Facts ("CSF"), at ECF pp. 57-59, 3 ¶¶ 160-166,[4] filed in all four actions on May 19, 2023. Clearly the concentration problems which justified the original 1995 Amendments, had greatly diminished by the time the 2001 Amendments were enacted.

---

[3] Throughout this Memorandum, whenever referring to pages in documents previously filed in these actions, for greater clarity, all page number references shall be to the stamped ECF page numbers, which will not necessarily be the same as the actual original page numbers or any Bates-stamped page numbers.

Also, to the extent links to prior documents are provided herein, since identical copies of many documents were filed in all four cases, but under unique document numbers for each case, the links shall be to the appearance of those documents as found in the docket in Action 3, Club at 60th v. City of New York, 02 CV 8333.

[4] CSF ¶ 160, at ECF p. 57, states that there were 177 known 100% adult establishments in all of New York City in 1993. Sixty-eight of these were adult eating or drinking establishments. However, ¶ 161, at ECF p. 58, states that in 2000, there were only 136 remaining establishments (with 35 consisting of 100% adult businesses and 101 consisting of 60/40 establishments).

Not only had the *concentrations* of businesses presenting any type of adult entertainment diminished significantly by 2001, but the evidence Plaintiffs presented (cited, again, in n. 19, *infra* and summarized by Justice York – *see* n. 20, *infra*) made clear that the 60/40 businesses were not causing the kind of problems experienced by the City from the earlier types of establishments.

Additionally, there are *currently* even fewer justifications to support the 2001 Amendments.  Specifically, while there were 136 known "adult" establishments in New York in 2000 (including both 100% and 60/40 establishments),[5] today there are only 42.[6] Thus the concentration of such businesses is dramatically less than it was even in 2001.

While the question of whether the *current* status of justifications may be considered in a challenge to the constitutionality of a law had been unclear, the Supreme Court's decisions in *Northwest Austin Municipal Util. Dist. No. One v. Holder,* 557 U.S. 193, 203-204 (2009) and *Shelby County v. Holder*, 570 U.S. 529, 557 (2013), made clear that a court must *also* look at *current* justifications for a law affecting fundamental rights to see if that law remains valid many years after its enactment.

In *Northwest Austin* the Supreme Court looked at current conditions in evaluating the justification for the Voting Rights Act of 1965.  In doing so, it held that "the Act imposes current burdens and must be justified by current needs."  *Id.* at 203. The Court

---

[5] Ibid.

[6] Specifically, there are only 32 known 60/40 businesses currently in New York and 10 known 100% adult businesses.  *See* Consolidated Statement of Stipulated Facts, ECF p. 59, ¶¶ 170 and 167 respectively.

noted that "[t]he statute's coverage formula [which was based on more recent amendments to the Act] is based on data that is now more than 35 years old, and there is considerable evidence that it fails to account for current political conditions." *Id.*

In *Shelby County* the Supreme Court once again looked at current conditions in re-evaluating the justification for the Voting Rights Act of 1965. The Court, citing *Northwest Austin,* noted that the "Act imposes current burdens and must be justified by current needs." In addition, "the conditions that originally justified these measures no longer characterize voting in the covered jurisdictions." Indeed, "[n]early 50 years later [*i.e.*, since the original enactment of the Act], things have changed dramatically." The Court noted that "Coverage today is based on decades-old data and eradicated practices."  Perhaps most significantly, the Court concluded its decision by stating: "Our country has changed, and while any racial discrimination in voting is too much, Congress must ensure that the legislation it passes to remedy that problem speaks to current conditions." *Shelby*, 570 U.S. at 557.

Here, as in both *Northwest Austin* and *Shelby County*, the challenged legislation is multiple decades old and, as Judge Pauley noted in granting a preliminary injunction, the circumstances have changed radically since these provisions were enacted:

> The adult-use regulations that are the subject of these now-revived constitutional challenges are a throwback to a bygone era. The City's landscape has transformed dramatically since Defendants last studied the secondary effects of adult establishments twenty-five years ago. As Proust might say, the "reality that [the City] had known no longer existed," and "houses, roads, [and] avenues are as fugitive, alas, as the years." Marcel Proust, Swann's Way, in Remembrance of Things Past (C.K. Scott Moncrieff trans., 1922) (1913).

*725 Eatery Corp. v. City of New York,* 408 F.Supp.3d 424, at 470 (S.D.N.Y. 2019).

PRG8622.docx

In conclusion, even though the 2001 Amendments "impose[] current burdens" (*Shelby,* 570 U.S. at 536), the City has failed to prove that the 2001 Amendments, either at the time of their enactment or currently, would "significantly reduce" secondary effects.

    (2) **The City has failed to show that the 2001 Amendments will leave the "quantity and accessibility" of speech "substantially intact."**

Not only has the City failed to prove that the 2001 Amendments would "significantly" reduce secondary effects, either originally or today, it has also failed to prove the other half of the proportionality test which requires an analysis of "how speech will fare" (535 U.S. at 450) and that an adult zoning law will leave the "quantity and accessibility" of speech "substantially intact" (*Id.* at 449).

    (a) **The City has failed to prove that the 2001 Amendments will leave the *quantity* of speech "substantially intact."**

The City's failure of proof of *legally permissible* sites is fully briefed *infra* under Point I-D and that discussion is incorporated here. However, a significantly different analysis is required by Justice Kennedy's controlling opinion in *Alameda.* Specifically, the test of "how speech will fare" is not the same analysis as merely counting the number of legally permissible sites. Instead, there must be reasonable evidence that the quantity of the affected speech will remain "substantially intact," *i.e.*, there must be reasonable evidence of how speech is likely to actually fare. Justice Kennedy pointedly noted that the

PRG8622.docx

*Alameda* Plurality had failed to take that factor into account, notwithstanding that the Plurality continued to follow *Renton's*[7] basic alternative sites requirement.[8]

The *stipulated facts* independently show that speech will not fare well if the 2001 Amendments are upheld because they will not leave the quantity of speech "substantially intact" as required by Justice Kennedy.

Specifically, the evidence of the past 22 years amply demonstrates that even though there may be a large number of theoretically permissible sites for businesses presenting adult entertainment (and particularly a large number of sites for 60/40 businesses since

---

[7] *See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986)* , discussed at length in the Memorandum of Law in Support of Club Plaintiffs' Motions for Partial Summary Judgment (starting at ECF p. 31) filed in all four actions on September 16, 2022.

[8] Indeed, he emphasized a factor which would have been irrelevant in a pure "alternative sites" analysis.    Specifically, he emphasized that, on remand, the City's evidence should demonstrate that the effect of the ordinance, notwithstanding available relocation sites, would be for new independent adult bookstores and adult video viewing businesses to arise in numbers such that for each current combined store forced to cease so operating, there would thereafter be a separate adult video store and adult bookstore:

The analysis requires a few more steps.  If two adult businesses are under the same roof, an ordinance requiring them to separate will have one of two results:  One business will either move elsewhere or close.  The city's premise cannot be the latter.  It is true that cutting adult speech in half would probably reduce secondary effects proportionately.    But again, a promised proportional reduction does not suffice.  Content based taxes could achieve that, yet these are impermissible.

The premise, therefore, must be that businesses -- even those that have always been under one roof -- will for the most part disperse rather than shut down.  True, this premise has its own conundrum.  As Justice Souter writes, "[t]he city ... claims no interest in the proliferation of adult establishments." Post, at 461. The claim, therefore, must be that this ordinance will cause two businesses to split rather than one to close, that the quantity of speech will be substantially undiminished, and that total secondary effects will be significantly reduced.  This must be the rationale of a dispersal statute.

535 U.S. at 450-451.

9

PRG8622.docx

those businesses have been conditionally allowed for several years subject to the outcome of this and the prior state court litigation), the simple fact is that the combination of the adult zoning restrictions and market conditions are such that new adult businesses are not replacing those that have ceased operation.  Indeed, the numbers, as noted *supra,* show that there were 177 "adult" [9] businesses in 1994, 136 in 2000, but currently only 42. [10]   This means that if the remaining 32 known 60/40 businesses are required to terminate, it is *highly unlikely* they will be replaced (much less that the 136 such business which existed in 2001 will be replaced).  Consequently, because of the passage of over 20 years, there is no need to speculate.   The proof is clear that the public's access to this type of constitutionally protected expression will not "fare well" if the 2001 Amendments are upheld.

Even beyond the obvious proofs above, numerous other aspects of the evidentiary record show the City's failure to meet its burden of proof on how speech will fare.

---

[9] The term "adult" is used in this sentence to include not only 100% adult businesses but also 60/40s.

[10] As noted *supra*, 32 of those 42 businesses are 60/40 businesses.  CSF ¶ 171 at ECF p. 60 states that a chart accurately showing all these 60/40 businesses is presented as Exhibit 73 of the Joint Request and Stipulations Regarding Judicial Notice filed in all four actions on May 9, 2022 (hereafter "Judicial Notice Request").  That Exhibit (found in Volume 10 of the Judicial Notice Request at ECF p. 86) shows that 8 of the 32 60/40 businesses which will have to relocate are 60/40 adult eating or drinking establishments (which would be competing for sites with 24 60/40 bookstores).

PRG8622.docx

Underscoring the City's failure to evaluate, much less prove, the effect that enforcing the 2001 Amendments would have on how speech would fare, the City has **stipulated**[11] that:

- The City "did **not** conduct a specific transportation analysis to determine the accessibility of each or any site [that it asserts is a legally permissible alternative site for a new or relocating business], nor relate each or any mode of transportation to each or any site."  [CSF ¶ 145(a), ECF p. 51 (emphasis added).]

- The City "did **not** conduct a basic infrastructure (or equivalent) analysis for each or any site, other than to observe that all of the listed (alleged alternative) sites have street frontage."  [CSF ¶ 145(b), ECF p. 51 (emphasis added).]

- The City "did **not** determine for each or any of the sites on its list of legally permissible alternative sites the economic burdens which would be incurred in order to use the site as an adult establishment."  [CSF ¶ 145(c), ECF p. 51 (emphasis added).]

- The City "did **not** determine for each or any site on its list of legally permissible alternative sites how much it would cost to convert the site into what is required for either (i) an adult establishment, or (ii) a commercial use, generally."  [CSF ¶ 145 (d), ECF p. 51 (emphasis added).]

---

[11] *See* Consolidated Statement of Stipulated Facts filed, (as noted above) in all four actions on May 19, 2023.

- The City "did **not** analyze whether the presence of wetlands and/or flood plains precluded a site from being commercially developed."[12]   [CSF ¶ 145(e), ECF p. 51 (emphasis added).  And *see also*, CSF ¶¶ 146 – 158 ("Flood Zone Facts."), ECF pp. 54-57, esp. CSF ¶ 154, ECF p. 56 ("Only four of the Manhattan lots are not in coastal zones.").]

- The City "did **not** confirm that the listed sites would not be rendered unavailable by virtue of any pending proposed text amendments to the Zoning Resolution."[13]  [CSF ¶ 145(f), ECF p. 53 (emphasis added).]

- The City "did **not** specifically analyze every listed site as to whether it is suitable for some generic commercial enterprise."[14] [CSF ¶ 145(g), ECF p. 53 (emphasis added).]

---

[12] The City qualified this Stipulation as follows:

"[H]owever the City maintains that it excluded sites from its list of available alternative sites that it identified would be unlikely to be available for development including those under public ownership and those used for park, transportation or utility purposes and the City maintains that it also conducted visual confirmation of each site using imagery and excluded those that appeared unlikely to be available for development; further, the City maintains that location in a flood plain does not automatically preclude a site from being commercially developed." [CSF ¶ 145(e), ECF p. 52.]

[13] The City qualified this Stipulation as follows:

"[H]owever, the City maintains that it did exclude sites from its list of available alternative sites that it anticipated would be rendered unavailable by virtue of proposed text amendments and the City contends that none of the amendments would materially affect the conclusion that numerous sites are available for adult use establishments," [CSF ¶ 145(f), ECF p. 53]

[14] The City qualified this Stipulation as follows: "[H]owever the City represents that all of the sites on the City's list of alternative sites are zoned for use by commercial enterprises, and the

- The City "did **not** analyze the pragmatic likelihood of each of the listed sites ever becoming available to a generic commercial enterprise" and doing so "would require an analysis of private financial and contractual information that is not in the City's possession, custody or control." [CSF ¶ 144(h), ECF p. 53 (emphasis added).]

- The City's list of allegedly "legally permissible alternative sites" includes "sites ranging from a minimum of 5,000 sq ft. to a maximum of 7,346,540 sq. ft." and "the City did **not** exclude any [of the listed] lots as being too large."[15] [CSF ¶ 145(i), ECF p. 54 (emphasis added).]

Because the City concededly did not study anything other than the number of potentially available sites (i.e., the quantitative aspect of the issue), with no examination of the likelihood they might actually be utilized by new or relocating adult businesses, it cannot sustain its constitutional burden of proving that enforcing the 2001 Amendments will not, in fact, substantially diminish the quantity of speech - - a different analysis than simply the arithmetic exercise of counting the number of theoretically available sites regardless of condition or viability as an adult business.  In other words, establishing "the number of available alternative sites" may have been sufficient to defend a zoning

---

City represents that these sites are zoned for use by one or more types of adult establishments." [CSF ¶ 145(g), ECF p. 53]

[15] In connection with this Stipulated Fact, it was noted that "some large lots can be sub-divided or used by multiple commercial enterprises, although plaintiffs maintain that the process for subdividing large lots is burdensome, costly and typically takes over a year to complete." [CSF ¶ 145(i), ECF p. 54 .]

13

ordinance under *Renton*, but it is clearly not sufficient under the Kennedy Test.  The Court here is simply being asked by the City to speculate whether there are actually commercially viable locations to which the adversely affected businesses are actually likely to open following the closing of the existing locations.  Speculation is not proof, and is certainly not sufficient to carry the City's constitutional burden.

Most importantly, the City did not factor in the critical factor that we have had 21 years to see whether the numerous Outer Borough sites it relies on would be developed by adult businesses, and the significance of the fact that they have not.  This evidence inexorably leads to the conclusion that they are not sites likely to be developed in the future and, thus, that speech will not fare well if the 2001 Amendments are upheld.

### (b) The City has also failed to prove that the 2001 Amendments will leave the *accessibility* of speech substantially intact.

Justice Kennedy's *Alameda* opinion requires that an adult zoning ordinance not only leaves the "quantity" of adult businesses "substantially intact," but also that it leaves the "accessibility" of such businesses to the public "substantially intact."  535 U.S. at 449.

First, of course, if there are likely to be even fewer adult eating or drinking establishments if the 2001 Amendments are enforced than now, that would *ipso facto*, mean that the public's access is diminished and not left "substantially intact."

However, entirely apart from the mere *number* of adult eating or drinking establishments that might exist if the 2001 Amendments are enforced, there is no question that the public's *access* to any replacement businesses would unquestionably not remain "intact."  Specifically, five of the six adult eating or drinking establishments of plaintiffs

herein are located in Manhattan and their owners or operators have all submitted sworn

declarations that they would not relocate out of Manhattan because too many of the type

of clientele they cater to would not patronize them if they moved outside of Manhattan. [16]

This is because Manhattan (according to the NYC Visitors Bureau) is "an American

icon" and "NYC's most visited borough" (https://www.nycgo.com/boroughs-

neighborhoods/manhattan), and, as the City's Department of Economic Development itself

admits, Manhattan is a "global capital … renowned for its iconic attractions," and "an

island of superlatives," with 151 subway stations and more than 14 million tourists each

year.  https://edc.nyc/manhattan.   In short, Manhattan is unique, and no reasonable person

would expect that businesses dependent on patrons drawn from the central business and

tourist sectors could simply be removed from Manhattan locations and "dispersed" to the

Outer Boroughs (particularly to the far reaches of the Outer Boroughs) without material

---

[16] As to Sapphire (the club operated by plaintiff Club at 60th St.), *see* the Declaration of
David M. Talla in Support of Plaintiffs' Motion for Partial Summary Judgment filed in case No.
02 CV 8333 on September 16, 2022, Doc. No. 157, at ECF p. 2, ¶ 4, and the reasons for that
position are found in (Doc. 157-1) at ECF p. 11, ¶ 38, and ECF pp. 16-17, ¶¶ II-A through II-D.

As to Platinum (the club operated by plaintiff 725 Eatery Corp.) and Satin Dolls (the club
operated by plaintiff 689 Eatery Corp.), *see* Doc. No. 171 (Declaration of Keith Warech in Support
of Plaintiffs' Motion for Partial Summary Judgment) filed in case no. 02 CV 4431 on September
23, 2022 (at ¶¶ 2-3 on ECF p. 2), incorporating his attached previously filed preliminary injunction
declaration and specifically note ¶ 13 on ECF p. 6 and Part II of Exhibit A thereto (starting at the
bottom of ECF p. 10, *i.e.* ¶¶ A-D).

As to Flashdancers Downtown (f/k/a New York Dolls) (the club operated by plaintiff 59
Murray Enterprises) and Flashdancers NYC (f/k/a/Private Eyes) (the club operated by plaintiff
AAM Holdings Corp.), *see* Doc. No. 138 (Declaration of Barry Lipsitz in Support of Plaintiffs'
Motion for Partial Summary Judgment) filed in case no. 02 CV 4432 on September 23, 2022 (at
¶¶ 2-3 on ECF p. 2), incorporating his attached previously filed preliminary injunction declaration
and specifically note ¶ 31 on ECF p. 12 and Part II of Exhibit A thereto (ECF pp. 15-17).

adverse effect on the accessibility of protected expression, and particularly to the large numbers of tourists who frequent Manhattan. Nor has the City studied this issue or provided the Court with any evidentiary basis to conclude that the accessibility of speech would be substantially undiminished if the 60/40 business model were outlawed and Plaintiffs forced to close or leave Manhattan. (*See* previous point.)

Justice Kennedy anticipated these concerns when he wrote the new test that emerged from *Alameda Books,* that a municipality must answer in defending the constitutionality of a dispersal zoning scheme: "**how speech will fare under the city's ordinance**" (535 U.S. at 450) and its component requirement that an adult zoning scheme "leav[e] … the accessibility of speech substantially intact." (*id.* at 449) And it is exactly these tests that the City's defense of the 2001 Amendments fails in our case, particularly taking into account the disproportionate number of adversely affected adult establishments located in Manhattan and the disproportionate and unique role that Manhattan plays in the life of the City's residents and visitors.


**C.  The City has failed to prove that the 2001 Amendments survive even the more lax justification test imposed by the *Alameda* plurality.**

Even under the more lax standards set out by the *Alameda* plurality[17] (joined by J. Kennedy for this portion of its opinion), the City would have the burden of proving that its

---

[17] They are "more lax" because they lack a required analysis of "how speech will fare" and they lack a proportionality test to require that a City demonstrate that secondary effects will be "significantly reduced" while the quantity and accessibility of speech will be left "substantially intact."

zoning ordinance was justified in the event that the Plaintiffs put on some evidence that cast doubt on the City's rationale for its ordinance:

> This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in Renton. *If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.*

535 U.S. at 438-439 (emphasis added).

Here, the City has only offered its 1994 Study to attempt to justify its additional 2001 restrictions. It admits it did no studies of the 60/40 businesses which were thereafter created to meet the "substantial portion" requirement of the 1995 Amendments, or, equally importantly, of the circumstances which existed in the City in 2001 when it enacted its tightened restrictions.[18] However, Plaintiffs cast doubt on those restrictions by introducing substantial evidence of experts demonstrating that, in 2001, the secondary effects complained of in 1994 no longer existed, at least with respect to 60/40 businesses, if not generally.[19] And state trial judge York, presented with the same evidence, found it

---

[18] *See* CSF ¶ 188 at ECF p. 63, filed in all four actions on May 19, 2023.

[19] *See, e.g.*, Exhibits 62 through 64 found in Volume 9 of the Joint Request and Stipulations Regarding the Taking of Judicial Notice (filed in all four actions on May 9, 2022), which include the following:

**Exhibit 62** (found in Volume 9 starting at ECF p. 35): Study by Linz and Paul, "Measuring the Secondary Effects of 60/40 Businesses in New York City: A Study of Calls For Service to the Police", including Figures and Tables (2005) (Exhibits 6 and 6A admitted into evidence at

persuasive.[20]  Finally, as noted above, Judge Pauley as well (*see* p. 7) eloquently recognized

the substantially changed circumstances in 2001.

_____

evidentiary hearing held on February 23 through March 2, 2009, in Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County, Index No. 121197 /2002).

**Exhibit 63** (found in Volume 9 starting at ECF p. 86): Study by Freeman, "Examining The Relationship Between Businesses That Comply With the '60/40' Zoning Regulations and Surrounding Property Values in New York City" (2008) (Exhibit 8 admitted in evidence at evidentiary hearing held on February 23 through March 2, 2009, in Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County, Index No. 121197 /2002).

**Exhibit 64** (found in Volume 9 starting at ECF p. 121): Study by Focus Probe, Inc., "Perceived Differences Between Adult Entertainment Clubs With ' Subdued Facades ' vs. 'Loud Facades'), with photographs (Exhibits 12, 12A, 12B and 12C admitted in evidence at evidentiary hearing held on February 23 through March 2, 2009, in Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County, Index No. 121197 /2002).

[20] *See For the People Theatres of NY, Inc. v. City of New York,* 38 Misc. 3d 663,672-673, 954 N.Y.S.2d 801, 807-808 (Supreme Court, New York County 2012), *aff'd* 131 A.D.3d 279, 14 N.Y.S.3d 338 (1st Dept. 2015) , *rev'd* , 29 N.Y.3d 340; 79 N.E.3d 461 (2017), based on the Court of Appeals' *assumption* that 60/40 businesses had the same secondary effects as the 1994 100% business and, therefore, the City did not need to put on any evidence of secondary effects of 60/40 businesses in response to the substantial evidence to the contrary presented by the plaintiffs in that case).

However, Justice York made each of the following findings of fact (*see* 38 Misc. at 672-673), which were affirmed by the Appellate Division and not discussed by the Court of Appeals:

a.      the overall quality of life associated with areas in which 60/40 clubs were located was better than the overall quality of life associated with areas in which 100% clubs (permitted under the 1995 Amendments) were located;

b.      the neighborhoods in which 60/40 clubs were located were safer than the neighborhoods in which 100% clubs were located;

c.      the neighborhoods in which 60/40 clubs were located were preferable places to live and in which to shop than the neighborhoods in which 100% clubs were located;

d.      60/40 clubs were not associated with negative secondary crime effects;

e.      60/40 clubs were not "hot spots" for crime in their neighborhoods;

Given that Plaintiffs put on substantial evidence to "cast doubt" on the City's findings, the *Alameda* Plurality required the City to put on additional evidence to rebut that showing.   Under *Celotex*, *supra,* the City's failure to submit any rebuttal evidence on justification entitles Plaintiffs to an award of summary judgment even under the test of the *Alameda* Plurality.

**D.   The City has failed to prove that the changes effected by its 2001 Amendments guaranteed a "reasonable opportunity" for establishment and relocation of adult businesses even under the pre-*Alameda* adequate alternative sites test.**

Even if not measured under *Alameda's* required analysis of proportionality, and wholly apart from whether the City's *justification* for the 2001 Amendments is adequate, the City has also failed to prove that it has provided an adequate number of legally permissible alternative sites providing a "reasonable opportunity" for the establishment and relocation of adult businesses even as measured under pre-*Alameda case law*.   That test

---

f.      crimes did not increase with the opening of a 60/40 club and did not decrease after the closing of a 60/40 club;

g.      the proximity of a 60/40 club does not result in a diminution of residential property values;

h.      close proximity to a 60/40 club tended to increase property values;

i.      since the adoption of the 1995 Amendments the numbers of adult establishments had dramatically declined;

j.      since the adoption of the 1995 Amendments the location of adult clubs had become far more widely dispersed;

k.      the signage for 60/40 clubs was less garish, more subdued; and

l.      frequently the non-adult portion of 60/40 clubs was equally or more prominent than the adult portion.

was stated in *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 54 (1986), which held that the First Amendment requires that a City's adult zoning may not "effectively den[y] . . . a reasonable opportunity to open and operate."

While the City asserts the existence of some 245 lots which it contends could simultaneously operate consistent with its required 500-foot separation requirement between adult establishments,[21] it has failed to meet its burden of proof in establishing that *any* of those sites (much less all) are in fact either: (1) legally permissible sites for an adult business, or (2) provide a "reasonable opportunity" for establishment of an adult business.

**(1) The City has failed to meet its burden to prove that *any* of its proposed alternative sites are in fact legally permissible.**

Specifically, the City employed a flawed methodology in that it failed to draw 500-foot buffers around certain "sensitive receptors," and therefore failed to exclude lots within those required buffers from its list of potential alternative sites for adult uses. The City's claim of 1703 alternative sites therefore overstates the number of alternative sites—and, from the record evidence, appears to overstate the number dramatically. Indeed, because of the City's methodological errors there is no way to know whether *any* alternative sites would be available for adult uses. The City therefore cannot meet its burden of proof on the issue of whether there are sufficient alternative sites for adult establishments if the 2001 Amendments are enforced.

**(a) The City created its list of potential alternative sites in several phases.**

---

[21] *See* Declaration of Susan E. Amron (filed by the City in all four actions on September 16, 2022), at ECF p. 8, ¶ 14.

Generally speaking, the 2001 Amendments prohibit adult uses from being established (1) in certain entire zoning districts; (2) in the 500 feet surrounding those zoning districts; and (3) in the 500 feet surrounding any "sensitive receptor." *See* Declaration of Susan Amron, filed 9/16/22 ("Amron Declaration") (doc. 159 in 02-CV-8333) at ECF p. 5, ¶ 8. Sensitive receptors include other adult establishments, schools, daycares, and "houses of worship," among other things.

The City determined its list of 1703 potential sites as follows, in what the Court might think of as several phases: first the "zoning district" phase, then the "sensitive receptors" phase, and finally the "review" phase. The City then separately performed a "mixed use" phase of its analysis, in a failed attempt to cure some of the defects in its earlier analyses.[22]

> **(i)** **The "zoning district" phase correctly eliminated the majority of lots as alternative sites by using data about the lots from the City's "MapPluto" software.**

For the "zoning district" phase, the City used an in-house program called MapPluto—a "geospatial dataset" that "contains over seventy data fields derived from various source data files maintained by various City agencies." *See* CSF ¶ 229 at ECF p. 74. From MapPluto the City determined that there are 857,298 tax lots in New York City. *Id.* at ¶ 231. The City eliminated as potential adult-business sites all lots that are located in (or within 500 feet of) the following zoning districts, all of which prohibit adult

---

[22] The "phase" nomenclature is a descriptive term used for this brief. The City did not have any internal terminology for these parts of its analysis.

establishments: all Residential districts; the C1, C2, C3, C4, C5, C6-1, C6-2, and C6-3 Commercial districts; and the M1-5A, M1-5B, M1-5M, M1-6M, and M*D Manufacturing districts. *Id.* at ¶ 232.

**(ii)** **The "sensitive receptors" phase relied in part on inexact proxies, rather than actual information about the location of sensitive receptors.**

After the "zoning district" phase, the City analyzed the remaining potential alternative sites in the "sensitive receptors" phase. The purpose of the "sensitive receptors" phase was to eliminate from consideration all lots within 500 feet of a sensitive receptor. To do that, the City had to know where sensitive receptors were. The City used MapPluto for this as well. Among MapPluto's data fields is a "building class" code for each lot. *Id.* at ECF p. 74, ¶ 233. The building code identifies the major use of structures on the lot. *Id.*

Using MapPluto's building class codes to identify sensitive receptors—especially houses of worship—is an imperfect approach at best, and is not as straightforward as using zoning districts for the purpose of eliminating sites. Among the problems: The building codes are generated by the New York City Department of Finance's tax categorizations, not by the Zoning Department, *id.* at ECF p. 74, ¶ 231, and the term "house of worship" is not defined in the Zoning Resolution at all. *Id.* at ECF p. 74, ¶ 229. These factors necessarily make the City's methodology unreliable. Perhaps that is why the City has admitted via stipulation that the building class code assigned to any given lot in MapPluto from the Department of Finance's *tax* categorizations "is not necessarily controlling on the *zoning* question of whether [a use] is a 'house of worship.'" *Id.* (emphasis added). In other words, the City apparently does not intend to be bound by its own list of alternative sites,

22

and when push comes to shove, if an adult establishment actually attempts to locate or relocate to one of those sites in JNR Exhibit 71, the City might in fact determine that the site is an impermissible one for use as an adult establishment after all.

In any event, lots which have houses of worship as their *primary* or *major* use are marked with the M1, M2, M3, M4, and M9 building class codes, and in the "sensitive receptors" phase of its analysis, the City identified all lots with those codes, drew a 500-foot buffer around those lots, and eliminated all lots within the buffer zone as potential sites for adult establishments. *See* Amron Declaration at ECF p. 6, ¶ 10 (explaining how buffers were drawn). *See also* CSF ¶ 237 at ECF p. 76 (explaining that M1, M2, M3, M4, and M9 building codes—and only those codes—were used for that purpose[23]).

The "sensitive receptors" phase of the City's analysis was fatally flawed. While drawing buffers around lots that had a building class code indicating that the major use was a house of worship is necessarily imprecise, the larger problem is that many lots have *multiple uses*, and "[t]he building class codes for mixed uses do not specify whether a house of worship is contained in the structure."   CSF ¶ 236 at ECF p. 76.   "These mixed-use building class codes include the S0, S1, S2, S3, S4, S5, S9, RC, RD, RM, RX, and RZ."  *Id*, ¶11.  Nonetheless, sensitive receptors must still be buffered even when they are not the only (or *primary* or *major*) use of the lot. The "sensitive receptors" phase of the City's

---

[23] The City also eliminated other lots for other reasons (such as proximity to other sensitive receptors, like schools) but those actions are not relevant to the Court's understanding of why the City's methodology is fatally flawed; the flaws addressed in this brief are in the City's treatment of houses of worship. The other steps the City took in the "sensitive receptors" phase are discussed in the Amron Declaration at ECF p. 6, ¶ 10.

analysis did not consider any potential sensitive receptors (and in particular any houses of worship) on any of those mixed-use lots. Accordingly, unless the City then went ahead and somehow cured this problem, it meant that it potentially failed to draw a 500' buffer around a large number of sites where a "house of worship" may have existed on a mixed use building code lot (and this is especially likely given that the term "house of worship" is a loose one, going undefined in the ZR).  The City attempted to rectify this problem in its separate "mixed use" analysis, but as discussed below that analysis also had a fatal flaw.

> **(iii)    The "review" phase eliminated only individual lots from what remained after the first two phases.**

The City contends that the elimination of lots in the "zoning district" phase and "sensitive receptors" phase left 5009 lots as potential sites for adult uses. Amron Declaration at ECF p. 6, ¶ 10. That list was further winnowed to 2217 by eliminating lots that were impossible to use for adult establishments for reasons unrelated to the Zoning Resolution or the 2001 Amendments (e.g., publicly owned lots, lots being used for parks or transportation or utilities, or very small lots). *Id.* ECF p. 7, at ¶ 11.

In the "review" phase, the 2217 individual lots remaining on the City's list were reviewed by eight staff members of the Department of City Planning using computer programs and their knowledge of the areas (they did not conduct in-person inspections) with an eye toward determining whether those lots had a house of worship or other sensitive receptor, or whether they were otherwise impossible to use for adult establishments for reasons unrelated to zoning. *Id.* at ECF p. 7, ¶ 12. "Of the 2,217 lots reviewed by DCP planners, 514 were excluded as either fitting [those] criteria or [being] questionable," and

"[t]he remaining 1,703 lots were identified as available for adult use establishments," *id.*, and are listed in JNR Exhibit 71.

> **(b) The City list of "available sites"[24] is inaccurate because the City failed to create 500-foot buffer zones around all sensitive receptors, and failed to eliminate all lots within those buffer zones from its list of alternative sites.**

There are two fatal flaws in the methodology described above. Either one standing alone makes it impossible for the City to meet its burden of establishing sufficient alternative sites.

> **(i)    The City did not buffer around sensitive receptors in the "review" phase.**

One fatal flaw is that in the "review" phase of the final 2217 sites, when DCP staff encountered a sensitive receptor in one of the final 2217 sites, they were instructed simply that it should be "excluded from the list of available sites."  *See* part 4(c)(i) of JNR Exhibit 71-1 filed on 5/9/22 as doc 147-10 in 02 CV 8333, at ECF p. 56.[25]

DCP staff then treated those lots that way: "In DCP staff's in-office review of over 2,200 sites…lots that appeared to the reviewer to contain a house of worship based on their building class code were excluded from the list of lots available for adult establishments." CSF ¶ 238 at ECF p. 76.

---

[24] The City's use of the word "available" is a misnomer as it suggests actual availability, though that is certainly not the case (nor does the City contend it to be).  All the City actually claims is that such sites are legally permissible and were not otherwise excluded due to a conclusion that it would be highly unlikely that an adult use could ever be established there.  There was no evidence that any sites were currently actually available on the market.

[25] Exhibit 71-1 is described in the Index to Volume 10 of the JNR (at ECF p. 2 of Doc. 147-10) as being "Defendants' Responses to Plaintiffs' Questions about the Methodology Used by Defendants to Prepare the List of 1,703 Unencumbered Lots."

What DCP staff should have been instructed to do was not merely eliminate *those lots* from the list of available sites, but rather to (1) draw a 500-foot buffer around those lots and then (2) exclude from the list of alternative sites *all lots within the buffer*. The Zoning Resolution is clear on this point: no adult establishments may be within 500 feet of a house of worship.  *See* ZR §§32-01(b) and 42-01(b).  Crossing houses of worship off the list of available sites is not enough—the City must draw a buffer around each house of worship and cross off all lots in that 500-foot radius.

The record does not reflect how many of the 514 sites excluded in the review phase were excluded because of the presence of a sensitive receptor on the lot (rather than for a non-zoning reason), but each 500-foot circle has the potential to exclude dozens or hundreds of lots from the list of sites available for adult uses.[26] The City's methodology completely failed to draw these buffer zones, and therefore completely overlooks that huge swaths of land are unavailable for use as adult establishments. The City therefore has not met its burden of proof of showing the availability of alternative sites.

> **(ii)    The City did not buffer around mixed-use lots that had houses of worship.**

---

[26] A circle with radius of 500 feet has an area of more than 785,000 square feet. Because the City contends that lots of 5000 square feet or larger are big enough to support adult establishments, *see* Amron Declaration at ECF p. 7, ¶ 11, one circle with a 500-foot radius could exclude 157 entire lots of 5000 square feet each.

A different comparison may be helpful: 785,000 square feet is more than 18 acres. The playing field at Yankee Stadium is about 3.5 acres. The Court might visualize the City's error by imagining that each time the City eliminated one lot in the "review" phase, what it should have been doing is eliminating all lots in an area more than five times the size of the field at Yankee Stadium.

The second fatal flaw is similar to the first in that the City failed to draw required buffers, but this flaw occurred in the "sensitive receptors" phase. This brief explains above that the City (appropriately) drew buffers around and excluded lots within 500 feet of lots that had building class codes of M1, M2, M3, M4, or M9 (the codes that indicated that the major use of the lot was a house of worship). The problem, as noted *supra,* is that many lots have *multiple uses*, and houses of worship are sensitive receptors that must be buffered even when they are not the *primary* or *major* use of the lot.  Drawing buffers only around those uses with building codes of M1, M2, M3, M4 or M9 did not eliminate those sites within 500' of mixed use lots with *other* building class codes where a "house of worship" may not be deemed the dominant use for building class code purposes.

"Where a tax lot contains multiple structures or multiple uses within a single building or tax lot, the building class code indicates that the lot contains mixed uses without specifically identifying each underlying use." CSF ¶ 235 at ECF p. 75. These building codes include S0, S1, S2, S3, S4, S5, S9, RC, RD, RM, RX, and RZ. *Id.* When the City went to "determin[e] whether a site enumerated on the JNR Exhibit 71 list was within 500 feet of a house of worship" in the sensitive-receptors phase of its review, it "did *not* consider lots with building class codes S0, S1, S2, S3, S4, S5, S9, RC, RD, RM, RX, and RZ for this purpose." *Id.* at ¶ 237 (emphasis added).

The City attempted to remedy its failure to consider mixed-use lots by conducting a separate "mixed-use" phase of analysis. The City used MapPluto to determine that there were 37,104 lots with mixed-use building codes that could potentially have a house of worship. *Id.* at ¶ 237. The City then (correctly) ignored 35,595 of those lots because those

lots had already been eliminated in the "zoning district" phase (because, for example, those lots were in a Residential district, which does not allow adult establishments). *Id.* That left 1509 mixed-use lots remaining. *Id.*

The City determined that 1427 of those remaining lots were located "within a 500-foot buffer of a sensitive receptor," and took no further action with respect to those lots; the City simply ignored them because they were already marked as unavailable for use as an adult establishment due to their location inside an existing 500-foot buffer. *Id.* That left 82 lots with mixed-use building codes.

The City should not have merely ignored those 1427 lots—it should have drawn 500-foot buffers around any houses of worship on those lots, and excluded all lots within those additional buffer zones as potential alternative sites, precisely as it should have done with the sensitive receptors discussed in the "review" phase.

To be sure, because those 1427 mixed-use-building-code lots were already within a 500-foot buffer of a sensitive receptor, the new 500-foot buffers drawn around them would *partially* overlap with an existing buffer—but they would never *fully* overlap, because two lots cannot occupy the same spot.

For example, if the City had drawn a 500-foot buffer around a sensitive receptor (a school, say) in the "sensitive receptors" phase of its analysis, and had then discovered a house of worship inside that buffer during the "mixed-use" phase of its analysis, an additional 500 foot buffer would need to be drawn from that house of worship—but the City did not draw any such additional buffers and did not exclude lots in the new buffer zones from its list of available sites; the City assumed that its one 500-foot buffer was

28

sufficient. It was not. Properly drawn buffer zones around houses of worship that are themselves in other buffer zones should resemble Venn diagrams (not unlike the Mastercard logo, or the Olympic rings).

A set of illustrations will make the point explicitly clear. This diagram represents a sensitive receptor indicated by the number "1," and shows a 500-foot buffer around that sensitive receptor. All lots within that 500-foot buffer are unavailable for use as an adult establishment:



In the mixed-use phase of its analysis, the City identified 1427 lots that were inside an existing 500-foot buffer, *and* had mixed-use building codes that indicated the possible presence of a house of worship. That situation is illustrated as follows, with the number "1" again representing the initial sensitive receptor, the circle representing the 500-foot-radius buffer, and the number "2" representing the mixed-use building-code lot that is a possible house of worship:



Every time this scenario occurred—all 1427 times—the City took no further action.

But when the "2" in this diagram is a house of worship, all lots within 500 feet of it are unavailable for use as an adult establishment, and another buffer is required. The following diagram shows these same lots with a second 500-foot buffer added:



The new buffer circle—the circle centered on the number "2"—partially overlaps the original circle. But more than half of the new buffer circle lands outside of the original circle, and every lot within the new circle is also unavailable for use as an adult establishment. The City's methodology fails to eliminate as possible adult-use sites all lots in the area shaded in this diagram:



Obviously, the greater the distance is between the sensitive receptor that created the first buffer (the "1" in the diagram) and any house of worship that the City ignored (the "2" in the diagram), then the less overlap there is between the two circles, and the larger the number of new lots that would be encompassed by the new circle (and therefore the

PRG8622.docx

larger the number of additional lots that would be excluded as potential adult sites). Less than half of the two circles overlap if the distance between a mixed-use building-code lot that contains a house of worship and the first sensitive receptor is more than about 404 feet.[27]

This means that for every mixed-use-building-code house of worship that the City ignored in this phase of its analysis, at least *some* lots should have been excluded as potential adult-establishment sites, but they were not.

> **(c) The City's methodological errors make it impossible to know whether there are *any* alternative sites available under the 2001 Amendments.**

Because the City did not buffer around houses of worship in either the "review" phase or the "mixed use" phase, there is no way to know exactly how many of the 1703 lots on JNR Exhibit 71 would have been excluded as potential adult-establishment sites— but the remainder of the parties' Second Supplemental Joint Statement of Facts helps illustrate the severity of the City's error.

After the City improperly just *ignored* the 1427 mixed-use-building-code lots inside existing buffers in the "review" phase (rather than drawing additional 500 foot buffers around them), it considered only the 82 mixed-use-building-code lots that remained. The parties have stipulated that if 500-foot buffers were drawn around those 82 lots, "an

---

[27] The specific calculations and equations that lead to this conclusion involve enough geometry and algebra that they are not easy to describe in text, so this brief won't attempt to do so. But the details of the calculations and equations are beside the point—it is self-evident that no matter precisely where point "2" is inside the buffer created from point "1," there will always be at least some points (i.e., lots) in the buffer around point "2" that were not in the buffer around point "1." Those lots would be off-limits for adult uses, but the City did not eliminate them from its list of potential alternative sites in JNR Exhibit 71.

additional 412 lots of the 1,703 would not be available for adult establishments as they would be within 500 feet of a sensitive receptor, i.e., house of worship." CSF ¶ 13 at ECF p. 76. This would be a nearly one-quarter reduction in the number of available sites—all from just 82 additional buffers.

The City identified up to 514 potential houses of worship in the "review" phase and up to 1427 potential houses of worship in the "mixed use" phase, for a total of up to 1941 lots that should have had (but did not have) a 500-foot buffer drawn around them. To be clear, the Plaintiffs are not contending that every one of those 1941 lots must have a buffer; only those lots that have a house of worship must be buffered. The Plaintiffs' point is that the City's methodology is fatally flawed because it never investigated which of those mixed-use building-code lots had houses of worship, and did not draw *any* buffers. Based on the significant reduction (nearly 25%) in the number of potentially available alternative sites if as few as 82 additional buffers were drawn, it is reasonable to conclude that the presence of houses of worship on only a small percentage of those 1941 lots that the City did not investigate or draw buffers around would result in enough additional buffers that most, or possibly all, of the remaining alternative sites would be eliminated from the City's list of potential sites for adult establishments.

On this record, because of the City's flawed methodology, there is no way to know if there are *any* alternative sites available for adult establishments under the 2001 Amendments. The City has not met its constitutionally required burden of proof to show that there are sufficient alternative sites available. Accordingly, under *Celotex, supra,* Plaintiffs are entitled to an award of summary judgment on this basis as well.

**(2) The City has failed to meet its burden to prove that its proposed alternative sites present a "reasonable opportunity" for establishment of an adult business.**

The stipulated evidence demonstrates that the City's zoning scheme *in fact* "effectively denies" a reasonable opportunity to open and operate an adult live entertainment business.  The best proof of this is the vastly diminished numbers of adult live entertainment establishments in the City since the time not only that the City's original adult zoning provisions were added in 1995, but even since the time of its 2001 Amendments.  *See* the discussion of the greatly reduced numbers of adult businesses presented in Point I-B (1), *supra*.

Additionally, at least as to live entertainment establishments, the stipulated facts are that there are not even enough *legally permissible* relocation sites in Manhattan for relocation of the Manhattan clubs which would be required to relocate under the 2001 Amendments, much less ones which provide any type of remotely "reasonable opportunity" for relocation.[28]  Additionally, according to Plaintiffs' expert, Michael Berzak, who has examined all the Manhattan sites the City claims are legally permissible and constitutionally countable, no more than three legally permissible sites exist in

---

[28] The City contends that there are 13 lots in Manhattan which could simultaneously be occupied by new adult businesses.  Plaintiffs contend that the number is 9.  CSF ¶ 143 at ECF p. 51.  (These numbers do not represent how many of those sites, if any, are currently *actually* available on the commercial real estate market, so the actual number of such sites which would in *fact* be available is likely *much* smaller.)  However, the parties agree that there are currently 19 60/40 businesses in Manhattan which would need to relocate if the 2001 Amendments are upheld.  CSF ¶ 173 at ECF p. 60.

Manhattan that could simultaneously be occupied and would be commercially feasible for adult club businesses, [29] and there is no evidence that any of those sites is actually available for sale or rental on the commercial real estate market.  Additionally, even *those* sites would become unavailable if first taken by a new or relocating adult bookstore. Also, as shown *supra,* in n.16*,* the owners of the Club Plaintiffs' businesses located in Manhattan have all submitted sworn declarations that they either would not, or do not believe they could, relocate outside Manhattan due to the market forces involved in their business models.

However, entirely apart from the question of whether Manhattan can be considered separately due to the unique impact on the public's access to expression there if the 2001 Amendments are upheld,[30] the evidence of the past 27 years makes clear that the sites in the other boroughs would *not,* in fact, be reasonable sites for adult club businesses because there have been 27 years to see if any entrepreneurs would find those sites a "reasonable opportunity" for establishing an adult club, and instead of a growing number of such clubs in those supposedly reasonable sites, the evidence shows only drastically declining numbers, notwithstanding all those supposedly reasonable relocation sites.

---

[29] *See* CSF ¶ 144 at ECF p. 51, and Declaration of Michael Berzak Regarding Adult Business Sites in Support of Plaintiffs' Motion for Preliminary Injunction, which appears in Volume 1 of the Plaintiffs' Joint Appendix in Support of Plaintiffs' Motion for Preliminary Injunction filed in all four actions on November 21, 2018, at ECF p. 24, ¶ 6-g and ECF p. 35, ¶ 37.

[30] Note that contrary to the City's mischaracterization in the preliminary injunction ruling in this case, Plaintiffs' position is not that the City must prove that each borough provides a reasonable opportunity to open and operate.  Plaintiffs' position is that Manhattan is a unique entertainment and tourist venue and, for that reason, because of the unique impact the 2001 Amendments would have on the public's access to expression there, the zoning restrictions must not deny a reasonable opportunity to relocate there.

The bottom line is that the City has failed to demonstrate both that any of its proposed sites are legally permissible, and that it has provided a "reasonable opportunity" for the opening and operation of adult businesses.  Consequently, under *Celotex*, Plaintiffs are entitled to summary judgment even apart from any application of Justice Kennedy's opinion in *Alameda.*

**E.    The City has failed to prove that its ordinances meet the compelling interest test required of all content-based restraints on expression as required by *Reed v. Town of Gilbert* and *City of Austin v. Reagan National Advertising*.**

As the Club Plaintiffs briefed extensively in their Memorandum of Law in Support of Their Motions for Partial Summary Judgment filed in all four actions on September 16, 2022 (at ECF pp. 38-41), the cases of *Reed v. Town of Gilbert,* 576 U.S. 155 (2015) and *City of Austin v. Reagan National Advertising,* ___ U.S. ___, 142 S.Ct. 1464 (2022)[31], have rejected *Renton's* assertion that only intermediate scrutiny is required for those time, place and manner restrictions which have content-neutral *justifications*, but which are facially content-based.

Given that the City's 2001 Amendments are *unquestionably* content-based under the standard of *Reed* and *Austin* (since their restrictions only apply to businesses defined by the content of their expression), the City has the burden to show that its 2001 Amendments were necessary to support a *compelling* municipal interest.  Given the greatly reduced secondary effects in existence in 2001, compared to 1994, based on the great

---

[31] To prevent duplicative briefing on this point, the Club Plaintiffs will simply incorporate the briefing of these two cases which appears in their Memorandum in Support of their partial summary judgment motions at ECF pp. 36-41.

reduction in the concentration and numbers of adult businesses during that time (and even greater reduction currently), the City cannot even show a *substantial* government interest for enforcing its 2001 Amendments, much less a *compelling* one.

Accordingly, for these reasons as well, the Club Plaintiffs are entitled to an order of Summary Judgment.

**II**

**PLAINTIFFS' RESPONSES TO ISSUES RAISED IN CITY'S MOTION FOR SUMMARY JUDGMENT TO THE EXTENT NOT ALREADY ADDRESSED ABOVE OR IN PLAINTIFFS' MEMORANDUM OF LAW FILED IN ALL CASES ON SEPTEMBER 16, 2022, IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

The primary briefing supporting the Club Plaintiffs' responses in opposition to the City's Memorandum of Law in Support of Their Motion For Summary Judgment ("City's SJ Memo") filed in all four actions on September 16, 2022, is set forth earlier in this brief in support of the Club Plaintiffs' *own* Cross Motion for Summary Judgment and also in the briefing the Club Plaintiffs supplied on September 16, 2022, in support of *their own* motion for partial summary judgment (i.e., Club Owner Plaintiffs' Joint Memorandum of Law In Support of Their Motions for Partial Summary Judgment).  However, to the extent the City raised any points in the City's SJ Memo to which a more particularized response may be required, those additional supplemental responses are set forth below.

**A.  Supplemental Responses to City's Preliminary Statement**

At p. 2 (ECF p. 14) of the City's SJ Memo, the City asserts: "Judge Pauley nonetheless largely disagreed with the primary arguments advanced by plaintiffs in support of these latest challenges to the 2001 Amendments."  That is entirely incorrect.  The *primary* arguments asserted by Plaintiffs are those presented in their previously filed motion for partial summary judgment,[32] and Judge Pauley expressly declined to address them as being unnecessary for resolution at the preliminary injunction phase of the case

---

[32] Again, if any of those arguments is successful, it would provide far more limited relief than the relief sought by Plaintiffs' Cross Motion, but it would provide all the relief Plaintiffs require and would render the remaining issues moot and non-justiciable in these actions.

given that he had already decided to grant the injunction on other grounds. *See 725 Eatery Corp. v. City of New York*, 408 F.Supp.3d 424, 459 (S.D.N.Y. 2019):

> Because this Court finds that Plaintiffs are more likely than not to succeed on the merits of their First Amendment free speech claims—the crux of their complaints—it does not address their alternative theories for finding the 2001 Amendments unconstitutional.

At p. 3 of the City's SJ Memo (ECF p. 15), it asserts that "the thrust of plaintiffs' challenge to these already upheld zoning amendments is the availability and viability of alternative sites for adult establishments."   Again, that is entirely incorrect.   Plaintiffs' primary challenges are those raised in their Partial Summary Judgment motions.   But even within just Plaintiffs' Cross Motion, their primary challenge is not their traditional "alternative sites" challenge but are based, instead, on Justice Kennedy's proportionality test, requiring the City to prove, *inter alia,* that the 2001 Amendments will leave the quantity and accessibility of speech "substantially intact" in terms of how speech will *actually fare*, and to prove that the justifications for the 2001 Amendments were (and still are) so compelling as to justify any impact they have on the quantity or accessibility of expression.   That is quite different from a traditional "alternative sites" challenge (though, as an *additional* argument, in Point I-D herein, Plaintiffs assert that the City has not even met its burden of proof with respect to a *traditional* "alternative sites" challenge).

Next, at ECF p. 16, the City asserts, with no citations to support it, that "amortization provisions akin to the ones at issue here have routinely been upheld by reviewing courts."   This is entirely incorrect.   To Plaintiffs' knowledge there are *no* decisions addressing the constitutionality of an ordinance which imposes more strict (much

less *far* more strict) amortization requirements on non-conforming adult businesses than on all other types of non-conforming uses.  Moreover,  because of this content-based (extremely) discriminatory treatment, it is constitutionally irrelevant whether some or all of the Plaintiffs have had adequate time to "recoup their investments", which would be a Due Process Challenge arising under the Fourteenth Amendment. Rather, the challenge here is a First Amendment challenge, based on the amortization provisions being clearly content-based restrictions that fail under tests of both strict and even intermediate scrutiny.

Further down on ECF p. 16, the City asserts: "Third, adult establishments are simply not similarly situated to other establishments that are permitted to remain as non-conforming uses at locations where zoning regulations have changed."  The City provided no evidence to support this specious conclusion, nor did it previously do any studies to compare adult non-conforming uses with other non-conforming uses.  If a use is made non-conforming by zoning changes, that means the City has concluded that the use would now be an undesirable one in the zone in which it is located.  There is absolutely no basis, absent a compelling legislative record to the contrary presented in support of the legislation, for the City to conclude that adult non-conforming uses are categorically and significantly more problematic than all other non-conforming uses, and even to the extent that most other such uses may stay in place *forever* absent an expansion or discontinuance of the use.

Finally, at ECF p. 17, the City asserts that Plaintiffs' challenges to the permitting and vesting procedures have been rendered "largely moot" based on prospective steps it has taken which it believes will fix all its problems if the 2001 Amendments are upheld. This assertion, as well, is demonstrably incorrect, as Plaintiffs will establish below.

39

**B. Supplemental Responses to City's Statement of Material Facts[33]**

While the parties agree on most of the material facts, the City's description of a few of those facts not only leaves out a few key details, but suggests a conclusion that is contradicted by those facts.

First, at ECF p. 19 of the City's SJ Memo, the City provides an incomplete and inaccurate description of how the 1995 law applied to adult eating or drinking establishments. The City's brief notes (correctly) that, under the 1995 law, only those businesses where a "substantial portion" of the business is used as, *inter alia,* an "adult eating or drinking establishment" are subject to the regulation. But the City's brief then makes the incorrect jump to conclude that a *regulated* eating or drinking establishment was intended to "include *any* restaurant, bar or theater that 'regularly features' adult entertainment and that customarily excludes minors" (emphasis added).

However, contrary to the City's assertions, it is clear from the face of the 1995 Amendments that they were intended to include *only* those businesses which featured adult performances in *a substantial portion* of the business. [1995 AZR § 12-10 ("An 'adult establishment' is a commercial establishment where a 'substantial portion' of the establishment includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof.")]

To compound the problem, the City also omits the undisputed facts regarding the *creation* of the 60/40 rule.

---

[33] The City's Statement of Material Facts commences at ECF p. 17 of its SJ Memo.

Specifically, before enforcement of the original 1995 Amendments could commence, bookstores and eating or drinking establishments challenged the Amendments' definition of "substantial portion" on vagueness grounds in federal court before Judge Cedarbaum in *Amsterdam Video v. City of New York,* S.D.N.Y. No. 96-cv-2204-MGC. While that action was pending, and two days before the hearing on the plaintiffs' vagueness challenges, the City's Department of Buildings (DOB) issued Operation Policy and Procedure Notice (OPPN) # 4/98 (JNR 11), to eliminate the vagueness problem by establishing the 60/40 rule for both bookstores and eating or drinking establishments. (*See* CSF ¶¶ 9-12.) The City then so informed the Court. Based upon the City's representations to the federal judge and parties, all plaintiffs – including eating or drinking establishments – withdrew their vagueness challenges. (CSF ¶ 12.)

Next, at ECF p. 20 of its SJ Memo, the City asserts that "the adult entertainment industry largely attempted to evade enforcement through sham compliance." However, in *City of New York v. Les Hommes,* 94 N.Y.2d 267 (1999), the Court of Appeals expressly rejected the City's attempted prosecution of a 60/40 bookstore deemed by the City to be in "sham" compliance with the 1995 Amendments, holding that a business is entitled to comply with the letter of the law and that such requirements are necessary to prevent businesses from being subject to discriminatory enforcement. In a subsequent case, the same court found that the 60/40 test was also fully applicable to 60/40 eating or drinking

establishments, even if they regularly presented adult entertainment.  *City of New York v. Dezer Props, Inc.,* 95 N.Y.2d 771 (2000). [34]

Moreover, the City presents no evidence to support its current assertion that attempts to achieve mere formal compliance without real changes (what the City calls sham compliance) were the norm rather than the exception.[35]  Indeed, in *For the People Theatres v. City of New York, supra,* Justice York individually examined and described several 60/40 eating and drinking establishments, and made the following findings of fact concluding to the contrary.

> This court finds significant and distinct differences between the 1994 adult entities and 60/40 entities, so that the current establishments no longer resemble their 1994 predecessors. Given their current arrangements and secondary characteristics, these entities no longer operate in an atmosphere placing more dominance of sexual matters over nonsexual ones. Accordingly, there is no need for the 2001 amendments. On their face, therefore, they are a violation of free speech provisions of the US and State Constitutions.

---

[34] It should also be noted that just two months after the federal plaintiffs dropped their vagueness challenge, the City attempted to go back on what it represented to Judge Cedarbaum by enacting OPPN # 6/98 (JNR 12) which, though extremely imprecise, *appeared* to say that the 60/40 rule created by OPPN # 4/98 (JNR 11) no longer applied to eating or drinking establishments. (*See* CSF ¶ 13.)  Fortunately, the state courts rejected that claim, asserting that the City could not tell the federal court one thing, and then do the other.  *See City of New York v. Show World, Inc.,* 683 N.Y.S.2d 376, 383 n.4 (Sup. Ct. N.Y. Co. 1998).  This suggests that the City should, perhaps, have first looked inwardly before asserting that it was the adult industry that engaged in any type of "sham" compliance.

[35] Specifically, at ECF p. 20, the City's SJ Memo says: "the adult entertainment industry *largely* attempted to evade enforcement through sham compliance," but unsupported by any facts to show that sham compliance was the rule, rather than the exception (emphasis added).

38 Misc.3d. at 674 (2012).[36]

Finally, at ECF p. 21 the City says that the 2001 Amendments were enacted "to close the loopholes utilized by adult establishments to evade enforcement." Again, this was no "loophole." Not only did the 1995 Amendments *expressly* apply *only* to those businesses where a "substantial portion" was devoted to adult presentations or materials, but, as noted above, in 1998 the City represented to the plaintiffs and court in a pending federal lawsuit that DOB had adopted an OPPN clarifying that a test of 60/40 floor space would be used to determine whether all types of businesses – including eating or drinking establishments – were "adult establishments" and subject to the 1995 Amendments.

**D. Supplemental Responses to City's Discussion of its "Recent Analysis" of alternative sites.**

At ECF p. 25, the City describes its 2019 analysis of the sites it contends are currently available for adult business establishments. Plaintiffs will rely on the briefing they supplied on this point *supra* in Point I-D-(1).

**E. Supplemental Responses to City's Argument Point I-A (the assertion that adult zoning laws are presumptively valid)**

---

[36] As noted in n.20, *supra*, Justice York was reversed on appeal, but his findings of fact were not challenged. The Court of Appeals merely *ignored* those findings based on what Plaintiffs believe was its incorrect legal presumption, unsupported by evidence, that there was no difference in the secondary effects of adult uses and 60/40 uses, merely because the 60/40s still presented sexually oriented entertainment.

At ECF p. 29 of the City's SJ Memo, it asserts that zoning enactments "are clothed with a strong presumption of validity" and are to be found valid if they "bear a reasonable relationship to the health, safety or welfare of the public."  While this is true of most zoning provisions that do *not* affect First Amendment interests, the City leaves out that the test is decidedly otherwise where such enactments are challenged as restrictions on expression or other fundamental rights.  As to the rule where expression is directly affected, *see e.g.,* both the plurality and concurring opinions in *Alameda Books, supra,* (applying unique standards to *adult* zoning laws) and heightened scrutiny is required *whenever* zoning restrictions affect fundamental rights.[37]  This is consistent with the previously cited holding in *Playboy Entertainment Group, supra,* 529 U.S. at 818, that "When First Amendment compliance is the point to be proved, the risk of non-persuasion – operative in all trials – must rest with the Government, not with the citizen."

Again, because zoning laws which single out adult businesses for unique treatment are, by definition, content-based (as not only clarified by Justice Kennedy in *Alameda*, *supra,* 535 U.S. at 444 and 448, but as is equally demonstrated by the broadened definition of the term "content-based" provided more recently in the cases of *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), and *City of Austin v. Reagan National Advertising of Austin, LLC,*

---

[37] *See, e.g., Christian Fellowship Ctrs. of N.Y., Inc. v. Vill. of Canton*, 377 F.Supp. 3d 146 (N.D.N.Y. 2019) (zoning law affecting religious freedom subject to strict scrutiny); *Reed v. Town of Gilbert*, *supra* (zoning law imposing sign restrictions subject to strict scrutiny); *Marin v. Town of Se.*, 136 F.Supp. 3d 548 (S.D.N.Y. 2015) (zoning law imposing sign restrictions on political speech subject to strict scrutiny); and *Family Planning Clinic v. Cleveland,* 594 F.Supp. 1410, 1417-18 (N.D. Ohio 1984) (zoning restriction on abortion clinics subject to heightened intermediate scrutiny).

___ U.S. ___, 142 S.Ct. 1464 (2022), both discussed at length in the Club Plaintiffs'
Memorandum of Law in Support of their Motions For Partial Summary Judgment at ECF
pp. 36-41), the holding in *Ashcroft, supra,* is fully applicable here: "[T]he Constitution
demands that content-based restrictions on speech be *presumed invalid* . . . and that *the
Government bear the burden of showing their constitutionality*." (Emphases added.)
*Ashcroft v. ACLU,* 542 U.S. at 660.   Both *Reed* and *Ashcroft* rejected the premise initially
articulated in *Renton* (the case relied on by the City here), that a law should be deemed
content-neutral if it is *justified* based on assertedly content-neutral justifications.

Also, it is no answer to say that Justice Kennedy allowed *intermediate* scrutiny of
adult zoning laws in *Alameda* so therefore the *Renton* test (which also used intermediate
scrutiny) applies.  This is because his idea of the correct intermediate scrutiny test for adult
zoning laws differed significantly from the *Alameda* plurality's (and from *Renton's*) in that
it included his new requirement of "how speech will fare" and that prohibited adult zoning
laws where the justifications did not significantly exceed the need for the restrictions (*i.e.*,
his "proportionality" test).

Consequently, for all the reasons above, the cases relied on by the City (*e.g., Renton*
and the 1989 state court decision which relied on *Renton, Town of Islip v. Caviglia,* 73
N.Y.2d 544 (1989)), are unavailing.

## F.  Supplemental Responses to City's Point I-B (the City's discussion of the state court rulings upholding the 1995 Amendments)

At ECF pp. 33-35, the City emphasizes that the 1995 Amendments were upheld by
the state courts in several pre-*Alameda* decisions.  But the 1995 Amendments allowed

plenty of alternative sites where adult materials and performances could be presented.  The key thing the City fails to mention is that the law before the New York Court of Appeals then *allowed* 60/40 businesses to exist in any part of the City where their non-adult counterparts were allowed, thus ensuring that the 1995 Amendments would not significantly reduce the public's access to expression.  Also, the conditions showing the *need* for the 1995 Amendments were certainly far different from those in existence in 2001 (and certainly those conditions in existence today).  For *both* of these key reasons, the decisions upholding the 1995 Amendments are no longer helpful in assessing the validity of the 2001 Amendments.

### G. Supplemental Responses to City's Point I-C (the City's discussion of asserted sham compliance)

Plaintiffs believe they have already adequately responded to the City's assertion of "numerous" businesses engaging in "sham compliance," so will rely on their briefing in Point I-B herein.

### H. Supplemental Responses to City's Point I-D (the assertion that courts have concluded that Justice Kennedy's *Alameda* concurrence makes no meaningful change in the required analysis of adult zoning laws)[38]

---

[38] Note:  The City's Point I-D (at ECF p. 37) states that "The 2001 Amendments are Constitutional for the Same Reasons the 1995 Regulations Were Found to Be Constitutional," but it appears to be incorrectly labeled.  The City briefed that point in its Point I-B at ECF pp. 33-35 and Plaintiffs have already responded herein.  In fact, however, the City's Point I-D addresses a different point, *e.g.*, recent decisions involving the laws of other cities which discussed the significance of Justice Kennedy's *Alameda* concurrence.  It is that point to which Plaintiffs will respond here.

At ECF p. 37 of the City's SJ Memo, it asserts that "Judge Pauley correctly concluded that Justice Kennedy's concurrence in *Alameda* did not materially alter" the *Renton* framework.  Plaintiffs dispute that Judge Pauley's analysis on this point was correct.  However, since Plaintiffs *prevailed* on their preliminary injunction application, albeit on other grounds, they had no standing to appeal that aspect of Judge Pauley's ruling. That said, and for all the reasons stated both herein and also in support of their prior Motions for Partial Summary Judgment, they believe Judge Pauley was mistaken in his conclusion in this regard.

The City cites only three cases for the conclusion that Justice Kennedy's concurrence in *Alameda* did not effect any significant change from the law as it existed under *Renton*: *Ben's Bar, Inc. v. Village of Somerset, 316 F.3d 702, 721 (7th Cir. 2003),* *Entertainment Productions, Inc. v. Shelby County, 721 F.3d 729, 742 (6th Cir 2013)* and *Center For Fair Public Policy v. Maricopa County, 336 F.3d 1153, 1162-64 (9th Cir. 2003).* A brief analysis will show that these cases do not hold up against the greater weight of authority to the contrary, and two of them in fact actually state, in *dictum*, that Justice Kennedy's *Alameda* concurrence is fully applicable to adult *zoning* laws like the one now before the Court.

First, *Ben's Bar*, possibly the *first* published case discussing the significance of *Alameda*, was not even an adult *zoning* case.  Instead, it involved challenges to only two provisions in an ordinance regulating adult businesses: (1) a provision prohibiting full nudity in adult businesses; and (2) a provision banning alcohol in adult entertainment businesses (*see* 316 F.3d at 706).  (Note: These were not only not adult *zoning* provisions,

but were not even time, place, or manner restrictions.)   While *Ben's Bar* had some discussion of Justice Kennedy's concurrence in *Alameda*, it was purely *dictum* as it did not attempt to apply *Alameda* to any of the locational provisions in the ordinance.  Indeed, its analysis of J. Kennedy's concurrence in *Alameda* suggests that it may well have ruled differently had the court been asked to rule on the validity of the *locational* provisions in the ordinance.[39]  Moreover, the Court's primary reasons for upholding the challenged provisions would have had no application to any locational restrictions (i.e., zoning restrictions): (1) it found that the alcohol ban did not in any way limit the *locations* where speech could occur; and (2) it found that the ban on nudity did not violate the Supreme Court's decisions in two cases involving nude dance prohibitions, *City of Erie v. Pap's AM,* 529 U.S. 277 (2000) and *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560 (1991).

The City's reliance on *Entertainment Productions, Inc.* is equally misplaced.  In that case, just as in *Ben's Bar,* no adult zoning ordinance was at issue.  Instead, the court was analyzing a challenge only to bans on nudity, alcohol, touching entertainers and a license requirement.  *None* of those challenges was to any zoning restriction.

Moreover, the court in *Entertainment Productions* stated that the applicable test was Justice Kennedy's proportionality test and implied that in a proper case, like this one, where the challenged law requires discontinuance of expression, the law would not be upheld.  Quoting from J. Kennedy's opinion in *Alameda*, it acknowledged that a "statute must leave 'the quantity and accessibility of speech substantially intact.'"  721 F.3d at 735.

---

[39] The Court acknowledged that Justice Kennedy required that an adult *zoning* ordinance must "leave the quantity and accessibility of speech substantially undiminished."  *Id.* at 711.

However, it concluded that none of the *challenged* provisions impaired the quantity or accessibility of speech.

Finally, the City's reliance on *Center For Fair Public Policy* is even *less* supportive of the City's position.   In that case the Plaintiffs asserted that Justice Kennedy's proportionality test was not limited to adult *zoning* laws but applied equally to hours of operation restrictions on adult businesses.  All three judges agreed that Justice Kennedy's proportionality test would fully apply to an adult *zoning* law, but a divided panel held that it was not intended to apply outside the zoning context (*see* 336 F.3d at 1161-1163).   On that basis, it upheld the hours of operation restriction there at issue, the only type of law challenged in that case.

Moreover, the Ninth Circuit, in a subsequent case, *i.e., Alameda Books* on remand, subsequently agreed with all three Judges in *Center,* and clarified that adult *zoning* laws must meet Justice Kennedy's test that "[a] city must advance some basis to show that its challenged regulation of adult entertainment businesses has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact."  *Alameda Books, Inc. v. City of Los Angeles*, 631 F.3d 1031, 1037 (9th Cir.2011).  Continuing, the court said:

> Put another way, "[a] city may not assert that it will reduce secondary effects by reducing speech in the same proportion." *Id.* Justice Kennedy reasoned that "[i]t is no trick to reduce secondary effects by reducing speech or its audience." *Id.* at 450, 122 S.Ct. 1728. Applying that principle to the present facts, the concurrence explained that, "the premise [underlying the Ordinance] must be that businesses—even those that have always been under one roof—will for the most part disperse rather than shut down." *Id.* at 451, 122 S.Ct. 1728. Taken as a whole, then, the Supreme Court's *Alameda Books* opinion requires courts to employ the new burden-shifting framework when applying the traditional *Renton* analysis, and

provides that a municipality's justification must not be that its regulation will reduce secondary effects simply by reducing speech proportionately.

*Id.*

Other courts analyzing adult *zoning* laws, have also found Justice Kennedy's test fully applicable.  *See, e.g.,* R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402 (7th Cir. 2004), where an exotic dance club challenged an adult zoning ordinance, arguing that no, or not enough, secondary effects would be eliminated by the ordinance.  The Court of Appeals, applying Justice Kennedy's proportionality test, agreed that the case should be remanded and retried under that test:

> [O]ur inquiry requires us to answer two questions: (1) "what proposition does a city need to advance in order to sustain a secondary-effects ordinance?"; and (2) "how much evidence is required to support the proposition?" *Alameda Books*, 535 U.S. at 449 (Kennedy, J., concurring). Justice Kennedy put forth a proportionality principle to guide courts in answering the first question. He explained that "a city may not assert that it will reduce secondary effects by reducing speech in the same proportion." *Id*. Following this guideline, Justice Kennedy concluded that the rationale of a dispersal statute must be that the targeted businesses will disperse rather than shut down. *Id*. at 451.
>
> Accordingly, Rockford's premise in support of the Ordinance must be that locating Exotic Dancing Nightclubs away from churches, schools, and residential neighborhoods, and separating Exotic Dancing Nightclubs from one another will significantly reduce negative secondary effects that occur when there is a concentration of adult uses in an area without substantially diminishing the availability of speech.

361 F.3d at 410-411.

Justice Kennedy's proportionality test was also used in analyzing an adult zoning law in *New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556 (7th Cir. 2009), allowing a preliminary injunction against enforcement of an adult zoning law to remain in place pending trial because the city had not yet made an adequate showing under the

50

*Alameda* plurality's "shoddy evidence" test, and clarifying that, on remand, the city must also show compliance with Justice Kennedy's requirement that "the reduction in adverse secondary effects may not be achieved just by curtailing speech." [40]

Here, the stipulated facts are that "[a]ll of the [Club Plaintiffs'] eating and drinking establishments would have to close or relocate if the 2001 Amendments are allowed to take effect" (CSF ¶ 174), that there are not enough legally permissible relocation sites in Manhattan for the businesses that will have to close (CSF ¶ 175), much less commercially viable sites (CSF ¶ 144), none of the Club Plaintiffs would be willing to relocate if the 2001 Amendments are upheld (*see* the declarations filed on behalf of all the plaintiff clubs [41]), and in the 21+ years since the 2001 Amendments have been in effect, the proof that the closure of Plaintiffs' businesses would reduce expression is that none of the assertedly permissible relocation sites offered by the City in the outer boroughs have in fact ever been

---

[40] *See also Annex Books, Inc. v. Indianapolis*, 581 F.3d 460 (7th Cir. 2009), reversing a summary judgment award to a city in a challenge to an hours of operation restriction on adult businesses, citing Justice Kennedy's opinion in *Alameda* and holding that "to prevail, the City needs evidence that the restrictions actually have public benefits great enough to justify any curtailment of speech." *Id.* at 462.

[41] *See* Doc. 157 (Talla Declaration) in Club at 60th v. New York, 02 CV 8333 at ECF p. 2, ¶ 4; Doc. 171 (Warech Declaration) in 689 Eatery Corp. v. New York, 02 CV 4431 at ECF p. 2, ¶ 6; Doc. 138 (Lipsitz Declaration) in 59 Murray Enterprises v. New York, 02 CV 4432 at ECF p. 3, ¶ 6; and Doc. 139 (D'Amico Declaration) in 59 Murray Enterprises v. New York, 02 CV 4432 at ECF pp. 2-3, ¶¶ 6-7.

PRG8622.docx

*developed* by any adult eating or drinking establishments.  In short, time has proven that the 2001 "experiment"[42] won't work!

Accordingly, the City's position, *at best*, is that the 2001 Amendments were intended to reduce secondary effects (which were presumed but unproved as to 60/40 businesses *and,* in any event were comparatively insignificant by 2001 and now appear even less significant) simply by reducing speech in the same proportion.  Regardless of whether the 2001 Amendments may validly be applied to locations which never previously housed adult businesses (an issue not presented in this case), under Justice Kennedy's test, the removal of a majority of *existing* businesses, unless *substantially* outweighed by a reduction in secondary effects, is clearly impermissible.

In any event, the cases cited by the City do not support its position that Justice Kennedy's "proportionality test" is anything other than fully applicable to adult zoning restrictions.

## I. Supplemental Responses to City's Point I-D-1 (the assertion that the 2001 Amendments are content-neutral)

At ECF p. 38 of the City's SJ Memo, it makes the now-unsupportable assertion that the 2001 Amendments are "content-neutral," citing only Judge Pauley's preliminary injunction ruling in support.  That opinion, however, did not mention the significance of

---

[42] *Renton*, quoting from the Court's original adult zoning case, *Young v. American Mini Theaters, Inc.*, 427 U.S. 50, 71 (1976), noted that cities "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." 475 U.S. at 52.

*This* particular adult zoning law, however, is beyond the "experiment" stage, as we have had 21 years to see whether the sites offered by the City are likely to in fact be developed by adult clubs.

Justice Kennedy's controlling opinion in *Alameda* saying that adult zoning laws should be called content-based[43] (and a majority agreeing that they should no longer be called content-neutral,[44]) and then the Supreme Court's decision in *Reed*, *supra,* which clarified that laws which single out expressive uses *on their face* are content-based *regardless* of whether they may have content-neutral justifications:

> A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of "animus toward the ideas contained" in the regulated speech.

576 U.S. at 156.

Moreover, Judge Pauley's opinion was written before the Supreme Court decided *City of Austin v. Reagan, supra,* which reaffirmed *Reed's* definition of content-based, reasoning that a law is not content-based unless (like the 2001 Amendments) on its face it "single[s] out any topic or subject matter for differential treatment." 142 S.Ct. at 1472.

Given this overwhelming weight of controlling authority, there can no longer be any reasonable doubt that adult zoning ordinances are content-based.

---

[43] 535 U.S. at 448 (Kennedy, J.)

[44] As stated in *Center For Fair Public Policy, supra,* 336 F.3d at 1161:

[Justice Kennedy] agreed with the four dissenting justices that sexually-oriented business regulations should no longer be designated as "content neutral" when they were clearly not. Whether a statute is content based or content neutral, he explained, "is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *Id.* Classifying regulations of the type at issue in *Renton* and *Alameda Books* as content neutral, explained Justice Kennedy, was an unhelpful legal fiction which only leads to doctrinal incoherence; these types of ordinances "are content based and we should call them so." *Id.*

**J. Supplemental Responses to City's Point I-D-2 (the assertion that the 2001 Amendments are narrowly tailored to achieve a substantial governmental interest)**

The City relies on a rejected test to conclude that the 2001 Amendments are "narrowly tailored." Specifically, it asserts that in order to demonstrate that the challenged provisions are "narrowly tailored," "the City need only demonstrate that the 2001 Amendments promote the City's interest in reducing secondary effects more efficiently than if they did not exist." City's SJ Memo at ECF p. 38. While Judge Pauley's preliminary injunction ruling did say that (*see* 408 F.Supp. at 465), that is very clearly the wrong standard.[45] Under that incorrect standard, a city could validly enact an ordinance banning adult entertainment businesses *everywhere* in a city, or could impose a jail sentence on anyone who violates a broad ordinance prohibiting all peaceful protest gatherings throughout a city at all times and in all places, the latter based merely on an indisputable claim that traffic congestion and litter would be reduced less efficiently in the absence of that law. Such a test is clearly not one which looks to see if a law is actually *narrowly tailored.* [46]

---

[45] Even before *Alameda Books,* the Supreme Court clarified that the portion of the narrow tailoring test excerpted by Judge Pauley was only *part* of the test, not the whole test. *See Turner Broadcasting System, Inc. v. F.C.C.,* 520 U.S. 180, 189 (1997), which said:

A content-neutral regulation will be sustained under the First Amendment if it advances *important* governmental interests unrelated to the suppression of free speech *and does not burden substantially more speech than necessary* to further those interests. (Emphases added.)

[46] Or a city could allow disfavored businesses (e.g., adult entertainment businesses) or religious institutions (mosques) engaging in protected expression to only operate for one hour a day, between four and five a.m., again on a traffic reduction rationale.

Moreover, such a standard is *directly* in conflict with Justice Kennedy's controlling opinion in *Alameda* which says that an adult zoning law may not reduce secondary effects by merely reducing speech in the same proportion. Such a law is simply not "narrowly tailored."

Also, the City's description of the legal challenges in *Alameda Books* (*see* City's SJ Memo at ECF p. 40) is significantly incomplete.[47] The primary challenge of the *Alameda* plaintiffs was not that the City had failed to do a new study to support its "two uses" ordinance (though that challenge was made), but, rather that the City's adult zoning ordinance already prohibited all adult uses from locating within 500 feet of any residence, so that provision already sufficiently ameliorated any claimed secondary effects. That being the case, additionally banning adult bookstores from containing video booths was unnecessary for protection of any surrounding neighborhoods. In short, the restriction had a drastic impact in restricting expression, but was not narrowly tailored to further any *significant* governmental interest. Justice Kennedy then addressed this concern in adopting his proportionality test, concluding that the justification for an adult zoning ordinance must always be *significantly greater* than whatever impact it has in reducing expression, stating that a "promised proportional reduction does not suffice." 535 U.S. at 451.

## K. Supplemental Responses to City's Point I-D-3 (the assertion that the 2001 Amendments afford ample alternative means of communication)

The Club Plaintiffs will rely on their briefing of this issue in Point I-D herein.

---

[47] Undersigned counsel, Mr. Garrou, is well aware of this because he represented Alameda Books in all proceedings up to and including those in the Supreme Court.

**L.  Supplemental Responses to City's Point I-D-4 (the assertion that the cases of *Reed* and *Ward v. Rock Against Racism* are not persuasive)**

At ECF p. 50 of its SJ Memo, the City first takes issue with Plaintiffs' alternative reliance on *Reed v. Town of Gilbert,* observing that two courts (*see Free Speech Coal. Inc. v. AG United States*, 825 F.3d 149, 161 n.8 (3d Cir. 2016), and *BBI, Inc. v. City of Angola,* 809 F.3d, 317, 326 n.1 (7th Cir. 2015)) have asserted (one, *BBI,* as part of its holding and one, *Free Speech Coalition,* as *dictum*) that *Reed's* broadly stated strict scrutiny principles should not be applied to adult zoning laws.  The City leaves out that another Court of Appeals (the Fifth Circuit) has decidedly ruled otherwise, and expressly abrogated several prior decisions on that basis.  *Reagan National Advertising v. City of Austin*, 972 F.3d 696, 702-04 (5th Cir. 2020), *rev'd on other grounds, Austin, supra,* 142 S.Ct. 1464.  Rather than submitting duplicate briefing, Plaintiffs will simply refer the Court to their prior briefing of this point in the Club Plaintiffs' Memorandum of Law in Support of Motions For Partial Summary Judgment (filed in all cases on September 16, 2022) at ECF pp. 52-53.

However, it suffices to say that the question of whether adult zoning laws are subject to strict scrutiny is currently an open one.  But even more so, if they are *not* subject to traditional strict scrutiny, a comparison of *Reed* and Justice Kennedy's concurrence in *Alameda Books* strongly suggests that something considerably *more* than *traditional* intermediate scrutiny clearly applies, *e.g.,* not only a careful examination of "how speech will fare" (535 U.S. at 450) and whether the regulation will leave both "the quantity and accessibility of speech substantially intact" (*id.* at 449), but also the requirement that a mere "proportional reduction [of secondary effects] does not suffice (*id.* at 451).  Those elements

are *not* part of any traditional test of intermediate scrutiny, *i.e.,* the test applicable to content-*neutral* time, place or manner regulations.

Finally, the City also takes issue even with Plaintiffs' fall-back argument that the 2001 Amendments are also subject to invalidation under the less rigorous test of content-*neutral* time, place or manner restrictions announced in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989).  That test, as stated in *Ward* (*id.* at 800 and 802)*,* and repeated later in *Turner* (*see* n.45, *supra*)*,* requires invalidation of even content-neutral time, place or manner restrictions if they are *substantially broader than necessary* for eliminating targeted secondary effects.

It is one thing to propose that the tests for content-based adult zoning laws are not entitled to *Reed's* test of strict judicial scrutiny, but another thing entirely to assert that they are not even entitled to the minimal constitutional requirements generally applicable to those time, place or manner restrictions which are actually content-neutral.  Such an approach is surely unsustainable, particularly following Justice Kennedy's concurrence in *Alameda Books* clarifying that the more traditional type of intermediate scrutiny claimed by the *Alameda* plurality did not go far enough.

## M. Supplemental Responses to City's Point II (the assertion that the City's permitting procedures are constitutional)

The Club Plaintiffs' primary briefing of this point is in Point II of the Club Plaintiffs' Memorandum of Law in Support of Motions for Partial Summary Judgment filed in all four cases on September 16, 2022.  What follows are supplemental responses to specific points asserted in the City's SJ Memo.

In n. 11 at ECF p. 52 of its SJ Memo, the City says the "the permitting procedures plaintiffs challenge are entirely separate and apart from the 2001 Amendments" and "[c]onsequently the constitutionality of the permitting procedures is not dependent on the constitutionality of the 2001 Amendments, and vice versa."  While this statement is true as far as it goes, the *enforceability* of the 2001 Amendments *is* dependent on there being constitutional procedures in place for the permitting and vesting of adult entertainment uses.  This is because an adult zoning ordinance forcing discontinuance of an existing use cannot be enforced unless a constitutional scheme is in place for the establishment of new or relocating adult uses.   In the absence of such a scheme, there is no "reasonable opportunity" to establish an adult use, as required by *City of Renton v. Playtime Theaters, supra,* 475 U.S. at 54,[48] and the zoning scheme is unenforceable until such obstacles to relocating are fixed. [49]

The City also argues that certain challenged aspects of the City's permitting procedures will assertedly not be applicable in the future should the 2001 Amendments be upheld.  (These are its previous discriminatory prohibition of self-certification of building permit applications only by architects for adult uses, and a requirement to have general

---

[48] "The *First Amendment* requires . . . that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city." *Id.*

[49] If Plaintiffs are correct that the City's permitting provisions as applied to adult uses are constitutionally deficient for lacking adequate and enforceable time limits, etc., the only effective relief would be to enjoin the zoning provisions which require them to close or relocate, with the enforceability deferred until such time as the City amends its permitting procedures to meet constitutional requirements.  That is because a federal court lacks jurisdiction to authoritatively construe state legislation by creating new time limits or enforceability provisions in order to cure constitutional deficiencies.  *U.S. v. Thirty-Seven Photographs*, 402 U.S. 363, 369 (1971).  That is solely a task for a legislative body.

PRG8622.docx

counsel review adult business permit applications prior to their consideration by DOB). *Id.* at ECF 52. As to the first point (*i.e.*, the unequal self-certification point), the City's repeal of that discriminatory provision has removed that issue from the case and none of the challenges in Plaintiffs' Partial Summary Judgment memo are based on that argument. With respect to the City's latter point (*i.e.*, the point involving general counsel review), the City reiterates it in more detail later in its brief, and Plaintiffs will respond to that point *infra*.

Next, Plaintiffs agree with the City's assertion (at point (2) at the top of ECF p. 53 of the City's SJ Memo) that the Plaintiffs would not have standing to challenge the City's permitting and vesting provisions if the Court otherwise finds the 2001 Amendments unenforceable. So, for example, that is why the Club Plaintiffs' partial summary judgment motions are stated in the alternative. *See* Club Owner Plaintiffs' Joint Memorandum of Law in Support of Their Motions For Partial Summary Judgment ("P's PSJ Memo") at ECF p. 12. The Club Plaintiffs clarified that they first seek an injunction against enforcement of the 2001 Amendments due to the unconstitutionally discriminatory mandatory termination requirements applicable only to adult non-conforming uses and no other non-conforming uses. Then, they expressly stated that they challenge the permitting and vesting provisions only in the alternative, in the event they fail in their challenge based on the mandatory termination provisions.

Likewise, if Plaintiffs prevail on any of their *other* direct challenges to the 2001 Amendments (*see* the additional challenges stated in their current cross motions for summary judgment), that would *also* render their permit challenges moot. Accordingly,

Plaintiffs clarify that their permitting and vesting challenges are likewise raised only in the *alternative* to the claims in their Cross Motion for Summary Judgment.

However, the City appears to reach the unsupportable conclusion that this fact somehow supports its assertion that Plaintiffs' permitting and vesting claims are somehow moot.[50]  To the contrary, this demonstrates that the City concedes that those challenges are *fully justiciable* in the event the 2001 Amendments are upheld and found applicable to Plaintiffs.

## N. Supplemental Responses to City's Point II-A (the assertion that Plaintiffs' Permitting Challenges are Moot)

At ECF p. 53 of its SJ Memo, the City claims that its Buildings Bulletin ("BB") 2020-005, issued on April 2, 2020 (JNR Exhibit 17) renders moot Plaintiffs' complaint that the permitting procedures are unconstitutional because review of adult business building permit applications (and/or requests for preliminary approval of construction documents) by DOB's general counsel prior to ultimate review by DOB officials is not subject to any specified and brief time limits.  However, for *several* reasons, that is clearly not the case. (And, moreover, the City does not explain, or even assert, how BB 2020-005 could possibly render Plaintiffs' challenges to the City's adult use *vesting* provisions moot.)

First, as is made clear from the Club Plaintiffs' Partial Summary Judgment Motions and briefing, the problem of General Counsel reviews of unlimited duration, prior to DOB's own staff review of adult use building permit applications and requests for

---

[50] City's SJ Memo at ECF p. 53.

construction document approvals was only one of *several* fatal constitutional flaws in the City's scheme for permitting and vesting of adult uses which Plaintiffs have identified,[51] so even if BB 2020-005 cured that one problem (which it decidedly *didn't* as shown below), it could not possibly render Plaintiffs' *other* challenges to the permitting and vesting schemes moot.

Second, BB 2020-005 only states that "routine" review by DOB's general counsel is no longer "required" ("Applications that propose Adult Establishments *need not* be subject to *routine* review by the Department's General Counsel."  Emphases added.)  Not only does this fail to *prohibit* such review and delay, it in fact *affirmatively authorizes* DOB to proceed in this manner whenever DOB deems it to be a non-routine case.  While there is no problem with DOB general counsel reviewing a business' permit application when DOB staff deem it necessary, the failure of that BB or any other written provision to provide strict and enforceable written time limits for such review,[52] or to state that the total time for review by DOB may not be increased by any time taken for review by its general counsel, renders the procedure constitutionally defective in its application to adult uses.[53]

---

[51] For example, *see* the following points briefed in P's PSJ Memo: Point II-B (the "sensitive use veto" problem), Point II-C-3-a (the lack of any time limits for DOB to issue the permit), Point II-C-3-b (lack of time limits for resolving post-issuance pre-opening recission or revocation proceedings); Point II-C-3-c (lack of an effective remedy for enforcement of any time limits), and Point II-D (unbridled *substantive* discretion to initiate revocation or recission proceedings).

[52] *See* CSF ¶ 93: "There are no published time limits for the preliminary review of building permit applications by DOB Legal counsel."

[53] And, as noted *supra*, a federal court lacks jurisdiction to authoritatively construe a state or local provision to include any safeguards not contained on its face.

As such it is remarkably similar to the fatal defect in *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215 (1990), where the Court struck down Dallas' permit requirement for adult businesses because, even though there was a 30 day deadline for review by the permit issuer (the Chief of Police), the permit could not be approved until other agencies had also approved it and there was no time limit for those other agencies to act.

> Although the ordinance states that the "chief of police shall approve the issuance of a license by the assessor and collector of taxes to an applicant within 30 days after receipt of an application," the license may not issue if the "premises to be used for the sexually oriented business have not been approved by the health department, fire department, and the building official as being in compliance with applicable laws and ordinances." § 41A-5(a)(6). Moreover, the ordinance does not set a time limit within which the inspections must occur.

*Id.* at 227.

And this discretion for General Counsel review of unlimited potential duration is a particular concern given the City's proven history that review by DOB Counsel has always occurred *before* DOB does its own review of a permit application (*see* CSF ¶¶ 89 and 90), that adult use permit applications (and no others) were put "on hold" pending any review by DOB General Counsel (CSF ¶ 94), and that when DOB General Counsel has reviewed adult permit applications, it almost always takes far longer than any asserted time limit for DOB to act, *e.g.*, it has typically taken General Counsel a minimum of 3-4 months.[54]

---

[54] *See* ¶¶ 30-31 of Declaration of Michael Berzak in Support of Permitting Issues Presented in Plaintiffs' Motion For a Preliminary Injunction (2018 Berzak Permitting Declaration) filed on November 21, 2018, as part of Notice of Filing of Plaintiffs' Joint Appendix Volume 4 in Support of Plaintiffs' Motion for Preliminary Injunction (Doc. 62 in case no. 02-cv-8333) at ECF p. 90.

PRG8622.docx

## O. Supplemental Responses to City's Point II-B (the assertion that Plaintiffs lack standing to bring a facial challenge to the permitting and vesting procedures)

In Point II-B of the City's SJ Memo it asserts that Plaintiffs lack standing to bring a facial challenge to its permitting and vesting scheme because "the permitting procedures applicable to adult establishments once the 2001 Amendments become enforceable will be identical to those generally applicable to all establishments …."[55]  ECF p. 54.  As briefed at length in Point II-C-1 and 2 of the Club Plaintiffs' PSJ Memo (*see* ECF pp. 70-77), even if BB 2020-005 takes effect, a whole host of other problems render the permitting and vesting scheme more onerous on adult businesses than others[56] and, according to the Supreme Court's decision in *FW/PBS, Inc. v. Dallas, supra,* when that is the case, even what appears to be a facially neutral licensing scheme is subject to facial challenge:

> "The city asserted at oral argument that it requires every business - without regard to whether it engages in First Amendment-protected speech - to obtain a certificate of occupancy when it moves into a new location or the use of the structure changes. Tr. of Oral Arg. 49; see also App. 42, Dallas City Code § 51-1.104 (1988) (certificate of occupancy required where there is new construction or before occupancy if there is a change in use). Under the challenged ordinance, however, inspections are required for sexually oriented businesses whether or not the business has moved into a new structure and whether or not the use of the structure has changed. Therefore, even assuming the correctness of the city's representation of its "general" inspection scheme,

---

[55] The City even goes so far as to say that the "*current* permitting procedures . . . are the same permitting procedures applicable to all establishments …."  City's SJ Memo at ECF p. 55. That contention is, however, absurd because, according to the City, it is *currently* only the architects for *adult* businesses which are prohibited from self-certifying their building permit applications.  *See* CSF ¶¶ 70-72 at ECF p. 35.

[56] As discussed in detail in Plaintiffs' PSJ Memo, these include: (1) it is more onerous in getting initial construction document approvals and permit issuance because of the unique (and proven) time-consuming problems related to determining zoning compliance (*see* Plaintiffs' PSJ Memo at ECF pp.74-76) and (2) it is more onerous in using unique zoning issues to cause post-issuance delays of unlimited duration, including those based on unsubstantiated complaints (*see id.* at ECF pp. 76-77).

> *the scheme involved here is more onerous with respect to sexually oriented businesses than with respect to the vast majority of other businesses.* For example, inspections are required whenever ownership of a sexually oriented business changes, and when the business applies for the annual renewal of its permit. *We, therefore, hold, as a threshold matter, that petitioners may raise a facial challenge to the licensing scheme*, and that as the suit comes to us, the businesses challenging the scheme have a valid First Amendment interest.

*Id.* at 225 (emphases added).

Moreover, *FW/PBS* held that a permit requirement for adult businesses which, on its face, had a 30 day time limit for permit issuance by the chief of police, could be challenged *on its face* for lack of adequate time limits, where the claim was that *other* agencies (including the building department) needed to approve the permit, and the procedures governing those other agencies did not meet the heightened procedural requirements applicable where a permit is a prerequisite to engage in constitutionally protected expression.

Since approval by DOB is required before an adult use may be established, and because the DOB procedures apply in a more time-consuming and onerous manner to adult businesses than others, *FW/PBS* clearly gives Plaintiffs standing to bring a facial challenge to the City's permitting procedures.

Furthermore, Plaintiffs also clearly have standing to challenge the City's *vesting* procedures for adult uses.  The City did not even *brief* this issue.

The vesting provisions come from 1 New York City Rules (RCNY) § 9000-01 and, they unquestionably create a scheme which allows the singling out of adult businesses for more onerous treatment.  For just the most basic and obvious example, a church may obtain

a DOB vesting permit even if it locates next to an already vested and existing adult business.  But an adult use cannot be established and vest near an already permitted church.

Moreover, because of the requirement for a uniquely complicated zoning analysis,[57] an adult use permit applicant will routinely require several weeks, if not months, to get the permit needed to vest its site,[58] but a church or school can get that vesting approval in less than a week (and often in as little as two or three days – *see id.* and ¶ 28 of Berzak's 2022 PSJ Declaration at ECF p. 9).

Lastly, the City, not having the benefit of Plaintiff's Partial Summary Judgment briefing, incorrectly asserts that "plaintiffs do not allege that the building permitting procedures vest DOB with unbridled discretion in issuing permits." However, this is not the case.  *See* Point II-D of Plaintiffs' PSJ Memo (at ECF p. 71-73) and ¶¶ 18, 22-26, 29-32, and 36-41 of Berzak's 2022 PSJ Declaration (starting at ECF p. 6), which demonstrate that DOB officials have unlimited *substantive* discretion to rescind permit approvals prior to issuance of a certificate of occupancy or the opening of an adult business without even a requirement that they have a "reasonable" belief that the permit initially issued in error,

---

[57] For example, before zoning can be approved for an adult use, accurate measurements must be made to all sensitive uses and other adult uses.  Also, a determination must be made whether all potentially disqualifying other uses are in fact validly existing and permitted as such so as to disqualify a new adult use within 500 feet.  As the Declaration of Michael Berzak in Support of Club Plaintiffs' Motion For Partial Summary Judgment ("Berzak's 2022 PSJ Declaration) filed in all four actions on September 16, 2022, made clear, this seemingly simple determination can take the City *months* since there are no time limits on its completion.  In contrast, there are no such time-consuming requirements for a church or school to obtain zoning approval.

[58] *Id*.

and that such discretion results in additional and very significant additional delays in the issuance of a final certificate of occupancy to a proposed adult use.

As the City itself points out, the Second Circuit has held that "facial challenges to facially neutral licensing regulations may be permitted" where the statute vests "unbridled discretion in a government official over whether to permit or deny expressive activity." *See* City's SJ Memo at ECF pp. 56-57, quoting from *Dean v. Town of Hempstead*, 527 F.Supp.3d 347, 410 (E.D.N.Y. 2021), which, in turn references *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 193 (2d Cir. 2006).

Here, Plaintiffs have demonstrated that the City can rescind permits prior to opening of an adult business without even a requirement of a "reasonable belief" that the permit issued in error, thereby giving government officials "unbridled discretion . . . over whether to permit or deny expressive activity." *Id.* Again, *see* Plaintiffs PSJ Memo at Point II-D (ECF pp. 71-73) and Point II-C-3-b at ECF pp. 68-69, ¶ 12 of the Supplemental Joint Statement of Facts filed in all four actions on September 8, 2022 (Doc. No. 153-1 in case no 02-cv-8333) at ECF p. 4), and Berzak's 2022 PSJ Declaration, documenting how DOB temporarily rescinded a permit to Sapphire 2 (and even *repeated* this groundless accusation at a different stage of the permitting process) based on an anonymous complaint that there was a disqualifying house of worship nearby, even though the City's 1 RCNY § 9000-01(b)[59] makes clear that only a *permitted* house of worship can disqualify a proposed adult use within 500 feet, and even though prior DOB officials (and the City

---

[59] JNR Exhibit 75.

Attorney's office) had repeatedly concluded that the asserted house of worship was *not* in fact a permitted house of worship, and any reasonable investigation would have quickly revealed that it did not have a permit as a house of worship prior to the time Sapphire 2 had been issued *its* permit.

## P. Supplemental Responses to City's Point II-C-1 (the assertion that the City's permitting procedures are not subject to strict scrutiny)

At ECF p. 45 of its SJ Memo, the City mischaracterizes Plaintiffs' challenge to the City's permitting requirements as being an assertion that such requirements are subject to "strict scrutiny." However, not only have Plaintiffs not made that argument, but the relevant legal analysis of licensing laws affecting expression is not one of strict scrutiny, intermediate scrutiny or even rational basis scrutiny as it does not focus on whether laws are "content-based" or "content-neutral." Rather such laws are analyzed to see if they act as prior restraints on expression and, if they do, they trigger the heightened substantive and procedural safeguards applicable to prior restraints. *See FW/PBS v. Dallas, supra,* 493 U.S. at 222-23 which noted the distinction in these two modes of analysis:

> Because we conclude that the city's licensing scheme lacks adequate procedural safeguards, we do not reach the issue decided by the Court of Appeals whether the ordinance is properly viewed as a content-neutral time, place, and manner restriction aimed at secondary effects arising out of the sexually oriented businesses.

*Id.* at 223.

Continuing, the Court explained that permitting requirements applicable to expressive uses must contain both *substantive* and *procedural* safeguards to insure that they do not allow the opportunity for indirect censorship:

PRG8622.docx

> Our cases addressing prior restraints have identified two evils that will not be tolerated in such schemes.  First, a scheme that places "unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 757 (1988).  See *Saia v. New York*, 334 U.S. 558 (1948); *Niemotko v. Maryland,* 340 U.S. 268 (1951); *Kunz v. New York,* 340 U.S. 290 (1951); *Staub v. City of Baxley,* 355 U.S. 313 (1958); *Freedman v. Maryland,* 380 U.S. 51 (1965); *Cox v. Louisiana,* 379 U.S. 536 (1965); *Shuttlesworth v. Birmingham, supra; Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947 (1984). "'It is settled by a long line of recent decisions of this Court that an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official -- as by requiring a permit or license which may be granted or withheld in the discretion of such official -- is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.'" *Shuttlesworth, supra,* at 151 (quoting *Staub, supra,* at 322).

> Second, a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible.  *Freedman, supra,* at 59; *Vance v. Universal Amusement Co.,* 445 U.S. 308, 316 (1980) (striking statute on ground that it restrained speech for an "indefinite duration").

*Id.* at 225-226.

The question the Court had to resolve in *FW/PBS* was whether the Dallas scheme functioned as a prior restraint, thus triggering a requirement to contain these substantive and procedural safeguards.  The Court concluded that the lack of time limits on the building department and other departments which were required to approve the permit, combined with the fact that the time needed for obtaining such approvals was longer for adult businesses than others (due to the need for additional inspections), caused the permit requirement to function as an impermissible prior restraint.  That is the essence of Plaintiffs' permitting challenge here.

To the same effect, *see* the Sixth Circuit's treatment of this issue in *H.D.V.-Greektown, LLC v. City of Detroit,* 568 F.3d 609, 617 (6th Cir. 2009):

> The district court correctly noted that in cases where, as here, businesses protected by the First Amendment must apply for special zoning approval as a condition of operating, this renders the zoning scheme equivalent to a licensing process that effectuates a prior restraint upon protected expression. *See Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1361-1362 (11th Cir. 1999) (finding standing where the plaintiff alleged that the zoning scheme in question functioned as a prior restraint on adult businesses). Facial challenges are appropriate in such situations because "every application of the [law] creates an impermissible risk of suppression of ideas." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223-24 (1990).

## Q. Supplemental Responses to City's Point II-C-2 (the assertion that the City's permitting procedures need not include time limits on their face to the extent they apply to adult businesses)

In Point II-C-2 of its SJ Memo, the City asserts that its permitting system is not even *required* to have time limits, relying primarily on the Supreme Court's decision in *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002). However, *Thomas* has no impact whatsoever on the present case, as the City's own quotation from *Thomas* makes clear:

> We have never required that a *content-neutral* permit scheme regulating speech *in a public forum* adhere to the procedural requirements set forth in *Freedman*.

City's SJ Memo at ECF p. 60 (emphases added).

For *two* reasons, both clear from the City's own quote, *Thomas* is inapplicable here: (1) *Thomas* was addressing only regulations applicable to a city's regulations of its own limited amount of space which it makes available to the public as a public forum; and (2) the regulations in *Thomas* were in fact content-neutral.

69

Here, the City's permit requirements apply to all privately owned businesses conducted inside buildings on privately owned land. The City cites no case suggesting that it has the right or power to use permits to deprive persons from expressing their constitutional rights in such private circumstances absent a permitting system that provides the substantive and procedural safeguards that protect against the possibility of censorship.

Second, even entirely apart from the fact that *Thomas* does not purport to apply outside the public forum circumstance, *Thomas* is inapplicable because DOB's permitting system is *not* in fact content-neutral. This is because it is the mechanism by which the City enforces its clearly content-based adult zoning restrictions. And, worse yet, it is those zoning restrictions which cause the permitting procedure to take much longer for adult businesses than all others. In short, that was the same type of defect which caused the ordinances in *FW/PBS, H.D.V.-Greektown* and *Lady J. Lingerie* to be subject to facial challenge for lacking adequate time limits.

Lastly, none of the lower court cases cited by the City as following *Thomas* support its position here. The Second Circuit case, *Field Day, LLC v. County of Suffolk,* 463 F.3d 167 (2d Cir. 2006), was, like *Thomas,* a truly content-neutral regulation of a public forum on land owned by the public; *Granite State Outdoor Adver., Inc. v. City of St. Petersburg,* 348 F.3d 1278 (11 Cir. 2003), though not a regulation of land owned by the city, was a truly content-neutral regulation regulating outdoor advertising signs visible to the public. Unlike an adult zoning scheme, it did not impose more burdens to getting a permit on signs advertising one type of content than on any other; and *Covenant Media of S.C. v. City of*

70

*South Charleston*, 493 F.3d 421 (2007), just like *Granite State,* was merely another content-neutral regulation of advertising signs.

The City's other two cited cases, S.*Or. Barter Fair v. Jackson County*, 372 F.3d 1128 (9th Cir. 2003) and *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009), are also inapplicable.

In *Jackson County*, the court applied *Thomas,* rather than *FW/PBS,* to a truly content-neutral requirement that those conducting "outdoor mass gathering[s]" (defined as involving a minimum of 3,000 people) must obtain a county permit in order to do so. There was no suggestion that those engaged in any one particular type of expression were subject to delays not common to all such permit applicants.

*H.D.V.-Greektown* is the more interesting case. There the court heard *two* appeals*,* one asserting that the City's *zoning* restrictions were facially invalid for failure to contain adequate time limits for issuing permits to adult businesses, and the other asserting that the City's *sign* permit requirements were facially invalid for failure to contain adequate time limits for issuing such permits. The court there noted and did not dispute the district court's conclusion that the *FW/PBS* time limits did apply to the zoning provisions and concluded that once such a finding is made, it required issuance of a permanent injunction to prevent enforcement of the *zoning* requirements. In contrast, it applied *Thomas* in concluding that the *sign* permit requirements were content-neutral and therefore need not contain the otherwise required time limits.

However, the permitting restrictions in the present case are content-based because they enforce a zoning scheme which has been demonstrated to be more onerous and time

consuming for adult businesses than all others.[60]  Thus, *H.D.V.-Greektown* favors Plaintiffs, not the City.[61]

## R. Supplemental Responses to City's Point II-C-3 (the assertion that the City's permitting procedures satisfy *FW/PBS's* time limit requirements)

The City's SJ Memo is telling, both in connection with what it does and does not say about its assertion that even if *FW/PBS* applies, its permitting scheme meets any required time limit requirements.

First, it does *not* say that there are any time limits for review of adult business permit applications by DOB's general counsel (and in fact stipulates that there are *no* such time limits[62]).  Second, it admits that it has never subjected any *other* types of permit applications to such preliminary general counsel review.[63]  Third, it admits that such review by DOB's general counsel, when it has occurred, has always been performed *prior* to any consideration of the adult business' application by DOB itself.[64]  Lastly, it is clear on its

---

[60] Again, *see* Plaintiffs' PSJ Memo at ECF pp. 73-77, Berzak's 2018 Permitting Declaration, Berzak's 2022 PSJ Declaration, and nn. 56 and 57, *infra*.

[61] However, even looking solely at its analysis of the sign permit issue (*see* 568 F.3d at 620-623), *H.D.V.* noted that its conclusion to apply the standards of *Thomas* rather than *FW/PBS* was in contrast to the Eleventh Circuit's reasoning in *Solantic, LLC v. City of Neptune* Beach, 410 F3d 1250, 1266 (11th Cir. 2005), which found a Neptune Beach sign ordinance to in fact be content-based.  However, it now appears that *Solantic* provided the proper analysis, given the Supreme Court's conclusion in *Reed v. Town of Gilbert,* discussed *supra,* rejecting the notion that such signage restrictions should be analyzed as content-neutral restrictions.

[62] *See* CSF ¶ 93 at ECF p. 40.

[63] *See* CSF ¶ 94 at ECF p. 40.

[64] *See* CSF ¶¶ 89-90 at ECF p. 40.

face that Buildings Bulletin 2020-005[65] still gives the City discretion, when it elects to exercise it, to impose the same type of pre-DOB review by its general counsel that it used to always require in every case. All BB 2020-005 accomplished was to remove the *mandatory* pre-review by DOB general counsel, but actually *expressly guaranteed* the City's right to impose it any time, in its unfettered discretion, it deemed an application to be non-"routine."  That is the *epitome* of an impermissible discretionary licensing scheme and cannot stand under *FW/PBS*.

Next, the parties agree that obtaining a building permit is a two-stage process.  One must first obtain DOB approval of their construction documents before they may then seek issuance of their building permits.  *See* CSF ¶ 102 at ECF p. 41.

The City also stipulates that DOB previously had a deadline set forth in New York City Administrative Code § 27-144, which has since been rescinded, of 40 days for issuing a building permit following approval of the plans submitted in connection with a building permit application (CSF ¶ 100) and that it was not replaced with any new deadline (CSF ¶ 101).  The City has in fact *stipulated* that there is no longer any fixed time limit for issuance of building permits which is binding on DOB.   CSF ¶ 103.

Given that fact, the City's only argument is that it still has a 40-day time limit for approval of plans (aka "construction documents") and that its failure to have a written and binding time-limit for issuance of an actual *building permit* (the only thing which would trigger vesting of an adult use against a nearby house of worship, school or other adult use)

---

[65] Discussed at length *supra*.

should be excused because, in *most cases,* it issues the building permit shortly after approval of the construction documents.

But that is precisely the reason for the constitutional requirement of binding written time-limits.  No one is concerned with DOB's actions in the "average case."  The purpose of the time limit requirement is to ensure that licensing officials do not have discretion, in the exceptional case, to deviate from their normal practice in order to adversely impact an expressive business.

As the Supreme Court explained in *United States v. Stevens* 559 U.S. 460, 480 (2010):

> [T]he First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.

### S.  Supplemental Responses to City's failure to demonstrate any effective ordinance-provided remedy if DOB fails to meet what few time limits it has.

The City's SJ Memo does not describe or assert any ordinance-provided remedy for an adult business permit applicant (or any other applicant for that matter) if DOB fails to abide by its own time limit for approval of construction documents.  However, in the Joint Statement of Facts, it has stipulated that "[t]here is no administrative remedy available to a building permit applicant if the DOB fails to adhere to its own deadlines for approval or denial of an application for approval of construction documents."  CSF ¶ 106 at ECF p. 41.

PRG8622.docx

As the Club Plaintiffs briefed in Point II-C-3-c of their PSJ Memo, (*see* ECF pp. 79-81), this, as well, is a fatal defect when challenged by those seeking a permit which is a prerequisite to opening a business engaged in expressive activity.  Presumably the City will address this point in its Response to Plaintiffs' PSJ motion and Plaintiffs will then respond in their Reply to that brief.  However, suffice it to say that even if the City *did* have time limits for acting on a building permit application, any such time limit would be meaningless absent some type of meaningful remedy in the event the time limit is not met.

**T. Supplemental Responses to City's Point II-D (the assertion that the City's permitting procedures do not create the possibility of a sensitive use veto)**

For *several* reasons, the City's SJ Memo utterly fails to demonstrate that Plaintiffs will fail to prevail on their facial challenge to the City's vesting provisions for adult uses. These include misunderstandings of both the relevant facts, as well as the relevant legal precedent.

### 1.  The City's asserted facts are refuted by the uncontroverted evidence.

The City asserts that the possibility of a sensitive use veto under the City's scheme for vesting of adult uses is "highly remote".  In fairness, at the time the City wrote that, it did not have the benefit of the overwhelming evidence of an attempt at a sensitive use veto documented in great detail in Berzak's 2022 PSJ Declaration.  That Declaration demonstrates how those whose sole interest was to stop the permitting of Sapphire 2 attempted everything in their power to prevent its licensing by assertions that it was located too close to an asserted house of worship (which wasn't actually a house of worship but only a Seventh Day Adventist bookstore), and which wasn't even *permitted* as a house of

worship.  It also documents the enormous amount of time-consuming and costly *delay* in the permitting of the adult use which was directly attributable to the efforts of those persons (*i.e.,* both the Seventh Day Adventist bookstore and the adult club competitor of Sapphire 2 that apparently backed it) in the hopes that this so-called house of worship would defeat Sapphire 2's application.[66]

Additionally, that Declaration showed that, after substantial delay of Sapphire 2's application caused by its opponents, the opponents finally realized that a so-called house of worship could defeat Sapphire 2 only if it had first obtained its own priority permit under 1 RCNY § 9000-1. It then sought the needed house of worship priority permit and *that* permit issued in under a *week*!  In contrast, due to their delaying efforts, Sapphire 2's application had taken several months.  This utterly refutes the City's assertion that the players are all on a level playing field.[67]

But, by sheer luck (for Sapphire 2), and only because its opponents didn't realize until too late that they could only stop Sapphire 2 if their use had obtained its *own* priority permit (which permit they were then able to obtain almost immediately, but after the horses

---

[66] The 2022 Berzak PSJ Declaration makes very clear why Plaintiffs use the phrase "so-called" to describe that asserted house of worship use.  *See, e.g.,* ECF pp. 8 and 13, at ¶¶ 27 and 43.

[67] And as further proof of this statement, as the Ninth Circuit said in *Simi Valley*:

A potential adult business owner is not on an "equal footing" with other businesses, however, when his permit can be defeated after he buys or leases a site, merely because another member of the community disagrees with the content of his speech.

216 F.3d at 819.

had left the proverbial barn), Sapphire 2 was ultimately able to open, albeit after incurring *far* more delay and expense than it otherwise would have incurred.[68]

In short, had Sapphire 2 not obtained its permit slightly before the so-called "house of worship" obtained *its* priority permit, 1 RCNY § 9000-1 would have *required* the denial of Sapphire 2's application!  This conclusively demonstrates that the threat of a sensitive use veto is anything but hypothetical.

Lastly, the City argues that "even currently, with a prohibition on professional certification, the sensitive use veto scenario is far-fetched and highly speculative," suggesting that the possibility of professional certification is all that is needed to cure its vesting provisions.  That is wrong for several reasons.  First, a professionally certified building permit application does not accomplish automatic approval of the *zoning* aspects of an application.[69]  Such certification only guarantees the construction elements of the application, not its zoning compliance.   After any professional certification, the Department will then "conduct a zoning audit of each application . . . prior to acceptance." CSF ¶ 210.  Moreover, "[a]dditional 'targeted audits are performed of professionally certified applications pursuant to Buildings Bulletin 2016-010-4-A-1 *based on receipt of a complaint* … or at the discretion of the Commissioner"  (CSF ¶ 213) and DOB retains

---

[68] And Mr. Talla's declaration clarifies that although his company would eagerly look forward to obtaining and opening new adult club locations (*see* ECF p. 2, ¶ 5), at least in Manhattan should a feasible site become available, it would not even *attempt* to do so in the future given the knowledge it learned from its Sapphire 2 experience of the unforeseeable amounts of cost and delay that could be added to the project in the event it had to fight another sensitive use veto attempt.  See Declaration of Michael Talla in Support of Plaintiffs Motion for Partial Summary Judgment at ECF pp. 3-7, ¶¶ 9-18.

[69] *See* CSF ¶¶ 209-210..

discretion to rescind an approval of an application for construction document approval, including its zoning aspect, *prior to issuance of any type of building permit*, including a no-work permit, and may elect to do so *based on receipt of a complaint* … or at the discretion of the Commissioner" (CSF ¶ 214 ).  As the Sapphire 2 circumstance clearly demonstrates, the receipt of an anonymous private complaint was the primary, if not *sole* basis for *several* of DOB's actions in repeatedly delaying issuance of Sapphire 2's requested building permits.

In sum, the City's repeal of its previous denial of professional certification to adult business architects in no way reduces or eliminates the very real sensitive use veto possibility inherent in its adult zoning scheme.  And now that this technique for stopping an adult use permit application is better known (including to existing adult business owners who want to keep out potential new competitors), the very real possibility of such a trumped-up veto now has an extreme chilling effect on those who would otherwise attempt to acquire a location to convert it to an adult use.  *See* the several declarations filed by the owners of the Club Plaintiffs.[70]

---

[70] As to Sapphire, *see* the Declaration of David M. Talla in Support of Plaintiffs' Motion for Partial Summary Judgment filed in case No. 02 CV 8333 on September 16, 2022, Doc. No. 157, at ECF pp. 4-7, ¶¶ 11-18, and particularly the conclusion in ¶ 18.

As to Platinum and Satin Dolls, *see* the Declaration of Keith Warech in Support of Plaintiffs' Motion for Partial Summary Judgment filed in case No. 02 CV 4431 on September 16, 2022, Doc. No. 171 in that case, at ECF p. 2, ¶ 7.

As to Flashdancers Downtown (f/k/a New York Dolls) and Flashdancers NYC (f/k/a/Private Eyes), *see* the Declaration of Barry Lipitz in Support of Plaintiffs' Motion for Partial Summary Judgment filed in case No. 02 CV 4432 on September 23, 2022, Doc. No. 138 in that case, at ECF p. 3, ¶ 7.

## 2. The City's *legal* assessment of the *Simi Valley* decision is also 100% incorrect.

The City attempts to distinguish *Young v. City of Simi Valley*, 216 F.3d 807 (9th Cir. 1999), by asserting that its holding was dependent on the fact that the City had a small number of relocation sites.  City's SJ Memo at ECF. 65-66.  However, the court made very clear that its holding was *not* dependent in any way on the number of sites, but was a *facial* invalidation based solely on the fact that the scheme worked by allowing the possibility of a sensitive use veto, which they described as follows:

> [T]he Simi Valley Planning Commission has ruled that the buffer zone requirement between adult businesses and sensitive uses must be satisfied as of the date of a project's approval, not just as of the application's filing date. It is this interpretation of the ordinance that gives rise to the sensitive use veto.

*Simi Valley*, 216 F.3d at 817.

The court then repeatedly emphasized that it was this impermissible *procedure* and not the number of available sites which was the basis for its holding:

> Importantly, however, the Court in Renton did not expressly limit its "reasonableness" inquiry to the number of available sites within a city. See 475 U.S. at 53-54. The *procedure* by which a city dispenses its permits may deprive potential businesses of reasonable alternative avenues of communication in the same way that a paucity of available sites would.

*Id.*

---

As to Vixen, see the Declaration of Anthony D'Amico in Support of Plaintiffs' Motions For Partial Summary Judgment filed in case no 02 CV 4432 on September 23, 2022, Doc. No. 139, at ECF p. 3, ¶ 7.

PRG8622.docx

Finally, after discussing at length the problem *whenever* private parties are given

any type of potential veto power over the expression of others (*see* 216 F.3d at 819-820),

the court concluded:

> We therefore hold that the sensitive use veto provision of the Simi Valley
> ordinance is unconstitutional on its face.

*Id.* at 820.

In conclusion, the City has utterly failed to distinguish *Simi Valley* in any way,

meaningful or otherwise.  It compels the conclusion that the City does not currently provide

a reasonable opportunity to open a new adult business and therefore it cannot compel

relocation of Plaintiffs' businesses until such time as it has cured this serious defect in its

permitting scheme.

## U. Supplemental Responses to City's Point II-E (the assertion that the City's permitting procedures do not violate Plaintiffs' right to equal protection)

Point II-E of the City's SJ Memo addresses a point that the Club Plaintiffs are not

making, *i.e.*, that the City's former bar on professional certification by architects for adult

uses violates the Fourteenth Amendment's Equal Protection clause.  Contrary to the City's

position here, it appears to the Club Plaintiffs from BB 2020-005 that the former bar will

cease to exist upon the conclusions of this lawsuit, *regardless* of which side wins.  That

would appear to render moot (or at least unripe) any challenge to that restriction.

However, if the City were to re-impose that restriction upon the conclusion of this

case, the Club Plaintiffs would primarily challenge it under the First Amendment as a

content-based restraint on expression, but would also challenge it under the equal

protection clause because, as the City concedes, content-based laws are also subject to strict

scrutiny under the Equal Protection clause, and contrary to the City's assertion, the ban on

professional certifications by architects only for adult businesses was *unquestionably* a

content-based discriminatory restriction.

### V. Supplemental Responses to City's Point III (the City's assertion that due process did not entitle Plaintiffs to notice of the City's consideration of the adoption of the 2001Amendments)

As this point addresses claims raised by the Bookstore Plaintiffs (i.e., the plaintiffs

in Case no. 18-cv-3732), the Club Plaintiffs will now defer to (and hereby adopt) the

briefing of it that will be provided by those plaintiffs.

### W. Supplemental Responses to City's assertion in its Point IV that its requirement of mandatory termination for *adult* non-conforming uses and no others is constitutional.

Plaintiffs will rely primarily on their already-submitted briefing of this point in

Point I of their previously filed PSJ Memo.  However, they supplement that briefing here

in order to specifically respond to a few points raised in the City's SJ Memo.

At ECF p. 71-75 of the City's SJ Memo, the City asserts that requiring the

termination of *adult* non-conforming uses and no others is constitutional but does not

provide a single case to so hold (or even to have *addressed* the issue).  Instead, the best it

can come up with is a single state court case with a split opinion which merely held that a

City's amortization requirement for non-conforming adult uses, under the facts of that case,

was constitutional. *Islip v. Caviglia*, 73 N.Y.2d 544 (1989).  The court's opinion does not

81

mention what the amortization requirements (if any) were for *non*-adult non-conforming uses in Islip, and does not purport to address a challenge asserting that Islip's non-conforming adult uses were treated more harshly than most or all other non-conforming uses.

Plaintiffs do not assert that a city can never require termination of non-conforming adult uses under any circumstances, but only that it must do so in a non-discriminatory way and treat them no more harshly than other non-conforming commercial uses.  Or, at the very least, that it may not treat them more harshly than other non-conforming uses without analyzing the secondary effects not only of the non-conforming *adult* uses, but also of the non-conforming *non*-adult uses, and then comparing them so it can be determined whether there is indeed a need to treat non-conforming *adult* uses far more harshly than all other commercial non-conforming uses.  Such discriminatory treatment not only fails under a test of strict scrutiny (applicable because it is a content-based restriction) but would undoubtedly fail even under intermediate scrutiny of the type outlined by Justice Kennedy in *Alameda.*

Specifically, under Justice Kennedy's "proportionality" and "how speech will fare" requirements, the City would have to show how any secondary effects from the few remaining 60/40 businesses would substantially outweigh the impact there would be on the public's access to expression if they were all forced to close.  The submitted evidence makes clear that the impact on the public's access would be dramatic, as all the Club Plaintiffs would be forced to close and none would re-open under the existing permitting

82

and vesting scheme, and most would not re-open outside Manhattan,[71] where there are already not enough legally permissible sites even *theoretically* available for relocation and the actual number of sites likely to be developed is far less as there is no evidence that any of the sites is actually available much less commercially feasible.[72]   Moreover, there is no evidence that the few remaining grandfathered 60/40 clubs are causing any sort of adverse secondary effects, much less effects great enough to substantially outweigh the impact on the public's access to expression should they all be forced to close.

And, as noted above, the City hasn't demonstrated that any secondary effects of non-conforming 60/40 clubs are far greater than the secondary effects of most or all other types of non-conforming uses.  The 2001 Amendments, for the first time, banned all the businesses that converted to 60/40 uses, and the City admits (*see* CSF ¶ 188 at ECF p. 63) that it did so without any examination of whether these new 60/40 clubs were causing adverse secondary effects, much less secondary effects far greater than those of most other non-conforming uses.  And there is no evidence that the City studied the secondary effects of any of the vast majority of *other* types of non-conforming uses, so it could hardly have

---

[71] *See* n. 16, *supra*.

[72] As noted *supra,* Plaintiffs' expert Michal Berzak has personally examined all the legally permissible sites in Manhattan and found only three that would be commercially feasible for a new or relocating adult eating or drinking establishment business (*see* Declaration of Michael Berzak Regarding Adult Business Sites in Support of Plaintiffs' Motion For Preliminary Injunction, ¶ 6-g at ECF p. 24 and ¶¶ 35-37 at ECF p. 34-35 of Doc. 59 in case no 02-cv-8333), and there is no evidence that any of those three sites (or any others suggested by the City) is presently available.

done a fair comparison.  Accordingly, for this reason as well, enforcement of the mandatory termination provisions would be unconstitutional.[73]

Finally, the City argues that Plaintiff Jacaranda Club, LLC ("Jacaranda"). is not entitled to assert a challenge to the City's mandatory termination provisions because it took over a previous 60/40 location after the 2001 Amendments were enacted.  City's SJ Memo at ECF p. 76.  What the City misses (and what it already has stipulated to) is that, under the City's Zoning Resolution, once a use obtains lawful non-conforming use status, that status runs with the land, not with the owner.  CSF ¶ 44 at ECF pp. 14-15.[74]  The City has stipulated that the site now operated by Jacaranda was "being operated as [a] 60/40 Business[] prior to adoption of the 2001 Amendments.  CSF ¶ 38 at ECF p. 13.  The City has also stipulated that "it is uncontroverted that, with the exception of any periods of discontinuance of less than two years, the address[] of [Jacaranda] ha[s] continuously operated as [a] 60/40 Business[] since prior to the adoption of the 2001 Amendments.  CSF ¶ 39 at ECF p. 14.  Accordingly, Jacaranda has the same claim to grandfathering rights as any other plaintiff in the case.

---

[73] As noted by the court in *Association of Club Executives of Dallas, Inc. v. City of Dallas*, 604 F. Supp. 3d 414 (N.D. Tex. 2022), "Because the City provided no non-SOB comparison data indicating that the problems of which the City complains are particularly associated with SOBs, the Ordinance amounts to a targeted and unjustified restriction on protected speech" (*id.* at 437).

[74] Specifically, that stipulated fact states: "Under the general non-conforming use provisions of ZR 52-61, when a non-conforming use in a building is discontinued for less than two years, that non-conforming use may be resumed in that building.  For purposes of determining whether a non-conforming use has changed, the ZR considers the use and does not consider whether the owner or operator of the use has changed."

## III

**BECAUSE IT IS UNDISPUTED THAT ANY FINAL JUDGMENT UPHOLDING THE 2001 AMENDMENTS WOULD, AT *LEAST* FOR THE SHORT TERM, IMMEDIATELY AND SEVERELY LIMIT THE PUBLIC'S ACCESS TO THE TYPE OF EXPRESSION PROVIDED BY PLAINTIFFS, AND BECAUSE THE CITY HAS THE BURDEN TO SHOW THAT THE PUBLIC'S ACCESS WOULD NOT BE SO AFFECTED, ITS FAILURE TO MEET THAT BURDEN ALTERNATIVELY COMPELS ISSUANCE OF A TEMPORARY INJUNCTION OF *AT LEAST* ONE YEAR PREVENTING ENFORCEMENT OF THE 2001 AMENDMENTS FOLLOWING ANY FINAL JUDGMENT**

The Supreme Court has made clear that it is not only the rights of adult business owners which are at stake in challenges to adult zoning laws, but also their patrons' First Amendment rights of *access* to such expression.[75]

Moreover, as the Court made clear in *Elrod v Burns*, 427 U.S. 347, 374 (1976), injunctive relief should be provided to prevent even the *temporary* infringement of First Amendment rights: "The loss of First Amendment freedoms, for even minimal periods of

---

[75] *See, e.g., Young v American Mini Theaters, Inc.*, 427 U.S. 50, 61 (1976) (upholding Detroit's adult zoning ordinance only after finding that "There is no claim that … the viewing public is unable to satisfy its appetite for sexually explicit fare. Viewed as an entity, the market for this commodity is essentially unrestrained"); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986) ("we have cautioned against the enactment of zoning regulations that have 'the effect of suppressing, or greatly restricting access to, lawful speech'"); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, (2002) (J. Kennedy concurring) ("if a city can decrease the crime and blight associated with certain speech by the traditional exercise of its zoning power, and at the same time leave the quantity *and accessibility* of the speech substantially undiminished, there is no First Amendment objection") (emphasis added); and *Virginia v. American Booksellers Assn.*, 484 U.S. 383, 392-393 (1988) ("in the First Amendment context, "'[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" [Citations omitted.] This exception applies here, as plaintiffs have alleged an infringement of the First Amendment rights of bookbuyers.")

time, unquestionably constitutes irreparable injury.  *See New York Times Co.  v. United States*, 403 U.S. 713 (1971)".

The previously discussed uncontroverted evidence is that the five plaintiffs herein with eating or drinking establishment businesses in Manhattan would not relocate outside of Manhattan,[76] nor, due to concerns with the current vesting and permitting provisions, would *any* of the six Club Plaintiffs relocate *anywhere* in New York not already occupied by a previously permitted and vested adult business.[77] This means that even if the Court should conclude that the Plaintiffs have constitutionally acceptable options and therefore cannot complain on their own behalf, the plain fact is that the *public* will suffer a significant diminution of access to the expression they provide *at least* until such time, if ever, as replacement businesses may arise.

---

[76] *See* n.16, *supra*.

[77] As to Sapphire, *see* Declaration of David M. Talla in Support of Plaintiffs' Motion for Partial Summary Judgment filed in case No. 02 CV 8333 on September 16, 2022, Doc. No. 157, at ECF p. 7, ¶ 18, and the reason for that position, found in Exhibit A thereto (Doc. 157-1) at ECF p. 9, ¶ 33 and ECF pp. 21-22 (under heading IV: "Chilling Effect of Above").

As to Platinum and Satin Dolls, *see* the Declaration of Keith Warech in Support of Plaintiffs' Motion for Partial Summary Judgment filed in case No. 02 CV 4431 on September 16, 2022, Doc. No. 171 in that case, at ECF p. 2, ¶¶ 6-7, ECF p. 6, ¶ 13 and ECF pp. 12-16.

As to Flashdancers Downtown (f/k/a New York Dolls) and Flashdancers NYC (f/k/a/Private Eyes), *see* the Declaration of Barry Lipitz in Support of Plaintiffs' Motion for Partial Summary Judgment filed in case No. 02 CV 4432 on September 23, 2022, Doc. No. 138 in that case, at ECF p. 3 ¶¶ 6-7, ECF p. 12, ¶ 31 and ECF pp. 17-21.

As to Vixen, *see* the Declaration of Anthony D'Amico filed in Support of Plaintiffs' Motion for Partial Summary Judgment in case No. 02 CV 4432 on September 23, 2022, Doc. No. 139 in that case, at ECF p. 3, ¶ 7, ECF p. 8, ¶ 15 and ECF pp. 12-16.

However, the evidence is also uncontradicted that it would take *at least* a year to start a new adult eating or drinking establishment from scratch in New York.[78]  The City has put on no evidence to dispute this, nor has it put on any evidence that, as a practical matter, these businesses would be replaced even within a year's time after their closure, by any future businesses opening in compliance with the zoning and locational restrictions of the 2001 Amendments.  Indeed, the unlikelihood that new businesses would arise to replace Plaintiffs' is evident from the previously referenced historical fact that the sites provided

---

[78] *See*:

(1) *E.g.,* Attachment A to the Declaration of David M. Talla in Support of Club Plaintiffs' Motion For a Preliminary Injunction, filed on November 21, 2018, appearing in Volume 4 of Plaintiffs' Joint Appendix (which, *e.g.,* is Doc. 62 in case no. 02 CV 8333) at ECF pp. 217-220, ¶¶ III-A-H, and the first unnumbered paragraph of Point IV on ECF p. 220 (which document was then re-affirmed in Talla's more recent Declaration in Support of Plaintiff's Motion For Partial Summary Judgment (Doc.157 in case no. 02 CV 8333) filed on September 16, 2022, at ECF p. 2, ¶ 2. The Attachment A was then re-attached to that more recent declaration as Doc. 157-1 in case no. 02 CV 8333, where the relevant information appears at ECF pp. 18-21.

That same Attachment A was also attached to the declarations of other club owner plaintiffs which appear in the same Joint Appendix filed in all four actions on November 21, 2018. *See, e.g.* ECF pp. 230-234 (Warech declaration), ECF pp. 251-255 (Lipsitz declaration)*,* ECF pp. 264- 269 (D'Amico declaration), and ECF pp. 280-284 (Kavanagh declaration).

(2) The above-referenced allegations in Attachment A filed in 2018 were likewise reaffirmed and resubmitted as an attachment to several of the other Club Owners' more recent Declarations submitted in September of this year in support of their motions for partial summary judgment.  *See, e.g.,* the similar reaffirmations and re-incorporations of that Exhibit A made by other club owners in their more recent declarations filed in their separate actions under separate document numbers on September 16, 2022 (Warech) and September 23, 2022 (Lipsitz and D'Amico) in Support of Plaintiffs' Motions for Partial Summary Judgment.

(3) Declaration of Michael Berzak in Support of Permitting Issues Presented in Plaintiffs' Motion For A Preliminary Injunction filed in cases 1-3 (the Club Owner cases), appearing in Volume 4 of Plaintiffs' Joint Appendix (which is, e.g., Doc. 62 in case no. 02 CV 8333) filed on November 21, 2018, at ECF p. 94, ¶ 43.

by the City have *not* been developed by adult business owners in the 27 years that the City has had adult zoning restrictions.

For these reasons, even if all of Plaintiffs' other challenges should be unsuccessful, on the basis of the third-party rights of Plaintiffs' patrons and the general adult public, a temporary injunction should issue allowing Plaintiffs' 60/40 businesses to remain in operation for at least one year following finality of any judgment entered against them herein.

## CONCLUSION

For all the reasons above, the City's Motion for Summary Judgment should be denied and summary judgment should be awarded, instead, to Plaintiffs.


Respectfully submitted,

G. Randall Garrou
randygarrou@wgdlaw.com
Of Counsel to Weston Garrou & Mooney
12121 Wilshire Blvd. Suite 525
Los Angeles CA 90025
(310) 749-6069
randygarrou@wgdlaw.com

Jerome H. Mooney
jerrym@mooneylaw.com
Weston Garrou & Mooney
12121 Wilshire Blvd. Suite 525
Los Angeles CA 90025
(310) 442-0072

88

Alan M. Abramson
alanabramson@abramsonmorak.com

ABRAMSON & MORAK
35 Worth Street
New York, NY 10013
(212) 226-7098

by ___/s/ G. Randall Garrou_____
G. RANDALL GARROU

*Counsel for Plaintiffs in
02 Civ 8333 (LJL)*

s/ Jeffrey M. Nye_____
JEFFREY M. Nye, ESQ.
*Counsel for Plaintiffs in
02 Civ 4431 (LJL)*
Stagnaro, Saba & Patterson Co., LPA
7373 Beechmont Avenue
Cincinnati, OH 45230
*(513) 533-6714*
jmn@sspfirm.com

*On The Brief:*

/s/ Edward S. Rudofsky_____
EDWARD S. RUDOFSKY, ESQ.
*Counsel for Plaintiffs in 02 Civ 4432 (LJL)*
Zane and Rudofsky
Five Arrowwood Lane
Melville, NY 11747
(917) 913-9697
eed@rudofskylaw.com

89

PRG8622.docx